**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **v.** | § | **Case No. 21-CR-00022-KBJ** |
| | § | |
| | § | |
| **CHRISTOPHER RAY GRIDER,** | § | |
| | § | |
| **Defendant** | § | |

**DEFENDANT'S MOTION TO REVOKE DETENTION ORDER**

TO THE HONORABLE KETANJI BROWN JACKSON, UNITED STATES DIS-TRICT COURT JUDGE FOR THE DISTRICT OF COLUMBIA:

COMES NOW CHRISTOPHER RAY GRIDER, the Defendant in the above styled and numbered cause, by and through undersigned counsel, and, pursuant to 18 U.S.C. § 3145(b), moves this Court to revoke the Order of Detention Pending Trial entered by United States Magistrate Judge for the Western District of Texas, Austin Division, Susan Hightower, on January 27, 2021.

***Background and Procedural History***

1. Mr. Grider was charged by complaint with the offenses of destruction of government property in violation of 18 U.S.C. § 1361, unlawful entry into a restricted building or grounds in violation of 18 U.S.C. § 1752 (a)(1) and (b), and violent entry and disorderly conduct on Capitol grounds in violation of 40 U.S.C. § 5104(e)(2). (Doc. No. 1). Based on the complaint, Magistrate Judge Robin Meriwether issued an arrest warrant for Mr. Grider on January 20, 2021. (Doc. No. 1 in Case No. 21-

mj-00138).[1]

2. The following day, January 21, 2021, Mr. Grider self-surrendered himself to the FBI in Austin, Texas and was placed into the custody of the U.S. Marshals Service. *See* Pretrial Services Report (Amended 1/26/2021) at 1.[2]

3. The following day, January 22, 2021, Mr. Grider appeared before United States Magistrate Judge for the Western District of Texas, Austin Division, Susan Hightower, for his initial appearance. There, the Government moved for Mr. Grider's pretrial detention under 18 U.S.C. § 3141(f) on the basis that they believed that no condition or combination of conditions would reasonably assure Mr. Grider's appearance, as well as assure the safety of the community or any other person. (Doc. No. 2 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div.).[3] Accordingly, Judge Hightower ordered that Mr. Grider be detained temporarily and scheduled a detention hearing to be held on January 27, 2021. (Doc. No. 7 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div.).

4. On January 25, 2021, the U.S. Pretrial Services Officer assigned to Mr. Grider's case completed her investigation into his case and issued a report, followed with

---

[1] Mr. Grider was subsequently indicted in the above styled and numbered cause for those and additional, related offenses on January 26, 2021. (Doc. No. 6).

[2] Pursuant to Local Rule 57.1 for the Western District of Texas, Pretrial Services Reports are made available to Defense Counsel and the Government, however, the reports are not public record, are not to be reproduced or disclosed to any other party and shall remain confidential as provided in Title 18 U.S.C. § 3153(c)(1). Accordingly, Mr. Grider is not including the Pretrial Services Report in this filing and is requesting this Court obtain that report on its own or grant him leave to submit that under seal to this Court to review the information contained therein.

[3] Several motions filed by the parties and orders entered by Judge Hightower were not included with the Rule 5 documents filed with this Court under Docket No. 5. Accordingly, Mr. Grider is citing this Court to the filings in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Division where appropriate and including some of the filings as exhibits to this motion.

an amended report on January 26, 2021. Among other things, the report reflected the following:

    a.  Mr. Grider is the married father of three sons (ages 14, 10, and 3) who lives with his wife on property they own in Eddy, Texas in the central part of Texas.

    b.  Mr. Grider is self-employed as a winemaker who owns a vineyard and vineyard store in Eddy. He had previously worked as a teacher in various school districts throughout Texas, as well as a security guard, and in retail.

    c.  Mr. Grider served in the United States Army National Guard from May 1999 to October 2001 and in the United States Air Force as a security forces official from October 2001 until May 2004.

    d.  Mr. Grider reported that he has, among other conditions, asthma and is prescribed albuterol to control that condition.

    e.  Mr. Grider's only prior criminal history included an arrest for reckless driving in 2000 when he was 19 years old and an arrest for public intoxication in 2017. In regard to the reckless driving case, he completed 3 months of probation. There was (and is) no further record of any acts of violence or allegations of violence in his criminal history.

