# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **v.** | § | **Case No. 21-CR-00022-KBJ** |
| | § | |
| | § | |
| **CHRISTOPHER RAY GRIDER,** | § | |
| | § | |
| **Defendant** | § | |

## EXHIBITS TO
## DEFENDANT'S MOTION TO REVOKE DETENTION ORDER

**Exhibit A**    Transcript of Detention Hearing Before United States Magistrate Judge for the Western District of Texas, Austin Division,  Susan Hightower, on January 27, 2021

**Exhibit B**    Order of Detention (Doc. No. 14 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div.)

**Exhibit C**    Defendant's Motion to Reopen Detention Hearing (Doc. No. 17 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div.)

**Exhibit D**    Order denying Defendant's Motion to Reopen Detention Hearing ((Doc. No. 18 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div.)

**Exhibit E**    Defendant's Second Motion to Reopen Detention Hearing (Doc. 22 in in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div.)

**Exhibit A**          Transcript of Detention Hearing Before United States Magistrate Judge for the Western District of Texas, Austin Division,  Susan Hightower, on January 27, 2021

1               UNITED STATES DISTRICT COURT
                 WESTERN DISTRICT OF TEXAS
2                      AUSTIN DIVISION

3   UNITED STATES OF AMERICA ) Docket No. A 21-MJ-033(1) SH
                             )
4   vs.                      ) Austin, Texas
                             )
5   CHRISTOPHER RAY GRIDER   ) January 27, 2021

6

         TRANSCRIPT OF VIDEOCONFERENCE DETENTION HEARING
7           BEFORE THE HONORABLE SUSAN HIGHTOWER

8

9   APPEARANCES:

10  For the United States:    Mr. G. Karthik Srinivasan
                              Assistant U.S. Attorney
11                            903 San Jacinto Boulevard,
                              Suite 334
12                            Austin, Texas 78701

13

14  For the Defendant:        Mr. T. Brent Mayr
                              Mayr Law, P.C.
15                            5300 Memorial Drive, Suite 750
                              Houston, Texas 77007

16

17

18  Transcriber:              Ms. Lily Iva Reznik, CRR, RMR
                              501 West 5th Street, Suite 4153
19                            Austin, Texas 78701
                              (512)391-8792
20

21

22

23

24

25  Proceedings reported by digital sound recording,
    transcript produced by computer aided-transcription.

**I N D E X**

| Witnesses: | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|

(None)

**E X H I B I T S**

| | Offered | Admitted |
|---|---|---|
| Government's | | |
| (None) | | |
| Defendant's | | |
| #B | 13 | 14 |

```
1              (Proceedings commence at 1:35 p.m.)

2         THE CLERK:  Court is now in session for a

3    detention hearing:  21-MJ-33, United States vs.

4    Christopher Ray Grider.

5         MR. SRINIVASAN:  Good afternoon, your Honor.

6         Karthik Srinivasan for the government.

7         MR. MAYR:  Good afternoon, your Honor.

8         Brent Mayr on behalf of Mr. Grider.

9         THE COURT:  Good afternoon.  Thank you to

10   everyone.

11        I have a few announcements to make as we get

12   started today.  We have large number of participants

13   attending today, and I need to remind everyone that all

14   participants are -- cannot record, photograph, broadcast,

15   or televise any part of this proceeding.  Any violation of

16   this direction is punishable as contempt of court.

17        All members of the public who are attending are

18   asked to remain muted and with their video off.  The Court

19   will unmute and turn on the video for anyone testifying.

20   Anyone who attempts to disrupt this proceeding will be

21   removed.  And we are being recorded.  The Court is making

22   an audio recording today.

23        So with all that said, this matter comes before

24   the Court on the request of the government to detain the

25   defendant, Christopher Ray Grider, pending trial.  And
```

1  we're holding our proceeding by video conference because

2  due to the COVID-19 pandemic, holding the proceeding in

3  person would present a serious health risk to you, Mr.

4  Grider, to the other detainees, to the attorneys, and the

5  court staff involved.

6          So I'll ask you first, Mr. Grider, have you

7  discussed with Mr. Mayr proceeding by video conference

8  today?

9          THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  And do you consent to proceed with

11  this hearing by video conference?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  Mr. Mayr, do you consent to proceed

14  by video conference today?

15          MR. MAYR:  I do, your Honor.

16          THE COURT:  And, Mr. Srinivasan, on behalf of the

17  government, do you consent to proceed by video conference?

18          MR. SRINIVASAN:  Yes, your Honor.

19          THE COURT:  So I find that both parties consent

20  to proceed by video conference today.

21          I also need to remind counsel that as required by

22  Rule 5(f) of the Federal Rules of Criminal Procedure, the

23  United States is ordered to produce all exculpatory

24  evidence to the defendant pursuant to Brady vs. Maryland

25  and its progeny.  Not doing so in a timely manner may

1   result in sanctions that include the exclusion of

2   evidence, adverse jury instructions, dismissal of charges,

3   and contempt proceedings.

4           So in considering the government's detention

5   request today, courts are guided by several general

6   principles.  First, that the defendant, Mr. Grider, you're

7   entitled to the presumption of innocence at all times.

8   Under the Bail Reform Act, pretrial detention is an

9   exceptional step.  A defendant must be released before

10  trial unless I find that no condition or combination of

11  conditions exist that will reasonably assure your

12  appearance, if the government seeks detention based on the

13  risk of flight, or reasonably assure the safety of any

14  other person in the community, if the government seeks

15  detention based on you being a danger to the community,

16  Mr. Grider.

17          That Bail Reform Act requires that the least

18  restrictive conditions be imposed that are necessary to

19  provide those reasonable assurances.  If I can't find that

20  any condition or combination of conditions will reasonably

21  assure your appearance as required, or the safety of the

22  community, that I'm required by the Bail Reform Act to

23  order you held in custody.

24          So with that said, I'll ask Mr. Srinivasan:  How

25  does the government intend to proceed today?

1        MR. SRINIVASAN:  Your Honor, we are seeking
2   detention on the grounds of dangerousness.
3        THE COURT:  Okay.  Thank you.
4        And are you prepared to call -- are you
5   proceeding by witness or a proffer?
6        MR. SRINIVASAN:  By proffer, your Honor.  We're
7   relying on the nature and circumstances of the offense as
8   laid out in the complaint.
9        THE COURT:  Okay.  So the government has no
10  witnesses to call.
11       MR. SRINIVASAN:  That's correct, your Honor,
12  although I would note that to the extent the Court has
13  additional questions, FBI Special Agent Jeanette Taylor is
14  on the line here, although we were not planning to call
15  her.
16       THE COURT:  Okay.  Thank you very much.  So then,
17  that we'll proceed with you, Mr. Mayr.
18       Does the defense have any evidence that it would
19  like to present at this time?
20       MR. MAYR:  Yes, your Honor.  Before I proceed
21  with actual evidence, I just want to make sure that you've
22  had an oppor -- we're on the same page in terms of what
23  has been reviewed by the Court.
24       First and foremost, this court has received and
25  reviewed the amended Pretrial Services report recommending

1  release on certain conditions.  Is that correct?

