**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **No. 1:21-cr-00022** |
| | : | **No. 21-MJ-138** |
| | : | |
| **CHRISTOPHER RAY GRIDER,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S MEMORANDUM OPPOSING THE DEFENDANT'S MOTION TO REVOKE DETENTION ORDER AND SUPPORTING PRE-TRIAL DETENTION

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this memorandum opposing the motion to revoke pre-trial detention filed by the defendant, Christopher Ray Grider, pursuant to 18 U.S.C. § 3145(b), and seeking continued detention pursuant to 18 U.S.C. § 3142(f)(1)(A).   The defendant, who has been indicted on seven counts, including a crime of violence, was ordered detained by a magistrate judge of the Western District of Texas on January 27, 2021.   As that judge reasoned, "[t]here is evidence that Mr. Grider supplied the helmet used to break glass in the doors leading into the Speaker's Lobby, and personally pushed and kicked those doors"; that "[a] third party, Ashli Babbitt, then was fatally shot as she attempted to enter"; and that "[h]ad Mr. Grider succeeded in his alleged attempts to breach the entrance leading to the House Chamber, the tragedy could have been far greater."   Det. Order at 2.   Noting the "strong" weight of evidence and the "lengthy period of incarceration" the defendant faces if convicted," the judge concluded that "no condition or combination of conditions of release will reasonably assure the safety of the community."   *Id.*

1

at 1-2.   This Court should hold likewise and order the defendant's continued detention.

The government respectfully requests that the following points and authorities, as well as any other facts, arguments, and authorities in the Affidavit Supporting the Complaint and presented orally, be considered in the Court's determination regarding pre-trial detention.

## BACKGROUND

### Factual Background

On the evening of January 6, 2021, Christopher Grider ("the defendant") was interviewed, apparently via videoconference from Washington, D.C., on a story on KWTX-TV News 10, a local news media station in Waco, Texas.   During the interview, the defendant admitted to being inside the United States Capitol Building that day, when it was breached by large crowds as Congress convened in a Joint Session to affirm the Electoral College vote in the 2020 Presidential Election. The defendant described being within several feet of the woman who was shot inside the Capitol, later publicly identified as Ashli Babbitt.   The defendant stated on camera, "The president asked people to come and show their support… I feel like it's the least that we can do, it's kind of why I came from central Texas all the way to DC."   The story included video captioned as, "Courtesy: Chris Grider."   The video showed the crowds outside the United States Capitol and the moments after the shooting.   The defendant told the reporter, "They were shocked as everyone else was when the people on the other side of the door, from 20 feet away, shot her in the chest.   At that point we were all panicked, we couldn't leave because there were thousands of people behind us pushing us forward."   The printed web version of the story additionally quotes the defendant as saying, "The Capitol Police started pepper-spraying people and they were firing rubber bullets, and then after that started, that's when people started pushing to get into the Capitol building to be

2

heard" and reports that "Grider said … there were many protesters, like himself, who were protecting monuments and art from the crowds."1



Open-source videos corroborated the defendant's admission that he was inside the Capitol and near Babbitt's shooting on January 6, 2021.   The footage showed the defendant wearing a black puffy jacket that appeared to match the one during his KWTX-TV news interview, a yellow "Don't Tread on Me" flag tied around his neck, a black backpack around his shoulders, blue jeans, and a blue surgical mask over his mouth.   In some of the footage, he was also wearing a red "Make America Great Again" baseball cap.

Law enforcement agents retrieved the defendant's driver's license photo and confirmed that the defendant matched the appearance and build of the above-described individual in the video footage.   The FBI also received a tip on January 9, 2021 that provided a screenshot of the above-described individual from open-source video footage and identified him as "Chris Grider" from the "Waco, Tx area" who "[o]wns a local winery … called The Kissing Tree Winery," and "[w]as very vocal about going to DC yesterday and then confirmed he actually did go with a news interview last night on KWTX Channel 10 here in Waco from his DC hotel room."

---

1  The interview can be viewed at https://www.kwtx.com/2021/01/07/central-texas-man-witnessed-deadly-shooting-as-trump-supporters-stormed-us-capitol/.

