## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **v.** | § | **Case No. 21-CR-00022-KBJ** |
| | § | |
| | § | |
| **CHRISTOPHER RAY GRIDER,** | § | |
| | § | |
| **Defendant** | § | |

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION TO REVOKE DETENTION ORDER

TO THE HONORABLE KETANJI BROWN JACKSON, UNITED STATES DIS-TRICT COURT JUDGE FOR THE DISTRICT OF COLUMBIA:

COMES NOW CHRISTOPHER RAY GRIDER, the Defendant in the above styled and numbered cause, by and through undersigned counsel, and submits the following memorandum in support of his Motion to Revoke Detention Order filed with this Court on February 11, 2021. (Doc. No. 10).

### *Introduction and Question Presented*

The question presented here is whether the Government has proven clearly and convincingly, based *solely* on Mr. Grider's actions at the United States Capitol Building on January 6, 2021, that he is such a danger to the community that there are no condition or combination of conditions to ensure the safety of the community. Let there be no mistake about it: the Government has not presented (nor can it present) a single piece of evidence to show that anything about Mr. Grider before or after that fateful day even raises a suspicion that he might be a danger to the community.

Let there also be no mistake that the Government has not presented (nor can it present) a single piece of evidence to show that Mr. Grider planned his actions at the Capitol Building, or that he rejoiced and continued to threaten violence thereafter. The evidence presented to the magistrate and this Court shows the exact opposite.

This Court must ask itself: if the FBI or other law enforcement agencies *really* believed that Mr. Grider was such a danger to the community, why did they not go out and arrest him immediately? As the Government points out in their memorandum, Mr. Grider's presence at the Capitol was made known immediately thereafter when he voluntarily participated in an interview with a local television station in nearby Waco. Law enforcement, by the Government's own admission, confirmed this days later on January 9, 2021.[1] The following day, Mr. Grider's previous counsel was communicating with the United States Attorney's Office for the District of Columbia regarding Mr. Grider's involvement in the January 6 incident at the Capitol.[2] More than 10 days passed before federal agents contacted Mr. Grider. Did they show up at his home in Chilton, Texas in SWAT gear with assault weapons drawn? No. Did they make forced entry into his home to arrest him in the middle of the night? No. What did they do? They called him up and asked him to come to Austin, Texas. And that is exactly what Mr. Grider did.

All of this speaks volumes — and more importantly, the truth — about how

---

[1] Gov't Memorandum in Opposition to Defendant's Motion to Revoke Detention Order [hereafter Gov't Memo] at 2–3.

[2] *See* Confidential Memorandum in Support of Pretrial Release, Doc. No. 12 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div., *filed under seal*, at 1–2.

Mr. Grider is not a danger to the community. It is precisely why the Pretrial Services Officer who investigated this case recommended that Mr. Grider be released on an unsecured bond with standard conditions of release. It is precisely why this Court should find that the Government failed to meet its burden.

### Application of Section 3141

As Mr. Grider laid out in his Motion to Revoke the Detention Order — and as this Court has recognized — "it is clear beyond cavil that, before a guilty plea or conviction, 'liberty is the norm and detention prior to trial or without trial is the carefully limited exception.'"[3] To say there are "carefully limited exceptions" is an understatement. As the Supreme Court pointed out *twice* in *Salerno*, "The Bail Reform Act carefully limits the circumstances under which detention may be sought to the most serious of crimes,"[4] "a specific category of *extremely serious offenses*."[5]

Mr. Grider is not charged with any of these enumerated "extremely serious offenses."[6] On the contrary, in five of the seven counts against him, he is charged with

---

[3] *United States v. Wiggins*, No. 19-CR-258-KBJ, 2020 WL 1868891, at *3 (D.D.C. Apr. 10, 2020)(quoting *United States v. Salerno*, 481 U.S. 739, 755, 107 S. Ct. 2095, 95 L. Ed. 2d 697 (1987)).

