IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

United States of America,      ) Criminal Action
                               ) No. 1:21-cr-00022-KBJ
                Plaintiff,      )
                               )
vs.                            ) **Motion Hearing** (via Zoom)
                               )
Christopher R. Grider,          ) Washington, D.C.
                               ) February 22, 2021
                Defendant.      ) Time:  11:00 a.m.
_____

Transcript of **Motion Hearing** (via Zoom)
Held Before
The Honorable Ketanji Brown Jackson (via Zoom)
United States District Judge

_____

A P P E A R A N C E S

For the Plaintiff:       **Candice Chiu Wong**
(via Zoom)               U.S. ATTORNEY'S OFFICE FOR THE
                         DISTRICT OF COLUMBIA
                         555 Fourth Street, Northwest
                         Washington, D.C.  20530

For the Defendant:       **Brent Mayr**
(via Zoom)               MAYR LAW, P.C.
                         5300 Memorial Drive, Suite 750
                         Houston, Texas 77007

Also Present (via telephone):
                         Christine Schuck, Pretrial Services
                         Officer
_____

Stenographic Official Court Reporter:
(via Zoom)               Nancy J. Meyer
                         Registered Diplomate Reporter
                         Certified Realtime Reporter
                         United States Courthouse, Room 6509
                         333 Constitution Avenue, Northwest
                         Washington, D.C. 20001
                         202-354-3118

1                    P R O C E E D I N G S

2              (REPORTER'S NOTE:  This hearing was held during the
COVID-19 pandemic restrictions and is subject to the

3       limitations of technology associated with the use of
technology, including but not limited to telephone and video

4       signal interference, static, signal interruptions, and other
restrictions and limitations associated with remote court

5       reporting via telephone, speakerphone, and/or
videoconferencing.)

6

7              THE COURTROOM DEPUTY:  Your Honor, this is Criminal

8       Case 21-022, United States of America v. Christopher Grider.

9              Starting with government counsel, I'm going to ask that

10      you please state your appearance for the record.

11             MS. WONG:  Good morning, Your Honor.  Candice Wong

12      for the United States.

13             THE COURT:  Good morning, Ms. Wong.

14             MR. MAYR:  Good morning, Your Honor.  It's a pleasure

15      and an honor to be appearing before you.  My name is Brent

16      Mayr, and I am the attorney for Mr. Grider.

17             THE COURT:  Good morning, Mr. Mayr.  And I see that

18      Mr. Grider is on video.  Mr. Grider, can you hear me?

19             THE DEFENDANT:  Yes, Your Honor.

20             THE COURT:  All right.

21             THE COURT REPORTER:  Judge, can we ask him to mute

22      his microphone until it's time for him to speak?

23             THE COURT:  Mr. Grider, do you have the capacity to

24      mute your video [sic]?  Did they tell you how to do that?  If

25      you can do that, that would be helpful.

1          All right.  Thank you.

2          So as my career clerk mentioned, we are proceeding via

3    videoconference technology in light of the ongoing COVID

4    pandemic.  The Chief Judge of our court has issued a standing

5    order that authorizes the court to use videoconference

6    technology for certain criminal proceedings during the pendency

7    of the courthouse's closure with the consent of the defendant

8    and when further delay would cause serious harm to the

9    interests of justice.

10          Motion hearings, such as this one, are not the type of

11   proceeding that requires defendants to consent, but it is my

12   practice to ask, nevertheless.  So let me ask Mr. Mayr, on

13   behalf of Mr. Grider, whether Mr. Grider consents to proceed by

14   video-teleconference this morning.

15          MR. MAYR:  Your Honor, we do consent to proceed by

16   videoconference.

17          THE COURT:  All right.  And Ms. Wong?

18          MS. WONG:  Yes, Your Honor, the government consents.

19          THE COURT:  All right.  For the record, I do find

20   that it is in the interest of justice to proceed with today's

21   hearing via remote technology for various reasons, including

22   the fact that Mr. Grider is incarcerated and any further delay

23   could result in serious harm to the interests of the defendant

24   and the public.

25          As I may have indicated -- although I did not -- this is

1    a motion hearing in which I am being asked to rule upon the

2    motion that Mr. Grider has filed, which seeks reversal of

3    Magistrate Judge Hightower's detention order in this case.  I

4    have reviewed your briefs and the evidence that has been

5    submitted.  I'm familiar with your arguments, and I'm also

6    prepared to consider whatever additional oral arguments you

7    wish to present here today.

8         So because we are proceeding by video, I think it is

9    most prudent and efficient to allow each side to present its

10   argument for and against the motion.  I may have a few

11   questions, but if you would like to present orally, I think

12   that would be helpful.

13        Mr. Mayr, since this is your motion, would you like to

14   present oral argument on the detention issue?

15             MR. MAYR:  I would, Your Honor.

16             THE COURT:  All right, sir.  You may begin.

17             MR. MAYR:  Thank you, Your Honor.

18        I appreciate and respect the fact that you've reviewed

19   all of the materials that we filed in this case.  There has

20   been an abundant amount, including letters and videos, and I

21   appreciate the time that the Court has taken to review all of

22   that.  In my -- in this time, I would like to just add a couple

23   of things just to, kind of, wrap up my argument as a whole.

24        There has been a lot that we have learned since that

25   fateful and tragic day in American history over one month ago.

1    We have learned the following:  We have learned that there were

2    several people who came to Washington, D.C., with a plan, a

3    plan to take action, a plan to do harm, a plan to do violence,

4    a plan to riot, a plan to participate in an insurrection.  We

5    have learned that several of these people who have been charged

6    criminally conspired with others and coordinated their plan of

7    attack.

8         We have learned that others planned things on their own

9    and armed themselves with the necessary implements:  plastic

10   handcuffs, stun guns, baseball bats, tactical gear.  They armed

11   themselves and brought those things with them to the Capitol

12   Building on January the 6th, all a part of their plan.

13        We've learned that many were vocal about their plans.

14   They may not have been shouting it from the rooftops, but many

15   have been found to have posted on social media and confided

16   with friends and family that they were coming to participate in

17   a revolution, that they were coming to Washington, D.C., to

18   fight.  That was their plan.

19        Your Honor, as I watched the impeachment trial against

20   Donald Trump a few weeks ago, I watched the video presented by

21   the House impeachment managers.  The same videos were seen by

22   everyone in the Senate and by millions of Americans.  And as I

23   watched those videos, I saw those people.  I saw the planners.

24   I saw those people pushing, grabbing, and injuring Capitol

25   police officers, yelling, "Fuck the blue."  I saw those people

1    screaming, yelling, swinging away.  I heard those people

2    yelling to kill leaders like Vice President Pence and Speaker

3    of the House Pelosi.  I saw those people carrying out their

4    plan.

5         But as I went back and I watched those videos a second

6    time and I moved my focus away from the folks of the camera, I

7    saw someone else, the other people, the other people in the

8    background, standing there, looking around but not engaged in

9    the same violence and threats of violence, present and willing

10   for their voices to be heard, but not engaged in the same

11   violence and threats of violence.

12        I went back and I watched the videos that my client,

13   Mr. Grider, took on his cell phone, and I saw the same thing.

14   I saw the others standing, along with Mr. Grider, among the

15   throngs of people.  I saw the others, along with Mr. Grider, as

16   he walked between the velvet ropes as they passed through the

17   Capitol rotunda.  It wasn't right.  But they were doing nothing

18   violent.

19        I saw the planners in those videos, the people in the

20   tactical gear, the people kicking at the doors, the people

21   there to carry out their plan.  There is no doubt that they

22   made it in there and they were, indeed, carrying out their

23   plan.

24        But I saw the others; the others, Your Honor, who were

25   and still are good, law abiding American citizens; others --

1     the good, law abiding American citizens -- who came to

2     Washington, D.C., to hear and see their President one last time

3     but never expecting that his rally, which started off like the

4     hundreds of other rallies that he had held all over the

5     country, would turn into this.  Others, whose good and moral

6     personalities and psyche, were manipulated by the manipulators,

7     January 6th will, without any doubt, forever remain a tragic

8     day in American history, but we don't fix one tragedy by

9     creating another one.

10          Christopher Grider did not come to Washington, D.C.,

11     with a plan.  He did not come here to do violence.  He did not

12     come here to do harm.  He did not leave the Capitol Building

13     with anything other than shame, regret, and the images that he

14     captured that forever remind him of that.  He did not leave

15     here, Washington, D.C., promising to come back or to take

16     further action against the government or elected officials.  He

17     left Washington, D.C., went home to central Texas, and realized

18     what is most important to him:  his family, his business, his

19     community, his church.  And, Your Honor, he's been trying to

20     make right of it ever since then.

21          To take Mr. Grider, one of the others, and keep him

22     locked up with the planners, the doers, the insurrectionists,

23     just creates another sad chapter in this American chapter.

24     Christopher Grider is not a danger to anyone.  If the FBI or

25     law enforcement thought that, they would have been at his

1     doorsteps day after -- days after January 6th with guns drawn,

2     ready to lead him away in handcuffs.  What do they do instead?

3     They called him up 15 days later, asked him to get in his truck

4     and drive to Austin where he would surrender himself on these

5     charges.

6             THE COURT:  Mr. Mayr, let me ask you about that,

7     because I did see that in your most recent filing.

8             MR. MAYR:  Yes.

9             THE COURT:  My understanding is that the police

10    didn't do much to follow up on and/or arrest anyone, really,

11    right after this event, including the people that you call the

12    actual insurrectionists and the planners.  So I'm not sure that

13    I can take much away from the fact that it took them 15 days or

14    whatnot to get to your client.

15            MR. MAYR:  Well, here's the thing, Your Honor, is

16    this wasn't -- this wasn't him just waiting.  As I also noted

17    in that memorandum -- and has been pointed out in some of the

18    other filings -- Mr. Grider had previous counsel who reached

19    out to the U.S. Attorney's Office for the District of Columbia,

20    and as Ms. Wong can confirm, they did send a proffer letter

21    to -- indicating their willingness to meet with Mr. Grider on

22    January the 10th.  So there was a back-and-forth dialogue.

23            This wasn't like they were scrambling to do anything

24    else and trying -- they knew where he was, and, most

25    importantly, there was a back-and-forth dialogue that was

1    going -- that was taking place before I even came on the case.

2         So, you know, at any point, again, if there was some

3    reason to think that he was a danger or concern, there were --

4    there were easy steps they could have done to take him into

5    custody.  So this is -- what -- I don't know if what your

6    concern is is, well, look, they were so overwhelmed and they

7    couldn't find him.  That wasn't the case.  They knew where he

8    was.  He -- they knew he had counsel.  There was communication

9    going back and forth, and, again, if there was some concern or

10   danger from him, then -- then move in and get him right away.

11        THE COURT:  I understand that, but, you know, that's

12   not really the -- maybe even the primary test of dangerousness.

13   In fact, one of the things that I was a little confused by in

14   all of the filings was the lack of focus on the statutory

15   presumption of dangerousness that attaches to the particular

16   crime that your client -- one of the particular crimes that

17   your client has been charged with.

18        So it's -- it's not as though we evaluate dangerousness

19   necessarily based on the timing of the police response or how

20   the FBI reacts.  There's other indicia, and one of them is the

21   nature of the crime.  So, you know, I guess I was just reacting

22   to that particular argument, which was the suggestion that the

23   Court should evaluate his dangerousness based on how law

24   enforcement responded.

25        MR. MAYR:  Sure.  And again, Judge, even -- even if

1    you look past the amount of time that had passed, you can just

2    look at the circumstances of what happened.  They didn't go out

3    and arrest him.  They called him up, and he voluntarily drove

4    himself down to Austin to surrender himself.  So even if you

5    look past the fact it took them 15 days before the complaint

6    was filed in this case, I think you can just look at the

7    actions of what happened once the complaint was filed.

