IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

| | |
|---|---|
| United States of America, | ) Criminal Action |
| | ) No. 1:21-cr-00022-KBJ |
| Plaintiff, | ) |
| | ) |
| vs. | ) **Motion Hearing** (via Zoom) |
| | ) |
| Christopher R. Grider, | ) Washington, D.C. |
| | ) April 6, 2021 |
| Defendant. | ) Time:  2:30 p.m. |

_____

Transcript of **Motion Hearing** (via Zoom)
Held Before
The Honorable Ketanji Brown Jackson (via Zoom)
United States District Judge

_____

A P P E A R A N C E S

For the Plaintiff:        **Candice Chiu Wong**
(via Zoom)                U.S. ATTORNEY'S OFFICE FOR THE
                          DISTRICT OF COLUMBIA
                          555 Fourth Street, Northwest
                          Washington, D.C.  20530

For the Defendant:        **Brent Mayr**
(via Zoom)                MAYR LAW, P.C.
                          5300 Memorial Drive, Suite 750
                          Houston, Texas 77007

_____

Stenographic Official Court Reporter:
(via Zoom)                Nancy J. Meyer
                          Registered Diplomate Reporter
                          Certified Realtime Reporter
                          United States Courthouse, Room 6509
                          333 Constitution Avenue, Northwest
                          Washington, D.C. 20001
                          202-354-3118

P R O C E E D I N G S

(REPORTER'S NOTE:  This hearing was held during the COVID-19 pandemic restrictions and is subject to the limitations of technology associated with the use of technology, including but not limited to telephone and video signal interference, static, signal interruptions, and other restrictions and limitations associated with remote court reporting via telephone, speakerphone, and/or videoconferencing.)

THE COURTROOM DEPUTY:  This is Criminal Case 21-022, United States of America v. Christopher Grider.

Starting with government counsel, I'm going to ask that you please state your appearance for the record.

MS. WONG:  Good afternoon, Your Honor.  Candice Wong for the United States.  I'm joined here today by my section chief in the background, Dineen Baker.  She's the chief of the violent crime, narcotics, and trafficking section, should the Court wish to hear from her.

THE COURT:  Good afternoon.

MR. MAYR:  Good afternoon, Your Honor.  Brett Mayr. I'm present here with my client, Christopher Grider.

THE COURT:  Good morning, Mr. Mayr and Mr. Grider.

This is a status conference that was set in the ordinary course on February 22nd, 2021, before it came to the Court's attention that defense counsel had given a media interview concerning this criminal case and also before there was a second nationally televised appearance by defense counsel concerning this matter.  I am emphasizing the timing because

1   unlike in Judge Mehta's case where I understand there was not

2   an attempt by the media to intervene, there is such a motion

3   pending in my case, but today's proceeding was not set as a

4   hearing per se, nor is it the Court's intention to turn today's

5   proceeding into such a hearing.

6        This Court ordinarily proceeds by motion and would most

7   certainly not enter any order of this nature without requiring

8   the parties to brief the legal issues and having an actual

9   hearing on those briefs.

10       So for today's purposes, the Court merely asked the

11  parties to be prepared to discuss the local rules concerning

12  the duties of counsel and the authority of the Court during the

13  course of this previously scheduled status conference,

14  primarily because I wanted to determine whether counsel for

15  both sides are aware of their obligations under this Court's

16  local rules as a precursor for any potential future

17  determination of whether an order under Local Rule 57.7(c) is

18  warranted.

19       So let me start by summarily denying without prejudice

20  the news organizations' pending motion to intervene as

21  unnecessary and premature under these circumstances.

22       And for the purposes of today's conference, let me just

23  start by addressing Mr. Mayr concerning his understanding of

24  the local rules in connection with the media appearances that

25  have occurred.  The Court is aware of two instances of -- or

1    participation in nationally televised interviews.  I understand

2    that this is not your ordinary jurisdiction.  So let me just

3    hear from you about your view of whether the appearances that

4    you made are consistent with the local rules, or maybe you're

5    just not aware of those duties and restrictions.

