**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **v.** | § | **Case No. 21-CR-00022-CKK** |
| | § | |
| | § | |
| **CHRISTOPHER RAY GRIDER,** | § | |
| | § | |
| *Defendant* | § | |

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANT'S AMENDED MOTION TO DISMISS
COUNT FOUR OF THE INDICTMENT**

TO THE HONORABLE COLLEEN KOLLAR-KOTELLY, UNITED STATES DIS-
TRICT COURT JUDGE FOR THE DISTRICT OF COLUMBIA:

      CHRISTOPHER RAY GRIDER, the Defendant in the above styled and num-

bered cause, by and through undersigned counsel, submits the following memoran-

dum of law in support of his Amended Motion to Dismiss Court Four of the Indictment

filed concurrently with this memorandum and seeking an order dismissing that count

pursuant to Rules 7(c)(1) and 12(b)(3)(B) of the Federal Rules of Criminal Procedure,

the Fifth and Sixth Amendments to the United States Constitution, and the authority

discussed herein.

      In short, the Government is attempting to prosecute Mr. Grider for an offense

that falls under Chapter 73 of Title 18 of the United States Code, titled "Obstruction

of Justice," where there is no allegation that he obstructed justice or a proceeding

related to the administration of justice, or did anything to obstruct witnesses or evi-

dence or a proceeding where witnesses or evidence are presented.

# TABLE OF CONTENTS

I.    Introduction and Background ............................................................. 1

II.   Grounds for Dismissal ...................................................................... 2

    A.    The certification of the electoral college vote does not qualify as an "official proceeding" as defined in 18 U.S.C. § 1515 and applied in 18 U.S.C. § 1512(c)(2). ........................................................................ 4

    B.    The structure of 18 U.S.C. § 1512(c) and the use of "otherwise" in section (c)(2) creates a requirement that the obstructive conduct undermine a proceeding's truth-finding function by impairing the integrity and availability of evidence or otherwise obstructs justice. No such allegation exists here. ............................................................. 17

    C.    The use of the word "corruptly" in 18 U.S.C. § 1512(c) and the lack of a limiting principle makes section 1512(c)(2) unconstitutionally vague as applied based on the allegations in the indictment. .................................. 31

    D.    The rule of lenity also can be used to find that the allegation in the indictment falls outside the scope of 18 U.S.C § 1512(c)(2). ...................... 51

# TABLE OF AUTHORITIES

## Cases

*Arthur Andersen LLP v. United States*, 544 U.S. 696, 125 S. Ct. 2129, 161 L. Ed. 2d 1008 (2005)........................................................................................................ 14

*Bates v. United States*, 522 U.S. 23, 118 S. Ct. 285, 139 L.Ed.2d 215 (1997) .......... 38

*\*Begay v. United States*, 553 U.S. 137, 128 S. Ct. 1581, 1584, 170 L. Ed. 2d 490 (2008) ................................................................... 20, 21, 22, 23, 25, 26, 27, 28, 29

*Bouie v. City of Columbia*, 378 U.S. 347, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964).... 31

*Cleveland v. United States*, 531 U.S. 12, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000) ...... ........................................................................................................................... 51, 52

*Connally v. General Construction Company*, 269 U.S. 385, 46 S. Ct. 126, 70 L. Ed. 322 (1926)............................................................................................................. 32

*Duncan v. Walker*, 533 U.S. 167,  121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001) .......... 38

*Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 102 S. Ct. 3245, 3252, 73 L. Ed. 2d 973 (1982) .................................................................................................... 37

*I.N.S. v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 112 S. Ct. 551, 556, 116 L. Ed. 2d 546 (1991)............................................................................................. 18

*Johnson v. United States*, 576 U.S. 591, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015). 31

*Kolender v. Lawson*, 461 U.S. 352, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983) .......... 31

*Liparota v. United States*, 471 U.S. 419, 105 S. Ct. 2084, 85 L. Ed. 2d 434 (1985) .. 52

*Marinello v. United States*, 138 S. Ct. 1101, 200 L. Ed. 2d 356 (2018) .................... 30

*NASDAQ Stock Mkt., LLC v. Sec. & Exch. Comm'n*, 961 F.3d 421 (D.C. Cir. 2020).... ........................................................................................................................... 17

*Rewis v. United States*, 401 U.S. 808, 91 S. Ct. 1056, 28 L. Ed. 2d 493 (1971)......... 51

*Russell v. United States*, 369 U.S. 749, 82 S. Ct. 1038, 8 L. Ed. 2d 240 (1962)........... 5

*Russello v. United States*, 464 U.S. 16, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983)......... 38

*Stirone v. United States*, 361 U.S. 212, 80 S. Ct. 270, 4 L. Ed. 2d 252 (1960)............. 5

*Taylor v. United States*, 495 U.S. 575, 110 S. Ct. 2143, 109 L. Ed. 2d 607 (1990)........ ..................................................................................................................... 21, 22

*United States v. Barry*, No. MAG 18-00111 (RMM), 2019 WL 2396266 (D.D.C. June 5, 2019)............................................................................................................. 40

*United States v. Begay*, 470 F.3d 964 (10th Cir. 2006) ............................................ 22

*United States v. Burge*, 711 F.3d 803 (7th Cir. 2013)................................................ 14

*United States v. Caldwell, et al*, 21-cr-28-APM, ECF Dkt. 558 ............................. 4, 5

*United States v. Carson*, 560 F.3d 566 (6th Cir. 2009)............................................. 25

*United States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237 (S.D. Tex. 2020)............... 23

\*United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013) ............................ 5, 6, 7, 8

*United States v. Hillie*, 227 F.Supp.3d 57 (D.D.C. 2017) ........................................... 4

*United States v. Jefferson*, 751 F.3d 314 (5th Cir. 2014)........................................... 25

*United States v. Judd*, 21-cr-40-TNM, ECF Dkt. 203 ................................................ 42

*United States v. Kelley*, 36 F.3d 1118 (D.C. Cir. 1994)............................................. 14

*United States v. Lucas*, 499 F.3d 769 (8th Cir.2007)................................................. 25

*United States v. McGarrity*, 669 F.3d 1218 (11th Cir. 2012) ...................................... 5

*United States v. Mintmire*, 507 F.3d 1273 (11th Cir. 2007)....................................... 25

*United States v. Montgomery, et al*, 21-cr-46-RDM, ECF Dkt. 87 ............................... .......................................................................... 4, 5, 6, 11, 12, 24, 26

*United States v. Nordean, et al*, 21-cr-175-TJK, ECF Dkt. 263 ............................. 4, 5

*United States v. North*, 910 F.2d 843 (D.C. Cir. 1990)............................................. 33

*United States v. Petruk*, 781 F.3d 438 (8th Cir. 2015) .............................................. 25

*United States v. Phillips*, 583 F.3d 1261 (10th Cir. 2009) ........................................ 25

\*United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991) ....... 32, 33, 34, 35, 37, 38

*United States v. Ramos*, 537 F.3d 439 (5th Cir. 2008) ................................................ 7

*United States v. Reffitt*, 21-cr-32-DLF, Minute Order 12/11/21 ................................... 4

*United States v. Ring*, 628 F. Supp. 2d 195 (D.D.C. 2009) ................................... 14, 23

*United States v. Sandlin, et al*, 21-cr-88-DLF, ECF Dkt. 63 ................................ 4, 5

*United States v. Simmons*, 96 U.S. 360, 24 L. Ed. 819 (1877) ..................................... 5

*United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 73 S. Ct. 227, 97 L. Ed. 260 (1952)................................................................................................................. 52

*United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014)....................................... 24

*United States v. William Pepe*, 21-cr-52, ECF No. 55 (D.D.C. 2021) ........................ 13

*Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 134 S. Ct. 2427, 189 L. Ed. 2d 372 (2014) ....................................................................................................................... 17

*Yates v. United States*, 574 U.S. 528, 135 S. Ct. 1074, 191 L. Ed. 2d 64 (2015)........... ............................................................................................................................ 30, 39, 51

## Statutes

18 U.S.C. § 1512 ...................................................................................................... 18, 28

18 U.S.C. § 1512(a)(1) .................................................................................................... 19

18 U.S.C. § 1512(a)(2) .................................................................................................... 19

18 U.S.C. § 1512(b) ........................................................................................................ 19

18 U.S.C. § 1512(c) ................................................................................................... 19, 20

18 U.S.C. § 1512(c)(1) .................................................................................................... 23

18 U.S.C. § 1515(a)(1)(A) ................................................................................................ 6

18 U.S.C. § 1515(a)(1)(B) ................................................................................................ 6

18 U.S.C. § 1515(a)(1)(C) ................................................................................................ 6

18 U.S.C. § 1515(a)(1)(D) ................................................................................................ 6

18 U.S.C. § 1515(b) ............................................................................................ 32, 38, 39

18 U.S.C. § 1752 .............................................................................................................. 35

3 U.S.C. § 15...................................................................................................... 15

3 U.S.C. § 18...................................................................................................... 15

3 U.S.C. § 5........................................................................................................ 15

3 U.S.C. § 6........................................................................................................ 15

40 U.S.C. § 5104................................................................................................ 35

## Other Authorities

"Proceeding," Oxford English Dictionary, available at http://www.oed.com)............. 7

"US House Democrats stage gun violence sit-in," C-SPAN, June 22, 2016, available
    at https:// www.c-span.org/video/?411500-1/us-house-democrats-stage-sit-gun-
    violence...................................................................................................... 36

"Kavanaugh protestors ignore Capitol barricades ahead of Saturday vote," Roll Call,
    Oct. 6, 2018, available at: https://www.rollcall.com/2018/10/06/kavanaugh-
    protesters-ignore-capitol-barricades -ahead-of-saturday-vote/ ............................. 40

"Kavanaugh protestors take over Sen. Grassley's office," Wash. Post., Sept. 6, 2018,
    available at: https://www.washingtonpost.com/video/politics/kavanaugh-
    protesters-take-over-sen-grassleys-office/2018/09/06/9732de44-b1ef-11e8-8b53-
    50116768e499_video.html ..................................................................... 40

"Kavanaugh protests escalate, over 120 arrested on Capitol Hill," ABC News, Sept.
    24, 2018, available at: https://abcnews.go.com/Politics/kavanaugh-protests-
    escalate-120-arrested-capitol-hill/story ?id=58048599 ......................................... 40

Criminal Resource Manual, CRM 1729, Department of Justice (available at
    https://www.justice.gov/archives/jm/criminal-resource-manual-1729-protection-
    government-processes-tampering-victims-witnesses-or) (emphasis added) .... 13, 18

David M. Herszenhorn and Emmarie Huetterman, "House Democrats' Gun-Control
    Sit-In Turns Into Chaotic Showdown With Republicans," N.Y. Times, June 22,
    2016, available at https://www.nytimes.com/2016/06/23/us/politics/house-
    democrats-stage-sit-in-to-push-for-action-on-gun-control.html ............................. 36

Donovan Slack and Deborah Barfield Berry, "Democrats continue gun control sit-in
    after House adjourns," USA Today, June 23, 2016, available at
    https://www.usatoday.com/story/news/politics/ 2016/06/22/house-democrats-stage-
    sit-in-over-gun-legislation/86241864/ ................................................................ 36

Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* 3–4 (2d ed. 1899) ........................................................................................................ 7

Final Report of the National Commission on Reform of Federal Criminal Laws (1971) ................................................................................................................. 8

PROCEEDING, BLACK'S LAW DICTIONARY 1241 (8th ed. 2004) ..................................... 7

Reena Flores, "Democrats stage sit-in on House floor over gun control," CBS News, June 22, 2016, available at https://www.cbsnews.com/news/democrats-stage-sit-in-on-house-floor-over-gun-control/ ........................................................................ 36

TRIBUNAL, BLACK'S LAW DICTIONARY (11th ed. 2019) ............................................... 7

Vasan Desavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. REV. 1653, 1659 (2002) .................................................................................................... 15, 16

WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1598 (1961) ........................... 22

## Rules

FED. R. CRIM. P. 7(c)(1) ................................................................................................. 5

## Constitutional Provisions

U.S. CONST. amend. XII ........................................................................................... 15, 16

U.S. CONST. art. II, § 1 ................................................................................................. 15

## Legislation & Legislative Material

10 Annals of Cong. 130 ................................................................................................ 16

128 Cong. Rec. 26807 .................................................................................................. 10

167 CONG. REC. H79 (2021) .................................................................................. 14, 16

167 CONG. REC. S16 (2021) ................................................................................... 14, 17

House Special Committee, Counting Electoral College Votes, H.R. Msc. Doc. 44-13 (1877) .......................................................................................................... 16

PUB. L. 97-291, Oct. 12, 1982, 96 Stat. 1252 ......................................................... 8, 18

S. REP. 97-532 ........................................................................................ 8, 9, 10, 11, 18

S. REP. NO. 107-146 ....................................................................................... 11, 12, 25

SARBANES-OXLEY ACT OF 2002, Pub. L. No. 107-204, § 1101, 116 Stat. 745 ............ 28

SARBANES-OXLEY ACT OF 2002, Pub. L. No. 107-204, § 1102, 116 Stat. 745............. 28

SARBANES-OXLEY ACT OF 2002, Pub. L. No. 107-204, 116 Stat. 745 ........................ 11

## I.      Introduction and Background

Mr. Grider is charged by indictment for acts alleged to have been committed at the United States Capitol Building on January 6, 2021. Dkt. 6. He was originally charged by complaint with the offenses of destruction of government property in violation of 18 U.S.C. § 1361, unlawful entry into a restricted building or grounds in violation of 18 U.S.C. §§ 1752(a)(1) and, violent entry and disorderly conduct on Capitol Grounds in violation of 40 U.S.C. § 5104(e)(2). Dkt. 1.

