**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | |
| | : | **No. 1:21-cr-00022-CKK** |
| | : | |
| **CHRISTOPHER RAY GRIDER** | : | |
| | : | |
| **Defendant.** | : | |

<u>**GOVERNMENT'S OPPOSITION TO DEFENDANT'S AMENDED MOTION TO
DISMISS COUNT FOUR OF THE INDICTMENT**</u>

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant Christopher Grider's Amended Motion to Dismiss Count Four of the Indictment (hereinafter, "Def. Mot.")—namely, defendant's alleged violation of 18 U.S.C. §§ 1512(c)(2) and 2.   For the reasons set forth below, and consistent with recent rulings by other judges in this district in *United States v. Sandlin,* 21-cr-88 (DLF), 2021 WL 5865006 (D.D.C. Dec. 10, 2021), *United States v. Caldwell*, 21-cr-28 (APM), 2021 WL 6062718 (D.D.C. Dec. 20, 2021), *reconsideration denied*, 2022 WL 203456 (D.D.C. Jan. 24, 2022); *United States v. Mostofsky*, 21-cr-138 (JEB), 2021 WL 6049891 (D.D.C. Dec. 21, 2021), *United States v. Montgomery*, 21-cr-46 (RDM), 2021 WL 6134591 (D.D.C. Dec. 28, 2021), and *United States v. Nordean*, 21-cr-175 (TJK), 2021 WL 6134595 (D.D.C. Dec. 28, 2021)—which the defendant concedes have "addressed and rejected" these same arguments "in one form or another" (Def. Mot. at 4)—the defendant's motion should be denied.   The Joint Session of Congress convened on January 6, 2021 to certify the Electoral College vote in the 2020 Presidential Election—a proceeding enshrined in and prescribed by the United States Constitution and federal law—plainly constitutes an "official proceeding" under 18 U.S.C. § 1512(c)(2).   Nothing in

§ 1512(c)(2)'s text, structure, or history limit the statute to obstructive acts akin to the destruction of evidence.   Section 1512(c)(2) is not unconstitutionally vague as applied to the defendant, and the rule of lenity does not counsel a different interpretation.   The defendant's various arguments to the contrary are unsupported by the law and facts of this case.

## PROCEDURAL HISTORY

On January 26, 2021, a grand jury in the District of Columbia returned an indictment charging the defendant, Christopher Ray Grider, with destruction of government property, in violation of 18 U.S.C. §§ 1361 and 2, obstruction of an official proceeding, in violation of 18 U.S.C. §§ 1512(c)(2) and 2 (Count Four), entering or remaining in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(1), disorderly and disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2), disorderly conduct in a Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(D), impeding passage through the Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(E), and an act of physical violence in the Capitol building, in violation of 40 U.S.C. § 5104(e)(2)(F).

On March 22, 2021, the defendant filed a Motion to Dismiss Count Four of the Indictment, D.E. 21, which the government opposed on April 5, 2021, D.E. 22.   On May 4, 2021, the defendant's counsel emailed the Court to hold the motion "in abeyance" and "withhold making a ruling," and the Court issued a minute order that same day vacating a motions hearing.   At the July 1, 2021, status hearing, the defendant's counsel reiterated that the motion should continue to be held in abeyance as the defense moved "in a different direction."   In the interim, the defendant's counsel pursued litigation of the same issue in *United States v. Montgomery*, 21-cr-46 (RDM), filing motions to dismiss the charged violations of 18 U.S.C. § 1512(c)(2) on June 18, 2021, September 17, 2021, and December 6, 2021.   On December 28, 2021, the *Montgomery*

court denied the motion to dismiss.   On January 12, 2022, the defendant's counsel filed the instant Amended Motion to Dismiss, D.E. 69.

## **FACTUAL BACKGROUND**

The U.S. Capitol is secured 24 hours a day by the United States Capitol Police ("USCP"). Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol. On January 6, 2021, the exterior plaza of the U.S. Capitol was closed to members of the public.

On January 6, 2021, a joint session of the United States Congress convened at the U.S. Capitol. During the joint session, elected members of the United States House of Representatives and the United States Senate were meeting in separate chambers of the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The joint session began at approximately 1:00 p.m. Eastern Standard Time ("EST"). Shortly thereafter, by approximately 1:30 p.m. EST, the House and Senate adjourned to separate chambers to resolve a particular objection. Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol building, and USCP were present and attempting to keep the crowd away from the Capitol building and the proceedings underway inside.

At around 1:00 p.m. EST, rioters broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

At approximately 2:00 p.m. EST, some people in the crowd forced their way through, up, and over the barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police Officers or other authorized security officials. At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

Shortly after 2:00 p.m. EST, individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts.

Shortly thereafter, at approximately 2:20 p.m. EST, members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Pence, were instructed to—and did—evacuate the chambers. That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber. As individuals attempted to break into the House chamber by breaking the windows on the chamber door, law enforcement officers were forced to draw their weapons to protect the victims sheltering inside.

At approximately 2:30 p.m. EST, rioters broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side

and the east side of the building. Once inside, the rioters broke windows and doors, destroyed property, stole property, and assaulted federal police officers. Many of the federal police officers were injured, and several were admitted to the hospital. The rioters also confronted and terrorized members of Congress, Congressional staff, and the media. The rioters carried weapons including tire irons, sledgehammers, bear spray, and Tasers. They also took police equipment from overrun police including shields and police batons. At least one of the rioters carried a handgun with an extended magazine. These actions resulted in the disruption and ultimate delay of the vote Certification.

Also at approximately 2:30 p.m. EST, USCP ordered the evacuation of lawmakers, Vice President Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

At around 2:47 p.m. EST, rioters broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened the door to the Senate Chamber.

Between 3:25 and around 6:30 p.m. EST, law enforcement officers were able to clear rioters from the U.S. Capitol. Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 pm EST after the building had been secured. Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

### *The Defendant's Participation in the January 6, 2021, Capitol Riot*

On the evening of January 6, 2021, the defendant, Christopher Grider, was interviewed, apparently via videoconference from Washington, D.C., on a story on KWTX-TV News 10, a local news media station in Waco, Texas.   During the interview, the defendant admitted to being inside the U.S. Capitol Building that day, when it was breached by large crowds as Congress convened in a Joint Session to affirm the Electoral College vote in the 2020 Presidential Election.   The defendant described being within several feet of the woman who was shot inside the Capitol.   The defendant stated on camera, "The president asked people to come and show their support… I feel like it's the least that we can do, it's kind of why I came from central Texas all the way to DC." The story included video captioned as, "Courtesy: Chris Grider."   The defendant told the reporter, "They were shocked as everyone else was when the people on the other side of the door, from 20 feet away, shot her in the chest.   At that point we were all panicked, we couldn't leave because there were thousands of people behind us pushing us forward."   The web version of the story additionally quotes the defendant as saying, "The Capitol Police started pepper-spraying people and they were firing rubber bullets, and then after that started, that's when people started pushing to get into the Capitol building to be heard" and reports that "Grider said … there were many protesters, like himself, who were protecting monuments and art from the crowds."

Open-source videos corroborated the defendant's admission that he was inside the Capitol on January 6, 2021.   The footage showed the defendant wearing a black puffy jacket that appeared to match the one during his interview, a yellow "Don't Tread on Me" flag tied around his neck, and at some points, a red "Make America Great Again" baseball cap.   Before the breach of the Capitol Building, the defendant was viewed outside amongst the crowd standing on a marble landing near scaffolding.   He was holding his phone and moving it around likely taking videos or pictures of the crowd, and then observed walking on the railing beside the stairs.

