## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | § | |
| | § | |
| | § | |
| **v.** | § | **Case No. 21-CR-00022-CKK** |
| | § | |
| | § | |
| **CHRISTOPHER RAY GRIDER,** | § | |
| | § | |
| *Defendant* | § | |

## DEFENDANT'S REPLY TO THE GOVERNMENT'S OPPOSITION TO DEFENDANT'S AMENDED MOTION TO DISMISS COUNT FOUR OF THE INDICTMENT

TO THE HONORABLE COLLEEN KOLLAR-KOTELLY, UNITED STATES DISTRICT COURT JUDGE FOR THE DISTRICT OF COLUMBIA:

CHRISTOPHER RAY GRIDER, the Defendant in the above styled and numbered cause, by and through undersigned counsel, submits the following reply to the Government's Opposition to his Amended Motion to Dismiss Court Four of the Indictment. ECF Dkt. 74.

The Government's response sets forth a "factual background" that ignores a wealth of evidence that shows that Mr. Grider did not intend to obstruct or actually obstruct the *pro forma* Electoral College vote certification of January 6, 2021. More importantly, it ignores or summarily dismisses many of Mr. Grider's arguments without fully addressing the problems the Government faces by using 18 U.S.C. § 1512(c)(2) in an unprecedented manner and in a way that Congress never intended for it to be used.

1

## I.       Reply to the Government's "Factual Background"

Although this Court's analysis of whether Count Four of the Indictment should be dismissed is a legal question limited to the "four corners of the indictment," *United States v. Safavian*, 429 F. Supp. 2d 156, 161 n.2 (D.D.C. 2006), the Government nevertheless elected to open its response with a recitation of alleged facts presumably to sway this Court in its favor or provide this Court with a "preview" of the evidence it intends to offer against Mr. Grider at trial. *See* Gov't Opp. at 3–10. Its one-sided presentation of the facts — in particular, its section titled "The Defendant's Participation in the January 6, 2021, Capitol Riot" — however, demands a response as it ignores substantial evidence to show that Mr. Grider did not enter the Capitol intending to do harm or obstruct anything.

The Government opened that section by referring to the key piece of evidence that brought Mr. Grider to law enforcement's attention: an interview that Mr. Grider gave to a local news reporter with KWTX-TV News 10 in Waco, Texas given immediately after he left the Capitol building on January 6. *See id*. at 6. Mr. Grider encourages this Court to, rather than read the snippets of quotes from Mr. Grider set forth by the Government in their response, watch the actual, entire news story here: https://www.kwtx.com/2021/01/07/central-texas-man-witnessed-deadly-shooting-as-trump-supporters-stormed-us-capitol/. What this Court will see and hear is <u>not</u> some crazed individual proclaiming, "[F]uck yes, I am proud of my actions, I fucking charged the Capitol today with patriots today. Hell, yes I am proud of my actions," *cf. United States v. Jenny Louise Cudd*, 21-cr-00068-TNM, ECF Dkt. 1. Instead, this

Court will see a man humbled and in shock over what he had witnessed.

What the story also reflects — and the Government ignores in their "factual background" — is that Mr. Grider video recorded his movements in and around the Capitol using his cell phone and shared some of those videos to be used in the story. Since the beginning of this case, the Government has ignored these videos (which Mr. Grider made available to them) and failed to acknowledge them in any of their filings from the time of his initial detention to present. These videos show that Mr. Grider was not acting with the intent to harm or obstruct anything:

- Mr. Grider is seen walking up to an entrance on the ground level of the Capitol building and walking through an open door along with hundreds of other individuals.

- Shortly after entering the building, Mr. Grider can be heard shouting to others, "Don't break anything! Don't break anything!"

- While several other individuals are heard shouting things like "Stop the Steal!" and yelling obscenities, Mr. Grider is mostly silent throughout the entirety of the videos.

- While in the Crypt, a large crowd began pushing several people including Mr. Grider around. He was pushed into a Capitol police officer and was heard apologizing to the officer and seen trying to push back away from him to avoid injuring the officer.

The Government used four pages with screen shots from various videos to then paint a twisted narrative of what occurred at the entrance to the Speaker's Lobby. *See* Gov't Opp. at 7–10. What videos from Mr. Grider's cell phone show, however, is him walking up to the entrance to the Speaker's Lobby where multiple Capitol Officers were standing guard. Mr. Grider did not yell, shout, or make any threatening comments to them. Instead, he is heard telling the officers, "People are

going to get crushed on that other side if they don't open that door" (referring to the area from where he had just come from). He was pleading with the officers, telling them, "There are two cops getting crushed." Others can then be seen walking up and banging on the Speaker's Lobby doors, but not Mr. Grider. Eventually, more and more people began approaching the door and, as space became confined, the video no longer captured any images. However, the audio still recorded and, at no time could Mr. Grider be heard making any threatening comments or directing any-one to try and break open or damage the doors or do anything else.

