## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

     Plaintiff,

v.

CHRISTOPHER RAY GRIDER.

     Defendant.

Criminal Action No. 21-22 (CKK)

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S MOTION TO DISMISS COUNTS
## ONE, TWO, FOUR, FIVE & SIX OF THE SUPERSEDING INDICTMENT

TO THE HONORABLE COLLEEN KOLLAR-KOTELLY, UNITED STATES DIS-TRICT COURT JUDGE FOR THE DISTRICT OF COLUMBIA:

CHRISTOPHER RAY GRIDER, the Defendant in the above styled and numbered cause, by and through undersigned counsel, submits the following memorandum of law in support of his Motion to Dismiss Counts One, Two, Four, Five and Six of the Superseding Indictment filed concurrently with this memorandum and seeking an order dismissing those counts pursuant to Rules 7(c)(1) and 12(b)(3)(B) of the Federal Rules of Criminal Procedure, the Fifth and Sixth Amendments to the United States Constitution, and the authority discussed herein.

# TABLE OF CONTENTS

I.   Introduction ................................................................................................ 1

II.  Count One alleging a violation of Section 231(a)(3) should be dismissed ..........
     .................................................................................................................. 3

  A.  The Government does not allege a "federally protected function" ................... 3

  B.  Section 231(a)(3) exceeds Congress's Commerce Clause authority ................. 7

    1.   The police power and the Commerce Clause's prohibition on Congress's
    regulation of intrastate activity that does not "substantially affect" interstate
    commerce ................................................................................................. 8

    2.   Section 231(a)(3) does not substantially affect interstate commerce .......... 9

      i.   Section 231(a)(3) does not regulate economic activity ............................... 10

      ii.   The jurisdictional element of Section 231(a)(3) does not limit its reach to
      activities that substantially affect interstate commerce ................................ 11

      iii.   Congress did not find that Section 231(a)(3)'s activities substantially
      affect interstate commerce ................................................................. 13

      iv.   The relationship between Section 231(a)(3)'s activities and any effect on
      interstate commerce is too attenuated ........................................................ 14

    3.   The Section 231(a)(3) charge must be dismissed since the statute as applied
    is overbroad .............................................................................................. 15

III.  Count Two alleging a violation of Section 1512(c)(2) should be dismissed .... 19

  A.  The Government's interpretation of Section 1512(c)(2), upheld by this Court, is
  invalid under the First Amendment. .................................................................... 20

  B.  The novel construction principle of the Due Process Clause requires rejection
  of the government's interpretation, which would operate as an *ex post facto* law 24

IV.  The Section 1752 counts should be dismissed ................................................. 26

  A.  Counts Four, Five and Six fail to state an offense because only the United
  States Secret Service restricts areas under Section 1752 ..................................... 26

  B.  If the government's interpretation of § 1752 is applied, it is unconstitutionally
  vague as to Mr. Grider ..................................................................................... 32

C.   The rule of lenity dictates that ambiguities in Section 1752 be resolved in Mr. Grider's favor.......................................................................................................... 34

D.   The novel construction principle dictates against the government's interpretation, which would operate as an *ex post facto* law ................................. 37

# TABLE OF AUTHORITIES

## Cases

*Apprendi v. New Jersey*, 530 U.S. 466 (2000) ................................................................ 6

*Arthur Andersen LLP v. United States*, 544 U.S. 696 (2005) .................................... 36

*Ashcroft v. Free Speech Coalition*, 535 U.S. 234 (2002) ............................................. 21

*Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987) ................................................................................................................................. 21

*BedRock Ltd., LLC v. United States*, 541 U.S. 176 (2004) ........................................ 31

*Bond v. United States*, 572 U.S. 844 (2014) ................................................................. 36

*Bouie v. City of Columbia*, 378 U.S. 347 (1964) ....................................... 24, 25, 26, 37

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ............................................................. 21

*Brown v. Louisiana*, 383 U.S. 131 (1966) .................................................................... 22

*Citizens for Responsibility & Ethics in Wash. v. United* States, 922 F.3d 480 (D.C. Cir. 2019) ......................................................................................................................... 32

*City of Houston v. Hill*, 482 U.S. 451 (1987) ........................................... 16, 17, 18, 24

*Cleveland v. United States*, 531 U.S. 12 (2000) .......................................................... 36

*Corley v. United States*, 556 U.S. 303 (2009) ............................................................. 30

*Ctr. for Biological Diversity v. E.P.A.*, 722 F.3d 401 (D.C. Cir. 2013) ..................... 30

*Edwards v. Dist. of Columbia*, 755 F.3d 996 (D.C. Cir. 2014) ............................ 20, 21

*Glik v. Cunniffe*, 655 F.3d 78 (1st Cir. 2011) .............................................................. 17

Gonzales v. Raich, 545 U.S. 1 (2005) ............................................................................ 11

*Hubbard v. United States*, 514 U.S. 695 (1995) ........................................................... 5

*Jones v. United States*, 526 U.S. 227, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999) ....... 6

*Kelly v. United States*, ___ U.S. ___ , 140 S. Ct. 1565 (2020) ................................... 35

*Kolender v. Lawson*, 461 U.S. 352 (1983) ................................................................... 34

*Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011 (9th Cir. 2009) .................................................................................................................. 18

*Marinello v. United States*,___ U.S. ___, 138 S. Ct. 1101 (2018) ................................. 35

*McCoy v. City of Columbia*, 929 F. Supp. 2d 541 (D.S.C. 2013).................................. 17

*McDonnell v. United States*, 579 U.S. 550 (2016)....................................................... 35

*Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998)............................... 30

*Musick v. Burke*, 913 F.2d 1390 (9th Cir. 1990) ........................................................ 15

*R.A.V. v. St. Paul*, 505 U.S. 377 (1992) ...................................................................... 20

*Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015) .................................................. 20

*Rewis v. United States*, 401 U.S. 808 (1971)................................................................ 36

*Roy v. City of Monroe*, 950 F.3d 245 (5th Cir. 2020)................................................... 16

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991) ........................................................................................................................ 20

*Skilling v. United States*, 561 U.S. 358 (2010) ........................................................... 36

*Snyder v. Phelps*, 562 U.S. 443 (2011) ....................................................................... 22

*St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531 (1978)................................. 13

*Texas v. Johnson*, 491 U.S. 397 (1989)................................................................. 20, 22

*Tinker v. Des Moines Ind. Comm. School. Dist.*, 393 U.S. 503 (1969) ...................... 22

*United States v. Adams*, 343 F.3d 1024 (9th Cir. 2003)............................................... 9

*United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534 (1940) ............................. 30

*United States v. Bingert*, No. 1:21-CR-91-RCL, 2022 WL 1659163 (D.D.C. May 25, 2022) .......................................................................................................................... 3

*United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005) ........................................ 29, 30

*United States v. Caputo*, 201 F. Supp. 3d 65 (D.D.C. 2016)...................................... 23

*United States v. Dean*, 55 F.3d 640 (D.C. Cir. 1995) .................................................. 5

*United States v. Dubin*, 27 F.4th 1021 (5th Cir. 2022)............................................... 35

*United States v. Grace*, 461 U.S. 171 (1983) .............................................................. 22

*United States v. Lopez*, 514 U.S. 549 (1995) ...................................... 7, 8, 10, 11, 13

*United States v. McCoy*, 323 F.3d 1114 (9th Cir. 2003) ................................................ 9

*United States v. Miller*, No. 1:21-CR-00119 (CJN), 2022 WL 1718984 (D.D.C. May 27, 2022) ...................................................................................................................... 19

*United States v. Miller*, No. 1:21-cr-119 (CJN), 2022 WL 823070 (D.D.C. Mar. 7, 2022) ...................................................................................................................... 19

*United States v. Moore*, 613 F.2d 1029 (D.C. Cir. 1979) ............................................ 28

*United States v. Morrison*, 529 U.S. 598 (2000) ......................... 7, 8, 9, 10, 11, 13, 15

*United States v. O'Brien*, 391 U.S. 367 (1968) ..................................................... 22, 23

*United States v. Oakar*, 111 F.3d 146 (D.C. Cir. 1997) ............................................... 5

