## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 1:21-cr-00022-CKK** |
| | : | |
| **v.** | : | |
| | : | |
| **CHRISTOPHER RAY GRIDER,** | : | |
| Defendant | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNTS ONE, TWO, FOUR, FIVE AND SIX OF THE SUPERSEDING INDICTMENT

### Introduction

The United States, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to defendant Christopher Grider's Motion to Dismiss Counts One, Two, Four, Five and Six of the Superseding Indictment, ECF 101, (hereinafter, "Def. Mot" or "Grider's present motion"). Those counts charge Grider's alleged violations of 18 U.S.C. §§ 231(a)(3), 1512(c)(2) and 2, and 1752(a)(1), (a)(2) and (a)(4), respectively.

Grider's present motion plows no new ground in the face of the steep wall of failed legal challenges brought by other January 6 defendants against the charges lodged against them under those statutes. As Judge Berman Jackson recently noted with words that apply equally here, "[t]his case is one of many arising out of the events at the United States Capitol on January 6, 2021, and all of the legal challenges [defendant] raises in her motions have been considered and rejected by other courts in this district." *United States v. Williams*, No. CR 21-0618 (ABJ), 2022 WL 2237301, at *1 (D.D.C. June 22, 2022).[1]

---

[1] Citing *United States v. Griffin*, 549 F. Supp. 3d 49, 52–58 (D.D.C. 2021) (18 U.S.C. §§ 1752(a)(1)); *United States v. Sandlin*, 21-cr-88 (DLF), 2021 WL 5865006, at *3–5, *10–13 (D.D.C. Dec. 10, 2021) (challenging charges under 18 U.S.C. § 1512(c)(2)); *United States v. Caldwell*, 21-cr-28 (APM), 2021 WL 6062718, at *4–11 (D.D.C. Dec. 20, 2021) (18 U.S.C.

Grider wastes no time showing he has nothing new to offer that should cause this Court to depart from the vast weight of decisions in this district that have rejected claims like his. Right out of the gate, he claims other January 6 rioters who engaged in similar conduct as he did were not charged with the same crimes. Def. Mot. at 1-3. Citing no law, he states, "This Court cannot ignore the disparity." *Id.* at 3. To the contrary, this Court should "decline[] [Grider's] invitation to compare the charges that the government has brought in each of the January 6 cases. Judicial authority is at its most limited when reviewing the Executive's exercise of discretion over charging determinations." *United States v. McHugh*, 21-cr-453 (JDB), 2022 WL 296304, at *12 (D.D.C. Feb. 1, 2022) (cleaned up) (defendant alleged "that the government has been inconsistent in its

---

§ 1512(c)(2)); *United States v. Mostofsky*, 21-cr-138 (JEB), 2021 WL 6049891, at *8–13 (D.D.C. Dec. 21, 2021) (18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1)); *United States v. Montgomery*, 21-cr-46 (RDM), 2021 WL 6134591, at *4–10, *18–23 (D.D.C. Dec. 28, 2021) (18 U.S.C. § 1512(c)(2)); *United States v. Nordean*, 21-cr-175 (TJK), 2021 WL 6134595, at *4–12, *14–19 (D.D.C. Dec. 28, 2021) (18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1)); *Order, United States v. Reffitt*, 21-cr-32 (D.D.C. Dec. 29, 2021) (18 U.S.C. § 1512(c)(2)); *United States v. McHugh*, 21-cr-453 (JDB), 2022 WL 296304, at *3, *22 (D.D.C. Feb. 1, 2022) (18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2)); *United States v. Grider*, 21-cr-22 (CKK), 2022 WL 392307, at *3–8 (D.D.C. Feb. 9, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Bozell*, 21-cr-216 (JDB), 2022 WL 474144, at *1–7 (D.D.C. Feb. 16, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Robertson*, 21-cr-34 (CRC), 2022 WL 969546, at *3–6 (D.D.C. Feb. 25, 2022) (18 U.S.C. § 1512(c)(2)); *United States v. Andries*, 21-cr-93 (RC), 2022 WL 768684, at *3–17 (D.D.C. Mar. 14, 2022) (18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1); 18 U.S.C. § 1752(a)(2)); *United States v. Fischer*, 21-cr-234 (CJN), 2022 WL 782413, at *1–4 (D.D.C. Mar. 15, 2022) (18 U.S.C. § 231(a)(3)); *United States v. Puma*, 21-cr-454 (PLF), 2022 WL 823079, at *4–19 (D.D.C. Mar. 19, 2022) (18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1); 18 U.S.C.   § 1752(a)(2)); *United States v. Sargent*, 21-cr-258 (TFH), 2022 WL 1124817, at *2–6 (D.D.C. Apr. 14, 2022) (18 U.S.C. § 231(a)(3)); *United States v. McHugh*, 21-cr-453 (JDB), 2022 WL 1302880, at *2–12 (D.D.C. May 2, 2022) ("*McHugh II*") (18 U.S.C. § 1512(c)(2)); *United States v. Bingert*, 21-cr-91 (RCL), 2022 WL 1659163, at *3–11, *12–15 (D.D.C. May 25, 2022) (18 U.S.C. § 231(a)(3); 18 U.S.C. § 1512(c)(2); 18 U.S.C. § 1752(a)(1)); *United States v. Fitzsimons*, 21-cr-158 (RC), 2022 WL 1698063, at *3–13 (D.D.C. May 26, 2022) (18 U.S.C. § 1512(c)(2)).

charging decisions by charging some January 6th rioters but not others with obstruction under § 1512(c)(2)") (*citing, e.g., United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) and *Cmty. for Creative Non-Violence v. Pierce*, 786 F.2d 1199, 1201 (D.C. Cir. 1986)). Enforcing criminal laws necessarily "requires the exercise of some degree of police judgment." *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). "It is not unusual for a particular act to violate more than one criminal statute, ... and in such situations the Government may proceed under any statute that applies." *United States v. Aguilar*, 515 U.S. 593, 616 (1995) (Scalia, J., concurring in part and dissenting in part) (cleaned up).

The Executive Branch's exercise of its powers under U.S. Const. Art. II, § 3 to "take Care that the Laws be faithfully executed" means that it's charging decisions are generally not subject to judicial review absent proof that it engaged in invidious discrimination based on "an unjustifiable standard such as race, religion, or other arbitrary classification." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). Grider makes no such allegation here, so his comparison of the charges against him with those against other rioters is an irrelevant distraction. This Court can rest assured that the government has carefully assessed the relevant facts in each of the January 6 cases and made charging decisions without regard to any defendant's membership in a protected class.

Grider also complains that he is being prosecuted under criminal statues "that have never before been used to prosecute similar conduct" as that which he is charged with committing. Def. Mot. at 1. But that's only because, before January 6, 2021, no one in the history of this country attacked the United States Capitol, together with thousands of other like-minded persons, to prevent the peaceful transition of presidential power.

## PROCEDURAL HISTORY AND FACTUAL DEVELOPMENT

The government refers the Court to its Opposition to Grider's Amended Motion to Dismiss Count Four of the [Initial] Indictment, ECF 74, pages 2-10, regarding the procedural history and factual development of this case. Pages 11 and 12 of that document lay out the legal standard for obtaining dismissal of an indictment under Federal Rule of Criminal Procedure 12(b)(3)(B)(v), which applies to Grider's present motion.

## ARGUMENT

**I. BECAUSE COUNT ONE ALLEGES THE JANUARY 6, 2021 RIOT AT THE UNITED STATES CAPITOL ADVERSLEY AFFECTED COMMERCE IN THE DISTRICT OF COLUMBIA, THIS COURT NEED NOT DECIDE WHETHER IT ALSO ADVERSELY AFFECTED A FEDERALLY PROTECTED FUNCTION OR INTERSTATE COMMERCE.**

Grider claims that to convict him of violating 18 U.S.C. § 231(a)(3), "the Government must allege and prove beyond a reasonable doubt that the 'civil disorder' on January 6 had an adverse effect on a 'federally protected function.'" Def. Mot. at 3. He's wrong. Conduct involving a civil disorder that had an adverse effect on a federally protected function is one of two independent ways to violate § 231(a)(3), which makes unlawful

> commit[ing] or attempt[ing] to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects *commerce or the movement of any article or commodity in commerce or the conduct **or** performance of any federally protected function.*

18 U.S.C. § 231(a)(3) (emphasis added).

As such, § 231(a)(3) is "a so-called 'divisible statute' … [that] sets out one or more elements of the offense in the alternative—for example, stating that burglary involves entry into a building or an automobile." *Descamps v. United States*, 570 U.S. 254, 257 (2013). As explained below, even if the Superseding Indictment failed to sufficiently allege that Grider's conduct

4

adversely affected the performance of any federally protected function (as shown below, it did), that would be no basis to dismiss Count One. That's because the Superseding Indictment sufficiently alleged an adverse effect on commerce within the District of Columbia.

### A. COUNT ONE'S ALLEGATION THAT GRIDER INTERFERED WITH POLICE DURING A CIVIL DISTURBANCE THAT AFFECTED COMMERCE IN THE DISTRICT OF COLUMBIA SUFFICIENTLY STATES A VIOLATION OF 18 U.S.C. 231(A)(3).

