**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 1:21-cr-00022-CKK** |
| | : | |
| **v.** | : | |
| | : | |
| **CHRISTOPHER RAY GRIDER,** | : | |
| | : | |
| **Defendant** | : | |

**UNITED STATES' RESPONSE TO DEFENDANT'S NOTICE OF INTENT TO RAISE PUBLIC AUTHORITY DEFENSE**

Defendant Christopher Grider seeks to raise a defense of "entrapment by estoppel" at his December trial in this matter. *See* Def't Br. In Supp., Dkt. 108. But listening to then-President Trump's speech before the riot on January 6, 2021 certainly cannot be a reasonable defense – let alone an exoneration – of the crimes with which he is charged.

This is not the first time in this District that defendants have argued that high-ranking government officials authorized criminal misconduct. Thirty years ago, the D.C. Circuit considered an asserted defense not unlike that made by Grider. In the wake of the Iran-Contra scandal, Oliver North faced criminal prosecution for conduct that North said he had been directed to engage in by the National Security Advisor to President Reagan, allegedly with the President's acquiescence or approval. North was a high-ranking government official indisputably working on behalf of the Administration; his superior, the National Security Advisor, had not only condoned but engaged in similar misconduct; and his superior reported directly to the President. North subpoenaed the then-former President to be a witness at his trial. North also requested that the trial court use this jury instruction at his trial: "If you find that . . . North acted in good faith on a superior's apparent authorization of his action, and that his reliance was reasonable based on the facts as he perceived them, that is a complete defense . . . ."

*United States v. North*, 910 F.2d 843, 879 (D.C. Cir. 1990) (per curiam), *opinion withdrawn and superseded in part on reh'g*, 920 F.2d 940 (D.C. Cir. 1990).

The D.C. Circuit flatly rejected North's claim that he could raise a good-faith defense based on the apparent or implied authorization by his superiors in the Executive Branch:

> North's suggested instruction, quoted above, goes so far as to conjure up the notion of a "Nuremberg" defense, a notion from which our criminal justice system, one based on individual accountability and responsibility, has historically recoiled. In the absence of clear and comprehensible Circuit authority that we must do so, we refuse to hold that following orders, without more, can transform an illegal act into a legal one.

*Id.* at 881. The Court similarly concluded that whether North "was following President Reagan's orders" was "immaterial" to whether North intended to "corruptly" obstruct Congress under 18 U.S.C. § 1505. *Id.* at 884. In so doing, the Court rejected North's "stunning" idea that he could "escape the criminal consequences of his otherwise unlawful acts merely by asserting that his reason for committing the acts was that he was 'following orders.'" *Id.* at 883-84.

Grider's claim is weaker than North's unsuccessful claim in virtually every respect. He is not—nor ever has been—a government official, let alone a government official engaged in high-level national security work. Instead, he is a member of the public who claims that he went to a rally and heard the former President tell him to "walk down to the Capitol" and "show strength," among other things. Dkt. 108 at 3. Based on that, Grider contends that he is entitled to raise an entrapment-by-estoppel defense at trial.

This Court should reject Grider's attempt to deflect responsibility. The narrow affirmative defense he invokes has no application here, and he should be precluded from raising it at trial. Grider cannot show that former President Trump advised him that the criminal statutes he is alleged to have violated did not apply to his conduct. And Grider cannot show that

it was objectively reasonable for him to rely on the statements of former President Trump as invitations to commit consequence-free criminal acts.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Grider took a flight from Dallas to Washington, D.C. on January 6, 2021, after texting with friends and family about his plans. Once in Washington, D.C., he attended the "Stop the Steal" rally on the National Mall. He then headed to the U.S. Capitol building, joining other rioters in the scaffolding on the northwest terrace of the buildings. As Grider walked up the railing of the terrace steps, other rioters scaled the walls of the terrace, and he entered the building through the Senate wing doors just minutes after that door was first breached, at 2:15PM.

At approximately 2:19PM, he headed toward the Crypt, where he joined with a crowd of rioters chanting "Stop the Steal" and "Our house" in front of a line of police officers. Grider waved others in as the crowd grew and chanted. Beginning at 2:25PM, he and the crowd started pushing on the police line and eventually overwhelmed the police officers. Grider even spoke with a police officer he pushed past on his way out of the Crypt. Grider continued to encourage others to participate in the riot throughout his time in the Capitol, waving people in as he walked through the Statuary Hall Connector.

