UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTOPHER RAY GRIDER,<br>          Defendant | Criminal Action No. 21-022 (CKK) |

**MEMORANDUM OPINION**
(July 29, 2022)

This criminal case is one of several hundred arising from the insurrection at the United States Capitol on January 6, 2021. For his actions at the Capitol on January 6, Defendant Christopher Ray Grider ("Defendant" or "Grider") is charged by indictment with three felony and six misdemeanor counts. Before the Court is Defendant's [101] Motion to Dismiss Counts One, Two, Four, Five, and Six of the Superseding Indictment. Upon consideration of the briefing,[1] the relevant legal authorities, and the entire record, the Court shall **DENY** Defendant's Motion.

          **I.    BACKGROUND**

Defendant is charged by indictment with: (1) Civil Disorder, in violation of 18 U.S.C. § 231(a)(3); (2) Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2); (3) Destruction of Government Property, in violation of 18 U.S.C. § 1361;

---

[1] The Court's consideration has focused on:
- Defendant's Memorandum of Law in Support of Defendant's Motion to Dismiss Counts One, Two, Four, Five, and Six of the Superseding Indictment, ECF No. 101-1 ("Motion" or "Mot.");
- The Government's Opposition to Defendant's Motion to Dismiss Counts One, Two, Four, Five, and Six of the Superseding Indictment, ECF No. 109 ("Opp.");
- The Government's Affidavit in Support of its Sealed Complaint, ECF No. 1-1 ("Aff."); and
- Superseding Indictment, ECF No. 97 ("Indictment").

In an exercise of its discretion, the Court has concluded that oral argument would not be helpful in the resolution of the Motion.

1

(4) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (5) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation 18 U.S.C. § 1752(a)(2); (6) Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. §1752(a)(4); (7) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D); (8) Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. §5104(e)(2)(F); and (9) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G). The Court previously addressed this case's factual and procedural background in its last memorandum opinion denying Defendant's first motion to dismiss. *United States v. Grider*, --- F. Supp. 3d ---, 2022 WL 392307, at *1-3 (D.D.C. Feb. 9, 2022). The Court repeats that background here.

### A. Certification of the 2020 Presidential Election and Capitol Riot

The Twelfth Amendment of the United States Constitution provides that, after the members of the Electoral College "meet in their respective states and vote by ballot for President and Vice-President," they "shall sign and certify [their votes], and transmit [them] sealed to the seat of government of the United States, directed to the President of the Senate." U.S. Const. amend. XII. The Vice President of the United States, as President of the Senate, must then, "in the presence of the Senate and House of Representatives, open all the certificates[,], and the votes shall then be counted." *Id.* To count the votes and "declar[e] the result" of the Electoral College, federal law mandates that "Congress shall be in session on the sixth day of January succeeding every meeting of the electors" and that "[t]he Senate and House of Representatives shall meet in the Hall of the House at the hour of 1 o'clock in the afternoon on that day." 3 U.S.C. §§ 15-16.

Pursuant to the Constitution and federal law, Congress convened in a joint session at 1:00 PM on January 6, 2021, to count the votes of the Electoral College and certify the results of the

2020 Presidential Election, which had taken place on November 3, 2020. *See* Compl., Stmt. of Facts ("SOF") at 1, ECF No. 1-1. With then-Vice President Michael R. Pence presiding, proceedings began and continued until 1:30 PM, when the United States House of Representatives and the United States Senate adjourned to separate chambers within the Capitol to debate and consider an objection to the Electoral College vote from the State of Arizona. *Id.* Vice President Pence continued to preside in the Senate chamber. *Id.*

Shortly before noon, then-President Donald J. Trump took the stage at a rally of his supporters staged just south of the White House. *Trump v. Thompson*, 20 F.4th 10, 17 (D.C. Cir. 2021). Then-President Trump declared that the election was "rigged" and "stolen" and urged the crowd to "demand that Congress do the right thing and only count the electors who have been lawfully slated." *Id.* at 18 (cleaned up). During and after then-President Trump's speech, a mass of attendees marched on the Capitol. *See id.*

As they gathered outside the Capitol, the crowd faced temporary and permanent barricades and Capitol Police positioned to prevent unauthorized entry to the Capitol. Aff. ¶ 6. Shortly after 2:00 p.m., "crowd members forced entry into the Capitol building, including by breaking windows and assaulting Capitol Police officers, while others in the crowd encouraged and assisted those acts." *Id*. These violent acts caused members of the Senate and House of Representatives to evacuate the chambers of the Capitol and suspend the certification process of the presidential election results. *Id*. ¶ 7. The violent riot "desecrated [the Capitol], blood was shed, and several individuals lost their lives." *Thompson*, 20 F.4th at 19. All told, "[t]he events of January 6, 2021 marked the most significant assault on the Capitol since the War of 1812." *Id*. at 18-19 (footnote omitted).

