*Judge CKolla-Kotelly*
*Dec 2, 2022*

*LEAVE TO FILE GRANTED*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CHRISTOPHER RAY GRIDER,<br><br>Defendant. | Case No. 21-cr-22-CKK |

### DECLARATION OF CHARLES D. TOBIN IN SUPPORT OF
### GRAY MEDIA GROUP, INC.'S MOTION TO QUASH

I, Charles D. Tobin, pursuant to 28 U.S.C. § 1746, declare as follows:

1.     I am a partner in the Washington, D.C. office of Ballard Spahr LLP, and am admitted to practice in this Court. I am one of the attorneys representing non-party Gray Media Group, Inc. ("Gray"). I submit this declaration to put before the Court certain information and documents relevant to Gray's Motion to Quash (the "Motion"). I have personal knowledge of the facts set forth herein and would be competent to testify to them.

2.     On November 21, 2022, counsel for Defendant Christopher Ray Grider ("Defendant") purported to serve, via email, a subpoena for trial testimony and documents on Rissa Shaw, a journalist for KWTX-TV, a Waco, Texas-based television station owned and operated by Gray. A true and correct copy is attached as Exhibit A. The subpoena is returnable for 9:00 a.m. on December 12, 2022 and commands the production of "[a]ny notes or records related to your interview of Christopher Grider on January 6, 2021."

3.     By telephone conference on November 21, 2022, I conferred with Defendant's counsel who issued the subpoena. I raised Gray's general policy of objecting to the compelled testimony of its journalists or the disclosure of its unpublished newsgathering materials. I asked

whether counsel would consider voluntarily withdrawing the subpoena. Defendant's counsel declined, explaining that he intended to elicit testimony from Ms. Shaw about her interactions with Defendant, specifically (1) what Defendant said to her, and (2) her impressions of Defendant's mental state at the time of the interview. I asked whether Defendant intended to waive his Fifth Amendment privilege and testify at trial, and Defendant's counsel represented that Defendant had not yet made a decision on that issue.

4.      After consideration, I notified Defendant's counsel on November 22, 2022 that Gray would bring this motion to quash if Defendant did not withdraw the subpoena voluntarily.

5.      On November 23, 2022, Defendant's counsel notified me that Defendant would not be withdrawing the subpoena. Defendant's counsel further suggested that his proffering of Ms. Shaw's potential testimony at Defendant's January 27, 2021 detention hearing had effected a waiver of the reporter's privilege. A true and correct copy of the transcript of the detention hearing is attached as Exhibit B.

6.      That same day, I conferred about the subpoena with Government counsel, who expressed that the Government does not consider Ms. Shaw a necessary witness in this case and does not intend to take a position on this Motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed this 2nd day of December, 2022.

_/s/ Charles D. Tobin_____
Charles D. Tobin

# Exhibit A

AO 89 (Rev. 08/09) Subpoena to Testify at a Hearing or Trial in a Criminal Case

# UNITED STATES DISTRICT COURT

for the

District of Columbia

| | | |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| Christopher Ray Grider | ) | Case No.  21-cr-22-CKK |
| | ) | |
| *Defendant* | ) | |

## SUBPOENA TO TESTIFY AT A HEARING OR TRIAL IN A CRIMINAL CASE

To:   Rissa Shaw

**YOU ARE COMMANDED** to appear in the United States district court at the time, date, and place shown below to testify in this criminal case.  When you arrive, you must remain at the court until the judge or a court officer allows you to leave.

| Place of Appearance: | U.S. District Court for the District of Columbia, 333 Constitution Avenue N.W.,Washington D.C. 20001 | Courtroom No.: | 28A |
|---|---|---|---|
| | | Date and Time: | 12/12/2022 9:00 am |

You must also bring with you the following documents, electronically stored information, or objects *(blank if not applicable)*:

Any notes or records related to your interview of Christopher Grider on January 6, 2021

PLEASE NOTE THAT IT IS POSSIBLE THAT YOU MAY BE APPEARING BY VIDEOCONFERENCE USING ZOOM (you will be notified as soon as possible)

Date:    11/21/2022

CLERK OF COURT

_____
*Signature of Clerk or Deputy Clerk*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*    Christopher Grider
_____, who requests this subpoena, are:

Brent Mayr
5300 Memorial Drive, Suite 750
Houston, TX 77007
713-808-9613
bmayr@mayr-law.com