5. Based on the foregoing — and not surprisingly given the findings of her investigation — the Pretrial Services Officer recommended that Mr. Grider be released on a $10,000 unsecured bond with standard conditions of supervision.

6. Mr. Grider followed up to the report with his own memorandum in support of pretrial release. (Doc. No. 12 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div., *filed under seal*). In that memorandum, Mr. Grider showed that, in addition to the standard conditions recommended by the Pretrial Services Officer:

   a. He was willing to voluntarily restrict his travel to his county of residence and the surrounding counties and would not travel to Washington, D.C. except for court proceedings related to his case;

   b. He had arranged to have his passport delivered to the court for self-surrender;

   c. He had submitted to the court three potential third-party custodians including his wife, and a neighbor; and

   d. He had previously arranged to have all firearms and ammunitions removed from his home.

   *Id.* Additionally, Mr. Grider submitted letters from twenty-two (22) individuals including family members, the pastor of his church, parishioners of his church, neighbors, employees of his winery, fellow business owners in the community, and friends of many years, all who attested that Mr. Grider was a loving and caring individual and was, in no way, a danger to the community or others. *Id.*

7. On January 27, 2021, Judge Hightower held the detention hearing by Zoom videoconference. A transcript of the hearing is attached hereto as Exhibit A.

8. The Government moved forward only on the "grounds of dangerousness," called

no witnesses to testify, and relied solely on "the nature and circumstances of the offense as laid out in the complaint." Detention Hearing (hereafter "DH") at 6.

9. Mr. Grider, after confirming that Judge Hightower had received and reviewed both the Pretrial Services Report and his Memorandum in Support of Pretrial Release, proffered testimony from four witnesses appearing by Zoom:

    a.  Ryan Ford, a neighbor to Mr. Grider and a former county commissioner, who would testify that, in the over 7 years that he had known Mr. Grider both in a personal and professional capacity, he had "never seen Mr. Grider exhibit any behaviors or speech that could be even remotely considered threatening or harmful to anyone." DH at 8.

    b.  Michelle Tyler, a friend and professional acquaintance, who would testify that Mr. Grider "has an upstanding character, [and] is a devoted husband and father." DH at 10.

    c.  Christopher Johnson, the "super-max ultra-protective" brother of Mr. Grider's wife, who would testify that in all the years Mr. Grider and Mr. Johnson's sister had been together, he saw that Mr. Grider is "not a dangerous person. He is peaceful and he is loving." DH at 10–11.

    d.  Rissa Shaw, a television reporter for KWTX TV News 10 in Waco, Texas, who interviewed Mr. Grider during and immediately after the events of January 6 at the U.S. Capitol. DH at 12–16. Mr. Grider offered, and Judge Hightower admitted a video of her news story from January 6 which included videos from Mr. Grider speaking about what happened that fateful

day. *See* DH at 13; Exhibit B for DH.[4] Mr. Grider then proffered that Shaw would testify that as she spoke to Mr. Grider to prepare her story, he was clear, calm, and most importantly "did not at any point ever think that he was a threat to anyone" or "engaged in any violent acts." DH at 14. She would have testified that "there was never any indication of him acting maniacally or espousing radical views, or anything of the sort." DH at 14. Shaw would also have testified that, aside from her interactions with him that day, she had known Mr. Grider before then and knew him to help others including helping troubled teens from broken homes within their community. DH at 15. Based on everything she knew about Mr. Grider and what she observed, she did not believe that he was a danger to the community in any way. DH at 16.

10. At the conclusion of the hearing, the Government argued that Mr. Grider "was at the front line, breaching a secure location with violence after disrupting Congress performing a constitutional duty." DH at 17. It then pointed to events that allegedly took place at the Speaker's Lobby door within the Capitol Building, arguing that Mr. Grider gave a helmet to another person "who had already tried to breach those doors" and ultimately this other person did "smash the doors," and that Mr. Grider himself tried to push open the doors. *Id*. It then argued that Mr. Grider was part of the "causal chain of events that led to the death of an individual,"

---

[4] For ease, Mr. Grider has made a duplicate copy of Exhibit B offered and admitted at the Detention Hearing available here: https://app.box.com/s/t9wbn40zto4csht79qjgt9f9kzl1g5fo.

namely, Ashli Babbitt. *Id.* Repeatedly, the Government argued that Mr. Grider was an active participant in violent acts. *See* DH at 17, 19.