2          THE COURT:  Yes.

3          MR. MAYR:  Okay.  I also, earlier this morning,

4  filed a confidential memorandum on pretrial release,

5  supplied a copy of that to the government after conferring

6  with them.  And I just want to confirm that you have had

7  an opportunity to review that and the several letters that

8  I included, in addition to that memorandum.

9          THE COURT:  Mr. Mayr, I've reviewed the entire

10 submission.

11         MR. MAYR:  Thank you very much, your Honor.  I

12 appreciate that.

13         Then in addition to those -- in addition to

14 what's set out there, your Honor, I would -- I have four

15 witnesses that I would proffer testimony on.  I would

16 start with Mr. Ryan Ford, who was present in the Zoom

17 room.  If he could be at least just permitted to show his

18 face and just acknowledge the Court, and then, I can

19 explain what I would proffer his testimony to be.

20         THE COURT:  Certainly.  We're proceeding -- we

21 will turn on -- as any witnesses identified, we'll turn on

22 their camera and unmute them.  So it might take just a

23 moment, but I'll ask the courtroom deputy to do so.  The

24 last name is -- can you spell it, please?  Is it F-O-R-D?

25         MR. MAYR:  Like the car.  Ryan Ford.

1      THE COURT:  Okay.

2      MR. MAYR:  Okay, your Honor.  At least on my

3  screen, he's directly below me, but that there is Ryan

4  Ford.  Your Honor, by proffer, I would -- Mr. Ford would

5  testify that he is a neighbor and close friend of Mr.

6  Grider's.  He's the former county commissioner for Falls

7  County.  So he -- to say that he has his pulse on the

8  community is a pretty good one.

9      He would testify that he and Mr. Grider have been

10  neighbors for over seven years, and during that time, he's

11  never done anything but work at his business and support

12  his family.  It is his opinion that those are -- that his

13  family and his business are his main and sole priorities.

14  Without him present, all of those stand to fail.  He's

15  lived next to him, he's worked with him to help him grow

16  his business, which as you are familiar with from having

17  reviewed the materials is the winery.

18      In doing that, Mr. Ford would testify that he's

19  never seen Mr. Grider exhibit any behaviors or speech that

20  could be even remotely considered threatening or harmful

21  to anyone.  In fact, he does everything to avoid

22  conflicts, even with his own employees.  He's more -- he's

23  more inclined to cut back someone's hours rather than

24  terminate them simply for wanting to avoid a confrontation

25  with his employees.  Mr. Ford would testify that he's --

1  that Mr. Grider's a good Christian man, a loving, caring

2  husband and a father.

3        Thank you, Mr. Ford.  That's all I would have for

4  Mr. Ford.

5        THE COURT:  Okay.  Thank you, Mr. Ford.

6        MR. MAYR:  The next witness that I would proffer,

7  your Honor, is Michelle Tyler, who is also present on

8  Zoom.

9        THE COURT:  I can see Ms. Tyler.  Thank you.

10        MR. MAYR:  Thank you.  Thank you, your Honor.

11        Ms. Michelle Tyler is zooming in all the way from

12  Pensacola, Florida.  However, I would proffer that she

13  would testify that she knows Mr. Grider.  She has known

14  him for close to 10 years.  Knew him from when they used

15  to sell their wares together in a farmers market,

16  eventually working together, they developed a close

17  personal relationship, Mr. Grider and his family with Ms.

18  Tyler and her family.

19        You have already reviewed a letter from her

20  husband, Matthew Tyler.  But Michelle Tyler would really

21  by way of proffer, would convey to the Court the real

22  special bond that she sees with Mr. Grider and his

23  children.  Mr. Grider's son and Ms. Tyler's son are both

24  -- have been best friends.  Even though they now live in

25  Florida, they still will get together at least twice a

1    year, go on camping trips.

2           She could also attest to not only seeing him in a

3    -- on a personal context, but in a business context as she

4    continues to sell her goods through his business.  She

5    would testify that he has an upstanding character, is a

6    devoted husband and father, but also is committed to his

7    business and his community.  His -- she would testify that

8    he's ambitious, driven to succeed, and his dedication to

9    accuracy and creative vision is reflected clearly in his

10   success.

11          She knows beyond any doubt that he holds deep

12   respect for his responsibilities and has always stood firm

13   in his obligations.  And that's all that I would have for

14   Ms. Tyler.

15          THE COURT:  Thank you, Ms. Tyler.

16          MR. MAYR:  The next witness I would proffer, your

17   Honor, is Christopher Johnson.  He is C. Johnson on the

18   Zoom video and he -- C. Johnson.  Your Honor, that's Mr.

19   Christopher Johnson.  He is Mr. Grider's brother-in-law.

20   He lives down in the Houston area.  He is a senior

21   engineer with Varco National, and he wouldn't be able to

22   be in court, anyway, because he's currently recovering

23   from COVID.

24          Your Honor, by way of proffer, I really enjoyed

25   talking with Mr. Johnson and felt that this court needed

1    to really give much consideration to what he has to say

2    because he is the big brother of Mr. Grider's wife,

3    Crystal, who is present in the Zoom room and you've

4    reviewed -- you've seen reference to her.

5            I'm a big brother, he's a big brother, and so, we

6    -- in talking with him, he talked about how he was -- when

7    it comes to protective brothers, he is super-max ultra

8    protective, and he wasn't going to just let anyone be a

9    part of his little sister's life.  He is solely committed

10   to protecting her.  It's very im -- he loves her to death

11   and wouldn't -- never want her to be with anyone that

12   would in any way endanger her.

13           He would testify that in getting to know Mr.

14   Grider that he felt comfortable with him.  He felt safe

15   with him.  He trusts Chris and he felt confident that he

16   would treat her with respect and he's proven that.  He

17   would testify that over all the years that Mr. Grider and

18   his wife, Crystal, have been together, Mr. Johnson has

19   come to love and appreciate how Mr. Grider loves and cares

20   for his little sister as much as he does.  I think it's

21   relevant because it shows for someone who would care the

22   most about someone's safety, okay, he knows that Chris is

23   not a dangerous person.  He is peaceful and he is loving,

24   and he is willing to come before you and testify to that

25   under oath, but I will offer by way of a proffer.