On the video footage, the defendant was seen outside amongst the crowd prior to the security breach at one of the Capitol Building entrances.   He was seen on what appears to be the southwest side standing on a marble landing near scaffolding.   He was seen holding his phone and moving it around likely taking videos or pictures of the crowd.   He was then observed walking on the railing beside the stairs.





Inside the Capitol, the defendant was observed in several areas.   At one point, the

defendant was in a raucous crowd that was gathered up against an entrance to the House Chamber, chanting "Stop the Steal."   He was seen in the crowd holding a black helmet up in the air.



Large numbers of the crowd appeared to leave that entrance to the House Chamber and stream toward the Speaker's Lobby, a hallway that also connects to the House Chamber.   U.S. Capitol Police footage captured a couple individuals beckoning members of the crowd away from the entrance and then a stream of people following as they made their way toward the Speaker's Lobby.   The defendant appeared to be among the first people to heed the call and he was seen racing down the hallway.





Open-source video, as well as the video from the defendant's phone provided by the defendant's counsel titled "IMG_1883," showed that the defendant was one of the first individuals to arrive by the Speaker's Lobby door.



The words "Speaker's Lobby" were visible at the top of the doors.    Chairs, visible through the door's glass panels, were used to barricade the door from the inside of the Speaker's Lobby.    The door was guarded by three Capitol Police officers in front.

The Speaker's Lobby area soon became packed with a crowd.   The defendant continued to stand near the front of the crowd by the glass-paned doors leading to the Speaker's Lobby, and remained near the front until seconds before Babbitt's shooting.   Members of the crowd were shouting and gesticulating at the officers.   A young male wearing a fur-lined hat was observed repeatedly punching the glass panels of the doors immediately behind the officers with his fists, causing the glass to splinter.   While throwing two of the punches, that male pushed his body up against one of the Capitol Police officers guarding the door.   That male was also observed shouting and pointing aggressively at the officers.   Grider was then observed handing a black helmet to the male and speaking to him.   The defendant appeared to knock on the top of the helmet, signifying that it was a hard instrument, and the young male accepted it.   Additional officers in riot gear arrived behind the crowd at the Speaker's Lobby doors, and the three officers guarding the door appeared to move to the adjacent wall.

Seconds after the officers stepped away from the doorway, the defendant moved in and attempted to push open the doors and appeared to kick the doors in an attempt to breach the doorway.   The young male with the fur-lined hat proceeded to use the defendant's helmet to violently and repeatedly strike the glass-paned doors in the center and far-right hand side, further shattering the glass.   Another individual rammed the glass repeatedly with a flagpole.   Chants could be heard of "Break it down!" and "Let's fucking go!"















Within seconds, the defendant was observed backing away from the Speaker's Lobby door as individuals in the crowd were screaming "gun."   Babbitt was shot by an officer on the other side of the door while attempting to climb through one of the shattered windows.   After the shooting, several people ran out of the hallway as police were yelling to get out of the way.   An area was eventually cleared as a path to allow Babbitt to be carried out of the building.   The defendant remained and could be seen minutes after the shooting leaning over the railing to get a better glimpse of Babbitt bleeding on the floor.   The defendant was holding his phone over the stairway appearing to capture a video or pictures of Babbitt.



Based on an assessment by the Superintendent of the U.S. Capitol building, the cost to

repair the damaged Speaker's Lobby doors exceeds $1,000.

On January 27, 2021, a search warrant was executed at the defendant's home to recover items including the defendant's clothing and other items on his person from the Capitol Building. Agents recovered the defendant's black puffy jacket and backpack.   The defendant's wife stated that she had given the yellow flag and red baseball cap to a neighbor because the defendant had called her one day after receiving a letter from the U.S. Attorney's Office about the incident and told her to "get rid of his Trump things," including those items.   The defendant's wife said she gave them to a neighbor.   Law enforcement later contacted the neighbor, who said he returned them after the search, and the defendant's wife then voluntarily turned over the items.   The defendant's wife also told agents that the defendant had told her that he found the helmet on the ground because he was afraid of violence and wanted to protect himself.