[4] *Salerno*, 481 U.S. at 747, 107 S. Ct. at 2101.

[5] *Id.* at 747, 107 S. Ct. at 2101.

[6] *See* 18 U.S.C. § 3141(f)(1) (West 2020). Although the Government did not move for detention on this basis, in its Memorandum, for the first time, the Government maintains that this case involves a "crime of violence," namely, the allegation against Mr. Grider that he committed the offense of Destruction of Government Property over $1,000 in violation of 18 U.S.C. § 1361. *Cf.* Doc. No. 2 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div.(Government's Motion for Detention) and Gov't Memo at 14. To support this position, the Government cites to the definition of "crime of violence" laid out in 18 U.S.C. § 16(b) and then, without authority, argues that this offense meets this definition. *See* Gov't Memo at 14. This definition of "crime of violence," however, has been declared as unconstitutionally vague by the Supreme Court and Mr. Grider maintains that this Court should not consider Section 3141(f)(1)'s application here. *See Sessions v. Dimaya*,___ U.S.___, 138 S. Ct. 1204, 1216, 200 L. Ed. 2d 549 (2018).

only misdemeanors. In one of the remaining two counts, he is alleged to have destroyed government property over $1,000 and aided and abetted the commission of that offense. While the offense is punishable by up to 10 years in prison, the Sentencing Guidelines prescribe a base offense level of 6, which, with Mr. Grider's limited criminal history, places him in the 0–6 month sentencing range.[7] In the other count against him, Mr. Grider is charged generally with obstruction of an official proceeding, namely Congressional proceedings, and aiding and abetting the commission of that offense. While that offense is punishable by up to 20 years in prison, the Sentencing Guidelines prescribe a base offense level of 14 which, with Mr. Grider's limited criminal history, places him in the 15–21 month sentencing range.[8] In short, none of the alleged offenses could be considered to fall within that category of offenses deemed to be "extremely serious."

The Government's motion to detain, in fact, did not move to detain Mr. Grider under any of the grounds set out in Section 3142(f). Instead, their motion simply alleged that there were no condition or combination of conditions that would reasonably assure the appearance of the person as required and the safety of any other person and the community.[9] As Mr. Grider set out in his Motion to Revoke Detention Order, this is not a permissible basis for detention based on the cases cited therein and Mr.

---

[7] *See* 18 U.S.C. § 1361 (West 2020); U.S.S.G. § 2B1.1.

[8] *See* 18 U.S.C. § 1512(c) (West 2020); U.S.S.G. § 2J1.2.

[9] *See* Doc. No. 2 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div.(Government's Motion for Detention); 18 U.S.C. § 3142(e)(1) (West 2020).

Grider maintains that he should be released on that basis alone.[10]

However, even if this Court chooses to apply the factors set out in Section 3142(g) for making such a determination, a careful and thorough inspection of the evidence presented here establishes that all these factors weigh in favor of Mr. Grider and require his release.

### Nature and Circumstances of the Offense Charged

There are two ways to look at the nature and circumstances of the offense charged. This Court can rely on the Government's *interpretation* of the limited bits and pieces of the puzzle that it chose to present to the magistrate and chooses to present to this Court. Or this Court can see and hear with its own eyes and ears everything that took place when Mr. Grider approached the Speaker's Lobby door on the multiple videos showing what took place, including his own video located by clicking on this link: https://app.box.com/s/1efe2q4mloibgpbhjrzqb48bnjxvrci2. While he regrets being inside the Capitol Building, Mr. Grider has no reservations about allowing this Court to see his video. It shows the truth about what happened and, more importantly, shows that his actions were not consistent with someone who wanted to inflict harm, breach the chamber doors, or otherwise engage in violence.