8         And, again, they didn't -- they didn't -- they knew

9    where he lived.  They didn't go out and arrest him.  They said:

10   Look, just get in your truck, come down here, and you'll

11   surrender yourself.  I think -- I think it's not the only

12   factor, I agree with you, Your Honor, on that, but -- but it

13   certainly -- I think it carries a lot of weight.

14        Now, there's something else --

15        THE COURT:  What do I -- what do I make of at least

16   some indication in the filings that in addition to dialoguing

17   with law enforcement, Mr. Grider was also apparently telling

18   his wife to take his clothes from the rally and the things that

19   he had with him, that presumably would identify him, and give

20   them to a neighbor?

21        MR. MAYR:  Judge, I think I addressed that in my

22   memorandum.  The -- that was not part of any attempt to

23   conceal.  That was part of an attempt to preserve, just like my

24   client had backed up his videos from his cell phone to a

25   computer.  There was -- he was worried.  People knew where he

1    lived.  There were -- he was getting threats from people in the

2    community via social media, and he didn't know if people were

3    going to come and break into his home.  He wanted to preserve

4    everything.

5          But more importantly, at that point, again, there's

6    nothing to conceal.  I mean, he -- he had already gone on a

7    local television station and said that he was there.  He had

8    already reached out to the U.S. Attorney's Office and had

9    indicated a willingness to come forward and cooperate.  So

10    there's really nothing to have concealed at that point.

11          So I would dispute that categorization of the government

12    to say that that was some sort of effort to obstruct or

13    anything else like that.  Again, the FBI's never given any

14    indication of that.  The government's never really given any

15    indication of that up until this recent filing.

16          So -- and, again, the -- you look at bits and pieces

17    like the government does, and, yeah, it doesn't look right.

18    But when you look at the big picture and you look at everything

19    that he was doing, this is not someone who was trying to

20    distort justice or create violence or do harm to other people.

21    I mean, this was a person who was willing to come forward and

22    do his part to accept responsibility and -- and move forward

23    with -- with the --

24                THE COURT:  What -- what -- what is his

25    responsibility?  I mean, I see some statements in your filings

1    that suggest that there's a question about whether the helmet

2    that he was carrying was taken from him or whether he actually

3    gave it to the person who then used it to break the glass.

4    What -- what is your view on that?  I saw the video.  We all

5    saw the video.  So are you trying -- is he trying to indicate

6    that he really was just a passive bystander with no

7    responsibility whatsoever for what happened?

8             MR. MAYR:  No.  As I made clear in the filings,

9    there's no dispute that he was inside the Capitol.  There's no

10   dispute that he -- he had a helmet.  Now, there's other

11   evidence to suggest -- I want to be very clear.  There's no

12   indication that he came there with that helmet.  What we

13   anticipate the evidence is going to show is that he found the

14   helmet and that he carried it around for him -- for his own

15   protection.

16            But as the videos show, in conjunction with listening to

17   the audio from his video, while he may have handed off this --

18   this -- this helmet may have been taken or -- was transferred

19   from him to this other person, Mr. Alam, there's nothing on his

20   recording -- you can hear on that recording when they're

21   breaking the glass.  You can hear when the gunshot is fired.

22   But you can hear him engaged in the dialogue with the police

23   officers telling them there's people getting crushed.  What you

24   don't hear him saying is, Mr. -- telling this person:  Here.

25   Take this and smash the glass.  Here.  Do this and continue to

1    do harm.  That's not there.

2          And so, you know, in terms of what his intent was, it's

3    certainly going to be like I maintained all along; that he did

4    not intend to do any damage or harm to the United States

5    Capitol.  Period.  That is what our defense -- that is what our

6    position is going to be.  And the evidence that we've presented

7    and that we've uncovered so far seems to corroborate that.

8          We haven't been presented with -- and you haven't been

9    presented with anything else to suggest that he wanted to do

10   harm, that he wanted to do damage.  And so our position is --

11   is that, as you know, aiding and abetting requires a culpable

12   mental state.  We don't believe that that culpable mental state

13   existed and that he was giving that helmet to this person with

14   the intent that -- knowing that that person was going to then

15   start using it to smash the windows open.

16         So that's our position in regard to that, and, again,

17   there's -- all the videos and everything else is consistent

18   with him not intending to do any damage.

19         Now, if I may, one thing that I do -- that you had

20   mentioned in one of your previous questions was this idea that

21   this might be one of those offenses that would be a presumption

22   offense under (f)(1).  I want to make sure that we're

23   abundantly clear on this.  Before the magistrate, the

24   government did not make any motions under (f)(1) or (f)(2) to

25   detain -- I'm talking about 3142.  They did not make a motion.

1    That is -- that -- if -- the motion -- I believe I included

2    that as an exhibit to my motion to the -- to the motion to

3    revoke the detention order.  I believe I attached that.  So the

4    government did not move that, and, again, it's our position

5    that this isn't a presumption offense, you know.

6             THE COURT:  But, of course, the presumption is in

7    3142(e).  So I'm not quite sure I understand your concern --

8    your suggestion that the government didn't move under 3142(f).

9             MR. MAYR:  Right.  So you -- the -- 3142(e),

10   Your Honor, talks about what happens after a hearing pursuant

11   to the provisions of subsection (f).  What my position is is

12   that we don't even get there because the government didn't move

13   under subsection (f) to detain him.  They -- they -- and

14   this -- this ties back into the -- the legal authority that I

15   cited to and the motion to revoke the detention order; that you

16   can't get to -- you can't get to (e) unless you first go

17   through (f) and you establish there's either -- this is either

18   an (f)(1) or an (f)(2) situation.

19        The government moving to detain him just based on no

20   conditions, that's not a presumption.  That -- that, as you

21   know, is -- is something that the government has to prove, and

22   they have to prove it by clear and convincing evidence that

23   he's a danger to the community or upon a preponderance that

24   he's a flight risk, which is not an issue in this case

25   according to judge -- to the magistrate judge in this case.

1        But it's not a presumption.  If -- if -- if the

2   government is going to establish that there's no conditions or

3   combination of conditions that can be established to assure the

4   safety of the community, they have to do that by clear and

5   convincing evidence.  And that's really what is -- I hope --

6        I have not been able to figure out how clearly and

7   convincingly what happens in this span of seconds in the

8   United States Capitol establishes clearly and convincingly that

9   Mr. Grider is a danger to the community when you look at

10  everything that he's done before, when you look at everything

11  he's done after.  I understand.  It's upsetting.  It's

12  frustrating.  It was a horrible thing that took place.

13       But to detain him and -- like I said, at the very

14  beginning of my argument, to put him in the same category of

15  the planners, the insurrectionists, the people intending to do

16  this is just fundamentally un- -- it's just unfair.  It's not

17  what -- it's not what the Bail Reform Act was designed to do.

18  Again, I think if we go back to *Salerno,* *Salerno* talks about

19  the -- it being limited -- pretrial detention being limited for

20  the most extremely serious offenses.  These were serious, but I

21  just don't see how what it is that Mr. Grider is accused of

22  falls into that same category.  There's --

23            THE COURT:  Of course, Mr. Mayr, that's really not

24  how the process works.  I mean, I -- I appreciated your

25  arguments about, sort of, general characterizations of what he

1    had been charged with or what he's accused of doing and what

2    the tape shows and all of that.  But the way in which the

3    presumption actually works is it's based on the statute of

4    conviction.

5         And I see your argument with respect to the government

6    moving under (f).  But if you read the language of that

7    provision, it merely says that the judicial officer shall hold

8    a hearing to determine whether any condition or combinations of

9    conditions set forth in subsection (c) will reasonably assure

10   the appearance of such person as required and the safety of any

11   other person in the community upon motion of the attorney for

12   the government, in a case that involves . . .

13        So the government doesn't have to move under (f).  The

14   government just has to move for detention, and the Court has to

15   determine whether this case involves a crime of violence, a

16   section -- a violation of section 1591, or an offense listed in

17   section 2332b(g)(5)(B) for which a maximum term of imprisonment

18   of ten years or more is prescribed.  That is, in fact, this

19   case.  The 1361 charge that the government has brought is an

20   offense listed in section 322b(g)(5)(B) [sic] for which there

21   is a maximum term of imprisonment of at least ten years.

22        And if you go back to section (E), it explains the

23   circumstance under which a rebuttable presumption that no

24   conditions or condition -- or combination of conditions will

25   suffice, and this offense is one such offense.

1          So I -- I -- I appreciate your argument that, you

2     know -- and I'm not saying that you don't eventually get to

3     what you are arguing with respect to the government's burden,

4     because, of course, it's just a rebuttable presumption.

5                    MR. MAYR:  Sure.

6                    THE COURT:  Presumption exists insofar as the

7     defendant is able to point to some evidence that indicates that

8     he would not pose such a danger, then it shifts back to the

9     government and we're at the initial point again.  But I think

10    you can't credibly say that there's no presumption in this case

11    under these circumstances given the language of the statute.

12                   MR. MAYR:  If I may, Your Honor.  Let me just say

13    that what you have said has been the first time that I've heard

14    that in this -- in these entire proceedings; okay?  I've been

15    aware of it, but here's the problem is the government never

16    moved under that ground to detain him, first and foremost,

17    before the magistrate, and, second of all -- and, quite

18    frankly, that's what this is all about.  I mean, this is a

19    *de novo* review of what took place before there.

20         And so for the government to now have been -- again,

21    it's not really the government.  It's -- you're the first one

22    to say that.

23                   THE COURT:  Right.  And I don't want to belabor the

24    point.  It is an evidentiary burden.  It's not a basis for

25    moving for detention.

```
 1              MR. MAYR:  Sure.

 2              THE COURT:  It is a way in which the government can

 3      establish the statutory criteria for detention, and they might

 4      invoke it, they may not invoke it, but, you know, it's --

 5      it's -- it's something that I believe exists in this case.

 6      Nevertheless, you know, you're right.  No one else has really

 7      focused on that.

 8              MR. MAYR:  Okay.  And -- and in light of that,

 9      Your Honor, you know, I will maintain that like -- and I

10      maintained this from the very beginning with the magistrate,

11      and I think I've maintained this in my previous filings.  I

12      understand what a presump- -- I understand the presumption.

13              I've dealt with those several times, but what -- what I

14      told the magistrate judge, I said:  Look, even if this is

15      not -- even if this is not a presumption case or even if the

16      government is not moving on the basis that this is a

17      presumption case, everything that we've still presented still

18      proves, overcomes the rebuttable presumption because of -- when

19      you look at everything to show that he is not a violent

20      dangerous person.

21              Pretrial services recognized that.  Multiple people have

22      vouched for that.  His actions afterwards account for that.  I

23      think all of that -- if -- if that's how -- if Your Honor is

24      going to treat this as a rebut- -- as a presumption case, I

25      still believe and strongly maintain that we have overcome that
```

1    burden with everything that we've presented to the Court.

2         THE COURT:  All right.  So I have two final quick

3    questions.  One is about there's a repeated suggestion in your

4    materials that pretrial detention cannot be based on a finding

5    of danger- -- dangerousness alone as a matter of law.  Where is

6    that coming from?  Because I've never seen that and --

7         MR. MAYR:  Yes.  It's actually -- you know, I'm going

8    to be frank with Your Honor.  This wasn't -- you know, as you

9    may recall from my motion to practice *pro hac vice*, I pointed

10   out that I'm a member of the CJA panel down here in the

11   Southern District of Texas.  Last year, right before the COVID

12   pandemic, I went to a CJA seminar out in Los Angeles where I

13   heard a presentation about how there seem to be some -- not a

14   lot of consistency with how the law was being applied in regard

15   to dangerousness only.