6              MR. MAYR:  Sure, Your Honor.

7              THE COURT:  You may have to speak up.  I'm sorry.

8              MR. MAYR:  Yes.  I hope you can hear me okay.  I'll

9    try to speak up a little bit louder.

10             So first and foremost in that regard, Your Honor, as far

11   as the application of the local rules, I will represent to the

12   Court that as was required when I submitted my motion to appear

13   pro hac vice on this case, I did affirm that I had reviewed the

14   local rules.  Now, in all honesty, I kind of skimmed over the

15   local civil rules, but I paid close attention to the local

16   criminal rules and was aware of the rule dealing with pretrial

17   publicity, noting its similarities to Model Rule 3.6, which is

18   something that I'm very -- which I'm very familiar with.

19             I -- I -- I want -- I want to start off by letting the

20   Court know that I did not take my appearances on any of these

21   nationally televised interviews lightly; that a lot of

22   forethought went into these to make sure that, one, I was

23   complying with the local rules; two, I was complying with my

24   ethical obligations in doing so.

25             As I stated, I reviewed the Model Rule 3.6.  I reviewed

1  local rules for the D.C. Bar, just -- just to see if there was

2  any difference there.  I'm very familiar with the

3  Supreme Court's decision in *Gentile v. State Bar of Nevada*.

4      Judge, I'm -- I'm cochair of the ethics committee for

5  the Texas Criminal Defense Lawyers Association.  I actually --

6  my -- my former employer gave a seminar on pretrial publicity

7  that I made sure that -- watched to make sure there wasn't

8  anything I wasn't picking up.  So I was very well aware of the

9  limitations and ethical obligations that I was bound by and

10  took those into consideration.

11      In -- in doing the interviews and reading the rules, I

12  did not intend nor believe that any of my comments ran afoul of

13  the rules.  For one, I don't believe that my comments in any

14  way -- to take from -- to take from (b)(1) of the rule, I did

15  not believe and had no intention of having my statements

16  interfere with a fair trial or otherwise prejudice the

17  administration of justice.  Obviously --

18      THE COURT:  Right.  I was listening very carefully

19  because I was trying to understand when you said you were

20  familiar with the rules if you were referencing in particular

21  the local rules of this Court -- and, that is, Local Rule

22  57.7(b)(1), which I now take you to be referencing in

23  particular.  And so let's just be as clear as we can concerning

24  what that rule says.

25      MR. MAYR:  Sure.

1          THE COURT:  "It is the duty of the lawyer or law firm

2     not to release or authorize the release of information or

3     opinion which a reasonable person would expect to be

4     disseminated by means of public communication, in connection

5     with pending or imminent criminal litigation with which the

6     lawyer or the law firm is associated, if there is a reasonable

7     likelihood that such dissemination will interfere with a fair

8     trial or otherwise prejudice the due administration of

9     justice."

10          So, you know, again, I'm not trying to turn this into a

11     hearing necessarily.  I just wanted to get a sense of whether

12     you were aware of this particular rule and -- and suggesting

13     that you don't believe that what you did ran afoul of it or you

14     just weren't aware of that.  It sounds like -- it sounds like

15     the -- the former.

16          MR. MAYR:  Definitely, Your Honor.  Very familiar

17     with it.  In fact, I remember when I -- when I was first

18     familiarizing myself with the local rules before submitting my

19     application to appear pro hac vice, I remember reviewing this

20     rule and saying:  Okay.  That looks just -- that looks pretty

21     much like Model Rule 3.06 [sic], which -- and it has the

22     same -- it has the same reasonable likelihood of -- of language

23     that was discussed by the Supreme Court in the *Gentile*

24     decision.

25          So I immediately recognized it, and I knew that, look, I

1    don't need to go -- I don't go on there and try to, you know,

2    throw out some crazy statements that are just going to ruin the

3    ability to have a fair trial in this case.