Immediately prior to his detention hearing in the Western District of Texas, however, the Government sought and obtained the present indictment which added additional charges, including, relevant to this motion, the allegation in Count Four that on or about January 6, 2021, Mr. Grider "attempted to, and did corruptly obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, by entering and remaining in the United States Capitol without authority and engaging in disorderly and disruptive conduct and destroying federal property" in violation of 18 U.S.C. §§ 1512(c) and 2. Dkt. 6.

On March 22, 2021, Mr. Grider filed his original Motion to Dismiss Count Four of the Indictment, along with a memorandum in support thereof. Dkt. 21. The Government filed a response in opposition to the motion on April 5, 2021. Dkt. 22. On May 4, 2021, the Honorable Ketanji Brown Jackson, who this matter was pending before prior to transfer to this Court, entered a minute order holding the motion in abeyance at Mr. Grider's request. After transfer to this Court, on July 1, 2021, this Court held that it would continue to hold the motion in abeyance at his request.

Mr. Grider has now filed his Amended Motion to Dismiss Count Four of the Indictment seeking dismissal of that count on the following grounds.

## II.   **Grounds for Dismissal**

Mr. Grider moves to dismiss Count Four on the following grounds:

A.   **"Official Proceeding."** Count Four must be dismissed because the allegation in the indictment fails to state an offense and does not ensure that a grand jury has found sufficient evidence of the necessary elements of the offense in violation of Rule 7(c)(1) of the Federal Rules of Criminal Procedure, and the Fifth and Sixth Amendments to the United States Constitution. More specifically, the indictment fails to state what "official proceeding" and, even more specifically, what "proceeding before Congress" Mr. Grider allegedly obstructed. Assuming *arguendo* that the "proceeding before Congress" was Congress' certification of the electoral college vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15–18, the indictment still suffers from the same infirmities. 18 U.S.C § 1512(c)(2) does not proscribe conduct affecting a unique, largely ministerial proceeding like the certification of the electoral college vote. Rather, as discussed *infra*, (a) the text, structure, and the practical application of the statute, (b) caselaw interpreting and applying the same, and (c) its legislative history, all reflect that the statute has (and always should be) applied to official proceedings that involve the administration of justice or Congress' power of inquiry or investigation where witnesses are called or evidence is presented and considered. Since the election

2

certification proceedings of January 6, 2021 did not involve any of these applications, the present indictment does not sufficiently allege an offense.

B. **"Otherwise."** Count Four must be dismissed because the allegation in the indictment fails to state an offense and does not ensure that a grand jury has found sufficient evidence of the necessary elements of the offense in violation of Rule 7(c)(1) of the Federal Rules of Criminal Procedure, and the Fifth and Sixth Amendments to the United States Constitution. More specifically, the indictment fails to allege what the statute requires, namely, an allegation that the alleged corrupt, obstructive conduct affected a proceeding's truth-finding function through actions impairing the integrity and availability of evidence or otherwise obstructed justice. Since there is no allegation that Mr. Grider's alleged, obstructive conduct did such things, the present indictment does not sufficiently allege an offense.

C. **"Corruptly."** Count Four must be dismissed because 18 U.S.C. § 1512(c)(2) and its unique and specific application in this case demonstrates that it is unconstitutionally vague. More specifically, the term "corruptly" is undefined and itself unconstitutionally vague in this unique, unprecedented application.

D. **Rule of Lenity.** Count Four must be dismissed because, applying the rule of lenity, 18 U.S.C. § 1512(c)(2) is inapplicable to the alleged conduct in that count.

Mr. Grider offers the following arguments in support of these grounds while

3

recognizing that some (but not all) of these arguments have been purportedly ad-dressed and rejected in one form or another by other Judges in this District. *See United States v. Sandlin, et al*, 21-cr-88-DLF, ECF Dkt. 63 (Opinion issued 12/10/21); *United States v. Caldwell, et al*, 21-cr-28-APM, ECF Dkt. 558 (Opinion issued 12/20/21); *United States v. Montgomery, et al*, 21-cr-46-RDM, ECF Dkt. 87 (Opinion issued 12/28/21); *United States v. Nordean, et al*, 21-cr-175-TJK, ECF Dkt. 263 (Opin-ion issued 12/28/21); *but see United States v. Reffitt*, 21-cr-32-DLF, Minute Order 12/11/21. Mr. Grider respectfully requests that, considering the arguments presented herein, this Court come to a different conclusion.

**A.    The certification of the electoral college vote does not qualify as an "official proceeding" as defined in 18 U.S.C. § 1515 and applied in 18 U.S.C. § 1512(c)(2).**

As it relates to his first two grounds for dismissal, Mr. Grider would direct this Court to *United States v. Hillie*, 227 F.Supp.3d 57 (D.D.C. 2017), for the legal stand-ards applicable to determining the sufficiency of an indictment when considering a motion to dismiss such as this. As correctly recognized there, the sufficiency of an indictment implicates "at least two core constitutional protections": (1) the Sixth Amendment's right of an individual accused of a crime "to be informed of the nature and cause of the accusation" and, (2) the Fifth Amendment's guarantee that a crimi-nal defendant may only be prosecuted for offenses, the elements of which have been considered and found to exist by a grand jury such that the defendant may not be subject to multiple prosecutions for the same offense. *Id.* at 69–70 (citations omitted); *see also Russell v. United States*, 369 U.S. 749, 764, 82 S. Ct. 1038, 8 L. Ed. 2d 240

(1962); *United States v. Simmons*, 96 U.S. 360, 362, 24 L. Ed. 819 (1877); *Stirone v. United States*, 361 U.S. 212, 217, 80 S. Ct. 270, 273, 4 L. Ed. 2d 252 (1960); *United States v. McGarrity*, 669 F.3d 1218 (11th Cir. 2012). Federal Rule of Criminal Procedure 7(c)(1) applies these constitutional mandates by requiring that an indictment contain a "plain, concise, and definite written statement of the essential facts constituting the offense charged...." FED. R. CRIM. P. 7(c)(1).

At issue here in Count Four is the allegation that Mr. Grider's alleged conduct affected an "official proceeding," namely, "a proceeding before Congress." Dkt. 6. While the latter is included in the definition of the former in 18 U.S.C. § 1515(a)(1), as Judge Moss recently and correctly noted, "the definition is 'somewhat circular[]' with respect to the meaning of the word 'proceeding.'" *Montgomery*, ECF Dkt. 85 at 9 (quoting *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013); *see also Nordean*, ECF Dkt. 262 at 10 (Judge Kelly noting the same); *Sandlin*, ECF Dkt. 63 at 6–7 (Judge Sandlin noting the same); *but see Caldwell*, ECF Dkt.55 at 8–10 (dismissing the observation and finding the definition is "straightforward"). More notably, section 1515 does not define the term "proceeding." *Montgomery*, ECF Dkt. 85 at 9.

As Judge Moss further correctly observed, "[t]here are good reasons [ ] to conclude that Congress did not use [this] word in the sweeping sense" and that "not every event occurring within the walls of Congress constitutes an 'official proceeding.'" *Id.* at 10. Among those reasons, he noted, is the fact that, "in each iteration of section

5

1515's definition of 'official proceeding,' the word 'proceeding' is followed by the preposition '*before*.'" *Id.* (emphasis added); *see* 18 U.S.C. §§ 1515(a)(1)(A) ("a proceeding *before* a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury"); (a)(1)(B) ("a proceeding *before* the Congress"); (a)(1)(C) ("a proceeding *before* a Federal Government agency which is authorized by law"); (a)(1)(D) ("a proceeding involving the business of insurance whose activities affect interstate commerce *before* any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce").

The Ninth Circuit was one of the first courts to consider the meaning of "official proceeding" as defined in 18 U.S.C. § 1515 and applied in 18 U.S.C. § 1512(c)(2) albeit in a slightly different context. *See Ermoian*, 752 F.3d at 1168. There, the court considered whether a criminal investigation constituted an "official proceeding." *Id.* at 1168–69. Looking at the plain language of section 1515, the court explained that "[s]everal aspects of the definition for 'official proceeding' suggest that the legal — rather than the lay — understanding of the term 'proceeding' is implicated in the statute." *Id.* at 1170. As the court pointed out, "the descriptor 'official' indicates a sense of formality normally associated with *legal proceedings*," and not "a mere 'action or series of actions.'" *Id.* (citing "Proceeding," Oxford English Dictionary, available at

http://www.oed.com) (emphasis added). "Moreover, when used to define 'official proceeding,'" the court pointed to the fact that "the word 'proceeding' is surrounded with other words that contemplate a legal usage of the term, including 'judge or court,' 'Federal grand jury,' 'Congress,' and 'Federal Government agency.'" *Id.* More notably, the court stated "'[p]roceeding' is a word much used to express the *business done in courts*' and 'is an act done *by the authority or direction of the court,* express or implied.'" *Id.* at (quoting BLACK'S LAW DICTIONARY 1241 (8th ed. 2004) in turn, quoting Edwin E. Bryant, *The Law of Pleading Under the Codes of Civil Procedure* 3–4 (2d ed. 1899)) (emphasis in original).