Inside the Capitol, the defendant was observed in several areas.  At one point, the defendant was in a raucous crowd that was pushed up against an entrance to the House Chamber, chanting "Stop the Steal."  He was seen in the crowd holding a black helmet in the air in the direction of the entrance around the time that shouts of "Use your Kevlar" could be heard.



Large numbers of the crowd appeared to leave that entrance to the House Chamber and stream toward the Speaker's Lobby, a hallway that also connects to the House Chamber.  The defendant appeared to be among the first people to race down the hallway.



The defendant was among the first individuals to arrive by the Speaker's Lobby door.



The words "Speaker's Lobby" were visible at the top of the doors.   Chairs, visible through the door's glass panels, were used to barricade the door from the inside of the Speaker's Lobby.   The door was guarded by three Capitol Police officers in front.

The area soon became packed.   The defendant continued to stand near the front of the crowd by the doors, and remained near the front until seconds before a woman's fatal shooting. Members of the crowd were shouting and gesticulating at the officers.   A male rioter wearing a fur-lined hat was observed repeatedly punching the glass panels of the doors immediately behind the officers with his fists, causing the glass to splinter.   While throwing two of the punches, that rioter pushed his body up against one of the Capitol Police officers guarding the door.   That rioter was also observed shouting and pointing aggressively at the officers.   The defendant was then observed handing a black helmet to that rioter and speaking to him.   The defendant appeared to knock on the top of the helmet, signifying that it was a hard instrument, and the rioter then took it. Additional officers in riot gear arrived behind the crowd at the Speaker's Lobby doors, and the three officers guarding the door appeared to move to the adjacent wall.

Seconds after the officers stepped away from the doorway, the defendant moved in and attempted to push open the doors.   The rioter with the fur-lined hat used the defendant's helmet to violently and repeatedly strike the glass-paned doors in the center and far-right hand side, further shattering the glass.   Another rioter rammed the glass repeatedly with a flagpole.   Chants could be heard of "Break it down!" and "Let's fucking go!"









Within seconds, the defendant was observed backing away from the Speaker's Lobby door as individuals in the crowd were screaming "gun."   A woman was shot while attempting to climb through one of the shattered windows.   After the shooting, several people ran out of the hallway as police were yelling to get out of the way.   The defendant remained and could be seen minutes after the shooting leaning over the railing to look at the woman and holding up his phone. Ultimately, large numbers of Metropolitan Police Department officers arrived and pushed the gathered crowd, including the defendant, out of an exit on the House side of the Capitol Building.

## LEGAL STANDARD

Before trial, a defendant in a criminal case may move to dismiss an indictment for failure to state an offense. Fed. R. Crim. P. 12(b)(3)(B)(v). A valid indictment must set out "the elements of the offense intended to be charged and sufficiently apprise the defendant of what he must be prepared to meet." *United States v. Pickett*, 353 F.3d 62, 67 (D.C. Cir. 2004). The Government must state the essential elements of the crime and allegations "with sufficient specificity." *United States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995), *see also United States v. Griffin*, 21-cr-92 (TNM), 2021 WL 2778557 (D.D.C. Jul. 2, 2021).

A pretrial motion may challenge "a defect in the indictment or information" if "the basis for the motion is then reasonably available and the motion can be determined without a trial on the merits." *Id*. "An indictment must be viewed as a whole and the allegations must be accepted as true in determining if an offense has been properly alleged." *United States v. Bowdin*, 770 F. Supp. 2d 142, 146 (D.D.C. 2011). The operative question is whether the allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed. *Id*. Although a court's supervisory powers provide the authority to dismiss an indictment, "dismissal is granted only in unusual circumstances." *United States v. Ballestas*, 795 F.3d 138, 148 (D.C. Cir. 2015).

Federal Rule of Criminal Procedure 7(c)(1) governs the "Nature and Contents" of an indictment. The rule states, in relevant part, that "[t]he indictment … must be a plain, concise, and definite written statement of the essential facts constituting the offense charged," and that "[f]or each count, the indictment or information must give the official or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated."

Section 1512(c)(2) of Title 18 of the U.S. Code provides that "[w]hoever corruptly . . . obstructs, influences, or impedes any official proceeding, or attempts to do so, shall be fined under this title or imprisoned not more than 20 years, or both."

## ARGUMENT

## I.     THE DEFENDANT WAS AFFORDED ADEQUATE NOTICE OF WHAT "OFFICIAL PROCEEDING" HE IS CHARGED WITH OBSTRUCTING.

The defendant's motion suggests in passing that he was not afforded sufficient notice of "what 'proceeding before Congress' Mr. Grider allegedly obstructed" (Def. Mot. at 2).   But the defendant is well aware that the "proceeding before Congress" that he allegedly obstructed was the certification of the Electoral College vote for the 2020 Presidential Election.  He received ample notice not only from the indictment, but the criminal complaint, which devoted a page and half to detailing the commencement, disruption, and resumption of the Electoral College vote certification on January 6, 2021, and in connection with his detention-related hearings and associated filings in both the Western District of Texas and this jurisdiction.  As his pleading reflects, there is no basis for suggesting that the defendant is unable to sufficiently understand what proceeding he is being charged with obstructing.

To be sufficient under the Constitution, an indictment "need only inform the defendant of the precise offense of which he is accused so that he may prepare his defense and plead double jeopardy in any further prosecution for the same offense." *United States v. Verrusio*, 762 F.3d 1, 13 (D.C. Cir. 2014); *see United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007).   Federal Rule of Criminal Procedure 7(c) effectuates that understanding, requiring "a plain, concise, and definite written statement of the essential facts constituting the offense charged."   As this Court has stated, "'an indictment must contain every element of the offense charged *and* must fairly apprise the accused *of the conduct allegedly constituting the offense* so as to enable him to prepare a defense

against those allegations.'" *United States v. Hillie*, 227 F. Supp. 3d 57, 81 (D.D.C. 2017) (emphases in original).

The defendant's indictment readily meets this standard.   Count Four sets forth the essential elements of a § 1512(c)(2) offense.   It not only tracks and echoes the statute, but specifies the date of the obstruction ("January 6"), its precise location ("in the United States Capitol"), the acts amounting to obstruction ("entering and remaining … without authority and engaging in disorderly and disruptive conduct and destroying federal property"), and the type of official proceeding ("that is, a proceeding before Congress").   *See United States v. Resendiz-Ponce*, 549 U.S. 102, 108 (2007) (upholding sufficiency of indictment that echoed statute while specifying time and place of the offense and identity of the threatened officer); *United States v. Williamson*, 903 F.3d 124, 131 (D.C. Cir. 2018) (same).   The defendant is in no way uncertain about what conduct of his "allegedly constitut[es] the offense."   *Hillie*, 2127 F. Supp. 3d at 81.   He is in no way hamstrung in his preparation of a defense or ability to invoke double jeopardy should he be prosecuted again for this same conduct.   And to the extent his dispute ultimately lies with *why* that proceeding constitutes a "proceeding before Congress"—not *which* "proceeding before Congress" he obstructed—that argument has nothing to do with notice or the sufficiency of the indictment.