The Government states, "Seconds after the officers stepped away from the doorway, the defendant moved in and attempted to push open the doors." Gov't Opp. at 9. Again, this statement and the screen shot taken from another video take that account out of context. What the other video (known now as the "Jayden X video") shows is — unlike several others who are repeatedly pushing at the door with great force, punching and kicking at the door, and striking the door with various objects — Mr. Grider walked up, placed his hand on the door, pushed it lightly enough to see that it was secured, turned around, and moved away from the door and the oth-er individuals who were obviously trying to damage and forcibly open the door.

Surprisingly, the Government states that Mr. Grider "was then observed *handing* a black helmet" to another "rioter" who then used the helmet to "repeated-ly strike the glass-paned doors." Gov't Opp. at 8–9 (emphasis added). Mr. Grider maintains this is a surprising representation because, in the sworn complaint filed in the case of that other individual, Zachary Alam, the agent giving a sworn account

of Alam's actions at the Speaker's Lobby door stated Alam "*took* a black-colored helmet from an individual" later determined to be Mr. Grider. *See United States v. Zachary Alam*, 21-cr-00190-DLF, ECF Dkt. 1 at 6. Again, while the video shows one thing, the audio recorded by Mr. Grider's cell phone does not reflect that he said anything encouraging Alam to take the helmet and use it to inflict any harm on anyone or anything.

And while the Government's response states, "Within seconds, the defendant was observed backing away from the Speaker's Lobby door as individuals in the crowd were screaming 'gun,'" what the video actually shows is that Mr. Grider was trying to move away well before then. The video shows that Mr. Grider turned away from the door and tried to follow officers also moving away from the door. Four seconds later, as he was still trying to move away from the door, another individual, Ashli Babbitt, was seen trying to climb through the broken windows where she was ultimately shot. Mr. Grider was not seen conversing with her, pushing her, or doing anything to aid or abet her actions.

Also noticeably absent from the Government's recitation of facts is that, unlike other several cases of individuals criminally charged for their actions on January 6, there is no evidence to show that Mr. Grider traveled to Washington, D.C. with the intent to obstruct or do harm. Likewise, his actions in the aftermath of that day demonstrate that he was neither proud nor boastful; he never admitted intending to obstruct or do harm. As Mr. Grider showed through the proffered testimony of Rissa Shaw, the reporter who interviewed Mr. Grider and reported on his

5

entry into the Capitol, as she spoke to Mr. Grider to prepare her story, he was clear, calm, and, most importantly, she "did not at any point ever think that he was a threat to anyone" or "engaged in any violent acts." *See* Exhibit A to Defendant's Motion to Revoke Detention Order, ECF Dkt. 10, Exhibit 1 at 14 (transcript from detention hearing). She would have testified that "there was never any indication of him acting maniacally or espousing radical views, or anything of the sort." *Id.* Within days, Mr. Grider's previous counsel was communicating with the United States Attorney's Office for the District of Columbia regarding Mr. Grider's involvement in the January 6 incident at the Capitol attempting to cooperate with their investigation.[1]

In sum, while Mr. Grider expects this Court will judge his motion to dismiss based on the "four corners of the indictment," he does not want this Court to have a one-sided, skewed view of the evidence. More importantly, he wants this Court to recognize that there is a genuine issue of fact concerning whether he intended to obstruct any proceeding or do any harm inside the Capitol building.

## II.   Reply to the Government's Arguments that Mr. Grider's Alleged Conduct "Clearly" Violates Section 1512.

## A.   The Government fails to recognize the significance of Congress' actions in defining "official proceeding" in 18 U.S.C. § 1515 and used in 18 U.S.C. § 1512(c)(2).

Although the Government recognizes Mr. Grider's argument — that only those official proceedings that involve the administration of justice or Congress'

---

[1] *See* Confidential Memorandum in Support of Pretrial Release, Dkt. No. 12 in Case No. 21-mj-00033-SH in the Western District of Texas, Austin Div., *filed under seal*, at 1–2.

power of inquiry or investigation where witnesses are called or evidence is present-
ed fall within the purview of the statute — *see* Gov't Opp. at 18–19, its response is
not only flawed, it relies on opinions by other judges in this District whose opinions
on this issue *proves* the Government's response is flawed.

The Government bases the bulk of its response of the position that Mr. Grid-
er's "contortions are at odds with the plain statutory text" of the statute and the le-
gal principles that, when determining the meaning of a statute, a court "'look[s] first
to its language, giving the words used their ordinary meaning'" and, if that lan-
guage is "'unambiguous, the judicial inquiry is complete.'" Gov't Opp. at 19 (quoting
*Levin v. United States*, 568 U.S. 503, 513, 133 S. Ct. 1224, 1231, 185 L. Ed. 2d 343
(2013) and *Babb v. Wilkie*, --- U.S. ---, 140 S. Ct. 1168, 1177, 206 L. Ed. 2d 432
(2020)); *see also* Gov't Opp. at 21. While Mr. Grider does not dispute those legal
principles, their application here is inapt. That is not just according to Mr. Grider.