*United States v. Pupo*, 841 F.2d 1235 (4th Cir. 1988) ................................................. 6

*United States v. Robertson*, 514 U.S. 669 (1995) ........................................................ 8

*United States v. Stevens*, 559 U.S. 460 (2010) .......................................................... 16

*Van Buren v. United States*, ___ U.S. ___, 141 S. Ct. 1648 (2021) ............................ 35

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489 (1982) ............ 34

*Washington State Grange v. Washington State Republican Party*, 552 U.S. 442 (2008) ...................................................................................................................... 20

*Winters v. New York*, 333 U.S. 507 (1948) ................................................................ 16

## Statutes

18 U.S.C. § 1505 .................................................................................................... 6, 24

18 U.S.C. § 1752 ................................................................... 2, 3, 27, 28, 30, 36

18 U.S.C. § 231(a)(3) ............................................................................................. 3, 12

18 U.S.C. § 232(1) ................................................................................................ 14, 18

18 U.S.C. § 232(3) ....................................................................................................... 4

18 U.S.C. § 3056(d) ................................................................................. 28

18 U.S.C. § 6 ..................................................................................... 4, 5

5 U.S.C. § 101 ....................................................................................... 4

5 U.S.C. § 105 ....................................................................................... 4

## Other Authorities

114 Cong. Rec. 1294–95 (Jan. 29, 1968) ........................................... 13, 14

114 Cong. Rec. 1819 (Feb. 1, 1968) ...................................................... 17

114 Cong. Rec. 5535–36 (Mar. 6, 1968) ................................................ 14

116 Cong. Rec. 35,651 (1970) ............................................................... 31

116 Cong. Rec. 35,653 (1970) ............................................................... 31

ANY, BLACK'S LAW DICTIONARY (11th ed. 2019) ................................... 13

*Authority of the Secretary of the Treasury to Order the Closing of Certain Streets Located Along the Perimeter of the White House*, 19 Op. Off. Legal Counsel 109 (1995) .................................................................................................. 32

INCIDENT, BLACK'S LAW DICTIONARY (11th ed. 2019) ............................ 12

S. REP. NO. 91-1252 (1970) ................................................................... 31

SUBSTANTIAL, BLACK'S LAW DICTIONARY (11th ed. 2019) ....................... 13

## Constitutional Provisions

U.S. CONST. amend I ............................................................................. 34

U.S. CONST. amend. V ............................................................................. 6

## I.    Introduction

With the filing of the Superseding Indictment in this case, Mr. Grider now brings this new challenge to multiple counts in that indictment. From the outset, it once again must be recognized that the Government's charging decisions here are unprecedented. Statutes that have never before been used to prosecute similar conduct are being used to prosecute Mr. Grider. Interpretations that have never been judicially vetted or approved are being applied. And, worse, the Government is applying them without any consistency.

This Court cannot ignore that several other individuals who were present at the United States Capitol on January 6, 2021 who engaged in similar — and in several instances worse — conduct than anything Mr. Grider is alleged to have done, have <u>not</u> been charged with violating the statutes that the Government alleges were violated in this case.

Consider the case of Boyd Allen Camper who appeared before this Court last year. *See* 21-cr-325-CKK. Like Mr. Grider, Camper entered the Capitol through an open door. Like Mr. Grider, Camper recorded himself using a GoPro video camera inside the Capitol. And like Mr. Grider, Camper participated in a video interview with a television news outlet "while still on or near the Capitol ground." That is about where the similarities end. *Unlike* Mr. Grider, Camper "stated he believed he was on the 'front line' and entered a 'combat' state of mine in which he imagined they (the rioters) would take the Capitol steps and demand transparency on the election." *See* ECF Dkt. 30 at 6 in 21-cr-325-CKK (Government's Sentencing Memorandum). *Unlike* Mr. Grider who has shared photos and video recordings taken inside the Capitol with

his iPhone to prove that he did not engage in any illegal activity, *see e.g.* Defendant's Motion to Revoke Detention Order, ECF Dkt. 10 at 9–10, Camper actively concealed and impaired the availability of his GoPro recordings to law enforcement after January 6. *See* ECF Dkt. 30 at 6–7 in 21-cr-325-CKK. More notably, *unlike* Mr. Grider, Camper made his intentions at the Capitol known when he was interviewed by CBS News and stated, "We're going to take this damn place. If you haven't heard it's called the insurrection act and we the people are ready." *Id.* at 5; *cf.* Defendant's Motion to Revoke Detention Order, ECF Dkt. 10 at 5–6 (proffer of television reporter who interviewed Mr. Grider attesting to his peaceful disposition when interviewing him); the news story itself located at https://www.kwtx.com/2021/01/07/central-texas-man-witnessed-deadly-shooting-as-trump-supporters-stormed-us-capitol/.

But, unlike Mr. Grider, despite Camper's intention to participate in an insurrection and efforts to conceal physical evidence of his actions thereafter, Camper was never charged with obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) or civil disorder in violation 18 U.S.C. 231(a)(3). Although charged with violating 18 U.S.C. § 1752, those charges were dismissed as part of a plea agreement for Camper to plead guilty to violating 40 U.S.C. § 5104. *See* 21-cr-325-CKK.

Or consider the case of Virginia Spencer who also appeared before this Court. *See* 21-cr-147-2-CKK. As this Court may recall, after bringing her 14-year-old child to the Capitol and entering through the Senate Wing Door, Spencer actually entered the suite of offices assigned to Speaker of the House Nancy Pelosi and then joined the

crowd that formed outside the Chamber for the House of Representatives that attempted to enter while lawmakers were still trapped inside. *See* ECF Dkt. 55 at 2, 9–10 in 21-cr-147-2 (Government's Sentencing Memorandum). Again, unlike Mr. Grider who did not enter any offices and only once tried to open the Speaker's Lobby door before trying to retreat, Spencer too was never charged with obstruction of an official proceeding in violation of 18 U.S.C. § 1512(c)(2) or civil disorder in violation 18 U.S.C. 231 (a)(3) and, although charged with violation 18 U.S.C. § 1752, those charges were dismissed as well as part of a plea agreement for Spencer to plead guilty to violating 40 U.S.C. § 5104.

This Court cannot ignore the disparity.

Where no disparity exists is in the arguments that Mr. Grider now advances. His arguments here, like Judge Lamberth recently noted, admittedly "echo those that other January 6, 2021 defendants have filed." *United States v. Bingert*, No. 1:21-CR-91-RCL, 2022 WL 1659163, at *2 (D.D.C. May 25, 2022). And while indeed, "Plenty of ink has been spilled in this district denying motions that raise a combination of these arguments," *id.*, Mr. Grider is respectfully requesting this Court spill a different kind of ink that dismisses the counts as set out against him.

## II.   Count One alleging a violation of Section 231(a)(3) should be dismissed

### A. The Government does not allege a "federally protected function"

To establish Mr. Grider is guilty of a Section 231(a)(3) offense, the Government must allege and prove beyond a reasonable doubt that the "civil disorder" on January 6 had an adverse effect on a "federally protected function." *See* 18 U.S.C. § 231(a)(3).

A "[f]ederally protected function" is defined as any "function, operation or action car-

ried out . . . by any *department, agency, or instrumentality of the United States* or by

an officer or employee thereof." 18 U.S.C. § 232(3) (emphasis added). Section 6 of Title

18 defines "department" and "agency" for the title:

> The term "department" means one of the executive departments enu-
> merated in section 1 of Title 5,[1] unless the context shows that such term
> was intended to describe the executive, legislative, or judicial branches
> of the government.

> The term "agency" includes any department, independent establish-
> ment, commission, administration, authority, board or bureau of the
> United States or any corporation in which the United States has a pro-
> prietary interest, unless the context shows that such term was intended
> to be used in a more limited sense.[2]

18 U.S.C. § 6.

The Supreme Court has held that Section 6's definition of "department" as "one

of the *executive* departments enumerated in section 1 of Title 5" presumptively con-

trols any Title 18 statute's use of that term unless the government makes a "fairly

powerful" "showing" that Congress intended, *in the statute at issue*, that "department"

should refer to the "legislative, or judicial branches of government," which the Court

held was the "unusual sense" of the term. *Hubbard v. United States*, 514 U.S. 695,

---

[1] The Executive Departments enumerated in section 1 of Title 5 are: The Department of State; The Department of Treasury; The Department of Defense; The Department of Justice; The Department of the Interior; The Department of Agriculture; The Department of Commerce; The Department of Labor; The Department of Health and Human Services; The Department of Housing and Urban Development; The Department of Transportation; The Department of Energy; The Department of Education; The Department of Veterans Affairs; and The Department of Homeland Security. 5 U.S.C. § 101.