Grider contends that § 231(a)(3) violates the Commerce Clause of Article I, Section 8, Clause 3. Def. Mot. at 7-15. That claim is both misdirected and meritless because Congress's power under the Commerce Clause is not at issue in this case. In addition to its *limited* power to regulate foreign and interstate commerce under Clause 3, Congress has *plenary* power under Article I, Section 8, Clause 17, to legislate regarding matters affecting the District of Columbia. Congress exercised its Clause 17 power in 18 U.S.C. 231(a)(3), which prohibits, *inter alia*, obstructing police officers performing their official duties during a civil disorder which has "any effect whatsoever" on commerce "within the District of Columbia." *See* 18 U.S.C. § 232(2)(C).

Grider does not address Congress's Clause 17 power, but only its power to regulate interstate commerce under Clause 3. Congress's power under Clause 3, unlike its power under Clause 17, is bounded by the power of every state to regulate wholly intrastate commerce. Congress's Clause 17 power to regulate not only commerce but matters within the government's police powers with respect to the District of Columbia is not constrained by the power of the states. Grider's Commerce Clause challenge to the § 231(a)(3) charge for conduct he committed wholly inside the District of Columbia is therefore wholly beside the point.

Regardless of whether § 231(a)(3) exceeds Congress's power under the Commerce Clause—and it does not, *see* infra at xxx—for cases such as Grider's involving criminal conduct

committed wholly within the District of Columbia, that statute fits comfortably within Congress's power under Clause 17. It states:

> The Congress shall have Power ... To exercise exclusive Legislation in all Cases whatsoever, over such District (not exceeding ten Miles square) as may, by Cession of particular States, and the Acceptance of Congress, become the Seat of the Government of the United States….

U.S. Const. Art. I, § 8, Cl. 17.

Congress's power under Clause 17 "is plenary." *Palmore v. United States*, 411 U.S. 389, 397 (1973). *See also Hyde v. S. Ry. Co.*, 31 App. D.C. 466, 469 (D.C. Cir. 1908) ("The legislative power of Congress over the District of Columbia and the Territories [is] plenary, and [is] not depending upon the interstate-commerce clause"). "Not only may statutes of Congress of otherwise nationwide application be applied to the District of Columbia, but Congress may also exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes." *Palmore*, 411 U.S. at 397. "Congress may legislate within the District for every proper purpose of government," and "[w]ithin the District of Columbia, there is no division of legislative powers such as exists between the federal and state governments." *Neild v. D.C.*, 110 F.2d 246, 249 (D.C. Cir. 1940) (citing *Kendall v. United States ex rel. Stokes*, 37 U.S. 524 (1838); *Atlantic Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427 (1932); and *O'Donoghue v. United States*, 289 U.S. 516 (1933)). "[W]hen it legislates for the District, Congress … exercise[es] complete legislative control as contrasted with the limited power of a state legislature, on the one hand, and as contrasted with the limited sovereignty which Congress exercises within the boundaries of the states, on the other." *Neild*, 110 F.2d at 250-51. "Congress 'may exercise within the District all legislative powers that the legislature of a state might exercise within the State … so long as it does not contravene any provision of the

constitution of the United States.'" *Palmore*, 411 U.S. at 397 (quoting *Capital Traction Co. v. Hof*, 174 U.S. 1, 5 (1899)).

When enacting § 231(a)(3), Congress relied on its Clause 17 power. That statute prohibits "any act" that "obstruct[s], impede[s], or interfere[s] with any … law enforcement officer … engaged in [his] official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce." 18 U.S.C. § 231(a)(3)(emphasis added). "Commerce," as used in § 231(a)(3), "means commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; *or (C) wholly within the District of Columbia*." 18 U.S.C. 18 U.S.C.A. § 232(2) (emphasis added).

> Count One of the Second Superseding Indictment charges that Grider
>
> committed and attempted to commit an act to obstruct, impede, and interfere with a law enforcement officer, lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder *which in any way and degree obstructed, delayed, and adversely affected commerce and the movement of any article and commodity in commerce…*

ECF 97, page 2 (emphasis added). Regardless of whether Congress had authority under the Commerce Clause to regulate such conduct in jurisdictions other than the District of Columbia, it did not and could not exceed its "plenary authority" to exercise "police power" within the District of Columbia. *See generally Darnell v. Markwood*, 220 F.2d 374, 375-77 (D.C. Cir. 1954) (reversing dismissal of complaint under the Sherman Act, 15 U.S.C. §§ 1, 2, and 3, alleging that defendants "restrain[ed] interstate trade and commerce, and trade and commerce in the District" of Columbia; although defendants' activities wholly within the District of Columbia "do not come within the control of the Commerce Clause, or, therefore, within either Sections 1 or 2 of the

Sherman Act," "Section 3 … is not dependent upon the Commerce Clause but rests upon the plenary legislative power of Congress within the District of Columbia").

Because § 231(a)(3) was a valid exercise of Congress's 17 power, it is of no moment that the Commerce Clause does not also provide Congress with a basis to enact that statute. All of Grider's challenges to the commerce element of § 231(a)(3) are beside the point, because all are grounded upon limitations on Congress's power under Clause 3. *See* Def. Mot. at 9 ("Section 231(a)(3) does not substantially affect interstate commerce"); *id*. at 10-11 ("Section 231(a)(3) does not regulate economic activity"); *id*. at 11-13 ("The jurisdictional element of § 231(a)(3) does not limit its reach to activities that substantially affect interstate commerce"); *id*. at 13-14 ("Congress did not find that § 231(a)(3)'s activities substantially affect interstate commerce"); *id*. at 14-15 ("The relationship between § 231(a)(3)'s activities and any effect on interstate commerce is too attenuated").

Even for criminal statues with nation-wide application that do not single out commerce within the District for special protection, as § 232(2)(C) does with respect to § 231(a)(3), Commerce Clause challenges to prosecutions for crimes occurring wholly within the District must fail. *See United States v. Mahdi*, 598 F.3d 883, 896 (D.C. Cir. 2010) (rejecting claim that VICAR, 18 U.S.C. § 1959, "is facially unconstitutional as it violates the Commerce Clause"; "[I]t is impossible to see how a statute regulating conduct within the District of Columbia could exceed congressional authority under the Commerce Clause"). *See id*. ("Even if there were some doubt about § 1959's constitutionality outside the District of Columbia, 'we need not find the language of [§ 1959] constitutional in all its possible applications in order to uphold its facial constitutionality.'") (*quoting Griffin v. Breckenridge*, 403 U.S. 88, 104 (1971)); *accord United*

8

*States v. Carson*, 455 F.3d 336, 368 (D.C. Cir. 2006) ("Within the District, Congress did not need to rely on its Commerce Clause authority.").

This Court should reject Grider's challenge to the commerce predicate in the § 231(a)(3) count, where Congress expressly targeted civil disorders that affected commerce within the District of Columbia.

**B.    COUNT ONE SUFFICIENTLY ALLEGES THAT THE CAPITOL RIOT ADVERSLEY AFFECTED INTERSTATE COMMERCE.**

Although this Court need not reach the Grider's Commerce Clause challenge to 231(a)(3), if it does, it should reject it. Judge Boasberg and district judges in other judicial districts that have addressed similar claims have held that § 231(a)(3) does not exceed Congress's Commerce Clause authority, even when applied to conduct outside the District of Columbia. "[T]he Court concurs with the Government and the other district courts that § 231(a)(3) contains a jurisdictional element that ensures a sufficient connection to interstate commerce in each application." *United States v. Mostofsky*, 21-cr-138 (JEB), 2021 WL 6049891, at *7 (D.D.C. Dec. 21, 2021). "Section 231(a)(3) expressly limits the statute's sweep to instances where there is a civil disorder that affects interstate commerce and a defendant obstructs law-enforcement officials lawfully conducting their duties incident to such disorder." *Id. See also United States v. Phomma*, 2021 WL 4199961, at *2-3 (D. Or. Sept. 15, 2021) (notwithstanding *Lopez* and *Morrison*, "§ 231(a)(3) is within Congress's Commerce Clause authority because the statute includes an express jurisdictional element, requiring that the defendant's obstruction or interference with a law enforcement officer or firefighter must occur 'during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce.'"); *accord, United States v. Howard*, 2021 WL 3856290, at *11 (E.D. Wis. Aug. 30, 2021); *United States v. Wood*, 2021 WL 3048448, at *4–6 (D. Del. July 20, 2021); *United States v. Pugh*, 1:20-cr-00073-TFM-B, ECF95 at 7-11 (S.D. Ala.,

May 13, 2021); *see generally United States v. Huff*, 630 F. App'x 471, 484-85 (6th Cir. 2015) (unpublished) (rejecting Commerce Clause challenge to a charge of transporting a firearm in furtherance of a civil disorder, in violation of 18 U.S.C. § 231(a)(2)).