Shortly after 2:30PM, Grider had almost made it to the House Chamber door. He and a small crowd gathered in the hallway between Statuary Hall and the House Chamber. They chanted "break it down," and "We want Trump" in front of another line of police officers who were standing guard in front of the House Chamber door, for at least five minutes. Then, Grider and the crowd pushed past the line of police to get to the House Chamber door. They clamored directly outside of the House Chamber, with some banging on the door and all trying to get in.

At one point, a rioter yelled, "Use your helmet, use your kevlar!" and shortly thereafter, Grider held up his black helmet to the rioters in front of him.

Unable to get into the House Chamber at this door, a couple rioters beckoned the crowd away from the entrance and then a stream of people followed as they made their way toward the Speaker's Lobby. Grider appeared to be among the first people to heed the call as he sprinted down the hallway. He was one of the first rioters to arrive at the Speaker's Lobby door. Grider, and other rioters, directly confronted the police officers guarding the door, agitating to get inside. He told officers that "people are going to get hurt, just open the door man." Then, as Grider looked on, another rioter punched the window to the right of the door. The rioter appeared to have cracked, but not entirely broken that window. Grider approached the rioter then, holding out his black helmet. Grider appeared to knock on the top of the helmet, signifying that it was a hard instrument, and then handed it over to the rioter.

The three officers guarding the door appeared to move to the adjacent wall. Seconds later, Grider moved in and attempted to push open at least one of the doors. Chants could be heard of "Break it down!" and "Let's fucking go!" Using Grider's helmet, the other rioter attacked the door and a window in the door. The other rioter, again using Grider's helmet, then attacked the window to the right of the door. Grider was at the door this entire time, observing everything that had been set in motion with his helmet.

A woman, later publicly identified as Ashli Babbitt, climbed through the emptied-out window frame. At the same time, Grider backed away from the door as rioters in the crowd started screaming "gun." As Babbitt was climbing through the window, she was shot by an officer on the other side of the door. After the shooting, several rioters ran out of the hallway as police yelled for people to get out of the way. An area was eventually cleared as a path to allow

Babbitt to be carried out of the building. Grider remained and could be seen minutes after the shooting, leaning over the railing to get a better glimpse of Babbitt bleeding on the floor. He was holding his phone over the stairway appearing to capture a video or pictures of Babbitt.

Approximately ten minutes later, he exited the building and told people outside the Capitol building about a woman getting shot. Later that evening, Grider gave a televised interview, apparently via videoconference from Washington, D.C., to KWTX-TV News 10, a local news media station in Waco, Texas. During the interview, he admitted to being inside the United States Capitol Building that day when it was breached by large crowds as Congress convened in a Joint Session to affirm the Electoral College vote in the 2020 Presidential Election. He also described witnessing Babbitt being shot.

Grider stated on camera, "The president asked people to come and show their support… I feel like it's the least that we can do, it's kind of why I came from central Texas all the way to DC." The accompanying article additionally quoted the defendant as saying, "The Capitol Police started pepper-spraying people and they were firing rubber bullets, and then after that started, that's when people started pushing to get into the Capitol building to be heard" and reported that "Grider said … there were many protesters, like himself, who were protecting monuments and art from the crowds."[1]

Based on this conduct, Grider was charged with Civil Disorder under 18 U.S.C. § 231(a)(3) (Count One); Obstruction of an Official Proceeding under 18 U.S.C. § 1512(c)(2) and (2) (Count Two); Destruction of Government Property under 18 U.S.C. § 1361 (Count Three); Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C.

---

1 The interview can be viewed at https://www.kwtx.com/2021/01/07/central-texas-man-witnessed-deadly-shooting-as-trump-supporters-stormed-us-capitol/.

§ 1752(a)(1) (Count Four); Disorderly and Disruptive Conduct in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(2) (Count Five); Engaging in Physical Violence in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(4) (Count Six); Disorderly Conduct in a Capitol Building under 40 U.S.C. § 5104(e)(2)(D) (Count Seven); Act of Physical Violence in the Capitol Grounds or Buildings under 40 U.S.C. § 5104(e)(2)(F) (Count Eight); and Parading, Demonstrating, or Picketing in a Capitol Building under 40 U.S.C. § 5104(e)(2)(G) (Count Nine).