### B. Events Specific to Defendant

Defendant is one of more than 700 individuals charged with federal crimes for his conduct on January 6th. According to the allegations in the Indictment and the Affidavit in Support of Criminal Complaint, ECF No. 1-1,[2] Defendant traveled from central Texas to the District of Columbia for then-President Trump's rally. *See* Aff. at ¶ 10. After the rally, Grider made his way to the Capitol and entered the building with the crowd. *Id.* at ¶ 13. Once inside, Defendant continued all the way to the doors of the Speaker's Lobby, an area directly outside of and with access to the Floor of the United States House of Representatives. *See id.* at ¶¶ 10, 15. The photos included in the Affidavit show that only three Capitol police officers, two doors, and stacked furniture separated the mob from Members of Congress huddled behind the doors to the Floor. *See id.* ¶¶ 11, 15. The photos show Grider at the very front of the mob, "attempt[ing] to push open the doors and then kick the doors in an attempt to breach the entrance leading to the House Chamber." *Id.* at ¶ 15. The Affidavit also alleges that Grider handed a black helmet to another rioter to assist the rioter in breaking open the windows on the doors. *Id.* That rioter succeeded and another rioter standing next to Grider jumped through the broken window. *Id.* As she jumped through the window, she was shot by a Capitol Police officer guarding Members of Congress. *Id.* at 16. Grider later told a local news station that he was present when that rioter was shot; "[a]t that point we were all panicked, we couldn't leave because there were thousands of people behind us pushing us forward." *Id.* at 10.

---

[2] "It is appropriate if not necessary to rely on other official documents for the specific factual allegations underlying the [] Indictment, as the indictment itself contains few, if any, details about [Defendant's] alleged conduct." *United States v. McHugh*, --- F Supp. 3d ---, 2022 WL 296304 at *2 n.2 (D.D.C. Feb. 1, 2022) (JDB); *accord United States v. Mostofsky*, Crim. Action No. 21-138, 2021 WL 6049891 at *1 (D.D.C. Dec. 21, 2021) (JEB).

### C. Procedural History

On January 26, 2021, a grand jury in the District of Columbia returned a seven-count indictment against Defendant. On February 22, 2021, Defendant entered a plea of "not guilty." and the Court released him on personal recognizance with conditions. Defendant filed his initial motion to dismiss Count Four of the Indictment on March 22, 2021, which the Court denied on February 9, 2022. Order, ECF No. 77. The Government then filed its operative [97] Superseding Indictment on June 1, 2022. Pending with this Motion is Defendant's [108] Pretrial Memorandum in Support of Defendant's Notice to Raise Public Authority Defense, which the Court shall address in a separate memorandum opinion.

## II.   LEGAL STANDARD

Pursuant to Federal Rule of Criminal Procedure 12(b)(3), a criminal defendant may, before trial, move to dismiss a count of the indictment based on a "defect in the indictment." As relevant here, defects include "failure to state an offense." *Id.* "Failure to state an offense" may be due to a question of statutory interpretation or a constitutional issue. *See United States v. Stone*, 394 F. Supp. 3d 1, 8 (D.D.C. 2019). When considering a challenge to the indictment, "a district court is limited to reviewing the face of the indictment;" the Court must "presume the allegations [in the] indictment to be true." *United States v. Sunia*, 643 F. Supp. 2d 51, 60 (D.D.C. 2009) (internal quotation marks removed). "The operative question is whether [those] allegations, if proven, would be sufficient to permit a jury to find that the crimes charged were committed." *United States v. Sanford Ltd.*, 859 F. Supp. 2d 102, 107 (D.D.C. 2012).

## III.   DISCUSSION

Defendant's challenges to the Superseding Indictment are multitudinous. He challenges the reach of the civil disorder charge under the Commerce Clause, in addition to insisting that the

5

statute is vague and overbroad. So too is section 1512(c)(2) vague and overbroad, rehashing arguments the Court has already rejected in addition to some new arguments rejected by other judges of this court. Next, Defendant insists that, were the Court to rule against him, doing so would effect an *ex post facto* law in violation of the Fifth Amendment. All these challenges fail.