# Exhibit B

```
 1                    UNITED STATES DISTRICT COURT
                       WESTERN DISTRICT OF TEXAS
 2                          AUSTIN DIVISION

 3   UNITED STATES OF AMERICA ) Docket No. A 21-MJ-033(1) SH
                              )
 4   vs.                      ) Austin, Texas
                              )
 5   CHRISTOPHER RAY GRIDER   ) January 27, 2021

 6
              TRANSCRIPT OF VIDEOCONFERENCE DETENTION HEARING
 7              BEFORE THE HONORABLE SUSAN HIGHTOWER

 8

 9   APPEARANCES:

10   For the United States:    Mr. G. Karthik Srinivasan
                               Assistant U.S. Attorney
11                             903 San Jacinto Boulevard,
                               Suite 334
12                             Austin, Texas 78701

13

14   For the Defendant:        Mr. T. Brent Mayr
                               Mayr Law, P.C.
15                             5300 Memorial Drive, Suite 750
                               Houston, Texas 77007
16

17

18   Transcriber:              Ms. Lily Iva Reznik, CRR, RMR
                               501 West 5th Street, Suite 4153
19                             Austin, Texas 78701
                               (512)391-8792
20

21

22

23

24

25   Proceedings reported by digital sound recording,
     transcript produced by computer aided-transcription.
```