11. Mr. Grider responded by arguing that there was no evidence that he traveled to Washington, D.C. with the intent to commit any violent act or crime and deeply regretted what occurred that fateful day. DH at 20. As for what happened at the Speaker's Lobby doors, he argued that there was no evidence that he actively participated in trying to force the doors open nor did he do anything that could be construed as contributing to Ms. Babbitt's death. DH at 22.

12. After argument, although Judge Hightower found that Mr. Grider was not a flight risk, she concluded based on the weight of the evidence against him and the nature and circumstances of the alleged offense, the Government had proven by clear and convincing evidence that there was no condition or combination of conditions to ensure the safety of the community. DH at 25–26. She specifically noted, the evidence did not show that he was a "member of the crowd on January 6," but rather the evidence was strong that he "supplied the helmet used to break the speaker's lobby doors," and that he "pushed and kicked on those doors in attempt (sic) to breach the House chambers." DH at 25. She subsequently issued her detention order finding that Mr. Grider was "a leading participant in the offenses charged inside the United States Capitol Building on January 6, 2021." (Doc. No. 14 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div.; Exhibit B [attached]).

13. Shortly after the conclusion of the detention hearing, counsel for Mr. Grider began

searching the internet for the video that the Government had taken "still shots" from and included in their complaint to fit their narrative. (*See* Doc. No. 17 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div. — Defendant's Motion to Reopen the Detention Hearing; Exhibit C [attached]). Although he had been unable to locate it prior to the detention hearing, counsel for Mr. Grider discovered the video located at the following web address: https://www.youtube.com/watch?v=PfiS8MsfSF4. *Id.* As Mr. Grider submitted in his motion to reopen the detention the hearing, contrary to Judge Hightower's conclusion and the representations made by the Government at the detention hearing, in the portions of that video purportedly depicting Mr. Grider, he did not appear to be a "leading participant" and, more importantly, did not appear to be engaged in a "forceful and continued attempt to breach the doors to the Speaker's Lobby." *Id.* Mr. Grider further expressed concerns "about the Government's effort to show [Judge Hightower] only the pieces of the puzzle needed to fit their narrative." *Id.*

14. The following day, January 28, 2021, Judge Hightower issued a written order denying the motion to reopen the detention hearing. (Doc. No. 18 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div.; Exhibit D [attached]). In explaining her decision, Judge Hightower noted the following:

> This information has no material bearing on the factors on which the detention order was based: the nature and circumstances of the offenses charged, including whether the offense is a crime of violence; the weight of the evidence against Mr. Grider; and the nature and seriousness of the danger to the community that would be posed by his release. 18 U.S.C. § 3142(f). Stated differently, whether or not he led or encouraged

others in the alleged commission of the offenses charged, there is ex-
tremely strong evidence that Mr. Grider *participated at the forefront* in
the events that led to the fatal shooting inside the Capitol Building on
January 6, 2021.

*Id.* (emphasis added).

15. Despite this ruling, counsel for Mr. Grider continued to investigate the incident
    and locate additional evidence to correct the false belief maintained by the Gov-
    ernment and Judge Hightower.

16. On February 1, 2021, Mr. Grider filed his Second Motion to Reopen the Detention
    Hearing. (Doc. 22 in Case No. 21-mj-00033-SH in the Western District of Texas,
    Austin Div.; Exhibit E [attached]). Mr. Grider noted that since federal agents had
    seized his cell phone, he did not have immediate access to the photographs and
    videos contained on it at the detention hearing. *Id.* His counsel, subsequent to the
    detention hearing, however, was able to locate backup copies of the files on one of
    Mr. Grider's computers. *Id.* The videos reflect the following:

    a. In a video file titled, IMG_1878.m4v, Mr. Grider is seen walking up to an
       entrance on the ground level of the Capitol building and walking through
       *an open door* along with hundreds of other individuals. While other individ-
       uals nearby shattered glass windows, there is no obvious indication that
       the door which Mr. Grider walked through along with hundreds of others
       was opened by force and there was clearly no forcible entry made by Mr.
       Grider.