1          That's all I have on Mr. Johnson.

2          THE COURT:  Thank you, Mr. Johnson.

3          MR. MAYR:  Finally, your Honor, the last witness

4   I would proffer is going to be Rissa Shaw.  She is Rissa

5   Shaw on the Zoom screen.

6          THE COURT:  Hi, Ms. Shaw.  I see you.

7          MR. MAYR:  Thank you.

8          Judge, this is a very interesting witness that I

9   would be proffering.  Rissa Shaw -- I say it's

10  interesting.  As you may recall in reading the complaint

11  in this case, specifically paragraph 10, the complaint by

12  the agent in this case makes reference to a story that

13  aired on KWTX TV News 10, the local media station in Waco,

14  Texas that featured Grider on one of his segments.

15         Your Honor, Ms. Shaw is the reporter who

16  interviewed Mr. Grider while he was allegedly in the

17  capitol.  I have the video -- I have the video of her

18  story that I would like to publish for the Court so that

19  you could see what her story reported, and then, I can by

20  way of proffer add a little bit beyond what is reflected

21  in the story.

22         So with the Court's permission, I would like to

23  -- and I'm sorry I didn't make arrangements to handle this

24  beforehand, but however you would like for me to do that,

25  I would like to mark and offer what I'm going to call

1    Defendant's Exhibit B, since Exhibit A was attached to the

2    memorandum.  I'm going to call this Exhibit B, and it is

3    going to be the video recording of Ms. Shaw's story that

4    was published and is referenced in the complaint.

5             THE COURT:  Mr. Srinivasan, any objection?

6             MR. SRINIVASAN:  Your Honor, I've not seen this

7    particular clip, but based on that representation, I have

8    no reason to object at this point.  But I would reserve

9    just in case something comes up after viewing it.

10             THE COURT:  Certainly.  And since I haven't even

11   seen it either, is it something that you're able to play

12   at this time and share your screen?

13             MR. MAYR:  I am.  That exactly what I was

14   intending to do and I'm setting up to do with your

15   permission, your Honor.

16             THE COURT:  That's fine.  Take your time and

17   afterwards, we'll ask Mr. Srinivasan if he needs to lodge

18   any objection.

19             MR. MAYR:  Thank you.  And for the record, your

20   Honor, I will go ahead and publish the -- this will be

21   Defendant's Exhibit B, and I will waive any transcription

22   of this, if that is so necessary.

23             (Audio file played.)

24             THE COURT:  Could you just pause for a moment,

25   Mr. Mayr, and see -- I'm seeing it and I can hear it a

1  little bit.  But so I can hear it better and for the

2  record, is there any way to increase the volume?

3          MR. MAYR:  That's exactly what I'm doing right

4  now.  One moment, your Honor.

5          THE COURT:  Thank you.

6          MR. MAYR:  Okay.  Now I'm ready to share.

7          (Audio file played.)

8          THE COURT:  Okay.  So let me ask Mr. Srinivasan:

9  Is there any objection to the -- to Mr. Mayr's offer of

10  this Exhibit B into evidence?

11          MR. SRINIVASAN:  No objection, your Honor.

12          THE COURT:  Okay.  Thank you.  It's admitted, Mr.

13  Mayr.

14          MR. MAYR:  Judge, in addition to that, Ms. Shaw

15  would talk about everything leading up to that story.  She

16  would testify that like most news stories, there's a lot

17  more information that she obtains, but what she would

18  convey to the Court is that she was overwhelmed by what

19  was happening and received -- and was contacted by Mr.

20  Grider and felt a need to report what was going on.

21          In talking with Mr. Grider, he was clear, he was

22  calm.  She did not at any point ever think that he was a

23  threat to anyone.  She did not -- she did not think that

24  he was engaged in any violent acts.  She testified -- she

25  would testify that in talking with him, she never -- it

1 never even really crossed her mind that he was committing

2 any crime.  It was her belief that he was reporting what

3 he saw, but there was never any indication of him acting

4 maniacally, or espousing radical reviews, or anything of

5 the sort.  He was very clear, calm, lucid, and really felt

6 that his only purpose was to just report and document what

7 was taking place.

8        She would proffer and testify that she knows and

9 has a relationship with Mr. Grider and Mrs. Grider.  She

10 has done previous stories on their winery there in

11 Bruceville-Eddy.  And she has always been just incredibly

12 impressed by Mr. Grider and what he is and who he does.

13       She would testify that in getting to know Mr.

14 Grider and his wife that they are Texans through and

15 through, and they are in no way a flight risk or a danger

16 to the community.  They -- she would testify that he know

17 -- she knows him to be -- provide people many

18 opportunities in the greater Houston area.  I think you

19 probably already read about some of those people that he's

20 helped out in the Waco area.

21       She's seen firsthand former public school

22 teachers -- Mr. Grider helping former school teachers,

23 helping troubled teens from broken homes, bringing him out

24 to his business, bringing him out to his property to help

25 them earn a living.  And she would testify that she

1    believes that he is -- that he is a respectful person and

2    that he believes in the institutions of our country.  She

3    would respectfully request just based on everything that

4    she actually saw and observed, she would assure this court

5    that she does not believe that Mr. Grider is a danger to

6    the community in any way.  And that's what I --

7              THE COURT:  Mr. Mayr, just to be clear since

8    we're proceeding by proffer, I'll ask you, rather than Ms.

9    Shaw, she is located in the Waco area, correct?  She was

10   not in Washington, D.C. at the time of the report?

11             MR. MAYR:  That is correct, your Honor.  So she

12   would have -- yeah.  That is correct.  She was receiving

13   and reporting from Waco.

14             THE COURT:  Thank you.

15             MR. MAYR:  Okay.  Unless you have any other

16   questions, your Honor, that's all I have for Ms. Shaw.

17             THE COURT:  I do not.  Thank you, Ms. Shaw.

18             MR. MAYR:  If I may just have a moment, your

19   Honor.

20             THE COURT:  Certainly.

21             MR. MAYR:  That is all the evidence that I have

22   by way of proffer that I care to present to the Court at

23   this time.

24             THE COURT:  Okay.  Well, thank you, Mr. Mayr.

25             So, Mr. Srinivasan, I believe that we're ready to

1    proceed to argument.

2             MR. SRINIVASAN:  Yes, your Honor.  Thank you.

3             We believe that Mr. Grider poses a danger to the

4    community.  And we believe that the nature and

5    circumstances of the offense as well as some of the

6    information that was just presented to the Court, I think,

7    demonstrate the risks that he poses.  He was not a

8    bystander in the capitol.  He wasn't just swept up in the

9    crowd.  He was at the front lines, breaching a secure

10   location with violence after disrupting Congress

11   performing a constitutional duty.

12            He had a helmet with him, and he gave it to

13   somebody who had already tried to breach those doors.  He

14   indicated as, you know, set forth in the complaint that

15   the helmet was hard, meaning that it was an implement that

16   could be used for this purpose, gave it to that person.