## **Procedural History**

On January 20, 2021, the defendant was charged by complaint with violations of 18 U.S.C. §§ 1361 and 2 (Destruction of Government Property Over $1,000); 18 U.S.C. § 1752(a) and (b) (Entering or Remaining in a Restricted Building or Grounds); and 40 U.S.C. § 5104(e)(2) (Violent Entry and Disorderly Conduct on Capitol Grounds).

On January 21, 2021, the defendant was arrested.   He had his initial appearance on January 22, 2021 in the Western District of Texas, and the court set both a preliminary hearing and detention hearing for January 27, 2021.

On January 26, 2021, a grand jury in the District of Columbia returned a seven-count indictment of the defendant on violations of 18 U.S.C. § 1361 and § 2 (Destruction of Government Property over $1,000); 18 U.S.C. § 1512(c)(2) and § 2 (Obstruction of an Official Proceeding); 18

U.S.C. § 1752(a)(1) (Entering or Remaining in a Restricted Building or Grounds) and § 1752(a)(2) (Disorderly and Disruptive Conduct in a Restricted Building or Grounds); and 40 U.S.C. § 5104(e)(2)(D) (Disorderly Conduct in a Capitol Building), § 5104(e)(2)(E) (Impeding Passage through the Capitol Grounds or Buildings), and § 5104(e)(2)(F) (Act of Physical Violence in the Capitol Grounds or Buildings).

On January 27, 2021, after a detention hearing at which the government sought detention on dangerousness grounds based primarily on the nature and circumstances of the offense, and at which the defense proffered the testimony of numerous friends and family of the defendant, both through letters and defense proffer via videoconference, the defendant was ordered detained.   The magistrate judge based her decision on "the nature and circumstances of the offenses charged," "the nature and seriousness of the danger to the community posed by Mr. Grider's release," the "strong" weight of the evidence, and the "lengthy period of incarceration" Grider would be subjected to if convicted:

> In particular … there is extremely strong evidence that Mr. Grider was a leading participant in the offenses charged inside the United States Capitol Building on January 6, 2021.   There is evidence that Mr. Grider supplied the helmet used to break glass in the doors leading into the Speaker's Lobby, and personally pushed and kicked those doors. A third party, Ashli Babbitt, then was fatally shot as she attempted to enter…. Had Mr. Grider succeeded in his alleged attempts to breach the entrance leading to the House Chamber, the tragedy could have been far greater.

That day, the defendant filed a motion to reopen the detention hearing, primarily taking issue with the words "leading participant."   The motion stated that after the detention hearing, defense counsel located on YouTube the open-source video from which screenshots were pasted into the affidavit supporting the complaint.   The motion highlighted various timestamps where the defendant appeared to be having conversations rather than yelling, shouting, waving his arms,

12

or using any physical force against anyone and claimed that he pushed the Speaker's Lobby door "not in a manner that would appear that he was truly trying to break it open, but simply to see whether it was secure or not."

On January 28, 2021, the magistrate judge denied the motion, holding that to the extent the motion cited information that could be considered "not known" at the time of the detention hearing, it had "no material bearing" on the Court's detention analysis.   The judge stated that even as the defendant disputed "how forcefully" he pushed on the Speaker's Lobby doors, the defendant did not deny "enter[ing] the United States Capitol Building on January 6, 2021, as Congress convened in Joint Session to affirm the Electoral College vote in the 2020 Presidential Election; progress[ing] inside the Capitol Building to the doors of the Speaker's Lobby; suppl[ying] the helmet used to break glass in the doors leading into the Speaker's Lobby; or push[ing] on those doors."   There remained "extremely strong evidence that Mr. Grider participated at the forefront in the events that led to the fatal shooting inside the Capitol Building on January 6, 2021."

On February 1, the defendant filed a second motion to reopen the detention hearing. Citing photographs and videos from the defendant's own computer – described as backups to those on his phone, which was seized during Grider's arrest – the defendant claimed that his counsel had found "new, additional evidence" that the defendant "wanted his voice to be heard and nothing more."   In particular, defense counsel described footage of defendant making a "non-forcible entry" into the Capitol Building; of the defendant telling the officers by the Speaker's Lobby that "People are going to get crushed on that other side if they don't open that door," apparently referring to the mobbed entrance of the House Chambers; and of the defendant having his back when Babbitt is shot.