The video begins with Mr. Grider walking up to the Speaker's Lobby door along with a few other people. In their Memorandum at Page 7, the Government states the following:

- "*Members of the crowd were shouting and gesticulating at the officers*." As the

---

[10] Doc. No. 10 at 12–13.

video shows, Mr. Grider is *not* shouting nor is he "gesticulating at the officers." To the contrary, he is genuinely pleading with the officers to take some action to help people that are being crushed in the large crowds, including other officers. Listen to it. It is clear as day on the video.

- "*A young male wearing a fur-lined hat was observed repeatedly punching the glass panels of the doors immediately behind the officers with his fists, causing the glass to splinter*."[11] Mr. Grider's video, nor any of the open-source (aka YouTube) videos show Mr. Grider "repeatedly punching the glass panels" there or anywhere else in Capitol Building.

- "*While throwing two of the punches, that male pushed his body up against one of the Capitol Police officers guarding the door.*" Mr. Grider, on the other hand, was never seen in his videos or any other open-source videos placing his hands on *any* officer in an offensive or assaultive manner anywhere in the Capitol Building.

---

[11] This male has been identified as Zachary Alam who has been charged under case 21-mj-165, arrested, and detained in the Eastern District of Pennsylvania. *See* Case No. 2021-mj-00196 in the United States District Court for the Eastern District of Pennsylvania. Per his complaint, Mr. Alam is in a distinctly different position than Mr. Grider. While he is charged with the same offenses as Mr. Grider, he is also charged with assault on an officer with a deadly or dangerous weapon in violation of 18 U.S.C. § 111(a) and (b). *See* Doc. No. 1 in Case No. 21-mj-165. Also distinctly different are the facts that (1) Alam entered the Capitol Building through a broken window, (2) engaged in the acts described above, and (3) after the incident, concealed his whereabouts by using a different telephone number to contact family members, failing to reveal his location to a family member, and telling that family member that "he was not going to turn himself into authorities because he did not want to go to jail again." *See id.* at 5–14. Also worth noting about Mr. Alam's case: in the sworn complaint of the federal agent in that case, the agent states that Alam "*took* a black-colored helmet from an individual with a yellow 'Don't tread on me' flag"; that is far different from what the Government maintains here, arguing that Mr. Grider gave the helmet to Alam, somehow facilitating Alam's independent acts of violence. *See id.* at 6 (emphasis added).

- "*That male was also observed shouting and pointing aggressively at the officers.*" Mr. Grider, however, is never seen nor heard shouting and pointing at the officers in any aggressive manner.

- "*Grider was then observed handing a black helmet to the male and speaking to him. The defendant appeared to knock on the top of the helmet, signifying that it was a hard instrument, and the young male accepted it*." Critically lacking is any evidence that Mr. Grider ever instructed or directed the male to use the helmet to break the door or the windows. Nor is there any evidence that the male told Mr. Grider that he wanted to break the door or the windows with the helmet. Although eventually no video images are captured on Mr. Grider's video, the audio is still recording and never once does it capture any incriminating statements.

- "*Additional officers in riot gear arrived behind the crowd at the Speaker's Lobby doors, and the three officers guarding the door appeared to move to the adjacent wall*." This is where the video located at https://youtu.be/AZ9oThRuMVs shows exactly what Mr. Grider did. At 38 seconds into the video, Mr. Grider, draped in a yellow flag, is seen turning away from the door and trying to follow officers away from the door. Four seconds later, as he is still trying to move away from the door, the person who is presumably Ashli Babbitt is seen trying to climb through the broken windows where she was ultimately shot. He was not seen conversing with her, pushing her, or doing anything to aid or abet her actions.