16        And I cited the Court to the *Gibson* case which comes out

17   of the Northern District of Indiana, and in that particular

18   case, the judge -- it was -- I had it here.  One second.

19   Judge -- I'm sorry.  I don't have it off the top of my head.

20   Judge Kolar does a really -- does a really good job of

21   explaining how a finding of dangerousness alone is not

22   sufficient -- isn't sufficient; that there's a -- there's a

23   disagreement between some of the authority.

24        But the majority of the authority, the leg- -- case law

25   out there seems to indicate that if it's not a -- if it's not a

1   presumption offense, if -- if it's just moot -- if the

2   government just wants to move to detain someone just based

3   under 3142(e), that there's no condition or conditions of

4   release that can assure appearance and safety of the community,

5   then a finding of dangerousness alone is not sufficient; that

6   it has to first fall under an (f) -- you have to first

7   establish an (f)(1) or (f)(2) situation, but just to find -- to

8   detain someone just based on a finding of dangerousness alone

9   is not actually sufficient.

10          THE COURT:  All right.  Well, that might be the law

11  in Judge Kolar's jurisdiction, but it's not in the District of

12  Columbia.  There --

13          MR. MAYR:  There's not any authority.  I mean, his --

14  his -- his opinion cites to opinions from the Second Circuit,

15  the Fifth Circuit, I think the Seventh Circuit, and the

16  Eleventh Circuit, as well as some other district courts

17  scattered throughout the country.  I've reviewed this opinion.

18          I've reviewed some of your decisions.  I've reviewed

19  some decisions by some of your fellow jurists in the District

20  of Columbia, and no one has squarely addressed this issue.

21          THE COURT:  Well, I found a case by my colleague

22  Judge Collyer, *United States v. Scott*, 2019, in which she ends

23  by saying, ". . . even if a defendant is not considered a

24  flight risk, his or her danger to the community alone is

25  sufficient reason to order pretrial detention, and vice versa."

1     And she cites *Salerno* and, prior to that, quotes from the

2     statute.

3          And that is consistent with my understanding of this,

4     because I -- you won't be surprised to know that I have done

5     this before in terms of reviewing detention determinations, and

6     it's often the case in my district that the government will

7     argue that a person is dangerous, and that's the basis and not

8     flight risk.

9          MR. MAYR:  Sure.

10         THE COURT:  And Courts in this district often hold

11    that dangerousness alone is sufficient to order detention.

12         MR. MAYR:  And I've seen you make -- I've seen you

13    refer to that and make that -- take that position, although not

14    directly addressing this argument, in other opinions by you.

15    So I recognize that I'm -- I'm sort of on the back side of

16    this, but I still think it's -- it's persuasive authority that

17    I'd like to -- you know, I'd like to get the argument before

18    the Court.  I mean, I --

19         THE COURT:  Let me ask you finally, if I were to

20    decide to release Mr. Grider, consistent with what some of my

21    colleagues have done in similar cases involving this very same

22    event, they have imposed pretty stringent conditions of release

23    to include electronic monitoring, a curfew, that sort of thing.

24    So what are you proposing in terms of the conditions of release

25    that you say your client is willing to abide by during this

```
1    period?

2              MR. MAYR:  Yes, Your Honor.  So as I -- as I set out

3    in paragraph 40 at page 19 of my motion to revoke the detention

4    order, he has absolutely no problems or issues being on home

5    confinement with GPS ankle monitoring.  Something that he's

6    also willing to do that I set out were what I called daily

7    check-ins with local law enforcement.  So --

8              THE COURT:  I'm not sure that they'd want to hear

9    from him that frequently.

10             MR. MAYR:  Well, surprisingly, he's -- he's got a

11   pretty good relationship with them.  And -- and even though I

12   couldn't get any of them to go on record saying that they

13   believe that he would be -- even though I couldn't get any of

14   them to go on record saying that they feel like he wouldn't be

15   a danger to the community, I do know that he does have a good

16   enough relationship with the local police department that if

17   there were any problems, they would immediately notify the

18   pretrial services officer for the Western District of Texas.

19   So that is something he's going to do.

20             I've indicated that he would be willing to consent to a

21   search of his home, business, and vehicles for any contraband.

22   What I can tell the Court is -- we had represented this to

23   judge -- to Magistrate Judge Hightower, but I'll let the Court

24   know again, there are no firearms or ammunitions in the home.

25   They have all been removed.  He has no access to any firearms
```

1    or anything else like that.

2          We will permit pretrial services and any -- any other

3    law enforcement to go in and search his home thoroughly.  When

4    they executed the search warrant, they were given no problems

5    being allowed to come in and search for whatever they needed

6    to.

7          And then as the statute provides, you can also order a

8    psychological assessment and any treatment, if necessary.  We

9    don't believe that's an issue.  Again, everyone seems to have a

10   pretty good opinion of Mr. Grider, but just to provide this

11   Court and the community some -- some -- some peace of mind, he

12   would willing -- be willing to do that.  I mean, he's -- he's

13   been very open about this, Your Honor, and, again, he is not

14   willing to hide or conceal anything from the Court.  So any

15   other conditions that the Court feel -- feels are necessary,

16   he -- he's willing to -- he's willing to do what is -- like I

17   said, do what he needs to do to make this right.

18             THE COURT:  All right.  Thank you, Mr. Mayr.

19        Ms. Wong?

20             MR. MAYR:  Thank you, Your Honor.

21             MS. WONG:  Good morning, Your Honor.

22             THE COURT:  Good morning.

23             MS. WONG:  If I may start with just two legal points

24   before turning to some of the evidence that I do want to note.

25   Just to make two legal points.  I did want to address this

1    argument about the Northern District of Indiana case that

2    Your Honor and Mr. Mayr were just discussing.  That is

3    addressed -- this *Gibson* case is addressed in the government's

4    brief in this case, and the government would submit that that

5    entire issue that is identified, while an interesting and

6    academic issue, is not applicable even to the facts of this

7    case.

8         That judge was discussing specifically -- and the

9    language is quoted in my brief, Your Honor -- the situation

10   where a detention hearing was only deemed warranted under a

11   serious risk of flight; that that was the basis for the

12   detention hearing.  And the question is if that's your

13   threshold for the detention hearing, whether you can then --

14   based on the no reasonable condition can assure safety, the

15   dangerousness ground, to order actual detention.  That was not

16   the case here.  The government has never alleged serious risk

17   of flight as the basis for a detention hearing.

18        THE COURT:  All right.  So it's the government's

19   position -- and I did see that in your brief.  I did not go to

20   *Gibson* because I was pretty confident in the District of

21   Columbia we detain people all the time on the basis solely of

22   dangerousness, but the government's position is that that is

23   appropriate and proper under the statute?

24        MS. WONG:  Absolutely, Your Honor.  That's correct.

25   The government did also move on dangerousness.  The government

1    believes that is appropriate and consistent with the law of

2    this jurisdiction.

3         And the second point I just wanted to make, Your Honor,

4    is, as you are correct, that the presumption under

5    3142(e)(3)(C) applies here because 1361 is one of the

6    enumerated offenses to which that presumption, that -- the

7    ultimate standard, that no reasonable conditions can assure

8    community safety.

9         THE COURT:  All right.  So Mr. Mayr says, but, hey,

10   you didn't move for that.  You didn't, you know, raise that

11   before the magistrate judge.  Does that matter?

12        MS. WONG:  Your Honor, the government said from the

13   beginning in the Western District of Texas that they were

14   seeking a detention hearing and that their standard was that --

15   the standard had been met of dangerousness so that no

16   reasonable conditions can assure community safety.  Given that,

17   I think it's exactly the same, whether or not you have -- they

18   were not asked to stipulate which provision under which we

19   believe a detention hearing was warranted.  Nor was there any

20   objection to whether or not a detention hearing was warranted.

21        So the only question is whether that ultimate standard

22   has been met, and that's the exact same standard, Your Honor.

23   Whether or not there's a presumption that it is satisfied or

24   not, the ultimate question requires the Court to find that no

25   condition or combination of conditions could reasonably assure

1       that the defendant doesn't pose a danger.

2               THE COURT:  All right.  So why -- why has the

3       government met the standard here?

4               MS. WONG:  Yes, Your Honor.  I'd like to start with

5       what the defendant just said, which is that others planned an

6       insurrection and that others did harm.  Your Honor, reading the

7       brief, it's clear that the defendant's -- the defendant's

8       position is that he was but a law abiding bystander who

9       witnessed this violent attack on government property but

10      himself was not part of that effort.  That's what he states in

11      his brief.

12              And as stated in his earlier briefs, that he wanted his

13      voice to be heard and nothing more and that he simply pushed

14      the Speaker's Lobby's door to see whether or not they can

15      secure, but not so as -- with any intent to breach those doors.

16              Your Honor, the government would submit that on the

17      evidence that is simply not credible.  It does not stand to

18      reason, and it is entirely divorced from the context and the

19      evidence.  The defendant is not charged with being an organizer

20      of the riot.  He's not charged with being a planner.  And so

21      that is entirely a deflection to note that there may be others

22      who may have engaged in other acts.

23              What the magistrate in the arresting jurisdiction found

24      was the nature and circumstances of the offenses with which he

25      has been charged are extremely serious, and the government

1     would agree with that.  The defendant does stand here charged

2     with a seven-count indictment, including two serious felonies

3     carrying lengthy sentences, and one of those is a crime of

4     violence.  And based on the facts, it involved him knowingly

5     arming a manifestly violent individual right in front of him

6     with -- in the midst of an aggressive mob with what was a

7     dangerous weapon.

8          Your Honor, he is charged with this for that attack

9     because the weight of the evidence shows that he absolutely was

10    an active participant and that --

11         THE COURT:  Of course, this is -- we're in a

12    different stage of the litigation.  So fine.  He's charged with

13    that.  The government believes the evidence will show that,

14    that he will ultimately be convicted of that.  But right now

15    the question is what -- what is he required to do before we get

16    to that stage; is he so dangerous that no condition of release

17    will allow him to await trial on these charges at home as

18    opposed to being incarcerated, which I see as a different

19    analysis.

20         MS. WONG:  That's correct, Your Honor.  Although

21    ultimately, under the four (g) factors, Your Honor does have to

22    consider, obviously, the nature and circumstances of what he

23    has been charged with, and that was one of the primary reasons

24    that the magistrate relied on, as well as the weight of that

25    evidence.

1          But, in addition, the government would push back on this

2     notion that the history and characteristics of this defendant

3     weighs strongly in the other direction.  The government would

4     note in addition to the serious nature of this offense and

5     strong weight of the evidence, as well as the danger posed by

6     the defendant as reflected by his conduct on January 6th -- and

7     we can go into some of the preceding lead-off, as well as some

8     of his conduct afterwards shortly -- but we would also note

9     that the characteristics of the defendant do not weigh strongly

10    against that calculus.

11         And, Your Honor, if you look at the evidence, which the

12    government would submit -- you know, we've all seen this, but

13    it's not just what he did at the Speaker's Lobby doors,

14    Your Honor.  And it may well be that you cannot hear on the

15    video what he told that individual, but he's seen watching that

16    individual using his bare fists to smash down that glass door,

17    those glass-pane doors.  He's seen knocking on -- tapping at

18    his helmet, as if indicating that that was hard or showing him

19    whatever, but he is clearly cognizant of what's going on around

20    him, Your Honor.  And the defendant hands that to that

21    individual to then proceed to smash out those windows with the

22    protection and weaponization of that helmet.

23         Not only that, Your Honor, defendant is not just some

24    bystander here.  He is the first -- when those three officers

25    leave that scene, he's the first, according to the video, to

1    rush to that door and attempt to push on it.  That is evidence

2    of the intent to breach and the seriousness of the offense.