4         Now, I will say this:  Each of these times that I did do

5    some national interviews, it wasn't like I sought -- it's not

6    like I sought out to be interviewed by them.  These -- these

7    org- -- these media entities contacted me saying:  Hey, we

8    are -- we are doing this -- we're considering doing a story

9    regarding your client.  We'd like to know whether you would

10   want to be interviewed.

11        THE COURT:  I understand.  And I understand from at

12   least reading the media interviews and the transcripts that

13   other defense counsel were contacted as well and -- and others

14   decided not to do the interview.

15        MR. MAYR:  Sure.  And I was -- and I -- obviously I

16   saw that after the fact, but my position, as it pertained to my

17   client, was there's been -- this is obviously an unprecedented

18   situation.  There's been negative -- there's been publicity

19   about this almost on a daily basis since this occurred back in

20   January.  And there was an abundant amount of -- of -- of

21   publicity regarding my client's case, especially in his

22   community.

23        And when I was contacted by these -- it's interesting

24   you brought up other counsel, because after the fact, I heard

25   stories where other counsel said they declined to comment for

1   the story.  And I thought that's -- that's not good.  That's

2   not good that -- that the media is talking about their client's

3   case and is portraying it as -- in -- in what could be

4   construed in a negative light and there's no one there to

5   balance that out.

6           And so when I was contacted by these agencies, my

7   decision to -- to go on an interview with them is to try to --

8   not so much to interfere with a fair trial, but to ensure that

9   we have a fair trial, to ensure that the story just wasn't

10  reporting one side.  I wanted them to have both sides of the

11  story so that, again, my client wasn't being portrayed as just

12  some -- as just another Capitol rioter who was there to do harm

13  and -- and wreak havoc and lead an insurrection.  I felt

14  that -- that my ethical obligations required me to give a

15  counterpoint of that, and that was the reason why I did those.

16          And, again, in making my comments, I'm very familiar

17  with the rules, very familiar with the ethical obligations, as

18  well as my obligation to my client.  Try to keep things very

19  balanced.  I tried to focus on what was already out in the

20  public record, not to go much well beyond that, which is an

21  exception, and -- and -- but -- but provide some balance to the

22  story regarding my client.

23          THE COURT:  All right.  So it -- it sounds as though

24  we may need to have some briefing and -- and a hearing

25  concerning it, because the position that you are taking is one

1    that I'm going to have to evaluate, because it sounds as though

2    you believe that this was not a mistake or, you know, a

3    circumstance in which you didn't really understand the rules

4    and that you believe that, you know, it's not going to arise

5    again, and you wouldn't -- and you do take these rules to limit

6    your ability to -- to have a discussion.  In fact, it sounds as

7    though just the opposite is the case.

8         And so the Court is going to have to rule on whether or

9    not the -- these rules are consistent with the conduct that has

10   already occurred and that presumably might occur again if it is

11   your position that the rules do not prescribe that kind of --

12   of discussion on the part of an attorney.

13        MR. MAYR:  Yeah.  Let me be clear.  I -- I don't want

14   the Court or anyone, for that matter, to think that I'm just

15   flaunting these rules.  I mean, I -- I'm -- I take them very

16   seriously.  I mean, when I made that affirmation, I took it

17   very seriously.

18        I don't want the Court to think that I'm here to flaunt

19   them or just throw them to the wayside and I'm going to do

20   whatever I want to.  I'm obviously going to abide by whatever

21   the Court orders me to do, and I'm going to abide by whatever,

22   you know, you allow me to do and what you don't allow me to do.

23        Up until this point, you know, I look at the rule and

24   I -- I see that the rule says, look, you can't talk about prior

25   criminal record.  We haven't talked about prior criminal

1   record.  You can't talk about the existence or contents of any

2   confession or admission.  I haven't done that.  You can't talk

3   about the performance of any examinations or tests.  I haven't

4   done those things.

5          But (b)(3) does say that "The foregoing shall not be

6   construed to preclude the lawyer or law firm . . ." and it

7   gives a number of exceptions, if you would, where -- things

8   that I can comment on.  And, again, I -- I'm -- I know that

9   there's not a real clear bright line on a lot of these things,

10  and so I want the Court to be aware that, look, I will -- I

11  don't want to come across as saying that, look, I'm going to do

12  what I want to and, you know, whatever may -- I'll take

13  whatever.