The court then turned to the broader statutory context, looking at section 1515 as a whole, noting that "[t]he use of the preposition 'before' suggests an appearance in front of the agency *sitting as a tribunal*." *Id.* at 1171 (emphasis added).[1] The court further noted, "[a]s the Fifth Circuit explained when addressing this same definition, 'use[ of] the preposition 'before' in connection with the term 'Federal Government agency' ... implies that an 'official proceeding' involves some formal convocation of the agency in which parties are directed to appear." *Id.* (quoting *United States v. Ramos*, 537 F.3d 439, 462–63 (5th Cir. 2008)). Additionally, the court pointed out, "The use of the terms 'attendance', 'testimony', 'production', and 'summon[]' when describing an official proceeding strongly implies that some formal hearing before a tribunal is

---

[1] Black's Law Dictionary defines a "tribunal" as "[a] court of justice or other adjudicatory body." TRI-BUNAL, BLACK'S LAW DICTIONARY (11th ed. 2019). That same definition, however, also gives a sub-definition for an "administrative tribunal" that includes *inter alia* "[a] governmental division established to implement legislative policy." *Id.*

contemplated." *Id.* at 1172. In conclusion, the court considered "the plain meaning of the term 'proceeding,' its use in the grammatical context of the 'official proceeding' definition, and the broader statutory context" to hold that a criminal investigation is not an "official proceeding" as defined by section 1515 and applied under section 1512(c) since it did not meet those criteria. *Id.*

Support for this interpretation can be found in the legislative history of section 1515 which defined what an "official proceeding" is and demonstrates why it included certain "proceedings before Congress" in that definition. Section 1515's definition of "official proceeding" was made law as part of the Victim and Witness Protection Act of 1982. *See* PUB. L. 97-291, § 4(a), Oct. 12, 1982, 96 Stat. 1252. As reflected in the Senate Judiciary Committee's Report on Senate Bill 2420, the bill as originally proposed created section 1512 to create "offenses against witnesses, victims, or informants which occur before the witness testifies or the informant communicates with law enforcement officers," and used what was originally intended to be section 1514 to define the terms used in section 1512, including the term "official proceeding." S. REP. 97-532 at 14, 22.[2] In discussing the interplay between a proposed "broad residual

---

[2] As indicated in the Report of the Senate Judiciary Committee accompanying the bill, "the terms [of the statute] are similar to those used by the National Commission on Reform of Federal Criminal Laws," published in 1971. S. Rep. 97-532, at *16 & n.7 (1982) ((citing Final Report of the National Commission on Reform of Federal Criminal Laws (1971) (available at https://www.ndcourts.gov/Media/Default/Legal%20Resources/legal-research/criminal-code/FinalReport.pdf and hereinafter "Commission Report")). Section 1321 of the Commission Report, titled "Tampering with Witnesses and Informants in Proceedings," addressed obstruction of "official proceedings." Commission Report at 113. An "official proceeding" was defined by the Commission as a proceeding involving the taking of evidence:

a proceeding heard or which may be heard before any government agency or branch or public servant authorized to *take evidence under oath*, including any referee,

8

clause" originally included within proposed section 1512 and the proposed definition

of "official proceeding" in section 1514, the legislation intended to make it an offense

if a person "corruptly, by threats of force, or by any threatening letter or communica-

tion, intentionally influence[d], obstruct[ed], or impede[d] or attempt[ed] to influence,

obstruct, or impede the *enforcement and prosecution of federal law* under which an

official proceeding [was] being conducted, or *the exercise of a legislative power of in-*

*quiry.*" *Id.* at 17(emphasis added). As the report continued, the proposed legislation

was

> an outgrowth of congressional recognition of the variety of corrupt meth-
> ods by which the proper administration of justice may be impeded or
> thwarted, a variety limited only by the imagination of the criminally
> inclined.

> In the committee's view, this observation leads to the conclusion that
> the purpose of preventing an obstruction or miscarriage of justice cannot
> be fully carried out by a simple enumeration of the commonly prosecuted
> obstruction offenses. There must also be protection against the rare type
> of conduct that is the product of the inventive criminal mind and which
> also thwarts justice.

> ***

> In order to reach such cases . . . the committee determined to include
> subsection (a)(3). The committee does not intend that the doctrine of
> *ejusdem generis* be applied to limit the coverage of this subsection. In-
> stead, *the analysis should be functional in nature to cover conduct the*
> *function of which is to tamper with a witness, victim, or informant in*
> *order to frustrate the ends of justice.* For example, a person who induces
> another to remain silent or to give misleading information to a federal

---

hearing examiner, commissioner, notary or other person taking testimony or a
deposition in connection with any such proceeding

Commission Report, § 109 (ad), at 9 (emphasis added).

law enforcement officer would be guilty under subsection (a)(3), irrespective of whether he employed deception, intimidation, threat, or force as to the person.

The first branch of the proposed subsection, referring to the 'enforcement and prosecution of federal law' is designed to carry forward the basic coverage in 18 U.S.C. 1503. *The latter two branches of the subsection, referring to the 'administration of a law under which an official proceeding is being conducted' and to the 'exercise of a legislative power of inquiry,'* are designed to continue the general scope of the final paragraphs of 18 U.S.C. 1505.

*Id.* at 18–19 (emphasis added). Despite this extensive consideration, the proposed "broad residual clause" was ultimately removed from the proposed legislation. *See* 128 CONG. REC. 26810 (statement by Sen. John Heinz: "Subsection (3) of section 1512(a) of the Senate passed bill, general obstruction of justice residual clause of the intimidation section, was taken out of the bill as beyond the legitimate scope of this witness protection measure. It also is probably duplicative of obstruction of justice statutes already in the books.").[3] However, the proposed definition of "official proceedings" that was part of what was originally intended to be section 1514 remained intact and moved to its current location in section 1515. *See id.* at 26807 (showing how amended version of bill moved section 1514's definitions to section 1515).

Reading through the entire legislative history, therefore, one can clearly see that section 1515 was part of legislation meant to apply solely to the protection of witnesses who brought forth evidence as part of the "proper administration of justice" or as part of Congress' legislative power of inquiry. Stated differently, that section

---

[3] This arguably demonstrated that Congress wanted to exercise restraint when enacting its obstruction statutes and was considerate of the fact that other obstruction statutes were available to proscribe other types of obstructive conduct.

10

1515 included "a proceeding before Congress" within its definition of "official proceeding," as the legislative history confirms, Congress did so only with the intention of having witness tampering protections also apply when witnesses presented evidence as an "exercise of a legislative power of inquiry." S. REP. 97-532 at 17. There is nothing to suggest, however, that Congress intended for section 1515 to protect any and all formal proceedings before Congress, including the unique constitutional function of certifying the electoral college vote.[4]

The same can be said when looking at the legislative history for section 1512(c)(2). Section 1512(c) was passed as part of the Sarbanes-Oxley Act of 2002, "An Act to protect investors by improving the accuracy and reliability of corporate disclosures made pursuant to securities laws, and for other purposes." SARBANES-OXLEY ACT OF 2002, Pub. L. No. 107-204, 116 Stat. 745. The Senate Judiciary Committee report described the Act's purpose as "provid[ing] for criminal prosecution and enhanced penalties of persons who defraud investors in publicly traded securities or alter or destroy evidence in *certain Federal investigations*." S. REP. NO. 107-146, at 2 (2002) (emphasis added). As for the use of the term "official proceeding" in section

---

[4] Judge Moss did not consider or address this legislative history. Instead, he surmised that, had Congress intended to limit the application of section 1515, it could have elected to use more specific language in defining what was and was not an "official proceeding," namely, "a proceeding before Congress." *Montgomery*, ECF 87 at 11–12. Of course, this ignores what Congress' true intent was with the statute: to be able to prosecute the "variety of corrupt methods by which the proper administration of justice may be impeded or thwarted" and to "continue the general scope of the final paragraphs of 18 U.S.C. 1505," which serves to protect Congress' "exercise of a legislative power of inquiry." S. REP. 97-532 at 18–19.

1512(c), because the legislation was due in part to the collapse of Enron, the Committee Report noted that much of Enron's document destruction was "undertaken in anticipation of a SEC subpoena to Andersen for its auditing and consulting work related to Enron." *Id.* at 4. Congress was adamant that "[w]hen a person destroys evidence with the intent of obstructing any type of investigation and the matter is within the jurisdiction of a federal agency, overly technical legal distinctions should neither hinder nor prevent prosecution and punishment." *Id.* at 6–7s. In short, when considering the Act's preamble and the legislative history, it is clear that section 1512(c) was aimed at preventing corporations from destroying records relevant to federal securities investigations and was not intended to apply in all contexts of various governmental functions. More importantly, as was the case when section 1515 was made law, there is nothing to suggest that Congress intended for this new legislation to be sweeping and protect any and all formal proceedings before Congress, including the unique constitutional function of certifying the electoral college vote where no witnesses testify nor is there any investigation.[5]

---

[5] Judge Moss embarked on a much lengthier discussion of the legislative history behind section 1512(c)(2), not to address whether Congress intended to include the election certification proceedings within the meaning of "official proceeding," but as part of addressing whether section 1512(c)(2) was limited to protecting against obstructive conduct that affected a proceeding's truth-finding function through actions impairing the integrity and availability of evidence. *Montgomery*, ECF 87 at 32–36. While his recitation of the legislation makes it clear that "section 1512(c)(2) was intended to 'close[] [a] loophole by broadening the scope of section 1512,' which [Senator Hatch] noted was 'often used to prosecute' various 'forms of obstruction of justice'," *id.* (quoting 148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Hatch)), what he failed to recognize is that, nowhere in the legislative history is there even an iota of a suggestion that the statute was intended to go well beyond functions involving the administration of justice and reach a unique constitutional function such as certifying the electoral college vote.

In sum, the entire legislative histories for both sections 1515 and 1512(c)(2) indicate what is made obvious by the placement of these statutes within their respective places within Chapter 73 of Title 18: the "official proceeding" must be one that is related to the proper administration of justice or Congress' synonymous, legislative power of inquiry where witnesses are called to testify and/or evidence is otherwise considered. There is again absolutely nothing to support the inference that Congress intended it to apply to any and all proceedings before Congress such as the unique constitutional function of certifying the electoral college vote where no witnesses testify or offer evidence.

Turning to caselaw, as the Government will expectedly acknowledge, sections 1512(c)(2) and 1515 have never been used, interpreted, or even considered by a court prior to the events of January 6, 2021 to apply to a proceeding before Congress outside of proceedings where Congress is acting pursuant to its legislative power of inquiry.[6] The Government has further acknowledged that the election certification proceedings of January 6, 2021 at issue here were <u>not</u> a part of that Congressional function. *See, e.g., United States v. William Pepe*, 21-cr-52, ECF No. 55, p. 8 n. 3 (D.D.C. 2021) ("[T]he certification of the Electoral College vote is *not an 'inquiry or investigation.'*")

---

[6] The is presumably because the Department of Justice, as reflected in their Criminal Resource Manual, has always viewed section 1512 as a "a broad prohibition against tampering with a witness, victim or informant . . . proscrib[ing] conduct intended to illegitimately affect the presentation of evidence in Federal proceedings or the communication of information to Federal law enforcement officers." Criminal Resource Manual, CRM 1729, Department of Justice (available at https://www.justice.gov/archives/jm/criminal-resource-manual-1729-protection-government-processes-tampering-victims-witnesses-or) (emphasis added).

(emphasis added); 167 CONG. REC. H79, 105-06, 108, 111 (2021) and 167 CONG. REC. S16, 25, 32 (2021). What the caselaw confirms instead is that section 1512(c)(2) has always and only been used to prosecute obstructive conduct that affects a proceeding that is related to the administration of justice. *See, e.g. United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding an investigation by the Office of Inspector General did qualify as a "proceeding" because it possessed the quintessential qualities that an obstruction of justice offense served to protect: "adjudicative power" and "the power to enhance their investigations through the issuance of subpoenas or warrants."); *United States v. Ring*, 628 F. Supp. 2d 195, 224 (D.D.C. 2009) (indictment sufficiently alleged violation of 18 U.S.C. § 1512(c)(2) where defendant attempted to obstruct, influence, or impede an official proceeding by providing false statements to outside counsel "to cause and in an attempt to cause" those misrepresentations to be provided to the grand jury and Indian Affairs Committee); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 708, 125 S. Ct. 2129, 161 L. Ed. 2d 1008 (2005) (interpreting section 1512(c) as requiring that the defendant have "knowledge that his actions are likely to affect [a] *judicial proceeding*" in order to have the "requisite intent to obstruct"); *United States v. Burge*, 711 F.3d 803, 809 (7th Cir. 2013) (considering application of section 1512 and noting "[o]bstruction of justice occurs when a defendant acts to impede the types of proceedings that take place *before judges or grand juries*").

It is important to note that the certification proceedings of the electoral college vote do not possess the same qualities of the types of "official proceedings" that sections 1515 and 1512(c)(2) protect. Mr. Grider acknowledges that the unique constitutional function of certifying the electoral college vote is a formal and solemn occasion and serves an important role in our democratic process. But formality does not equate to adjudicatory or evidentiary nor does it convert this unique function into one that is protected by those statutes.

The procedures in Congress for certifying the electoral college vote are regarded primarily as a ministerial act. *See* Vasan Desavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. REV. 1653, 1659 (2002) ("The counting function appears to be a ministerial duty of tabulation imposed by the Constitution because each of the electoral colleges meet in their respective states instead of at some central location."). This is consistent with the directive set out in the Constitution requiring that "[t]he President of the Senate shall, in the presence of the Senate and House of Representatives, open all the certificates and the votes shall then be counted." U.S. CONST. amend. XII; *see also* U.S. CONST. art. II, § 1. Nothing in the Constitution or the Electoral Count Act (ECA), codified at 3 U.S.C. §§ 5–6, 15–18 — the legislation that sets out the procedures for the certification of the electoral college vote — requires the Joint Session of Congress call for witnesses to bring forth testimony or consider other evidence to carry out this "counting function."[7]

---

[7] Contrast this with The Grand Committee Bill of 1800, a piece of proposed legislation that would have created a committee to "sit with closed doors" and have the "power to send for persons, papers, and records to compel the attendance of witnesses" for determining the results of the electoral college vote.