## II.   COUNT FOUR STATES AN OFFENSE; THE DEFENDANT'S ALLEGED CONDUCT CLEARLY VIOLATES SECTION 1512.

Count Four of the indictment charges the defendant with violating § 1512(c)(2) by corruptly obstructing, influencing, or impeding any official proceeding.   The defendant principally argues that Count Four fails to state an offense because Congress's certification of the Electoral College vote on January 6 was not an "official proceeding" under 18 U.S.C. § 1515 (Def. Mot. at 2).   But several judges in this district have thoughtfully concluded otherwise, *see Sandlin*, 2021 WL 5865006; *Caldwell*, 2021 WL 6062718, *reconsideration denied*, 2022 WL 203456;

*Mostofsky*, 2021 WL 6049891; *Montgomery*, 2021 WL 6134591; *Nordean*, 2021 WL 6134595, and this Court should hold likewise in accordance with the statute's plain text, structure, and history.   The defendant's remaining arguments—that the word "otherwise" in § 1512(c)(2) limits its scope to obstructive conduct that impairs the integrity and availability of evidence; that the word "corruptly" in § 1512(c)(2) is unconstitutionally vague as applied; and that the rule of lenity warrants dismissal of the § 1512(c)(2) charge—are likewise without merit.   Section 1512(c)(2) is not constitutionally infirm, and the defendant's alleged conduct falls squarely within the ambit of the statute.

### A.      Certification of the Electoral College Vote is an "Official Proceeding"

Congress's Joint Session on January 6, 2021, to review, count, and certify the Electoral College vote as set out in the Constitution and federal statutes constitutes an "official proceeding" for purposes of § 1512(c)(2).   An "official proceeding" for purposes of § 1512(c)(2) is defined as:

> (A) a proceeding before a judge or court of the United States, a United States magistrate judge, a bankruptcy judge, a judge of the United States Tax Court, a special trial judge of the Tax Court, a judge of the United States Court of Federal Claims, or a Federal grand jury;
>
> (B) *a proceeding before the Congress*;
>
> (C) a proceeding before a Federal Government agency which is authorized by law; or
>
> (D) a proceeding involving the business of insurance whose activities affect interstate commerce before any insurance regulatory official or agency or any agent or examiner appointed by such official or agency to examine the affairs of any person engaged in the business of insurance whose activities affect interstate commerce.

18 U.S.C. § 1515(a)(1) (emphasis added).[2]   The certification of the Electoral College vote constitutes a "proceeding before the Congress" as a matter of the statute's plain text.   *See, e.g.,* *Caldwell*, 2021 WL 6062718 at *4 ("A straightforward reading of that definition easily reaches

the Certification of the Electoral College vote."); *Nordean*, 2021 WL 6134595, at *4 ("Under this straightforward definition [of § 1515(a)(1)(B)], Congress's certification was a 'proceeding.'").

Whatever conceivable questions arise as to the outer bounds of the term "proceeding before the Congress," the Electoral College vote certification constitutes a "proceeding" under any interpretation.   In its broadest and most "general sense," a proceeding refers to "[t]he carrying on of an action or series of actions; action, course of action; conduct, behavior."   *United States v. Ermoian*, 752 F.3d 1165, 1169 (9th Cir. 2013) (quoting *Proceeding,* Oxford English Dictionary, *available at* http://www.oed.com).   The defendant does not dispute that the certification of the Electoral College vote, which involves a detailed "series of actions" outlining how the vote is opened, counted, potentially objected to, and ultimately certified, would satisfy that broad definition.   And there is good reason to construe "proceeding" as used in 18 U.S.C. § 1515 broadly.   Section 1515's text encompasses not only congressional proceedings, but judicial proceedings, grand jury proceedings, any legally authorized proceedings before federal government agencies, and proceedings "involving the business of insurance."   18 U.S.C. § 1515(a)(1); *see* S. Rep. No. 97-532, at 17 (1982) (noting that the "term 'official proceeding'" in the obstruction statute is "defined broadly"); *Nordean*, 2021 WL 6134595, at *4 ("that the certification of the Electoral College vote consists of these 'series of actions' strongly suggests that it is a 'proceeding' under the statute").

But even if a "legal—rather than the lay—understanding" of proceeding governs § 1515's interpretation, *see Ermoian*, 752 F.3d at 1170, the Electoral College vote certification still qualifies.   This narrower definition includes the "business conducted by a court or other official body; a hearing."   Black's Law Dictionary, "proceeding" (11th ed. 2019).   Taken with its modifier "official," the term proceeding thus "connotes some type of formal hearing."   *Ermoian*,

752 F.3d at 1170; *see United States v. Ramos*, 537 F.3d 439, 462 (5th Cir. 2008) (the "more formal sense" of "official proceeding" is "correct in the context of § 1512").   For example, in cases assessing whether a law enforcement investigation amounts to an "official proceeding" as defined in Section 1515—including the *Ermoian* case relied upon by the defendant[1]—courts analyze the degree of formality involved in an investigation.   *See, e.g.*, *United States v. Sutherland*, 921 F.3d 421, 426 (4th Cir. 2019) (FBI investigation not an "official proceeding" because that term "implies something more formal than a mere investigation"), *cert. denied*, 140 S. Ct. 1106 (2020); *Ermoian*, 752 F.3d at 1170-72 (same); *United States v. Perez*, 575 F.3d 164, 169 (2d Cir. 2009) (internal investigation conducted by a review panel within the Bureau of Prisons was an "official proceeding" because the review panel's "work [was] sufficiently formal"); *Ramos*, 537 F.3d at 463 (internal investigation conducted by Customs and Border Patrol not an "official proceeding" because that term *"*contemplates a formal environment"); *United States v. Dunn*, 434 F. Supp. 2d 1203, 1207 (M.D. Ala. 2006) (investigation conducted by Bureau of Alcohol, Tobacco, and Firearms not an "official proceeding" because that term encompasses "events that are best thought of as hearings (or something akin to hearings)"); *see also United States v. Kelley*, 36 F.3d 1118, 1127 (D.C. Cir. 1994) (holding that a "*formal* investigation" conducted by the Officer of the Inspector General at the Agency for International Development qualified as a "proceeding" for purposes of 18 U.S.C. § 1505) (emphasis added).

---

1 *United States v. Ermoian*, 752 F.3d 1165 (9th Cir. 2013), involved the distinct issue of whether an FBI investigation counts as "a proceeding before a Federal Government agency which is authorized by law" under the distinct, narrower statutory definition of 18 U.S.C. § 1515(a)(1)(C).   The Ninth Circuit reasoned at the outset that the term "proceeding" did not "conclusively resolve whether an FBI investigation qualifies" because narrower definitions "would exclude criminal investigations in the field."   752 F.3d at 1170.   That is not the case here, where the Electoral College vote certification satisfies even the narrower formulations of "proceeding" cited in *Ermoian.*

The formality involved in the certification of the Electoral College vote places it "comfortably within the category" of an official proceeding. *Perez*, 575 F.3d at 169; *see Sandlin*, 2021 WL 5885006, at * 4 ("An 'official proceeding' … must be akin to a formal hearing," "Congress's Joint Session to certify the electoral results is such a formal hearing," and defendant's "extra requirements for an 'official proceeding' are absent from" the statutory text).   The defendant strains to characterize the proceeding as "primarily" or "largely ministerial" (Def. Mot. at 2, 15).   But few events are as solemn and formal as a Joint Session of the Congress.   That is particularly true for the certification of the Electoral College vote, which is expressly mandated under the Constitution and federal statute.   Two separate provisions in the Constitution mandate that the Vice President, while acting as the President of Senate "shall, in the Presence of the Senate and House of Representatives, open all the Certificates, and the Votes shall then be counted." U.S. Const. art. II, § 1, cl. 3; U.S. Const amend. XII.   Required by the Electoral Act of 1887 to begin at "the hour of 1 o'clock in the afternoon" on "the sixth day of January succeeding every meeting of the electors." 3 U.S.C. § 15, the Joint Session of the Senate and house of Representatives to certify the Electoral College vote is both a "hearing" and "business conducted by . . . [an] official body."   *See* Black's Law Dictionary, *supra*.   To the extent the defendant would require some formal convocation of the agency before which parties appear, the certification of the Electoral College vote involves the formal convocation of Congress.   The Vice President, as the President of the Senate, serves as the "presiding officer" over a proceeding that counts votes cast by Electors throughout the country in presidential election.   3 U.S.C. § 15.   As in a courtroom, Members may object, which in turn causes the Senate and House of Representatives to "withdraw" to their respective chambers so each House can render "its decision" on the objection.   *Id.*   And just as the judge and parties occupy specific locations in a courtroom, so too do the Members within the