Several other judges in this district who have considered this issue have *sub
silentio* acknowledged the ambiguity of the term "official proceeding." More specifi-
cally, as the Government pointed out in their response, Judges Friedrich and Moss
have acknowledged that "not all actions occurring before Congress constitute an 'of-
ficial proceeding.'" Gov't Resp. at 18 (citing *United States v. Sandlin*, --- F. Supp. 3d
----, No. 21-cr-00088 (DLF), 2021 WL 5865006, at *3–4 (D.D.C. Dec. 10, 2021); *Unit-
ed States v. Montgomery*, No. 21-cr-00046 (RDM), 2021 WL 6134591, at *4 (D.D.C.
Dec. 28, 2021)); *see also United States v. Nordean*, No. 21-cr-00175 (TJK), 2021 WL
6134595, at *5 (D.D.C. Dec. 28, 2021) (Judge Kelly stating, "[T]he Court agrees with

the court in *United States v. Sandlin* that not everything that falls under this general definition of 'proceeding' qualifies as a Section 1515(a)(1)(B) 'proceeding' because the phrase 'before the Congress' suggests that the 'proceeding' must involve 'some formal convocation' of the Legislative Branch."). Judge Bates earlier this week took the interpretation of "official proceeding" to another level and held that, based on his interpretation of the phrase, "'a proceeding before the Congress' must be a formal assembly of the Congress for the purpose of conducting official business and must involve some other entity as an integral component." *United States v. McHugh*, No. 21-cr-00453 (JDB), 2022 WL 296304, at *6 (D.D.C. Feb. 1, 2022).

Whether this Court's fellow jurists are right or wrong on this issue, what is abundantly clear is that there is no clearly accepted, unambiguous interpretation of the term "official proceeding." Accordingly, this Court must — contrary to the Government's position — rely on other tools of statutory interpretation to see that the certification of the Electoral College vote does not qualify as an "official proceeding." *See Facebook, Inc. v. Duguid*, --- U.S. ---, 141 S. Ct. 1163, 1170 n.5, 209 L. Ed. 2d 272 (2021) ("Difficult ambiguities in statutory text will inevitably arise, despite the best efforts of legislators writing in 'English prose,'. . . Courts should approach these interpretive problems methodically, using traditional tools of statutory interpretation, in order to confirm their assumptions about the 'common understanding' of words."). Or, as Justice Ginsberg pointed out in *Yates*, "'[t]he plainness or ambiguity of statutory language is determined [not only] by reference to the language itself, [but as well by] the specific context in which that language is used, and the broader

8

context of the statute as a whole.'" *Yates v. United States*, 574 U.S. 528, 537, 135 S.
Ct. 1074, 1081–82, 191 L. Ed. 2d 64 (2015) (quoting *Robinson v. Shell Oil Co.*, 519
U.S. 337, 341, 117 S. Ct. 843, 136 L. Ed. 2d 808 (1997)).

To this end, the Government ignores what Mr. Grider pointed to regarding
the specific context of the definition of "official proceeding" in Section 1515 and its
application in Section 1512(c)(2). More specifically, relying on *Ermoian*, Mr. Grider
pointed out that, when considering the broader statutory context and looking at sec-
tion 1515 as a whole, the Court in *Ermoian* noted that "[t]he use of the preposition
'before' suggests an appearance in front of the agency *sitting as a tribunal*." *United
States v. Ermoian*, 752 F.3d 1165, 1171 (9th Cir. 2013). Additionally, "The use of the
terms 'attendance', 'testimony', 'production', and 'summon[]' when describing an of-
ficial proceeding strongly implies that some formal hearing before a tribunal is con-
templated." *Id.* at 1172.

Although Judge Moss dismissed this argument in *Montgomery*, *see Montgom-
ery*, 2021 WL 6134591, at *7 ("Defendants overstate the holdings of *Ermoian* and
*Ramos* and misread the statutory text . . . The statute, accordingly, does not require
that any witness or party appear before a particular body or tribunal."), just last
week, Judge McFadden held to the contrary in a case before him, *United States v.
Guertin*, No. 21-cr-00262 (TNM), 2022 WL 203467 (D.D.C. January 24, 2022). In
that case, Judge McFadden considered another far-stretched attempt by the Gov-
ernment's attorney for the District of Columbia to prosecute an individual for violat-
ing 18 U.S.C. § 1512(c)(2) and considered the identical issue presented here, name-

9

ly, what constitutes an "official proceeding" for purposes of that statute. *Id.* at *6. Relying on *Ermoian* and the identical authority relied upon by Mr. Grider, Judge McFadden concluded that, "Taken together, § 1515(a)(1) and § 1512 make clear that a covered 'proceeding before a Federal government agency' must resemble a formal tribunal." *Id.* at *7.[2] More notably, Judge McFadden pointed out that, "throughout § 1512, Congress used the phrase 'official proceeding' in a manner that connotes a formal hearing in which persons are ***called to appear***." *Id.* (emphasis added).[3]