[2] "Executive agency" is defined as "an Executive department, a Government corporation, and an independent establishment." 5 U.S.C. § 105.

4

700 (1995). In *Hubbard*, a man was convicted under a now-superseded version of Section 1001 that punished "'[w]hoever, in any matter within the jurisdiction of *any department or agency of the United States* knowingly and willfully . . . makes any false, fictitious or fraudulent statements. . .'" *Id.* at 698 (quoting § 1001) (emphasis added). The man had filed false records in a bankruptcy court. The lower courts upheld his conviction on the ground that such a court was a "department . . .of the United States," in the sense that the executive, legislative, and judicial branches of government were sometimes referred to as "departments" in the 18th century. *Id.* Not only did the Supreme Court reverse his conviction on the ground that this interpretation of "department" was inconsistent with Section 6, it overruled its own prior contrary precedent notwithstanding the gauntlet of *stare decisis. Id.* at 701.

Applying the *Hubbard* rule, the D.C. Circuit has held that congressional entities do not satisfy Section 6's "department" and "agency" "of the United States" because they are not *executive* departments and agencies. *See United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997) (after Supreme Court's decision in *Hubbard*, "an entity within the Legislative Branch cannot be a 'department' within the meaning of § 1001 and 18 U.S.C. § 6," nor is Congress an "agency" under § 6); *United States v. Dean*, 55 F.3d 640, 659 (D.C. Cir. 1995) (reversing convictions under § 1001 for false statements to Congress, as *Hubbard* "narrowed the reach of ["department" and "agency"] *to matters within the executive branch*") (emphasis added).

Beyond those decisions, Title 18 distinguishes between congressional entities, on the one hand, and "departments" or "agencies" "of the United States," on the other.

Consistent with *Hubbard, Oakar,* and *Dean*, the latter always lie "within the executive branch." *See, e.g.,* 18 U.S.C. § 1505 (distinguishing between obstruction of congressional proceedings and "proceeding[s] . . . before any department or agency of the United States. . .").

Here, Count One does not specify what "federally protected function," was interfered with by Mr. Grider and is therefore constitutionally invalid.

Additionally, besides not satisfying the definitions of "department" and "agency" in Section 6, the indictment suffers from another flaw. The "civil disorder's" "adverse effect" on a "federally protected function" is a necessary element of the charge in Count One. That means the Government was required to establish probable cause of a "federally protected function" to the grand jury to satisfy the Fifth Amendment's presentment requirement. U.S. CONST. amend. V; *Apprendi v. New Jersey*, 530 U.S. 466, 500-18 (2000) (Thomas, J., concurring) (discussing cases and treatises since the 1840s, which repeatedly emphasize the importance of including every element in an indictment); *Jones v. United States*, 526 U.S. 227, 243 n.6, 119 S. Ct. 1215, 143 L. Ed. 2d 311 (1999) (holding that "under the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt"); *United States v. Pupo*, 841 F.2d 1235, 1239 (4th Cir. 1988) (en banc) ("It is well established that an indictment is defective if it fails to allege elements of scienter that are expressly contained in the statute that describes the offense.").

For every single criminal complaint charging a Section 231(a)(3) offense on the DOJ's January 6 website states that the "federally protected function" was this: *the joint session of Congress*. Capitol Breach Cases, DOJ, available at: https://www.justice.gov/usao-dc/capitol-breach-cases. *Hubbard, Oakar,* and *Dean* show that Congress is not a "department" or "agency" "of the United States."

Because Congress was not an executive department or agency, the Government has not alleged, and did not present to the grand jury, a "federally protected function" that was "adversely affected" by the "civil disorder." Accordingly, Count One must be dismissed for failure to state an offense and for a grand jury error.

### B. Section 231(a)(3) exceeds Congress's Commerce Clause authority

Whether or not the Government now attempts to rely on interstate commerce, the Section 231(a)(3) offense must also be dismissed because Congress lacked the constitutional power to legislate. The Commerce Clause prohibits the criminalization of noneconomic intrastate activity unless "the regulated activity 'substantially affects' interstate commerce." *United States v. Lopez*, 514 U.S. 549, 559 (1995). Under that test, the Supreme Court has invalidated federal criminal laws prohibiting gun possession in a school zone and domestic violence in the Violence Against Women Act. *Lopez*, 514 U.S. at 552-64; *United States v. Morrison*, 529 U.S. 598, 607–19 (2000). Following *Lopez* and *Morrison*, Section 231(a)(3) constitutes an unconstitutional exercise of Congress's power, intruding into the State's constitutionally protected police power because it regulates strictly local conduct and demonstrates no substantial connection to interstate commerce.

1. **The police power and the Commerce Clause's prohibition on Congress's regulation of intrastate activity that does not "substantially affect" interstate commerce**

"Under our federal system, the States possess primary authority for defining and enforcing the criminal law." *Lopez*, 514 U.S. at 561 n. 3 (internal quotation marks omitted). Accordingly, the Supreme Court in *Lopez* concluded that, in the criminal context, Congress's "power . . . [t]o regulate Commerce with foreign Nations, and among the several States[,]" under Article I, § 8, cl.3, is inherently limited by the Tenth Amendment's reservation of police power to the States. *Id.* The limited federal commerce power permits Congress to regulate only three categories of activity: (1) "the use of the channels of interstate commerce;" (2) "the instrumentalities of interstate commerce, or persons or things in interstate commerce;" and (3) "those activities that *substantially* affect interstate commerce." *Id.* (emphasis added).

The Supreme Court developed the third *Lopez* category in order to define "the outer limits" on Congress's authority to enact legislation "regulating intrastate economic activity" that "substantially affect[s] interstate commerce." *Lopez*, 514 U.S. at 559; *see also United States v. Robertson*, 514 U.S. 669, 671 (1995) ("The 'affecting commerce' test was developed in our jurisprudence to define the extent of Congress' power over purely *intra*state commercial activities that nonetheless have substantial *inter*state effects") (emphasis in original). The regulated activity must "substantially affect" interstate commerce because "[t]he regulation and punishment of intrastate violence that is not directed at the instrumentalities, channels, or goods involved in interstate commerce has always been the province of the States." *Morrison*, 529 U.S. at 618.

In *Morrison*, the Supreme Court established a "controlling four-factor test for determining whether a regulated activity 'substantially affects' interstate commerce." *United States v. Adams*, 343 F.3d 1024, 1028 (9th Cir. 2003) (quoting *United States v. McCoy*, 323 F.3d 1114, 1119 (9th Cir. 2003)). Those factors are:

> (1) whether the regulated activity is commercial/economic in nature; (2) whether an express jurisdictional element is provided in the statute to limit its reach; (3) whether Congress made express findings about the effects of the proscribed activity on interstate commerce; and (4) whether the link between the prohibited activity and the effect on interstate commerce is attenuated.

*Adams*, 343 F.3d at 1028 (citing *Morrison*, 529 U.S. at 610-612). "The 'most important' factors for a court to consider are the first and the fourth." *Id.*

### 2. Section 231(a)(3) does not substantially affect interstate commerce

Section 231(a)(3) criminalizes "any act" that obstructs, impedes, or interferes with a local police officer performing lawful duties "incident to and during the commission of a civil disorder which *in any way or degree* obstructs, delays, or adversely affects commerce of the movement of any article or commodity in commerce. . ." (emphasis added). Since Section 231(a)(3) is not directed at the channels or instrumentalities of commerce, only the third *Lopez* factor is at issue. However, under the four controlling factors described in *Adams* and *Morrison*, Section 231(a)(3) does not regulate activity that substantially affects interstate commerce. Accordingly, the statute is unconstitutional.