In mounting his Commerce Clause challenge, Grider principally relies on *United States v. Lopez*, 514 U.S. 549 (1995) and *United States v. Morrison*, 529 U.S. 598 (2000). In both cases, the challenged statutes contained no "jurisdictional element" that required the Government to prove that the offense conduct affected interstate commerce. *Lopez*, 514 U.S. at 561-62 (Gun Free Schools Zone Act "contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce," in contrast to former 18 U.S.C. § 1202(a), "which made it a crime for a felon to 'receiv[e], posses[s], or transpor[t] in commerce or affecting commerce ... any firearm"); *Morrison*, 529 U.S. at 613 (Violence Against Women Act, "[l]ike the Gun-Free School Zones Act at issue in *Lopez*, … contains no jurisdictional element establishing that the federal cause of action is in pursuance of Congress' power to regulate interstate commerce"; "Congress elected to cast § 13981's remedy over a wider, and more purely intrastate, body of violent crime").

Unlike those statutes, § 231(a)(3) has an "explicit jurisdictional element" that requires the Government to prove that the offense conduct interfered with interstate commerce. *Howard*, 2021 WL 3856290, at *11 ("defendant's reliance on *Lopez* and *Morrison* is misplaced. The statutes struck down in those cases did not have jurisdictional requirements. Section 231(a)(1) does."); *Wood*, 2021 WL 3048448, at *4-6 (rejecting defense claim based on *Morrison* and *Lopez* that "§ 231(a)(3) unconstitutionally exceeds Congress's authority and intrudes into the States' primary role in general law enforcement because it broadly applies to purely local conduct and requires only an attenuated connection to interstate commerce"; "courts have held that 'despite *Lopez* and

*Morrison*, the Government need only show a minimal effect on interstate commerce when the statute contains an explicit jurisdictional element'") (quoting *Pugh*, 1:20-cr-00073-TFM-B, ECF 95 at *9 and citing *United States v. Kukafka*, 478 F.3d 531 (3d Cir. 2007) (upholding "Deadbeat Parents Act" where the statute contains an explicit jurisdictional element limiting its reach to only interstate activity).

In *Mostofsky*, Judge Boasberg methodically rejected each of the arguments that Grider now advances in support of his Commerce Clause claim:

- "when a person deliberately commits some act to obstruct, impede or interfere with those officers [who are 'attempting to quell an interference with interstate commerce'], that person is impacting interstate commerce" (cleaned up);

- "'the incident to and during' language in § 231(a)(3) does not suggest that the 'act' or 'lawful performance of [an officer's] official duties' is somehow minimally related to the civil disorder. Rather, the most natural reading of the phrase is to indicate that those activities 'arise[ ] out of' or occur during the civil disorder, not that they are some tangential consequence far downstream from the disorder itself";

- rejecting Mostofsky's claim that "the jurisdictional element is insufficient as it 'does not require a substantial effect on interstate commerce, but instead requires a civil disorder that affects commerce 'in any way or degree'";

- rejecting Mostofsky's claim that "§ 231(a)(3) regulates criminal conduct without a sufficiently close connection with a commercial good or activity."

*Mostofsky*, 2021 WL 6049891, at *5-6.

The other on-point decisions agree. Contrary to Grider's contention that Congress's power under the Commerce Clause does not allow it to regulate non-commercial criminal activity, Def Mot. at 10-11, "under the Commerce Clause, Congress may proscribe violent conduct when such conduct interferes with or otherwise affects commerce over which Congress has jurisdiction." *United States v. Hill*, 927 F.3d 188, 193 (4th Cir. 2019), *cert. denied*, 141 S. Ct. 272 (2020) (federal Hate Crimes Prevention Act of 2009, 18 U.S.C. § 249(a)(2), "may be constitutionally applied to an unarmed assault of a victim engaged in commercial activity at his place of work"). And contrary

to Grider's contention that Congress's power under the Commerce Clause applies only to conduct that has a "substantial effect" on interstate commerce, Def. Mot. at 11-13, "Congress may regulate violent conduct interfering with interstate commerce even when the conduct itself has a 'minimal' effect on such commerce." *Id.* (citing *Taylor v. United States*, 579 U.S. 301, 309 (2016) (upholding Hobbs Act conviction for robbery of a drug dealer; "where the target of a robbery is a drug dealer, proof that the defendant's conduct in and of itself affected or threatened commerce is not needed. All that is needed is proof that the defendant's conduct fell within a category of conduct that, in the aggregate, had the requisite effect.").

For that reason as well, this Court should reject Grider's challenge to the commerce predicate in § 231(a)(3), as charged in Count One of the Second Superseding Indictment.

### C. COUNT ONE SUFFICIENTLY ALLEGES THAT THE CAPITOL RIOT ADVERSELY AFFECTED A FEDERALLY PROTECTED FUNCTION.

Grider contends that Count One fails to sufficiently allege an adverse effect on a federally protected function. Def. Mot. at 3-7. Because Count One can stand on the independent ground that the Capitol riot allegedly affected commerce in the District of Columbia (as well as commerce between the states), this Court need not resolve this claim. *See Mostofsky*, 2021 WL 6049891, at *3 ("Since the Court can resolve the Motion purely on Commerce Clause grounds, it need not decide at this point whether any 'federally protected function' was affected that day.").

If this Court elects to address this claim, it should reject it. Grider argues that Count One alleges only an adverse effect on Congress's certification of the results of the 2020 Electoral College election for President, and Congressional action cannot amount to a federally protected function because those functions are performed only by an "Executive Department" or an "agency" of the United States. Def. Mot. at 4. This claim fails. Count One sufficiently alleges an adverse effect on an Executive Department or agency.

A "federally protected function" is

> any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the United States or by an officer or employee thereof; and such term shall specifically include, but not be limited to, the collection and distribution of the United States mails.

18 U.S.C. § 232(3).

Section 232(3)'s definition of "federally protected function," speaks broadly of "any function, operation, or action" performed under federal law, but specifies that such function, operation, or action be carried out by a "department, agency, or instrumentality of the United States or by an officer or employee thereof." "Law enforcement officer" is defined expansively to include "any officer or employee of the United States, any State, any political subdivision of a State, or the District of Columbia, while engaged in the enforcement or prosecution of any of the criminal laws of the United States, a State, any political subdivision of a State, or the District of Columbia[.]" 18 U.S.C. § 232(7).

The definition and use of the term, "federally protected function," also reveals the statute's broad scope. That term appears only three times in the United States Code—exclusively in connection with the civil disorder statute at issue here. *See* 18 U.S.C. §§ 231(a)(1), 231(a)(3), and 232(3). As used in § 231(a)(1) and (3), the term "federally protected function" appears alongside (and as an alternative to) a broad invocation of Congress's expansive power to regulate under the Commerce Clause. In that context, "federally protected function" demonstrates Congress's intent to ensure that its anti-riot statute could reach any unlawful interference with law enforcement officers during a civil disorder that the federal government has authority to regulate.

If this case proceeds to trial, the government will rely on the following three instances of federally protected functions in order to prove a violation of § 231(a)(3).

1. **The Vice-President's Participation In The Congressional Certification Vote Was Performing A Federally Protected Function.**

Congressional certification of the Electoral College vote is a federally protected function because the Vice President, while serving as the President of the Senate, presides over the certification of the Electoral College vote. *See* 3 U.S.C. § 15. The Vice President is also an "officer or employee" of an agency, namely the Office of the Vice President. The Office of the Vice President is an "authority," *see* 18 U.S.C. § 6, and the Vice President wields the power under that authority as prescribed under the Constitution and federal statute. *Cf. United States v. Espy*, 145 F.3d 1369, 1373-74 (D.C. Cir. 1998) (even if the Executive Office of the President was an agency under § 6, it was not an "agency" under § 1001 because the false statement was not made "within the jurisdiction" of that office; the "jurisdictional" restriction in § 1001 does not appear in § 231(a)(3) or § 232(3)).

2. **The Capitol Police Protecting The U.S. Capitol Were Performing A "Federally Protected Function."**

The Capitol Police have a statutory obligation to protect the U.S. Capitol. See 2 U.S.C. § 1961 (Capitol Police "shall police the United States Capitol Buildings and Grounds," and shall do so "under the direction of the Capitol Police Board"). The "purpose" of the Capitol Police Board, in turn, is "to oversee and support the Capitol Police in its mission." Pub. L. No. 108-7, div. H, § 1014(a)(1). Because an agency includes any "board," 18 U.S.C. § 6, it includes the Capitol Police Board. And the Capitol Police, as its website describes, is "a federal law enforcement agency." See https://www.uscp.gov/the-department.

Law enforcement officers engaged in a regular responsibility—such as protecting the Capitol—whose responsibility is adversely affected by a civil disorder are no less protected under the statute than any other law enforcement officials. The courts have upheld convictions for violating § 231(a)(3) under similar circumstances. *See United States v. Dodge*, 538 F.2d 770, 780

14

(8th Cir. 1976) (law enforcement officers responding to civil disorder on federal enclave were "engaged in a federally-protected function"); *United States v. Jaramillo*, 380 F. Supp. 1375, 1377-78 (D. Neb. 1974) (§ 231(a)(3) properly invoked where the defendant interfered with FBI agents when they were responding to the Wounded Knee reservation for the purpose of "investigating [] reported crimes and the operation of the post office"; both were federally protected functions and "there was interference of both by the occupation of Wounded Knee").