On June 22, 2022, Grider filed a "Notice of Intent to Raise Public Authority Defense." Dkt. 102. The next day, the Court issued a Minute Order directing legal briefing on the issue. On July 7, 2022, Grider filed his brief in support of his intent to raise an "entrapment by estoppel" defense. Dkt. 108.

## II. ARGUMENT

As a matter of law, the entrapment-by-estoppel defense cannot apply on these facts. This defense applies only if a defendant was "actively misled . . . about the state of the law defining the offense," and relied on that misleading advice. *United States v. Cox*, 906 F.3d 1170, 1191 (10th Cir. 2018). No such advice was given to Grider on or before January 7. This defense also requires that a defendant's reliance be reasonable. Even if Grider believed that the statutes he is now charged with had been interpreted to permit his conduct, that belief would not be reasonable.

The Court should therefore preclude this defense in advance of trial. "In a variety of procedural contexts, the vast majority of cases have held, as a matter of law, that the defense was unavailable on the facts of the case." *United States v. Conley*, 859 F. Supp. 909, 926 (W.D. Pa. 1994). Accordingly, courts have routinely rejected either jury instructions or requests to put on

evidence by defendants whose proffered evidence fails, as a matter of law, to meet the defenses' requirements. *E.g.*, *United States v. Nichols*, 21 F.3d 1016, 1018 (10th Cir. 1994) (affirming denial of motion to appoint psychological expert to testify in support of entrapment-by-estoppel defense); *United States v. Weitzenhoff*, 35 F.3d 1275, 1290 (9th Cir. 1993) (upholding refusal to instruct jury on entrapment-by-estoppel defense); *United States v. Brebner*, 951 F.2d 1017, 1024-27 (9th Cir. 1991) (affirming exclusion of evidence purporting to raise the defense as immaterial as a matter of law); *United States v. Etheridge*, 932 F.2d 318, 320-21 (4th Cir. 1991) (order granting motion in limine precluding evidence upheld); *United States v. Thompson*, Case No. 1:21-cr-161-RBW, Dkt. 69 (Mar. 25, 2022) (excluding testimony of witnesses in Capitol riot case, where defendant sought admission to support entrapment-by-estoppel and public authority defense).

**A. No Executive official could empower Grider, explicitly or implicitly, to commit the criminal conduct he engaged in on January 6.**

As an initial matter, former President Trump did not have the authority to permit or authorize the criminal conduct engaged in by Grider—civil disorder, obstructing an official proceeding, disorderly conduct, engaging in physical violence in a Capitol building, entering and remaining in a restricted area, and parading and demonstrating in a Capitol building[2]—on January 6. As Chief Judge Howell wrote last year in rejecting the idea of an entrapment-by-estoppel defense for January 6 defendants:

> [A President] cannot, in keeping with his constitutional function and his responsibilities under Article II, lawfully permit actions that directly undermine the Constitution. Thus, a President cannot, within the confines of his constitutional authority, prevent the constitutionally mandated certification of the results of a Presidential Election or encourage others to do so on his behalf, nor can he direct an assault on the coequal Legislative branch of government. Were a President to

2 The defendant acknowledges that the proposed defense is unavailable to defend against at least Counts 3 and 8 of the Superseding Indictment.

> attempt to condone such conduct, he would act *ultra vires* and thus without the force of his constitutional authority. . . . Put simply, even if former President Trump in fact [explicitly directed the rioters' actions,] his statements would not immunize defendants charged with offenses arising from the January 6 assault on the Capitol from criminal liability.

*United States v. Chrestman*, 525 F. Supp. 3d 14, 32-33 (D.D.C. 2021).