### A. 1512(c) and Reconsideration

Before turning to the core of the Motion, the Court must address Defendant's exceptionally brief request for reconsideration of the Court's Memorandum Opinion denying Defendant's first request to dismiss the 1512(c) charge. In support thereof, Defendant cites, in no more than a sentence, Judge Carl J. Nichols' opinion in *United States v. Miller*, --- F. Supp. 3d ---, 2022 WL 823070 (D.D.C. Mar. 7, 2022). As several other judges have noted denying reconsideration on the same grounds, *Miller* departs from the great weight of authority in this jurisdiction and, to this day, remains the only decision to ever adopt Defendant's reading. *See, e.g.*, *United States v. McHugh*, Crim. A. No. 21-453, 2022 WL 1302880, at *12 (D.D.C. May 2, 2022) (JDB).[3] As Defendant offers no substantive argument for reconsideration, and in light of this overwhelming weight of authority, the Court adopts Judge John D. Bates' well-reasoned opinion in *McHugh* and reaffirms and incorporates as part of this opinion the Court's discussion in the Court's last

---

[3] *See also, e.g.*, *United States v. Sandlin,* --- F. Supp. 3d ---, 2021 WL 5865006, at *5–9 (D.D.C. Dec. 10, 2021) (DLF); *United States v. Caldwell*, --- F. Supp. 3d ---, 2021 WL 6062718, at *11– 19 (D.D.C. Dec. 20, 2021) (APM); *United States v. Mostofsky*, --- F. Supp. 3d ---, 2021 WL 6049891, at *11 (D.D.C. Dec. 21, 2021) (JEB); *United States v. Montgomery*, --- F. Supp. 3d --- 2021 WL 6134591, at *10–18 (D.D.C. Dec. 28, 2021) (RDM); *United States v. Nordean*, --- F. Supp. 3d ---, 2021 WL 6134595, at *6–8 (D.D.C. Dec. 28, 2021) (TJK); *United States v. Bozell*, Crim. A. No. 21-216, 2022 WL 474144, at *1-7 (D.D.C. Feb. 16, 2022) (JDB); *United States v. Robertson*, --- F. Supp. 3d ---, 2022 WL 969546, at *3-6 (D.D.C. Feb. 25, 2022) (CRC); *United States v. Andries*, Crim. A. No. 21-93, 2022 WL 768684, at *3-12 (D.D.C. Mar. 14, 2022) (RC); *United States v. Puma*, --- F. Supp. 3d ---, 2022 WL 823079, at *4-14 (D.D.C. Mar. 19, 2022) (PLF); *United States v. Bingert*, --- F. Supp. 3d ---, 2022 WL 1659163, at *3-11 (D.D.C. May 25, 2022) (RCL); *United States v. Fitzsimmons*, --- F. Supp. 3d ---, 2022 WL 1698063, at *3-13 (D.D.C. May 26, 2022) (RC); *United States v. Williams*, Crim. A. No. 21-618, 2022 WL 2237301, at *1-3 (D.D.C. June 22, 2022) (ABJ).

memorandum opinion in this case.  ECF No. 78.

### B. Civil Disorder and Congressional Authority

Defendant first argues that the Court should dismiss the civil disorder charge because Congressional regulation of the conduct here, an insurrection at the United States Capitol, exceeds Congress' authority under the Commerce Clause.  Mot. at 7.  Pursuant to section 231(a)(3):

> Whoever commits or attempts to commit any action to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federal protected function[] [s]hall be fined . . . or imprisoned not more than five years, or both.

For the purposes of this provision, "commerce" means "commerce (A) between any State or the District of Columbia and any place outside thereof; (B) between points within any State or the District of Columbia, but through any place outside thereof; or (C) *wholly within the District of Columbia*."  18 U.S.C. § 232(2) (emphasis added).  As such, section 231 authorizes the regulation of civil disorders that impact (1) *inter*state commerce or (2) commerce wholly within the District of Columbia.  Because Congress has plenary authority to regulate activities within the District of Columbia, the Court need not address Defendant's argument that section 231 exceeds Congress' authority to regulate interstate commerce.