LILY I. REZNIK, OFFICIAL COURT REPORTER
U.S. DISTRICT COURT, WESTERN DISTRICT OF TEXAS (AUSTIN)

```
 1                          I N D E X

 2                    Direct    Cross    Redirect  Recross
     Witnesses:
 3

 4   (None)

 5

 6                       E X H I B I T S

 7                                      Offered   Admitted

 8   Government's

 9   (None)

10

11   Defendant's

12   #B                                  13        14

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1              (Proceedings commence at 1:35 p.m.)

2              THE CLERK:   Court is now in session for a

3    detention hearing:   21-MJ-33, <u>United States vs.</u>

4    <u>Christopher Ray Grider</u>.

5              MR. SRINIVASAN:   Good afternoon, your Honor.

6         Karthik Srinivasan for the government.

7              MR. MAYR:   Good afternoon, your Honor.

8         Brent Mayr on behalf of Mr. Grider.

9              THE COURT:   Good afternoon.   Thank you to

10   everyone.

11             I have a few announcements to make as we get

12   started today.   We have large number of participants

13   attending today, and I need to remind everyone that all

14   participants are -- cannot record, photograph, broadcast,

15   or televise any part of this proceeding.   Any violation of

16   this direction is punishable as contempt of court.

17             All members of the public who are attending are

18   asked to remain muted and with their video off.   The Court

19   will unmute and turn on the video for anyone testifying.

20   Anyone who attempts to disrupt this proceeding will be

21   removed.   And we are being recorded.   The Court is making

22   an audio recording today.

23             So with all that said, this matter comes before

24   the Court on the request of the government to detain the

25   defendant, Christopher Ray Grider, pending trial.   And

1  we're holding our proceeding by video conference because

2  due to the COVID-19 pandemic, holding the proceeding in

3  person would present a serious health risk to you, Mr.

4  Grider, to the other detainees, to the attorneys, and the

5  court staff involved.

6          So I'll ask you first, Mr. Grider, have you

7  discussed with Mr. Mayr proceeding by video conference

8  today?

9          THE DEFENDANT:  Yes, your Honor.

10          THE COURT:  And do you consent to proceed with

11  this hearing by video conference?

12          THE DEFENDANT:  Yes, your Honor.

13          THE COURT:  Mr. Mayr, do you consent to proceed

14  by video conference today?

15          MR. MAYR:  I do, your Honor.

16          THE COURT:  And, Mr. Srinivasan, on behalf of the

17  government, do you consent to proceed by video conference?

18          MR. SRINIVASAN:  Yes, your Honor.

19          THE COURT:  So I find that both parties consent

20  to proceed by video conference today.

21          I also need to remind counsel that as required by

22  Rule 5(f) of the Federal Rules of Criminal Procedure, the

23  United States is ordered to produce all exculpatory

24  evidence to the defendant pursuant to Brady vs. Maryland

25  and its progeny.  Not doing so in a timely manner may

1   result in sanctions that include the exclusion of

2   evidence, adverse jury instructions, dismissal of charges,

3   and contempt proceedings.

4           So in considering the government's detention

5   request today, courts are guided by several general

6   principles.  First, that the defendant, Mr. Grider, you're

7   entitled to the presumption of innocence at all times.

8   Under the Bail Reform Act, pretrial detention is an

9   exceptional step.  A defendant must be released before

10  trial unless I find that no condition or combination of

11  conditions exist that will reasonably assure your

12  appearance, if the government seeks detention based on the

13  risk of flight, or reasonably assure the safety of any

14  other person in the community, if the government seeks

15  detention based on you being a danger to the community,

16  Mr. Grider.

17          That Bail Reform Act requires that the least

18  restrictive conditions be imposed that are necessary to

19  provide those reasonable assurances.  If I can't find that

20  any condition or combination of conditions will reasonably

21  assure your appearance as required, or the safety of the

22  community, that I'm required by the Bail Reform Act to

23  order you held in custody.

24          So with that said, I'll ask Mr. Srinivasan:  How

25  does the government intend to proceed today?

1          MR. SRINIVASAN:  Your Honor, we are seeking

2     detention on the grounds of dangerousness.

3          THE COURT:  Okay.  Thank you.

4          And are you prepared to call -- are you

5     proceeding by witness or a proffer?

6          MR. SRINIVASAN:  By proffer, your Honor.  We're

7     relying on the nature and circumstances of the offense as

8     laid out in the complaint.

9          THE COURT:  Okay.  So the government has no

10    witnesses to call.

11         MR. SRINIVASAN:  That's correct, your Honor,

12    although I would note that to the extent the Court has

13    additional questions, FBI Special Agent Jeanette Taylor is

14    on the line here, although we were not planning to call

15    her.

16         THE COURT:  Okay.  Thank you very much.  So then,

17    that we'll proceed with you, Mr. Mayr.

18         Does the defense have any evidence that it would

19    like to present at this time?

20         MR. MAYR:  Yes, your Honor.  Before I proceed

21    with actual evidence, I just want to make sure that you've

22    had an oppor -- we're on the same page in terms of what

23    has been reviewed by the Court.

24         First and foremost, this court has received and

25    reviewed the amended Pretrial Services report recommending

1   release on certain conditions.   Is that correct?

2           THE COURT:  Yes.

3           MR. MAYR:  Okay.  I also, earlier this morning,

4   filed a confidential memorandum on pretrial release,

5   supplied a copy of that to the government after conferring

6   with them.  And I just want to confirm that you have had

7   an opportunity to review that and the several letters that

8   I included, in addition to that memorandum.

9           THE COURT:  Mr. Mayr, I've reviewed the entire