    b. In a video file titled, IMG_1883.m4v, Mr. Grider is seen walking up to the

entrance to the Speaker's Lobby where multiple Capitol Officers are standing guard. Mr. Grider did not yell, shout, or make any threatening comments to them. Instead, he is heard telling the officers, "People are going to get crushed on that other side if they don't open that door" (referring to another area from where he had just come from). He was pleading with the officers, telling them, "There are two cops getting crushed." Others can then be seen walking up and banging on the doors, but not Mr. Grider. Eventually, more and more people began approaching the door and, as space became confined, the video no longer captured any images. However, the audio still recorded and, at no time, could Mr. Grider be heard making any threatening comments or directing anyone to try and break open or damage the doors or do anything else. The video can be seen here: https://app.box.com/s/1efe2q4mloibgpbhjrzqb48bnjxvrci2.

c. In addition to the photographs and videos obtained from Mr. Grider's phone, counsel for Mr. Grider also, subsequent to the detention hearing and his first motion to reopen the detention hearing, located an additional YouTube video showing what takes place at the Speaker's Lobby from a different angle: https://youtu.be/AZ9oThRuMVs. Worth noting in this video is that, as officers were moving away from the door, Mr. Grider was following them away from the door as well while others attempted to forcefully open it. Further, when the person who was presumably Ashli Babbitt began attempting to climb through the window to the Speaker's Lobby, Mr. Grider

had his back turned and was continuing his attempt to move away from the doors.

17. All this new material corroborates what Mr. Grider has maintained all along. Contrary to the finding by Judge Hightower, his presence at the Capitol was not one of a person who intended to inflict harm on anyone or commit any violent acts. He was not a "leading participant" nor did he "participate at the forefront of the events that led to the fatal shooting inside the Capitol Building."[5]

## *Legal Standards*

18. "To begin with, it is clear beyond cavil that, before a guilty plea or conviction, 'liberty is the norm and detention prior to trial or without trial is the carefully limited exception.'" *United States v. Wiggins*, No. 19-CR-258-KBJ, 2020 WL 1868891, at *3 (D.D.C. Apr. 10, 2020)(quoting *United States v. Salerno*, 481 U.S. 739, 755, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987)).

19. One of those exceptions applicable here is where a court "finds that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1) (West 2020). To make this determination, a court must evaluate four factors: (1) "the nature and circumstances of the offense charged"; (2) "the weight of the evidence against the person"; (3) "the history and characteristics" of the defendant; and (4) "the nature and seriousness of the danger to any person or the

---

[5] Judge Hightower denied this second motion without considering the merits of the new evidence presented, finding that she no longer had jurisdiction over the matter. (Doc. No. 25 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div.).

community that would be posed by the person's release." 18 U.S.C § 3142(g) (West 2020). "Consequently, a criminal defendant can only be detained pending trial consistent with the Bail Reform Act if, on balance, those four factors weigh in favor of detention, such that the court can confidently conclude that no condition or combination of conditions 'will reasonably assure the appearance of the person as required and the safety of any other person and the community.'" *Wiggins*, 2020 WL 1868891, at *4 (quoting 18 U.S.C. § 3142(e)(1)).

20. "If a person is ordered detained by a magistrate judge . . . the person may file, with the court having original jurisdiction over the offense, a motion for revocation or amendment of the order." 18 U.S.C. § 3145(b) (West 2020). The motion shall be determined promptly and this Court's review of the magistrate's order of detention is reviewed *de novo*. *United States v. Hunt*, 240 F. Supp. 3d 128, 132 (D.D.C. 2017).

### *Danger to the Community is not Sufficient to Order Detention*

21. At the outset, while Mr. Grider disputes Judge Hightower's determination that no condition or combination of conditions will reasonably assure the safety of any other person and the community in his case, this Court must consider whether that finding alone is sufficient to warrant detention. Stated differently, although Judge Hightower found that Mr. Grider was not a flight risk, could she legally order him detained solely because she found he was a danger to the community?