17   That person proceeded to smash the doors.  There's a

18   picture in the complaint of Mr. Grider trying to push the

19   doors.  He was an active participant in all this.

20            He stood there, tried to push the doors open.

21   The window was breached, and then, Ms. Babbitt was

22   tragically shot as a result of that.  He was part of the

23   causal chain of events that led to the death of an

24   individual.  And at various points, your Honor, I think

25   it's set forth in the -- you know, the complaint, there

1  were times when he is recording, he's taking pictures.  He

2  is taking video, your Honor.

3         He wasn't a peacemaker.  He didn't get there and

4  say, you know, hey, we shouldn't be doing this.  Didn't

5  try to get people to back off.  He didn't try to stop what

6  was happening, your Honor.  He didn't want to forget what

7  was happening, and he documented it for himself as he went

8  along.  And that is, I think, striking, your Honor, and

9  it's striking in contrast, I think, to some of the

10 evidence that's been presented to the Court today as well

11 as in the memorandum that Mr. Mayr submitted.

12        You look at the letters of Reverend Reg Seck, Mr.

13 Winkleman, Ms. Green, Ms. Ford, and some of the

14 information that was proffered today, and you get the

15 impression, I guess, two themes, I think, seem to emerge.

16 And the first is that these individuals don't know him to

17 be capable of such violence in their experiences with him,

18 and that he is fundamentally, they say, a good person and

19 seems should not be judged on this, you know, one -- one

20 day, this most horrible moment in his life when there's so

21 much other good that he has done.

22        And, your Honor, I think we would submit that

23 sometimes we can be judged and should be judged based upon

24 some of these worst moments because they reveal what an

25 individual is capable of.  And, you know, the -- what

1   happened there at the capitol, Mr. Grider's active

2   participation in it shows then that he's capable of

3   things, capable of participation in violence that

4   apparently is not known to any of the people who have come

5   to speak for him.

6          And so, there's a risk, your Honor, because this

7   was a moment of in great stress, excitement.  You know,

8   I'm not trying get inside his head, but in a situation of

9   a mob, there's a lot of things that go on, and going

10  forward, your Honor, Mr. Grider is going to face stresses

11  and strains.  He has now been indicted.  He is now facing

12  a felony charge -- multiple felony charges, one with a

13  20-year maximum 1512(c).  He's now facing significant

14  consequences for his action.

15         And I would close, your Honor, by -- you know, by

16  pointing out something that I found striking in the

17  proffer of Ms. Shaw's testimony, the reporter, as well as

18  the clip that was played, your Honor.  That Ms. Shaw as

19  proffered knows the Griders, spoke with Mr. Grider

20  shortly, you know, after these incidents, and yet, Mr.

21  Grider was not fully forthcoming with her as to what

22  actually happened.

23         When you listen to that video, you listen to the

24  proffer, it was all in the passive.  He was as a witness.

25  Ms. Babbitt got shot and so on.  And to the extent that,

1   you know, Mr. Mayr, Mr. Grider wants to persuade the Court

2   that that is something that you should consider, I think

3   you should also consider what is also -- what it shows in

4   the converse, which is that there's an aspect to this

5   person, a risk that this person poses, given the right

6   circumstances that is unacceptable, and it came out that

7   day, and it's one that it seems like no one else knows,

8   but it's right there.  The complaint right there on video,

9   your Honor.

10          THE COURT:  Thank you, Mr. Srinivasan.

11          Mr. Mayr.

12          MR. MAYR:  Thank you, your Honor.

13          My client, Mr. Grider, never envisioned when he

14   got on a plane to go to Washington D.C. that he would find

15   himself in the position that he now finds himself.  He did

16   not go there to commit a crime.  Let's be very clear about

17   that.  There is no evidence whatsoever to even support or

18   insinuate that.  He did not go up there to riot.  He did

19   not go up there to start an insurrection.

20          Your Honor, whatever happened on that tragic day

21   in American history at the United States Capitol, my

22   client deeply regrets ever being a part of it.  He is

23   ready to return home to his family, his community, his

24   church and his business, and to focus on those things and

25   those things alone.  The things that truly matter and mean

1    the most to him.

2            He's ready to respect and honor the institutions

3    of this great country of ours as he's done in the past,

4    serving in the military, and as he will in the future,

5    respecting and following any conditions that you require

6    of him.

7            Your Honor, I believe that you can put your faith

8    in him to do just that as so many others around him have

9    assured you.  Family, friends, neighbors, educators,

10   businesspeople, members of the clergy and his congregation

11   have all firmly and unequivocally attested to you how he

12   is a loving, peaceful person and will not be a danger to

13   their community.  From when he was a boy to the man he is

14   today, he is hard-working, dedicated to his family and his

15   community.

16           Your Honor, I think it's important to understand

17   that Mr. Grider is not some maniacal, radical extremist

18   who went there with some mal intentions.  When you watch

19   the videos, you see that he's not screaming, he is not

20   espousing crazy beliefs.  He is not acting like an

21   agitator.  He is there as an observer.  He went there to

22   see what was happening, not to participate in an

23   insurrection, not to riot, not to destroy.

24           Your Honor, the government talks about that the

25   violence and what he -- and how he was at the door.  I

1   think it's really important to understand what -- the only

2   thing the evidence shows, okay?  There's never been an

3   allegation that Mr. Grider took some object and started

4   trying to break the glass at the capitol doors and the

5   entrance to the speaker's lobby.  He was present.  He was

6   there and what happened there will -- was a tragedy.  No

7   doubt.

8          For the government to insinuate that he's somehow

9   responsible for Ms. Babbitt's death is just absurd.  I

10  think as lawyers, we could understand the breaks and the

11  causal links, but there is no indication that Mr. Grider

12  ever did anything to contribute to her death.  He's

13  certainly not been indicted for that.  As soon as it was

14  over with, he left Washington, he came back here, and this

15  court is aware of the actions that he has engaged in

16  subsequent to then.

17         I think it speaks volumes, your Honor, that he

18  went down and surrendered himself to the FBI.  You have, I

19  imagine, have had several defendants appear before you

20  charged with much more serious federal offenses who have

21  been arrested in the middle of the nights, after their

22  homes are raided by federal agents.  I think it speaks

23  volumes, your Honor, that in this particular case, the

24  agents called Mr. Grider up, asked him to come down to

25  Austin.  He got in his car, drove himself down there and

1  voluntarily surrendered himself, knowing what he had done

2  and what was coming.

3        His car is still there in Austin, your Honor.

4  We'd like you to let him get back in that car, drive back

5  home to Falls County to take care of his family, take care

6  of his community, and together with me, work to -- work

7  with him to seek a positive resolution of these charges

8  against him.