On February 8, 2021, the magistrate judge denied the second motion to reopen, holding that the proper course would be to seek review in the District of Columbia under 18 U.S.C. § 3145, where all future proceedings should take place; she therefore had no need to resolve whether his arguments even met the threshold for reopening a hearing.

## **ARGUMENT**

### **Applicable Statutory Authority**

A judicial officer may detain a defendant pending trial upon government motion in a case that, as here, involves a crime of violence. 18 U.S.C. § 3142(f)(1)(A).   The term "crime of violence" means, among other things, "any . . . offense that is a felony and that, by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense." 18 U.S.C. § 16(b).   Committing a violation of 18 U.S.C. § 1361 (Destruction of Government Property over $1,000), particularly with the dangerous weapon of a helmet, makes this case one that involves a crime of violence.

The government's ultimate burden is to show that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).   In determining whether the burden is met, this Court considers four factors: (1) the nature and circumstances of the offense charged, including whether, for example, the offense is a crime of violence; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release.   18 U.S.C. § 3142(g).

The defendant seeks revocation of the detention order issued by the arresting jurisdiction

pursuant to 18 U.S.C. § 3145(b), while the government seeks continued detention pursuant to 18 U.S.C. § 3142(f)(1).   This Court determines *de novo* whether the ultimate determination in § 3142(e)(1) is warranted.   *United States v. Hunt*, 240 F. Supp. 3d 128, 132 (D.D.C. 2017).

## Analysis

### I.      The order of the magistrate judge is not "invalid" "on its face."

The defendant "submits that Judge Hightower's order on its face was invalid" based on *United States v. Gibson*, 384 F. Supp. 3d 955 (N.D. Ind. 2019), which he suggests indicates that detention cannot be based solely on the determination that "no condition or combination of conditions will reasonably assure the safety of any other person and the community."    Deft's Mot. at 12.   That misreads *Gibson*.   *Gibson* described as an "unresolved issue" whether, when "the government has moved to detain [the defendant] *only because the (f)(2) predicate of serious risk of flight was met* … a judge may detain a defendant *in such a case* solely because the defendant is such a danger to the community that no conditions can reasonably assure public safety."    384 F. Supp. 3d at 960 (emphasis added); *see also id.* ("That is, after holding a detention hearing *on the basis that the defendant is a serious risk of flight*, if a judge is convinced that the government has not met its burden of showing that there is no conditions or combination of conditions that can reasonably assure the defendant's appearance as required, is that the end of the analysis, or is the judge to move on to consider danger to the community as the sole reason to detain the defendant pending trial?") (emphasis added).

That issue is not present here, where the government sought detention on dangerousness grounds – not risk of flight.   *Gibson* and the opinions it discusses thus have no bearing on this case, and do not remotely render the magistrate judge's finding that no combination of conditions

can reasonably assure the safety of the community "invalid" "on its face."

    **II.**    **The § 3145(g) factors, and particularly the nature and circumstances of the offense, favor detention.**

    The magistrate judge's finding that no condition or combination of conditions will reasonably assure the safety of the community was not only facially valid, but appropriate.   A weighing of the factors enumerated in 18 U.S.C. § 3145(g) favors detention.

    The defendant's seven-count indictment include a felony count of destruction of government property – a crime of violence – based on the destruction of the glass-paned doors to the Speaker's Lobby, carrying a 10-year maximum penalty.   It also includes a charge for obstruction of an official proceeding, which carries a 20-year maximum penalty.   As the magistrate judge recounted, "[t]here is evidence that Mr. Grider supplied the helmet used to break glass in the doors leading into the Speaker's Lobby, and personally pushed and kicked those doors"; that "[a] third party, Ashli Babbitt, then was fatally shot as she attempted to enter"; and that "[h]ad Mr. Grider succeeded in his alleged attempts to breach the entrance leading to the House Chamber, the tragedy could have been far greater."   Det. Order at 2.