Later in their Memorandum, the Government points to what "the mob" or "others"

were doing, but never can specifically point to something Mr. Grider himself is doing:

> Context is surely instructive, and here the defendant's efforts to paint his actions by the Speaker's Lobby as innocuous falter because they are divorced from context: *the yelling, gesticulating mob that he was at the front of*; *the mob's sustained efforts to breach a guarded, visibly barricaded entrance in close proximity to the House Chamber*; *the mob's cursing and cries of "Fuck the blue!" directed at the Capitol Police officers responsible for guarding the doorway*; and *the violent attack on government property that occurred before the defendant's eyes and with his facilitation*.[12]

Again, all the videos show that Mr. Grider was not yelling, not gesticulating, nor ever participating in a "sustained effort" to breach the lobby door. Never once in these or any other videos is Mr. Grider heard shouting "Fuck the blue!" at any police officers.[13]

While Mr. Grider may have witnessed a "violent attack on government property" with his own eyes, the evidence shows that he was not part of that effort. And, while there were certainly others there who were focused on doing harm and committing violence, there is nothing to show that Mr. Grider had that intent. That leads to consideration of the second factor in this analysis.

### The Weight of the Evidence Against Mr. Grider

Mr. Grider concedes that there is an abundant amount of evidence created of his own volition that can and will be used against him before this Court. From his

---

[12] Gov't Memo at 17 (emphasis added).

[13] This is consistent with him having worked as a military police officer and having supported local law enforcement in the community where he lives as reflected in the Pretrial Services Report and his Memorandum in Support of Pretrial Release submitted to the magistrate. *See* Confidential Memorandum in Support of Pretrial Release, Doc. No. 12 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div., *filed under seal*, Exhibit A.

videos and statements to the multiple other open-source videos, it goes without saying that there is absolutely no doubt that he entered the Capitol Building on January 6, 2021.

Where the magistrate and the Government erred, however, is leaping to the conclusion that, just because there is video evidence to show Mr. Grider inside the Capitol Building, this equates to "extremely strong evidence" to show that Mr. Grider was a leading participant in the offenses charged or, more importantly, intended to commit the alleged offenses. What the videos do *not* show entirely is what was going through Mr. Grider's mind on that tumultuous day, what his subjective intent was, and what his objectives were inside of the Capitol.

There is still much to be uncovered regarding this critical element of the offenses. As has been stated repeatedly, there is no evidence that Mr. Grider traveled to Washington, D.C. intending to participate in a riot or insurrection, much less commit a criminal or violent act, unlike several others who have been charged for their actions on January 6. As Mr. Grider showed through the proffered testimony of Rissa Shaw, the reporter who interviewed Mr. Grider and reported on his entry into the Capitol, as she spoke to Mr. Grider to prepare her story, he was clear, calm, and, most importantly, she "did not at any point ever think that he was a threat to anyone" or "engaged in any violent acts." DH at 14. She would have testified that "there was never any indication of him acting maniacally or espousing radical views, or anything of the sort." DH at 14.

As stated in his Motion to Revoke Detention Order, Mr. Grider is not a member

of the Three Percenters, Proud Boys, Oath Keepers or any other right-wing extremist group. He does not subscribe to the beliefs of QAnon or other conspiracy theories related to the government.

The weight of the evidence at this point in time simply shows Mr. Grider, like thousands of others, entered the Capitol Building on January 6, 2021. Every other action by him prior to and after that fateful day proves he is not a violent person who went there with the intent to commit violent acts or developed the intent to commit violent acts. This leads to the third factor in this analysis.

### *The History — and Incredible Characteristics of Christopher Grider*

The Government is absolutely right about one thing: Mr. Grider has "minimal criminal history" and "has numerous individuals who have vouched for his character." But that is still a massive understatement.

Christopher Grider grew up "as an obedient son."[14] As the oldest sibling of three younger siblings, he "could be trusted to care, tend, and be sure they were content." One of his sisters noted that, while growing up, she watched her "brother be completely dedicated to whatever job he had at the time," sometimes working multiple jobs to help support his family. Another sister recounted that his "whole childhood and young adult life was committed to serving his country." As his father recalled, Chris joined the Civil Air Patrol while in high school and eventually enlisted in the Army National Guard.