3         Your Honor, I do want to mention, Mr. Mayr has mentioned

4    multiple times that the defendant wished to come clean, that he

5    reached out to the U.S. Attorney's Office even before he was

6    arrested.  Your Honor, the defendant should not get to wrap

7    himself in the mantle of having affirmatively gone to court

8    publicity the very night of January 6th, giving an extremely

9    self-serving account of what happened that is not consistent

10   with what the government later found on evidence.

11        You know, the government made no efforts after --

12   when -- when they were told what the defendant's account was of

13   his involvement, there was, in those early days, an interest in

14   potentially debriefing.  The government, as soon as they had

15   evidence indicating what the defendant's actual involvement was

16   on January 6th, abandoned any effort to debrief with the

17   defendant after that point.

18        The government would note also, he shouldn't get credit

19   for the fact that he wasn't -- there was no squad that rushed

20   out immediately on January 7th to arrest him.  What we had at

21   that point was the defendant's statements on television in

22   which he claims that he was protecting monuments, but what you

23   see on that video, Your Honor, shows not only that the

24   defendant was not somebody who was there simply to protect

25   monuments and art from others, but you also have a window into

1        the defendant's own failure to grapple with the seriousness of

2        that situation.

3               Even after all that had conspired, he willingly chose to

4        go on television to provide his footage and give an account

5        that did not betray any sense of the seriousness or

6        dangerousness of the situation that he had just been part of.

7               THE COURT:  All right.  You also -- sorry.  Go ahead,

8        Ms. Wong.  Go ahead.

9               MS. WONG:  I would just note -- Your Honor mentioned

10       this already, but the government is troubled, of course, by

11       what happened subsequent to the arrest where we learned that

12       the defendant had asked to get rid of his Trump things.  That's

13       simply not credible, Your Honor, to suggest that was an effort

14       to preserve evidence.  These were obviously identifying items.

15       He had other identifying items, including his backpack and his

16       jacket, that he kept at his home.  Your Honor, that is not a

17       reasonable or rational way to understand --

18               THE COURT:  But what about Mr. Mayr's suggestion that

19       there was really no serious effort to hide because he had

20       already gone on television; he was in communication with law

21       enforcement; they knew that he was there?  So what difference

22       would it have made to have transferred some items over to

23       someone else?

24               MS. WONG:  Your Honor, whether or not it was an

25       effective strategy, the question, again, that still is raised

1    by this is why would you act -- and the quote given was get rid

2    of his Trump things, Your Honor.  He was not on video on local

3    news stating what he was wearing that day.  He was -- in fact,

4    again, what he said was that he was near the shooting and

5    that -- according to the print version -- that he was

6    protecting monuments and artwork from others and that even

7    after the shooting, that thousands of people were pushing him

8    and -- so that they couldn't leave.

9         Now, that's not, again, anything that can be squared

10   with the actual video.  But none of this is to say that the

11   defendant identified himself in the video nor his conduct.

12   That was not any part of the defendant's own interview, nor

13   what was represented to the government at that time.

14        THE COURT:  So the one thing I was slightly confused

15   about, Ms. Wong, was in the opposition brief and, again, here

16   this morning, you suggest something about Mr. Grider having

17   committed a crime of violence.  You know, I'm trying to

18   understand the implications of that, the reason why the

19   government is characterizing what he did as a crime of

20   violence.  And to anticipate what Mr. Mayr is going to say, why

21   now, since you had not apparently said this previously when you

22   were before the magistrate?

23        MS. WONG:  Yes, Your Honor.  So I would note that

24   this was something that the judge in the arresting jurisdiction

25   specifically noted in her orders; that the nature and

1    circumstances of the offense, including whether or not it's a

2    crime of violence, she repeated both in her initial detention

3    order and in her denial of -- I believe it was the second

4    motion for reopening.

5         Your Honor, the government would agree with your parsing

6    of the statutory language.  Clearly under (f), 3142(f), the

7    government made the motion for the detention hearing.  It

8    appeared that all parties agreed that a detention hearing was

9    warranted.  The government would submit this is plainly a crime

10   of violence, and it's not just involving, you know, an offense

11   that involves a risk of danger to property.  He's been actually

12   charged with the destruction of.

13        THE COURT:  Right.  Well, first of all, you may not

14   need that.  I think you don't given the way that I've

15   interpreted the statute.  But ordinarily a crime of violence

16   requires the whole categorical approach and you've got to look

17   at the elements of the statute and all of that.  Is that what

18   you're implicating -- or is that what you're suggesting when

19   you say that this is a crime of violence?

20        MS. WONG:  Your Honor, I do believe this is -- and

21   it's not just the residual clause.  I do think under the

22   elements offense this would -- this would meet the definition

23   as well.  I know I did cite the residual clause, but I do

24   believe under the definition in 3156(a)(4) that this would --

25   this would meet that standard.

1    THE COURT:  But you don't need it for any relevant

2    purpose, do you?  I mean, you still -- the way the Court is

3    reading the statute, an offense -- as you said, everybody

4    agreed a detention hearing was warranted.  The government moved

5    for one.

6         This is a case that involves an offense listed in

7    section 32- -- 2332b(g)(5)(B); right?  So the crime of violence

8    characterization, it seems to me to be superfluous and possibly

9    opening the door to all kinds of other potential legal

10   arguments and considerations that aren't necessary.

11        MS. WONG:  I see what Your Honor is saying.

12   Absolutely you're right.  We need not prove under (f)(1)(A) the

13   crime of violence language specifically applies because later

14   language in that same provision, (f)(1)(A), as to an offense

15   listed in 2332b(g)(5)(B) also does apply.  That is correct,

16   Your Honor.

17        And either way, the government would submit that this is

18   all largely academic; where we're just talking about what the

19   basis for the detention hearing at all was, and there was no

20   question as to that.  They moved straight to the ultimate

21   determination on whether the conditions would meet the ultimate

22   standard.  So that's why all the discussion was about

23   dangerousness.

24        THE COURT:  All right.  Is there anything else that

25   you would like to add before I give -- I think what I will do

1    is turn to Ms. Schuck on pretrial and then I'll come back to

2    Mr. Mayr for closing before I -- I rule.

3             MS. WONG:  No, Your Honor.  Just -- just in closing,

4    I would just want to note that the defendant should not be able

5    to find safe harbor in the notion he did not personally put his

6    fist to his helmet to the door.  He has been charged -- you

7    know, whether as a principal or as an aider or abettor, you

8    would be punishable and liable as a principal because in this

9    case, as the government would submit, the weight of the

10   evidence shows that the defendant's intent was there, both from

11   the context of what was transpiring in front of those doors,

12   the context of everything that preceded it, the fact that the

13   defendant was not there just in some momentary blip.

14        But he was there seen attempting to get into the other

15   House doors, the other entrance to the House Chambers.  He was

16   seen racing down that hallway trying to be the first at the

17   Speaker's Lobby, and he was a front-row participant for minutes

18   in front of that Speaker's Lobby door as all of these incidents

19   were happening, as all the violence, as that mob was charging

20   on that door, Your Honor.

21        Given all of the evidence as a totality, the government

22   would submit that that intent is consistent with the evidence

23   certainly as a matter of probable cause.  Thank you.

24             THE COURT:  All right.  Thank you.

25        Ms. Schuck for pretrial.  Good morning.

1          THE PRETRIAL SERVICES OFFICER:  Yes, Your Honor, good

2     morning.  Christine Schuck, pretrial services.

3          THE COURT:  Yes.  Do you-all have a position -- I

4     know that in situations like this where a defendant's home is

5     elsewhere but he's being called to face charges in this

6     jurisdiction, I think D.C. works with pretrial services

7     elsewhere; is that correct?  If he were to be --

8          THE PRETRIAL SERVICES OFFICER:  Yes, Your Honor.

9          THE COURT:  If he were to be --

10         THE PRETRIAL SERVICES OFFICER:  Yes, Your Honor.

11         THE COURT:  Okay.  And --

12         THE PRETRIAL SERVICES OFFICER:  Pretrial services did

13    reach out to the U.S. Pretrial Services Office for the Western

14    District of Texas, the Waco office.  We spoke to the supervisor

15    down there.  And should Your Honor decide that release is

16    appropriate, they are willing to supervise the defendant to

17    include location monitoring, if that is to be imposed.

18         THE COURT:  All right.  And in a situation like this,

19    does D.C. pretrial take any position?  I -- I understood from

20    the materials that were submitted that -- at least before the

21    magistrate judge -- the Western District of Texas pretrial had

22    taken the position that there were conditions that he could

23    follow and that they would be willing to monitor him.  But does

24    D.C. take a position in a situation like this?

25         THE PRETRIAL SERVICES OFFICER:  In this specific

1    case, pretrial services for the District of Columbia is not

2    going to take any position.

3            THE COURT:  Is not going to take any; all right.

4    Okay.  Anything else, Ms. Schuck?

5            THE PRETRIAL SERVICES OFFICER:  No, Your Honor.

6            THE COURT:  All right.  Mr. Mayr, I will let you

7    respond, if you would like to, to anything that you've heard.

8    And then we'll take a five-minute break, and then I'll come

9    back and rule.

10           MR. MAYR:  Your Honor, just on that last note from

11   Ms. Schuck.  Pretrial services not only recommended release on

12   standard conditions of release, they recommended release on an

13   unsecured bond.  Now, that's something else that I didn't

14   address.  If the Court wanted some security on the bond, that

15   is also something that Mr. Grider would be willing to put up, a

16   cash deposit to secure any amount of a bond in this case.  So

17   that's just one other thing I wanted to point out in that

18   regard.

19           I'm just going to briefly respond to just three things

20   that were addressed with Ms. Wong.  First, there was this talk

21   about his appearance on television that very night, and I -- we

22   have -- I think both sides have submitted the video, the news

23   story that was aired on KWTX in Waco.  And I think it speaks

24   volumes, Your Honor, that we proffered and had -- the

25   television reporter herself, Rissa Shaw, was willing to come

1    forward and -- and vouch for Mr. Grider and say:  Look, even

2    talking to him in that -- right after, immediately after that

3    tumultuous time, she never got the impression that he was

4    boastful, that he was proud, that he was trying to conceal

5    anything.  He -- it was quite the opposite.

6         He was -- he was trying to share his account of what he

7    saw and what took place, because that is what he did.  He was

8    there witnessing what took place.  He wasn't there to actually

9    take action, do harm against that.  And that's going to --

10   ultimately going to be what the issue is in the trial.  I think

11   you've recognized that, Your Honor; that there is obviously

12   going to be very much a dispute in this case regarding what was

13   really going through his mind and what his intentions and

14   motives were.  But I think the evidence, again, as I've heard

15   over and over again, establishes that he wasn't there to do

16   harm.  He wasn't there to damage property or do any violence.

17        One other thing -- the second thing that I'll respond to

18   is this notion regarding, again, the -- telling his wife to

19   get -- get his Trump stuff and -- and move it.  Look,

20   Your Honor, if -- if my client was concerned and wanted to

21   conceal evidence, he could have burned all of his clothes.  He

22   could have burned all of his Trump materials, like we've seen

23   happen with other defendants charged related to the January 6th

24   incident at the -- at the United States Capitol.  He didn't do

25   that; okay?  He -- when his -- when -- they went back down on

1    January 7th.  His wife was ready there to hand it to them with

2    open hands.  I saw the materials with my own hand [sic].  There

3    was never any indication that -- that those items were going to

4    be concealed or destroyed.  It was to preserve everything so

5    that we can get in front of a jury and tell our story.

6         But this leads to the last and what I think is the

7    most important point to consider here, Your Honor.  You asked

8    the government the question:  How does this equate to

9    dangerous [sic] to the community?  How does what Christopher

10   Grider did in the span of seconds at the Speaker's Lobby

11   door -- and you can interpret it however you want to.