14         I'm willing to comply with any limitations that the

15  Court feels is necessary, but, in the same respect, you know,

16  again, I feel like I do have an -- I do have an obligation to

17  my client and to -- consistent with his First Amendment rights

18  to at least be able to comment regarding this is what's

19  happening, this is what my -- this is what our defense is, this

20  is what we anticipate happening without breaching those

21  barriers that are discussed in the -- that are discussed in the

22  rest of the rules.  So anyway --

23         THE COURT:  All right.  Well, let me -- let me -- let

24  me hear from the government.  I mean, the Court was mostly

25  focused on (b)(1) and the extent to which one might interpret

1    the interviews that have already occurred as presenting a

2    reasonable likelihood of interference or prejudicing the

3    administration of justice.  And I think that we may need to

4    brief that to the extent that defense counsel at least doesn't

5    think that talking on a national news program about his

6    client's defense would, in fact, run afoul of that rule.

7        But let me hear -- maybe the government agrees with his

8    view on -- of this.

9        MS. WONG:  Your Honor, the government is certainly

10    happy to submit anything on the -- in writing that would help

11    the Court in addressing your minute entry that was entered the

12    other day.

13        I think maybe I can start by just noting that defense

14    counsel has noted that one of his reasons was that there was

15    abundant publicity involving this case.  I do just want to note

16    for the record, Your Honor, to my knowledge, the government has

17    not issued any public statement on Mr. Grider's case to date

18    nor even a press release as to this criminal matter.

19        All I'll say for now, Your Honor, is that the government

20    is mindful of the obligations that bind, you know, both

21    government attorneys, as well as defense counsel, in Local

22    Rule 57.7, not just (b)(1), but the specifically delineated

23    categories in (b)(3) as well, which include the

24    57.7(b)(3)(vi) -- subpart (vi) -- that no discussion of an

25    ". . . opinion as to the accused's guilt or innocence or as to

1     the merits of the case or the evidence in the case."  That is a

2     specifically delineated category.

3            But beyond that, if I can just speak to the government's

4     obligations.  We do recognize and take seriously not only the

5     obligations -- we are familiar with the obligations and ethical

6     duties in Local 57.7, but also the further obligations that are

7     spelled out in the justice manual, as well as the Department of

8     Justice regulations that would further ascribe anything the

9     government would say in this case.

10           And we certainly agree and expect -- we think it's

11    appropriate for Your Honor to reiterate these obligations and

12    these duties and certainly expect that this matter should not

13    be tried, you know, in the court of public opinion, but rather

14    in this courtroom.

15           THE COURT:  Yeah.  So, Mr. Mayr, I have to say that

16    I'm trying to assess whether or not it makes sense to spend

17    time on really fleshing these things out or whether the

18    language the government counsel points to, which is, you know,

19    well-taken here, Rule 57.7(b)(3)(vi), which appears to limit

20    counsel's ability to comment concerning an opinion as to the

21    accused's guilt or innocence or as to the merits of the case or

22    the evidence in the case.

23           You know, I saw the *60 Minutes* interview.  I pulled

24    up -- I saw that live, by the way.  I saw that on the night

25    that it was actually broadcast, and I saw the CNN interview

1    earlier, just in preparation for this matter, and I think it's

2    sufficiently close that, you know, if it were your intention to

3    kind of go on the media circuit and continue in this fashion,

4    you really would have to sort of assess the extent to which the

5    law and the rules as they are set forward really do prescribe

6    the particular conduct.