15

Additionally, the Twelfth Amendment provides that once the President of the Senate has opened all the Certificates, "the votes shall *then* be counted" and, in the case of electoral deadlock, the House of Representatives is to "immediately" choose the next President from those on the list. U.S. CONST. amend. XII (emphasis added). These principles of immediacy "militates against the deliberative aspects of counting and the judging of the electoral votes." *See* Desavan at 1719 ("After all, judicial determinations take time.").

Historical practice since the dawn of the Republic confirms this. Prior to and after the passage of the ECA, there has never been an instance where Congress engaged in a full-blown investigation with the calling of witnesses to give testimony, requests for records, or consideration of other evidence in order to decide the electoral count. *See id.* at 1678–94 (providing a survey of all historical incidents where a problem arose with the electoral count). Even during the Joint Session of Congress on January 6, 2021, despite numerous objections being raised concerning the electoral votes, the objections were overruled without consideration of any evidence or testimony to support the allegations. *See* 167 CONG. REC. H79, 105-06, 108, 111 (2021)

---

*See* Desavan at 1671 (quoting House Special Committee, Counting Electoral College Votes, H.R. Msc. Doc. 44-13, at 17 (1877)). During the debates on this bill, Senator Charles Pickney, one of the Constitution's original framers, noted how this was entirely contradictory of the Framer's Intent:

> It never was intended, nor could it have been safe, in the Constitution, to have given to Congress thus assembled in convention, the right to object to any vote, or even to question whether they were constitutionally or properly given. . .. To give to Congress, even when assembled in convention, a right to reject or admit the votes of States, would have been so gross and dangerous an absurdity, as the [F]ramers of the Constitution never could have been guilty of.

*Id.* at 1672 (quoting 10 Annals of Cong. 130). Ultimately, the bill failed to pass and no efforts were ever made to grant Congress the same levels of power proposed therein. *See id.* at 1673.

and 167 Cong. Rec. S16, 25, 32 (2021) (where legislators requested, but did not receive authority to open investigation regarding electoral certificates).

In sum, little to nothing about the election certification proceedings bring it within the category of proceedings that Congress intended to protect when it created the definition of "official proceeding" in section 1515 and then amended section 1512 to add subsection (c)(2) which prohibits the corrupt obstruction of any "official proceeding." Because the certification of the electoral college vote on January 6, 2021 did not qualify as an "official proceeding" as that term is defined, interpreted, and intended to be used under those statutes, the allegation in Count Four of the indictment against Mr. Grider is insufficient and must be dismissed.

**B.**    **The structure of 18 U.S.C. § 1512(c) and the use of "otherwise" in section (c)(2) creates a requirement that the obstructive conduct undermine a proceeding's truth-finding function by impairing the integrity and availability of evidence or otherwise obstructs justice. No such allegation exists here.**

Although not mentioned in the indictment, 18 U.S.C. § 1512(c)(2) includes a critical term — "otherwise" — that, combined with the structure of section (c), creates an additional deficiency in Count Four's allegation against Mr. Grider. Before looking at that specific section and the use of that term, however, it bears worth considering the statute as a whole. *See NASDAQ Stock Mkt., LLC v. Sec. & Exch. Comm'n*, 961 F.3d 421, 426 (D.C. Cir. 2020) (quoting *Util. Air Regulatory Grp. v. E.P.A.*, 573 U.S. 302, 321, 134 S. Ct. 2427, 189 L. Ed. 2d 372 (2014)) ("A statutory provision that may seem ambiguous in isolation is often clarified by the remainder of the statutory

17

scheme[,] because only one of the permissible meanings produces a substantive effect that is compatible with the rest of the law.").

Section 1512 is titled "Tampering with a witness, victim, or an informant." 18 U.S.C. § 1512; *see I.N.S. v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 189, 112 S. Ct. 551, 556, 116 L. Ed. 2d 546 (1991) ("the title of a statute or section can aid in resolving an ambiguity in the legislation's text."). Consistent with that title, the Department of Justice has always viewed section 1512 as "a broad prohibition against tampering with a witness, victim or informant . . . proscrib[ing] conduct intended to illegitimately affect the presentation of evidence in Federal proceedings or the communication of information to Federal law enforcement officers." Criminal Resource Manual, CRM 1729, Department of Justice. This is, as discussed *supra*, consistent with Congress' intent when it enacted the statute in 1982. *See* PUB. L. 97-291, § 4(a), Oct. 12, 1982, 96 Stat. 1252; S. REP. 97-532

The statute opens with the most serious scenario of witness tampering, making it an offense to kill or attempt to kill another person with the intent to

    (A) prevent the attendance or testimony of any person in an official proceeding;

    (B) prevent the production of a record, document, or other object, in an official proceeding; or

    (C) prevent the communication by any person to a law enforcement officer or judge of the United States of information relating to the commission or possible commission of a Federal offense or a violation of conditions of probation, parole, or release pending judicial proceedings.

18

18 U.S.C. § 1512(a)(1). It then expands to multiple scenarios of witness tampering where a person uses physical force or the threat of physical force against another person, or attempts to do so, with the intent to impair the integrity and availability of that witness and their ability to offer testimony. *See* 18 U.S.C. § 1512(a)(2). As it applies to "official proceedings," that includes acting with the intent to (a) influence, delay, or prevent the testimony of any person in an official proceeding; or (b) causing or inducing any person to either (1) withhold testimony, or withhold a record, document, or other object, from an official proceeding, (2) alter, destroy, mutilate, or conceal an object with intent to impair the integrity or availability of the object for use in an official proceeding, (3) evade legal process summoning that person to appear as a witness, or to produce a record, document, or other object, in an official proceeding; or (4) be absent from an official proceeding to which that person has been summoned by legal process. *Id*. Section (b) of the statute then turns toward witness tampering scenarios where a person "knowingly uses intimidation, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person" acting with, as it applies to "official proceedings," the intent to do the same things listed in previous section (a)(2). 18 U.S.C. § 1512(b).

Section (c) goes beyond witnesses and turns toward protecting evidence or potential evidence the witness may possess or have knowledge of. 18 U.S.C. § 1512(c). The statute provides:

> (c) Whoever corruptly—

19

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or

(2) otherwise obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

*Id.* Section (c)(1) is obviously limited to the impairment of certain, specified types of evidence: records, documents, or other similar objects. The issue here is what the term "otherwise" does to section (c)(2).

The Supreme Court's decision in *Begay v. United States*, 553 U.S. 137, 128 S. Ct. 1581, 1584, 170 L. Ed. 2d 490 (2008), provides almost perfect guidance on what the term "otherwise" and the structure of a statute using that term does in terms of defining the scope a statute. There, the Court considered whether driving under the influence of alcohol (DUI) was a "violent felony" under the Armed Career Criminal Act. *Id.* at 140. As relevant there (and here as well), that Act defined a "violent felony" as a crime that is "burglary, arson, or extortion, involves use of explosives, or *otherwise* involves conduct that presents a serious potential risk of physical injury to another." *Id.* at 139–40 (quoting 18 U.S.C. § 924(e)(2)(B) (2000 ed.)) (emphasis added). Even though the Court acknowledged that DUI "presents a serious potential risk of physical injury to another," the Court concluded that DUI did not fall within the scope of the statute. *Id.* at 141, 148. In doing so, the Court pointed to multiple things.

First, the Court noted that "the provision's listed examples — burglary, arson, extortion, or crimes involving the use of explosives — illustrate the kinds of crimes

that fall within the statute's scope." *Id.* at 142. According to the Court, "Their presence indicates that the statute covers only similar crimes, rather than every crime that 'presents a serious potential risk of physical injury to another.'" *Id.* In simpler terms, the specific offenses listed limited, rather than expanded the statute's reach.

Second, the Court looked at "[t]he statute's history" which "offer[ed] further support for [the] conclusion that the examples . . . limit the scope of the clause to crimes that are similar to the examples themselves." *Id.* at 143. More specifically, the Court noted that, while the prior version of the statute applied its enhanced sentence to offenders with prior convictions for robbery or burglary only, Congress sought to expand that definition to include both crimes against the person and certain "physically risky crimes against property." *Id.* at 143–44 (citing H.R. REP. No. 99–849, p. 3 (1986)). "When doing so, Congress rejected a broad proposal that would have covered *every* offense that involved a substantial risk of the use of 'physical force against the person or property of another.'" *Id.* at 144 (emphasis in original) (citing *Taylor v. United States*, 495 U.S. 575, 583, 110 S. Ct. 2143, 109 L. Ed. 2d 607 (1990) in turn quoting S. 2312, 99th Cong., 2d Sess. (1986); H.R. 4639, 99th Cong., 2d Sess. (1986)).

Thirdly — and most relevant here — the Court not only considered, but emphasized the placement of the word "otherwise" immediately after the example

crimes.[8] *Id.* at 144. The Court first dismissed the Government's argument that "otherwise" was "*sufficient* to demonstrate that the examples do not limit the scope of the clause." *Id.* (emphasis in original). The Court continued by explaining,

> That is because the word 'otherwise' *can* (we do not say *must* [ ]) refer to a crime that is similar to the listed examples in some respects but different in others — similar, say, in respect to the degree of risk it produces, but different in respect to the 'way or manner' in which it produces that risk."

*Id.* (emphasis in original) (quoting WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1598 (1961) (defining "otherwise" to mean "in a different way or manner")).

The Court then concluded by looking at the Armed Career Criminal Act's "basic purpose" and pointed to a "distinction [that] matters considerably." *Id.* at 146. According to the Court, "[a]s suggested by its title, the Armed Career Criminal Act focuses upon the special danger created when a particular type of offender — a violent criminal or drug trafficker — possesses a gun." *Id.* (citing *Taylor*, 495 U.S. at 587–588; *United States v. Begay*, 470 F.3d 964, 981, n. 3 (10th Cir. 2006) (McConnell, J., dissenting in part) ("[T]he title [of the Act] was not merely decorative")). As the Court continued, "Were we to read the statute without this distinction, its 15–year mandatory minimum sentence would apply to a host of crimes which, though dangerous, are

---

[8] Judge Moss dismissed this part of the opinion in *Begay* as "remarkably agnostic" and concluded "the majority assigned little significance to Congress's use of the word 'otherwise.'" *Montgomery*, ECF 87 at 24–25. While Mr. Grider respectfully disagrees with that interpretation and insists that a reading of the opinion shows otherwise — the Court, after all, added emphasis on its own in italics to the word "otherwise" when quoting the statute — it also bears worth noting that, as Judge Moss pointed out, Justice Scalia "developed this point in greater detail in his separate [concurring] opinion." As discussed *infra*, both the majority *and* Justice Scalia's interpretation (again, in disagreement with Judge Moss' interpretation) further advance his argument here.

not typically committed by those whom one normally labels 'armed career criminals.'" *Id.* Hence, because DUI was a "strict-liability crime," and "differ[ed] from a prior record of violent and aggressive crimes committed intentionally such as arson, burglary, extortion, or crimes involving the use of explosives" and because "[t]he latter are associated with a likelihood of future violent, aggressive, and purposeful 'armed career criminal' behavior in a way that the former are not," the Court ultimately concluded that the DUI offense did not qualify as a "violent felony" for purposes of the statute. *Id.* at 148.

Applying these four observations by the Court in *Begay* to the statute at issue here all provide support for Mr. Grider's position that the allegation against him in Count Four does not fall under the statute's prohibited conduct.