"Hall." *See* 3 U.S.C. § 16 (President of the Senate is in the Speaker's chair; the Speaker "immediately upon his left"; the Senators "in the body of the Hall" to the right of the "presiding officer"; the Representatives "in the body of the Hall not provided for the Senators"; various other individuals "at the Clerk's desk," "in front of the Clerk's desk," or "upon each side of the Speaker's platform"). The Electoral College vote certification, moreover, must terminate with a decision: no recess is permitted until the "the count of electoral votes" is "completed," and the "result declared." *Id.* In short, the certification of the Electoral College vote readily constitutes a "proceeding before the Congress." *See* 18 U.S.C. § 1515(a)(1)(B).

Accordingly, other judges of this Court have concluded that even if not all actions occurring before Congress constitute an "official proceeding," the certification of the Electoral College does. *See, e.g., Sandlin,* 2021 WL 5865006, at *3-4 (finding that the certification of the Electoral College is an official proceeding because the "Joint Session has the trappings of a formal hearing before an official body[,]… the certificates of electoral results are akin to records or documents produced during judicial proceedings, and any objection to these certificates can be analogized to evidentiary objections."); *Montgomery*, 2021 WL 6134591, at *4 ("Although Defendants are correct that not every action taken within the walls of Congress constitutes an 'official proceeding' within the meaning of Section 1512(c), a joint session of Congress convened to verify and count the electoral vote for President and Vice President of the United States does").

The defendant nonetheless draws on various contextual features and snippets of legislative history to import a quasi-adjudicatory and quasi-evidentiary gloss to the meaning of an "official proceeding" (Def. Mot. at 15). The defendant asserts that only those official proceedings "that involve the administration of justice or Congress' power of inquiry or investigation where witnesses are called or evidence is presented and considered" fall within the statute (Def. Mot. at

18

2).   Under that narrowing construction, mere "formality does not equate to adjudicatory or evidentiary" (Def. Mot. at 13), and the defendant contends that absent witnesses being called to testify and evidence being considered, even an unquestionably formal Joint Session of Congress to certify the Electoral College vote cannot be considered an official proceeding.

Those contortions are at odds with the plain statutory text.   Whatever the merits of that argument for other provisions in § 1515(a)(1), it finds no textual support in § 1515(a)(1)(B). Section 1515(a)(1)(B) speaks in plain and capacious terms of "a proceeding before the Congress" – not "a proceeding before the Congress *involving the administration of justice or Congress' power of inquiry or investigation where witnesses are called or evidence is presented and considered.*" As is well-established, to determine the meaning of a statute, the Court "look[s] first to its language, giving the words used their ordinary meaning." *Levin*, 568 U.S. at 513 (quoting *Moskal v. United States*, 498 U.S. 103, 108 (1990)).   In ordinary parlance, a gathering of the full Congress to certify the Electoral College vote is "a proceeding before the Congress."   Because § 1515(a)(1)(B)'s words "are unambiguous, the judicial inquiry is complete."   *See Babb v. Wilkie*, 140 S. Ct. 1168, 1177 (2020) (internal quotation marks omitted); *see also Connecticut Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there."). The defendant offers no rationale for breezing past the statute's plain text to divine "Congress' true intent" from other interpretive tools (Def. Mot. at 11 n.4).   And, as other judges have underscored, it does not fall to the courts to add qualifiers where Congress itself did not see fit to do so.   *See, e.g., Caldwell*, 2021 WL 6062718 at * 5 ("Congress did not intend to limit the congressional proceedings protected under section 1512(c) to only those involving its adjudicatory, investigative, or legislative functions. And the court will not add a requirement to

the statute that Congress did not see fit to include."); *Sandlin*, 2021 WL 5865006, at \*4 ("[T]he Court will not read an 'administration of justice' requirement into 'official proceeding'" and "an 'official proceeding' need not be adjudicative"); *Montgomery*, 2021 WL 6134591, at \*6 (rejecting argument that Congress intended to limit the definition of "official proceeding" and "quasi-judicial" proceedings, to proceedings at which witnesses appear and give testimony, or to proceedings related "to the administration of justice"); *Nordean*, 2021 WL 6134595, at \*5-6 ("even if an 'official proceeding' had to be quasi-adjudicative or quasi-judicial in some way—a requirement missing from the plain text of the statute—because Congress's certification of the Electoral College vote has *some* of those features, it would pass the test.").

That Congress could have elected to limit § 1515(a)(1)(B) to quasi-adjudicative or quasi-evidentiary settings, yet did not, is made all the more apparent by a comparison with 18 U.S.C. § 1505. Section 1505, only a few provisions away, criminalizes obstruction of "the due and proper administration of the law under which any pending proceeding is being had" by a federal department or agency. Indeed, § 1505 expressly criminalizes obstruction of "any inquiry or investigation [that] is being had by" Congress, including by congressional committees and subcommittees. 18 U.S.C. § 1505; *see United States v. Bowser*, 964 F.3d 26, 31 (D.C. Cir. 2020). By contrast, Congress in § 1515(a)(1)(B) elected for broad language—"a proceeding before the Congress"—that covers a wider range of proceedings than the "inquir[ies] and investigation[s]" envisioned in § 1505. It would make little sense to read into § 1515(a)(1)(B) unwritten limits that are written explicitly into § 1505. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship.").

The defendant also delves into legislative history, but that too lends minimal support to his extra-textual overlays on the statute. "[T]here is little legislative history that sheds light on the purposes of" § 1512(c)(2) because it "did not originate in a committee" and "what little history exists should not be given much weight because it comes in the form of floor statements." *Montgomery*, 2021 WL 6134591, at *15. As for § 1515, to the extent any weight can be placed on references in a Senate Report (discussing a never-enacted proposal) to prototypical obstruction scenarios like witness tampering or the taking of evidence (Def. Mot. at 9-11), that same Report underscored interest in ensuring broad protection "against the rare type of [obstructive] conduct that is the product of the inventive criminal mind" that might not be as common. S. Rep. 97-532, at 18 (1982). More fundamentally, the very text of § 1512(c)(2) reaches well beyond witness tampering and evidence-gathering: it "operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific" obstruction offense. *United States v. Petruk*, 781 F.3d 438, 447 (8th Cir. 2015) (quoting *United States v. Volpendesto*, 746 F.3d 273, 286 (7th Cir. 2104)).

At bottom, the legislative history cannot cloud or supplant the law that Congress enacted, and it certainly does not fall to floor statements or committee reports to define the outer bounds or rarer applications of any statute. The "best evidence of [a statute's purpose] is the statutory text adopted by both Houses of Congress and submitted to the President," *West Va. Univ. Hosps., Inc. v. Casey*, 499 U.S. 83, 98 (1991), and "[i]f the text is clear, it needs no repetition in the legislative history." *Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1143 (2018).