As Mr. Grider pointed out in his memorandum in support of his motion, Black's Law Dictionary defines a "tribunal" as "[a] court of justice or other adjudicatory body." TRIBUNAL, BLACK'S LAW DICTIONARY (11th ed. 2019). That same definition, also gives a sub-definition for an "administrative tribunal" that includes *inter*

---

[2] The fact that Judge McFadden was looking at the definition of "official proceeding" set out in Section 1515(a)(1)(C) as opposed to the definition at issue here set out in Section 1515(a)(1)(B) is a distinction without a difference. Both definitions use the same grammatical structure, are listed as alternative definitions to the same term, and were enacted at the same time. There is absolutely no reason to interpret one different from the other.

[3] This distinction is what sets Section 1515(a)(1)(B) apart from Section 1505 and dispels the Government's point about the relationship between the two. *See* Gov't Opp. at 20. The Government posits that Congress elected to use broader language in Section 1515 to cover a "wider range of proceedings than the 'inquir[ies] and investigation[s] envisioned in § 1505'" and that "[i]t would make little sense to read into § 1515(a)(1)(B) unwritten limits that are written explicitly into § 1505." *Id.* But, another interpretation — one consistent with Judge McFadden's interpretation — is that Congress actually intended to use the term "official proceeding" to cover a more *limited* range of proceedings than just any proceeding where Congress is acting pursuant to its power of inquiry and investigation. As Judge Moss pointed out in *Montgomery*, there are often times where Congress is acting pursuant to its power of inquiry or investigation and <u>not</u> calling witnesses to appear or ordering others to produce evidence. *See Montgomery*, 2021 WL 6134591, at *8. If a person were to corruptly obstruct such a proceeding, then unquestionably such conduct would violate Section 1505 and the person would be subject to up to 5 years imprisonment if convicted. *See* 18 U.S.C. § 1505. However, when a person corruptly obstructs an "*official* proceeding" where witnesses were *directed to appear* either to provide testimony or other evidence before Congress, then, consistent with Congress' intent to protect those witnesses and the evidence they produce, Congress determined that is much more serious and, therefore, made that conduct punishable up to 20 years if convicted. *See* 18 U.S.C. § 1512(c). This is why Judge McFadden noted the two provisions "*are* textually distinct — § 1505 contains none of the above-mentioned indicia limiting its applicability to formal tribunals." *Guertin*, 2022 WL 203467, at 8.

*alia* "[a] governmental division established to *implement legislative policy*." *Id.* (emphasis added). With that in mind, the legislative histories behind Sections 1515 and 1512(c)(2) fit neatly into Judge McFadden's interpretation of what is an "official proceeding."

Looking at the legislative history of both statutes, there are two distinct observations to be made (observations the Government either ignores or summarily dismisses).[4] First, *nothing* in the legislative histories of either statute suggests, even in the slightest, that Congress intended the statutes to apply to *any* formal proceeding before Congress, especially a unique constitutional *pro forma* function like the certification of the Electoral College vote. Instead (and secondly), *everything* in the legislative histories of both statutes suggest that Congress was trained on protecting proceedings where witnesses were ***called to appear*** and protecting evidence that witnesses were compelled to provide. Witnesses and evidence that helped establish facts. Facts that would be used to determine whether some conduct violated the law and thus required the administration of justice. Or facts that would be used by Congress to implement legislation.

Further support comes from the location and placement of these statutes. If Congress was concerned about protecting *any* formal, solemn proceeding within its "hallowed halls" like the certification of the electoral college vote, or the awarding of

---

[4] The Government did not address the detailed account of the legislative histories behind both Sections 1515 and 1512(c)(2) referenced by Mr. Grider in his memorandum in support of his motion. Instead, it took certain portions from both out of context and attempted to use those non-contextual statements in a futile attempt to argue that both were intended to broadly prohibit all obstructive behavior or conduct. *See* Gov't Opp. at 21. A careful study of the entire legislative histories of both prove that is not the case.

a Congressional medal of honor, or even a President's State of the Union address, the most logical place to have inserted that statute would have been in Title 40, Chapter 51. Congress, in fact, did that with 40 U.S.C. § 5104.

One cannot turn a blind eye (like the Government does), however, to the fact that the statutes being used *here* are found in Title 18, Chapter 73 which sets forth crimes that involve "Obstruction of Justice." Further, one cannot ignore that the statute Mr. Grider is accused of violating is titled, "Tampering with a witness, victim, or an informant."[5] Again, the placement of these statutes in this specific location is consistent with Congress' intent to protect witnesses who offer testimony or bring forth evidence and the official proceedings where those witnesses appear.