### i.   Section 231(a)(3) does not regulate economic activity

As in *Lopez* and *Morrison*, the act of interfering with the duties of a law enforcement officer in a civil disorder is not economic in nature. It therefore fails the first *Morrison* factor.

In *Lopez*, the Court found the activity of gun possession under the Gun-Free School Zones Act has "nothing to do with 'commerce' or any sort of economic enterprise, however broadly one might define those terms." *Lopez*, 514 U.S. at 567. Further, the Gun-Free School Zones Act was "not an essential part of a larger regulation of economic activity, in which the regulatory scheme could be undercut unless the intrastate activity were regulated." *Id.* Similarly, in *Morrison*, the Supreme Court concluded that the civil remedy for gender-motivated violence under Violence Against Women Act was a regulation of noneconomic activity that exceeded Congress's commerce authority. *Morrison*, 529 U.S. at 617. Even though the VAWA was enacted with the support of significant congressional findings regarding the "nationwide, aggregated impact" of gender-motivated violence on interstate commerce, the Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." *Id.* at 617. The "noneconomic, criminal nature of the conduct at issue was central" to the *Lopez* and *Morrison* rulings. *Id.* at 610.

In contrast to *Lopez* and *Morrison*, in *Gonzales v. Raich*, the Supreme Court upheld a federal law prohibiting the intrastate cultivation of marijuana for personal use because the law formed an "essential part" of the Controlled Substances Act (CSA), which encompassed "a larger regulation of economic activity." 545 U.S. 1, 24-

25 (2005) (quoting *Lopez*, 514 U.S. at 561). The majority observed that the "primary purpose" of the CSA is "to control the supply and demand of controlled substances in both lawful and unlawful drug markets." *Raich*, 545 U.S. at 19. Understood within that larger framework, the challenged provision was a regulation on "economic activity" because "failure to regulate the intrastate manufacture and possession of marijuana would leave a gaping hole in the CSA." *Id.* at 22.

As with the statutes under consideration in *Lopez* and *Morrison*, the activity regulated by Section 231(a)(3) is noneconomic for purposes of the first *Morrison* factor. The gravamen of Section 231(a)(3) criminalizes obstruction, interference, and impeding state officers, with no direct connection to commerce or economic activity. And, unlike in *Raich*, Section 231(a)(3) is not part of any larger body of economic regulation; it involves "a brief, single-subject statute[,]" which "by its terms has nothing to do with commerce or any sort of economic enterprise, however broadly one might define those terms." *Raich*, 545 U.S. at 23-24 (distinguishing *Lopez*, 514 U.S. at 561) (internal quotation marks omitted); *accord Morrison*, 529 U.S. at 613 ("Gender-motivated crimes of violence are not, in any sense of the phrase, economic activity").

### ii. The jurisdictional element of Section 231(a)(3) does not limit its reach to activities that substantially affect interstate commerce

Although Section 231(a)(3) contains a commercial nexus element, the element is faulty because it does not limit the reach of the statute to activities that "substantially affect" interstate commerce. There are several problems under the second *Morrison* factor on limitations to the statute's reach.

First, the commercial nexus element is not connected to the "any act" element. Section 231(a)(3) makes it a crime to:

> commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder *which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce.*

(Emphasis added). The commercial nexus clause unambiguously modifies the term "civil disorder," not "any act." Thus, a charge under Section 231(a)(3) need not be supported by evidence that a defendant's *act* impacted interstate commerce. Instead, it requires evidence only that the act interfered with an officer engaged in the performance of duties "incident to and during the commission of a civil disorder," and that the civil disorder, not the individual's act, minimally affected commerce.

The statutory "incident to and during" connector further diminishes any required link to interstate commerce. Although the statute does not make clear whether the connector applies to the act itself or to the lawful performance of official duties, either construction places the interstate commerce element another step removed from the regulated activity. The term "incident" as an adjective connotes a degree of separation, in that one occurrence of lesser importance is "[d]ependent on, subordinate to, arising out of, or otherwise connected with (something else, usu. of greater importance)." INCIDENT, BLACK'S LAW DICTIONARY (11th ed. 2019). Activity with only an incidental connection to an event that affects commerce is not a permissible subject of federal criminal law.

Finally, the commercial nexus element of Section 231(a)(3) does not require a *substantial* effect on interstate commerce, but instead requires a civil disorder that affects commerce "in any way or degree." The terms are virtual opposites. Substantial means "[c]onsiderable in extent, amount, or value," whereas the word "any" is expansive and unqualified. *Compare* SUBSTANTIAL, BLACK'S LAW DICTIONARY (11th ed. 2019) *with* ANY, BLACK'S LAW DICTIONARY (11th ed. 2019); *see St. Paul Fire & Marine Ins. Co. v. Barry*, 438 U.S. 531, 550 (1978) (statutory language that covered "'any' act" was "broad and unqualified"). An "any way or degree" impact on commerce is not a "substantial" impact. The second *Morrison* factor, thus, is not satisfied.

### iii. Congress did not find that Section 231(a)(3)'s activities substantially affect interstate commerce

Formal congressional findings are neither required nor sufficient to establish a valid exercise of federal commerce authority. *Lopez*, 514 U.S. at 562-63; *Morrison*, 529 U.S. at 614. Congressional findings may demonstrate that an activity "substantially affects interstate commerce, even though no such substantial effect [is] visible to the naked eye." *Lopez*, 514 U.S. at 563. But "the existence of congressional findings is not sufficient" when Congress merely offers a "but-for causal chain from the initial occurrence of violent crime . . . to every attenuated effect upon interstate commerce." *Morrison*, 529 U.S. at 615. Here, Congress made no findings to establish that the activity regulated by Section 231(a)(3) substantially affects interstate commerce beyond any impact "visible to the naked eye." The only potentially relevant findings relate to the impact of "riots" on interstate commerce. 114 Cong. Rec. 1294–95 (Jan. 29, 1968). Upon first proposing the Civil Obedience Act, Senator Long stated certain

facts, without citation, concerning what he called "wholesale Negro violence," which he said "was an almost nightly affair in the streets of our cities" between 1965 and 1967. 114 Cong. Rec. 1295. For example, he said:

> In [1967], nearly 100 people were killed. Nearly 2,000 were injured. Police reported 4,289 cases of arson alone. Over 16,000 rioters were arrested. The estimated property loss was in the neighborhood of $160 million. The estimated economic loss to riot-torn businesses was $504 million.

*Id.* Senator Long asserted that these "riots" impeded interstate commerce:

> Any riot, as we know and experience them today, generally does impede the flow of goods in interstate commerce. It stops the movement of people in interstate commerce. It interferes with the goods that were intended to move in interstate commerce.

114 Cong. Rec. 5535–36 (Mar. 6, 1968).

But the statutory definition of "civil disorder" involves "acts of violence by assemblages of three or more persons." 18 U.S.C. § 232 has no connection to riots on the scale described by Senator Long. Moreover, Section 231(a)(3) does not target the destructive behavior attendant to a riot; the criminalized conduct is interference with an official's duties "incident to and during" a civil disorder. The congressional record contains no findings that individual interference with police and firefighters as defined under Section 231(a)(3) substantially affects interstate commerce. The third *Morrison* factor, thus, is also not satisfied.

### iv.   The relationship between Section 231(a)(3)'s activities and any effect on interstate commerce is too attenuated

Any causal chain that could link the activity proscribed under Section 231(a)(3) to any substantial impact on interstate commerce is too far attenuated to place the activity within reach of Congress' commerce authority. The offense conduct of Section

231(a)(3) need not affect commerce directly. It suffices to establish that a person's acts interfered with an official's duties performed "incident to and during" any "civil disorder" that, in turn, affects commerce. Such an "incidental effect on interstate commerce . . . does not warrant federal intervention." *Musick v. Burke*, 913 F.2d 1390, 1397 (9th Cir. 1990). The noneconomic conduct penalized by Section 231 by definition is too attenuated to satisfy the "substantially affects" test for commercial impact.