3.     **The U.S. Secret Service Protecting The Vice President Was Performing A Federally Protected Function.**

During the afternoon of January 6, officials of the United States Secret Service were engaged in the federally protected function of protecting the Vice President and the Vice President-elect. See 18 U.S.C. § 3056(a)(1). Because the civil disorder on January 6 required the Secret Service to move the Vice President to a secure location, the riot in some "way or degree obstruct[ed], delay[ed], or adversely affect[ed]" that protective function. It makes no difference what capacity the Vice President was serving (*i.e.*, as the Vice President or President of the Senate) at the time the civil disorder arose because the Secret Service protects the Vice President at any and all times. And of course, the Secret Service, an agency of the Department of Homeland Security, is part of an executive department. *See* 5 U.S.C. § 101.

4.     *Hubbard v. United States* **Does Not Compel a Different Result.**

Grider claims *Hubbard v. United States*, 514 U.S. 695 (1995) and its progeny requires dismissal of Count One. Def. Mot. at 4-5. Not so. There, the Court held that *the judicial branch was not a "department" or "agency"* as that term was used under since-amended language in the False Statements Act, 18 U.S.C. § 1001, which applied to statements made "within the jurisdiction of any department or agency." *Id.* at 700-01. *Hubbard* overruled *United States v. Bramblett*, 348 U.S. 503 (1955), where the Court interpreted "department" in § 1001 to encompass the "executive,

legislative, and judicial branches of the Government." *Id.* at 509. The following year, Congress amended § 1001 to extend its coverage to "any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States," effectively overturning *Hubbard*. *See* False Statements Accountability Act of 1996, Pub.L. No. 104–292, § 2, 110 Stat. 3459 (1996).

To the extent *Hubbard* has any continuing vitality beyond § 1001, it is distinguishable. Section 6 of Title 18 contains an exception to the definition of a "department" as an "executive branch entity." The exception applies when the "context" of a particular statute that incorporates the § 6 definition of "department" shows that Congress intended "department" "to describe" all three branches of the federal government. 18 U.S.C. § 6. Section 6 contains a similar exception to the definition of "agency." After concluding that the judicial branch was not a "department" or "agency" under 18 U.S.C. § 6, the *Hubbard* Court held that the foregoing exception in § 6 did not apply to § 1001 because "there is nothing in the text of [§ 1001], or in any related legislation, that even suggests—let alone 'shows'—that the normal definition of 'department' was not intended." 514 U.S. at 701.

That is decidedly not the case with § 231(a)(3). The phrase, "unless the context shows that such term was intended to describe the executive, legislative, or judicial branches of the government," refers to the text of the statute that incorporates § 6 or of related statutes. *See Rowland v. California Men's Colony, Unit II Men's Advisory Council*, 506 U.S. 194, 199 (1993) (interpreting the Dictionary Act, 1 U.S.C. § 1, which states "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise": "'Context' here means the text of the Act of Congress surrounding the word at issue, or the texts of other related congressional Acts").

Here, that context supports an interpretation that "department," as used in § 231(a)(3), includes Congress. In § 231(a)(3), Congress paired the phrase, "federally protected function," with the phrase, "affects commerce or the movement of any article or commodity in commerce." "[A]ffects commerce or the movement of any article or commodity in commerce" and "federally protected function" are twin "jurisdictional hooks" demonstrating a Congressional intention to regulate in an area that might otherwise be subject to purely state or local power. *See United States v. Galo*, 239 F.3d 572, 575 (3d Cir. 2001) ("the requirement that at least one of the materials used to produce the child pornography travel in interstate commerce provides the jurisdictional hook"). "Affecting commerce" are "words of art that ordinarily signal the broadest permissible exercise of Congress' Commerce Clause power." *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003).

Like the Congressional exercise of its commerce power in § 231(a)(3), its protection of "federally protected functions" in the same phrase of the same statute should be interpreted broadly. Specifically, yoking "commerce" and "federally protected function" together in the statutory text suggests that Congress sought to broadly prohibit unlawful conduct that might otherwise fall within the general police powers of the states. This Court should apply the exception clause of § 6 and find that "department" as used in § 232(3) "was intended to describe the executive, legislative, or judicial branches of the government." 18 U.S.C. § 6. No court has held to the contrary. [2]

---

[2] Grider relies on *United States v. Oakar*, 111 F.3d 146 (D.C. Cir. 1997) and *United States v. Dean*, 55 F.3d 640 (D.C. Cir. 1995). Neither addressed § 231(a)(3) and are off-point. In *Oakar*, the Court of Appeals held that "[i]n the wake of *Hubbard*, this court has been clear that an entity within the Legislative Branch cannot be a 'department' within the meaning of [18 U.S.C.] § 1001 and 18 U.S.C. § 6." 111 F.3d at 153. In *Dean*, the Court, again relying on *Hubbard*, vacated the defendant's convictions for violating o§ 1001 based on her statements before Congress. 55 F.3d at 658-59. As explained above, *Hubbard* does not control here because, for instance, the Secret Service's protection of the Vice President is a federally protected function that was wholly

### D.      GRIDER'S FIRST AMENDMENT CHALLENGE TO COUNT ONE IS MERITLESS.

Grider contends that § 231(a)(3) is unconstitutionally overbroad under the First Amendment because it "extends to a substantial amount of constitutionally protected speech and expressive conduct in excess of the law's legitimate sweep." Def. Mot. at 16. Although he contends the statute is overbroad "as applied," *id*. at 15, he makes no mention of his own conduct on January 6, much less explain how charging him with a violation of 231(a)(3) undermined his own First Amendment rights that he intended to exercise that day. *Id*. at 15-18. Indeed, he does not even address the differences between "as applied" and facial First Amendment challenges.[3] Rather, his argument presents only facial challenges to the statute that do not depend in any way on its application to this case.

For instance, Grider argues that "by penalizing 'any act,' § 231(a)(3) reaches to the outer limits of verbal and expressive conduct without drawing any distinction that could exclude acts undertaken merely to convey a message or symbolic content." *Id*. He also contends that the word, "interfere," as it appears in the statute but which the statute does not define, "reaches a broad range of speech and expressive conduct." *Id*.

---

absent in those cases. *See Nordean*, 2021 WL 6134595, at *14 (so holding and rejecting a challenge to § 231(a)(3) based on *Hubbard*.

[3] One raising a facial challenge must establish "that no set of circumstances exists under which [the challenged statute] would be valid or that the statute lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010). The person challenging the statute need not show injury to himself. *See Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958 (1984). On the other hand, to prevail on an as-applied First Amendment challenge, the person challenging the statute must show that the regulations are unconstitutional as applied to their particular speech activity. *See Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 802-03 (1984); *accord, Edwards v. D.C.*, 755 F.3d 996, 1001 (D.C. Cir. 2014).

As every other judge in this district who has addressed this precise claim has held, this claim fails. A criminal law is facially overbroad only if "'a substantial number' of its applications are unconstitutional, 'judged in relation to the statute's plainly legitimate sweep.'" *Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (quoting *New York v. Ferber*, 458 U.S. 747, 769-71 (1982)); *see also United States v. Williams*, 553 U.S. 285, 293 (2008); *Grayned v. City of Rockford*, 408 U.S. 104, 114 (1972). A facial overbreadth challenge faces a steep climb when the statute focuses mainly on conduct, as § 231(a)(3) assuredly does. *See Virginia v. Hicks*, 539 U.S. 113, 119 (2003) (noting the "substantial social costs created by the overbreadth doctrine when it blocks application of a law to ... constitutionally unprotected conduct").

Judge Berman Jackson is the most recent member of this court to reject an overbreadth challenge to § 231(a)(3). *See United States v. Williams*, 21-cr-0618 (ABJ), 2022 WL 2237301, at *6-7 (D.D.C. June 22, 2022). She noted that "[i]n the past year, at least four other courts in this district have considered whether section 231(a)(3) is overbroad on its face, and all have concluded it is not." *Id*. at *6.[4]

Judge Berman Jackson "agree[d] with the reasoning in those decisions." *Id*. "First, the statute plainly covers conduct, not speech, as it criminalizes 'any *act* to obstruct, impede, or interfere with' a law enforcement officer engaged in the performance of official duties, and the terms 'obstruct, impede, or interfere with' are all plainly understood and must be supported by the

---

[4] Citing *McHugh*, 2022 WL 296304, at *17; *Mostofsky*, 2021 WL 6049891, at *8–9; *Nordean*, 2021 WL 6134595, at *17; and *Fischer*, 2022 WL 782413, at *3. Judge Berman Jackson also cited three out of district cases that reached the same result. 2022 WL 2237301, at *6, citing *United States v. Howard*, 21-cr-28 (PP), 2021 WL 3856290, at *11-12 (E.D. Wis. Aug. 30, 2021); *United States v. Phomma*, 561 F. Supp. 3d 1059, 1067-68 (D. Or. 2021); and *United States v. Wood*, 20-cr-56 (MN), 2021 WL 3048448, at *7-8 (D. Del. July 20, 2021).

facts in any particular case." *Id*. (emphasis added). "Although some 'acts' could also serve an expressive function, and one could come up with a hypothetical scenario in which the alleged interference involved particularly obstreperous speech, the law does not require dismissing a charge merely because there is a possibility that the provision could reach some constitutionally protected activity." *Id*. "Since section 231(a)(3) does not 'make unlawful a substantial amount of constitutionally protected conduct,' it is not overbroad on its face." *Id*. (citing *City of Houston v. Hill*, 482 U.S. 451, 459 (1987)).