The D.C. Circuit came to the same conclusion in *North*, when addressing Oliver North's contention that President Reagan authorized his obstruction of Congress in that case. The court made clear that "'[n]either the President nor any of [North's] superiors had the legal authority to order anyone to violate the law,' particularly if such 'orders,' explicit or implicit, represented nothing more than [the President's] desires." *North*, 910 F.2d at 891 n.24. Fifteen years earlier, the D.C. Circuit did not even entertain the idea that the President can lawfully authorize an individual to obstruct justice or Congress when it would have most obviously applied. Three former high-ranking officials in the Nixon Administration were convicted of obstruction of justice, conspiracy, and perjury in connection with the Watergate scandal. *See United States v. Haldeman*, 559 F.2d 31, 51 (D.C. Cir. 1976). President Nixon had spoken directly and privately with several of the defendants and directed or at least acquiesced in much of their illegal conduct. *See id.* at 57-59. Yet neither the district court nor the D.C. Circuit apparently contemplated that Nixon's involvement in the Watergate cover-up could somehow immunize the participants from later prosecution. *Id.* at 84-88; *United States v. Mitchell*, 385 F. Supp. 1190 (D.D.C. 1974) (district court opinion). Indeed, the district court (later affirmed on appeal) thought so little of Nixon's importance to his subordinates' trial that it denied a continuance that would have allowed Nixon to testify, on the ground that his testimony was largely immaterial or cumulative to the defendants' case. *Mitchell*, 385 F. Supp. at 1192-93.

Thus, even if former President Trump explicitly called for Grider to engage in the charged criminal conduct, that could not underlie an entrapment-by-estoppel defense.

**B. There is no available entrapment-by-estoppel defense, because Grider cannot point to an interpretation of the statutes he is charged with violating on which he reasonably relied.**

Courts have narrowly confined the entrapment-by-estoppel defense. The Supreme Court first adopted a due process defense to entrapment by public officials in *Raley v. Ohio*, 360 U.S. 423 (1959). In *Raley*, the Supreme Court set aside the convictions of three individuals who refused to answer the questions of the Ohio Un-American Activities Commission, in reliance on inaccurate representations by the Commission "that they had a right to rely on the privilege against self-incrimination" under the Ohio Constitution. 360 U.S. at 425. The Court held that the convictions violated the Fourteenth Amendment's Due Process Clause because they involved "the most indefensible sort of entrapment by the State—convicting a citizen for exercising a privilege which the State clearly had told him was available to him." *Id.* at 438. The Court emphasized that the Commission's advice constituted "active misleading" as to the contours of that "vague and undefined" area of law. *Id.*

A few years later, the Court revisited the subject in *Cox v. Louisiana*, 379 U.S. 559 (1965). *Cox* reversed the conviction of a protester who had led a group of 2,000 in a civil rights march across the street from a courthouse and was later prosecuted for violating an anti-picketing statute prohibiting demonstrations "near" a courthouse. 379 U.S. at 560, 564-65. The statute did not define that term. *Id.* at 560. The protesters had been "affirmatively told" by "the highest police officials of the city, in the presence of the Sheriff and Mayor," that protesting across the street from the courthouse was lawful under that statute. *Id.* at 571. The Court determined that the statute's ambiguous term "near" necessarily "foresees a degree of on-the-

spot administrative interpretation by officials charged with responsibility for administering and enforcing it," and thus found that the demonstrators "would justifiably tend to rely on [the police's] administrative interpretation of how 'near' the courthouse a particular demonstration might take place." *Id.* at 568-69. The Court concluded that the local officials' interpretation of "near" was a "limited administrative regulation of traffic" that the protesters reasonably relied on. *Id.* at 569. But it also made clear that a defendant cannot reasonably rely on a law enforcement official's attempt to provide "a waiver of law," which the Court described as "beyond the power of the police." *Id.*

Distilling these cases, recent case law has limited the entrapment-by-estoppel defense to the narrow circumstances in which a defendant reasonably relies on an interpretation of a statute that, if accurate, would render the defendant's conduct non-criminal. "To win an entrapment-by-estoppel claim, a defendant criminally prosecuted for an offense must prove (1) that a government agent actively misled him about the state of the law defining the offense; (2) that the government agent was responsible for interpreting, administering, or enforcing the law defining the offense; (3) that the defendant actually relied on the agent's misleading pronouncement in committing the offense; and (4) that the defendant's reliance was reasonable in light of the identity of the agent, the point of law misrepresented, and the substance of the misrepresentation." *Cox*, 906 F.3d at 1191; *United States v. Burrows*, 36 F.3d 875, 882 (9th Cir. 1994) ("This defense applies when [1] a government official [2] tells a defendant that certain conduct is legal and the defendant commits what would otherwise be a crime [3] in reasonable reliance on the official's representation." (quoting *United States v. Baptista-Rodriguez*, 17 F.3d 1354, 1368 n.18 (11th Cir. 1994)); *United States v. Neville*, 82 F.3d 750, 761 (7th Cir. 1996) ("[W]e have required that [1] the government official "actively mislead the defendant; and that