The Constitution endows Congress with plenary power over the District of Columbia.  *See* U.S. Const. Art. I., § 8, Cl. 17; *Palmore v. United States*, 411 U.S. 389, 397 (1973).  "Not only may statutes of Congress of otherwise nationwide application be applied to the District of Columbia, but Congress may also exercise all the police and regulatory powers which a state legislature or municipal government would have in legislating for state or local purposes." *Palmore*, 411 U.S. at 397.  The prohibition of riots is, of course, a central police power and is one of the oldest common law and statutory crimes of Anglo-American law.  *See* 4 William Blackstone,

7

*Commentaries* *152, *152-53 (common law); James Pope, *Republican Moments: The Direct Role of Popular Power in the American Constitutional Order*, 139 U. Pa. L. Rev. 287, 333-35 (1990) (discussing English Riot Act of 1714, 1 Geo. 1 c. 5, and colonial corollaries). As such, the Court need not reach Defendant's Commerce-Clause argument in order to conclude that Congress has the constitutional authority to regulate civil disorders within the District of Columbia.[4] *See Darnell v. Markwood*, 220 F.2d 374, 375-77 (D.C. Cir. 1954) (federal antitrust action permitted against anticompetitive practice in the District of Columbia independent of allegations of interstate commerce because Congress has police power over District of Columbia); *cf. also Mostofsky*, 2021 WL 6049891, at *7 (agreeing, in dicta, that art. I, § 8, cl. 17 empowered Congress to enact section 231 as to civil disorders within the District of Columbia).

## C. Overbreadth

Grider maintains that sections 231 and 1512(c) are overbroad under the First Amendment. Although it is unclear whether Grider mounts a facial or as-applied challenge to section 231, it fails under either theory. So too does his as-applied challenge to section 1512(c).

To succeed on a facial challenge, the movant must show "'that no set of circumstances exists under which [the challenged law] would be valid or that the statute lacks any plainly legitimate sweep.'" *Edwards v. District of Columbia*, 755 F.3d 996, 1001 (D.C. Cir. 2014) (brackets altered and footnote omitted) (quoting *United States v. Stevens*, 559 U.S. 460, 472 (2010)). In the First Amendment context, the court may also invalidate a law as overbroad if "'a substantial number of its applications are unconstitutional, judged in relationship to its plainly legitimate sweep.'" *Id.* (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S.

---

[4] Nor does the Court reach Defendant's argument that the quadrennial Joint Session of Congress to count the votes of the Electoral College is not a "federal protected function" for the purposes of section 231. Nevertheless, the Court notes that at least one other court of this jurisdiction has rejected the same Commerce-Clause argument raised here. *Mostofsky*, 2021 WL 6049891, at *7.

442, 449 n.6 (2008)).  This latter course, however, is "strong medicine" to be prescribed "sparingly[,] only as a last resort," and only upon a showing of protected instances that would, in fact, violate the law at issue.  *See N.Y. State Club Ass'n, Inc. v. City of New York*, 487 U.S. 1, 14 (1988).  For an as-applied challenge, a movant "must show that the [law] is unconstitutional as applied to their particular speech activity." *Edwards*, 755 F.3d at 1001.  An as-applied challenge can prevail only if the movant's "conduct is, in fact, expressive." *United States v. Caputo*, 201 F. Supp. 3d 65, 71 (D.D.C. 2016); *see also Texas v. Johnson*, 491 U.S. 397, 403 (1989).

Any facial challenge to section 231 under the First Amendment fails.  Before turning to the extent of the law's "plainly legitimate sweep," it should be noted that section 231 uses the same language to proscribe the same conduct that is proscribed at common law and under most state statutes.  Section 231 bars, under certain circumstances, "civil disorders" which the statute defines as "public disturbance[s] involving acts of violence by assemblages of three or more persons, which cause[] an immediate danger of or results in damage or injury to the property or person of another individual."  18 U.S.C. § 232(1).  In this regard, section 231 defines "civil disorder" in the same way a riot is defined at common law and by statute.

> At common law, a riot is
>
> a tumultuous disturbance of the peace by three or more persons acting together (a) in the commission of a crime by open force, or (b) in the execution of some enterprise, lawful or unlawful, in such a violent, turbulent and unauthorized manner as to create likelihood of public terror and alarm.