10  submission.

11          MR. MAYR:  Thank you very much, your Honor.  I

12  appreciate that.

13          Then in addition to those -- in addition to

14  what's set out there, your Honor, I would -- I have four

15  witnesses that I would proffer testimony on.  I would

16  start with Mr. Ryan Ford, who was present in the Zoom

17  room.  If he could be at least just permitted to show his

18  face and just acknowledge the Court, and then, I can

19  explain what I would proffer his testimony to be.

20          THE COURT:  Certainly.  We're proceeding -- we

21  will turn on -- as any witnesses identified, we'll turn on

22  their camera and unmute them.  So it might take just a

23  moment, but I'll ask the courtroom deputy to do so.  The

24  last name is -- can you spell it, please?  Is it F-O-R-D?

25          MR. MAYR:  Like the car.  Ryan Ford.

1          THE COURT:  Okay.

2          MR. MAYR:  Okay, your Honor.  At least on my

3    screen, he's directly below me, but that there is Ryan

4    Ford.  Your Honor, by proffer, I would -- Mr. Ford would

5    testify that he is a neighbor and close friend of Mr.

6    Grider's.  He's the former county commissioner for Falls

7    County.  So he -- to say that he has his pulse on the

8    community is a pretty good one.

9          He would testify that he and Mr. Grider have been

10   neighbors for over seven years, and during that time, he's

11   never done anything but work at his business and support

12   his family.  It is his opinion that those are -- that his

13   family and his business are his main and sole priorities.

14   Without him present, all of those stand to fail.  He's

15   lived next to him, he's worked with him to help him grow

16   his business, which as you are familiar with from having

17   reviewed the materials is the winery.

18         In doing that, Mr. Ford would testify that he's

19   never seen Mr. Grider exhibit any behaviors or speech that

20   could be even remotely considered threatening or harmful

21   to anyone.  In fact, he does everything to avoid

22   conflicts, even with his own employees.  He's more -- he's

23   more inclined to cut back someone's hours rather than

24   terminate them simply for wanting to avoid a confrontation

25   with his employees.  Mr. Ford would testify that he's --

1   that Mr. Grider's a good Christian man, a loving, caring

2   husband and a father.

3          Thank you, Mr. Ford.  That's all I would have for

4   Mr. Ford.

5          THE COURT:  Okay.  Thank you, Mr. Ford.

6          MR. MAYR:  The next witness that I would proffer,

7   your Honor, is Michelle Tyler, who is also present on

8   Zoom.

9          THE COURT:  I can see Ms. Tyler.  Thank you.

10         MR. MAYR:  Thank you.  Thank you, your Honor.

11         Ms. Michelle Tyler is zooming in all the way from

12  Pensacola, Florida.  However, I would proffer that she

13  would testify that she knows Mr. Grider.  She has known

14  him for close to 10 years.  Knew him from when they used

15  to sell their wares together in a farmers market,

16  eventually working together, they developed a close

17  personal relationship, Mr. Grider and his family with Ms.

18  Tyler and her family.

19         You have already reviewed a letter from her

20  husband, Matthew Tyler.  But Michelle Tyler would really

21  by way of proffer, would convey to the Court the real

22  special bond that she sees with Mr. Grider and his

23  children.  Mr. Grider's son and Ms. Tyler's son are both

24  -- have been best friends.  Even though they now live in

25  Florida, they still will get together at least twice a

 1    year, go on camping trips.

 2            She could also attest to not only seeing him in a

 3    -- on a personal context, but in a business context as she

 4    continues to sell her goods through his business.  She

 5    would testify that he has an upstanding character, is a

 6    devoted husband and father, but also is committed to his

 7    business and his community.  His -- she would testify that

 8    he's ambitious, driven to succeed, and his dedication to

 9    accuracy and creative vision is reflected clearly in his

10    success.

11            She knows beyond any doubt that he holds deep

12    respect for his responsibilities and has always stood firm

13    in his obligations.  And that's all that I would have for

14    Ms. Tyler.

15            THE COURT:  Thank you, Ms. Tyler.

16            MR. MAYR:  The next witness I would proffer, your

17    Honor, is Christopher Johnson.  He is C. Johnson on the

18    Zoom video and he -- C. Johnson.  Your Honor, that's Mr.

19    Christopher Johnson.  He is Mr. Grider's brother-in-law.

20    He lives down in the Houston area.  He is a senior

21    engineer with Varco National, and he wouldn't be able to

22    be in court, anyway, because he's currently recovering

23    from COVID.

24            Your Honor, by way of proffer, I really enjoyed

25    talking with Mr. Johnson and felt that this court needed

11

1   to really give much consideration to what he has to say

2   because he is the big brother of Mr. Grider's wife,

3   Crystal, who is present in the Zoom room and you've

4   reviewed -- you've seen reference to her.

5          I'm a big brother, he's a big brother, and so, we

6   -- in talking with him, he talked about how he was -- when

7   it comes to protective brothers, he is super-max ultra

8   protective, and he wasn't going to just let anyone be a

9   part of his little sister's life.  He is solely committed

10  to protecting her.  It's very im -- he loves her to death

11  and wouldn't -- never want her to be with anyone that

12  would in any way endanger her.

13         He would testify that in getting to know Mr.

14  Grider that he felt comfortable with him.  He felt safe

15  with him.  He trusts Chris and he felt confident that he

16  would treat her with respect and he's proven that.  He

17  would testify that over all the years that Mr. Grider and

18  his wife, Crystal, have been together, Mr. Johnson has

19  come to love and appreciate how Mr. Grider loves and cares

20  for his little sister as much as he does.  I think it's

21  relevant because it shows for someone who would care the

22  most about someone's safety, okay, he knows that Chris is