22. As one federal magistrate judge has recently recognized, "The law is unclear regarding whether a judge may detain a defendant in such a case solely because the defendant is such a danger to the community that no conditions can reasonably

12

assure public safety." *United States v. Gibson*, 384 F. Supp. 3d 955, 960 (N.D. Ind. 2019). In *Gibson*, Judge Kolar noted multiple opinions that had interpreted Section 3142(f) as *not* permitting detention solely on a finding of dangerousness to the community. *Id.* at 960–62 (citing *United States v. Himler*, 797 F.2d 156, 160 (3d Cir. 1986); *United States v. Chavez-Rivas*, 536 F. Supp. 2d 962 (E.D. Wisc. 2008); *United States v. Byrd*, 969 F.2d 106, 109–10 (5th Cir. 1992); *United States v. Ploof*, 851 F.2d 7 (1st Cir. 1988)); *but cf. United States v. Holmes*, 438 F. Supp. 2d 1340 (S.D. Fla. 2005); *U.S. v. Ritter*, 2:08PO00031-53, 2008 WL 345832, at *2 (W.D. Va. Feb. 6, 2008)). This interpretation is consistent with what the Fifth Circuit recently stated when it noted that "the imposition of 'preventive [pretrial] detention' is 'abhorrent to the American system of justice.'" *ODonnell v. Harris Cty.*, 892 F.3d 147, 158 (5th Cir. 2018).

23. Mr. Grider submits that Judge Hightower's order on its face was invalid as, based on the foregoing authority, Section 3142(f) does not permit detention solely on a finding of dangerousness to the community. *See Gibson*, 384 F. Supp. 3d at 962–64 (noting that to interpret otherwise would run afoul of the constitutional concerns under the Due Process Clause of the Fifth Amendment and the Eighth Amendment's ban on excessive bail as discussed in *Salerno*).

***There is No Clear and Convincing Evidence of Danger to the Community***

24. Even if this Court were to interpret Section 3142(f) as permitting a criminal defendant's detention solely on the grounds that they are a danger to the community, Mr. Grider would submit that nothing about him, the nature and circumstances

of the offenses charged, or the weight of the evidence against him establishes *clearly and convincingly* that he is a danger to the community.

25. Mr. Grider is not a member of the Three Percenters, Proud Boys, Oath Keepers or any other right-wing extremist group. He does not subscribe to the beliefs of QAnon or other conspiracy theories related to the government. People belonging to and affiliated with these groups, along with several others who were not, re-portedly came to Washington, D.C. on January 6, 2021 with the intent to do harm to our Nation's Capitol and to lead an insurrection.[6] Mr. Grider was not one of those people.

26. As reflected in the Pretrial Services Report and his Memorandum in Support of Pretrial Release, Mr. Grider is a loving father of three young boys, devoted hus-band, and owner of a vineyard and winery in Central Texas. He has never been accused of a single violent act or crime in his entire life.

27. The multiple letters presented to Judge Hightower and the witnesses who ap-peared before her repeatedly affirmed that Mr. Grider is a non-violent person who loves and cares for his family and people throughout his community, accounts given with a verifiable basis for stating so based on their experience and knowledge of him.

28. It cannot be overlooked that, even though the United States Pretrial Services Of-

---

[6] Funke, Daniel, "FBI investigation of Capitol riot focuses on far-right groups," PolitFact, January 20, 2021 <available at https://www.politifact.com/article/2021/jan/20/fbi-investigation-capitol-riot-fo-cuses-far-right-g/> (last visited January 31, 2021).

fice recommended Mr. Grider's release on an unsecured bond with standard conditions of release, he was willing to go above and beyond and voluntarily abide by additional conditions needed to assure the court that he was not a flight risk or danger to the community.

29. The events of January 6, 2021 at the United States Capitol Building were undoubtedly tragic and shocking. As Mr. Grider stated, he simply went to Washington, D.C. because "The President asked people to come and show their support. I feel like it's the least we could do. That's kinda why I came from Central Texas all the way to D.C." *See* Exhibit B to DH. He never expected, nor anticipated that it would turn into what it did.