9        The government, as you're well aware, your Honor,

10  has the burden in this case.  I've sort of assumed the

11  burden to myself.  I wanted to prove by clear and

12  convincing evidence, I wanted to prove by a shadow of the

13  doubt that you have nothing to be concerned about.  The

14  government has not proven by clear and convincing evidence

15  that there's no conditions that could assure the safety of

16  the community.  There's clearly no evidence of intent to

17  flee.

18        I would respectfully ask, your Honor, that you

19  take into consideration everything that has been presented

20  to you in this matter and allow Mr. Grider to go home.

21  Thank you.

22        THE COURT:  Thank you, Mr. Mayr.

23        Mr. Srinivasan, any further argument?

24        MR. SRINIVASAN:  Your Honor, all I would say in

25  response to Mr. Mayr is that I think he emphasized

1  repeatedly that Mr. Grider was a witness and was observing

2  in what was there.  I think he used the word "observer."

3  I would just call the Court's attention -- I know you have

4  this before you -- page 8 of the complaint, your Honor,

5  the photo that's there.  That is a man with his hand on

6  that door, and there are people trying to breach it and he

7  is helping.  He is not a witness, your Honor.  He was an

8  active participant in an attempt to breach a secure

9  location, endangering Congress, your Honor.  He's a

10  participant in these activities, and we'd ask your Honor

11  to give that significant weight.  Thank you.

12         THE COURT:  Okay.  Thank you to everyone.

13         So as I would like to thank everyone specifically

14  who's participated today.  I'd like to thank counsel for

15  their very able arguments.  And I'll start out by saying

16  that the Bail Reform Act, which I referred to earlier,

17  Title 18 of the United States Code, Section 3142, requires

18  me to consider four specific factors.  Those are the

19  nature and circumstances of the alleged offense, including

20  whether it's a violent offense, the weight of the evidence

21  against the defendant, your history and characteristics,

22  Mr. Grider, and the nature and seriousness of the danger

23  to others or to the community.

24         So I have carefully considered all the evidence

25  that's been provided today on these factors.  And I've

1  also considered the recommendation of Pretrial Services,

2  which in this case is that you be released.  The letters,

3  the evidence, Exhibit A, the support of your family and

4  friends speak to your history and characteristics, Mr.

5  Grider; and based on that evidence, I find that you are

6  not -- the government hasn't met its burden to establish

7  that you are a flight risk.  So I will not be granting

8  detention on that basis.

9          But, Mr. Grider, I have to consider the other,

10  factors, as well, as required by the Bail Reform Act.  In

11  this case, in particular, the weight against you is

12  particularly strong.  I'm also going to consider the

13  nature and circumstances of the alleged offense, which is

14  extremely serious here.

15          And as Mr. Srinivasan said, you know, Mr. Mayr

16  argued that you were there as an observer.  You also -- it

17  was also reported in the news that you went to see for

18  yourself.  Mr. Grider, that's not what the evidence shows.

19  That does not show that you were a member of the crowd on

20  January 6th.  That the evidence is very strong that you,

21  in particular, supplied the helmet used to break the

22  speaker's lobby doors, and that you, yourself, pushed and

23  kicked on those doors in attempt to breach the House

24  chambers.

25          Now, as I previously said, you are presumed to be

1    innocent of these charges, but the evidence is quite

2    strong.  That's an extremely serious offense.  And while

3    those events of January 6th are quite unusual, it's not

4    unusual for me to see criminal defendants who have the

5    support of their family and friends and, yet, are accused

6    of offenses that are serious enough that they require

7    detention.

8            And here, based on the nature and circumstances

9    of the offense and the very strong weight of the evidence

10   against you, Mr. Grider, I'm going to -- I find that the

11   government has met its burden to show by clear and

12   convincing evidence that there's no condition or

13   combination of conditions that will reasonably assure the

14   safety of community -- of the community if you were to be

15   released.

16           I'll also mention, it's primarily based on the

17   first two factors.  But I think factor four, the nature

18   and seriousness of the danger to others or the community

19   is quite strong in this case, as well.

20           So I'll be preparing a written order of

21   detention.  And I'll remand you, Mr. Grider, into the

22   custody of the United States Marshal Service for transport

23   to the district of the District of Columbia for further

24   proceedings.

25           So before we adjourn today, Mr. Srinivasan, is

1  there anything else that the Court needs to address at

2  this time?

3          MR. SRINIVASAN:  Not from the government.  Thank

4  you.

5          THE COURT:  Okay.  Thank you.

6          And, Mr. Mayr, is there anything else that the

7  Court needs to address?

8          MR. MAYR:  Not at this time, your Honor -- ah, he

9  has been indicted.  I don't know if we need to handle any

10  other Rule 5 matters at this time as this is my first

11  appearance before you.  I don't know if those were

12  handled -- I couldn't tell if those were handled at the

13  initial, but if we can make sure that there isn't any

14  other Rule 5 matters that need to be addressed.

15          THE COURT:  Did you have anything in particular,

16  Mr. Mayr, that you can't tell whether it needs to be

17  addressed or not?

18          MR. MAYR:  Not really, your Honor.  Like I said,

19  I just -- you know, obviously we'll deal with arraignment

20  up in D.C.  And I imagine we'll deal with arraignment up

21  in D.C.  There's no reason for an identity hearing.  I'm

22  just kind of going through my mind, I think that --

23          THE COURT:  Mr. Mayr -- yes, Mr. Grider waived

24  identity hearing at the initial appearance.

25          MR. MAYR:  Okay.  That's what I -- just want to

1    confirm.  Other than that, I have nothing further, your

2    Honor.

3            THE COURT:  All right.  Mr. Srinivasan, is there

4    anything else, any other further Rule 5 procedure?  The

5    Court's not aware of any, but is there any further Rule 5

6    procedure you're aware of that Mr. Grider is entitled to

7    at this time?

8            MR. SRINIVASAN:  No, your Honor.

9            THE COURT:  Okay.  Thank you.

10           And I'll ask the courtroom deputy:  Is there

11   anything further that needs to be addressed before we

12   adjourn?

13           THE CLERK:  No, your Honor.

14           THE COURT:  Okay.  Thank you.

15           MR. MAYR:  Your Honor, actually, one thing.  I do

16   just to make sure we're clear on this.  As far as the

17   Exhibit B that I offered, the video clip, it's a very

18   large digital file.  What would be the most effective way

19   to get that to the Court and made part of the record in

20   this case?

21           THE COURT:  I'm going to defer to the courtroom

22   deputy if he has anything to add, but I believe that that

23   can be submitted on a USB drive.

24           MR. MAYR:  Okay.

25           THE COURT:  As a physical USB drive to the Court.

1          MR. MAYR:  All right.

2          THE COURT:  Does the courtroom deputy wish to add

3   anything further with regard to evidence?  The video

4   evidence?

5          THE CLERK:  That is a great question and I'll

6   certainly follow up with you following this hearing, Mr.