    Those reasons underscoring what she deemed the extremely serious "nature and circumstances" of the defendant's charged offenses remain compelling.   As the magistrate judge wrote in rejecting the defendant's motion to reopen, even the defendant's claim that he pushed the door "not in a manner that would appear that he was truly trying to break it open, but *simply to see whether it was secure or not*" amounted to "strong evidence of his attempt to breach the House Chamber."   Order Denying Mot. to Reopen at 3 (emphasis in original).   So too with the defendant's recent invocation of a personal video on which he is warning the officers by the Speaker's Lobby doorway that "People are going to get crushed on that other side if they don't

16

open that door," referring to the other entrance to the House Chamber where he had just been gathered with another mob; those statements likewise only reinforce the defendant's alleged efforts to obstruct and gain entry into the House Chamber.

The defendant's motion suggests that screenshots are only "limited bits of evidence" that do not give the broader context.   Deft's Mot. at 15.   Context is surely instructive, and here the defendant's efforts to paint his actions by the Speaker's Lobby as innocuous falter because they are divorced from context: the yelling, gesticulating mob that he was at the front of; the mob's sustained efforts to breach a guarded, visibly barricaded entrance in close proximity to the House Chamber; the mob's cursing and cries of "Fuck the blue!" directed at the Capitol Police officers responsible for guarding the doorway; and the violent attack on government property that occurred before the defendant's eyes and with his facilitation.

The context, moreover, shows that the defendant was one of the very first individuals to approach the Speaker's Lobby door, and that he remained near the front of the mob, right by the doors, until seconds before Babbitt's shooting:   He was there near the front as a young male with a fur-lined hat shattered the doors with his bare fists.   He was there as that same male yelled and gestured aggressively at an officer.   He was there when he chose to bestow his helmet on that same male and visibly tapped on the helmet, appearing to signify that it was hard.   He was there when the three officers moved away from their posts, and indeed rushed immediately in to push the door, appearing to be the first in the crowd to make contact.   And he was still there, near the front, as the young male resumed smashing the glass with added force and weaponization of the defendant's helmet, and as another male rammed the glass repeatedly with a flagpole.   It appears to have only been after the screams of a "gun" that the defendant finally turned away.   The

17

defendant notes that his back was turned as Babbitt began climbing as proof that his "true intentions were[] to get out of an escalating situation."   But those "true intentions" manifested only seconds before the shooting.   For much of the "escalating situation" at the Speaker's Lobby doorway, the defendant had a front row view and used that opportunity to actively participate.

What preceded the scene at the Speaker's Lobby provides additional disturbing context to the defendant's actions.   Prior to racing to the Speaker's Lobby doorway, the defendant was in the midst of yet another mob that was trying to breach yet another entrance to the House Chamber. That raucous, yelling crowd similarly chanted "Break it down!" and "Stop the steal!" as they sought to get into the House Chamber.   In the midst of this crowd, the defendant was also seen raising up his helmet.   At one point, when the crowd seemed to think the officers by that door would vacate their posts and allow them in, the defendant was seen telling the people, "The cops are leaving, the cops are leaving," and, when asked by someone, "They're giving us the building?!" he nodded.   According to the defendant's statements in his own video, moreover, he warned other officers of dire consequences if the officers did not "open that door."   Ultimately, large numbers of that crowd began streaming toward the Speaker's Lobby instead, and the defendant was among the first.   Having been thwarted from entering one entrance to the House Chamber, he was seen racing down the hallway, becoming one of the first to reach the alternate entrance of the Speaker's Lobby.

At bottom, strong evidence from the video footage of the defendant's own recorded actions reinforces the grave nature and circumstances of the offense.   The defendant has also conceded many of his actions, even as he disputes the degree of force used.   The defendant characterizes evidence his counsel discovered subsequent to the detention hearing—open-source video that

counsel found through a YouTube search and a video from the defendant's own computer—as "exculpatory." Deft's Mot. at 15. But as noted, the video from the defendant's own computer arguably only reinforces the evidence of the defendant's obstruction and intent to gain entry into the House Chamber. And the defendant's other snippets of video seek to highlight worse behavior by others or moments when he himself was not belligerent or engaged in violence, but they do not detract from the clear evidence of the actions he did undertake – much less exculpate him of the offenses with which he has been charged.