---

[14] Letter from Dana Barry to Judge Hightower, included in Exhibit A to Confidential Memorandum in Support of Pretrial Release, Doc. No. 12 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div., *filed under seal*. All facts conveyed in the following paragraphs come from the additional letters submitted and admitted as Exhibit A.

Chris' love and passion also extended — and continues to extend — to his wife, Crystal. The two of them were high school sweethearts and married when Crystal was a freshman at Texas A&M University. As Crystal suffers from significant hearing loss, she has to read lips to help her understand people speaking. Despite this disability, the love shared between the two was and still is unconditional.

In 2001, Chris switched over from the Army National Guard to the Air Force where he became involved in security forces as a military police officer. After he was honorably discharged, he returned to Dallas where he obtained employment as a loss prevention officer for the Neiman Marcus department store in downtown Dallas. He also worked part-time along with Crystal who worked full-time for another business in downtown Dallas. While working these two jobs, Chris also managed to attend school at Dallas Baptist University and earn a degree in teaching.

In 2008, Chris began his career as a teacher in the Dallas Independent School District before moving to the nearby McKinney Independent School District. During this time, his family grew with the birth of two of his sons. Despite his many obligations, he continued to maintain close relationships with his family and friends and help them in times of need.

One of his best friends' wife recounted how, when they were first married, they struggled financially, but Chris and Crystal were there to help them with their homemade wedding. She also recounted how when, in 2008, their first son tragically passed away in the NICU, Chris and Crystal were one of the few friends to go be with them and support them through their difficult times. As she recalled, "Chris was so moved

by our loss [that] he painted an art piece for us to remember the life we had lost," a painting which, to this day, still hangs in her office.

Chris' aunt, who accounted for Chris treating "others with equity, not putting himself above other," shared her experience when her ex-husband left her with her three daughters. As she explained, "Christopher welcomed us to his home for shelter until I could get back on my feet," including helping one of her daughter's who has special needs. She noted that Chris was "very accommodating, loving, and non-partial."

Chris also put his passion into teaching. As his sister recalled, she could "remember him telling [her] stories of how he would encourage his students to be their best and to help others with problems. He took the time to seat them in ways that were beneficial to the child's individual psyche and gave each student individual time when needed."

Chris' passion for teaching ultimately led him to return to school, enrolling in the University of Texas at Dallas's Masters in Fine Arts program where he was a "serious and dedicated student" and whose art pieces were recognized as "very compelling."

Right about the time he graduated from that program in 2012, Chris, Crystal, and their boys moved to Central Texas near Chilton, Texas to live on Crystal's grandfather's farm after he passed away. Chris continued teaching at a nearby school district where one fellow educator noted

how in tune Chris was with students from diverse backgrounds with a wide variety of artistic and academic abilities. He worked well with students in our program and especially those with the most profound disabilities which were able to attend his art class as one of just a few classes they could participate in as a mainstreamed student while being escorted by a paraprofessional. Chris loved introducing new ideas to our students. He inherited an art program based on basic drawings and transformed it into one of drawing, painting, sculpture, and photography. He allowed students to push their own comfort zones by using art as a format to express themselves, struggles of past generations, and hopes for the future. Chris single-handedly secured funds and planned a trip for our students to visit The Art Museum of Dallas.

Despite this passion and talent for teaching, however, the move back to Chilton created a new fire within Chris.

While living in Dallas, Chris and Crystal had worked at a winery and both developed a love, passion, and dream of opening a winery of their own one day. When the opportunity came for them to move back to the family farm in Chilton, that dream started to become a reality.

When Chris and Crystal first visited the farm shortly after they started dating in high school, they went out on the property, found a large hackberry tree that they climbed up into, and shared their first kiss. That tree came to be known to them as the "Kissing Tree." Hence, years later when they returned to the property as a married couple with a family, the tree would serve as the inspiration for their new company: Kissing Tree Winery. The two of them started from scratch, planting a vineyard on the farm property and eventually occupying several buildings in the tiny town of Bruceville-Eddy located on Interstate 35 just south of Waco.