12   Ultimately it's going to be up to a jury, but how does what he

13   did in a span of seconds establish that while we wait for trial

14   that he is going to be a continuing danger to the community?

15   The government can't answer that question.

16        This is what I was referring to earlier.  That I have

17   not been able to figure out how what allegedly takes place

18   right here in the span of a few seconds establishes that he is

19   such a danger that we have to keep him detained while we wait

20   for trial.  Because there's nothing of what he's done in his

21   entire life up to that point and there's nothing in his entire

22   life after that point that has indicated that he is a

23   continuing threat or a danger.

24        Conditions are appropriate in this case.  Conditions are

25   appropriate.  And we're asking you, Your Honor, to release

1     Mr. Grider under the conditions that you feel are necessary to

2     assure that he is not a danger to the community.  Thank you.

3           THE COURT:  All right.  Let's take five or so

4     minutes.  I should be ready then.  It's now -- it's a little --

5     it's a little difficult because now we're past noon, but why

6     don't we take until 12:10; all right?  So that's eight minutes.

7         Oh, Mr. Grider.  Are you able to take a break of that

8     nature?  Can you sit there?  He's on mute.

9           MR. MAYR:  The officers need to unmute him.

10          THE COURT:  Ah.

11          THE DEFENDANT:  Yes, Your Honor.  I am -- I am able

12     to wait here.  I was going to ask my counsel if -- if it was

13     okay for me to -- I don't know what the protocol or what the

14     rules are.  Is it -- is it appropriate for me to maybe say

15     something at this moment or --

16          MR. MAYR:  I'm -- I'm going to -- I'm going to ask my

17     client -- I'm going to ask Mr. Grider to hold off on that.

18     What I'd like, Your Honor, if possible, while we're taking this

19     break, maybe I can arrange for an opportunity to have a private

20     conversation with my client about this and then we can --

21          THE COURT:  Yes.  Let me see if we can do that.  Give

22     me one second.  I think we can put you-all in a breakout

23     room -- in the breakout room.  Okay.  Hold on.

24          MR. MAYR:  Okay.  You're obviously well versed in

25     Zoom with breakout rooms.

1          THE COURT:  You'll be moved to a private breakout

2     room where you two can talk, and then she'll bring you back

3     when we're ready to proceed.  And I'm going to go off camera.

4     Thank you.

5          (Recess taken.)

6          THE COURT:  We are back on the record.  Mr. Mayr, I

7     didn't know if you had anything more.

8          MR. MAYR:  Your Honor, just two really quick things.

9     One, my client just wanted to make it abundantly clear that he

10    was not leading the charge to the Speaker's Lobby door trying

11    to break through that door.  And I think the video evidence

12    that we submitted shows that.  He just wanted to make that --

13    he's very adamant about that and wanted to make that clear.

14          But, more importantly, at the beginning, you know, I

15    introduced myself and I -- I told the Court that I was pleased

16    and honored to be appearing before Your Honor.  Mr. Grider also

17    wanted to indicate that he is humbled and honored to appear

18    before you.  He has great respect for you and this institute,

19    this Court, and is willing to abide by any decisions made by

20    this Court moving forward.  So he just wanted to make that

21    abundantly clear as well.

22          That's all I have, Your Honor.

23          THE COURT:  All right.  Thank you.

24          I am ready to rule, unless Ms. Wong has anything else

25    she wants to say.

1          MS. WONG:  Nothing further for the government,

2     Your Honor.

3          THE COURT:  All right.  I have reviewed and

4     considered the detention-related arguments, exhibits, and

5     evidence that the parties have submitted.  I have also viewed

6     the various videotaped footage of the events in question, and

7     I, as I say, am prepared to rule on the motion for reversal of

8     the magistrate judge's detention order.

9          To begin my ruling, I'm going to start by restating the

10    basic facts and procedural history of this matter.  Mr. Grider

11    traveled from Texas to Washington, D.C., to participate in a

12    political rally on January 6th, 2021; and as part of that

13    participation, he joined a large crowd that entered the United

14    States Capitol Building while a joint session of Congress was

15    meeting to affirm the Electoral College vote in the 2020

16    Presidential Election.

17         Mr. Grider was wearing a bright yellow "Don't Tread On

18    Me" flag around his neck, and video footage of the events

19    clearly shows that he was inside the Capitol Building and that

20    he proceeded with the crowd towards the House Chamber and then

21    headed toward the Speaker's Lobby.

22         Importantly, as the crowd began to approach the

23    Speaker's Lobby area, which was plainly marked as such,

24    Mr. Grider was at the front of the pack, and he interacted with

25    the police officers who were there guarding the door.  He did

1     not yell or berate the officers.  Instead, it appears from the

2     footage that he told the officers who were standing there that

3     people elsewhere in the building were getting crushed by the

4     crowd, and he seemed to suggest that, as a result, the officers

5     should step aside to allow the mob to pass into the Speaker's

6     Lobby rather than stay there and guard the doors.

7          As the footage shows the crowd swelling behind

8     Mr. Grider and the angry shouting and jeering increasing,

9     Mr. Grider did not retreat or disassociate himself to the mob.

10    To the contrary, he stayed there, right up front, standing next

11    to the glass-paned doors of the Speaker's Lobby for more than

12    just a few seconds while many people screamed in the officers'

13    faces, beat on the doors trying to fracture the glass.

14         One man in particular was extraordinarily aggressive

15    toward the officers and the property, banging on the doors with

16    his hands, and Mr. Grider, who was holding a helmet, provided

17    his helmet to this person.  The man then used Mr. Grider's

18    helmet to break the glass, ultimately shattering it, leaving --

19    between his efforts and perhaps some others, there was a part

20    of the door that was left open, the glass fractured, and at one

21    point, Mr. Grider pushed the Lobby doors with his hand himself

22    and then backed away.

23         From what the Court can tell in looking at these videos,

24    very distressing videos, seconds later, Ashli Babbitt tried to

25    climb through the door pane that had been broken open and she

1    was shot by the police, steps from where Mr. Grider had been

2    standing.

3          That evening, while he was still in Washington, D.C.,

4    Mr. Grider was interviewed by a local news program in Waco,

5    Texas.  He admitted to entering the Capitol and described

6    witnessing Ashli Babbitt's shooting.  He also claims that he

7    went to D.C. because then-President Donald Trump had asked

8    people to do so and that while he didn't know whether the

9    election had been stolen, he didn't like the attitude of the

10   politicians who had been involved.  He said he thought coming

11   to Washington was the least he could do to show his support for

12   President Trump.

13         Approximately three weeks later, on January 20th, 2021,

14   a three-count criminal complaint was filed against Mr. Grider

15   in this court charging him with destruction of government

16   property in violation of 18 U.S.C. § 1361; knowingly entering

17   or remaining in a restricted building or grounds without

18   unlawful authority -- excuse me -- without lawful authority, in

19   violation of 18 U.S.C. 1752(a)(1) and (b); and violent entry

20   and disorderly conduct on Capitol grounds, in violation of

21   40 U.S.C. 5104(e)(2).  A warrant was issued for Mr. Grider's

22   arrest, and he voluntarily surrendered himself to the FBI in

23   Austin, Texas, on January 21st.

24         On January 22nd, Mr. Grider appeared before Magistrate

25   Judge Hightower of the Western District of Texas.  The

1    government moved for pretrial detention, and Magistrate Judge

2    Hightower ordered that Mr. Grider be detained temporarily and

3    set a detention hearing for January 27th.

4          On January 26th, Mr. Grider was indicted in this

5    court on seven counts, three of which overlap with the

6    charges in the criminal complaint.  The indictment charged

7    Mr. Grider with destruction of property and aiding and

8    abetting in violation of 18 U.S.C. §§ 1 -- 1361 and '62;

9    entering and remaining in a restricted building or grounds,

10   in violation of 18 U.S.C. § 1752(a)(1); disorderly and

11   disruptive conduct in a restricted building or grounds,

12   in violation of 18 U.S.C. 1752(a)(2); obstruction of an

13   official proceeding and aiding and abetting, in violation of

14   18 U.S.C. § 1512(c)(2); disorderly conduct in a Capitol

15   Building or grounds, in violation of 40 U.S.C. § 5104(e)(2)(D);

16   impeding passage through the Capitol grounds or buildings, in

17   violation of 40 U.S.C. 5104(e)(2)(E); and an act of physical

18   violence in the Capitol grounds or buildings, in violation of

19   40 U.S.C. § 5104(e)(2)(F).

20         At the detention hearing on January 27th, 2021,

21   Magistrate Judge Hightower heard from the parties, took

22   evidence, and then concluded that Mr. Grider must be detained

23   pretrial.  That same day, Mr. Grider filed a motion to reopen

24   the detention hearing, which Magistrate Judge Hightower denied.

25         Mr. Grider then filed a second motion to reopen the

1    detention hearing on February 1st, 2021, which Magistrate Judge

2    Hightower also denied, this time on the grounds that because

3    she had transferred this matter already to D.C., Mr. Grider was

4    required under law to seek review of her detention decision in

5    this court.

6         On February 11th, 2021, Mr. Grider filed a motion to

7    revoke Magistrate Judge Hightower's detention order under

8    18 U.S.C. 3145(b), and it is that motion that brings us here

9    today.

10        I will now turn to my analysis, which I have undertaken

11   after careful review of Mr. Grider's motion for review of his

12   pretrial detention, the government's opposition, Mr. Grider's

13   reply brief, the filings that were before the magistrate judge,

14   and the video footage.

15        The pretrial detention determination is undertaken

16   pursuant to specific legal standards, and I'm going to start by

17   laying out those standards before I explain my reasoning and

18   analysis of the detention question presented in this case.

19        A motion under 18 U.S.C. § 3145(b) for review of a

20   magistrate judge's detention order requires that the Court

21   review *de novo* whether conditions of release exist that will

22   reasonably assure the defendant's appearance in court or the

23   safety of any other person or the community.  The Court is free

24   to use in its analysis, any evidence or reasons relied on by

25   the magistrate judge, but it may also hear additional evidence

1    and rely on its own reasons.

2          It is well established that pretrial detention is an

3    exception to the general rule that a defendant remains at

4    liberty while awaiting trial.  In the Bail Reform Act, Congress

5    laid out the limited circumstances in which pretrial detention

6    is appropriate.  Such detention can be ordered based on a

7    judicial officer's determination either that no conditions of

8    release can reasonably assure that a defendant will appear as

9    required or that the defendant's release will endanger the

10   safety of any other person in the community.

11         In commonly used terminology, the statute directs the

12   Court to determine whether the defendant is a flight risk or a

13   danger to the community.  In this case, the Court's focus is on

14   whether Mr. Grider is a danger to the community as opposed to

15   flight risk, because dangerousness is the only basis on which

16   the government has sought pretrial detention.

17         And let me just say that dangerousness alone is

18   unquestionably sufficient to support pretrial detention.

19   Mr. Grider is simply incorrect that a defendant cannot be

20   detained pretrial based on a finding of dangerousness alone.

21   That basis is clearly laid out in the plain text of the

22   statute, and there is well-established case law in this

23   jurisdiction that concludes as much.  Therefore, the Court will

24   consider dangerousness, and it will evaluate that question

25   *de novo*.

1        It is also important to note that the Bail Reform Act

2    identifies certain types of offenses that a defendant may be

3    charged with from which there is a rebuttable presumption that

4    there are no conditions of release which can assure the

5    defendant's appearance or the community safety under section

6    3142(e)(3).  We talked a little bit about this in our back and

7    forth, and as the Court reads the statute, one of the crimes

8    with which Mr. Grider is charged, destruction of government

9    property involving damage in excess of a thousand dollars, is

10   one of the offenses that carries a statutory presumption of the

11   dangerousness.  Therefore, if there is probable cause to

12   believe that Mr. Grider committed the charged offense, then he

13   has the burden of producing at least some credible evidence

14   that rebuts the presumption that no condition of release could

15   assure the safety of the community.