7            MR. MAYR:  Right.

8            THE COURT:  I sort of hear you suggesting that that's

9    not your intention, that you don't want to run afoul of the

10   rules, and I guess I -- I can say, at this point, that I do

11   read these rules as preventing counsel from actually opining

12   on -- about his client's guilt or innocence or the merits of

13   the case because doing so, especially in the national forum --

14   doing so, in the Court's view at least, without it being

15   briefed and without making a definitive ruling on what you've

16   actually done, as a general matter, I -- I think there is a

17   reasonable likelihood that precisely because of the public

18   interest in this matter, that by having counsel going out,

19   having, you know, nationally televised interviews, talking

20   about the evidence, you know, people are playing the clips from

21   the videotapes that are likely going to be evidence in this

22   case, and having defense counsel put forward their view of

23   them, I think there is a reasonable likelihood that that

24   interferes with any potential future trial process concerning

25   this.

1          At a minimum, the Court now is going to have to really

2     tailor its *voir dire* if we go to trial to really assess whether

3     and to what extent any jurors may have seen these interviews.

4     And that should tell us something, I think, because if they've

5     seen them, then they've already gotten some idea of the

6     defendant's view of this case in a way that may be prejudicial

7     to the government in terms of its putting forward the evidence,

8     and we want to have people who don't have preconceived notions

9     of a matter as jurors.

10         So there is a likelihood, I think, a risk, when we have

11    counsel doing this, which is precisely why this rule exists.

12    So I'm not making now today any ruling about the extent to

13    which you have acted unethically or actually violated the

14    rules, but I will let this serve as something of a warning that

15    we're going to have to really bear down on this as a legal

16    matter if it is your intention to continue in this fashion

17    and -- and if this -- you know, this issue continues to arise

18    in the context of this case.

19         MR. MAYR:  Judge, I agree with everything --

20    Your Honor, I agree with everything you say, and I will -- I

21    will respectfully abide by that -- that -- that caution, that

22    warning.  I -- I know this is -- this is not an -- this is one

23    of the most difficult things for a criminal defense lawyer

24    is -- is responding to the -- is responding to what is out

25    there, and I want to be clear.  If I had it my way, there would

1    be no publicity about any of this stuff, but it's just not the

2    reality of it.

3            And, again, I want the Court to understand that, you

4    know, my intentions here were -- were to provide balance,

5    because, again, my concern is when these organizations reached

6    out saying, hey, we want to do a story about your client's

7    case, again, I did not want there -- I mean, I'll -- I'll let

8    the Court know that I've spoken with local media in the Waco

9    area regarding this case and not saying anything differently

10   than what I've -- what I've already stated and what's already

11   in the public record.  But, again, the whole reason of this is

12   just to provide balance -- to -- again, to ensure that there

13   isn't this -- that there isn't this prejudice to the

14   administration of justice by what is being published by the

15   media.

16           THE COURT:  But can I just say that justice is not

17   done in the media.  It is -- it's really -- my purview is not

18   really the concern of what -- what people in the media or

19   people in the world will think about your client, and -- and

20   it's not really the duty of counsel in this context to make

21   sure that the media portrays your client in a favorable light;

22   right?

23           What we care about in the justice system is whether your

24   client will have a fair trial to include the government's

25   ability to put forward its case and your ability to defend, and

1   when we have media representations -- obviously the media is

2   free to write stories about whatever it wants, but when we have

3   people who are actively involved in the criminal justice

4   system, also participating actively in the media realm, then we

5   have real risk that we're going to prejudice the jurors who the

6   Court would be called upon to bring into the courtroom and try

7   to actually hear the evidence and decide the case on what is

8   being presented to them in court.

9       So I completely understand that you may feel as though

10  the portrayals of your client in the media are unfair, but, you

11  know, with all due respect, really the most important thing is

12  whether your client is going to be able to get a fair trial

13  should it come to that, and in order for that to happen,

14  members of the case need not participate in the media

15  representations.  Do you understand?

16      MR. MAYR:  Absolutely.  And, again, Your Honor,

17  I -- I completely agree with everything you said.  Every

18  concern you've raised has been a concern that I have taken into

19  consideration and -- and weighed and balanced in doing what

20  I've done.  But I'm -- I'm hearing the Court loud and clear.

21  I -- again, rather than -- again, it's not my intention to try

22  this case in the media.  I want to make that abundantly clear.