Based on the first factor considered by the Court in *Begay*, when looking at section (c)(1), the presence of, and reference to specific pieces of evidence, namely, a "record, document, or other object," in that section "indicates that the statute covers only similar crimes" involving similar evidence and other items used as part of the administration of justice, "rather than every crime that" involves *any* obstructive conduct of *any* official proceeding, even one where there is no testimony or evidence considered. 18 U.S.C. § 1512(c)(1); *Begay*, 553 U.S. at 142. To be clear, Mr. Grider is not suggesting that section (c)(2) only applies to *tangible* evidence like a "record, document, or other object," an argument that has been rejected by multiple courts. *See, e.g. Ring*, 628 F. Supp. 2d at 224; *United States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237, 250 (S.D. Tex. 2020) (addressing the same argument and citing to other district

23

courts addressing the same). However, the natural and plausible reading of sections (c)(1) and (c)(2) together still requires, for section (c)(2), some conduct that impairs the integrity and availability of *some evidence*.[9] In other words, under the statute's plain language and structure, the most natural and plausible reading of section (c)(2) is that it covers acts that have the same kind of evidence-obstructive impact as the listed forms of obstruction in (c)(1) — altering, destroying, mutilating, or concealing a record, document, or other object — but cause this impairment, to use the Court's language from *Begay*, in a different way or manner and/or to other forms of evidence.

This conclusion is consistent with multiple cases that have properly applied section (c)(2) to attempts to interfere with, or render false, evidence other than a record, document, or other object that would become available in a proceeding or otherwise prevent the flow of such evidence to a proceeding. *See, e.g., United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014) (soliciting tips from corrupt cops to evade sur-

---

[9] Mr. Grider slightly reluctantly and hesitantly takes this and other similar arguments here verbatim from a Memorandum from former Attorney General William Barr to Deputy Attorney General Rod Rosenstein and Assistant Attorney General Steve Engel of June 8, 2018 (hereafter Barr Memo). As Judge Moss subtly pointed out, the memorandum was authored by Barr before he was appointed to serve as Attorney General in the Trump administration "(and long after he served as Attorney General in the Bush Administration)." *Montgomery*, ECF 87 at 21–22, n. 3. Whatever one's opinion is of Mr. Barr and the precedential value of his opinion, his analysis and words correctly address this issue as applicable here.

As to the point made here, Judge Moss respectfully was incorrect in his conclusion that the "the link or similarity between the crimes covered by sections 1512(c)(1) and (c)(2) is that both provisions apply to *conduct* that — directly or indirectly — "obstructs, influences, or impedes any official proceeding." *Id.* at 25 (emphasis in original). Such conclusion ignores section (c)(1)'s limitation to tangible evidence. Section (c)(1) also does not apply to broadly obstructing, influencing, and impeding the way section (c)(2) does; section (c)(1) is limited to specific types of obstruction of specific types of evidence, namely, altering, destroying, or concealing certain records, documents, or other objects. It is awkward to consider how an official proceeding could be altered, destroyed, or concealed.

veillance); *United States v. Phillips*, 583 F.3d 1261 (10th Cir. 2009) (disclosing identity of undercover agent to subject of grand jury drug investigation); *United States v. Carson*, 560 F.3d 566, 584 (6th Cir. 2009) (involving false testimony to a grand jury); *United States v. Jefferson*, 751 F.3d 314, 321 (5th Cir. 2014) (involving intentional false statements to court during a preliminary injunction hearing); *United States v. Lucas*, 499 F.3d 769, 780–81 (8th Cir.2007) (involving a defendant having others falsely claim ownership of a firearm); *United States v. Mintmire*, 507 F.3d 1273, 1290 (11th Cir. 2007) (involving defendant's "attempt[s] to orchestrate" grand jury witness's testimony by sending notes to an attorney who in turn "coached" the witness); *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (involving false statements in a court proceeding).

Turning to the second factor considered by the Court in *Begay*, section 1512, and more specifically, section (c)(2)'s history and purpose "offers" further support for [the] conclusion" that section (c)(1)'s prohibitions "limit the scope of [section (c)(2)] to crimes that are similar." *Begay*, 553 U.S. at 143. As has been explained *supra*, section 1512 was designed to create "offenses against witnesses, victims, or informants which occur before the witness testifies or the informant communicates with law enforcement officers," S. REP. 97-532 at 14, 22, while the legislation that section 1512(c)(2) was made part of was expressly designed to "clarify and close loopholes in the existing criminal laws relating to the destruction or fabrication of evidence and the preservation of financial and audit records." S. REP. NO. 107-146 at 14–15. The legislative history thus confirms that section (c)(2) was not intended as a sweeping provision

25

supplanting wide swathes of obstruction law, but rather as a targeted gap-filler designed to strengthen prohibitions solely related to the impairment of evidence and obstruction of justice. *See Montgomery*, ECF 87 at 34 (citing 148 Cong. Rec. S6550 (daily ed. July 10, 2002) (statement of Sen. Orrin Hatch)). More notably, as alluded to *supra*, there is absolutely nothing in the statute's history to support the inference that Congress intended section 1512 as a whole or section (c)(2) specifically to apply to *any* obstructive conduct to *any* official proceeding where there is no impairment of evidence or obstruction of justice, including Congress' certification of the electoral college vote. *See Begay*, 553 U.S. at 144 ("When doing so, Congress rejected a broad proposal that would have covered *every* offense that involved a substantial risk of the use of 'physical force against the person or property of another.'").

It is when we look at the Court's consideration, as well as Justice Scalia's own analysis in his concurring opinion in *Begay* of the use of the term "otherwise," that it becomes obvious that section (c)(2) is limited to obstructive conduct that is directed at undermining a proceeding's truth-finding function through actions impairing the integrity and availability of evidence or otherwise obstructing justice. As pointed out *supra*, the majority in *Begay* noted that the word "otherwise" "*can* (we do not say *must* [ ]) refer to a crime that is similar to the listed examples in some respects but different in others." *Id*. Justice Scalia developed this point in greater detail in his separate, concurring opinion:

> The Court is correct that the clause "otherwise involves conduct that presents a serious potential risk of physical injury to another" signifies a similarity between the enumerated and unenumerated crimes. It is

not, however, any old similarity, such as (to take a random example) "purposeful, 'violent, and 'aggressive' conduct." Rather, it is the particular similarity specified after the "otherwise" — i.e., that they all pose a serious potential risk of physical injury to another. They need not be similar in any other way. As the Court correctly notes, the word "otherwise" is this context means "'in a different way or manner.'" Therefore, by using the word "otherwise" the writer draws a substantive connection between two sets only on one specific dimension — i.e., whatever follows "otherwise."

*Id*. at 150–51 (Scalia, J., concurring in the judgment) (citations omitted). As discussed *supra*, under the statute's plain language and structure, the most natural and plausible reading of section (c)(2) again is that it covers acts that have the same kind of evidence-obstructive impact as the listed forms of obstruction in (c)(1) but cause this impairment in a different way or to other forms of evidence. To interpret section (c)(1)'s limited prohibition of altering, destroying, mutilating, or concealing a record, document, or other object differently and treat section (c)(2) as a broad prohibition against *any* obstructive conduct of *any* official proceeding, even if that conduct does not obstruct justice or impair the integrity and availability of evidence, places the two on two, entirely different dimensions with little to no similarities. It is clear, therefore, that use of the word "otherwise" in section (c)(2) expressly links the clause to the forms of obstruction specifically defined in both section (c)(1) and the remainder of section 1512. Unless it serves that purpose, the word "otherwise" does no work at all and is mere surplusage. Stated differently, by interpreting section (c)(2) as covering any and all acts that influence any proceeding reads the word "otherwise" out of the statute altogether.

27

Looking finally, similar to what the Court did in *Begay*, at section 1512's "basic purpose" and "title" also points to a "distinction [that] matters considerably." *Id.* at 146. Again, section 1512 is titled "Tampering with a witness, victim, or an informant." 18 U.S.C. § 1512. Just as it was "suggested by its title" in *Begay* that "the Armed Career Criminal Act focuses upon the special danger created when a particular type of offender — a violent criminal or drug trafficker — possesses a gun," section 1512's title likewise suggests that all its prohibitions focus on witnesses, victims, or informant who bring forth testimony or evidence, or the evidence itself. *Begay*, 553 U.S. at 164. Looking more broadly at Chapter 73 (which section 1512 falls under) and its title, it is also no coincidence that the statute is placed in that portion of Title 18 of the United States Code whose chapter is titled, "Obstruction of Justice." Again, as discussed *supra*, all this is consistent with statute's purpose.

Even if one were to look at the separate legislation that enacted the specific statutory provision at issue here years later, the same logic still applies. The title of the section of the legislation that added section 1512(c) was "Tampering with a record or *otherwise* impeding an official proceeding." SARBANES-OXLEY ACT OF 2002, Pub. L. No. 107-204, § 1102, 116 Stat. 745, 807 (emphasis added).[10] Once again, there is that word "otherwise." But, applying the reasoning of both the majority and Justice Scalia in *Begay*, it becomes obvious that the use of "otherwise" in the title of that legislation

---

[10] It is also worth noting that this section of the legislation fell under Title XI of the Act which is titled, "Corporate Fraud Accountability."116 Stat. at 807; *see also* SARBANES-OXLEY ACT OF 2002, Pub. L. No. 107-204, § 1101, 116 Stat. 745. One has to struggle to find how Congress intended this legislation related to "Corporate Fraud Accountability," to apply to the arguably obstructive acts of Mr. Grider and others during the unique constitutional function of certifying the electoral college vote.

suggests that the "impeding of an official proceeding" must share a "particular similarity" to "tampering with a record," and not "any old similarity." *Begay*, 553 U.S. at 150–51 (Scalia, J., concurring). As in *Begay*, "the word 'otherwise' is this context means 'in a different way or manner.'" *Id.* Hence, the legislation's title infers that the "impeding of an official proceeding" was referring to different ways or manners in which there would be "tampering with a record" — and not just "any old" and any kind of impeding of an official proceeding. And placement matters. If Congress intended to broadly proscribe any and all obstructive conduct of any official proceeding, then why did it choose to place it in this precise location within a statute whose purpose was to protect witnesses, victims, or informants who bring forth testimony or evidence or the evidence itself, a statute which itself is part of that chapter within Title 18 of the United States Code dealing with "Obstruction of Justice"? Congress' placement of this law within section 1512 and, more specifically, section (c) of that statute is proof that Congress intended to broaden the scope of its protections for witnesses, victims, or informants who bring forth testimony or evidence; for the evidence itself in whatever form or manner it is presented; and, to otherwise prevent the obstruction of justice. There is nothing to demonstrate that the law prohibits anything more beyond that.

In sum, the canons of construction employed by the Court in *Begay*, the text, structure, and the practical application of section 1512(c)(2) as demonstrated in caselaw, as well as its legislative history all support holding that the use of the term "otherwise" requires section (c)(2) to be construed in a similar vein to the terms that

are in section (c)(1). There must be some allegation that Mr. Grider's conduct under-mined a proceeding's truth-finding function through actions impairing the integrity and availability of evidence or otherwise obstructed justice. Because no such allega-tion exists in the indictment here (nor can there ever be one), this Court should dis-miss Count Four of the indictment.

It bears worth mentioning that, in addition to, and since *Begay*, in the past six years, the Supreme Court has twice rejected the Government's overbroad interpreta-tions of "catchall" or "residual" clauses in obstruction of justice statutes. *Marinello v. United States*, 138 S. Ct. 1101, 1109–10, 200 L. Ed. 2d 356 (2018); *Yates v. United States*, 574 U.S. 528, 549–51, 135 S. Ct. 1074, 191 L. Ed. 2d 64 (2015). In both cases, the Court rejected the government's argument that redundancy in other obstruction statutes created by its overbroad catchall interpretation was "mere overlap." *Mari-nello*, 138 S. Ct. at 1107–08 (While "[s]ome overlap in criminal provisions is, of course, inevitable," the Court had not seen "overlap and redundancy to the degree that would result from the Government's broad reading of § 7212"); *Yates*, 574 U.S. at 551 ("where *noscitur a sociis* and *ejusdem generis* apply, "known unknowns" should be similar to known knowns, i.e., here, records and documents. This is especially true because reading "tangible object" too broadly could render "record" and "document" superfluous."). The Government's interpretation and application of section 1512(c)(2) in this case is far broader than in *Marinello* and *Yates*. This Court should likewise reject such interpretation and application.