Nor does § 1512's title—"Tampering with a witness, victim, or an informant"—accomplish what the legislative history cannot. The defendant suggests that the title implies that the "official proceeding" definition in § 1515 is geared at witness-tampering and the presentation

of evidence and therefore does not cover the Electoral College vote certification.   But his contention runs headlong into "the wise rule" that neither "the title of a statute" nor "the heading of a section" can "limit the plain meaning of the text."   *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R. Co.*, 331 U.S. 519, 528-29 (1947).   Moreover, as other courts in this district have laid out, "Section 1512(c) was added in the Sarbanes-Oxley Act, and the title of the relevant section in the Act is 'Tampering with a record *or otherwise impeding an official proceeding*'" (quoting § 1102, 116 Stat. at 807).   The title in the U.S. Code is a byproduct of § 1512(c)'s placement in a preexisting provision; indeed, Congress named that title 20 years before it enacted § 1512(c) in the Sarbanes-Oxley Act.   As such, that title "was not altered to reflect the new subsection's focus" and "[t]he titles therefore offer no gloss on subsection (c)(2)'s plain meaning."   *Sandlin*, 2021 WL 5865006, at *7; *see also Montgomery*, 2021 WL 6134591, at *15 ("Section 1512(c)(2)'s title in the U.S. Code is unenlightening, and the title under which it was enacted arguably supports a broader reading of the statute.").

The defendant's crabbed reading of "proceeding before the Congress" would thus undercut the broad statute that Congress enacted.   And the proposed requirement of a nexus to "the administration of justice or Congress' power of inquiry or investigation where witnesses are called or evidence is presented and considered" is as arbitrary and indeterminate as it is atextual.   In the defendant's view, for example, an individual who threatened a Senator and a Representative with injury unless each agreed to object to the Electoral College certification—even though each Member knew that the objections were frivolous—would not amount to obstruction.   Nor would it appear to cover an individual who paid one of the tellers—who are appointed by the Senate and House of Representatives to handle the Electoral College votes—to falsify or destroy votes.   That approach fails to recognize that the certification of the Electoral College vote is an official

proceeding that is "crucial to the conduct of government" and therefore "entitled to go forward free of corrupting influences that not only delay [it]g but increase the chances of false and unjust outcomes."   *Sutherland*, 921 F.3d at 426.

Ultimately, even if there were a basis for the defendant's atextual gloss on the statute, the certification of the Electoral College vote as set out in the Electoral Count Act of 1887—with its myriad aspects of formality detailed above, and various features resembling an "adjudicative" proceeding before a tribunal, from the convening of a deliberative body, to the lodging and consideration of objections, and the delivery of a verdict before dissolving—would so qualify. *See* Vasan Kesavan, *Is the Electoral Count Act Unconstitutional?*, 80 N.C. L. Rev. 1653, 1659 (2002) (Under the Electoral Count Act, "the President-elect is not elected by 'We the People' on election day, or even by the electors on the day they cast their votes, but by the joint convention of the Senate and House of Representatives on the day the electoral votes are formally counted"); *see Nordean*, 2021 WL 6134595, at *5-6.   Whatever the outer limits of a "proceeding before the Congress," and however rarely obstruction of an Electoral College vote certification may occur or arise in the U.S. Reports, the Electoral College vote certification falls well within them.

## B.  "Otherwise" in Section 1512(c)(2) Does Not Require that Obstructive Conduct Impair the Integrity and Availability of Evidence

The defendant alternately argues that the word "otherwise" in § 1512(c)(2), read in light of the structure of the statute, limits the reach of the statute to "the same kind of obstructive impact as the ... forms of obstruction" listed in § 1512(c)(1).   Section 1512(c) provides:

(c) Whoever corruptly—

(1) alters, destroys, mutilates, or conceals a record, document, or other object, or attempts to do so, with the intent to impair the object's integrity or availability for use in an official proceeding; or
(2) *otherwise* obstructs, influences, or impedes any official proceeding, or attempts to do so,

shall be fined under this title or imprisoned not more than 20 years, or both.

*Id.* (emphasis added).   Specifically, the defendant theorizes that the word "otherwise" signifies that § 1512(c)(2) applies only to "acts that have the same kind of evidence-obstructive impact as the listed forms of obstruction in (c)(1)—altering, destroying, mutilating, or concealing a record, document, or other object—but cause this impairment … in a different way or manner and/or to other forms of evidence" (Def. Mot. at 23).   This novel, limiting, and atextual gloss on § 1512(c)(2) is likewise untenable and far from the most natural reading of the statute.

The defendant relies heavily on the Supreme Court's decision in *Begay v. United States*, 553 U.S. 137 (2008), as purported authority.   But *Begay* does not stand for the proposition the defendant claims, is not analogous, and ultimately lends little support to the crabbed interpretation of § 1512(c)(2) as criminalizing only the obstruction, influence, or impediment of an official proceeding that has equivalent "evidence-obstructive impact" as the desecration of records.   *See United States v. Phillips*, 583 F.3d 1261, 1262 (10th Cir. 2009) (affirming application of § 1512(c)(2) to obstructive conduct without requiring that conduct to have impaired evidence).

To start, as another court in this district recently ruled, "*Begay* does little to advance Defendant['s] contention here."   *Montgomery*, 2021 WL 6134591, at *11.   In *Begay*, the Supreme Court confronted the Armed Career Criminal Act's ("ACCA") definition of "violent felony"—namely, the language encompassing any crime that "is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another."   18 U.S.C. § 924(e)(2)(B)(ii).   The *Begay* opinion contained a relatively cursory, "remarkably agnostic" discussion of the word "otherwise," *Montgomery*, 2021 WL 6134591, at *11, as reproduced in its entirety below:

> [Section 924(e)(2)(B)(ii)] places the word "otherwise," just after the examples, so that the provision covers a felony that is one of the example crimes "or *otherwise* involves conduct that presents a serious potential risk of physical injury." § 924(e)(2)(B)(ii) (emphasis added).   But we cannot agree with the Government that the word "otherwise" is sufficient to demonstrate that the examples do not limit the scope of the clause.   That is because the word "otherwise" can (we do not say must, cf. post, at 1589 – 1590 (SCALIA, J., concurring in judgment)) refer to a crime that is similar to the listed examples in some respects but different in others—similar, say, in respect to the degree of risk it produces, but different in respect to the "way or manner" in which it produces that risk. Webster's Third New International Dictionary 1598 (1961) (defining "otherwise" to mean "in a different way or manner").

553 U.S. at 144.  *Begay* thus assigned "little significance to Congress's use of the word" and "merely hinted (in a single sentence)" that it can *sometimes*—though *not always*—suggest some degree of similarity as well as difference between what is listed before and after the "otherwise." 2021 WL 6134591, at *11.   None of that counsels in favor of the defendant's novel interpretation of § 1512(c)(2), which takes as its premise that (c)(2) *necessarily only* criminalizes obstruction of an official proceeding that has similar "evidence-obstructive impact" as the acts in (c)(1) and *precludes* criminalizing obstruction that does not.