On January 6th, Congress was not legislating or considering legislation and certainly was not involved in the administration of justice. Witnesses were not called to appear. There was no evidence presented to aid Congress as part of their power of inquiry and to investigate. There were no independent judgments being made about who was going to be President of the United States.[6] While the Gov-

---

[5] The Government cites to the 1947 case, *Board of R. R. Trainmen v. Baltimore & O. R. Co.,* 331 U.S. 519, 528–29, 67 S. Ct. 1387, 1392, 91 L. Ed. 1646 (1947), to support the principle that "neither 'the title of a statute' nor 'the heading of a section' can 'limit the plain meaning of the text.'" Gov't Opp. at 22. What the Government fails to recognize, however, is subsequent and more-recent opinions from the Supreme Court have taken a more expansive approach and considered the title of a statute or a section to aid in resolving an ambiguity in the legislation's text. *See FTC v. Mandel Bros., Inc.*, 359 U.S. 385, 388–389, 79 S. Ct. 818, 822, 3 L. Ed. 2d 893 (1959); *Mead Corp. v. Tilley*, 490 U.S. 714, 723, 109 S. Ct. 2156, 2162, 104 L. Ed. 2d 796 (1989); *I.N.S. v. Nat'l Ctr. for Immigrants' Rts., Inc.*, 502 U.S. 183, 189, 112 S. Ct. 551, 556, 116 L. Ed. 2d 546 (1991); *Yates*, 574 U.S. at 539 (considering § 1519's caption in interpreting whether statute prohibited spoliation of any and all physical evidence).

[6] It bears worth noting here that finding otherwise only gives credibility to former President Trump's incredulous claims that the Vice President or the members of Congress could override the will of the people through some deliberative or "adjudicative" process. If this Court finds that this was an "official proceeding" as that term was meant to be used in Title 73 or that Congress "deliberates" over "physical or documentary evidence" during the election certification proceedings, this Court's deci-

ernment claims Mr. Grider "strains to characterize the proceeding as . . . 'largely ministerial,'" Gov't Opp. at 17, it fails to recognize the detailed analysis of the Twelfth Amendment and the Electoral Count Act cited to and discussed by Mr. Grider. *See* Memo. at 15–16 (citing Vasan Desavan, *Is the Electoral Count Act Unconstitutional*, 80 N.C. L. REV. 1653, 1659 (2002)).[7] While Mr. Grider acknowledges and accepts as true the lengthy accounts of the certification of the Electoral College vote that the Government has set out, *see*, *e.g.*, Gov't Opp. at 17–18, what is critically absent from that unique, formal, solemn occasion is any semblance of what makes an "official proceeding" an "official proceeding" as that term is defined in 18 U.S.C. § 1515(a)(1) and applied in 18 U.S.C. § 1512(c)(2): Congress sitting as a tribunal where parties are directed to appear or produce evidence pursuant to its power of inquiry and investigation. Because that allegation does not (nor cannot) be set out in Count Four of the indictment, that count must be dismissed.

**B.    18 U.S.C. § 1512(c), its use of "otherwise," and *Begay*.**

Although the Government does not entirely ignore Mr. Grider's argument how the word "otherwise" limits the application of 18 U.S.C. § 1512(c)(2), it too easily and summarily dismisses his reliance on *Begay v. United States*, 553 U.S. 137,

---

sion will be treated as a divine edict by former President Trump and his followers to continue their efforts to override the will of the people by turning the certification proceedings into a mechanism for doing so. This Court should do as Vice President Mike Pence did and resist any attempts to treat the electoral certification proceeding as anything more than a ministerial act. *See* 167 CONG. REC. H79, 105-06, 108, 111 (2021) and 167 CONG. REC. S16, 25, 32 (2021) (where legislators requested, but did not receive authority to open investigation regarding electoral certificates).

[7] The Government, to the contrary, takes one quotation from Desavan entirely out of context, Gov't Opp. at 23, and relies on that to make its case. Mr. Grider hopes this Court does not gloss over Desavan's analysis of the ECA in the same manner as the Government apparently did as Mr. Grider moves to adopt and incorporate all the arguments and authority set out therein, including the suggestion that the ECA is unconstitutional.

128 S. Ct. 1581, 1584, 170 L. Ed. 2d 490 (2008) and relies heavily on Judge Moss'
flawed characterization that "*Begay* does little to advance Defendant['s] contention
here." Gov't Opp. at 24 (quoting *Montgomery*, 2021 WL 6134591, at *11).

In short, Mr. Grider trusts this Court to read *Begay* entirely for itself and de-
termine its significance here. He certainly does not rely on dicta or quotes from the
opinion taken out of context. As he suggested in his memorandum, there are four
critical features of that opinion that support his interpretation that Section
1512(c)(2) is limited to prohibiting corrupt obstructive conduct that undermines a
proceeding's truth-finding function through actions impairing the integrity and
availability of evidence (tangible or intangible) or otherwise obstructs justice. Mr.
Grider can only speculate why the Government chose to ignore the bulk of these ar-
guments, but he expects this Court give them their due consideration.