Even if interference with police Section 231(a)(3) could affect commerce in the aggregate, when considered on a nationwide scale, that would be insufficient to place those acts within the federal commerce authority. In *Morrison*, the Supreme Court "reject[ed] the argument that Congress may regulate noneconomic, violent criminal conduct based solely on that conduct's aggregate effect on interstate commerce." 529 U.S. at 617. Here, the paucity of cases prosecuted under Section 231(a)(3) further negates any claim of an aggregate effect.

In sum, the four *Morrison* factors demonstrate that Section 231(a)(3) regulates purely local, noneconomic activities that do not "substantially affect" interstate commerce. As a result, Section 231(a)(3) falls outside of Congress's power to regulate under the Commerce Clause and Count One should be dismissed on that basis.

### 3. The Section 231(a)(3) charge must be dismissed since the statute as applied is overbroad

"In the First Amendment context, . . . a law may be invalidated as overbroad if 'a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 481 (2010). Here, the Court should invalidate Section 231(a)(3) on that basis.

Section 231(a)(3) extends to a substantial amount of constitutionally protected speech and expressive conduct in excess of the law's legitimate sweep. Such broad criminal statutes like Section 231(a)(3) "must be scrutinized with particular care." *City of Houston v. Hill*, 482 U.S. 451, 459 (1987); *see also Winters v. New York*, 333 U.S. 507, 515 (1948) ("The standards of certainty in statutes punishing for offenses is higher than in those depending primarily upon civil sanction for enforcement."). Criminal laws that "make unlawful a substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application." *Id.* Several of the statute's terms are so left so broad and indefinite as to impose unqualified burdens on a range of protected expression.

First, by penalizing "any act," Section 231(a)(3) reaches to the outer limits of verbal and expressive conduct without drawing any distinction that could exclude acts undertaken merely to convey a message or symbolic content. *See Roy v. City of Monroe*, 950 F.3d 245, 252 (5th Cir. 2020) (acknowledging that "[s]tanding alone . . . a prohibition on 'any act [undertaken] in such a manner as to disturb or alarm the public' fails meaningfully to guide the police and thus poses a substantial risk of arbitrary or discriminatory enforcement.").

Second, Section 231(a)(3) imposes a substantial burden on protected expression by requiring that "any act . . . obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties." The term "interfere," which the statute leaves undefined, reaches a broad range of speech and expressive conduct. The law's author acknowledged this when, in a

Senate hearing two days after he introduced the Civil Obedience Act, he criticized the term "interference" as used in the hate crime law by asking whether "almost anything could be regarded as an interference?" 114 Cong. Rec. 1819 (Feb. 1, 1968) (Sen. Long)). In the context of Section 231(a)(3), Senator Long's interpretation of "interference" rings true because "there are numerous examples in which a person's speech could interfere with . . . a police officer in the lawful discharge of the officer's duties." *McCoy v. City of Columbia*, 929 F. Supp. 2d 541, 550 (D.S.C. 2013) (invalidating a state statute for overbreadth that made it "unlawful for any person to interfere with or molest a police officer in the lawful discharge of his duties.").

Indeed, Section 231(a)(3) authorizes a conviction for a bystander who yells at police to desist from an arrest, one who flips off officers to distract or to encourage resistance, or one who records police activity with a cell phone. *See Hill*, 482 U.S. at 459 ("[W]e have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them."); *Glik v. Cunniffe*, 655 F.3d 78, 83 (1st Cir. 2011) ("[T]he First Amendment protects the filming of government officials in public spaces."). The First Amendment does not permit such an unqualified prohibition on "interference" with police duties because "the freedom of individuals verbally to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state" *Hill*, 482 U.S. at 462–63.

Third, the term "civil disorder," as defined under Section 232(1), is extremely far-reaching, applying to "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of . . . injury to the property." Rather than limiting the statute, Section 231(a)(3)'s language reaches "any public disturbance" in the types of traditional public fora where First Amendment protections are at their zenith. *Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir. 2009) ("In traditional public fora . . . First Amendment protections are strongest, and regulation is most suspect.").

Moreover, the "civil disorder" definition sweeps broadly to cover incidents in which three or more persons cause an immediate danger of injury to persons or property. *See* 18 U.S.C. § 232(1). The definition can just as easily be met by a violent mob of thousands as it can by the ejection of several unruly individuals from a bar, concert, or sporting event, or even by three teenagers whose skateboarding damages property. Finally, to be convicted under Section 231(a)(3), a person's interference with police duties must merely occur "incident to and during" the civil disorder, and it need not be shown that the defendant incited the civil disorder or engaged in "acts of violence" that the civil disorder "involves." The term "civil disorder" fails to limit the overbreadth of penalizing "any act" of interference with police duties.

For all those reasons, the Court should invalidate Section 231(a)(3) for overbreadth and dismiss Count One on that basis as well.

### III.   Count Two alleging a violation of Section 1512(c)(2) should be dismissed

As mentioned in his Motion to Dismiss, Mr. Grider resubmits all his prior objections to Count Four of the original Indictment made in his Amended Motion to Dismiss filed under ECF Dkt. 69 and supporting documents. *See* ECF Dkt 70-2 (Defendant's Memorandum of Law in Support of Defendant's Amended Motion to Dismiss Count Four of the Indictment); ECF Dkt. 75 (Defendant's Reply to the Government's Opposition to Defendant's Amended Motion to Dismiss Count Four of the Indictment) and requests that they be applied to Count Two of the Superseding Indictment alleging the same thing.

While this Court considered those arguments and issued a memorandum opinion explaining why it was denying Mr. Grider's previous motion, as this Court is surely aware, Judge Stone has ruled to the contrary on some of the arguments related to the validity of the Section 1512(c)(2) count — arguments almost identical to those initially raised by Mr. Grider — *see United States v. Miller*, No. 1:21-cr-119 (CJN), 2022 WL 823070 (D.D.C. Mar. 7, 2022) and denied the Government's motion for reconsideration of that ruling. *See United States v. Miller*, No. 1:21-CR-00119 (CJN), 2022 WL 1718984, at *1 (D.D.C. May 27, 2022).

Mr. Grider is respectfully requesting this Honorable Court join Judge Stone based on his decision in the *Miller* case and dismiss Count Two of the present indictment. In the alternative, he is requesting this Court to consider the following additional grounds in support of dismissing Count Two.

**A. The Government's interpretation of Section 1512(c)(2), upheld by this Court, is invalid under the First Amendment.**

Mr. Grider's activities on January 6 arguably included political expression, assembly, and petitioning of the government for a redress of grievances. U.S. CONST. amend. I. Insofar as the Section 1512(c)(2) charge characterizes protest per se as obstruction of congressional proceedings, it is an unconstitutional application of the statute as applied to Mr. Grider.

To prevail on an as-applied challenge under the First Amendment, Mr. Grider must merely show that Section 1512(c)(2) is being unconstitutionally applied as to the specific protected activity for which he is charged. *Edwards v. Dist. of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014). The first question is whether Mr. Grider's alleged conduct was "expressive." *Texas v. Johnson*, 491 U.S. 397, 404 (1989). "[T]o bring the First Amendment into play," Mr. Grider must merely show "[a]n intent to convey a particularized message was present" and "the likelihood . . . that the message would be understood by those who viewed it." *Id.* Next, the court assesses whether the challenged statute is related in any way to the suppression of free expression.

Doctrinally, there is a long and unbroken line of cases that stands for the proposition that conduct involving the First Amendment is protected by strict judicial scrutiny. *See e.g., Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015); *R.A.V. v. St. Paul*, 505 U.S. 377, 395 (1992); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 115, 118 (1991). That is, when the First Amendment is implicated, statutes are subject to facial challenges of overbreadth. *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449, n. 6 (2008).

Indeed, the overbreadth doctrine prohibits any ban on unprotected speech that chills or prohibits a substantial amount of protected speech in the process. *See Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 255 (2002); *Bd. of Airport Comm'rs of City of Los Angeles v. Jews for Jesus, Inc.*, 482 U.S. 569 (1987).