Judge Berman Jackson also noted that "a *scienter* requirement may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed." *Id*. at *7 (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 499 (1982)). She concluded that § 231(a)(3) "only criminalizes acts performed 'to obstruct, impede, or interfere with' a law enforcement officer," "in other words, the statute requires obstructive intent." *Id*. *See also Nat'l Mobilization Comm. to End War in Viet Nam v. Foran*, 411 F.2d 934, 937 (7th Cir. 1969) ("It is true that section 231(a)(3) does not specifically refer to intent, but it only applies to a person who 'commits or attempts to commit any act to obstruct, impede, or interfere' with firemen or law enforcement officers."); *United States v. Mechanic*, 454 F.2d 849, 854 (8th Cir. 1971) (agreeing with *Foran* "that § 231(a)(3) must be construed to require intent"). Other judges of this district are in accord. *See Mostofsky*, 2021 WL 6049891, at *8 (rejecting overbreadth challenge to § 231(a)(3)); *Nordean*, 2021 WL 6134595, at *16-18 (§ 231(a)(3) is neither vague nor overbroad); *McHugh*, 2022 WL 296304, at *13 (same).

Those decisions properly applied controlling law. In the typical case, a litigant bringing a facial constitutional challenge "must establish that no set of circumstances exists under which the [law] would be valid," or the litigant must "show that the law lacks a plainly legitimate sweep."

*Americans for Prosperity Found. v. Bonta*, 141 S. Ct. 2373, 2387 (2021) (quotation omitted). In the First Amendment context a litigant must demonstrate that "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Id*. (cleaned up). Refusing to enforce a statute because of overbreadth concerns is "strong medicine," and courts will refuse to enforce the statute on such grounds "only as a last resort. *Broadrick v. Oklahoma*, 413 U.S. 601, 613 (1973). "Rarely, if ever, will an overbreadth challenge succeed against a law or regulation that is not specifically addressed to speech or to conduct necessarily associated with speech," *Virginia v. Hicks*, 539 U.S. 113, 124 (2003).

The Eighth Circuit's decision in *Mechanic*, rejecting an overbreadth challenge to § 231(a)(3), is particularly instructive. After noting that the statutory language "applies only to a person who acts to impede, obstruct, or interfere with an official described in the statute," that court held that "conduct involved here [the massing of a mob that threw stones at an R.O.T.C. building on a college campus to protest the Viet Nam war, followed by rock and bottle throwing at firemen who arrived to quell the disturbance] is not entitled to constitutional protection." 454 F.2d at 852. "The First Amendment has not been extended to protect rioting, inciting to riot, or other forms of physical violence." *Id*. (citing *Foran*, 411 F.2d at 937). Thus, § 231(a)(3) "does not purport to reach speech of any kind. It reaches only acts to impede, obstruct, or interfere with police officers and firemen." *Id*. "[I]t is not just any public disturbance which is the subject of the section, but only public disturbances which (1) involve acts of violence (2) by assemblages of three or more persons, and which (3) cause immediate danger of or result in injury to (4) the property or person of any other individual." *Id*.

Apparently seeking to identify "a substantial number" of unconstitutional applications of 231(a)(3), Grider contends the statute's prohibitions would apply to someone who "flips off

officers to distract or to encourage resistance," or "records police activity with a cell phone." Def Mot. at 17. He also contends that "civil disorder" which is "any public disturbance involving acts of violence by assemblages of three or more persons, which causes an immediate danger of ... injury to the property," is "extremely far-reaching." Def. Mot. at 18. This would apply, he contends, to "three teenagers whose skateboarding damages property." *Id.*

Grider's examples do not demonstrate that § 231(a)(3) is unconstitutionally overbroad. "[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984); *see also Howard*, 2021 WL 3856290, at *11 (rejecting overbreadth claim that "the government perhaps could charge someone who yelled at an officer during a civil disorder and could argue that the yelling was an 'act' that 'attempted to obstruct' an officer performing her lawful duties"). Rather, a defendant must show a "realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court." *Members of City Council of City of Los Angeles*, 466 U.S. 789, 801 (1984). Grider identifies no such cases, and no wonder. Laws like § 231(a)(3) that are "not specifically addressed to speech or to conduct necessarily associated with speech (such as picketing or demonstrating)" are far less likely to present such a danger. *Hicks*, 539 U.S. at 124. Indeed an "overbreadth challenge" to such a law will "[r]arely, if ever … succeed." *Id.*

Grider has given this Court no reason to depart from the unanimous holdings of other judges in this district and elsewhere that 231(a)(3) is not unconstitutionally overbroad.

II.   **GRIDER'S RENEWED AND NEW CHALLENGES TO COUNT TWO, CHARGING A VIOLATION OF 18 U.S.C. 1512(C)(2), ARE MERITLESS.**

A.   **GRIDER'S RELIANCE ON *UNITED STATES V. MILLER*, STANDING ALONE AGAINST A TIDE OF CONTRARY DECISIONS FROM OTHER JUDGES ON THIS COURT, IS NO BASIS FOR THIS COURT TO REPUDIATE ITS PRIOR DECISION THAT COUNT TWO IS PROPERLY PLED.**

This Court previously rejected Grider's motion to dismiss the § 1512(c)(2) count from the initial indictment on the ground that it failed to state an offense. *United States v. Grider*, 21-cr-0022 (CKK), 2022 WL 392307, at *8 (D.D.C. Feb. 9, 2022). The Superseding Indictment re-alleges that offense *verbatim*, but Grider urges this Court to repudiate its prior decision and to adopt the contrary reasoning of Judge Nichols (Grider refers to him as "Judge Stone") in *United States v. Miller*, 1:21-cr-00119 (CJN), 2022 WL 823070 (D.D.C. Mar. 7, 2022). Def. Mot. at 19. This Court should decline that invitation.

According to Judge Nichols' decision in *Miller*, § 1512(c)(2) applies only when a defendant seeks to corruptly disrupt a Congressional proceeding such as the certification vote if he interferes with tangible evidence such as documents. *See* 2022 WL 823070, at *15. Grider neglects to mention that every judge in this district to rule on that claim since *Miller* was handed down has rejected Judge Nichols' reasoning and instead aligned themselves with all the other judges in this district who have found, as this Court did in this case, that § 1512(c)(2) charging language that is identical to that in the Superseding Indictment in this case satisfies Rule 7. *See United States v. Puma*, 2022 WL 823079, at *5 D.D.C., March 29, 2022) (Friedman, J.) (declining to follow *Miller*) ; *McHugh*, 2022 WL 1302880, at *12 (Bates, J.) (declining to follow *Miller*; "the government's broad reading of § 1512(c)(2) is the correct interpretation of the statute"; it "prohibits acts which obstruct, influence, or impede an official proceeding 'in a different way'

from the interference with documents or evidence covered by paragraph (c)(1), regardless of how that obstruction is accomplished."); *United States v. Reffitt*, 2022 WL 1404247, at *5 (D.D.C., May 04, 2022) (Friedrich, J.) ("For the reasons explained below, the Court does not find *Miller* persuasive."); and *United States v. Fitzsimons*, 2022 WL 1698063, at *7 (D.D.C. May 26, 2022) (Contreras, J.). ("upon examination of Judge Nichols's thorough reasoning [in *Miller*], this Court concludes that these objections do not undermine its reading or render the statute ambiguous."). Consequently, *Miller* is the only one of sixteen decisions from the judges of this court to dismiss a § 1512(c)(2) charge in a January 6 prosecution. *See* footnote 1, *supra*.

Moreover, *Miller* was incorrectly decided, and the Solicitor General's Office is weighing a decision to appeal. In *Miller*, Judge Nichols erroneously applied the rule of lenity after concluding that he did "not believe that there is a single obvious interpretation of the statute." 2022 WL 823070, at *12. Judge Nichols' interpretation of § 1512(c)(2)'s scope placed undue emphasis on a single word ("otherwise") and a single Supreme Court decision, *Begay v. United States*, 553 U.S. 137 (2008) that interpreted that word as used in a different statute and statutory context. *Id*. at *7. As the other judges of this district who have weighed in on this issue have unanimously concluded, a proper reading of § 1512(c)(2)'s text, structure, and history demonstrates that it prohibits any corrupt conduct that intentionally obstructs or impedes an official proceeding, not merely where a "defendant ha[s] taken some action with respect to a document, record, or other object," *id*. at *15.