the defendant's reliance be [2] actual and [3] reasonable in light of the identity of the agent, the point of law represented, and the substance of the misrepresentation."). Last year, Chief Judge Howell adopted the Tenth Circuit's four-part test in preliminarily rejecting a Capitol riot defendant's claim to a defense similar to Grider's. *See Chrestman*, 525 F. Supp. 3d at 33 (adopting *Cox*'s four-part test for entrapment-by-estoppel defense).

Grider cannot make out an entrapment-by-estoppel defense. No official provided an interpretation of the law covering Grider's alleged criminal conduct, thereby assuring Grider that his conduct was legal. Moreover, assuming Grider relied on former President Trump's words to commit civil disorder, obstruction of Congress, and other crimes, that reliance was objectively unreasonable.

**1. Grider identifies no witness who "actively misled" him by interpreting a law in a manner indicating that his criminal conduct was non-criminal.**

In his speech on January 6, 2021, former President Trump did not purport to interpret the scope of the statutes Grider is charged with violating. Said another way, former President Trump did not "affirmatively assure[] the defendant that certain conduct [was] legal." *United States v. Howell*, 37 F.3d 1197, 1204 (7th Cir. 1994); *United States v. Troncoso*, 23 F.3d 612, 615 (1st Cir. 1994) (defense fails absent advice from official that conduct "was actually legal"). Former President Trump did not state that the U.S. Capitol grounds were no longer "restricted" under 18 U.S.C. § 1752(a); nor that it would not constitute obstruction to enter the Capitol building under 18 U.S.C. § 1512; nor that it would not constitute an act to obstruct or impede law enforcement officers to enter the Capitol building and join a mob to break windows and doors under 18 U.S.C. § 231. Former President Trump did not purport to reinterpret a specific criminal statute to render Grider's conduct non-criminal. He therefore did not "actively

mis[lead]" Grider "about the state of the law defining the offense." *Cox*, 906 F.3d at 1191. Grider has not identified anyone else who might have authority to do so who did so either. Further, Grider identifies no comment made by former President Trump that purported to reinterpret any law. As Chief Judge Howell observed last year, an entrapment-by-estoppel defense by a January 6 rioter:

> would not be premised, as it was in *Raley* [and] *Cox*, . . . on a defendant's confusion about the state of the law and a government official's clarifying, if inaccurate, representations. It would instead rely on the premise that a defendant, though aware that his intended conduct was illegal, acted under the belief President Trump had waived the entire corpus of criminal law as it applied to the mob.

*Chrestman*, 525 F. Supp. 3d at 32; *see also North*, 910 F.2d 843 (noting that "North does not even claim that he relied on *any* 'conclusion or statement of *law*'"); *United States v. Smith*, 940 F.2d 710, 715 (1st Cir. 1991) (rejecting entrapment-by-estoppel defense because federal agent allegedly encouraged defendant to keep firearms to assist with undercover operation, but never was alleged "to have represented that keeping the guns was, in fact, *legal*").

Grider cites *United States v. Khanu*, 664 F.Supp.2d 35, 41 (D.D.C. 2009) in support of his assertion that the former President "created the effect of advising Mr. Grider and others that their actions were legal." But *Khanu* does not support that claim. In *Khanu*, the defendant, who was prosecuted for tax evasion and related crimes, claimed that a "Closing Agreement" he had executed with the Internal Revenue Service (IRS) led him to reasonably believe that his criminal conduct was lawful. *Khanu*, 664 F.Supp.2d at 41. But this Court disagreed, pointing out that the statements at issue in the Agreement did not discuss criminal liability and certainly could not be "reasonably construed as an official pronouncement of what conduct is lawful in a criminal context." *Id*. As an initial matter, Grider's situation is nothing like what transpired in *Khanu*, where the IRS concluded an agreement directly with the defendant. And in any event,

Grider's claim fails for the same reason that Khanu's did: the former President's statements regarding marching to the Capitol building and showing strength cannot reasonably be interpreted as "official pronouncement" concerning whether certain conduct violated the criminal laws.