*Riot*, Black's Law Dictionary (9th ed. 2020) (quoting Perkins & Boyce, *Criminal Law* (6th ed. 1967)); *see also* 77 C.J.S. Riot § 6 (West 2022) (collecting cases).  Similarly, most criminal statutes define a "riot" as an "assemblage" of a certain number of people "resulting in conduct which creates an immediate danger of damage to property or injury to persons" and criminalizes such conduct when a defendant "knowingly participated" in the assemblage.  *See, e.g.*, *Hirschi v. State*,

9

683 S.W.2d 415, 417 (Tex. Crim. App. 1984) (en banc).[5]  As such, if Defendant truly attempts a facial challenge to section 231, he is, in effect, asking the Court to vitiate centuries of criminal law across a swath of jurisdictions.

In fact, such an argument faces an even higher hurdle insofar as section 231 is narrower than the crime of rioting itself at common law and under most state criminal codes.  Not only must a defendant participate in a "civil disorder" to be criminally liable under section 231, but he must *also* "obstruct, impede, or interfere with [a] fireman or law enforcement officer" while that fireman or law enforcement officer is engaged in suppressing the civil disorder.  In other words, here, Government must show that Defendant took an additional, overt act in furtherance of the civil disorder at issue.  For the mere fact that section 231 is narrower than the crime of rioting, the Court would be inclined to conclude that very few, if any, of section 231's "applications are unconstitutional, judged in relationship to its plainly legitimate sweep." *See Edwards*, 755 F.3d at 1001.

Nevertheless, the Court shall pause to discuss in more detail why a facial challenge fails.  In so doing, this Court joins five other courts in this district in concluding that section 231 is not "overbroad on its face."  *See Williams*, 2022 WL 2237301, at *6-7.[6]  As these other courts have explained, section 231's focus is on obstructive "acts."  *See id.* at *7.  Nowhere does the provision proscribe speech.[7]  To illustrate this point, contrast section 231 with the federal Anti-Riot Act, 18

---

[5] *See also, e.g.*, Va Code Ann. § 18.2-405 (similar); Del. Code Ann. tit. 11, § 1302 (similar); D.C. Code § 22-1322 (similar).

[6] Joining *McHugh*, 2022 WL 196304, at *17; *Mostofsky*, 2021 WL 6049891, at *8-9; *Nordean*, 2021 WL 6134595, at *17; and *Fischer*, 2022 WL 782413, at *3.

[7] There is, however, a small disagreement over the scope of the word "act."  The *Mostofsky* court notes, for example, that "there could be limited instances in which speaking constitutes the 'act' of interfering with a law-enforcement officer," but that those instances would likely be rare.  2021 WL 6049891, at *8; *accord McHugh*, 2022 WL 296304, at *17.  This Court is not so concerned.  The criminal law regularly proscribes "speech acts," i.e., speech that directly causes extant criminal activity, particularly in inchoate offenses.  *See United States v.* Ali, 870 F. Supp. 2d 10,

10

U.S.C. § 2102. Unlike that statute, the Anti-Riot Act also criminalizes *speech* "promot[ing]" or "encourag[ing]" a riot and incitement. *Id.* § 2102(a)(1)-(2). As the United States Court of Appeals for the Fourth Circuit recently held, proscribing that speech *is* overbroad because the First Amendment protects statements encouraging violent action, so long as it is not "directed and likely to produce imminent lawlessness." *United States v. Miselis*, 972 F.3d 518, 533 (2020). Section 231, like most riot statutes, faces no such problem. *See id.* at 540 (noting participation in a riot is not protected by the First Amendment); *United States v. Mechanic*, 454 F.2d 849, 853 (8th Cir. 1971) (rejecting overbreadth challenge to section 231). *Cf. also United States v. Matthews*, 419 F.2d 1177, 1180-82 (D.C. Cir. 1969) (discussing D.C. Code provision barring participation in a riot).

An as-applied challenge to section 231 fails as well. The complaint does not allege any expressive conduct on Grider's part. Rather, it claims that Grider "hand[ed] a black helmet to [another rioter]" while "signify[ing] that it [wa]s a hard instrument." Aff. at 7. That rioter then used the helmet to break down a portion of the doors to the Speaker's Lobby, leading directly to a third rioter's death. *Id.* at 7-8. The complaint further alleges that "Grider attempted to push open the doors and then kick the doors in an attempt to breach the entrance leading to [the] House Chamber where members of Congress were located." [8] *Id.* at 8. Such destructive acts are neither

---

18 n.10 (D.D.C. 2012). That certain speech acts may obstruct law enforcement in suppressing a civil disorder should be neither surprising nor concerning, particularly where a strict *mens rea* requirement would exempt protected activity from criminal liability. *See id.* at 18-19. The precise elements, however, are irrelevant to Grider's First Amendment challenge because the complaint charges overt acts that are not expressive.