23  not a dangerous person.  He is peaceful and he is loving,

24  and he is willing to come before you and testify to that

25  under oath, but I will offer by way of a proffer.

1          That's all I have on Mr. Johnson.

2          THE COURT:  Thank you, Mr. Johnson.

3          MR. MAYR:  Finally, your Honor, the last witness

4 I would proffer is going to be Rissa Shaw.  She is Rissa

5 Shaw on the Zoom screen.

6          THE COURT:  Hi, Ms. Shaw.  I see you.

7          MR. MAYR:  Thank you.

8          Judge, this is a very interesting witness that I

9 would be proffering.  Rissa Shaw -- I say it's

10 interesting.  As you may recall in reading the complaint

11 in this case, specifically paragraph 10, the complaint by

12 the agent in this case makes reference to a story that

13 aired on KWTX TV News 10, the local media station in Waco,

14 Texas that featured Grider on one of his segments.

15          Your Honor, Ms. Shaw is the reporter who

16 interviewed Mr. Grider while he was allegedly in the

17 capitol.  I have the video -- I have the video of her

18 story that I would like to publish for the Court so that

19 you could see what her story reported, and then, I can by

20 way of proffer add a little bit beyond what is reflected

21 in the story.

22          So with the Court's permission, I would like to

23 -- and I'm sorry I didn't make arrangements to handle this

24 beforehand, but however you would like for me to do that,

25 I would like to mark and offer what I'm going to call

1   Defendant's Exhibit B, since Exhibit A was attached to the

2   memorandum.  I'm going to call this Exhibit B, and it is

3   going to be the video recording of Ms. Shaw's story that

4   was published and is referenced in the complaint.

5           THE COURT:  Mr. Srinivasan, any objection?

6           MR. SRINIVASAN:  Your Honor, I've not seen this

7   particular clip, but based on that representation, I have

8   no reason to object at this point.  But I would reserve

9   just in case something comes up after viewing it.

10           THE COURT:  Certainly.  And since I haven't even

11   seen it either, is it something that you're able to play

12   at this time and share your screen?

13           MR. MAYR:  I am.  That exactly what I was

14   intending to do and I'm setting up to do with your

15   permission, your Honor.

16           THE COURT:  That's fine.  Take your time and

17   afterwards, we'll ask Mr. Srinivasan if he needs to lodge

18   any objection.

19           MR. MAYR:  Thank you.  And for the record, your

20   Honor, I will go ahead and publish the -- this will be

21   Defendant's Exhibit B, and I will waive any transcription

22   of this, if that is so necessary.

23           (Audio file played.)

24           THE COURT:  Could you just pause for a moment,

25   Mr. Mayr, and see -- I'm seeing it and I can hear it a

1    little bit.  But so I can hear it better and for the

2    record, is there any way to increase the volume?

3              MR. MAYR:  That's exactly what I'm doing right

4    now.  One moment, your Honor.

5              THE COURT:  Thank you.

6              MR. MAYR:  Okay.  Now I'm ready to share.

7              (Audio file played.)

8              THE COURT:  Okay.  So let me ask Mr. Srinivasan:

9    Is there any objection to the -- to Mr. Mayr's offer of

10   this Exhibit B into evidence?

11             MR. SRINIVASAN:  No objection, your Honor.

12             THE COURT:  Okay.  Thank you.  It's admitted, Mr.

13   Mayr.

14             MR. MAYR:  Judge, in addition to that, Ms. Shaw

15   would talk about everything leading up to that story.  She

16   would testify that like most news stories, there's a lot

17   more information that she obtains, but what she would

18   convey to the Court is that she was overwhelmed by what

19   was happening and received -- and was contacted by Mr.

20   Grider and felt a need to report what was going on.

21             In talking with Mr. Grider, he was clear, he was

22   calm.  She did not at any point ever think that he was a

23   threat to anyone.  She did not -- she did not think that

24   he was engaged in any violent acts.  She testified -- she

25   would testify that in talking with him, she never -- it

1 never even really crossed her mind that he was committing

2 any crime.  It was her belief that he was reporting what

3 he saw, but there was never any indication of him acting

4 maniacally, or espousing radical reviews, or anything of

5 the sort.  He was very clear, calm, lucid, and really felt

6 that his only purpose was to just report and document what

7 was taking place.

8         She would proffer and testify that she knows and

9 has a relationship with Mr. Grider and Mrs. Grider.  She

10 has done previous stories on their winery there in

11 Bruceville-Eddy.  And she has always been just incredibly

12 impressed by Mr. Grider and what he is and who he does.

13         She would testify that in getting to know Mr.

14 Grider and his wife that they are Texans through and

15 through, and they are in no way a flight risk or a danger

16 to the community.  They -- she would testify that he know

17 -- she knows him to be -- provide people many

18 opportunities in the greater Houston area.  I think you

19 probably already read about some of those people that he's

20 helped out in the Waco area.

21         She's seen firsthand former public school

22 teachers -- Mr. Grider helping former school teachers,

23 helping troubled teens from broken homes, bringing him out

24 to his business, bringing him out to his property to help

25 them earn a living.  And she would testify that she

1    believes that he is -- that he is a respectful person and

2    that he believes in the institutions of our country.  She

3    would respectfully request just based on everything that

4    she actually saw and observed, she would assure this court

5    that she does not believe that Mr. Grider is a danger to

6    the community in any way.  And that's what I --

7              THE COURT:  Mr. Mayr, just to be clear since

8    we're proceeding by proffer, I'll ask you, rather than Ms.

9    Shaw, she is located in the Waco area, correct?  She was

10   not in Washington, D.C. at the time of the report?