30. The Government only presented limited bits of evidence to piece together a narrative implying that Mr. Grider was a violent protestor who forced his way into the Capitol Building, then tried to force his way into the House Chamber, was at the forefront of the push to breach the Speaker's Lobby doors, and ultimately part of the causal chain of events that led to the death of Ashli Babbitt. Evidence discovered by counsel from Mr. Grider subsequent to the detention hearing — exculpatory evidence presumably in the possession of the Government from the outset — proves quite the opposite.

    a. Videos from Mr. Grider's phone show him walking up to the Capitol Building along with hundreds of others. Mr. Grider, like several others, simply followed a group through an open door where several others were already inside and roaming around.

b. As discussed *supra*, an additional video from Mr. Grider's phone, a video file titled, IMG_1883.m4v, shows him walking up to the entrance to the Speaker's Lobby where multiple Capitol Officers are standing guard. Mr. Grider made no threatening comments. He is not heard directing anyone to try and break open the doors. Rather, he expressed concern for others including other officers who were" getting crushed."

c. While the Government included in its complaint a copy of a still shot from a video available on YouTube with Mr. Grider's hand on the Speaker's Lobby door to imply he was trying to force the door open, when one watches the *entire* video and others available and referenced in his motions to reopen the detention hearing, it is apparent what Mr. Grider's true intentions were: to get out of an escalating situation. As shown in the video located at https://youtu.be/AZ9oThRuMVs, as officers moved away from the Speaker's Lobby door, Mr. Grider followed them away from the door as well. Further, when the person who is presumably Ashli Babbitt began climbing through the window to the Speaker's Lobby, Mr. Grider had his back turned and was continuing his attempt to move away from the doors.

31. There is no evidence that Mr. Grider conspired with others to do harm at the Capitol. There is no evidence that he threatened any public officials. There is no evidence he entered either of the Legislative Chambers or the private offices of any legislators. There is no evidence he used any force against any public servant.

32. Mr. Grider deeply regrets what took place on that tragic day at the United States

Capitol. But nothing about his alleged acts, his history, and characteristics establishes that he is of such a danger to the community that he needs to be detained pending trial in his case.[7] The evidence presented by him, on the contrary, establishes by clear and convincing evidence that he is *not* a danger to the community.

### Mr. Grider's Detention During the COVID-19 Pandemic

33. This Court has recognized "the unprecedented magnitude of the COVID-19 pandemic and the extremely serious health risks that it presents for all of us, including, and perhaps especially, those individuals who are unfortunately presently detained in federal custody." *Wiggins*, 2020 WL 1868891, at *8. Although since this Court's ruling in *Wiggins*, multiple vaccines have been developed to contain the spread of COVID-19, the virus continues to spread — and kill — at an alarming rate. Furthermore, scientists are now concerned about mutations of the virus spreading at a much-higher rate.[8]

34. This Court has recognized the need for courts to "determine, on an *ad hoc*, case-by-case basis, whether [a] detained defendant who files a motion for release on the

---

[7] *Cf. e.g. United States v. Wilmar Jeovanny Montano Alvarado*, Case No. 1:21-mj-00169-GMH-1, granted pretrial release in the Southern District of Texas, Houston Division, Case No. 4:21-mj-00207 (where defendant is charged with *inter alia* Assaulting Resisting or Impeding Certain Officers or Employees); *United States v. Tam Dinh Pham*, Case No. 1:21-mj-00116-ZMF, granted pretrial release in Southern District of Texas, Houston Division, Case No. 4:21-mj-00134-1 (where defendant, a Houston Police Department, charged with Violent Entry and Disorderly Conduct on Capitol Grounds); *United States v. Joshua Loller*, 1:21-mj-00045-ZMF-1, granted pretrial release in Southern District of Texas, Houston Division, Case No. 4:21-mj-00086 (where defendant, a Houston Police Department, charged with Violent Entry and Disorderly Conduct on Capitol Grounds)

[8] *See* Johnson, Carolyn Y. and Wan, William, "Mutated Virus May Reinfect People Already Stricken Once with Covid-19, Sparking Debate and Concerns," *Washington Post*, February 5, 2021 <available at https://www.washingtonpost.com/health/2021/02/05/virus-variant-reinfection-south-africa/> (last visited February 8, 2020).

basis of COVID-19 can be let out jail consistent with the dictates of the law." *Wiggins*, 2020 WL 1868891 at *8.