7   Brent, to --

8          MR. MAYR:  I'll do the same with you, Mr.

9   Ferrell.  Thank you.

10         THE COURT:  Thank you, Mr. Mayr.  You can

11  communicate by e-mail, but I believe making it --

12  submitting it on a drive, an external drive will be

13  sufficient.

14         So with nothing else, Mr. Grider, I'll wish you

15  good luck and Court's adjourned.

16         (Proceedings conclude at 2:12 p.m.)

17

18

19

20

21

22

23

24

25

```
 1

 2

 3                    REPORTER'S CERTIFICATE

 4

 5      I, LILY I. REZNIK, DO HEREBY CERTIFY THAT THE FOREGOING

 6   WAS TRANSCRIBED FROM AN ELECTRONIC RECORDING MADE AT THE

 7   TIME OF THE AFORESAID PROCEEDINGS AND IS A CORRECT

 8   TRANSCRIPT, TO THE BEST OF MY ABILITY, MADE FROM THE

 9   PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, AND THAT THE

10   TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE PRESCRIBED BY

11   THE COURT AND JUDICIAL CONFERENCE OF THE UNITED STATES.

12

13   /s/Lily I. Reznik                  February 1, 2021

14   LILY I. REZNIK, CRR, RMR           DATE
     Official Court Reporter
15   United States District Court
     Austin Division
16   501 W. 5th Street, Suite 4153
     Austin, Texas 78701
17   (512)391-8792
     SOT Certification No. 4481
18   Expires:  1-31-23

19

20

21

22

23

24

25
```

**Exhibit B**          Order of Detention (Doc. No. 14 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div.)

# UNITED STATES DISTRICT COURT

for the
Western District of Texas
Austin Division

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No.  1:21-mj-00033-SH |
| Christopher Ray Grider | ) | |
| *Defendant* | ) | |

## ORDER OF DETENTION PENDING TRIAL

### Part I - Eligibility for Detention

On Motion of the Government attorney pursuant to 18 U.S.C. § 3142(f)(1), the Court held a detention hearing on January 27, 2021, and found that detention is warranted. This order sets forth the Court's findings of fact and conclusions of law, as required by 18 U.S.C. § 3142(i), in addition to any other findings made at the hearing.

### Part II - Analysis and Statement of the Reasons for Detention

After considering the factors set forth in 18 U.S.C. § 3142(g), the pretrial services report, and the evidence and arguments of counsel presented at the detention hearing, the Court concludes that the defendant must be detained pending trial because the Government has proven:

X By clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of the community.

☐ By a preponderance of evidence that no condition or combination of conditions of release will reasonably assure the defendant's appearance as required.

In addition to any findings made on the record at the hearing, the reasons for detention include the following:

X Weight of evidence against the defendant is strong

X Subject to lengthy period of incarceration if convicted

**Other Reasons or Further Explanation:**

My decision is based on the factors listed above, as well as the nature and circumstances of the offenses charged, including whether the offense is a crime of violence, and the nature and seriousness of the danger to the community that would be posed by Mr. Grider's release. In particular, as stated during the hearing, there is extremely strong evidence that Mr. Grider was a leading participant in the offenses charged inside the United States Capitol Building on January 6, 2021. There is evidence that Mr. Grider supplied the helmet used to break glass in the doors leading into the Speaker's Lobby, and personally pushed and kicked those doors. A third party, Ashli Babbitt, then was fatally shot as she attempted to enter. As counsel for Mr. Grider argued during the detention hearing: "What happened there was a tragedy." Had Mr. Grider succeeded in his alleged attempts to breach the entrance leading to the House Chamber, the tragedy could have been far greater.

The nature and circumstances of the offenses charged support a finding that Mr. Grider's release would pose a serious danger to the community. Considering all information available, the government has established by clear and convincing evidence that no condition or combination of conditions of release will reasonably assure the safety of the community, and the Court orders Mr. Grider detained on that basis.

**Part III - Directions Regarding Detention**

The defendant is remanded to the custody of the Attorney General or to the Attorney General's designated representative for confinement in a corrections facility separate, to the extent practicable, from persons awaiting or serving sentences or being held in custody pending appeal. The defendant must be afforded a reasonable opportunity for private consultation with defense counsel. On order of a court of the United States or on request of an attorney for the Government, the person in charge of the corrections facility must deliver the defendant to a United States Marshal for the purpose of an appearance in connection with a court proceeding.

Date:    January 27, 2021

Susan Hightower
United States Magistrate Judge

**Exhibit C**      Defendant's Motion to Reopen Detention Hearing (Doc. No. 17 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div.)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| v. | § | Case No. 21-mj-00033-SH |
| | § | |
| | § | |
| CHRISTOPHER RAY GRIDER, | § | |
| | § | |
| Defendant | § | |

**DEFENDANT'S MOTION TO REOPEN THE DETENTION HEARING**

TO THE HONORABLE SUSAN HIGHTOWER, UNITED STATES MAGISTRATE
JUDGE:

COMES NOW CHRISTOPHER RAY GRIDER, the Defendant in the above
styled and numbered cause, by and through undersigned counsel, and, pursuant to
18 U.S.C. § 3142(f), moves this Court to reopen the detention hearing to consider new
evidence that was not known to Defendant at the time of the hearing and that has a
material bearing on the issue whether there are conditions of release that will rea-
sonably assure the safety of any other person and the community.

1. As reflected in this Court's order, this Court is under the impression that Defend-
   ant was "a *leading participant* in the offenses charged inside the United States
   Capitol Building on January 6, 2021." Order of Detention Pending Trial at 2 (em-
   phasis added). This Court — as the Government argued — further placed empha-
   sis on acts alleged to have been committed at the doors leading to the Speaker's
   Lobby. *Id.*

2. Shortly after the conclusion of the detention hearing in the matter, counsel for

1

Defendant attempted to locate additional videos that shed further light as to what took place at the doors leading to the Speaker's Lobby.

3. While the complaint includes images from what appears to be a video marked with the distinct watermark "JAYDEN X " taken at the doors leading to the Speaker's Lobby, despite his best efforts, undersigned counsel was unable to locate that video nor was provided that evidence by the Government prior to the detention hearing.

4. As reflected on attached Exhibit A to this motion, the internet search history for undersigned counsel's personal web browser, at 2:20 p.m. today after the detention hearing concluded, undersigned counsel located on YouTube what appears to be that video. The web address for that video is https://www.youtube.com/watch?v=PfiS8MsfSF4.

5. While the video is lengthy, the portions purportedly depicting Mr. Grider begin at 31:02 into the video. The person believed to be Mr. Grider is seen in a rotunda and is certainly not a "leading participant." To the contrary, at 31:21 into the video, the person believed to be Mr. Grider is pushing people back as Capitol officers are trying to move away from a closed door, and he is waving at the surrounding group of people and saying, "The cops are leaving, the cops are leaving." Mr. Grider is then seen backing away.