As the magistrate judge reasonably found, those actions support a finding that the defendant poses a danger to other persons or the community if released. The defendant's willingness to arm a manifestly violent individual in an aggressive mob with a dangerous weapon, a helmet – rendering the destruction being wrought around him all the more violent and dangerous – should give this Court concern about the threat he is capable of posing. The defendant was not a peacemaker who sought to convince others rioters in the U.S. Capitol to back away. The evidence indicates that he illegally entered the Capitol Building, joined more than one mob, facilitated the violence, documented for himself on his own phone what was happening as he went along, and – that same night – courted publicity by offering his footage and giving a self-serving interview in which he minimized his own role.

As for the defendant's history and characteristics, the government recognizes that the defendant has minimal criminal history as detailed in the defendant's motion and that he has numerous individuals who have vouched for his character. That said, it is worth noting that although the defendant now states that he "deeply regrets what took place on that tragic day," Deft's Mot. at 16, he expressed no such remorse when he chose to go on television on January 6,

2021, couching himself as a protector of monuments and glossing over his active participation in the day's tragic chain of events.   That the defendant, when contacted by law enforcement, promptly instructed his wife to get rid of evidence of his clothing from January 6, 2021, further casts doubt on his characteristics of compliance.

On balance, the government respectfully submits that a weighing of the four factors of 18 U.S.C. § 3145(g) – and in particular, the nature and circumstances of the defendant's offense and strength of the evidence – favors continued detention.

### III.       The defendant's representations of asthma do not warrant release.

Finally, the defendant's motion asserts that "the current health crisis resulting from the COVID-19 virus and its variants, combined with his personal health condition of suffering from asthma, require this Court to strongly consider and order his release."   Deft's Mot. at 19.   The defendant's representations do not so alter the consideration of his history and characteristics under 18 U.S.C. § 3142(g)(3) as to change the detention analysis and warrant his release.

The defendant cites CDC guidance that people with moderate to severe asthma have a high risk of getting very sick from COVID-19.   But the defendant has not even asserted, much less established, that the defendant has "moderate to severe asthma."   *See United States v. Riggins*, 456 F.Supp.3d 138, 146 (D.D.C. 2020) (denying release from pre-trial detention because, *inter alia*, Riggins failed to show that he had moderate to severe asthma or "even that he is experiencing asthma currently" and there was thus little evidence to demonstrate a higher risk for getting severely ill if he contracts COVID-19); *United States v. Demirtas*, 2020 WL 3489475, *2 (D.D.C. Jun. 25, 2020) (noting it is an "open question" as to whether "asthma and allergies, standing alone, place people at a higher risk of severe illness or death resulting from COVID-19," and noting that

20

defendant had not "carried his burden of establishing that his asthma is moderate to severe"); *United States v. Wheeler*, 2020 WL 2801289, *3 (D.D.C. May 29, 2020) (noting that the CDC only recognizes "moderate-to-severe" asthma as placing individuals at a higher risk for severe illness due to COVID-19, and a number of district courts have denied release when a defendant's asthma was mild").

Meanwhile, the defendant is 39 years old.   The defendant has not cited any other medical conditions that might make him unusually vulnerable to COVID-19.   Nor has he indicated that he has been unable to manage his condition with the medication he has, even as he states that he has not been provided with "at least a 30-day supply."   Deft's Mot. at 19.   In short, the defendant's representations about his asthma do not materially alter the analysis of the factors under 18 U.S.C. § 3145(g).

## <u>CONCLUSION</u>

WHEREFORE, the United States respectfully requests that the Court deny the defendant's

motion for revocation and grant the government's motion to detain the defendant pending trial.

Respectfully submitted,

Michael R. Sherwin

Acting United States Attorney
New York Bar No. 4444188

By: _____
     Candice C. Wong
     DC Bar No. 990903
     Candice.wong@usdoj.gov
     Assistant United States Attorney
     555 4th Street, N.W.
     Washington, D.C. 20530
     (202) 252-7849

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 16, 2021, I caused a copy of the foregoing motion to be served on counsel of record via electronic filing.

*   /s/ Candice C. Wong*
CANDICE C. WONG
Assistant United States Attorney