The project became a full-time endeavor for Chris and so, in 2016, he left his teaching position and committed himself fully to getting Kissing Tree off the ground.

Nevertheless, as one teacher recalled, Chris "continued to play a vital role in the lives of several young men" at a local high school, employing them to work at the vineyard in rural Falls County. As she explained, "Knowing these teenagers did not have cars or an adult willing to bring them out, [Chris] would drive to Waco (approximately 30 miles) each morning to pick them up, guide them through hard labor work during the day, feed them lunch and return them to Waco each evening, often making sure they made it back in time for summer workouts with the football team."

As Chris grew the winery, the positive impact was felt by many in the local community. Chris began hiring many people in and around the area from all backgrounds and races, veterans, and people needing a second chance. When one friend lost their job in 2016 due to downsizing, Chris offered him a job as a "jack of all trades" at the winery for several weeks until he could get back on his feet. Over time, Chris developed a "great reputation in the community as a good employer who is honest, generous, and understanding" and helped revitalize the local economy. Employees saw him as a good boss who was "respectful and as accommodating as possible to any needs [they] may have." In the tasting room in Bruceville-Eddy, Chris proved to be a savvy entrepreneur, interacting with customers, getting to know them on a personal level, and making sure everyone left the store happy.

By 2020, the winery grew into such a successful enterprise that Chris and Crystal took the opportunity to launch their "expansion project," the Taste by Kissing Tree Winery steakhouse in downtown Waco. Just as the restaurant was getting off to

a successful start and showing promise, the COVID-19 pandemic hit, effective shutting the new business down.

Chris, however, continued to work hard to support his family, his community, and keep the winery running.

In short, absolutely nothing about Mr. Grider's history or characteristics demonstrate in the remotest sense that he a danger to the community. This leads to the final, and apparently overlooked factor.

### Nature and Seriousness of the Danger Posed by Mr. Grider's Release

What the Government has not — and cannot — point to is the nature and seriousness of the danger to any person or the community that would be posed by Mr. Grider's release. Again, as proof positive of this, this Court simply needs to look at the actions of law enforcement officials once they knew about Mr. Grider's participation in the events of January 6 at the Capitol. No one went running to arrest him. SWAT teams did not immediately descend on his farm to detain him. What did they do instead? They called him up and allowed him to drive to Austin days later to surrender himself.

Although not presented to the magistrate, Mr. Grider would proffer that he never considered himself to be politically active until recently as he became enamored with then-President Donald Trump. He eventually bought himself "Trump flags" and attended two campaign rallies where Trump himself spoke. As his brother-in-law (himself a self-proclaimed "liberal") described it, Mr. Grider came to "idolize" Trump.

Mr. Grider was undeniably disappointed when Trump lost the presidential

election. In terms of the narrative being pushed by Trump that the election was "stolen," Chris' position was "maybe it was, maybe it wasn't"; what really concerned him was the "nothing-to-see here attitude" being taken by elected officials.[15]

Noticeably absent in Mr. Grider's case — but seen in several other cases involving individuals detained for their involvement of the events of January 6 at the Capitol — is any efforts by him planning for a riot, insurrection, or other unlawful or violent activities in Washington or anywhere else for that matter.

Mr. Grider's decision to travel to Washington, D.C. was literally a "last-minute" decision between he and a friend. With his wife taking a "girls vacation" toward the end of January, he and his friend saw this as their "guys' trip." The plan was to fly into Washington, attend the rally, have a nice dinner at a steakhouse afterward, spend the night, and return to Texas the following day. When he arrived at Trump's rally, he became overwhelmed by the excitement and the crowds present as he stood at the back of the crowd. When Trump told the massive crowd that he wanted them to "march down Pennsylvania Avenue" to the Capitol and that he was going to join the crowd, Mr. Grider was shocked and surprised. He had no idea the event would move there. The next thing he knew, he was moving toward the Capitol with the rest of the crowd.