16       If he's able to meet that burden, then the Court

17   proceeds to evaluate the ultimate issue of the appropriateness

18   of pretrial detention, mindful that the burden of persuasion

19   remains with the government.  Thus, ultimately, if a defendant

20   to whom the presumption applies successfully rebuts the

21   presumption by offering some evidence that he is not a flight

22   risk or a danger, the government must demonstrate by clear and

23   convincing evidence that the defendant is, in fact, a flight

24   risk or a danger.

25       And in making that determination, the Court must weigh

1    four factors that the Bail Reform Act specifies.  One, the

2    nature and circumstances of the offense charged, including

3    whether the offense involves a controlled substance or a

4    firearm; two, the weight of the evidence against the person;

5    three, the history and characteristics of the person; and four,

6    the nature and seriousness of the danger to any person or the

7    community that would be posed by the person's release.

8         I have considered all of the factors and all of the

9    statutory criteria that I have just laid out, and I will now

10   explain my ruling on this motion.

11        To start, I want you all to understand that the

12   detention question in this case is a really close call, perhaps

13   the closest that I have seen in my time on the bench.

14        On one hand, I can see clearly Magistrate Judge

15   Hightower's reasoning.  I fully understand her conclusions,

16   especially after reviewing the videotaped evidence of the

17   events in question.

18        Mr. Mayr, in your filings you consistently say, you

19   know, look at the videotape, the videotape shows what happened.

20   Don't go with the government's, you know, representations.  And

21   I have to tell you, I have looked at the tapes, and I actually

22   think the tapes are much more inculpatory than exculpatory

23   because they clearly demonstrate how Mr. Grider put himself at

24   the center of this conflict, steps away from some of the most

25   violent, lawless, and reprehensible acts that occurred in the

1    Capitol on that day.

2         And rather than asking myself whether anybody really

3    believes that Mr. Grider presents a danger based on the actions

4    of the FBI or law enforcement after the fact, as your reply

5    brief asked me to do, I think that the real question that arose

6    in my mind in looking at those videos as I watched with horror

7    how the events actually unfolded inside the Capitol is how

8    close can a person be to unquestionably violent and completely

9    unacceptable lynch-mob-like acts of others and still claim to

10   be a nondangerous, truly innocent bystander.

11        I understand your argument, Mr. Mayr.  You -- you say

12   there are those who came with a plan, those who came with a

13   purpose, those who were executing that purpose, and then there

14   were the others.  What I would like to suggest after looking at

15   those videos is that your client may not be fully in one camp

16   or the other in the way that you have set it up, because he was

17   right there -- "right there" -- next to those who were engaged

18   in these kinds of activities.

19        Magistrate Judge Hightower plainly rejected the

20   characterization of Mr. Grider as a mere bystander based on the

21   events depicted, and I completely understand that conclusion.

22   I also see that there is another way to view this, and, again,

23   this is what makes this case so hard.

24        I've been wrestling with this since setting the hearing

25   date and starting to look through all of the materials.  The

1    video does show that there were people in that mob who were

2    actually aggressively engaged in violent acts.  They were

3    clearly depicted.  They were the people who were screaming and

4    throwing things and hitting the glass.  And it is true that

5    Mr. Grider was not one of those people on that fateful day.  He

6    was in the midst of the violence and the chaos, but if you

7    isolate just what he did and his own acts, it's not easy to

8    conclude that he is so dangerous that no conditions of release

9    can protect the community.

10          But as I said, this is an extremely close call, and one

11   that I've not taken lightly.

12          For the reasons that I'm about to explain, I find that

13   Mr. Grider has sufficiently rebutted the statutory authority of

14   dangerousness under the circumstances presented here and that

15   the government has not proven by clear and convincing evidence

16   that Mr. Grider is so dangerous that the conditions of release

17   do not exist that can assure the safety of the community if he

18   is released, especially if he is released under heightened

19   supervision.  Therefore, I will grant Mr. Grider's motion and

20   reverse the magistrate judge's pretrial detention order.

21          Mr. Grider, I see that your hand is raised, but let me

22   finish my recitation, and then you can talk to your lawyer, if

23   there's something else you would like to say.

24          To understand my conclusion, it's important to recognize

25   that the only pretrial detention issue question is whether

1    Mr. Grider poses a danger to the community within the meaning

2    of the Bail Reform Act.

3        Both parties in your presentations here -- here this

4    morning circled around the ultimate issue of the elements of

5    the offense and whether Mr. Grider has actually committed a

6    crime in your discussions about intent.  That's not really what

7    the Court is focused on at this moment.  This is about whether

8    Mr. Grider poses a danger to the community such that he cannot

9    be released pretrial.

10        Now, as a presumptive matter, he does pose such a danger

11    because, as I'm about to explain, a grand jury has found that

12    there's probable cause to believe that he committed the

13    government property offense that the government has charged

14    under 18 U.S.C. 1361.  It is striking to me, as I suggested,

15    that neither the magistrate judge nor the parties really

16    provided the analysis of the presumption of dangerousness in

17    the way that I'm used to seeing it; but determining whether

18    there is such a presumption and whether it's been rebutted is

19    where the proper legal analysis starts.  If there is a

20    rebuttable presumption of dangerousness, then Mr. Grider has to

21    provide evidence to rebut it, and only if he successfully does

22    so can the Court move on to evaluating the four bail reform

23    factors that I previously mentioned.

24        So with respect to the rebuttable presumption, as I

25    said, it's clear to the Court that it applies.  And I'm talking

1    about the presumption codified at 18 U.S.C. 3142(e).  This is

2    because section (e)(3)(C) of that statute says that the

3    presumption applies for an offense listed in 2332b(g)(5)(B) for

4    which a maximum term of imprisonment of ten years is

5    prescribed.  And Mr. Grider has been charged with such a crime,

6    destruction of government property, in violation of 18 U.S.C.

7    1361 with an estimated damage exceeding a thousand dollars, is

8    an offense that is listed in that statute and that carries a

9    maximum sentence of ten years of imprisonment.  Thus, the

10   presumption is implicated on that basis alone.

11          Furthermore, there is probable cause, I conclude, to

12   believe that Mr. Grider committed the offense as demonstrated

13   by the grand jury's indictment and the evidence that the

14   government has presented.  So we have to start there.  We have

15   to start with the presumption that no condition or combination

16   of conditions can assure the safety of the community if

17   Mr. Grider is released, and it is his responsibility to present

18   credible evidence that this is not so in order to overcome the

19   presumption.

20          Given this presumption and the evidence in the record,

21   the Court finds that Mr. Grider has successfully rebutted the

22   presumption for several reasons.  First, Mr. Grider has almost

23   no criminal history.  What criminal history he does have is

24   relatively old, relatively minor:  an arrest for reckless

25   driving in 2000 when he was 19 years old and public

1     intoxication in 2017.  Mr. Grider's lack of any documented

2     involvement with prior violent crimes or drug or gun offenses

3     is evidence, some evidence, that he is not a danger to the

4     community.

5          Additionally, Mr. Grider has a substantial employment

6     history, which indicates that he has been a successful and

7     productive member of society.  He's worked as a teacher, a

8     security guard, and he currently runs his own winery and

9     vineyard store.  He's also served in the United States Army

10    National Guard and the Air Force.  Therefore, the facts

11    pertaining to his history and background, minimal involvement

12    in past crimes, service to our country, successful employment,

13    all of these things are credible evidence that he is not a

14    danger to the community such that the Court finds that the

15    presumption of dangerousness is rebutted.

16         What this means, as a practical matter, is that the

17    government cannot rely simply and solely on the charged offense

18    and the statutory presumption to carrying its burden of

19    establishing that no combination of conditions could assure the

20    safety of the community for the purpose of pretrial detention.

21    Rebuttable presumption is about evidence and what the

22    government has to prove in order to meet the statutory

23    requirements.

24         So with the presumption rebutted, they can't just rest

25    and not say anything more.  They have to actually establish by

1    clear and convincing evidence that he is a danger.  So it

2    shifts back to the government to -- to demonstrate that, that

3    he has to be detained for the safety of the community, and it

4    is that finding that I ultimately determined that -- that the

5    government did not satisfy.

6         And let me explain why.  That determination is made

7    relative to the four factors related to detention that the Bail

8    Reform Act prescribes.

9         First, the nature and circumstances of the offense.

10   Now, I'm going to pause here to focus on the offense at issue,

11   and I have to say that it is hard to overstate the seriousness

12   of the offense at issue in the big picture when you're thinking

13   about what happened on January 6th.  We've all seen and heard a

14   lot about what happened on that day.  People came from all over

15   the country in response to lies about the status of the

16   election in order to participate in a political rally that

17   forcefully objected to Congress performing its constitutional

18   duty, and that duty was to certify the vote tally of the 2020

19   Presidential Election.

20        Many of the attendees of this rally were lured to the

21   Capitol Building itself, and many of these people ultimately

22   forcibly breached the perimeter of that building while

23   lawmakers and the Vice President of the United States were

24   inside.  And they participated in what many scholars and

25   commentators have characterized as an armed insurrection aimed

1   at disrupting Congress's constitutional function through

2   threats and intimidation and apparently -- "apparently" -- with

3   the intent of overthrowing the duly-elected government of the

4   United States.

5          If there is a more serious offense in terms of who we

6   are as a society and the democratic order that is at the core

7   of our constitutional scheme, I don't know what is.

8          Now, Mr. Grider's memoranda and his counsel here this

9   morning emphasized that armed insurrection was not his intent.

10  Mr. Mayr says Mr. Grider left his home in Texas, traveled to

11  the District of Columbia on the date in question because the

12  President had asked him to do so and he wanted to show his

13  support; that he did not have a plan to participate in the

14  breach of the Capitol.

15         But make no mistake, Mr. Grider, you did participate.

16  You did have a role in one of the most egregious assaults on

17  our democracy in the history of this country, and as a result,

18  regardless of what I say here today concerning your detention

19  status, you will face very serious and significant federal

20  criminal charges.

21         The question for the Court at this point in the

22  proceedings is not whether you are guilty of the offenses with

23  which you have been charged.  Indeed, at this stage you are

24  presumed to be innocent.  The only question is whether you must

25  be detained pending trial or other resolution of these charges,

1    and as I have now repeatedly indicated, this is a very close

2    question.

3           One of the things that I've done to determine how to

4    rule on this is to look at the circumstances and the detention

5    status of other similarly situated individuals.  Whenever I

6    have a criminal case, one of the things I'm most concerned

7    about is making sure that similarly situated people are being

8    treated in a similar fashion.  I think that is the essence of

9    justice, and that's what I try to do.

10           Many of my colleagues here in D.C. have now dealt with

11   similar defendants -- that is, defendants who were involved in

12   some way in the January 6th attack on the Capitol -- and a set

13   of factors about the nature and circumstances of the individual

14   defendant's participation has emerged that I think are helpful

15   to guide in the detention considerations.

16           So these criteria that other judges have found

17   significant in making detention decisions in this context is

18   whether the defendant entered the Capitol Building; whether the

19   defendant committed an act of violence or damaged property;

20   whether there is evidence that the defendant took steps to plan

21   for the attack, such as by buying or amassing the weapons;

22   whether the defendant had or used a weapon during the attack;

23   whether the defendant had a leadership role in the attack; and

24   whether the defendant tried to cover his or her tracks after

25   the fact.

1          I think these are useful criteria in assessing the

2     nature and circumstances of the offense for the purpose of

3     making the detention decision, and I applied them here.