23  I just -- and I think the best way for that to happen is for me

24  to decline any future interviews.

25      I will limit myself to the very clear plain language of

1     the rule, which will only allow me to comment on scheduling

2     matters, letting -- letting the media know, okay, on this date

3     there's a hearing, but nothing beyond that, and -- and, again,

4     my client is -- is pleading not guilty and we're looking

5     forward to our day in court, and beyond that -- that's only if

6     I'm asked.  I'm not going to make any statements or reach out

7     or do anything else any further from this point forward.

8             THE COURT:  All right.  Well, I think that's helpful,

9     and as a result, let's just table this discussion.  Hopefully

10    we won't have to go any further.

11        Now, the other things that were on the agenda for

12    today's status conference concern the various other pending

13    motions about discovery, speedy trial clock and the like, and

14    the defendant's motion to dismiss.

15        Let me ask government counsel about the discovery.  I

16    received your notice informing the Court of items that have

17    been produced to defense counsel via file sharing and also the

18    government's motion for the release of 6(e) materials.  So

19    maybe you can say a little bit about the status of discovery in

20    this case.

21            MS. WONG:  Yes, Your Honor.  We do appreciate that

22    even back before that discovery letter on March 10th, you did

23    very quickly sign our unopposed motion for protective order

24    then.  So the government was able to make a production that is

25    delineated in that discovery letter that's filed on the docket

1    on March 10th.  It included not only charging documents but

2    search warrant returns, subpoena returns, Capitol Police

3    footage, various other videos that reflect the defendant's

4    conduct inside the Capitol Building that were in the

5    government's possession from the dates in context.

6         That is a separate track -- I mean, that's -- that is

7    the extent of discovery that has been disclosed to date, the

8    March 10th production, that is an informal discovery

9    production.  We do have, separately, a process that is being

10   sorted out in connection with, you know, discussions with the

11   federal public defender's office regarding a system we can have

12   that will ultimately amass sort of a formal process here,

13   including as additional video evidence, voluminous video

14   evidence, is gathered.  Some of this is referenced, Your Honor,

15   in the most recent motion for tolling that the government's

16   filed.

17        THE COURT:  Well, let me ask you about that, because

18   I have had some defense counsel in other cases push back

19   concerning the tolling and the plan that the government has, in

20   conjunction with the federal public defender's office, to toll

21   the clock for extended periods of time to allow for this kind

22   of coordination.  And the concern that defense counsel has

23   expressed, and that I think some of my colleagues on the court

24   have actually been persuaded by, is the concern that the

25   government seems to be working on a consolidated, coordinated

1    production of discovery with respect to maybe all of these

2    cases or most of these cases and it's not particularized to the

3    individual defendant.

4         So I had a case -- one of these cases where the

5    discovery was limited with respect to the individual, but the

6    government was still asking through this form motion for 60

7    days, 90 days, or whatever it was, because it said it was

8    engaged in this larger effort to coordinate the -- the -- the

9    video, you know, on a more generic basis.  So what can you say

10   here about the evidence that pertains to Mr. Grider in

11   particular that would warrant what the government is asking for

12   here, which is a 60-day period of exclusion?

13         MS. WONG:  Sure.  Yes, Your Honor.  I think they're

14   not distinct in that sense.  I mean, we are certainly

15   collecting and amassing all the video evidence and other

16   evidence that we have with respect to Mr. Grider, and I do

17   expect, I should say, to make an additional production of all

18   these items that are currently in my possession on this

19   informal track.

20         The formal track, though, is because given the nature of

21   this evidence and the nature of the events on January 6th,

22   there is evidence -- you know, there was a lot of footage that

23   is being recovered.  For instance, whether through legal

24   process of other defendants that are being investigated, may

25   still not be out there, but that where Mr. Grider may or may

1   not appear from different angles and other footage that I do

2   not currently have and that defense counsel currently does not

3   have.