**C.    The use of the word "corruptly" in 18 U.S.C. § 1512(c) and the lack of a limiting principle makes section 1512(c)(2) unconstitutionally vague as applied based on the allegations in the indictment.**

The allegation of "corruptly" is all that takes the charges against Mr. Grider from an offense punishable up to six months imprisonment to an offense punishable by up to twenty years imprisonment. *Cf.* Indictment, Count Five (charging Mr. Grider with knowingly engaging "in disorderly and disruptive conduct in any of the Capitol Buildings with the intent to impede, disrupt, and disturb the orderly conduct of a session of Congress and either House of Congress, and the orderly conduct in that building of a hearing before or any deliberation of, a committee of Congress or either House of Congress") and Count Four (charging Mr. Grider with attempting to, "and did, *corruptly* obstruct, influence, and impede an official proceeding, that is, a proceeding before Congress, by entering and remaining in the United States Capitol without authority and engaging in disorderly and disruptive conduct and destroying property.").

In order to comply with the requirements of due process, a statute must give fair warning of the prohibited conduct. *Bouie v. City of Columbia*, 378 U.S. 347, 351, 84 S. Ct. 1697, 12 L. Ed. 2d 894 (1964). A statute is unconstitutionally vague under the due process clause if "it fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595–96, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015); *see also Kolender v. Lawson*, 461 U.S. 352, 357–58, 103 S. Ct. 1855, 75 L. Ed. 2d 903 (1983)) ("a penal statute must define the criminal offense with sufficient definiteness that

ordinary people can understand what conduct it prohibits, and do so in a manner that does not invite arbitrary and discriminatory enforcement by which 'policemen, prosecutors, and juries ... pursue their personal predilections.'"); *Connally v. General Construction Company*, 269 U.S. 385, 391, 46 S. Ct. 126, 70 L. Ed. 322 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law.). The allegations against Defendants in Count Ten of the indictment fail in both respects.

Although "corruptly" is defined in section 1515 as "acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information," as set out in that same section, that definition is *only applicable to section 1505*. 18 U.S.C. § 1515(b). Congress has never amended section 1515 to define "corruptly" as used in section 1512. Accordingly, this Court must look elsewhere for that definition. In this Circuit, that discussion starts with *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991).

Like the Defendants here, the defendant in *Poindexter* was charged with a similar offense that involved "corruptly influencing, obstructing, or impeding"; in that case, it was congressional inquiries that were allegedly obstructed by, among other things, making false and misleading statements to members of Congress. *Poindexter*, 951 F.2d at 377. On appeal, the court held the term "corruptly" as used in section 1505 "is too vague to provide constitutionally adequate notice that it prohibits lying

32

to Congress." *Id*. at 379. In so ruling, the court relied on the definitions of "corrupt" and "corruptly" applied in *United States v. North*, 910 F.2d 843 (D.C. Cir. 1990):

> '[C]orruptly' is the adverbial form of the adjective 'corrupt,' which means 'depraved, evil: perverted into a state of moral weakness or wickedness ... of debased political morality; characterized by bribery, the selling of political favors, or other improper political or legal transactions or arrangements. A 'corrupt' intent may also be defined as 'the intent to obtain an improper advantage for [one]self or someone else, inconsistent with official duty and the rights of others.'

*Poindexter*, 951 F.2d at 378 (quoting *North*, 910 F.2d at 881–82). The court noted several problems with the use of the term "corruptly." For one, it noted "that, on its face, the word 'corruptly' is vague." *Id*. It further added that "[t]he various dictionary definitions of the adjective 'corrupt' quoted in *North I* do nothing to alleviate the vagueness problem involved in attempting to apply the term 'corruptly' to Poindexter's conduct." *Id*. ("Vague terms do not suddenly become clear when they are defined by reference to other vague terms.").

As further support for its holding, the court also considered the legislative histories of section 1503, 1505 and 1512, as well as cases interpreting section 1505, to determine whether those statutes provided a narrowing interpretation of the term "corruptly" to provide adequate notice that it criminalized false and misleading statements to Congress. *Id*. at 379–386. The court ultimately concluded that no such narrowing interpretation was provided by legislative history or case law. *Id*. at 386.[11]

---

[11] Part of the legislative history relied upon by the court to reach this conclusion was the same legislative history discussed *supra*.

33

There are several things worth noting about *Poindexter* before turning to the allegation against Mr. Grider. First, in noting that the word "corruptly" was vague on its face, the court added, "in the absence of some narrowing gloss, people must 'guess at its meaning and differ as to its application.'" *Id.* at 378. To make its point, the court noted "'corruptly influencing' a congressional inquiry does not at all clearly encompass lying to the Congress, which is, by way of contrast, clearly a violation of § 1001, the False Statements statute.'" *Id.* Second, as the court pointed out, the term "corruptly" "must have some meaning . . . because otherwise the statute would criminalize all attempts to 'influence' congressional inquiries — an absurd result that the Congress could not have intended in enacting the statute." *Id.* at 377–78. Third, the court found that "corruptly" would only not be unconstitutionally vague if one corruptly influenced another person to violate their legal duty. *Id.* at 379 ("Narrowing the transitive interpretation to include only 'corrupting' another person by influencing him to violate his legal duty would both take account of the context in which the term 'corruptly' appears and avoid the vagueness inherent in words like 'immorally.'). In so finding, however, the court pointed out that either a transitive or an intransitive interpretation of "corruptly" would still be unconstitutionally vague if more specific content is not given to that word. *Id.* ("corrupt" may be used transitively ("A corrupts B," i.e., "A causes B to act corruptly") or intransitively ("A corrupts," i.e., "A becomes corrupt, depraved, impure, etc.")).

Turning to the allegations against Mr. Grider, one can see how all these problems exist in this context as well.

34

Regarding the first problem from *Poindexter* noted *supra*, "in the absence of some narrowing gloss," Mr. Grider indeed "must 'guess at its meaning and differ as to its application.'" *Id.* at 378. Just as the Court in *Poindexter* exemplified this point by noting "'corruptly influencing' a congressional inquiry does not at all clearly encompass lying to the Congress, which is, by way of contrast, clearly a violation of § 1001, the False Statements statute,'" the same point can be made here. *Id.* That is, *corruptly* obstructing, influencing, and impeding a proceeding before Congress does not at all clearly encompass entering and remaining in the United States Capitol without authority and engaging in disorderly and disruptive conduct and destroying federal property. By way of contrast, however, clearly such conduct violates other statutes, namely, 18 U.S.C. § 1752 and 40 U.S.C. § 5104. But, for instance, if a person stands up at a congressional hearing and shouts out in a disruptive way requiring a brief adjournment of the hearing, it is entirely unclear whether that "disorderly and disruptive conduct" is inherently "depraved," "evil," "immoral," "wicked," or "improper." *See Poindexter*, 951 F.2d at 379.

To demonstrate the real problem with what Mr. Grider expects will be the Government's position here — that they can establish corrupt obstruction of a proceeding before Congress simply by showing "consciousness of wrongdoing" — this Court should consider the actions of several Democratic Representatives back in June 2016. After gun control measures failed to pass in the United States Senate in the aftermath of the Orlando nightclub shooting, Democratic lawmakers, including Representative John Lewis and roughly 60 others, staged a sit-in on the House floor in

Congress.[12] In what was considered "unprecedented" action, Lewis and several others moved to the well of the House and announced they would "occupy the floor until there is action" on their legislation.[13] Representative Ted Poe "attempted to gavel the House into order at noon, but when the Democrats refused to quiet, he gaveled the House into recess instead."[14] The "extraordinary protest" continued for "more than 20 hours after [the] sit-in brought legislative business to a halt and triggered a chaotic, late-night showdown."[15] Representative Maxine Waters proclaimed, "I am prepared to stay here until hell freezes over."[16] "As Democrats fought for control of the floor, they pressed against the speaker's dais, waving signs with the names of gun victims and chanting 'No bill! No break!' as Mr. Ryan repeatedly banged his gavel in an attempt to restore order."[17]  Worth noting for this particular "insurrection," the Representatives were knowingly acting in contravention of House rules.[18]

---

[12] Reena Flores, "Democrats stage sit-in on House floor over gun control," CBS News, June 22, 2016, available at https://www.cbsnews.com/news/democrats-stage-sit-in-on-house-floor-over-gun-control/.

[13] *See* "US House Democrats stage gun violence sit-in," C-SPAN, June 22, 2016, available at https://www.c-span.org/video/?411500-1/us-house-democrats-stage-sit-gun-violence (referenced action seen at 1:18:15).

[14] Donovan Slack and Deborah Barfield Berry, "Democrats continue gun control sit-in after House adjourns," USA Today, June 23, 2016, available at https://www.usatoday.com/story/news/politics/2016/06/22/house-democrats-stage-sit-in-over-gun-legislation/86241864/.

[15] *Id.*

[16] *Id.*

[17] David M. Herszenhorn and Emmarie Huetterman, "House Democrats' Gun-Control Sit-In Turns Into Chaotic Showdown With Republicans," N.Y. Times, June 22, 2016, available at https://www.ny-times.com/2016/06/23/us/politics/house-democrats-stage-sit-in-to-push-for-action-on-gun-control.html.

[18] *Id.* (noting the Democrats' use of internet broadcasting services to skirt the C-Span television blackout violated House rules which bans cameras or other electronic devices on the floor).

By the Government's logic, each of the Democratic representatives who partic-

ipated in these events could be charged with violating section 1512(c)(2). They une-

quivocally acted to "obstruct, influence, impede", "block", "make difficult", and "hin-

der" subsequent legislative proceedings. They did so with "the intent to obstruct, im-

pede, or influence" those proceedings. Most notably, they did so with "consciousness

of their wrongdoing," disregarding House rules and the Speaker's call to order, intent

on continuing their "wrongful" conduct until "hell freezes over." This example should

demonstrate the absurdity of the Government's interpretation of section 1512(c)(2).

*See Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575, 102 S. Ct. 3245, 3252, 73

L. Ed. 2d 973 (1982) ("interpretations of a statute which would produce absurd results

are to be avoided if alternative interpretations consistent with the legislative purpose

are available.").

This leads to the second problem from *Poindexter* noted *supra*. Allowing the

Government to proceed on Count Four against Mr. Grider would, similar to what the

court pointed out in *Poindexter*, criminalize all attempts to "influence" congressional

proceedings — "an absurd result that the Congress could not have intended in enact-

ing the statute." *Poindexter*, 951 F.2d at 377–78. The allegation in Count Four does

exactly what the court was concerned about in *Poindexter*: it criminalizes any at-

tempts to obstruct any congressional proceeding without any limiting principle.

The third issue from *Poindexter* noted *supra*, further presents a problem here.

The only non-vague interpretation of "corruptly," according to *Poindexter*, is when, as

applied, the person's action "corruptly influenced another person to violate their legal

duty." *Id.* at 379. No such allegation exists in this case (nor can it). The allegation is simply that Mr. Grider corruptly obstructed, influenced, and impeded an official proceeding, that is, a proceeding before Congress, by entering and remaining in the United States Capitol without authority and engaging in disorderly and disruptive conduct and destroying federal property. There is no allegation that Mr. Grider (a) influenced others to engage in obstructive behavior or (b) did so in violation of some legal duty. More importantly, there is no context given to what specific conduct he engaged in that made his conduct "corrupt." *See id.* (noting either a transitive or an intransitive interpretation of "corruptly" would still be unconstitutionally vague if more specific content is not given to that word).

While the Government might maintain that these problems were alleviated by amending the definition of "corruptly" in section 1515, there are two problems with using that definition. First, as mentioned *supra*, that definition is only applicable to section 1505. 18 U.S.C. § 1515(b). Congress never amended section 1515 to define "corruptly" as used in section 1512 even though it explicitly made other definitions ("official proceeding," for instance) applicable to that section. *See* 18 U.S.C. § 1515(a); *Bates v. United States*, 522 U.S. 23, 29–30, 118 S. Ct. 285, 139 L.Ed.2d 215 (1997) (quoting *Russello v. United States*, 464 U.S. 16, 23, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983)) ("'Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'"); *Duncan v. Walker*, 533 U.S. 167, 173, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001). Second, and

more importantly, a reading of the definition of "corruptly" in section 1515 demonstrates that the definition applies to some act that interferes with *evidence* whether it be a statement, document, or something containing other information. *See* 18 U.S.C. § 1515(b) ("corruptly" means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement, or withholding, concealing, altering, or destroying a document or other information); *Yates*, 574 U.S. at 544 (applying *noscitur a sociis* to interpret section 1519 as applying to records and documents). Because there is no allegation that Mr. Grider affected the availability and integrity of evidence, section 1515's definition serves no purpose here.