In fact, to the extent *Begay*'s treatment of "otherwise"—defined as "in a different way or manner"—is imported to § 1512(c)(2), it counsels in favor of the government's interpretation. Justice Scalia's *Begay* concurrence observed that the "otherwise" in § 924(e)(2)(B)(ii) did not connote "*any* old similarity" between the crimes before and after, but rather "the *particular* similarity specified after the 'otherwise'—*i.e.*, that they all pose a serious potential risk of physical injury to another."   553 U.S. at 150-51 (Scalia, J. concurring in the judgment).   As Judge Moss noted in *Montgomery*, "if one looks to the 'particular similarity specified after the 'otherwise'' in Section 1512(c)(2), the link or similarity between the crimes covered by Sections 1512(c)(1) and (c)(2) is that both provisions apply to conduct that—directly or indirectly—'obstructs, influences, or impedes any official proceeding.'"   *Montgomery*, 2021 WL 6134591, at *12.   That

"similarity" does not bolster the defendant's reading at all, much less limit § 1512(c)(2)'s scope to those acts that impair evidence equivalently to those in § 1512(c)(1).   Indeed, it is already plain from the statutory text that "the official proceeding is the … object of the intent requirement" in both § 1512(c)(1) and § 1512(c)(2)—the "indirect object" in § 1512(c)(1) and the "direct object" in § 1512(c)(2).   *Montgomery*, 2021 WL 6134591, at *12; *see also Nordean*, 2021 WL 6134595, at *6 ("The use of the word 'otherwise' suggests that Section 1512(c)(2) was intended to target something different than (c)(1).").

More fundamentally, the comparison to *Begay* is inapt.   Section 1512(c)(1) and § 1512(c)(2) do not relate in the same way that the language before and after the "otherwise" within § 924(e)(2)(B)(ii) relate.   In the context of ACCA, where Congress confronted the thorny challenge of devising one definition of a qualifying "violent felony" from the near-limitless array of federal and state crimes, it made sense for "otherwise" to play the role of capturing crimes that approximated in kind and degree the examples (burglary, arson, extortion, and the like) preceding the word "otherwise."   But "otherwise" as used in § 1512(c)—which sets apart the distinct subsections of § 1512(c)(1) and § 1512(c)(2), and thus creates a separate prohibition, not merely an additional term at the end of a list—shouldered no such challenge.   Indeed, "otherwise" in § 1512(c)(2) is more naturally read to "signal[] a shift in emphasis" between the two somewhat different means or tools for criminalizing actions that impair official proceedings.   *Montgomery*, 2021 WL 6134591, at *12.   The word does not become, as the defendant suggests, "mere surplusage" (Def. Mot. at 27).   Rather, "otherwise" sets apart the statute's targeting of acts that alter evidence and thereby indirectly impair official proceedings from the targeting of acts that directly obstruct the proceedings themselves.   And if Congress had wished to limit § 1512(c)(2) to only those obstructive acts with equivalent "evidence-obstructive impact" to the acts in

§ 1512(c)(1), "it would have been easy" to borrow from or cross-reference the terms used in § 1512(c)(1) to achieve that goal.  *Id.*   Congress did not elect to do so.  *See Mostofsky*, 2021 WL 6049891 at *11 (rejecting defendant's argument that § 1512 only applies to conduct similar to document destruction and explaining that the defendant's position "would have the Court ignore the plain meaning of the words contained in (c)(2)—to wit, 'obstructs, influences, or impedes'— which cannot be read so narrowly. The use of 'otherwise' is better understood as 'clarif[ying] that the latter prohibits obstruction by means *other than* document destruction.'"); *Caldwell*, 2021 WL 6062718 at * 14 ("The natural reading of the two sections is that section 1512(c)(2) 'operates as a catch-all to cover otherwise obstructive behavior that might not constitute a more specific offense like document destruction'" (citation omitted)); *Nordean*, 2021 WL 6134595, at *7 ("Section 1512(c)(2)" is "set apart by a semicolon, and set off in different subsection," as "the catch-all for all other efforts to obstruct an official proceeding").   The use of the word 'otherwise' suggests that Section 1512(c)(2) was intended to target something different than (c)(1).").

Indeed, it bears mention that numerous courts have rejected similar attempts by defendants to limit § 1512(c)(2) by reference to § 1512(c)(1), dismissing such efforts as contrary to the statute's plain language.   In *United States v. Ring*, 628 F. Supp. 2d 195, 224-25 (D.D.C. 2009), for instance, Judge Huvelle held that "the meaning of § 1512(c)(2) is plain on its face" and that "§ 1512(c)(2)'s application is not limited to the destruction of documents" or to "conduct that is similar to the type of conduct proscribed by subsection (c)(1)—namely, conduct, that impairs the integrity or availability of 'record[s], document[s], or other object[s]' for use in an official proceeding."  *See also United States v. De Bruhl-Daniels*, 491 F. Supp. 3d 237, 252 (S.D. Tex. 2020) ("There is no requirement that an indictment for obstruction under § 1512(c)(2) allege that a defendant tampered with a tangible object" because that interpretation "is contrary to the plain

language of the statute"); *United States v. Kumar*, 2006 U.S. Dist. LEXIS 96142, at *13-15 (E.D.N.Y. Feb. 21, 2007) (declining to limit § 1512(c)(2) to tampering with physical evidence given "the clear, succinct and unambiguous language" of § 1512(c)(2)).   The defendant notably disclaims the notion that § 1512(c)(2) should be limited to tangible evidence, conceding that this argument "has been rejected by multiple courts" (Def. Mot. at 23).   But in seeking to nonetheless press ahead with a theory that § 1512(c)(2) should be limited to "acts that have the same kind of evidence-obstructive impact as the listed forms of obstruction in (c)(1) … but cause this impairment … in a different way or manner and/or to other forms of evidence," the defendant merely adopts an increasingly more complicated gloss on the statute that is on even weaker textual footing.   The defendant fails to heed the very lesson of those cases that have rejected attempts to read the language of § 1512(c)(1) into § 1512(c)(2)—namely, that § 1512(c)(2)'s clear, broad language should be applied by its own terms.

### C.   "Corruptly" in Section 1512(c)(2) Does Not Render the Statute Unconstitutionally Vague As Applied to the Defendant

The defendant next argues that § 1512(c)(2)—and principally its use of the word "corruptly"—is unconstitutionally vague as applied and does not provide fair notice as to the conduct it proscribes (Def. Mot. at 31).   This argument, too, lacks merit.   *See Sandlin,* 2021 WL 5865006; *Caldwell*, 2021 WL 6062718; *Mostofsky*, 2021 WL 6049891; *Montgomery*, 2021 WL 6134591; *Nordean*, 2021 WL 6134595, at *9-11.   The defendant fails to overcome the strong presumption that § 1512(c)(2) passes constitutional muster.   *See United States v. Nat'l Dairy Products Corp.*, 372 U.S. 29, 32 (1963) ("The strong presumptive validity that attaches to an Act of Congress has led this Court to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language.").

The Due Process Clauses of the Fifth and Fourteenth Amendments prohibit the government from depriving any person of "life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV.   An outgrowth of the Due Process Clause, the "void for vagueness" doctrine prevents the enforcement of a criminal statute that is "so vague that it fails to give ordinary people fair notice of the conduct it punishes" or is "so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015).   To ensure fair notice, "'[g]enerally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply.'" *United States v. Bronstein*, 849 F.3d 1101, 1107 (D.C. Cir. 2017) (quoting *Texaco, Inc. v. Short*, 454 U.S. 516, 532 (1982)). To avoid arbitrary enforcement, the law must not "vest[] virtually complete discretion" in the government "to determine whether the suspect has [violated] the statute." *Kolender v. Lawson*, 461 U.S. 352, 358 (1983).   The "touchstone" of vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

A statute is not unconstitutionally vague simply because its applicability is unclear at the margins, *United States v. Williams*, 553 U.S. 285, 306 (2008), or because reasonable jurists might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). "As a general matter," a law is not vague where it "call[s] for the application of a qualitative standard . . . to real-world conduct; 'the law is full of instances where a man's fate depends on his estimating rightly . . . some matter of degree.'" *Johnson*, 576 U.S. at 603-04 (quoting *Nash v. United States*, 229 U.S. 373, 377 (1913)).   A statutory provision is therefore "not rendered unconstitutionally vague because it 'do[es] not mean the same thing to all people, all the time, everywhere.'" *Bronstein*, 849 F.3d at

29

1107. A statute is instead vague where it fails to specify any "standard of conduct ... at all." *Coates v. Cincinnati*, 402 U.S. 611, 614 (1971). That is, a provision is impermissibly vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *United States v. Williams*, 553 U.S. 285, 306 (2008); *see Smith v. Goguen*, 415 U.S. 566, 578 (1974).