For instance, how can it be ignored that in *Begay*, like here, the Court was
looking at a statute that "listed examples — burglary, arson, extortion, or crimes
involving the use of explosives — [to] illustrate the kinds of crimes that fall within
the statute's scope" and then noted, "[t]heir presence indicates that the statute co-
vers only similar crimes, rather than every crime that 'presents a serious potential
risk of physical injury to another'"? *Begay*, 553 U.S. at 142. A fair interpretation of
that is that the use of the specific offenses listed (or, as in this case, specific ways
the offense can be committed) limited, rather than expanded the statute's reach. Or
how does one ignore what the Court considered in *Begay* including the statute's his-

tory, purpose, and even its title? *Id.* at 143–148. The Government's lack of response to those points speaks volumes here.

What the Government instead spends a considerable amount of effort on is trying to set forth an argument that Mr. Grider is attempting to "merely adopt[] an increasingly more complicated gloss on the statute that is on even weaker textual footing." Gov't Opp. at 27–28. What the Government fails to recognize (or respond to) is that no such "complicated gloss" exists because there are multiple cases that recognize that Section 1512(c)(2) involves some obstruction of non-tangible evidence or the proper gathering of evidence, such as soliciting tips from corrupt cops to evade surveillance and the gathering of further evidence, *see United States v. Volpendesto*, 746 F.3d 273 (7th Cir. 2014), or disclosing the identity of an undercover officer to a target of a grand investigation, *see United States v. Phillips*, 583 F.3d 1261 (10th Cir. 2009), or having others falsely claim ownership of a firearm to avoid being charged with unlawful possession of the weapon, *see United States v. Lucas*, 499 F.3d 769 (8th Cir. 2007). All these, and the other cases cited in his memorandum, support the interpretation that section (c)(2) applies to attempts to interfere with, or render false, evidence other than a record, document, or other object that would become available in a proceeding or otherwise prevent the flow of such evidence to a proceeding.

In conclusion, it makes entirely no logical sense for a statute that opens with prohibiting a very limited and specific type of obstructive conduct (altering, destroying, mutilating, or concealing a record, document, or other object) to use the word

"otherwise" and then broadly prohibit any and all kind of obstructive conduct in any shape, form, or fashion and in a context entirely unrelated to the gathering and consideration of evidence. Again, based on the structure of the statute, there must be some allegation that Mr. Grider's conduct undermined a proceeding's truth-finding function through actions impairing the integrity and availability of evidence (tangible or non-tangible) or otherwise obstructed justice. Because no such allegation exists in the indictment here (nor can there ever be one), this Court should dismiss Count Four of the indictment.

## C.   "Consciousness of wrongdoing" does no more to cure the vagueness problems created by the use of the word "corruptly" in 18 U.S.C. § 1512(c).

Not surprisingly, the Government continues to grasp on to its position that any constitutional vagueness problems with Section 1512(c)(2)'s application here are magically wiped away because, "[t]he statute requires that a defendant act[] with consciousness of wrongdoing." Gov't Opp. at 30. It summarily dismisses the application of *Poindexter* and focuses more on *Arthur Andersen LLP v. United States*, 544 U.S. 696, 704–08, 125 S. Ct. 2129, 161 L. Ed. 2d 1008 (2005), to support this element of "consciousness of wrongdoing." *Id.* at 31–32. It even goes so far to try and suggest that the Court held (or "implied") in *Arthur Anderson* that "corruptly" was not "too vague," when the Court never even used the word "vague" in its opinion, nor considered the vagueness of the specific term at issue here on its own (the Court instead interpreted what was meant by "knowingly . . corruptly persuades" as

used in Section 1515(*b*)). *See id.* at 31–32; *Arthur Andersen LLP*, 544 U.S. at 704–08.

Mr. Grider suggests that this Court put aside the holdings of *Poindexter* and *Arthur Andersen* for a moment and just consider the following guiding legal principles before then considering the use and application of the term "corruptly" in the context of this case. "[I]t is reasonable that a fair warning should be given to the world in language that the common world will understand, of what the law intends to do if a certain line is passed." *McBoyle v. United States*, 283 U.S. 25, 27, 51 S. Ct. 340, 341, 75 L. Ed. 816 (1931). "To make the warning fair, so far as possible the line should be clear." *Id.* To quote from the Government's response, "a provision is impermissibly vague only if it requires proof of an 'incriminating fact' that is so indeterminate as to invite arbitrary and "wholly subjective" application." Gov't Opp. at 30 (quoting *United States v. Williams*, 553 U.S. 285, 306, 128 S. Ct. 1830, 1846, 170 L. Ed. 2d 650 (2008)). Indeed, as Justice Scalia reminded us in *Williams*, the Court has "struck down statutes that tied criminal culpability to whether the defendant's conduct was "annoying" or "indecent" — wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings." *Id.* (citations omitted).