The instant matter quintessentially places protected speech at the center of the analysis. Mr. Grider, for example, is not accused of destroying evidence. Rather, the thrust of the allegations against him in respect to violating Section 1512(c)(2) is his *verbal* interactions. That protestors engage in speech — even sharp, challenging speech cannot elevate conduct to a violation of Section 1512(c)(2). Such a threat of prosecution has the effect of chilling constitutionally protected speech, which is the policy justification for prescribing the "strong medicine" declaring a statute unconstitutional under the overbreadth doctrine. *See Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). The point here is that if the Court can imagine clearly constitutionally protected speech subject to the reach of Section 1512(c)(2), then the statute has a substantial likelihood of burdening First Amendment rights.

In the alternative, if the restriction is viewed as content-neutral, this Court must subject the statute to intermediate scrutiny. *Edwards*, 755 F.3d at 1002. Under that standard, the statute is constitutionally applied only if (1) "it is within the constitutional power of the government"; (2) "it furthers an important or substantial governmental interest"; (3) "the governmental interest is unrelated to the suppression of

free expression"; and (4) "the incidental restriction on alleged First Amendment free-doms is no greater than is essential to the furtherance of that interest." *United States v. O'Brien*, 391 U.S. 367, 377 (1968).

Here, theentire thrust of the Section 1512(c)(2) offense is that Mr. Grider and others protested at the Capitol concerning the results of the 2020 presential election. That is the very core of the First Amendment. *See*, *e.g.*, *Johnson*, 491 U.S. at 404 (flag burning expressive); *Tinker v. Des Moines Ind. Comm. School. Dist.*, 393 U.S. 503, 505 (1969) (students wearing black armbands to protest war is expressive); *Brown v. Louisiana*, 383 U.S. 131, 141–142 (1966) (sit-in to protest segregation expressive); *United States v. Grace*, 461 U.S. 171 (1983) (picketing is expressive); *Snyder v. Phelps*, 562 U.S. 443, 444 (2011) ("A statement's arguably inappropriate or controversial character . . . is irrelevant to the question [of] whether it deals with a matter of public concern.").

Similarly, there is no argument that Section 1512(c)(2)'s application here is unrelated to the suppression of expression, assembly and the petitioning of the gov-ernment for a redress of grievances. Again, the thrust of the obstruction claim is that Mr. Grider and the other defendants intended to affect the actions of Congress: oth-erwise known as political demonstration and protest. Critically, the government's ob-struction claim is not *limited* to any alleged intent to *enter* the Capitol and to affect congressional action *by force or threats*. The Superseding Indictment does not charge that offense and its obstruction theory encompasses the very act of protesting to affect

congressional action itself. Accordingly, Section 1512(c)(2) is here "related to the sup-
pression of free expression." *See*, *e.g.*, *United States v. Caputo*, 201 F. Supp. 3d 65, 71
(D.D.C. 2016) (restricted area statute "related to the suppression of free expression"
where charged defendant jumped White House fence to protest executive action).

Accordingly, under an intermediate scrutiny test, if this Court should decide
to apply that test, this Court should apply the *O'Brien* factors to determine the con-
stitutionality of Section 1512(c)(2)'s application here. The following two factors show
that the statute's application here is patently unconstitutional: (1) the government's
interest *is* related to the suppression of free expression; and (2) the incidental re-
striction on First Amendment freedoms *is* greater than is essential to the furtherance
of that interest. *O'Brien*, 391 U.S. at 377. As explained, that the Government's Section
1512(c)(2) theory in this case is not limited to an attempt to influence Congress by
threats or force can only mean that it covers acts that influence Congress through
protest and demonstration. Moreover, nothing in the Superseding Indictment limits
Mr. Grider's "obstruction" to the act of entry into the Capitol Building.[3] If his "ob-
struction" encompasses protest outside the Capitol Building, the government is crim-
inalizing not just his expression, but the expression of every group that politically
demonstrates outside that building with a view to affecting, or "obstructing," legisla-
tion. Second, that restriction is far greater than is "essential" to the furtherance of
the Government's legitimate interest in preventing obstruction of official proceedings

---

[3] In fact, in the January 6 cases, the Government has charged many with felony "obstruction of Con-
gress" who did not enter the Capitol.

of Congress. For the Government could adequately protect that interest merely by preventing obstruction of Congress "by threats or force" — *i.e.*, using the proper statute for the crime it is failing to allege, 18 U.S.C. § 1505 — or at the very least by preventing obstruction of Congress through unlawful entry into the building. *See Hill*, 482 U.S. at 459 ("[W]e have repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them."). Accordingly, Count Two's overbroad charge against Mr. Grider under Section 1512(c)(2) unconstitutionally infringes on his First Amendment rights and should be dismissed on that basis.

### B. The novel construction principle of the Due Process Clause requires rejection of the government's interpretation, which would operate as an *ex post facto* law

Because no court prior to January 6, 2021 has construed Section 1512(c)(2) as the Government does in this case, to apply that novel construction against Mr. Grider in this matter would violate the novel construction principle of the Due Process Clause of the Fifth Amendment.

The Supreme Court has held that the novel construction principle is similar to an *ex post facto* law which has been described as one "that makes an action done before the passing of the law, and which was innocent when done, criminal; and punishes such action." *Bouie v. City of Columbia*, 378 U.S. 347, 353 (1964). "[A]n unforeseen judicial enlargement of a criminal statute, applied retroactively, operates precisely as an *ex post facto* law, such as Art. I, § 10, of the Constitution forbids." *Id*. If a "legislature is barred by the *Ex Post Facto* Clause from passing such a law, it must

follow that a [court] is barred by the Due Process Clause from achieving precisely the same result by judicial construction." *Id.*

*Bouie* also concerned a trespass prosecution that gave indications of being politically motivated. The 1964 case involved a combination drugstore and restaurant in South Carolina. *Id.*at 348. The establishment would not serve black Americans. *Id.* Two black college students took seats in the restaurant. *Id.* After they entered, an employee hung up a "no trespass" sign. *Id.* The store manager called the police, who asked the students to leave. *Id.* When they refused, they were arrested and charged with trespass. *Id.* The students were tried and convicted, with the State Supreme Court upholding the trespass convictions. *Id.* The Supreme Court vacated the convictions based on the novel construction principle of the Due Process Clause. *Id.* at 353. It reasoned that the South Carolina Supreme Court's construction of the trespass statute was effectively an *ex post facto* law. *Id.* at 362. By its terms, the state statute merely prohibited "*entry* upon the lands of another . . .*after* notice from the owner . . prohibiting such entry. . ." *Id.* at 355 (emphasis added). However, there "was nothing in the statute to indicate that it also prohibited the different act of *remaining* on the premises *after* being asked to leave. Petitioners did not violate the statute as it was written; they received no notice before entering either the drugstore or the restaurant department." *Id.* (emphasis added). Finally, "the interpretation given the statute by the South Carolina Supreme Court . . . ha[d] not the slightest support in prior South Carolina decisions." *Id.* at 356.

So too here, Mr. Grider did not "violate the statute as it was written." *Id.* at 355. Section 1512 prohibits obstruction of "official proceedings" which all courts have construed to mean proceedings before a tribunal that mimic a court of law — and none, prior to January 6, of which interpreted it to apply to the unique constitutional function of certifying the electoral college vote. There is "nothing in the statute to indicate that it also prohibited the different act," of interfering with proceedings that do not hear evidence or find facts. *Id.* at 355. "The interpretation given the statute by the [government] . . . has not the slightest support in prior [Section 1512] decisions." *Id.* Accordingly, the novel construction principle requires rejection of the government's interpretation, which would operate as an *ex post facto* law in violation of the Due Process Clause of the Fifth Amendment.

## IV.   The Section 1752 counts should be dismissed

### A.   Counts Four, Five and Six fail to state an offense because only the United States Secret Service restricts areas under Section 1752

Counts Four, Five, and Six allege that Mr. Grider violated Section 1752 by entering the Capitol Building, which the Superseding Indictment characterizes as "restricted building and grounds," as that phrase is defined in Section 1752. However, it does not allege that the United States Secret Service (hereafter USSS) restricted that area under the statute.[4] The Government's position that any government entity may set a restricted area under Section 1752 finds no support in the statutory text, the case law, or the legislative history.

---

[4] The government has conceded in other January 6 cases that the USSS did not set any restricted area on that day.