Grider does not even acknowledge those decisions, much less explain why they are wrong and Judge Nichols was right in *Miller*. Given the overwhelming weight of opinion by members of this court on this point, Grider has given this Court no reason to join the single judge who has adopted a contrary view.

**B.      SECTION 1512(C)(2) DOES NOT VIOLATE THE FIRST AMENDMENT.**

Grider presents an "as applied" overbreadth challenge to § 1512(c)(2), claiming that his "activities on January 6 arguably included political expression, assembly, and petitioning of the government for a redress of grievances." Def. Mot. at 20. "Insofar as the Section 1512(c)(2) charge characterizes protest *per se* as obstruction of congressional proceedings, it is an unconstitutional application of the statute as applied to" him. *Id.* at 19. This claim fails.

"[T]o prevail on an as-applied First Amendment challenge," Grider "must demonstrate that the statute is unconstitutional as applied to [their] particular expressive activity." *United States v. Caputo*, 201 F. Supp. 3d 65, 71 (D.D.C. 2016). In addressing such a claim, "[t]he Court must first assess whether [the defendant's] conduct is, in fact, expressive." *Id.*; *see also Texas v. Johnson*, 491 U.S. 397, 403 (1989) ("We must first determine whether Johnson's burning of the flag constituted expressive conduct, permitting him to invoke the First Amendment in challenging his conviction."). Addressing the same claim in *United States v. Nordean*, 21-cr-175 (TJK), 2021 WL 6134595 (D.D.C. Dec. 28, 2021), Judge Kelly "easily conclude[d] that it is not." *Id.* at *13.

Grider asserts that "the entire thrust of the Section 1512(c)(2) offense is that Mr. Grider and others protested at the Capitol concerning the results of the 2020 presential election," which is "core" First Amendment activity. Def. Mot. at 22. That's incorrect. Count Two does not charge Grider for protesting. Rather, it charges him with "corruptly" obstructing, influencing, and impeding an official proceeding, to wit "Congress's certification of the Electoral College vote as set out in the Twelfth Amendment of the Constitution of the United States and 3 U.S.C. §§ 15-18." ECF 97, Count Two. That Grider's obstruction was motivated by his political beliefs or that he "intended to affect the actions of Congress," Def. Mot. at 22, does not create a First Amendment shield against prosecution. "No matter Grider's political motivations or any political message they

wished to express, this alleged conduct is simply not protected by the First Amendment." *Nordean*, 2021 WL 6134595, *13.

Grider contends, using a double-negative, that "there is no argument that Section 1512(c)(2)'s application here is unrelated to the suppression of expression, assembly and the petitioning of the government for a redress of grievances." Def. Mot. at 22. But there very much is an argument on that point. The impetus for this prosecution is wholly unrelated to the suppression of expression. Had Grider corruptly obstructed the certification vote as part of a violent mob for reasons wholly unrelated to his apparent support of former President Trump or apparent opposition to then President-elect Biden, or had he done so with no political motivation whatsoever, the government's response would have been the same.

Grider is charged in Count Two with unlawfully entering the Capitol *in order to* corruptly disrupt the certification vote. Although he tries to link his corrupt conduct on January 6 with obviously expressive conduct in other cases, he is not charged with anything like burning flags, wearing black armbands, or participating in mere sit-ins or protests. Def. Mot. at 22 (citing *Johnson*, 491 U.S. at 404 (flag burning was expressive conduct); *Tinker v. Des Moines Ind. Comm. School. Dist.*, 393 U.S. 503, 505 (1969) (students wearing black armbands to protest the Viet Name war was expressive); *Brown v. Louisiana*, 383 U.S. 131, 141–42 (1966) (sit-in to protest segregation was expressive)). Indeed, by focusing on "corrupt" actions, § 1512(c)(2) does not even reach free speech. *See United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996) ("By targeting only such persuasion as is corrupt, Section 1512(b) does not proscribe lawful or constitutionally protected speech[.]") (cleaned up); *United States v. Jeter*, 775 F.2d 670, 679 (6th Cir. 1985) (statute limited to those who "corruptly endeavor to interfere with the due administration of justice ... is clearly limited to ... constitutionally unprotected and purportedly illicit activity").

And even if Grider's charged conduct had some expressive aspect, "it lost whatever First Amendment protection it may have had." *Nordean*, 2021 WL 6134595, *13. "Where demonstrations turn violent," as the January 6 riot most certainly did, in contrast to the flag-burning, armband wearing, and silent protesting cases discussed above, "they lose their protected quality as expression under the First Amendment." *Grayned*, 408 U.S. at 116. *See also Cameron v. Johnson*, 390 U.S. 611, 617 (1968) (government may punish physical obstruction); *Cox v. Louisiana*, 379 U.S. 536, 555 (1965) (First Amendment does not allow a "group of demonstrators" to "insist upon the right to cordon off a street, or entrance to a public or private building, and allow no one to pass who did not agree to listen to their exhortations."); and *United States v. Gregg*, 226 F.3d 253, 267-68 (3d Cir. 2000) ("Activities that injure, threaten, or obstruct are not protected by the First Amendment, whether or not such conduct communicates a message.").

Grider also complains that Count Two does not "limit" his obstruction "to the act of entry into the Capitol Building" and "is not limited to an attempt to influence Congress by threats or force," meaning it seeks to criminalize mere "protest and demonstration." Def. Mot. at 23. But Grider knows the trial evidence will establish that he penetrated the Capitol all the way to the Speaker's Lobby and was on the front line of a group of rioters who violently smashed the window of a door to that lobby as vastly outnumbered police tried to stop them. Since Grider's "as applied" challenge to Count Two must account for what he is charged with doing and not what some hypothetical defendant who never entered the Capitol did, this argument is beside the point.

Even if this Court treated Grider's obstructive conduct among a horde of violent rioters as expressive conduct, his First Amendment claim still fails. He contends that § 1512(c)(2)'s "incidental restriction on alleged First Amendment freedoms is ... greater than is essential to the furtherance of" the Government's interest. Def. Mot. at 23. (quoting *United States v. O'Brien*, 391

U.S. 367, 377 (1968). To avoid trampling his First Amendment rights, he contends, Congress could

do no more than "prevent obstruction of Congress by 'threats or force.'" *Id*. at 24.

That's incorrect. Without violating the First Amendment, Congress could prevent a horde

of protestors from peacefully occupying the Capitol with so many people that physical movement

inside the building, and thus the execution of Congress's duties, would be physically impossible.

*Cf. Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50, 55–56 (D.D.C. 2000) ("the expression of

ideas inside the Capitol may be regulated in order to permit Congress peaceably to carry out its

lawmaking responsibilities" so "the inside of the United States Capitol is a nonpublic forum for

First Amendment forum analysis purposes").

To be sure, "when speech and nonspeech elements are combined in the same course of

conduct, a sufficiently important governmental interest in regulating the nonspeech element can

justify incidental limitations on First Amendment freedoms." *O'Brien*, 391 U.S. at 376 (cleaned

up). But the government "has a weighty interest in protecting Congress's ability to function

without 'corrupt' interference, and that interest is unrelated to the suppression of free expression."

*Nordean*, 2021 WL 6134595, *14. "And here, given that Congress was convened in Joint Session

to undertake one of its most solemn and important constitutional duties, that interest could hardly

have been more important." *Id*.

"[A]pplying the statute to [Grider] imposes no more than an incidental limitation on [his]

First Amendment freedoms, if even that." *Nordean*, 2021 WL 6134595, *14. That's because the

statute "leave[s] open ample alternative channels for communication of the information." *Am. Libr.*

*Ass'n v. Reno*, 33 F.3d 78, 88 (D.C. Cir. 1994) (quoting *Ward v. Rock Against Racism*, 491 U.S.

781, 791 (1989)). "Quite obviously, there were many avenues for [Grider] to express [his] opinions

about the 2020 presidential election, or [his] views about how Congress should perform its

constitutional duties on January 6, without resorting to the conduct with which they have been charged." *Nordean*, 2021 WL 6134595, at *14. *See also United States v. Bozell*, 21-cr-216 (JDB), 2022 WL 474144, at *7 (D.D.C. Feb. 16, 2022) (rejecting defendant's argument that the § 1512(c)(2) charge "is unconstitutional as applied to him because his activities on January 6 included political expression, assembly and petitioning of the government for a redress of grievances"; defendant "is not being prosecuted for exercising his First Amendment rights to peacefully protest outside the Capitol, but rather on the belief that he corruptly used force to disrupt the January 6 Certification."). Grider's First Amendment challenge to Count Two fails.

### C.   NOR DOES SECTION 1512(C)(2) VIOLATE THE *EX POST FACTO* CLAUSE.

Grider contends that charging him under § 1512(c)(2) violates the *Ex Post Facto* clause of the Fifth Amendment because it would be a "novel interpretation of the statute." Def. Mot. at 24-26. This claim fails.