**2. Any reliance would not be objectively reasonable.**

In any event, even if former President Trump's statements could be construed as an unexpressed interpretation of the criminal laws applicable to Grider's conduct, and even if he relied on that interpretation, Grider cannot show that his reliance was reasonable. "[R]easonable reliance occurs" only "if 'a person sincerely desirous of obeying the law would have accepted the information as true, and would not have been put on notice to make further inquiries.'" *United States v. Lynch*, 903 F.3d 1061, 1077 (9th Cir. 2018) (internal quotation marks omitted); *United States v. Corso*, 20 F.3d 521, 528 (2d Cir. 1994) (adopting "sincerely desirous" standard). After former President Trump's remarks, Grider walked on top of the railing on the Capitol building's terrace stairs, next to scaffolding where rioters were throwing objects and climbing on beams. He entered the building through a door with a busted window, joined a crowd of rioters in the Crypt, and then continued into the Statuary Hall connector corridor. In both locations, he was part of a crowd that pushed at and overwhelmed police lines, finally arriving at the House Chamber door. After unsuccessfully trying to get into the House Chamber through that door, he sprinted to the Speaker's Lobby door to find another entry point to the House Chamber. There, watching others attempting to break through the door and windows, he offered up his helmet to another rioter, to assist with the destruction. After that rioter successfully used Grider's helmet to break the windows, Ashli Babbitt tried to climb through to the Speaker's Lobby, and was shot and killed.

Grider could not have reasonably relied on statements by former President Trump to conclude that that conduct was lawful. His reliance on *United States v. Barker*, 546 F.2d 940 (D.C. Cir. 1976) (per curiam), is unavailing. In *Barker*, the court reversed the convictions of two defendants who participated in the burglary of Daniel Ellsberg's psychiatrist's office. The defendants claimed they did so at the behest of E. Howard Hunt, a long-time CIA agent who worked under the supervision of John Ehrlichman in the White House. *North*, 910 F.2d at 879. The case featured fractured separate opinions from the three-judge panel. Judge Wilkey, half of the two-judge majority, wrote that a defendant's reasonable reliance on the "apparent authority" of a government official (there, Hunt) to authorize his conduct could make out a defense. *Id.* (quoting *Barker*, 546 F.2d at 949 (opinion of Wilkey, J.). But that portion of *Barker* was not the controlling rationale, and the panel majority in *North* subsequently rejected North's request for an instruction invoking his superiors' "apparent authorization of his action." *Id.* at 881. In any event, Judge Wilkey's application of reasonable reliance in *Barker* hinged on specific facts in that case that have no analogue here: the *Barker* defendants, each of whom had worked with the CIA, claimed that a government official (and previous CIA supervisor) authorized what they allegedly were told was a counter-espionage operation. Grider, a private citizen, alleges no similar relationship with former President Trump.

Thus, regardless of former President Trump's intent or the foreseeability of Grider's and other rioters' reactions to his statements, when Grider engaged in the conduct described above, any reasonable person in his shoes would "[know] he was breaking the law." *Corso*, 20 F.3d at 529. Certainly, one "sincerely desirous of obeying the law" could not have accepted at face value any purported assurance that such conduct was lawful. *Lynch*, 903 F.3d at 1077-78. Grider therefore cannot rely on the defense of entrapment by estoppel. That would be true even

if former President Trump explicitly called for violence and mayhem: it is unreasonable, as a matter of law, for anyone to believe that a call for violence rendered their ensuing misconduct lawful.

## III. CONCLUSION

Therefore, this Court should preclude Grider from pursuing an entrapment-by-estoppel defense at trial.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:

*s/ Cindy J. Cho*
CINDY J. CHO
Assistant United States Attorney
Member of NY Bar
Detailee
10 W. Market St., Ste 2100
Indianapolis, IN 46204
(317) 246-0107
Cindy.Cho@usdoj.gov

**CERTIFICATE OF SERVICE**

I hereby certify that on July 20, 2022, I caused a copy of the foregoing motion to be served on counsel of record via electronic filing.

*/s/ Cindy J. Cho*
Cindy J. Cho
Assistant United States Attorney