[8] Grider also admits that he attempted, perhaps successfully, to convince the Capitol Police guarding the Speaker's Lobby to abandon their post. *See* ECF No. 75 at 3-4. Grider evidently thinks this admission exculpatory. It is not. Rather than leaving the riot, or even attempting to convince his *fellow rioters* to go home, Grider decided to convince law enforcement to let an insurrection through the doors, feet from the Floor of the United States House of Representatives. Indeed, Grider can be seen immediately moving to the doors as soon as the Capitol Police officers moved out of the way. Aff. at 8. Doing so likely "interfere[d]" with law enforcement's attempt

expressive nor protected by the First Amendment. *Nordean*, 2021 WL 6134595, at *14; *United States v. Gregg*, 226 F.3d 253, 267-68 (3d Cir. 2000) ("Activities that injure, threaten, or obstruct are not protected by the First Amendment, whether or not such conduct communicates a message.").

Grider's as-applied challenge to 1512(c) also fails. As discussed in more detail in the Court's last memorandum opinion, incorporated herein, section 1512(c)(2) criminalizes "corruptly . . . obstruct[ing], influenc[ing], or imped[ing] any official proceeding, or attempts to do so." *Grider*, 2022 WL 392307, at *3. The operative indictment alleges that Grider unlawfully entered the United States Capitol in order to corruptly disrupt the quadrennial certification of the votes of the Electoral College. *See* ECF No. 97 at 2. "More specifically, [Grider] is charged with conduct involving acts of trespass, depredation of property, and interference with law enforcement, all intended to obstruct Congress' performance of its constitutional duties." *Id.* As other courts of this jurisdiction have concluded, obstruction is not expressive conduct, much less protected expressive conduct, *e.g.*, *Nordean*, 2021 WL 6134595 at *13, particularly so for obstruction done "corruptly," *United States v. Thompson*, 76 F.3d 442, 452 (2d Cir. 1996) ("By targeting only such persuasion as is corrupt, [18 U.S.C. §] 1512(b) does not proscribe lawful or constitutionally protected speech.") (cleaned up). *Cf. also United States v. Jeter*, 775 F.2d 670, 679 (6th Cir. 1985) (obstruction of justice statute, 18 U.S.C. § 1503, is limited to "constitutionally unprotected and purportedly illicit activity" where it criminalizes only those who "corruptly endeavor to interfere with the due administration of justice"). Even were Grider's alleged actions expressive, behavior within the Capitol buildings that prevents "Congress [from] peaceably [] carry[ing] out its

---

to combat the mob in the midst of a "civil disorder." As to whether *this* conduct is expressive and, if so, protected by the First Amendment, the Court reserves judgment having found that the complaint alleges overt, non-communicative acts.

lawmaking responsibilities" is not speech protected by the First Amendment. *Bynum v. U.S. Capitol Police Bd.*, 93 F. Supp. 2d 50, 55-56 (D.D.C. 2000). Accordingly, Grider's First Amendment challenge to his 1512(c) charge fails.

**D. Section 1752**

Section 1752 bars certain unlawful conduct in "restricted buildings or grounds." The statute defines these areas as, in relevant part, "a building or grounds where the President or other person protected by the Secret Service is or will be temporarily visiting" or "a building or grounds so restricted in conjunction with an event designated as a special event of national significance." *Id.* (c)(1)(B)-(C). Defendant first argues that the United States Secret Service ("Secret Service"), and the Secret Service only, must first designate an area "restricted" before conduct in that area is unlawful for the purposes of section 1752. Mot. at 26-27. Second, Defendant argues that permitting any other reading would render the clause constitutionally vague. *Id*. at 32-33. These arguments do not convince.