11             MR. MAYR:  That is correct, your Honor.  So she

12   would have -- yeah.  That is correct.  She was receiving

13   and reporting from Waco.

14             THE COURT:  Thank you.

15             MR. MAYR:  Okay.  Unless you have any other

16   questions, your Honor, that's all I have for Ms. Shaw.

17             THE COURT:  I do not.  Thank you, Ms. Shaw.

18             MR. MAYR:  If I may just have a moment, your

19   Honor.

20             THE COURT:  Certainly.

21             MR. MAYR:  That is all the evidence that I have

22   by way of proffer that I care to present to the Court at

23   this time.

24             THE COURT:  Okay.  Well, thank you, Mr. Mayr.

25             So, Mr. Srinivasan, I believe that we're ready to

1    proceed to argument.

2            MR. SRINIVASAN:  Yes, your Honor.  Thank you.

3            We believe that Mr. Grider poses a danger to the

4    community.  And we believe that the nature and

5    circumstances of the offense as well as some of the

6    information that was just presented to the Court, I think,

7    demonstrate the risks that he poses.  He was not a

8    bystander in the capitol.  He wasn't just swept up in the

9    crowd.  He was at the front lines, breaching a secure

10   location with violence after disrupting Congress

11   performing a constitutional duty.

12           He had a helmet with him, and he gave it to

13   somebody who had already tried to breach those doors.  He

14   indicated as, you know, set forth in the complaint that

15   the helmet was hard, meaning that it was an implement that

16   could be used for this purpose, gave it to that person.

17   That person proceeded to smash the doors.  There's a

18   picture in the complaint of Mr. Grider trying to push the

19   doors.  He was an active participant in all this.

20           He stood there, tried to push the doors open.

21   The window was breached, and then, Ms. Babbitt was

22   tragically shot as a result of that.  He was part of the

23   causal chain of events that led to the death of an

24   individual.  And at various points, your Honor, I think

25   it's set forth in the -- you know, the complaint, there

1    were times when he is recording, he's taking pictures.  He

2    is taking video, your Honor.

3           He wasn't a peacemaker.  He didn't get there and

4    say, you know, hey, we shouldn't be doing this.  Didn't

5    try to get people to back off.  He didn't try to stop what

6    was happening, your Honor.  He didn't want to forget what

7    was happening, and he documented it for himself as he went

8    along.  And that is, I think, striking, your Honor, and

9    it's striking in contrast, I think, to some of the

10   evidence that's been presented to the Court today as well

11   as in the memorandum that Mr. Mayr submitted.

12          You look at the letters of Reverend Reg Seck, Mr.

13   Winkleman, Ms. Green, Ms. Ford, and some of the

14   information that was proffered today, and you get the

15   impression, I guess, two themes, I think, seem to emerge.

16   And the first is that these individuals don't know him to

17   be capable of such violence in their experiences with him,

18   and that he is fundamentally, they say, a good person and

19   seems should not be judged on this, you know, one -- one

20   day, this most horrible moment in his life when there's so

21   much other good that he has done.

22          And, your Honor, I think we would submit that

23   sometimes we can be judged and should be judged based upon

24   some of these worst moments because they reveal what an

25   individual is capable of.  And, you know, the -- what

1   happened there at the capitol, Mr. Grider's active

2   participation in it shows then that he's capable of

3   things, capable of participation in violence that

4   apparently is not known to any of the people who have come

5   to speak for him.

6          And so, there's a risk, your Honor, because this

7   was a moment of in great stress, excitement.  You know,

8   I'm not trying get inside his head, but in a situation of

9   a mob, there's a lot of things that go on, and going

10  forward, your Honor, Mr. Grider is going to face stresses

11  and strains.  He has now been indicted.  He is now facing

12  a felony charge -- multiple felony charges, one with a

13  20-year maximum 1512(c).  He's now facing significant

14  consequences for his action.

15         And I would close, your Honor, by -- you know, by

16  pointing out something that I found striking in the

17  proffer of Ms. Shaw's testimony, the reporter, as well as

18  the clip that was played, your Honor.  That Ms. Shaw as

19  proffered knows the Griders, spoke with Mr. Grider

20  shortly, you know, after these incidents, and yet, Mr.

21  Grider was not fully forthcoming with her as to what

22  actually happened.

23         When you listen to that video, you listen to the

24  proffer, it was all in the passive.  He was as a witness.

25  Ms. Babbitt got shot and so on.  And to the extent that,

1  you know, Mr. Mayr, Mr. Grider wants to persuade the Court

2  that that is something that you should consider, I think

3  you should also consider what is also -- what it shows in

4  the converse, which is that there's an aspect to this

5  person, a risk that this person poses, given the right

6  circumstances that is unacceptable, and it came out that

7  day, and it's one that it seems like no one else knows,

8  but it's right there.  The complaint right there on video,

9  your Honor.

10        THE COURT:  Thank you, Mr. Srinivasan.

11        Mr. Mayr.

12        MR. MAYR:  Thank you, your Honor.

13        My client, Mr. Grider, never envisioned when he

14  got on a plane to go to Washington D.C. that he would find

15  himself in the position that he now finds himself.  He did

16  not go there to commit a crime.  Let's be very clear about

17  that.  There is no evidence whatsoever to even support or

18  insinuate that.  He did not go up there to riot.  He did

19  not go up there to start an insurrection.

20        Your Honor, whatever happened on that tragic day

21  in American history at the United States Capitol, my

22  client deeply regrets ever being a part of it.  He is

23  ready to return home to his family, his community, his