35. Section 3142(g)(3)(A) requires a court to consider the physical and mental conditions of a person when deciding whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community. 18 U.S.C. § 3142(g)(3)(A) (West 2020).

36. As reflected in the Pretrial Services Report, Mr. Grider suffers from asthma and is prescribed and takes albuterol to help keep his asthma under control. The Centers for Disease Control has identified people with moderate to severe asthma as having a "higher risk of getting very sick from COVID-19."[9]

37. To "prepare for COVID-19," the CDC has recommended the following for people with moderate to severe asthma:

- Make sure that you have at least a 30-day supply of your medicines.

- Take everyday precautions like washing your hands, avoiding close contact, and staying at least 6 feet (about 2 arm lengths) from other people.

- Wear masks in public settings and when around people who don't live in your household.[10]

- Wash your hands often with soap and water for at least 20 seconds or use hand sanitizer that contains at least 60% alcohol.

38. Despite these recommendations, Mr. Grider has experienced the following since

---

[9] https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/asthma.html (last visited February 8, 2020).

[10] In the multiple videos submitted as evidence in this case, Mr. Grider was wearing a mask.

he has been in federal custody:

- He has not consistently received his albuterol and has certainly not been provided with "at least a 30-day supply" of that medication.

- There have been multiple instances where he has been in close contact with other inmates.

- There have been multiple instances when other inmates around him have not worn masks.

- There have been multiple instances where he has not been provided access to soap and water or hand sanitizer.

39. Applying the *ad hoc*, case-by-case approach that this Court has adopted, Mr. Grider submits that the current health crisis resulting from the COVID-19 virus and its variants, combined with his personal health condition of suffering from asthma, require this Court to strongly consider and order his release from custody.

### *Conditions of Release*

40. There are several conditions of release that have not been previously recommended that Mr. Grider is voluntarily willing to abide by to guarantee this Court that he will not be a flight risk or danger to the community including, but not limited to,

- Home curfew with GPS ankle monitoring;

- Daily "check-in's" with local law enforcement[11];

---

[11] As noted in one of the letters submitted along with his Memorandum in Support of Pretrial Release, Mr. Grider has previously donated and helped gather donations for the local police department, the Bruceville-Eddy Police Department, and has no doubts that they will assist this Court in ensuring that Mr. Grider follows any conditions of release.

- Consent to search his home, business, and vehicles for contraband; and,

- Psychological assessment and treatment, if necessary.

## *Conclusion*

Mr. Grider did not come to Washington, D.C. to do harm or participate in an insurrection. He did not come here to do violence. He never anticipated that what occurred that fateful day would have occurred and he wishes that it never did.

Despite whatever the evidence shows he did or did not do at the United States Capitol, the fact remains is that Mr. Grider is not a violent or dangerous person. Every action of his life proves that and nothing that occurred in that maelstrom in the Capitol Building on that fateful day proves differently. He no longer cares about politics or who is President of the United States. All he cares about is what has always mattered most to him: his family, his business, his community, and his church. It is time to let him return to them and, accordingly, he is respectfully requesting this Honorable Court revoke his order of detention and order him to be released on any conditions this Court deems appropriate.

Date: <u>February 11, 2021</u>               Respectfully Submitted,

                                        MAYR LAW, P.C.

                                        by: <u>/s/ T. Brent Mayr</u>
                                        T. BRENT MAYR
                                        Texas State Bar Number 24037052
                                        bmayr@mayr-law.com

                                        5300 Memorial Dr., Suite 750
                                        Houston, TX 77007
                                        Telephone:  713-808-9613
                                        Fax:  713-808-9613

ATTORNEY FOR THE DEFENDANT,
CHRISTOPHER RAY GRIDER

*Admitted to Appear Pro Hac Vice*

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this motion was sent to Counsel for the

Government on February 11, 2021, via CM/ECF and email.

/s/ T. Brent Mayr
T. BRENT MAYR