6. At 33:30 into the video, the videographer appears before the entrance to the Speaker's Lobby. The person believed to be Mr. Grider, again, is not "a leading participant." At 33:36 into the video, the person believed to be Mr. Grider is seen

in the far right of the frame, not yelling, nor shouting but having a tepid conver-
sation with another male in a tie, presumably a member of the Capitol Police or
Capitol staff.

7. The most critical portion of the video begins at 34:05 when the videographer be-
gins talking with what appears to be a member of the Capitol Police guarding the
doors to the Speaker's Lobby. From that point, the following is seen:

- At 34:13 into the video, the person believed to be Mr. Grider hands a hard,
  plastic helmet to another person and then looks back. While there appears
  to be limited dialogue, it cannot be heard on the video.

- Up until 34:22 into the video, the person believed to be Mr. Grider does not
  appear to be shouting, waving his arms, or using any physical force against
  anyone. To the contrary, he again appears at 34:37 into the video engaged
  in a calm dialogue with a Capitol Police officer guarding the door.

- Immediately thereafter, the officers move away from the door. Several in-
  dividuals then move in front of the person believed to be Mr. Grider and
  begin pushing on the door to the Speaker's Lobby. The person believed to
  be Mr. Grider then places his hand on the door — not the window — and
  pushes it, not in a manner that would appear that he was truly trying to
  break it open, but simply to see whether it was secure or not. Others then
  move in and make obvious attempts to forcefully open the door.

- Immediately thereafter, someone with dark pants clearly kicks the door to
  the Speaker's Lobby. But from the video, because there are several other

individuals at door, it is <u>not</u> clear that the person believed to be Mr. Grider was that person. What the video does clearly shows is that he *backs away* from the door while several others continue kicking at it and eventually smashing the windows. Nothing the person believed to be Mr. Grider is doing or saying can be construed as "leading" the group or encouraging others to engage in their own destructive behavior.

- Shortly thereafter, the videographer's focus turns to a gun on the other side of the doors pointed at the people at the door. From that point, the video depicts the graphic and tragic shooting of Ashli Babbitt.

- At 35:35, the person believed to be Mr. Grider is seen again, like others, standing over Babbitt and recording what is taking place but doing nothing more.

8. Defendant is deeply concerned about the Government's effort to show this Court only the pieces of the puzzle needed to fit their narrative. This newly-discovered video provides a much more complete picture, and more importantly, shows that the person believed to be Mr. Grider is <u>not</u>, like this Court found, "a leading participant," and he does <u>not</u> appear to be engaged in a forceful and continued attempt to breach the doors to the Speaker's Lobby.

9. Defendant respectfully requests that this Court reopen the detention hearing and spend simply five minutes watching this video so it can judge for itself whether its decision on detention was truly a correct one and whether the Government provided it with a clear and accurate depiction of what is believed to have taken place.

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully requests this Court reopen the detention hearing, accept and consider the evidence referenced herein, and revoke its previous Order to detain Defendant pending trial.

Respectfully Submitted,

MAYR LAW, P.C.

by:  /s/T. Brent Mayr
T. BRENT MAYR
Texas State Bar Number 24037052
bmayr@mayr-law.com

5300 Memorial Dr., Suite 750
Houston, TX 77007
Telephone:  713-808-9613
Fax:  713-808-9613

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this motion was sent to Counsel for the Government on January 27, 2021, via CM/ECF.

/s/T. Brent Mayr
T. BRENT MAYR

Exhibit A to
Defendant's Motion to Reopen Detention



**Exhibit D**       Order denying Defendant's Motion to Reopen Detention Hearing
                    ((Doc. No. 18 in Case No. 21-mj-00033-SH in the Western District
                    of Texas, Austin Div.)

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| **United States of America** | § | |
| | § | |
| **vs.** | § | **1:21-mj-33-SH** |
| | § | |
| **Christopher Ray Grider** | § | |

## O R D E R

Before the Court is Defendant's Motion to Reopen the Detention Hearing, filed January 27, 2021 (Dkt. 17).

## I.    Background

Defendant Christopher Ray Grider was arrested on January 21, 2021, pursuant to a warrant based on a complaint that he violated 18 U.S.C. § 1361, concerning willfully injuring or committing any depredation against any property of the United States; 18 U.S.C. § 1752(a), knowingly entering or remaining in restricted building or grounds without lawful authority; and 40 U.S.C. § 5104(e)(2), violent entry and disorderly conduct on Capitol grounds. Dkt. 1.

On January 26, 2021, Mr. Grider was indicted in the United States District Court for the District of Columbia on the following seven counts:

1. 18 U.S.C. §§ 1361 and 2, Destruction of Government Property and Aiding and Abetting
2. 18 U.S.C. § 1752(a)(1), Entering and Remaining in a Restricted Building
3. 18 U.S.C. § 1752(a)(2), Disorderly and Disruptive Conduct in a Restricted Building or Grounds
4. 18 U.S.C. § 1512(c)(2) and 2, Obstruction of an Official Proceeding and Aiding and Abetting
5. 40 U.S.C. § 5104(e)(2)(D), Disorderly Conduct in a Capitol Building
6. 40 U.S.C. § 5104(e)(2)(E), Impeding Passage Through the Capitol Grounds or Buildings
7. 40 U.S.C. § 5104(e)(2)(F), Act of Physical Violence in the Capitol Grounds or Buildings.

*United States of America v. Grider*, 1:21-cr-00022-KBJ, Dkt. 6.

1

After a detention hearing on January 27, 2021, this Court found, by clear and convincing evidence, that no condition or combination of conditions of release would reasonably assure the safety of the community. Dkt. 14. Defendant therefore was ordered detained pending trial. *Id.* Mr. Grider now moves to reopen the detention hearing.

## II.   Analysis

Under 18 U.S.C. § 3142(f)(2)(B), a detention hearing may be reopened

> at any time before trial if the judicial officer finds that information exists that was not known to the movant at the time of the hearing and that has a material bearing on the issue whether there are conditions of release that will reasonably assure . . . the safety of any other person and the community.

The complaint against Mr. Grider includes images from video apparently taken inside the Capitol. Dkt. 1 at 6-9. In his Motion, counsel for Mr. Grider states that, after the conclusion of the detention hearing, he "located on YouTube what appears to be that video."