After leaving the Capitol, he was stunned by what he had seen happen. Contrary to the Government's reference in their memorandum that "he expressed no such remorse when he chose to go on television" later that day, as the reporter who spoke

---

[15] *See* Exhibit B for DH.

with him and reported his story recounted, Mr. Grider felt "a need to report what was going on" and was shocked to see a woman get killed in front of him.[16] Again, noticeably absent is any reporting or discovery of social media posts, electronic communications, or any other evidence where Mr. Grider was threatening to commit any further acts of violence against anyone or anything.

While the Government brings up for the first time that Chris told his wife to "get rid of his Trump things" after his trip to Washington, D.C., insinuating that it "casts doubts on his characteristics of compliance," once again, the Government is only presenting bits and pieces of the story to fit its narrative and, worse, creating what it should know to be a false narrative.

As recounted *supra*, as soon as January 10, a previous attorney for Mr. Grider had already made contact with the United States Attorney's Office for the District of Columbia and indicated to them that Mr. Grider wanted to discuss his involvement in the events of January 6 at the Capitol. There was nothing to hide because it was already publicized that he was there. Because his story had been published in the media four days prior, public opinion was mounting against him and the winery and several people had posted threatening messages on social media. Any attempts to move clothing or other items were done out of concern for his and his family's safety and to preserve the evidence. Just as he had backed up the contents of his cell phone to a computer prior to taking it with him when he self-surrendered to federal agents in Austin, he wanted to make sure all other evidence was properly preserved.

---

[16] DH at 14.

When law enforcement executed its search warrant of Mr. Grider's home, his wife, Crystal, made no efforts to conceal the evidence, immediately informing them of the whereabouts of the items they were looking for. The entire time, the agents were cordial and polite with her and there was never any indication given to her that she nor Mr. Grider were attempting to obstruct justice. Consistent with that motive, the neighbor met with and confirmed this to agents.

The bottom line is that there is no evidence to show a danger to any person or the community that would be posed by Mr. Grider's release. On the contrary, more harm is being done to others and the community by keeping him detained.

Mr. Grider's wife is at home having to take care of and support their three children. As several people stated in their letters, Mr. Grider is needed to help keep their business running and employees working. As the winter storm hit Texas over the past week, their home, farm, and business has lost power and water and his wife is struggling to keep farm animals fed and alive all while trying to protect the vineyard and their investment. As the pastor of Mr. Grider's church stated in his letter to the magistrate, "He has a family to take care of and a business to run. He needs to be back at home taking care of his family and working hard to keep his business open."

In conclusion, the Government can speculate all it wants to and spin the evidence to fit their narrative. Mr. Grider simply wants this Court to see and know the truth. He is not a violent person. He is not a danger to the community. He did not travel to Washington, D.C. with the intent to commit any violence or any criminal act. He has not threatened violence since then. He will comply with any conditions of

release set by this Court and appear as required to answer the charges against him.

Mr. Grider respectfully requests this Honorable Court revoke his order of detention and order him to be released on any conditions this Court deems appropriate.

Date: <u>February 11, 2021</u>            Respectfully Submitted,

MAYR LAW, P.C.

by:  <u>/s/ T. Brent Mayr</u>
T. BRENT MAYR
Texas State Bar Number 24037052
bmayr@mayr-law.com

5300 Memorial Dr., Suite 750
Houston, TX 77007
Telephone:  713-808-9613
Fax:  713-808-9613

ATTORNEY FOR THE DEFENDANT,
CHRISTOPHER RAY GRIDER

*Admitted to Appear Pro Hac Vice*

### <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of this memorandum was sent to Counsel for the Government on February 18, 2021, via CM/ECF and email.

<u>/s/ T. Brent Mayr</u>
T. BRENT MAYR