4          In this case, Mr. Grider clearly entered the Capitol

5     Building.  And as I said, he put himself up front in the first

6     row of people who were menacing lawmakers outside the Speaker's

7     Lobby.  Mr. Grider did not break the glass panel to the

8     Speaker's Lobby himself.  He did not make any sort of violent

9     attempts in that regard, but he did give his helmet to someone

10    who used it to break the glass, thereby apparently facilitating

11    the destruction of government property.

12         Handing someone who has clearly violent tendencies an

13    implement to be used to gain entry into a restricted area of

14    the Capitol Building is a very serious offense, and Mr. Grider

15    probably should have known it to be so in the context of the

16    situation where a massive mob of people was trying to breach

17    the entry to the Speaker's Lobby, shouting threats and showing

18    aggressive destructive behavior.

19         And because it would have been obvious to anyone

20    standing in Mr. Grider's position, that the man he chose to

21    give the helmet to was acting in a violent and dangerous way,

22    this factor, the nature of Mr. Grider's offense, weighs in

23    favor of detention, notwithstanding the fact that all of the

24    different pieces aren't necessarily evidence in that case.

25         In that regard, let me just say that this offense is not

1    plainly as dangerous as some of the other defendants.  There's

2    no indication that he came to D.C. in order to participate

3    in -- in the attack on the Capitol.  There's no indication from

4    what I've seen that there was -- excuse me -- there was an

5    intent to cause damage necessarily.  And while the video does

6    show that Mr. Grider was at the front of the pack, it does not

7    appear that he was actually leading the crowd or inciting them

8    in any way.

9        Nor is it entirely clearly whether Mr. Grider actually

10   tried to cover his tracks in the immediate aftermath of the

11   Capitol attack.  One might infer that he attempted to hide

12   evidence by instructing his wife to give the clothes that he

13   wore during the attack to a neighbor, but he also voluntarily

14   went on the local news, admitted to being inside the Capitol,

15   turned himself in as well, and it's hard to square those

16   actions with an actual attempt to hide his association with the

17   events of the day.

18       That said, on the whole, the circumstances of entering

19   the Capitol amidst a call for armed insurrection where people

20   were clearly acting in a violent way and providing even the

21   minor assistance that he did is a factor that weighs in favor

22   of detention.

23       The second factor is the weight of the evidence.  The

24   vast majority of Mr. Grider's actions have been captured on

25   video and from multiple angles.  As I've now said repeatedly,

1    those videos made clear that Mr. Grider entered the Capitol

2    during a significant session of Congress after others had

3    forcibly breached the perimeter, that he was part of the mob

4    that tried to gain entry into the Speaker's Lobby in

5    particular.

6         Unfortunately, that same crowd was the crowd in which

7    there was actually the shooting that led to the death of one of

8    the people who were involved in the activities of that day, and

9    it -- the videos plainly demonstrate that Mr. Grider provided

10   his helmet to someone who used that implement to break the

11   glass of the Speaker's Lobby.

12        Therefore, the Court concludes that the evidence that

13   the government has presented strongly supports the aiding and

14   abetting destruction of government property and aiding and

15   abetting obstruction of official proceeding charges that the

16   government has brought in this case.  That means that the

17   second factor also weighs in favor of detention.

18        Turning to the third factor, Mr. Grider's history and

19   characteristics.  The bail reform statute sets forth various

20   criteria that a Court must consider in evaluating a defendant's

21   history and characteristics.  Those include the person's

22   character, physical and mental condition, family ties,

23   employment, financial resources, length of residence in the

24   community, community ties, past conduct, history relating to

25   drug or alcohol abuse, criminal history, and record concerning

1    appearance at court proceedings.

2         As I've noted, Mr. Grider has virtually no criminal

3    history, and his lack of criminal history weighs strongly

4    against pretrial detention.  In addition, Mr. Grider has strong

5    ties to his community in Texas where he lives with his wife and

6    three children.  He runs a business there and has close

7    relationships with many people in the community.  Mr. Mayr

8    talked about the record that he amassed before the magistrate

9    judge.  It appears that some 22 people submitted letters in

10   favor of Mr. Grider's release and attesting to his good

11   character.

12        Moreover, Mr. Grider's employment as a teacher and his

13   service in the National Guard and Air Force also indicate that

14   he has a stellar history and -- and set of characteristics.

15   And on balance, the Court thus    finds that this factor,

16   history and characteristics, also weighs in favor of release.

17        So we have two in favor of detention so far, one in

18   favor of release.

19        The fourth and final factor is the nature and

20   seriousness of the danger to the community that this

21   defendant's release was -- would pose.  As discussed with

22   respect to the first two factors, the videotaped evidence does

23   show that Mr. Grider had a willingness to place himself in the

24   center of the action and to facilitate the violence and

25   destruction that he was observing.

1        And let me just pause because there are public members

2    on this call, people who may not have seen what happened in the

3    Capitol that day, and I would encourage anyone who is not

4    familiar with what went on to watch the videos.  They are on

5    YouTube and they are breathtaking.

6        Mr. Grider, the Court finds that you were in the middle

7    of that ugliness and mayhem, and while you did not actively

8    engage, you also did not appear to be taking any steps to try

9    to stop it.  Your actions are in some ways very unfortunate and

10   unfathomable, just like that entire set of circumstances, and

11   they cannot be taken lightly.

12       But, again, I return to the factors that my colleagues

13   have found to be most significant when they are deciding

14   whether or not someone needs to be detained pretrial.  Is there

15   evidence that you planned to enter the Capitol and commit an

16   offense?  No.  Did you enter the Capitol with a weapon and an

17   intent to harm people who you viewed as having stolen the

18   election?  There's no evidence of that.  There's also no

19   indication that you had any real leadership role in the attack,

20   nor have you ever done anything violent or dangerous in the

21   past as far as the record indicates.

22       And given the lack of evidence concerning these crucial

23   aspects of your offense, if the Court is going to treat you

24   similarly to other similarly situated Capitol insurgent

25   defendants, then it must conclude that the nature and

1    circumstances of your release are not going to pose a danger to

2    the community that cannot be addressed through carefully

3    crafted conditions.

4         As Mr. Mayr pointed out, I also note that you

5    voluntarily arranged to have your firearms and ammunition

6    removed from your home.  You've preemptively agreed to be on

7    ankle monitoring and have frequent check-ins with law

8    enforcement, and I have no reason to believe -- based on what

9    evidence I have, I have no reason to believe that you will not

10   comply with those conditions.  Therefore, I find that the

11   nature and seriousness of the danger posed by your release

12   weighs in favor of release.

13        So if we're keeping tally with respect to the four

14   factors at issue, I find that two weigh in favor of detention;

15   two weigh in favor of release.  And that split is, of course,

16   part of what makes this call so difficult.

17        The lack of any criminal history and your willingness to

18   comply with conditions are very weighty factors that in my view

19   ultimately tip the balance.  And I also want to mention that in

20   thinking about the fourth factor in particular, the danger that

21   could be posed by your release, I cannot help but notice that

22   your particular community in Texas was in serious need this

23   past week, as were so many others in that region of the

24   country, and that you could have been there providing

25   assistance and support.  Far from posing a danger from being

1    released, you could have been there helping people if you had

2    not chosen to thrust yourself into the middle of a volatile

3    situation knowingly facilitating divisiveness and fomenting

4    violence.

5          I think you know that if we're all going to get through

6    all of the challenges that we face as a country, we've got to

7    pull together rather than tearing each other apart.  And I hope

8    that for your sake during this pretrial period you will go back

9    home, you will fastidiously follow the conditions.  You will

10   help your community to recover, and you will demonstrate that

11   you are not a dangerous force for evil as one might otherwise

12   conclude based on your presence in the Capitol on January 6th.

13         The Court ultimately concludes there are conditions of

14   release that can reasonably assure the safety of the community

15   while Mr. Grider awaits trial and that detention pending trial

16   is not warranted.

17         Accordingly, it is hereby ordered that Mr. Grider's

18   motion to revoke the detention order is granted.  Mr. Grider

19   will be released pretrial subject to the following conditions:

20   GPS location monitoring, weekly check-ins with pretrial

21   services in the Western District of Texas, no possession of

22   firearms or ammunition, no travel to D.C. unless for court

23   appearances.  We're now operating largely remotely.  So that

24   kind of travel will not be required.

25         You will have to surrender your passport, to the extent

1    that you have not already done so, and not travel outside of

2    your community.

3           You're going to also be subject to the standard

4    conditions of pretrial release, including the requirement that

5    you not commit another local, state, or federal crime.  And

6    upon your release, you must report immediately to the pretrial

7    services office in the district to which you are released for

8    further instructions.

9           Finally, Mr. Grider, I want you to note that the Court

10   will be supervising you during this period of pretrial release

11   and that it can revisit its decision concerning your detention

12   at any time.  If you fail to follow the conditions of pretrial

13   release, the Court will be notified.  And if the Court finds

14   that you are not in compliance, I may send you back to jail.

15          In addition, if you commit any crimes while on pretrial

16   release, that can result not only in you being placed back into

17   detention before trial, but you could also be prosecuted for

18   those separate crimes and also prosecuted -- also the fact that

19   you were on pretrial release at the time you committed those

20   other crimes could subject you to a separate penalty.

21          Am I clear about that, sir?

22               THE DEFENDANT:  Yes, Your Honor.

23               THE COURT:  All right.  I am going to leave it to my

24   courtroom deputy and pretrial services to sort out exactly what

25   documentation is necessary to execute this release.  Ms. Schuck

1    has indicated that D.C. pretrial will work with the Western

2    District of Texas pretrial in order to make sure that the

3    monitoring is established and that Mr. Grider returns to his

4    community.

5            Let me ask Ms. Schuck or Ms. Franklin if you have any

6    questions about the order that I am issuing.

7            THE COURTROOM DEPUTY:  Your Honor, this is your

8    courtroom deputy.  I do not have any questions.

9            THE COURT:  Ms. Schuck?

10           THE PRETRIAL SERVICES OFFICER:  Yes, Your Honor.

11   Christine Schuck, pretrial services.  Pretrial needs to know in

12   regards to the location monitoring if Your Honor is placing the

13   defendant on a curfew home detention or home incarceration.

14           THE COURT:  I am going to place him on a curfew.

15           THE PRETRIAL SERVICES OFFICER:  And what curfew will

16   that be, Your Honor?

17           THE COURT:  What are the standard conditions,

18   Ms. Schuck?  Is it 10:00 p.m. to 6:00 a.m.?

19           THE PRETRIAL SERVICES OFFICER:  The standard -- yes,

20   Your Honor, that is the standard curfew, 10:00 p.m. to

21   6:00 a.m.  And then in -- in other jurisdictions, outside the

22   District of Columbia, we would request that the defendant be --

23   have the condition imposed that he must pay for all costs of

24   the program, based on his ability to pay as determined by the

25   pretrial services office for the supervising officer.

1    THE COURT:  And if it's determined that he can't pay,

2  then you'll -- then that condition --

3    THE PRETRIAL SERVICES OFFICER:  Then they -- they

4  determine it, but in other jurisdictions outside the District

5  of Columbia, that is a standard condition that goes with the

6  location monitoring.

7    THE COURT:  All right.  I will impose that as well.

8    THE PRETRIAL SERVICES OFFICER:  And also request --

9  we would request the additional condition that he report as

10  soon as possible to the pretrial services office or supervising

11  officer every contact with law enforcement personnel, including

12  arrests, questioning, or traffic stops.

13    THE COURT:  All right.  Mr. Mayr.

14    MR. MAYR:  We have no problem with that condition.

15  Your Honor, just going back to the curfew, the only

16  thing I was going to ask is, as you may recall from the

17  letters, in running his business and running the winery, it

18  sometimes involves 18-hour days of working.  Would the Court be

19  willing to extend those hours from, say, 6:00 -- 6:00 a.m. --

20  to have him be at home from 10:00 p.m. to 6:00 a.m., thereby

21  giving him from 6:01 a.m. until 9:59 p.m. local time to -- to

22  do whatever he needs to do to facilitate the running of his

23  business.