4         And in order for the government and defense counsel, I

5   think, to feel that we have reasonably discharged our

6   obligations to have -- our ethical duties, but also to have

7   seen all the evidence, we do need that process in place where

8   that additional evidence that I said beyond sort of the obvious

9   footage -- or immediate footage, for instance, that has already

10   been recovered.

11         For instance, I noted that I have already disclosed

12   various video clips from U.S. Capitol Police surveillance

13   footage that I was able to identify, include Mr. Grider, but

14   there may be different video clips recovered from other

15   defendants' cell phones that are -- do not depict the same

16   course of events that are already on these cameras that are in

17   specified locations.

18         THE COURT:  But that -- but that potentially

19   implicate Mr. Grider?

20         MS. WONG:  Exactly.

21         THE COURT:  We have the complexity of lots of people

22   with lots of cell phones, you know, going at different angles,

23   and we don't yet know whether you have everything.  And so

24   there may be more time needed to ferret through all of this and

25   make sure that defense counsel has everything?

1          MS. WONG:  Precisely, and I think -- I, myself, would

2     not feel comfortable stating that I have fully, you know,

3     flagged all video footage that is in the government's

4     possession that features Mr. Grider at all, or that he might

5     find of interest, until we have that formal process or this

6     sort of technological infrastructure in place that will help,

7     you know, give us some comfort that we have gone through this

8     more methodically.

9          THE COURT:  All right.  And so, Mr. Mayr, do you

10    consent to the -- I see it's represented that this is an

11    unopposed motion to exclude time.  Is that your position?

12         MR. MAYR:  It is, Your Honor.  Again, I -- I don't

13    think I've agreed so much with the prosecutor before in a long

14    time, but, you know, the reality of it is is a lot of these

15    other videos -- I mean, in the informal discovery, there's been

16    some things that could be considered as much exculpatory as --

17    as they could be inculpatory, and -- and I'm -- I don't have

18    any reason to think that that's not going to be the case with

19    additional videos.

20         Ms. Wong hits the nail on the head.  There could be -- I

21    mean, there's -- there's one video that we're aware of where my

22    client is -- is yelling to other people inside the Capitol,

23    "Don't break anything.  Don't break anything."  That could be

24    very relevant, especially to the depravation charge that he's

25    facing in Count 1 of the indictment.  So it would be very

1    helpful for us to see other videos where he's maybe saying the

2    same thing or he's encouraging other people to not cause any

3    damage to the prosecutor [sic].  Just like for the government

4    it may be interested if he does something.

5         Along those lines, I would also say we are very

6    interested in any body camera footage from any of the officers.

7    We feel that that's going to be very important in our defense,

8    knowing what his interactions were like with the police

9    officers.  We saw a little bit of that in his interactions with

10   the officers at the Speaker's Lobby door.  So we -- I think we

11   need to see the rest of -- we need to see the rest of it and

12   have as complete and accurate picture --

13        THE COURT:  All right.  So it sounds like you are on

14   board with this 60-day exclusion?

15        MR. MAYR:  Yes.

16        THE COURT:  I will allow it in the interest of

17   justice given the representations that have been made.  I'm

18   going to look carefully at the actual written order.  I may

19   tailor it some.  I know some of my colleagues have tweaked it

20   to be more specific to the needs of this individual case, but I

21   will toll the clock for 60 days out, which is what I think the

22   government is asking for, and I will issue a ruling concerning

23   that.

24        I'll also grant the 6(e) motion, which I also understand

25   there's consent to, allowing for the release of those materials

1    and sealed materials pursuant to the protective order.  One

2    thing I did note with respect to that motion in particular,

3    Ms. Wong, is the mention of codefendants, and I didn't know

4    whether there was some -- whether that's sort of standard form

5    language in these motions or whether the government is

6    indicating that there may yet be a codefendant in this case.

7            MS. WONG:  That is standard language in the motion.

8    I do not currently believe there is a -- there will be,

9    imminently, a codefendant.

10           THE COURT:  Okay.  All right.  So that's -- those are

11   the main motions that -- procedural motions that exist.