The Supreme Court's well-founded and well-established concern is entirely applicable here: a penal statute must define the criminal offense "in a manner that does not invite arbitrary and discriminatory enforcement by which 'policemen, prosecutors, and juries ... pursue their personal predilections.'" *Kolender*, 461 U.S. at 357–58. To this end, this Court should consider (a) the actions of the Government in the context of other obstructive acts before Congress that occurred prior to January 6, 2021; (b) other obstructive — and destructive — acts against other federal buildings and federal officers; and, most notably, (c) the prosecution of other similarly situated defendants for their alleged actions on January 6, 2021.

Regarding individuals engaged in other obstructive acts before Congress that occurred prior to January 6, 2021, this Court should consider the multiple individuals

who engaged in the obstruction of the Senate judicial confirmation hearing for Supreme Court Justice Brett Kavanaugh. *See, e.g., United States v. Barry*, No. MAG 18-00111 (RMM), 2019 WL 2396266, at *1 (D.D.C. June 5, 2019) (where defendant was arrested and charged for obstructing the Senate judicial confirmation hearing for Supreme Court Justice Brett Kavanaugh but never accused of "corruptly" obstructing that proceeding in violation of section 1512(c)(2)). Prior to the Senate vote on Justice Kavanaugh's confirmation, "[p]rotesters broke through Capitol Police barricades and rushed up the steps to the Capitol Rotunda."[19] There is no record or indication that any of them were charged with "corruptly" obstructing that proceeding in violation of section 1512(c)(2). Prior to that, during the confirmation hearings themselves, hundreds of protestors were prowling around the offices of Senators who were targeted for their support of the Supreme Court nominee, including the office of Senate Judiciary Committee Chairman Chuck Grassley and others.[20] Video depicting protestors "taking control" of Senator Grassley's office depict scenes similar in some ways to those of January 6 defendants in Congressional offices.[21] The video is notable in that protestors admitted on camera that their intent was to disrupt the "official proceed-

---

[19] *See* "Kavanaugh protestors ignore Capitol barricades ahead of Saturday vote," Roll Call, Oct. 6, 2018, available at: https://www.rollcall.com/2018/10/06/kavanaugh-protesters-ignore-capitol-barricades-ahead-of-saturday-vote/.

[20] *See* "Kavanaugh protests escalate, over 120 arrested on Capitol Hill," ABC News, Sept. 24, 2018, available at: https://abcnews.go.com/Politics/kavanaugh-protests-escalate-120-arrested-capitol-hill/story?id=58048599.

[21] *See* "Kavanaugh protestors take over Sen. Grassley's office," Wash. Post., Sept. 6, 2018, available at: https://www.washingtonpost.com/video/politics/kavanaugh-protesters-take-over-sen-grassleys-office/2018/09/06/9732de44-b1ef-11e8-8b53-50116768e499_video.html.

ings," chanting *"The system is corrupt, and that's why we disrupt, the system is corrupt, and that's why we disrupt."* Again, there is no record or indication that any of these individuals were charged with "corruptly" obstructing that proceeding in violation of section 1512(c)(2).

This begs the question then: why prosecute Mr. Grider for violating section 1512(c)(2) and treat his conduct as "corrupt" when none of these individuals were prosecuted for their obstruction of Congressional proceedings? Mr. Grider allegedly broke through Capitol Police barricades, rushed up the steps on the Capitol, and entered protected areas within the Capitol building — no differently than those hundreds of individuals who did so with the intent to disrupt the confirmation hearings for Justice Kavanagh. None of the individuals arrested and charged during that "unprecedented" event were ever charged with violating section 1512(c)(2). When there has never been a case where someone has been charged with the "corrupt" obstructing, influencing, or impeding of a proceeding based on disruptive behavior in violation of section 1512(c)(2), how is one ever to know when that line is crossed and more importantly, where that line even is? The lack of precedent has to carry some weight in establishing the vagueness problems that exist when trying to decide whether someone is corruptly obstructing, influencing, or impeding a proceeding.

In addition to those acts of destruction before Congress, this Court should also consider the actions of multiple defendants who recently faced criminal charges in the District of Oregon, and were more recently considered by Judge McFadden in another case involving a defendant accused of disorderly conduct on January 6, 2021.

*See United States v. Judd*, 21-cr-40-TNM, ECF Dkt. 203 (Memorandum Order of 12/28/21). "Those defendants rioted outside the Mark Hatfield Federal Courthouse in Portland during the summer of 2020 . . . after the death of George Floyd in May 2020 and raged for months." *Id.* at 5–6. "Thousands gathered nightly, vandalizing the courthouse and hurling objects at federal agents guarding it." *Id.* at 6. "Officers responded with tear gas and rubber bullets to disperse rioters, but the riots continued, causing havoc." *Id.* (citation omitted). The Government charged 74 people for their involvement in those riots. *Id.*; *see* Appendix to Def.'s Judd's Motion at 1, ECF No. 138-1. None, however, were charged with violating section 1512(c)(2), including defendants who assaulted federal officers. *See id.* Additionally, as Judge McFadden expressed concern over, "[t]he Government dismissed 27 cases brought against Portland defendants, including five felony cases." *Judd*, ECF Dkt. 203 at 9–10 ("Dismissal of five is downright rare and potentially suspicious.").

If there are any concerns about differences with the actions of the protestors in Portland versus defendants like Mr. Grider here, this Court should then look to the Government's prosecution of other defendants for their obstructive actions at the United States Capitol on January 6, 2021. Consider the case of Robert M. Reeder. *See United States v. Robert M. Reeder*, 21-cr-00166-TFH. Per his Rule 11 Statement of Offense, Reeder entered the Capitol Building twice, leaving the first time and returning a subsequent time. *Id.*, ECF Dkt. 19. He made statements about how, "We had to do...ah... battle with the Police inside. It was crazy...absolutely insane." *Id.* Sentenc-

ing in his case initially had to be cancelled as a video emerged depicting Reeder attempting to punch police officers. *See id.*, ECF Dkt. 33 at 1. Nevertheless, the Government persisted with sentencing pursuant to a plea agreement to plead to misdemeanor parading in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G). *Id.*, ECF Dkt 20, 35, & 41. Reeder was never charged with violating section 1512(c)(2) despite his attempts to assault law enforcement officers. *Id.*, ECF Dkt. 6.

Or consider the case of Brittany Angelina Dillon. See *United States v. Brittany Angelina Dillon*, 21-cr-00360-DLF. Per the complaint filed in her case, Dillon attempted to enter the U.S. Capitol building through the Senate Carriage Door entrance. *Id.*, ECF Dkt. 1. Attempting to enter the building, Dillon pushed through a crowd, then fell at or near the threshold of the Senate Carriage Door, then stood back up, briefly pushed forward against law enforcement officers, and was repelled. *Id.*, ECF Dkt. 21 (Sentencing Memorandum by USA). In text messages with another person arrested in connection with their actions at the Capitol, Dillon stated, "I fought hard…I fell in the door and they tried to beat me with batons so I backed off and they pepper sprayed my eyes[.]" *Id.* Despite her use of physical force against law enforcement officers, Dillon was not charged with violating section 1512(c)(2). *Id.*, ECF Dkt. 1. Dillon instead pleaded guilty pursuant to a plea agreement to misdemeanor disorderly conduct in a Capitol building or grounds, in violation of 40 U.S.C § 5104(e)(2)(D). *Id.*, ECF Dkt 16 (Plea Agreement), 31 (Judgment).

Or consider the case of Bradley Rukstales. *See United States v. Bradley Rukstales*, 21-cr-00041-CJN. Per his Rule 11 Statement of Offense, Rukstales confronted U.S. Capitol Police and was present when "rioters threw chairs and hurled unknown substances at the officers." *Id.*, ECF Dkt. 90. Video surveillance then captured how officers retreated and, "moments later, Rukstales descended the stairwell, picked up one of the chairs at the bottom of the stairwell, and threw it in the direction of where the officers had retreated down the corridor." *Id.* Rukstales then "proceeded down the corridor closer to where the officers had formed their line" and when rioters refused their commands to leave the building, they began arresting individuals including Rukstales. *Id.* In attempting to arrest him, "Rukstales's arm stretched out in the officer's direction." *Id.* Despite his use of physical force against officers, Rukstales was never charged with violating section 1512(c)(2). *Id.*, ECF Dkt. 1 (Complaint), 7 (Information). Rukstales instead pleaded guilty pursuant to a plea agreement to misdemeanor parading in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G). *Id.*, ECF Dkt. 89 (Plea Agreement), 140 (Judgment).

Even though Mr. Grider never entered the Gallery of the Senate Chamber, the very location where the certification proceeding should have been occurring, consider also the case of Anthony Mariotto. *See United States v. Anthony Mariotto*, 21-cr-00094-RBW. Per his Rule 11 Statement of Offense, Mariotto "entered the U.S. Capitol through a door that had previously had its glass windows broken." *Id.*, ECF Dkt. 38. He then entered "the gallery of the Senate Chamber and took a self-photograph, also known as a 'selfie'" and then "later posted the selfie photograph on Facebook with the

44

following caption: "I'm in [sic] And there are just a few [sic] This is our house." *Id.*
Despite him "proceed[ing] all the way to the Gallery of the Senate Chamber, the very
location where the certification proceeding should have been occurring," *id.*, Mariotto
was not charged with violating section 1512(c)(2). *Id.*, ECF Dkt. 1 (Complaint), 8 (In-
formation). Mariotto instead pleaded guilty pursuant to a plea agreement to misde-
meanor parading in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G). *Id.* ECF Dkt.
37 (Plea Agreement), 39 (Judgment).

The Government may say that Mr. Grider engaged in the corrupt obstruction
of an official proceeding because along the way, he harassed and berated law enforce-
ment officers inside and outside the Capitol building. Consider then, not only the
cases of Reeder, Dillon, and Rukstales, discussed *supra*, but also the cases of Abram
Markofski and Brandon Nelson. *See United States v. Abram Markofski & Brandon
Nelson*, 21-cr-00344-JDB. Per their Rule 11 Statements of Offense, Markofski and
Nelson both entered the Capitol Building. At one point, Markofski texted Nelson, "We
stormed the Capitol and shut it down. Currently still insider (sic)." *Id.*, ECF Dkt. 41.
Later, Nelson texted Markofski, "We held the line . . . No backing down." *Id.* Markof-
ski replied, "Fuck. Yeah, brother is Patriots won't go down without a fight." *Id.* Nelson
responded, "Not I." *Id.* Despite their actions, neither Markofski nor Nelson were
charged with violating section 1512(c)(2). *Id.*, ECF Dkt. 1 (Complaint), 8 (Infor-
mation). Both instead pleaded guilty pursuant to a plea agreement to misdemeanor
parading in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G). *Id.*, ECF Dkt. 36, 40
(Plea Agreements), 58, 60 (Judgments).

45

Or consider then the case of Kevin Cordon. *See United States v. Kevin Cordon*, 21-cr-00277-TNM. Per his Rule 11 Statement of Offense, Cordon entered the U.S. Capitol by climbing through a broken window on the west side, Senate wing of the Capitol. *Id.*, ECF Dkt. 27. Per his complaint, he was dressed in an American flag and was wearing a black, ballistic vest and then, at one point, donned a black gas mask. *Id.*, ECf Dkt. 1. During an interview with the Finnish newspaper *Ilta Sanomat,* Cordon told the interviewer:

> We're here to take back our democratic republic. It's clear that this election is stolen, there's just so much overwhelming evidence and the establishment, the media, big tech are just completely ignoring all of it. And we're here to show them we're not having it. We're not- we're not just gonna take this laying down. We're standing up and we're taking our country back. This is just the beginning.