Section 1512(c)(2)'s prohibition on "corruptly ... obstruct[ing], influenc[ing], or imped[ing]" an "official proceeding" gives rise to "no such indeterminacy." *Williams*, 553 U.S. at 306. The statute requires that a defendant, acting with consciousness of wrongdoing and intent to obstruct, attempts to or does undermine or interfere with a statutorily defined official proceeding. While "it may be difficult in some cases to determine whether these clear requirements have been met," "'courts and juries every day pass upon knowledge, belief and intent—the state of men's minds—having before them no more than evidence of their words and conduct, from which, in ordinary human experience, mental condition may be inferred.'" *Id.* (quoting *American Communications Ass'n, CIO v. Douds*, 339 U.S. 382, 411 (1950)).

The defendant's attack on "corruptly" (Def. Mot. at 31-39), relying on *United States v. Poindexter*, 951 F.2d 369 (D.C. Cir. 1991), is unavailing. The D.C. Circuit in *Poindexter* held that the term "corruptly" was "vague . . . in the absence of some narrowing gloss." 951 F.2d at 378. *Poindexter* is inapposite for three reasons.[2] *See, e.g., Caldwell*, 2021 WL 6062718, at *10 (explaining "why this case is not controlled by *Poindexter*"); *Nordean*, 2021 WL 6134595, at *10 ("*Poindexter* does not mandate that the Court hold Section 1512(c) unconstitutionally vague in this case.").

---

[2] *Poindexter* was also superseded in significant part by the False Statements Accountability Act of 1996, Pub. L. No. 104-292, 110 Stat. 3459. As codified at 18 U.S.C. § 1515(b), the Act provides that the term "corruptly" in § 1505 "means acting with an improper purpose, personally or by influencing another, including making a false or misleading statement."

First, the D.C. Circuit narrowly confined *Poindexter*'s analysis to § 1505's use of "corruptly," and expressly declined to hold "that term unconstitutionally vague as applied to all conduct." 951 F.2d at 385. Five years later, in *United States v. Morrison*, 98 F.3d 619 (D.C. Cir. 1996), the D.C. Circuit rejected a *Poindexter*-based vagueness challenge to 18 U.S.C. § 1512(b) and affirmed the conviction of a defendant for "corruptly" influencing the testimony of a potential witness at trial. *Id.* at 629-30. Other courts have similarly recognized "the narrow reasoning used in *Poindexter*" and "cabined that vagueness holding to its unusual circumstances." *United States v. Edwards*, 869 F.3d 490, 502 (7th Cir. 2017); *see also, e.g.*, *United States v. Kelly*, 147 F.3d 172, 176 (2d Cir. 1998) (rejecting vagueness challenge to "corruptly" in 26 U.S.C. § 7212(a)); *United States v. Shotts*, 145 F.3d 1289, 1300 (11th Cir. 1998) (same for 18 U.S.C. § 1512(b)); *United States v. Brenson*, 104 F.3d 1267, 1280 (11th Cir. 1997) (same for 18 U.S.C. § 1503). The defendant's invocation of *Poindexter* accordingly fails to establish that Section 1512(c) suffers the same constitutional indeterminacy.

Second, *Poindexter* predated the Supreme Court's decision in *Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005). There, the Court explained the terms "'[c]orrupt" and 'corruptly' are normally associated with wrongful, immoral, depraved, or evil." *Id.* at 705 (citation omitted). In doing so, the Court "did not imply that the term was too vague." *Edwards*, 869 F.3d at 502.

Third, courts have encountered little difficulty when addressing "corruptly" in § 1512(c)(2) following *Arthur Andersen*. For purposes of § 1512(c)(2), "corruptly" includes two components: (1) intent to obstruct, impede, or influence; and (2) wrongfulness. *See United States v. Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011) (to act "corruptly" is to act "with an improper purpose" and "with the specific intent to subvert, impede or obstruct") (quoting *United States v. Mintmire*, 507 F.3d

1273, 1289 (11th Cir. 2007)); *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013) (same); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir. 2013) (upholding jury instruction defining "corruptly" as acting with "consciousness of wrongdoing") (internal quotation marks omitted); *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007) (upholding instruction defining "[c]orruptly" as acting "with the purpose of wrongfully impeding the due administration of justice"); Seventh Circuit Pattern Criminal Jury Instruction for § 1512(c) ("A person acts 'corruptly' if he or she acts with the purpose of wrongfully impeding the due administration of justice.").

That the term "corruptly" requires the government to prove that a defendant acted not only with intent to obstruct but also with "consciousness of wrongdoing" ensures that § 1512(c)(2) "reaches only" those who have committed felony obstruction. *Andersen*, 544 U.S. at 706. That limitation is particularly important where, as here, the defendant is alleged to have obstructed a congressional proceeding.

To prove that an attempted or actual obstruction of a congressional proceeding amounts to felony obstruction in violation of 18 U.S.C. § 1512(c)(2), the government must therefore adduce evidence establishing beyond a reasonable doubt that a defendant acted intentionally and with "consciousness of wrongdoing." *Andersen*, 544 U.S. at 706.   The indictment in this case alleges that the defendant participated in felony destruction of government property, and willfully, by means of punching or kicking, injured windows of the Speaker's Lobby doors and caused damage in excess of $1,000 (D.E. 6, Count 1).   It alleges that the defendant obstructed and impeded the congressional proceeding to certify the election results through, in part, that destruction of federal property and other disorderly conduct (D.E. 6, Count 4).   It alleges that the defendant willfully and knowingly engaged in an act of physical violence (D.E. 6, Count 7).   Evidence indicates that

the defendant made his way through multiple areas of the Capitol Building where crowds he was part of pushed their way past, and overpowered, Capitol Police lines.   It shows that the defendant was one of the first rioters to make his way to the Speaker's Lobby doorway, which was guarded by Capitol Police officers and mere feet away from the House Chamber.   It indicates that the defendant stood at the front of the raucous, aggressive crowd seeking to breach the Speaker's Lobby doors, watched another rioter violently smash the glass windows of the doorway with his fists, and then handed that rioter a helmet with which he could and did smash out the windows with more force. In short, the allegations entail obstructive acts by the defendant that fall on the obviously unlawful side of the line.   And for that reason, the defendant's assertions that there is no "limiting principle" to the government's reading of the statute (Def. Mot. at 37) are unavailing.

The statute's "corruptly" element does not invite arbitrary or wholly subjective application by either courts or juries. Indeed, "[o]ne to whose conduct a statute clearly applies may not successfully challenge it for vagueness." *Parker v. Levy*, 417 U.S. 733, 756 (1974). Whatever the "uncertainty around the edges," *Edwards*, 869 F.3d at 502, § 1512(c)'s "corruptly" element provided ample notice to the defendant that *his conduct* was criminal. *See Mostofsky*, 2021 WL 604891 at *11 (rejecting contention that § 1512(c)(2) is vague as applied to Mostofsky); *Sandlin*, 2021 WL 5865006 at *10-14 (rejecting defendant's challenge that "corruptly" was unconstitutionally vague as used in § 1512(c)(2)); *Montgomery*, 2021 WL 6134591, at *19 ("the Supreme Court did not cast any doubt on the constitutional adequacy of a 'corruptly' standard … Neither ignorance about the existence of a statute nor reasonable debate about how best to interpret the statute render the law unconstitutionally vague…"); *Nordean*, 2021 WL 6134595, at *12 ("the Court has little problem finding that the use of the word 'corruptly' does not render Section 1512(c)(2) unconstitutionally vague as applied to Defendants").