With those principles in mind, consider a case where one person convinces another person, not to alter, destroy, or mutilate a document (which would be prohibited under Section 1512(c)(1)), but to *create* a false document, say, a backdated agreement memorializing the sale of a stock, to try and keep the government from

17

trying to seize certain property in a forfeiture proceeding. That was, in fact, the case

in *United States v. Gordon*, 710 F.3d 1124, 1151 (10th Cir. 2013), one of the cases

cited by the Government in their response. *See* Gov't Opp. at 32. As the court stated

there, "Any rational jury could have determined that the creation of these false doc-

uments was for the corrupt purpose of redirecting the government, based upon false

pretenses, away from property that it was trying to seize" and thus, such conduct

violated Section 1512(c)(2). *Gordon*, 710 F.3d at 1151. Stated differently, there is no

question that the defendant's conduct could be considered "wrongdoing" and that he

could be "conscious" of it. That is, in fact, the case in every one of the cases that

have considered the application of Section 1512(c)(2) cited to by the Government —

there is no question that, in many of those instances where a person is trying to *ob-

struct justice*, their conduct could be considered "wrongdoing" and that they could be

"conscious" of that "wrongdoing." *See* Gov't Opp. at 31–32 (citing *United States v.

Friske*, 640 F.3d 1288, 1291 (11th Cir. 2011); *United States v. Mintmire*, 507 F.3d

1273, 1289 (11th Cir. 2007); *United States v. Watters*, 717 F.3d 733, 735 (9th Cir.

2013); *United States v. Matthews*, 505 F.3d 698, 705 (7th Cir. 2007).

The same, however, cannot be said of the alleged obstructive conduct at issue

in the present case where there is no allegation of obstruction of justice. Entering

and remaining in the United States Capitol without authority and engaging in dis-

orderly and disruptive conduct is not, to use Justice Rehnquist's language in *Arthur

Anderson*, "inherently malign." *Arthur Andersen LLP*, 544 U.S. at 704; *see also

United States v. Guy Wesley Reffitt*, 21-cr-32-DLF, Minute Order 12/11/21 (where

Judge Friedrich declined ruling on the defendant's motion to dismiss based on the unconstitutional vagueness of 18 U.S.C. § 1512(c)(2)). If it were, then, as pointed out in Mr. Grider's memorandum, several Democratic Representatives could be prosecuted under 18 U.S.C. § 1512(c)(2) for their obstructive conduct back in June 2016 where they remained on the House Floor without authority and continuously engaged in disruptive conduct to try and pass gun control measures (a point that the Government ignores in their response). Their circumstances prove yet another problem with relying on proof of "consciousness of wrongdoing" to avoid any constitutional vagueness problems.

Whether one could prove that those Representatives were acting with "consciousness of wrongdoing" is, again taking from Judge Scalia's opinion in *Williams*, "arbitrary" and wholly subjective. *Williams*, 553 U.S. at 306. Many of those Representatives, Mr. Grider submits, would strongly insist that they believed their conduct was not "wrong," but rather it was "necessary and right" for accomplishing their goals. Republican Representatives, on the other hand, trying to restore order to House proceedings would probably say otherwise. "Wrongdoing," in this context, is in the "eye of the beholder."

Unlike with the situation where a person is obstructing justice in a manner (where no one could dispute that they know that they are engaged in "wrongdoing"), in the context presented in both the situation involving the Democratic Representatives and the situation presented here involving Mr. Grider's actions at the Capitol on January 6, it is entirely *un*clear whether such conduct is "wrongdoing" and that

19

a person could thus be "conscious of that wrongdoing." After all, it is beyond dispute that former President Trump implored individuals like Mr. Grider that "if you don't fight like hell you're not going to have a country anymore" and then encouraged those individuals to "walk down Pennsylvania Avenue" to go to the Capitol to "try and give our Republicans . . . the kind of pride and boldness that they need to take back our country."[8]

In simplest terms, in the context presented here, "wrongdoing" is just as vague as the term "corrupt." That is why, in this unique context, the statute is unconstitutionally vague. That is why this Court should not wait for the Supreme Court to strike down this statute that "tie[s] criminal culpability to whether the defendant's conduct was ["corrupt" or "wrongdoing"] — wholly subjective judgments without statutory definitions, narrowing context, or settled legal meanings" in this particular context. This Court should dismiss the allegation in Count Four of the indictment against Mr. Grider as the statute is unconstitutionally vague as applied in these unique circumstances.