As it relates here, Section 1752 states

(a) Whoever—

    (1) knowingly enters or remains in any restricted building or grounds without lawful authority to do so;

    (2) knowingly, and with intent to impede or disrupt the orderly conduct of Government business or official functions, engages in disorderly or disruptive conduct in, or within such proximity to, any restricted building or grounds when, or so that, such conduct, in fact, impedes or disrupts the orderly conduct of Government business or official functions; or

        ***

    (4) knowingly engages in any act of physical violence against any person or property in any restricted building or grounds;

or attempts or conspires to do so, shall be punished as provided in subsection (b).

18 U.S.C. § 1752. The statute continues by giving relevant definitions:

(c) In this section—

    (1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area—

        (A) of the White House or its grounds, or the Vice President's official residence or its grounds;

        (B) of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

        (C) of a building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

    (2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

*Id.*

Penal statutes are to be strictly construed. *See United States v. Moore*, 613 F.2d 1029 (D.C. Cir. 1979). The plain meaning of Section 1752 unequivocally indicates that the USSS alone sets restricted areas. As shown above, all three definitions of "restricted building or grounds" in Section 1752(c)(1) concern the authority and actions of the USSS and not any other federal agency. Section 3056, concerning the "powers, authorities, and duties of United States Secret Service," confirms that Section 1752 is a statute directed to the USSS and not any other federal agency. *See* 18 U.S.C. § 3056(d).

Section 1752 defines "restricted building or grounds" to mean "any posted, cordoned off, or otherwise restricted area" in any of three scenarios set forth in the statute. 18 U.S.C. § 1752(c)(1). If an area is to be "restricted," some person or government entity must do the restricting. Areas do not restrict themselves. That statutory phrase's neighboring provisions, and common sense, reveal exactly which entity does the restricting. First, the restricting entity must be a government agency. If a Section 1752 restricted area could be set by any person, it would be illegal to enter an area "cordoned off" around the White House by a homeless person using tinfoil traffic cones. Second, that government agency is the USSS because each of the three types of "restricted area" are patrolled and managed by that specific agency and no other.

That is why what little Section 1752 precedent there is prior to January 6 supports Mr. Grider, while none supports the Government's interpretation. To be clear: before January 6, the government never prosecuted a Section 1752 case where the

"restricted area" was set by any entity other than the USSS. *See United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005). In *Bursey*, the defendant there entered an area restricted by the USSS in advance of a political rally in South Carolina held by the President. *Id.* at 304. Reviewing the trial record, the Fourth Circuit observed that "the Secret Service designated an area near [the rally] as a restricted area." *Id.* It also noted that the "authorized persons" admitted into the area all "wore lapel pins issued by the Secret Service," meaning that the USSS was the entity that granted "lawful access" to the area. *Id.* Intending to protest the Iraq war, Bursey approached the restricted area with a megaphone. *Id.* A Secret Service Agent advised him he could not remain in that area. He was repeatedly advised thereafter of the same by multiple law enforcement agents over a twenty to twenty-five minute period. *Id.* Bursey was ultimately charged and convicted under Section 1752(a)(1).

One sufficiency argument Bursey raised on appeal was that, as a matter of *mens rea*, "he was never advised that the area was a federally restricted zone, *so designated by the Secret Service.*" 416 F.3d at 308 (emphasis added). The Fourth Circuit rejected this argument. But not on the ground that Section 1752 restricted areas need not be so restricted by the USSS. Instead, trial evidence showed that Bursey "understood the restriction to have been created by the Secret Service (as opposed to state or local law enforcement)." *Id.* Added the Fourth Circuit,

> [T]here was ample evidence that Bursey understood the area to have been restricted by the Secret Service, *and thus a federally restricted zone*. Specifically, Bursey testified that he believed that "at that event, October, when the President came to town, that the circumstances would be similar to his prior visits, where ... the Secret Service comes in and preempts" local and state police. . . Bursey also acknowledged that,

29

in protesting at two earlier visits to South Carolina by the incumbent President, he was advised in both instances that "the Secret Service had basically preempted the security arrangements" of local police.

*Bursey*, 416 F.3d at 309 (emphasis added).

The import of the Fourth Circuit's logic is clear. Had the Fourth Circuit even contemplated the idea that entities other than the USSS could restrict areas under Section 1752, the above reasoning would lack sense.

The government's anyone-may-restrict interpretation yields absurd results. *See United States v. Am. Trucking Ass'ns, Inc.*, 310 U.S. 534, 543 (1940) ("When [one possible statutory] meaning has led to absurd or futile results . . . this Court has looked beyond the words to the purpose of the act."); *see also Corley v. United States*, 556 U.S. 303, 317 (2009) (interpreting criminal procedure statute to avoid "absurdities of literalism"); *Ctr. for Biological Diversity v. E.P.A.*, 722 F.3d 401, 411 (D.C. Cir. 2013) (recognizing "'the long-standing rule that a statute should not be construed to produce an absurd result'" (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1068 (D.C. Cir. 1998)). Consider a Secret Service protectee who is "temporarily visiting" a place. *See* 18 U.S.C. § 1752(c)(1)(B). The Secret Service sets a "restricted area" of one block around the protectee's presence. Under the Government's construction, any local police unit could decide to extend the "restricted area" to 20 blocks, without authorization from the Secret Service, the agency charged with protecting the person for whose sake the area is restricted in the first place. If any person were to enter the expanded area without "lawful authority" (from the local police? The Secret Service?) the same government that deemed the area limited to one block could also prosecute

a person for entering block 20. The statute has simply never worked that way, as the Secret Service would readily attest.

At the very least, the Government's interpretation is not unambiguously correct on the face of the statute. In that case, the Court would look to legislative history. *See*, *e.g.*, *BedRock Ltd., LLC v. United States*, 541 U.S. 176 (2004) ("Because we have held that the text of the statutory reservation clearly excludes sand and gravel, we have no occasion to resort to legislative history."). That history could hardly be clearer: the entire purpose of Section 1752 was to vest a specific federal agency with area-restricting authority which no agency then possessed, namely, the USSS. That way, the USSS would not need to "rely upon a patchwork of State laws and local ordinances and local officers" to restrict areas. *See* 116 Cong. Rec. 35,651 (1970) (statement of Sen. McClellan) (emphasis added); 116 Cong. Rec. 35,653 (1970) (statement of Sen. Hruska) (USSS does not "presently possess adequate Federal authority" to restrict areas). A Senate Judicial Committee report explicitly states that the purpose of Section 1752 was to vest the Secret Service specifically with the power to set federal restricted areas. S. Rep. No. 91-1252 (1970), at 7 ("[a]lthough the Secret Service [was] charged with protecting the person of the President . . . there [was], at the present time, no Federal statute which specifically authorize[d] *them to restrict entry to areas* where the President maintains temporary residences or offices.") (emphasis added).

This is not just Mr. Grider's view. It is (or was) also the view of the Office of Legal Counsel of the Department of Justice. *See Citizens for Responsibility & Ethics*

*in Wash. v. United* States, 922 F.3d 480, 483 (D.C. Cir. 2019) ("The authority of the OLC is nearly as old as the Republic itself."). In May 1995, the Secretary of the Treasury requested a legal opinion from the OLC on whether the Secretary had authority to restrict traffic on a segment of Pennsylvania Avenue in order to protect the President. *Authority of the Secretary of the Treasury to Order the Closing of Certain Streets Located Along the Perimeter of the White House*, 19 Op. Off. Legal Counsel 109 (1995). In crafting this opinion, OLC painstakingly examined the text of Section 1752 and its legislative history. *Id.* at 109–122. OLC determined that Section 1752 did, in fact, specify which government entity restricts areas under that statute. It is the Secret Service *via* the Treasury Department:

> Section 1752 plainly grants *the [Treasury] Secretary* authority to limit ingress and egress to an area where the President will be visiting *to create a security perimeter*, even when creating such a perimeter will require the closing of a public street to vehicular traffic.

Op. Off. Legal Counsel, p. 113 (emphasis added).

Counts Four, Five, and Six, accordingly, should be dismissed because the Government does not allege in the Superseding Indictment that the "restricted area" Mr. Grider entered was set by the USSS (nor can they).