"The *ex post facto* prohibition forbids the Congress and the States to enact any law which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28 (1981) (cleaned up). "Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Id*. at 28-29. "The ban also restricts governmental power by restraining arbitrary and potentially vindictive legislation." *Id*. at 29.

So construed, the "*Ex Post Facto* Clause is a limitation upon the powers of the Legislature and does not of its own force apply to the Judicial Branch of government." *Marks v. United States*, 430 U.S. 188, 191 (1977) (cleaned up). Nevertheless, "due process bars courts from applying a novel construction of a criminal statute to conduct that neither the statute nor any prior judicial

decision has fairly disclosed to be within its scope." *United States v. Lanier*, 520 U.S. 259, 266 (1997). *See United States v. Bailey*, 259 F.3d 1216, 1219 (10th Cir. 2001) ("[B]ecause he challenges judicial interpretations of a statute rather than the statute itself, Bailey raises a due process argument rather than one based directly on the *Ex Post Facto* Clause.").

A judicial interpretation of a criminal statute violates due process only if it is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964); *see also Johnson v. Kindt*, 158 F.3d 1060, 1063 (10th Cir. 1998) ("The test for determining whether the retroactive application of a judicial decision violates due process is essentially one of foreseeability."). A ruling would violate due process, for instance, if it both disadvantaged the defendant and *conflicted* with prior judicial announcements on the same subject. *See Williams v. Filson*, 908 F.3d 546, 577 (9th Cir. 2018) (emphasis added) (no due process violation where "Williams has identified no pre-*Cavanaugh* authority from Nevada courts that is inconsistent with the rule *Cavanaugh* adopted, and we have found none"; "[w]e cannot say that the Nevada Supreme Court's interpretation of § 200.033(5) constitutes an "unexpected and indefensible" break with prior Nevada law").

It is not enough for Grider to claim that § 1512(c)(2) was not previously deployed against persons who engaged in conduct similar to his. In order to establish a due process violation, he would have to show that prior judicial decisions stated that § 1512(c)(2) did not apply to conduct such as Grider's on January 6. Given the *sui generis* nature of the January 6 riot and the overwhelming judicial rejection of challenges to § 1512(c)(2) charges brought by Grider and other January 6 defendants, Grider understandably does not even try to meet that burden. *See Bailey*, 259 F.3d at 1219 ("we reject [the due process] argument both because [defendant] cites no authority from this or any other court interpreting § 3583 in the manner he seeks and because

interpreting § 3583(e)(3) and Rule 32.1(a)(2) to allow post-term revocation hearings is clearly foreseeable"). Grider's *Ex Post Facto*/due process claim fails.

## III.     GRIDER'S CHALLENGES TO THE SECTION 1751 COUNTS ARE MERITLESS.

Grider seeks dismissal of Counts Four, Five, and Six, alleging violations of 18 U.S.C. 1752(a)(1), (a)(2), and (a)(4), respectively. Def. Mot. at 26-37. His claim attacks a straw man: "The Government's position that *any government entity* may set a restricted area under Section 1752." *Id*. at 26 (emphasis added). See also Def. Mot. at 30 ("The government's *anyone-may-restrict* interpretation yields absurd results.") (emphasis added).

The government's actual position is that neither the statute's text, plain meaning, legislative history, nor purpose limits a "restricted area" to those demarcated by the United States Secret Service. Rather, as all of the judges of this court who have addressed this issued have concluded— decisions Grider studiously ignores—unlawful entry onto the United States Capitol Building and Grounds on January 6 into areas that had been restricted on that day by the United States Capitol Police, which marked those restrictions with clearly visible barriers and signs, violated § 1752(a)(1), (a)(2), and (a)(4). Grider's arguments cannot overcome *that* position.

### A.     AS ALL THE COURTS TO ADDRESS THE ISSUE HAVE HELD, THE CAPITOL BUILDING AND GROUNDS CAN BE RESTRICTED UNDER 18 U.S.C. § 1752 BY THE UNITED STATES CAPITOL POLICE.

Section 1752(c)(1) provides three alternate definitions for the term "restricted buildings and grounds."

(c) In this section—

> (1) the term "restricted buildings or grounds" means any posted, cordoned off, or otherwise restricted area--
>
> > (A)     of the White House or its grounds, or the Vice President's official residence or its grounds;

31

        (B)     of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting; or

        (C)     of a building or grounds so restricted in conjunction with an event designated as a special event of national significance; and

(2) the term "other person protected by the Secret Service" means any person whom the United States Secret Service is authorized to protect under section 3056 of this title or by Presidential memorandum, when such person has not declined such protection.

18 U.S.C. § 1752(c).

The definition that applies in this case is § 1752(c)(1)(B), "any posted, cordoned off, or otherwise restricted area ... of a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting." "Person[s] protected by the Secret Service" include the Vice President and the Vice President-elect. *See* § 1752(c)(2); 18 U.S.C. § 3056(a)(1) ("Under the direction of the Secretary of Homeland Security, the United States Secret Service is authorized to protect the … the Vice President").

Grider is charged with:

- "knowingly enter[ing] or remain[ing] in any restricted building or grounds without lawful authority to do so," § 1752(a)(1) (Count 4);

- "knowingly and with intent to impede or disrupt … government business," engaging in "disorderly or disruptive conduct" that "in fact, impedes or disrupts" government business," in a restricted building or grounds, § 1752(a)(2) (Count 5), and

- "knowingly engag[ing] in any act of physical violence against any person or property" in a restricted area, § 1752(a)(4) (Count 6).

ECF 97, pages 3-4.

Grider contends the "plain meaning of Section 1752 unequivocally indicates that the USSS alone sets restricted areas" because "all three definitions of 'restricted building or grounds' in Section 1752(c)(1) concern the authority and actions of the USSS and not any other federal agency." Def. Mot. at 27. That's wrong.

The text of Section 1752 "is not complex," *United States v. Griffin*, 549 F.Supp.3d 49, 54 (D.D.C. 2021). Like the defendant in *Griffin*, Grider "contends that the Secret Service must 'establish' the restricted area under § 1752(c)(1)" "[b]ut that requirement is not in the text." *Id*. at 54-55. "Indeed, the only reference in the statute to the Secret Service is to its protectees. Section 1752 says nothing about who must do the restricting." *Id*. at 55. The text "plainly does not require that the Secret Service be the entity to restrict or cordon off a particular area," *Mostofsky*, 2021 WL 6049891, at *13. "Congress's failure to specify how an area becomes 'restricted' just means that the statute does not require any particular method for restricting a building or grounds." *McHugh*, 2022 WL 296304, at *18. All the other judges of this court to have addressed this issue, now numbering seven, have come to the same conclusion as Judge McFadden in *Griffin*.[5]

Grider relies on *United States v. Bursey*, 416 F.3d 301 (4th Cir. 2005), Def. Mot. at 29-30, but that case offers him no support. There, the Fourth Circuit *affirmed* a § 1752 conviction for entering an airport hangar that was restricted by the Secret Service ahead of a rally involving the President. *Id*. at 309. On appeal, Bursey challenged the District Court's finding that he acted willfully. Rejecting that claim, the Fourth Circuit pointed to evidence that Bursey must have

---

[5] *See United States v. Andries*, 2022 WL 768684, at *14; *Bozell*, 2022 WL 474144, at *8; *McHugh*, 2022 WL 296304, at *18; *Nordean*, 2021 WL 6134595, at *18; *Mostofsky*, 2021 WL 6049891, at *13; Omnibus Order, *United States v. Caldwell*, Crim. No. 21-28 (APM) (D.D.C. Sept. 14, 2021) [Dkt. No. 415] at 4; *United States v. Puma*, 1:21-cr-0454 (PLF), 2022 WL 823079, at *14–16 (D.D.C. Mar. 19, 2022); *United States v. Bingert*, 1:21-cr-91(RCL), 2022 WL 1659163, at *14 (D.D.C. May 25, 2022).

known he was violating the law by remaining in the restricted area, including evidence that "Bursey understood the area to have been restricted by the Secret Service, and thus a federally restricted zone." *Id.*

According to Grider's tautology, the Secret Service restricted the airport hangar; the airport hangar was a restricted area under § 1752; therefore, only the Secret Service can restrict areas for purposes of § 1752. As Judge McFadden explained, "the Fourth Circuit [in *Bursey*] had no reason to analyze [whether the Secret Service must impose the restrictions] because all parties agreed that the Secret Service secured the hangar. There is no holding—binding or persuasive—on this question." *Griffin*, 549 F. Supp. 3d. at 56.

Unable to overcome the statute's plain text, Grider invokes the legislative history of § 1752 to support his atextual argument. Def. Mot. at 31-32. But even Grider's cherry-picked snippets from the Congressional Record, *see* Def. Mot. at 31, say nothing about whether the Secret Service has *exclusive* authority to restrict areas for purposes of § 1752. Moreover, "the history of amendments to Section 1752 provides little information about who must restrict an area." *Puma*, 2022 WL 823079, at *14-16 (citing *Griffin*). "At the very least, the amendments to Section 1752 have served to increasingly, if only modestly, expand the scope of the statute." *Id.* In sum, the legislative history "provides no support whatsoever for the notion that there is an extratextual requirement that the Secret Service, rather than some other federal authority, must restrict the area." *Id.* at 16.