As an initial matter, Defendant's textual argument rests on the mistaken factual premise that the Secret Service did not designate any area as "restricted" in advance of Vice President Michael R. Pence's visit to the United States Capitol on January 6, 2021. *See* Mot. at 26 n.4 (citing nothing, claiming that the Government "has conceded in other January 6 cases that the [Secret Service] did not set any restricted area on that day"). To the contrary. As this Court found, crediting the testimony of Secret Service Inspector Lanelle Hawa, "[i]n partnership with the Capitol Police, the United States Secret Service [] set up a protective perimeter around the entire grounds of the United States Capitol." *United States v. Rivera*, --- F. Supp. 3d ---, 2022 WL 2187851, at *2 (D.D.C. June 17, 2022). In any event, nothing in the statutory text requires "the Secret Service to be the entity to restrict or cordon off a particular area," *Mostofsky*, 2021 WL

13

6049891, at *13,[9] nor does Grider point to any provision in the statute in support of such a proposition.

As for vagueness, the Court begins from the presumption that "statutes are not automatically invalidated as vague simply because difficulty is found in determining whether certain marginal offenses fall within their language." *United States v. Nat'l Dairy Prods. Corp.*, 372 U.S. 29, 32 (1963). A law is unconstitutionally vague when it "fails to give ordinary people fair notice of the conduct it punishes, or [is] so standardless that it invites arbitrary enforcement." *Johnson v. United States*, 576 U.S. 591, 595 (2015). This is a "'stringent standard.'" *Sandlin*, 2021 WL 5865006 at *10 (quoting *United States v. Harmon*, No. 19-cr-395 (BAH), 2021 WL 1518344 at *4 (D.D.C. Apr. 16, 2021)). The vagueness determination "must be made on the basis of the statute itself and other pertinent law, rather than on the basis of an ad hoc appraisal of the subjective expectations of particular defendants." *Bouie v. City of Columbia*, 378 U.S. 347, 355 n.5 (1964). Simply put, there is no statutory language susceptible of multiple meanings here and, again, Grider identifies none. Indeed, Grider identifies *no* authority anywhere that has concluded that a "restricted area" for the purposes of section 1752 can only be designated by the Secret Service. Accordingly, Grider's vagueness challenge fails. Similarly, because there is no "grievous ambiguity or uncertainty in the statute," Grider's brief invocation of the rule of lenity also fails. *See Barber v. Thomas*, 560 U.S. 474, 488 (2010) ("the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a 'grievous ambiguity in in the statute'"). Again, the vagueness argument has no bearing here, because the Secret Service *did* designate the Capitol grounds as a "restricted area." *See Rivera*, 2022 WL 2187851 at *2.

---

[9] *Accord United States v. Griffin*, F. Supp. 3d 49, 54 (D.D.C. 2021); *Andries*, 2022 WL 768684, at *14; *Bozell*, 2022 WL 474144, at *8; *McHugh*, 2022 WL 296304, at *18; *Nordean*, 2021 WL 6134595, at *18; *Puma*, 2022 WL 823079, at *14-16; *Bingert,* 2022 WL 165163, at *14.

### E. Ex Post Facto

Finally, Defendant insists that reading sections 231 and 1752 to apply to the conduct charged would effect an *ex post facto* law in violation of the Due Process Clause of the Fifth Amendment. Judicial interpretation of a criminal statute may not apply retroactively if the interpretation is "unexpected and indefensible by reference to the law which had been expressed prior to the conduct in issue." *Bouie v. City of Columbia*, 378 U.S. 347, 354 (1964). Generally, to prevail on a *ex post facto* challenge, a defendant must show some break with precedent. *See, e.g.*, *Williams v. Filson*, 908 F.3d 546, 577 (9th Cir. 2018); *accord Griffin*, 549 F. Supp. 3d at 58. Here, Grider has identified no precedent adopting his reading. Indeed, it is *Defendant's* reading of these statutes that appears to be novel. As the Court has concluded above, neither section 231 nor section 1752 are, for present purposes, susceptible of more than one meaning. The fact that Grider "has allegedly violated a rarely charged statute," or that the Government has applied the challenged provisions to conduct at the United States Capitol, "does not mean that the construction of the[se] statute[s] unfairly blindsided him." *See Griffin*, 549 F. Supp. 3d at 58; *see also Mostofsky*, 2021 WL 6049891 at *11. Accordingly, Defendant's *ex post facto* challenge fails.

### IV. CONCLUSION

For the foregoing reasons, Defendant's [101] Motion to Dismiss Counts One, Two, Four, Five, and Six of the Superseding Indictment is **DENIED**. An appropriate order consistent with this decision accompanies this memorandum opinion.

Dated: July 29, 2022

        /s/
COLLEEN KOLLAR-KOTELLY
United States District Judge