24  church and his business, and to focus on those things and

25  those things alone.  The things that truly matter and mean

1    the most to him.

2            He's ready to respect and honor the institutions

3    of this great country of ours as he's done in the past,

4    serving in the military, and as he will in the future,

5    respecting and following any conditions that you require

6    of him.

7            Your Honor, I believe that you can put your faith

8    in him to do just that as so many others around him have

9    assured you.  Family, friends, neighbors, educators,

10   businesspeople, members of the clergy and his congregation

11   have all firmly and unequivocally attested to you how he

12   is a loving, peaceful person and will not be a danger to

13   their community.  From when he was a boy to the man he is

14   today, he is hard-working, dedicated to his family and his

15   community.

16           Your Honor, I think it's important to understand

17   that Mr. Grider is not some maniacal, radical extremist

18   who went there with some mal intentions.  When you watch

19   the videos, you see that he's not screaming, he is not

20   espousing crazy beliefs.  He is not acting like an

21   agitator.  He is there as an observer.  He went there to

22   see what was happening, not to participate in an

23   insurrection, not to riot, not to destroy.

24           Your Honor, the government talks about that the

25   violence and what he -- and how he was at the door.  I

1  think it's really important to understand what -- the only

2  thing the evidence shows, okay?  There's never been an

3  allegation that Mr. Grider took some object and started

4  trying to break the glass at the capitol doors and the

5  entrance to the speaker's lobby.  He was present.  He was

6  there and what happened there will -- was a tragedy.  No

7  doubt.

8          For the government to insinuate that he's somehow

9  responsible for Ms. Babbitt's death is just absurd.  I

10  think as lawyers, we could understand the breaks and the

11  causal links, but there is no indication that Mr. Grider

12  ever did anything to contribute to her death.  He's

13  certainly not been indicted for that.  As soon as it was

14  over with, he left Washington, he came back here, and this

15  court is aware of the actions that he has engaged in

16  subsequent to then.

17          I think it speaks volumes, your Honor, that he

18  went down and surrendered himself to the FBI.  You have, I

19  imagine, have had several defendants appear before you

20  charged with much more serious federal offenses who have

21  been arrested in the middle of the nights, after their

22  homes are raided by federal agents.  I think it speaks

23  volumes, your Honor, that in this particular case, the

24  agents called Mr. Grider up, asked him to come down to

25  Austin.  He got in his car, drove himself down there and

1    voluntarily surrendered himself, knowing what he had done

2    and what was coming.

3           His car is still there in Austin, your Honor.

4    We'd like you to let him get back in that car, drive back

5    home to Falls County to take care of his family, take care

6    of his community, and together with me, work to -- work

7    with him to seek a positive resolution of these charges

8    against him.

9           The government, as you're well aware, your Honor,

10   has the burden in this case.  I've sort of assumed the

11   burden to myself.  I wanted to prove by clear and

12   convincing evidence, I wanted to prove by a shadow of the

13   doubt that you have nothing to be concerned about.  The

14   government has not proven by clear and convincing evidence

15   that there's no conditions that could assure the safety of

16   the community.  There's clearly no evidence of intent to

17   flee.

18          I would respectfully ask, your Honor, that you

19   take into consideration everything that has been presented

20   to you in this matter and allow Mr. Grider to go home.

21   Thank you.

22          THE COURT:  Thank you, Mr. Mayr.

23          Mr. Srinivasan, any further argument?

24          MR. SRINIVASAN:  Your Honor, all I would say in

25   response to Mr. Mayr is that I think he emphasized

1   repeatedly that Mr. Grider was a witness and was observing

2   in what was there.  I think he used the word "observer."

3   I would just call the Court's attention -- I know you have

4   this before you -- page 8 of the complaint, your Honor,

5   the photo that's there.  That is a man with his hand on

6   that door, and there are people trying to breach it and he

7   is helping.  He is not a witness, your Honor.  He was an

8   active participant in an attempt to breach a secure

9   location, endangering Congress, your Honor.  He's a

10  participant in these activities, and we'd ask your Honor

11  to give that significant weight.  Thank you.

12          THE COURT:  Okay.  Thank you to everyone.

13          So as I would like to thank everyone specifically

14  who's participated today.  I'd like to thank counsel for

15  their very able arguments.  And I'll start out by saying

16  that the Bail Reform Act, which I referred to earlier,

17  Title 18 of the United States Code, Section 3142, requires

18  me to consider four specific factors.  Those are the

19  nature and circumstances of the alleged offense, including

20  whether it's a violent offense, the weight of the evidence

21  against the defendant, your history and characteristics,

22  Mr. Grider, and the nature and seriousness of the danger

23  to others or to the community.

24          So I have carefully considered all the evidence

25  that's been provided today on these factors.  And I've

1    also considered the recommendation of Pretrial Services,

2    which in this case is that you be released.  The letters,

3    the evidence, Exhibit A, the support of your family and

4    friends speak to your history and characteristics, Mr.

5    Grider; and based on that evidence, I find that you are

6    not -- the government hasn't met its burden to establish

7    that you are a flight risk.  So I will not be granting

8    detention on that basis.

9           But, Mr. Grider, I have to consider the other,

10   factors, as well, as required by the Bail Reform Act.  In