Mr. Grider does not contend that this information has any bearing on whether he forcefully entered the United States Capitol Building on January 6, 2021, as Congress convened in Joint Session to affirm the Electoral College vote in the 2020 Presidential Election; progressed inside the Capitol Building to the doors of the Speaker's Lobby; supplied the helmet used to break glass in the doors leading into the Speaker's Lobby; or pushed on those doors. Rather, as described by Mr. Grider, it is not clear from the YouTube video that he was the person who kicked the door to the Speaker's Lobby because several other individuals also were at the doors. Dkt. 17 at 3-4. Mr. Grider further argues that:

> The person believed to be Mr. Grider then places his hand on the door — not the window — and pushes it, not in a manner that would appear that he was truly trying to break it open, but **simply to see whether it was secure or not**. Others then move in and make obvious attempts to forcefully open the door.

*Id.* at 3 (emphasis added).

2

As described by Mr. Grider, the video is strong evidence of his attempt to breach the House Chamber, although he disputes the Government's characterization of how forcefully he did so. This information has no material bearing on the factors on which the detention order was based: the nature and circumstances of the offenses charged, including whether the offense is a crime of violence; the weight of the evidence against Mr. Grider; and the nature and seriousness of the danger to the community that would be posed by his release. 18 U.S.C. § 3142(f). Stated differently, whether or not he led or encouraged others in the alleged commission of the offenses charged, there is extremely strong evidence that Mr. Grider participated at the forefront in the events that led to the fatal shooting inside the Capitol Building on January 6, 2021.

To the extent that Defendant's Motion to Reopen the Detention Hearing presents information that was not known at the time of the detention hearing, it has no material bearing on whether there are conditions of release that will reasonably assure the safety of the community. It remains the conclusion of the Court that Mr. Grider must be detained pending trial because the United States has proven by clear and convincing evidence that no condition or combination of conditions of release would reasonably assure the safety of the community.

### III. Conclusion

For the foregoing reasons, **IT IS ORDERED** that Defendant's Motion to Reopen the Detention Hearing (Dkt. 17) is **DENIED**.

**SIGNED** on January 28, 2021.

SUSAN HIGHTOWER
UNITED STATES MAGISTRATE JUDGE

3

**Exhibit E**          Defendant's Second Motion to Reopen Detention Hearing (Doc. 22 in in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div.)

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| | § | |
| v. | § | Case No. 21-mj-00033-SH |
| | § | |
| | § | |
| CHRISTOPHER RAY GRIDER, | § | |
| | § | |
| Defendant | § | |

DEFENDANT'S SECOND MOTION TO
REOPEN THE DETENTION HEARING

TO THE HONORABLE SUSAN HIGHTOWER, UNITED STATES MAGISTRATE
JUDGE:

COMES NOW CHRISTOPHER RAY GRIDER, the Defendant in the above
styled and numbered cause, by and through undersigned counsel, and, pursuant to
18 U.S.C. § 3142(f), moves this Court to reopen the detention hearing to consider new,
additional evidence that was not known to Defendant at the time of the hearing or
prior to his previous motion to reopen, evidence that has a material bearing on the
issue whether there are conditions of release that will reasonably assure the safety
of any other person and the community.

1. This Court and the Government continues to mistakenly believe that the Defend-
   ant *forcefully* entered the United States Capitol Building on January 6, 2021 and
   that he somehow played an active role "at the forefront in the events that led to
   the fatal shooting inside the Capitol Building" that same date.

1

2.  Subsequent to the detention hearing held by this Court and subsequent to Defendant's first motion to reopen the detention hearing filed on January 27, 2020, counsel for the Defendant has discovered new, additional evidence that has a material bearing on the issue whether there are conditions of release that will reasonably assure the safety of any other person and the community.

3.  Because the Defendant's cellular telephone was seized by federal agents upon surrendering to them on January 21, 2021, counsel for Defendant did not have access to any photographs or videos contained on that device taken by the Defendant on January 6, 2021 at the time of the detention hearing or prior to his first motion to reopen the detention hearing. On Friday, January 29, 2021, however, counsel for the Defendant, obtained a computer from the Defendant's property and after examining that computer, located backup copies of those photographs and videos.

4.  The videos reflect the following:

    a.  In a video file titled, IMG_1878.m4v, the Defendant is seen walking up to an entrance on the ground level of the Capitol building and walking through *an open door* along with hundreds of other individuals. While other individuals nearby shattered glass windows, there is no obvious indication that the door which the Defendant walked through was opened by force and there is clearly no forcible entry made by the Defendant. On the following page are still shots from that video showing this non-forcible entry:





b. In a video file titled, IMG_1883.m4v, the Defendant is seen walking up to the entrance to the Speaker's Lobby where multiple Capitol Officers are standing guard. The Defendant does not yell, shout, or make any threatening comments to them. Instead, he is heard telling the officers, "People are going to get crushed on that other side if they don't open that door" (referring to another area from where he had just come from). He is pleading with the officers, telling them, "There are two cops getting crushed." Others can then be seen walking up and banging on the doors, but not the Defendant. Eventually, more and more people begin approaching the door and, as space becomes confined, the video no longer captures any images. However, the audio is still recording and, at no time, can the Defendant be heard making any threatening comments or directing anyone to try and break open or damage the doors or do anything else. The video can be seen here: https://app.box.com/s/q6wfnaqvorgqhbtejvm0vqzal5r7dn5j.

5. In addition to the photographs and videos obtained from the Defendant's phone, counsel for the Defendant also located an additional YouTube video showing what takes place at the Speaker's Lobby from a different angle: https://youtu.be/AZ9oThRuMVs. Worth noting in this video is that as officers are moving away from the door, the Defendant is following them. Further, when the person who is presumably Ashli Babbitt begins attempting to climb through the window to the Speaker's Lobby, the Defendant had his back turned and was continuing his attempt to move *away* from the doors.

4

6. All this new material corroborates what the Defendant has maintained all along: his presence in the Capitol was not one of a person who intended to inflict harm on anyone or commit any violent acts. He wanted his voice to be heard and nothing more. He submits that wanting to be heard does not clearly and convincingly equate him to a person who is so dangerous and so violent that there are no condition or combination of conditions of release would reasonably assure the safety of the community. This is especially so when considering this new evidence in conjunction with his lack of any prior violent criminal history, his reputation as a caring and generous individual in the community, and the fact that he voluntarily surrendered himself to authorities.

WHEREFORE, PREMISES CONSIDERED, the Defendant respectfully requests this Court reopen the detention hearing, accept and consider the evidence referenced herein, and revoke its previous Order to detain Defendant pending trial.

Respectfully Submitted,

MAYR LAW, P.C.

by: /s/ T. Brent Mayr
T. BRENT MAYR
Texas State Bar Number 24037052
bmayr@mayr-law.com

5300 Memorial Dr., Suite 750
Houston, TX 77007
Telephone:  713-808-9613
Fax:  713-808-9613

COUNSEL FOR DEFENDANT,
CHRISTOPHER RAY GRIDER

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this motion was sent to Counsel for the

Government on February 1, 2021, via CM/ECF.

/s/T. Brent Mayr
T. BRENT MAYR