24    THE COURT:  Yes.  That -- that is the condition,

25  Mr. Mayr.

1          MR. MAYR:  Okay.  I just wanted --

2          THE COURT:  It is from 10:00 p.m. -- meaning he has

3    to be home at 10:00 p.m. through 6:00 a.m. in the morning, and

4    the hours of working and whatever else he needs to do will

5    occur between 6:01 and 9:59.

6          MR. MAYR:  Okay.  That's good.  I just want to make

7    sure we're clear on those hours.  Thank you, Your Honor.

8          THE COURT:  Yes.

9        Is there anything else that we need to discuss or

10   address here at this time?

11         THE COURTROOM DEPUTY:  Your Honor, one thing.  I need

12   to make sure, for the record, to swear Mr. Grider out to the

13   conditions -- make sure that he's sworn on the record to the

14   conditions of his release.

15         THE COURT:  All right.  It looks as though Mr. Grider

16   has some -- I don't know.  Mr. Grider, did you want to speak to

17   your lawyer before we do that?

18         THE DEFENDANT:  Sure.  He's saying yes.  So yes.

19         THE COURT:  All right.  We're going to do a little

20   breakout room for five minutes, and then we'll come back and

21   you'll be sworn out to the conditions.

22        Gwen, do I need to be here for that?

23         THE COURTROOM DEPUTY:  No, Your Honor.  But we do

24   have one more thing after this.  Ever since we've completed the

25   motions hearing, is it -- after this is over, can we -- after

1    the motion, can we go ahead and arraign Mr. Grider, do the

2    arraignment?

3              THE COURT:  Yes.  All right.  So we'll come back in

4    five minutes after we've had the breakout of Mr. Grider and his

5    lawyer.

6              MS. WONG:  Your Honor, can I say one thing about

7    conditions, or can we wait until afterwards?

8              THE COURT:  Why don't you say it now in case it's

9    something Mr. Mayr and his client would need to discuss.

10             MS. WONG:  Yes, Your Honor.  I just wanted to ask if

11   the conditions (l), (m), and (n) could be included.  Those are

12   the prohibition on using alcohol excessively and using or

13   unlawfully possessing a narcotic drug, submitting to testing.

14   Those were -- there is a basis for those, I think, based on the

15   pretrial services report and were recommended.

16             THE COURT:  Are those in the standard conditions,

17   Ms. Schuck?

18             THE PRETRIAL SERVICES OFFICER:  Yes, Your Honor.

19             THE COURT:  All right.

20             THE PRETRIAL SERVICES OFFICER:  The alcohol is not,

21   but the -- not to unlawfully possess narcotic drugs is, but I

22   can add whatever Your Honor wishes.

23             THE COURT:  All right.  Ms. Wong, tell me what the

24   basis -- there's a basis for that in the pretrial services

25   materials that you've received?  I don't need to --

1          MS. WONG:  Yes, Your Honor.  He has in the past --

2    he indicates alcohol use and narcotic use within a certain

3    period of time.  He also did have the intoxication arrest,

4    Your Honor.

5          THE COURT:  Yes.  Based on the 2017 intoxication

6    arrest, I will find that a condition concerning excessive

7    alcohol use is warranted.  And, Ms. Wong, if you can -- if

8    there's particular language that goes with that, if you can

9    provide it to both defense counsel and the pretrial services

10   officer, that would be great.

11         MS. WONG:  Absolutely, Your Honor.

12         THE COURT:  Okay.  Five-minute breakout for the --

13   Mr. Grider and his counsel.  Thank you.

14         (Recess taken.)

15         THE COURT:  I think we're all back again.  So

16   Ms. Franklin.

17         THE COURTROOM DEPUTY:  Yes.

18      Mr. Grider, you have heard the conditions of release set

19   forth on this videoconference.  Do you solemnly swear or affirm

20   under the pain of penalty of perjury that you will abide by all

21   conditions set forth today?

22         THE DEFENDANT:  Yes, ma'am.

23         THE COURTROOM DEPUTY:  Thank you.

24      Okay.  Your Honor, the only thing that defense counsel

25   and I had discussed was maybe doing the arraignment now for

1    Mr. Grider, and then we need to, from that, set another status

2    hearing date.

3              THE COURT:  Yes.  And we have to also -- also -- let

4    me find my paperwork -- talk about the speedy trial clock.  So,

5    yes, please go ahead with doing the arraignment.

6              THE COURTROOM DEPUTY:  Mr. Grider, you are charged in

7    a -- in a seven-count indictment with the following:

8    destruction of government property and aiding and abetting;

9    entering and remaining in a restricted building; disorderly and

10   disruptive conduct in a residential -- I'm sorry -- in a

11   restricted building or grounds; obstructive -- obstruction of

12   an official proceeding and aiding and abetting; disorderly

13   conduct in a Capitol Building; impeding passage through the

14   Capitol grounds or building; act of physical violence in the

15   Capitol grounds or building.  Do you waive the formal reading

16   of the indictment?

17             MR. MAYR:  We do -- we do, Your Honor.

18             THE COURTROOM DEPUTY:  And how do you wish to plead

19   to the seven-count indictment?

20             THE DEFENDANT:  Not guilty.

21             THE COURTROOM DEPUTY:  Your Honor, a plea of not

22   guilty is entered to the indictment.

23             THE COURT:  All right.  That is the arraignment

24   process.

25        The next thing that we need to focus on now that

1   Mr. Grider has been arraigned is the speedy trial clock, which

2   under our statute Mr. Grider has a certain amount of time by

3   which he would need to be tried if he intends to go to trial.

4   I will say that like so many other courts in our system right

5   now, our court is closed and our -- to trials, and our Chief

6   Judge has issued a standing order that suspends the speedy

7   trial clock as a result.  I don't have before me right at this

8   moment the date that the suspension has been held to.

9        Let me ask Ms. Wong, do you know when?

10            MS. WONG:  I believe it's March 15th, Your Honor.

11            THE COURTROOM DEPUTY:  15th.

12            MS. WONG:  I'm trying to get confirmation.  I believe

13   it's March 15th.

14            THE COURT:  All right.

15            MS. WONG:  In any event, the government is happy and

16   would like, in an abundance of caution, to make an additional

17   finding, Your Honor, that the interests of justice are

18   controlling.

19            THE COURT:  Well, I will.  But let's also figure out

20   when we plan to return on this matter.

21        Ms. Wong, what is the status of discovery.

22            MS. WONG:  Your Honor, the government is anticipating

23   providing informal discovery within the next -- my hope would

24   be the next two weeks.  We have not -- given the unique nature

25   of this prosecution, we are waiting for some overall planning

1    to assure consistency as we handle these matters from our

2    office.  Given the voluminous discovery here, including the

3    prevalence of video footage and to allow discussion of

4    potential resolution, the government would ask for a tolling

5    for approximately 45 days, to come back around the week of

6    April 5th.

7              THE COURT:  Are you saying -- I'm sorry, April 5?

8    April 5th?

9              MS. WONG:  Yes, Your Honor.

10             THE COURT:  Have you talked with Mr. Mayr about that?

11             MS. WONG:  I have not yet.

12             THE COURT:  Mr. Mayr, do you hear Ms. Wong's

13   representations about the need for coordination, a potential

14   nontrial disposition?  What is your view as to having a return

15   date be the week of April 5th?

16             MR. MAYR:  Your Honor, Ms. Wong has indicated that

17   she is going to provide informal discovery, just -- we haven't

18   discussed the time frames.  I have no objections on behalf of

19   Mr. Grider to the requested time frame and waiving speedy trial

20   to allow all of that discovery to be facilitated to us.

21             THE COURT:  All right.  The Court is available on

22   April 6th in the afternoon.  Why don't you-all check your

23   schedules to see if that is a possibility.

24             MS. WONG:  That works for the government, Your Honor.

25             MR. MAYR:  And that works for the defense as well,

1    Your Honor.

2            THE COURT:  All right.  I'll set this for the next

3    status date as April 6th at 2:30 p.m.  And I will find that it

4    is in the interest of justice -- given the circumstances and

5    the need for additional time to exchange discovery and evaluate

6    potential nontrial dispositions of this matter, that it is in

7    the interest of justice to toll the speedy trial clock until

8    return of court on this matter, which will be April 6th.

9            Is there anything else that we need to address at this

10   time?

11           MS. WONG:  Nothing from the government.  Thank you,

12   Your Honor.

13           THE COURT:  Mr. Grider is raising his hand.  I don't

14   know if that's --

15           THE DEFENDANT:  Your Honor, I just wanted to say I

16   recognize that, you know, you're very busy and there's a lot of

17   things going on.  I appreciate you taking this matter up and --

18   and weighing it.  And, you know, this whole experience, very

19   humbled -- humbled me and by -- by everything I've experienced

20   this year so -- including the stay.  That's just all I wanted

21   to stay.

22           THE COURT:  Well, thank you, Mr. Grider.  You will be

23   returning to your community.  You'll be under GPS monitoring

24   and expected to return probably by video on April 6th and to

25   follow all of the conditions between now and then.

1          Is there anything else that either party would like to

2     say at this time?

3          MR. MAYR:  Just briefly in regards to your

4     conditions, Your Honor.  Because -- you said returning to the

5     community.  My experience with -- at least the Western District

6     of Texas is that they normally limit travel to the county of

7     residence and surrounding counties.  As you know from my

8     filings, I'm in Houston, which is actually the Southern

9     District of Texas.  I don't know if you would be willing to

10    permit him to travel from the Western District, where he

11    resides and where he'll be supervised, into the Southern

12    District of Texas where I am so that if we need to meet and go

13    over anything, he'll be allowed to travel within those limits.

14    Beyond that, he's not going to need to go anywhere else, unless

15    we need to make a motion to the Court.

16          THE COURT:  I don't have a problem with that,

17    Mr. Mayr.  As an officer of the court, you can tell me whether

18    or not that's the sort of standard thing that the courts in

19    Texas allow.

20          MR. MAYR:  Sure.  Ordinarily they do.  They just --

21    pretrial wants -- the pretrial services, they want to have that

22    language in the conditions, so I can -- I'm just letting you

23    know because I'm going to let Ms. Schuck know, and I want to

24    make sure that everyone is aware of -- of just that particular

25    little hang-up.

1          THE COURT:  That's fine.  And just as Ms. Wong was to

2    provide the language that she wanted about the condition

3    related to alcohol to Ms. Schuck, you provide it to Ms. Wong

4    and Ms. Schuck, and the Court is fine with the condition that

5    allows for your client to travel from his district to yours in

6    order to facilitate attorney visits.

7          MR. MAYR:  All right.  Wonderful.  Thank you, Your

8    Honor.

9          THE COURT:  All right.  Anything else?

10          MS. WONG:  Nothing for the government.

11          MR. MAYR:  Nothing from the defense.

12          THE COURT:  All right.  Thank you.  Everyone be safe.

13          (The proceedings concluded at 1:19 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

1 <u>CERTIFICATE OF OFFICIAL COURT REPORTER</u>

2

3   I, Nancy J. Meyer, Registered Diplomate Reporter,

4 Certified Realtime Reporter, do hereby certify that the above

5 and foregoing constitutes a true and accurate transcript of my

6 stenograph notes and is a full, true, and complete transcript

7 of the proceedings to the best of my ability.

8

9       Dated this 12th day of March, 2021.

10

11      /s/ Nancy J. Meyer
       Nancy J. Meyer
12      Official Court Reporter
       Registered Diplomate Reporter
13      Certified Realtime Reporter
       333 Constitution Avenue Northwest, Room 6509
14      Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25