12           Turning to the reply brief hearing date, et cetera, for

13   the motion to dismiss, I have the motion to dismiss.  I have

14   the government's opposition that just came in yesterday.  So I

15   have not reviewed them yet.  I'm waiting for the -- the motion

16   to ripen.

17           Let me ask you, Mr. Mayr, whether you are seeking a time

18   for reply or would you like the Court to go ahead and evaluate

19   the motion from the opposition?

20           MR. MAYR:  Your Honor, I -- I think -- I think -- you

21   know, I had an opportunity to review the government's motion.

22   I don't believe a reply is -- at this time, I don't believe a

23   reply is necessary.

24           THE COURT:  All right.

25           MR. MAYR:  I think I will be just restating what is

1    in the motion.  So I'm ready for the Court to, you know, set --

2    set it for submission or do whatever is -- whatever action is

3    needed on the motion.

4         THE COURT:  All right.  I typically have a hearing

5    related to such matters, and I'm just looking -- my schedule is

6    a little complicated.  What I'll do is I will take a look.  Let

7    me just -- give me a second here to see.

8         I could see you-all on this matter in the afternoon of

9    the 16th, which is next Friday.  Would you be available for a

10   hearing on the motion to dismiss?

11        MS. WONG:  The government is available.

12        MR. MAYR:  Could I ask what time the Court is looking

13   to do this?

14        THE COURT:  About 2:30 or 3 o'clock Eastern.

15        MR. MAYR:  Yes.  We made that adjustment.

16        Yes, I will be available that afternoon.

17        THE COURT:  All right.  So let me set this for 2:30

18   Eastern on the 16th of April, and that will be for a hearing on

19   the pending defense motion to dismiss Count 4 of the

20   indictment.

21        So, then, we also now need to set a return date on this

22   case.  The question is whether I need to see you again before

23   the expiration of the 60-day tolling period.  Let me ask.

24        MS. WONG:  Your Honor, my -- I think 60 days brings

25   us to Saturday, June 5th.  I asked Mr. Mayr if he was available

1   the week of May 31st or June 7th.  All those dates work for me.

2   I believe he said everything but one of those dates might work

3   for him, and then we would just ask that you toll until that

4   date, whatever works for the Court.

5            THE COURT:  All right.  Mr. Mayr -- Mr. Mayr, what's

6   your availability the week of June 7th?

7            MR. MAYR:  The week of June 7th is a lot better than

8   the week of -- of May 31st.

9            THE COURT:  Could we do this on the 10th?

10            MR. MAYR:  Would it also be in the afternoon?

11            THE COURT:  That's fine.

12            MR. MAYR:  Yes, I'll be available.  That would work

13   perfectly.

14            THE COURT:  All right.  So let's set this for the

15   next status conference date, June 10th at 2:30 in the

16   afternoon.

17        And we will -- the Court will find that it's in the

18   interest of justice for the reasons represented in the

19   government's written motion to toll the speedy trial clock

20   between today and return of court on this matter, which will be

21   June 10th.  I will file a formal order concerning the tolling,

22   but for our purposes now, the clock will be tolled until then.

23        Is there anything else that I need to address in this

24   case at this time?

25            MS. WONG:  Nothing from the government, Your Honor.

1          MR. MAYR:  And nothing from the defendant.

2          THE COURT:  All right.  So I will see you-all on the

3    16th for the hearing on the motion to dismiss.  Take care.  I

4    will see you then.

5          (The proceedings concluded at 3:14 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              CERTIFICATE OF OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4    Certified Realtime Reporter, do hereby certify that the above

5    and foregoing constitutes a true and accurate transcript of my

6    stenograph notes and is a full, true, and complete transcript

7    of the proceedings to the best of my ability.

8

9                    Dated this 22nd day of June, 2021.

10

11                   /s/ Nancy J. Meyer
                     Nancy J. Meyer
12                   Official Court Reporter
                     Registered Diplomate Reporter
13                   Certified Realtime Reporter
                     333 Constitution Avenue Northwest, Room 6509
14                   Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25