*Id.* When the interviewer asked Cordon why he entered the Capitol, Cordon responded:

> It was um, it was a once in a lifetime opportunity to show that the people of this country are not gonna take this corruption laying down. And we're gonna show that we have the power. We have the power in numbers, we have the power in spirit to show them that they can't just push us around and take over our country with their corruption. So we had to actually step foot in their building that they think their [sic] own. And that's why everybody was shouting, "this is our house." Because it is! This is for the people, by the people, of the people government. And we needed to remind them because--and we need to remind ourselves. I needed to remind myself and I needed to remind the rest of the public that this is our country. This country was founded on individuals having their own sovereignty over their own lives and I think a lot of the public has forgotten that. And we're back to show that we're - we're reawakening to that reality that this is our country and we're not gonna take that nonsense.

*Id.* Cordon was initially charged with violating section 1512(c)(2). *Id.*, Dkt. 12 (Indictment). That count, however, was dropped as part of his plea agreement to plead to

46

entering and remaining in a restricted building or grounds, in violation of 18 U.S.C.

§ 1752(a)(1). *Id.*, ECF 26 (Plea Agreement); 40 (Judgment).

If the Government maintains that Cordon's plea agreement does not reflect

that there was ample evidence to charge a violation of section 1512(c)(2), then con-

sider the case of Derek Jancart. *See United States v. Derek Jancart*, 21-cr-00148-JEB.

Per the Government's sentencing memorandum in his case, Jancart

> prepared for violence by bringing a gas mask and two-way radios to
> Washington, D.C"; (2) was aware of the potential for violence because he
> responded to the Capitol only after hearing it had been "breached"; (3) he
> laughed and cheered while the forward line of the rioters broke through
> the police line and posted a video to Facebook of [his co-defendant]
> screaming "we have you surrounded" at the police officers attempting to
> hold the line around the Capitol; (4) he penetrated the U.S. Capitol all
> the way to the Speaker's conference room; (5) his statements on Facebook
> after January 6 reveal a total lack of remorse; (6) he actively spread prop-
> aganda on social media by falsely downplaying the violence on January
> 6; (7) he likely destroyed evidence by deleting videos and message
> threads from his phone; and (8) his social media statements reveal he
> believes a revolution is coming and suggest the possibility of future vio-
> lence by this defendant.

*Id.*, ECF Dkt. 29. Despite this "obstructive" behavior, Jancart was not charged with

violating section 1512(c)(2) and instead pleaded guilty pursuant to a plea agreement

to the misdemeanor offense of disorderly conduct in a capitol building, in violation of

40 U.S.C. § 5104(e)(2)(D). *Id.*, ECF Dkt. 20 (Plea Agreement), 33 (Judgment).

Or consider the case of Andrew Hatley. *See United States v. Andrew Hatley*,

21-cr-0098-TFH. Per the complaint in his case, Hatley entered the Capitol Building

on January 6 wearing a gas mask. *Id.*, ECF Dkt. 1. After January 6, Hatley attempted

to mislead investigators and the public by posting to his Facebook page: ""It has come

to my attention that there was someone who looks like me at the Capitol. I'd like to set the record straight. I don't have that kind of motivation for lost causes. I just don't care enough anymore, certainly not enough for all that." *Id.* Investigators, however, were able to find multiple sources of evidence to establish that Hatley, indeed, was the person depicted in multiple photographs taken of him wearing a gas mask inside of the Capitol Building. *Id.* Despite his "obstructive" behavior and actual attempts to conceal evidence of his wrongdoing, Hatley was not charged with violating section 1512(c)(2). *Id.*, ECF Dkt. 10 (Information). Hatley instead pleaded guilty pursuant to a plea agreement to misdemeanor parading in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G). *Id.*, ECF Dkt. 23 (Plea Agreement), 40 (Judgment).

Maybe if Mr. Grider smoked marijuana inside the Capitol, that would have made it where his actions were not viewed as the corrupt obstruction of an official proceeding. After all, consider the case of Eduardo Nicolas Alvear Gonzalez. *See United States v. Eduardo Nicolas Alvear Gonzalez*, 21-cr-00115-CRC. Per his Rule 11 Statement of Offense, after entering the Capitol Building Rotunda, Gonzalez proceeding to smoke marijuana and then distribute marijuana to other individuals inside of the Capitol building. *Id.*, ECF Dkt. 29. Per the complaint filed in his case, Gonzalez video recorded and transmitted his interaction within the Capitol, at one point, proclaiming that "we're taking out country back" and, at other points, laughing and saying, "yeah, this is the most protected building." *Id.*,ECF Dkt. 1. Gonzalez was not charged with violating section 1512(c)(2). *Id.*, ECF Dkt. 5 (Information). Gonzalez

instead pleaded guilty pursuant to a plea agreement to misdemeanor parading in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G). *Id.*, ECF Dkt. 28.

Likewise, consider the case of James Bonet. *See United States v. James Bonet*, 21-cr-00121-EGS. Per his Rule 11 Statement of Offense, as Bonet approached the entrance to the Capitol Building, he stated, "[w]e made it in the building bitches! We're taking it back! We are taking it back, we made it in the building!" *Id.*, ECF Dkt. 38. Then, once inside the Capitol Building, Bonet "walked into" the "office of Senator Jeff Merkley" and "smoked a marijuana cigarette." *Id.* Although Bonet was initially charged with violating section 1512(c)(2), that count was dropped as part of his plea agreement to plead to entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1). *Id.*, ECF Dkt. 25 (Superseding Indictment), 37 (Plea Agreement). One must wonder how Gonzalez or Bonet were *not* "conscious of their wrongdoing."

Maybe the Government will say Mr. Grider violated section 1512(c)(2) because he is a male and not a female. After all, consider the case of Dawn Bancroft. *See United States v. Dawn Bancroft*, 21-cr-00271-EGS. Per her Rule 11 Statement of Offense, Bancroft entered the Capitol Building through a separate, broken out window just to the south of the Senate Wing Door. *Id.*, ECF Dkt 33. After exiting, Bancroft filmed a "selfie style video of herself" stating, "We broke into the capitol, we got inside, we did out part, we were looking for Nancy *to shoot her in the frickin' brain*, but we didn't find her," presumably referring to Speaker of the House, Nancy Pelosi. *Id.* De-

spite her entering the Capitol through a broken window and then explicitly threatening to inflict serious bodily injury on the Speaker of the House, Bancroft was not charged with violating section 1512(c)(2). *Id.*, ECF 1 (Complaint), 18 (Information). Bancroft instead pleaded guilty pursuant to a plea agreement to misdemeanor parading in the Capitol in violation of 40 U.S.C. § 5104(e)(2)(G). *Id.*, ECF Dkt. 32 (Plea Agreement). Or consider the case of Jenny Louise Cudd. *See United States v. Jenny Louise Cudd*, 21-cr-00068-TNM. Per the complaint filed in her case, Cudd entered the Capitol Building and made multiple recordings of her actions therein. *Id.*, ECF Dkt. 1. In those recordings, Cudd made the following comments:

- "we just pushed, pushed, pushed, and yelled go and yelled charge. We just pushed and pushed, and we got it."
- "We did break down the Nancy Pelosi's office door and somebody stole her gavel and took a picture sitting in the chair flipping off the camera."
- "They had to evacuate it before we charged the Capitol."
- "….fuck yes, I am proud of my actions, I fucking charged the Capitol today with patriots today. Hell, yes I am proud of my actions."

*Id.* In an interview with a local news station two days after the events of January 6, Cudd again boasted, "we the Patriots did storm the U.S. Capitol," and, in reference to entering the Capitol, stated, "Yes, I would absolutely do it again." *Id.* While Cudd was initially charged with violating section 1512(c)(2), that count was dropped as part of her plea agreement. *Id.*, ECF Dkt. 18 (Indictment), 75 (Plea Agreement). On October 13, 2021, Cudd pleaded to entering and remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1). *Id.*, ECF Dkt. Minute Order 10/13/21. To be abundantly clear, Mr. Grider is not accusing the Government of gender discrimination. But the point should be coming into focus by now.

As all these cases demonstrate, even the Government's own parameters for charging and prosecuting individuals for their actions of January 6 is entirely arbitrary, entirely unclear, and entirely vague. It is "arbitrary enforcement" at its worst and exactly what the due process clause prohibits. *See Johnson v. United States*, 576 U.S. 591, 595–96, 135 S. Ct. 2551, 192 L. Ed. 2d 569 (2015). Mr. Grider should not have to climb into the mind of a creative Government prosecutor to decide whether his conduct would cross some imaginary line of when his conduct is considered "corrupt." More importantly, this question should not just be submitted to 12 jurors to determine whether or not that wrongfulness is felony obstruction as opposed to some kind of a misdemeanor.

The allegation in Count Four of the indictment against Mr. Grider should be dismissed as the statute is unconstitutionally vague as applied in these unique circumstances.

**D.    The rule of lenity also can be used to find that the allegation in the indictment falls outside the scope of 18 U.S.C § 1512(c)(2).**

If recourse to any of the "traditional tools of statutory construction leaves *any* doubt" about the meaning of "corruptly obstructing, influencing, or impeding a proceeding before Congress," as those terms are used in section 1512(c)(2) and applied in the allegation against Mr. Grider in Count Four, this Court could also invoke the rule that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates*, 574 U.S. at 547–48 (quoting *Cleveland v. United States*, 531 U.S. 12, 25, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000), in turn quoting *Rewis v. United States*, 401 U.S. 808, 812, 91 S. Ct. 1056, 28 L. Ed. 2d 493 (1971)). As it was in *Yates*,

"[t]hat interpretative principle is relevant here, where the Government urges a read-ing of [section 1512(c)(2)] that exposes individuals to 20–year prison sentences" for obstructing any proceeding before Congress in any manner that it deems "corrupt." *Id.* (citing *Liparota v. United States*, 471 U.S. 419, 427, 105 S. Ct. 2084, 85 L. Ed. 2d 434 (1985)) ("Application of the rule of lenity ensures that criminal statutes will pro-vide fair warning concerning conduct rendered illegal and strikes the appropriate balance between the legislature, the prosecutor, and the court in defining criminal liability."). "In determining the meaning of "corruptly obstructing, influencing, or im-peding a proceeding before Congress," as those terms are used in section 1512, as it was for the Court in interpreting section 1519 in *Yates*, it would also be "appropriate, before [choosing] the harsher alternative, to require that Congress should have spo-ken in language that is clear and definite." *Id.* (quoting *Cleveland*, 531 U.S. at 25 in turn quoting *United States v. Universal C.I.T. Credit Corp.*, 344 U.S. 218, 222, 73 S. Ct. 227, 97 L. Ed. 260 (1952)). Because they failed to do so and the Government has accused Mr. Grider such that it is not "clear and definite" that his conduct violates section 1512(c)(2), this Court should dismiss Count Four of the indictment against him.

There is no question that there are other more definitive statutes available to charge Mr. Grider for his alleged obstructive conduct (and he has, in fact, been charged with violating those other statutes). The Government's attempts to over-charge him using a statute that, by any interpretation, does not apply to his conduct does no justice. It goes against the text and structure of the statute and its legislative

history and violates multiple constitutional protections. Mr. Grider is being prose-cuted for an offense under a Chapter of Title 18 of the United States Code titled, "Obstruction of Justice" where there is no obstruction of justice.

Mr. Grider acknowledges that this Court will possibly not be the last court to consider this novel approach by the Government. Nevertheless, Defendants want this Court's first word to be the correct one and submit the authority and arguments herein to aid this Court in accomplishing that goal.

WHEREFORE, PREMISES CONSIDERED, Mr. Grider respectfully requests this Honorable Court dismiss Count Four of the indictment.

Date: <u>January 12, 2022.</u>   Respectfully Submitted,

            MAYR LAW, P.C.

            by: <u>/s/ T. Brent Mayr</u>
            T. BRENT MAYR
            Texas State Bar Number 24037052
            D.C.D.C. Bar ID TX0206
            bmayr@mayr-law.com

            5300 Memorial Dr., Suite 750
            Houston, TX 77007
            Telephone: 713-808-9613
            Fax: 713-808-9613

            ATTORNEY FOR THE DEFENDANT,
            CHRISTOPHER RAY GRIDER

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of this memorandum was sent to Counsel

for the Government, Candice Wong, on January 12, 2022, via CM/ECF and email.

<u>/s/ T. Brent Mayr</u>
T. BRENT MAYR

ATTORNEY FOR THE DEFENDANT,
CHRISTOPHER RAY GRIDER