The defendant points to other cases of uncharged protestors from incidents in the Capitol Building and cherry picks a number of factually distinguishable January 6 defendants, claiming that the "parameters for charging and prosecuting individuals for their actions of January 6 is entirely arbitrary, entirely unclear, and entirely vague" (Def. Mot. at 35-50, 51). This effort is flawed. Addressing similar arguments in *Nordean*, Judge Kelly opined that such examples "show 'the Executive's exercise of discretion over charging determinations,'" and noted that "'the presence of enforcement discretion alone does not render a statutory scheme unconstitutionally vague.'" 2021 WL 6134595, at *12.

Moreover, the vagueness doctrine asks whether "*the statute* … provide[s] a person of ordinary intelligence fair notice of what is prohibited." *Williams*, 553 U.S. at 304 (emphasis added). "Close cases can be imagined under virtually any statute. The problem that poses is addressed, not by the doctrine of vagueness, but by the requirement of proof beyond a reasonable doubt." *See Williams*, 553 U.S. at 306. The defendant cites no authority, and the government has found none, showing that charging decisions postdating the offense conduct have any bearing on this inquiry. The relevant question turns on whether the statute fairly informed the defendant that he would face criminal sanction for his conduct on January 6, 2021. The answer is yes, for the reasons articulated above. *Nordean*, 2021 WL 6134595, at *13 ("Section 1512(c)(2) is not 'narrow' at all. It sweeps broadly—punishing a host of 'corrupt' conduct. Thus, it hardly lulled Defendants into a false sense of security…").   If the government fails to carry its burden on the statutory elements at trial, the jury will say so. But that future presentation has no bearing on the question here—whether § 1512(c)'s text provided the defendant with adequate notice.

### D.     The Rule of Lenity Does Not Counsel a Different Interpretation.

Finally, the defendant invokes the rule of lenity to contend that his conduct falls outside

the scope of § 1512(c)(2), contending that "ambiguity concerning the ambit of criminal statutes"—here, the defendant's professed uncertainty as to why his conduct is unlawful—"should be resolved in favor of lenity." *Yates v. United States*, 574 U.S. 528, 547-48 (2015). But the rule of lenity has no application here.

The rule of lenity "only applies if, after considering text, structure, history, and purpose, there remains a grievous ambiguity or uncertainty in the statute, such that the Court must simply guess as to what Congress intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (citation and internal quotation marks omitted); *see also Shular v. United States*, 140 S. Ct. 779, 789 (2020) (Kavanaugh, J., concurring). As discussed above, there is no grievous ambiguity. Section 1512(c)(2)'s text, structure, history, and purpose make clear that it functions as a broad catch-all prohibition on obstructive conduct that covers "otherwise obstructive behavior that might not constitute a more specific" obstruction offense. *Petruk*, 781 F.3d at 447. And § 1512(c) provides ample notice to the defendant that his alleged conduct was criminal.

The Supreme Court's plurality opinion in *Yates* found the rule of lenity "relevant" in part given the absence of limiting principles under a broad construction of 18 U.S.C. § 1519. *See Yates*, 574 U.S. at 548. But neither of the features that constrain § 1512(c)(2)'s reach—a nexus to a contemplated official proceeding and the government's requirement to establish that the defendant acted "corruptly"—are present in § 1519. Section 1519 requires that the defendant act "knowingly" and "with the intent to impede, obstruct, or influence," but does not impose the more stringent "corruptly" *mens rea*. And courts of appeals have uniformly concluded that § 1519 does not include a "nexus" requirement. *See United States v. Scott*, 979 F.3d 986, 992 (2d Cir. 2020) (Supreme Court's decisions in *Marinello*, *Arthur Andersen*, and *Aguilar* do not "overrule[]" existing circuit precedent that § 1519 "does not have a nexus requirement"); *United States v. Moyer*, 674 F.3d

192, 209 (3d Cir. 2012) (declining to extend nexus requirement from § 1503 and § 1512(b)(2) to § 1519); *United States v. Kernell*, 667 F.3d 746, 753-55 (6th Cir. 2012); *United States v. Yielding*, 657 F.3d 688, 712-14 (8th Cir. 2011); *see also* S. Rep. No. 107-146, at 14-15 ("[§ 1519] is specifically meant not to include any technical requirement, which some courts have read into other obstruction of justice statutes, to tie the obstructive conduct to a pending or imminent proceeding or matter.").

In any event, even if § 1512(c)(2)'s application to this particular case was not expressly anticipated by Congress, that does not establish ambiguity; it merely underscores the breadth of the legislative command.  That is so even if the statute's application in a particular case goes "beyond the principal evil" legislators may have intended or expected to address. *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79 (1998). And any policy-based suggestion "that the current scheme should be altered," *Intel Corp. Inv. Policy Comm. v. Sulyma*, 140 S. Ct. 768, 778 (2020), ought to be addressed to Congress, not this Court, *see, e.g.*, *United States v. Rodgers*, 466 U.S. 475, 484 (1984) ("Resolution of the pros and cons of whether a statute should sweep broadly or narrowly is for Congress.").

The defendant intimates that to the extent his role in interfering with the Electoral College vote certification warranted prosecution, he only should have been charged under the "other more definitive statutes" beyond § 1512(c)(2) that "he has, in fact, been charged with"—namely, 18 U.S.C. § 1752(a)(2) and 40 U.S.C. § 5104 (Def. Mot. at 52).    But the premise and merits of that claim are flawed.  The mere fact that multiple criminal statutes apply to an individual's conduct does not render prosecution under one (or more) of those statutes suspect; indeed, "overlap" is not "uncommon in [federal] criminal statutes." *Loughrin v. United States*, 573 U.S. 351, 358 n.4 (2014); *see also Hubbard v. United States*, 514 U.S. 695, 715 n.14 (1995) ("Congress may, and

often does, enact separate criminal statutes that may, in practice, cover some of the same conduct."); *United States v. Batchelder*, 442 U.S. 114, 123 (1979) ("So long as overlapping criminal provisions clearly define the conduct prohibited and the punishment authorized, the notice requirements of the Due Process Clause are satisfied.").   Whatever overlap exists between the statutes is no license to manufacture grievous ambiguities with a statute where there are none, as is the case with § 1512(c)(2), or trigger application of the rule of lenity.

At bottom, Congress's certification of the Electoral College vote on January 6, 2021 was an "official proceeding."   Nothing in the word "otherwise" in § 1512(c)(2) limits its scope to obstruction that impairs the integrity of availability of evidence.   Nor does the word "corruptly" in § 1512(c)(2) render the statute or its application to this case unconstitutionally vague.   There is no ambiguity, let alone a grievous ambiguity, as to whether the alleged obstructive conduct falls within the ambit of § 1512(c)(2).

## CONCLUSION

For the foregoing reasons, and any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that the defendant's motion be denied.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:   */s/ Candice C. Wong*
Candice C. Wong
D.C. Bar No. 990903
Assistant United States Attorney
555 4th Street, N.W., Room 4816
Washington, D.C. 20530
(202) 252-7849
candice.wong@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 26, 2022, I caused a copy of the foregoing motion to be served on counsel of record via electronic filing.

*/s/ Candice C. Wong*
Candice C. Wong
Assistant United States Attorney