**D.     The rule of lenity is a viable option for finding that the allegation in the indictment falls outside the scope of 18 U.S.C § 1512(c)(2).**

There is one simple question this Court needs to ask itself regarding the application of lenity: is there absolutely ***no doubt*** about the meaning of "corruptly obstructing, influencing, or impeding a proceeding before Congress," as those terms are used in section 1512(c)(2) and applied in the allegation against Mr. Grider in

---

[8] *See* Brian Naylor, "Read Trump's Jan. 6 Speech, a Key Part of Impeachment Trial," NPR, February 10, 2021, available at https://www.npr.org/2021/02/10/966396848/read-trumps-jan-6-speech-a-key-part-of-impeachment-trial.

Count Four, or is there ***any doubt*** about the meaning of those words? As Mr. Grid-er pointed out in his memorandum, if recourse to any of the "traditional tools of statutory construction leaves *any* doubt" about the meaning, this Court should in-voke the rule that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates*, 574 U.S. at 547–48 (quoting *Cleveland v. United States*, 531 U.S. 12, 25, 121 S. Ct. 365, 148 L. Ed. 2d 221 (2000), in turn quoting *Rewis v. United States*, 401 U.S. 808, 812, 91 S. Ct. 1056, 28 L. Ed. 2d 493 (1971)) (emphasis added).

Throughout its response, the Government recognizes explicitly or implicitly that there are "conceivable questions as to the outer bounds of the term 'proceeding before the Congress," Gov't Opp. at 15, that "not all actions occurring before Con-gress constitute an 'official proceeding,'" *id.* at 18, that there is "'uncertainty around the edges'" whether Section 1512(c)'s "'corruptly' element provided ample notice to the defendant that *his conduct* was criminal," *id.* at 33 (emphasis in original), and that this is a "close case." *Id.* at 34. All this amounts to some doubt about the mean-ing of these terms.

Mr. Grider acknowledges that there is no clear consensus on when to apply the rule of lenity. *See* Intisar A. Rabb, "The Appellate Rule of Lenity," 131 HARV. L. REV. F. 179 (2018); Gov't Opp. at 35 (quoting *Barber v. Thomas*, 560 U.S. 474, 488, 130 S. Ct. 2499, 2508, 177 L. Ed. 2d 1 (2010))("the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a "grievous ambigu-ity or uncertainty in the statute, such that the Court must simply guess as to what

Congress intended."; *but see* Rabb, 131 HARV. L. REV. F. at 190–91 ("This stingy approach puts lenity 'dead last,' replacing the Court's once-dominant *lenity-first* approach."). Mr. Grider submits that because his liberty and substantive constitutional rights are at stake and, because, as it was in *Yates,* "the Government urges a reading of [section 1512(c)(2)] that exposes individuals [like him] to 20–year prison sentences," this Court should, as it has been the position of the Supreme Court for over 100 years, apply the statute in the manner that is most favorable to him. *See United States v. Santos*, 553 U.S. 507, 514, 128 S. Ct. 2020, 2025, 170 L. Ed. 2d 912 (2008) (citing *United States v. Gradwell,* 243 U.S. 476, 485, 37 S. Ct. 407, 61 L. Ed. 857 (1917); *McBoyle v. United States,* 283 U.S. 25, 27, 51 S. Ct. 340, 75 L. Ed. 816 (1931); *United States v. Bass,* 404 U.S. 336, 347–349, 92 S. Ct. 515, 30 L.Ed.2d 488 (1971)). As Justice Scalia noted in *Santos,*

> This venerable rule not only vindicates the fundamental principle that no citizen should be held accountable for a violation of a statute whose commands are uncertain, or subjected to punishment that is not clearly prescribed. It also places the weight of inertia upon the party that can best induce Congress to speak more clearly and keeps courts from making criminal law in Congress's stead.

*Id.*

This Court cannot ignore what the Government fails to acknowledge. The allegation in Count Four is an unprecedented use of a statute in an unprecedented manner. While the Government may respond that such unprecedented action is required to respond to the events of January 6, that is contrary to the rule of law. Mr. Grider should not be prosecuted for violating an inapplicable, unconstitutionally

vague statute, especially when there are other applicable, non-vague statutes under which to prosecute his alleged conduct.

WHEREFORE, PREMISES CONSIDERED, Mr. Grider respectfully requests this Honorable Court dismiss Count Four of the indictment.

Date: <u>February 4, 2022</u>          Respectfully Submitted,

MAYR LAW, P.C.

by: <u>/s/ T. Brent Mayr</u>
T. BRENT MAYR
Texas State Bar Number 24037052
D.C.D.C. Bar ID TX0206
bmayr@mayr-law.com

5300 Memorial Dr., Suite 750
Houston, TX 77007
Telephone: 713-808-9613
Fax: 713-808-9613

ATTORNEY FOR THE DEFENDANT,
CHRISTOPHER RAY GRIDER

**CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this memorandum was sent to Counsel for the Government, Candice Wong, on February 4, 2022, via CM/ECF and email.

<u>/s/ T. Brent Mayr</u>
T. BRENT MAYR

ATTORNEY FOR THE DEFENDANT,
CHRISTOPHER RAY GRIDER