### B. If the government's interpretation of § 1752 is applied, it is unconstitutionally vague as to Mr. Grider

If this Court concludes that the Superseding Indictment properly charges Mr. Grider with violating Section 1752 by crossing a boundary set by an agency other than the USSS, then the statute is unconstitutionally vague as applied to him.

Under the Government's interpretation of Section 1752, there is *no* notice, much less "fair notice," of the conduct proscribed *in this case*. As shown above, the

text, legislative history, and common sense all point to the ordinary person's reasonable conclusion that the government agency that may restrict a person from entering an area in which there is a Secret Service protectee is . . . the Secret Service. Assuming the truth of the Government's allegations in this case, Mr. Grider saw police lined up outside the U.S. Capitol, whether they were U.S. Capitol Police or Metro Police. But if the text, legislative history and common sense inform an "ordinary person" that he violates Section 1752 by entering an area the *Secret Service* has restricted — as in *Bursey*, one of the handful of cases interpreting the statute — there is no similar notice in the statute that being on the wrong side of a police barricade is, independent of the Secret Service, in violation of that statute. None of the counts at issue in the Superseding Indictment allege postings on January 6 warning Mr. Grider and others that the Secret Service designated the area he entered as restricted. They do not allege any law enforcement officers notified Mr. Grider of that fact. Nothing in Section 1752 so much as hints at the possibility that disobeying local law enforcement per se may result in liability under that federal statute, provided some USSS protectee lurks somewhere within the "restricted area."

The concern about vagueness-enabled arbitrary enforcement is manifested here. At a general level, the government's enforcement of Section 1752 against Mr. Grider is arbitrary because, prior to January 6, it had never prosecuted a violation of that statute with the allegation that the accused entered an area restricted by some government agency other than the USSS. Accordingly, the Government's election to

put a new interpretation on the statute for a select group of related cases raises questions about discriminatory law enforcement. *See Kolender v. Lawson*, 461 U.S. 352, 357–58 (1983)) ("a penal statute must define the criminal offense with sufficient definiteness that ordinary people can understand what conduct it prohibits, and do so in a manner that does not invite arbitrary and discriminatory enforcement by which 'policemen, prosecutors, and juries … pursue their personal predilections.'"). Those questions are only highlighted by the patently political nature of the circumstances of the offense, as well as the criminalization of Mr. Grider's First Amendment rights to political speech, assembly, and to petition the government for a redress of grievances. U.S. CONST. amend I; *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 500 (1982) (stricter scrutiny of vague statutes in the context of activities protected by the First Amendment).

Perhaps more serious is the specific arbitrariness here. Hundreds or perhaps thousands of other protesters "entered" the same "restricted area" as Mr. Grider on January 6. Yet it is undisputed that many of those people have not been charged under Section 1752 like him. Mr. Grider was singled out for reasons that do not concern the animating purpose of the Secret Service statute. Insofar as they both allege that Mr. Grider entered and remained in a "restricted area" set by an agency nowhere identified in the statute, Counts Four, Five, and Six are unconstitutionally vague.

## C. The rule of lenity dictates that ambiguities in Section 1752 be resolved in Mr. Grider's favor

Here, even if the Court decides that the Government's interpretation of Section 1752 is somehow formally correct — i.e., that any entity may set restricted areas

under Section 1752(c) — it is plainly not unambiguously so. That is shown by the lack of any references in Section 1752 to agencies other than the USSS; the statute's legislative history, which similarly focuses exclusively on the USSS; the clear role that the USSS plays in all three definitions of "restricted buildings or grounds" in Section 1752(c); the indication in Section 3056 that the USSS enforces restricted areas in Section 1752; the lack of any case law supporting the government's position; and the common sense notion that if the USSS patrols and guards the restricted areas in Section 1752, it also sets them.

"The Supreme Court's message is unmistakable: Courts should not assign federal criminal statutes a 'breathtaking' scope when a narrower reading is reasonable." *United States v. Dubin*, 27 F.4th 1021, 1041 (5th Cir. 2022) (Costa, J., dissenting) (quoting *Van Buren v. United States*, ___ U.S. ___, 141 S. Ct. 1648, 1661, (2021)). Year after year, the Court continually reminds us of this principle. *See Van Buren*, 141 S. Ct. at 1661 (holding that the Computer Fraud and Abuse Act should not be read in a way that "would attach criminal penalties to a breathtaking amount of commonplace ... activity"); *Kelly v. United States*, ___ U.S. ___ , 140 S. Ct. 1565, 1568 (2020) (refusing to expand federal fraud statutes to "criminalize all [ ] conduct" that involves "deception, corruption, [or] abuse of power"); *Marinello v. United States*,___ U.S. ___, 138 S. Ct. 1101, 1107, 1110 (2018) (rejecting expansive reading of tax obstruction law that would "transform every violation of the Tax Code into [a felony] obstruction charge"); *McDonnell v. United States*, 579 U.S. 550 (2016) (rejecting "expansive interpretation" of bribery law and refusing to construe it "on the assumption that the Government

will 'use it responsibly'"); *Yates v. United States*, 574 U.S. 528, 540 (2015) (plurality opinion) (rejecting an "across-the-board ban on the destruction of physical evidence of every kind"); *Bond v. United States*, 572 U.S. 844, 863 (2014) (rejecting government's interpretation of chemical weapons ban when it would transform statute "into a massive federal anti-poisoning regime that reaches the simplest of assaults"); *see also Skilling v. United States*, 561 U.S. 358, 410–11 (2010) (adopting a "reasonable limiting construction" of honest-services wire fraud statute and "resist[ing] the Government's less constrained construction absent Congress' clear instruction otherwise"); *Arthur Andersen LLP v. United States*, 544 U.S. 696, 703 (2005) (exercising "restraint" in interpreting obstruction statute to avoid criminalizing "innocuous" acts of persuasion).

It cannot be overlooked that the Government here is once again attempting to expand the reach of a statute — this time, 18 U.S.C. § 1752 — and apply it in an unprecedented manner using a never-before-used interpretation of the statute. In doing so, they ignore the rule that "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Yates*, 574 U.S. at 547–48 (quoting *Cleveland v. United States*, 531 U.S. 12, 25 (2000), in turn quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)).

Because the Government's interpretation of Section 1752 is not unambiguously correct, the Court is required to resolve any ambiguities in Mr. Grider's favor by dismissing Counts Four, Five, and Six.

**D. The novel construction principle dictates against the government's interpretation, which would operate as an *ex post facto* law**

Because no court before January 6 ever construed Section 1752 to mean that agencies other than the USSS may set restricted areas under the statute, such a construction would be retroactively applied to Mr. Grider and would constitute an *ex post facto* law in violation of the Due Process Clause of the Fifth Amendment. *See Bouie*, 378 U.S. at 353.

Mr. Grider did not "violate the statute as it was written." *Id.* at 355. Section 1752 prohibits entry into an area restricted by the USSS. There is "nothing in the statute to indicate that it also prohibited the different act" of entering into an area restricted by the U.S. Capitol Police. *Id.* at 355. The interpretation given the statute by the [Government] . . . has not the slightest support in prior [Section 1752] decisions." *Id.* Accordingly, the novel construction principle dictates against the government's interpretation, which would operate as an *ex post facto* law in violation of the Due Process Clause of the Fifth Amendment.

WHEREFORE, PREMISES CONSIDERED, Mr. Grider respectfully requests this Honorable Court dismisses Counts One, Two, Four, Five and Six of the Superseding Indictment against him.

Date: <u>June 22, 2022</u>                    Respectfully Submitted,

                                        **MAYR LAW, P.C.**

                                        by: <u>/s/ T. Brent Mayr</u>
                                        T. BRENT MAYR
                                        Texas State Bar Number 24037052
                                        D.C.D.C. Bar ID TX0206
                                        bmayr@mayr-law.com

5300 Memorial Dr., Suite 750
Houston, TX 77007
Telephone:  713-808-9613
Fax:  713-808-9991

ATTORNEY FOR THE DEFENDANT,
CHRISTOPHER RAY GRIDER

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of this memorandum was sent to Counsel

for the Government, Cindy Cho, on June 22, 2022, via CM/ECF and email.

/s/ T. Brent Mayr
T. BRENT MAYR