As a last gasp, Grider points to an opinion of the Office of Legal Counsel of the Department of Justice, which stated that the Secretary of the Treasury has authority under § 1752 to create a security perimeter around an area where the President will be visiting. Def. Mot. at 32 (citing Op. Off. Legal Counsel 109 (1995)). But that opinion—in addition to not binding this or any other

court—*see Casa De Maryland v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 692, n.1 (4th Cir. 2019)—says nothing about whether another entity also has authority to create a security perimeter pursuant to § 1752. Grider has offered nothing to convince this Court that it should reject the teaching of its colleagues on this issue.

## B.     SECTION 1752 IS NOT UNCONSTITUTIONALLY VAGUE.

Grider claims that § 1752 as applied to his conduct is unconstitutionally vague. Def. Mot. at 32-34. That is so, he claims, "because, prior to January 6, it had never prosecuted a violation of that statute with the allegation that the accused entered an area restricted by some government agency other than the USSS." *Id*. at 33. He claims that charging participants in the January 6 riots under § 1752 "raises questions of discriminatory law enforcement." *Id*. at 33-34. And he again complains that the government is prosecuting him with violating § 1752 but not others who acted similarly. *Id*. at 34.

Grider's argument misconstrues the vagueness doctrine. The challenger must overcome the "strong presumptive validity that attaches to an Act of Congress," which has led the Supreme Court "to hold many times that statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language," *United States v. Nat'l Dairy Products Corp*., 372 U.S. 29, 32 (1963). Nor is a statute impermissibly vague because a reasonable jurist might disagree on where to draw the line between lawful and unlawful conduct in particular circumstances, *Skilling v. United States*, 561 U.S. 358, 403 (2010). Rather, a statute is vague only if it requires proof of an "incriminating fact" that is so indeterminate as to invite arbitrary and "wholly subjective" application. *United States v. Williams*, 553 U.S. 285, 306 (2008) The "touchstone" of the vagueness analysis "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

A proper vagueness challenge, then, *must* turn on the precise wording of the challenged statute and explain why the statutory text fails to give a person of reasonable intelligence adequate notice that their charged conduct violated the statute. *See City of Chicago v. Morales*, 527 U.S. 41, 56 (1999) (the definition of "loitering" in the challenged ordinance as "to remain in any one place with no apparent purpose" was unconstitutionally vague); *United States v. Chhun*, 744 F.3d 1110, 1117 (9th Cir. 2014) ("Chhun's void for vagueness argument fails because, as discussed above, the statute's text is clear and unambiguous. A reasonable person would have no difficulty recognizing what conduct § 956(a) prohibits.").

Here, Grider declines to identify *any* portion of the text of *any* of the three subsections of § 1752 he is charged with violating that would create confusion in the mind of a reasonable person about the boundary between lawful and unlawful conduct. This Court should "not do [Grider's] work for him." *Wickens v. Shell Oil Co.*, 620 F.3d 747, 757 (7th Cir. 2010); *Meschino v. N. Am. Drager, Inc.*, 841 F.2d 429, 436 (1st Cir. 1988) ("We will not do counsel's work for him.").

Grider declines to mention that Judges Friedman, Bates, Kelly, McFadden, and Cooper have all rejected vagueness challenges to 18 U.S.C. 1752(a)(1) and (a)(2). *Puma*, 2022 WL 823079, at *3 ("This Court concludes that … 18 U.S.C. § 1752 [is] not unconstitutionally vague.") (Friedman, J.); *Bozell*, 2022 WL 474144, at *9 ("§ 1752 "is clear[,] gives fair notice of the conduct it punishes, and [does not] invite arbitrary enforcement."); *Nordean*, 2021 WL 6134595, at *19 (§ 1752(a)(1) and (a)(2) are "not unconstitutionally vague"); *Griffin*, 549 F. Supp. 3d at 57 ("This law is no trap awaiting the unwary."); *United States v. Caputo*, 201 F. Supp. 3d 65, 72 (D.D.C. 2016) ("18 U.S.C. § 1752(a)(1) is … not void for vagueness.") (Cooper, J.). Grider ignores those decisions. Nor does he identify any decision from any district holding to the contrary.

### C.       THE RULE OF LENITY DOES NOT APPLY HERE.

Grider relatedly contends the rule of lenity requires dismissal of § 1752 counts. Def. Mot. at 34-35. This claim also fails. The rule of lenity provides that, "ambiguity concerning the ambit of criminal statutes should be resolved in favor of lenity." *Cleveland v. United States*, 531 U.S. 12, 25 (2000) (quoting *Rewis v. United States*, 401 U.S. 808, 812 (1971)). Even in its most robust form, the rule of lenity only applies when, "after all legitimate tools of interpretation have been exhausted, 'a reasonable doubt persists' regarding whether Congress has made the defendant's conduct a federal crime." *Moskal v. United States*, 498 U.S. 103, 108 (1990)); *accord Barber v. Thomas*, 560 U.S. 474, 488 (2010) ("[T]he rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity or uncertainty in the statute,' such that the Court must simply 'guess as to what Congress intended.'") (cleaned up).

A criminal statute is ambiguous when, for instance, it "has two possible readings," one favorable to the defendant and the other unfavorable. *Abramski v. United States*, 573 U.S. 169, 203 (2014) (Scalia, J., dissenting); *accord United States v. Santos*, 553 U.S. 507, 512 (2008) (finding a statutory term ambiguous where two plausible readings of the term existed). But Grider ignores this textual point and instead focuses on irrelevancies. *See* Def. Mot. at 35 (pointing to: "the lack of any references in § 1752 to agencies other than the USSS"; legislative history; the statutory mention of the Secret Service and its enforcement role; the absence of caselaw regarding § 1752 and the crimes on January 6; and the supposed "common sense notion that if the USSS patrols and guards the restricted areas in § 1752, it also sets them." Def. Mot. at 35.

To take the last point first, the USCP has statutory authority to patrol and guard the United States Capitol Building and Grounds. *See* 2 U.S.C. § 1961(a). If Grider's "common sense" logic is correct, the USCP also has authority to determine the meets and bounds of the restricted areas. As to his third point, that cases before January 6 did not apply § 1752 to a similar riot during which

a mob of tens of thousands of persons stormed the Capitol in order to prevent the certification vote is because there was no remotely similar riot.

Grider's "rule of lenity" attacks on § 1752 all ignore the statutory text, which abjures any special role for the Secret Service for setting the restrictions. Judge McFadden made short work of a similar rule of lenity and "novel construction principle" challenge to § 1752 in *Griffin*:

> Neither applies. Lenity is "a sort of junior version of the vagueness doctrine." It comes into frame only when a court has exhausted all canons of statutory construction and is left with only a coin flip to resolve "grievous ambiguity."

> As the Court has explained, Section 1752 is capacious, not ambiguous. Griffin's ability to articulate a narrower construction of the statute does not trigger lenity.

*Griffin*, 549 F. Supp. 3d at 57 (cleaned up). Judges Bates and Boasberg reached the same conclusion. *Bozell*, 2022 WL 474144, at *9; *Mostofsky*, 2021 WL 6049891, at *13. No court has reached a contrary result. Grider mentions none of those decisions, much less explains why this Court should reject their conclusions or reasoning.

## D.    SECTION 1752 IS NOT AN *EX POST FACTO* LAW.

Reprising his challenge to § 231(a)(3), Grider contends that charging him with violations of § 1752 violates the *Ex Post Facto Clause* "because no court before January 6 ever construed [that statute] to mean that agencies other than the USSS may set restricted areas under the statute." Def. Mot. at 37. Other judges of this court have put paid to that claim, and this Court should as well. *See Griffin*, 549 F. Supp. 3d at 58 *Mostofsky*, 2021 WL 6049891, at *13. As Judge McFadden explained in rejecting an *Ex Post Facto* challenge to § 1752:

> Nor has there been an unforeseen judicial enlargement of a longstanding criminal statute so that it operates like an ex post facto law. Griffin has allegedly violated a rarely charged statute, but that does not mean the construction of the statute unfairly blindsided him. There was no prevailing practice of courts forgoing or blindsided him.

*Griffin*, 549 F. Supp. 3d at 58.

In summary, all of Grider's challenges to the § 1752 counts are without merit.

## CONCLUSION

For the foregoing reasons, and any additional reasons as may be cited at a hearing on this motion, the government respectfully requests that Grider's present motion to dismiss Counts One, Two, Four, Five, and Six of the Superseding Indictment be denied.


Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:

*/s/ Cindy J. Cho*
CINDY J. CHO
Assistant United States Attorney
Member of NY Bar
Detailee
10 W. Market St., Ste 2100
Indianapolis, IN 46204
Phone: (317) 246-0107
Email: Cindy.Cho@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 8, 2022, I caused a copy of the foregoing motion to be served on counsel of record via electronic filing.

*/s/ Cindy J. Cho*
Cindy J. Cho
Assistant United States Attorney