11   this case, in particular, the weight against you is

12   particularly strong.  I'm also going to consider the

13   nature and circumstances of the alleged offense, which is

14   extremely serious here.

15          And as Mr. Srinivasan said, you know, Mr. Mayr

16   argued that you were there as an observer.  You also -- it

17   was also reported in the news that you went to see for

18   yourself.  Mr. Grider, that's not what the evidence shows.

19   That does not show that you were a member of the crowd on

20   January 6th.  That the evidence is very strong that you,

21   in particular, supplied the helmet used to break the

22   speaker's lobby doors, and that you, yourself, pushed and

23   kicked on those doors in attempt to breach the House

24   chambers.

25          Now, as I previously said, you are presumed to be

1    innocent of these charges, but the evidence is quite

2    strong.  That's an extremely serious offense.  And while

3    those events of January 6th are quite unusual, it's not

4    unusual for me to see criminal defendants who have the

5    support of their family and friends and, yet, are accused

6    of offenses that are serious enough that they require

7    detention.

8            And here, based on the nature and circumstances

9    of the offense and the very strong weight of the evidence

10   against you, Mr. Grider, I'm going to -- I find that the

11   government has met its burden to show by clear and

12   convincing evidence that there's no condition or

13   combination of conditions that will reasonably assure the

14   safety of community -- of the community if you were to be

15   released.

16           I'll also mention, it's primarily based on the

17   first two factors.  But I think factor four, the nature

18   and seriousness of the danger to others or the community

19   is quite strong in this case, as well.

20           So I'll be preparing a written order of

21   detention.  And I'll remand you, Mr. Grider, into the

22   custody of the United States Marshal Service for transport

23   to the district of the District of Columbia for further

24   proceedings.

25           So before we adjourn today, Mr. Srinivasan, is

1    there anything else that the Court needs to address at

2    this time?

3            MR. SRINIVASAN:  Not from the government.  Thank

4    you.

5            THE COURT:  Okay.  Thank you.

6            And, Mr. Mayr, is there anything else that the

7    Court needs to address?

8            MR. MAYR:  Not at this time, your Honor -- ah, he

9    has been indicted.  I don't know if we need to handle any

10   other Rule 5 matters at this time as this is my first

11   appearance before you.  I don't know if those were

12   handled -- I couldn't tell if those were handled at the

13   initial, but if we can make sure that there isn't any

14   other Rule 5 matters that need to be addressed.

15           THE COURT:  Did you have anything in particular,

16   Mr. Mayr, that you can't tell whether it needs to be

17   addressed or not?

18           MR. MAYR:  Not really, your Honor.  Like I said,

19   I just -- you know, obviously we'll deal with arraignment

20   up in D.C.  And I imagine we'll deal with arraignment up

21   in D.C.  There's no reason for an identity hearing.  I'm

22   just kind of going through my mind, I think that --

23           THE COURT:  Mr. Mayr -- yes, Mr. Grider waived

24   identity hearing at the initial appearance.

25           MR. MAYR:  Okay.  That's what I -- just want to

1  confirm.  Other than that, I have nothing further, your

2  Honor.

3            THE COURT:  All right.  Mr. Srinivasan, is there

4  anything else, any other further Rule 5 procedure?  The

5  Court's not aware of any, but is there any further Rule 5

6  procedure you're aware of that Mr. Grider is entitled to

7  at this time?

8            MR. SRINIVASAN:  No, your Honor.

9            THE COURT:  Okay.  Thank you.

10           And I'll ask the courtroom deputy:  Is there

11  anything further that needs to be addressed before we

12  adjourn?

13           THE CLERK:  No, your Honor.

14           THE COURT:  Okay.  Thank you.

15           MR. MAYR:  Your Honor, actually, one thing.  I do

16  just to make sure we're clear on this.  As far as the

17  Exhibit B that I offered, the video clip, it's a very

18  large digital file.  What would be the most effective way

19  to get that to the Court and made part of the record in

20  this case?

21           THE COURT:  I'm going to defer to the courtroom

22  deputy if he has anything to add, but I believe that that

23  can be submitted on a USB drive.

24           MR. MAYR:  Okay.

25           THE COURT:  As a physical USB drive to the Court.

1          MR. MAYR:  All right.

2          THE COURT:  Does the courtroom deputy wish to add

3    anything further with regard to evidence?  The video

4    evidence?

5          THE CLERK:  That is a great question and I'll

6    certainly follow up with you following this hearing, Mr.

7    Brent, to --

8          MR. MAYR:  I'll do the same with you, Mr.

9    Ferrell.  Thank you.

10          THE COURT:  Thank you, Mr. Mayr.  You can

11    communicate by e-mail, but I believe making it --

12    submitting it on a drive, an external drive will be

13    sufficient.

14          So with nothing else, Mr. Grider, I'll wish you

15    good luck and Court's adjourned.

16          (Proceedings conclude at 2:12 p.m.)

17

18

19

20

21

22

23

24

25

```
 1
 2
 3                    REPORTER'S CERTIFICATE
 4
 5      I, LILY I. REZNIK, DO HEREBY CERTIFY THAT THE FOREGOING
 6   WAS TRANSCRIBED FROM AN ELECTRONIC RECORDING MADE AT THE
 7   TIME OF THE AFORESAID PROCEEDINGS AND IS A CORRECT
 8   TRANSCRIPT, TO THE BEST OF MY ABILITY, MADE FROM THE
 9   PROCEEDINGS IN THE ABOVE-ENTITLED MATTER, AND THAT THE
10   TRANSCRIPT FEES AND FORMAT COMPLY WITH THOSE PRESCRIBED BY
11   THE COURT AND JUDICIAL CONFERENCE OF THE UNITED STATES.
12
13   /s/Lily I. Reznik                February 1, 2021
14   LILY I. REZNIK, CRR, RMR             DATE
     Official Court Reporter
15   United States District Court
     Austin Division
16   501 W. 5th Street, Suite 4153
     Austin, Texas 78701
17   (512)391-8792
     SOT Certification No. 4481
18   Expires:  1-31-23
19
20
21
22
23
24
25
```