**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | **No. 1:21-cr-00022-CKK** |
| | : | |
| **v.** | : | |
| | : | |
| **CHRISTOPHER RAY GRIDER,** | : | |
| | : | |
| **Defendant** | : | |

<u>**UNITED STATES' TRIAL BRIEF**</u>

The United States, by and through its attorneys, respectfully submits this brief summarizing the government's evidence at trial and any legal or factual issues likely to be brought before the Court.

**I.    THE JANUARY 6 CAPITOL RIOT AND GRIDER'S ACTIONS**

On January 6, 2021, thousands of people descended on the U.S. Capitol building and grounds when a joint session of Congress had convened to certify the votes of the Electoral College for the 2020 Presidential Election. Vice President Michael Pence, as the President of the Senate, was there to preside over the joint session and, later, the Senate proceedings. On that day, physical barriers surrounded the U.S. Capitol building and grounds.  At all relevant times, the United States Capitol building and its grounds were closed to members of the public.

The defendant, Christopher Grider, took a flight from Dallas to Washington, D.C. on January 6, 2021, after texting with friends and family about his plans.  Once in Washington, D.C., he attended the "Stop the Steal" rally on the National Mall.  He then headed to the U.S. Capitol building, joining other rioters in the scaffolding on the northwest terrace of the buildings. In order to enter that scaffolding, Grider had to breach the already weak police line defending the entry into the scaffolding.  Once he had penetrated the scaffolding, he gained access to the

northwest terrace steps.  As he walked along the handrail of those steps, other rioters scaled the walls of the terrace, and he entered the building through the Senate wing doors just minutes after that door was first breached, at 2:15PM.

At approximately 2:19PM, he headed toward the Crypt, where he joined with a crowd of rioters chanting "Stop the Steal" and "Our house" in front of a line of police officers.  Grider waved others in as the crowd grew and chanted.  Beginning at 2:25PM, he and the crowd started pushing on the police line and eventually overwhelmed the police officers.  Grider even spoke with a police officer he pushed past on his way out of the Crypt.

Shortly after 2:30PM, Grider had almost made it to the House Chamber door.  He and a small crowd gathered in the hallway between Statuary Hall and the House Chamber – also known as the Statuary Hall connector.  They chanted "break it down," and "We want Trump" in front of another line of police officers who were standing guard in front of the House Chamber door, for at least five minutes.  Grider continued to encourage others to participate in the riot, waving people in as he stood in the Statuary Hall connector. Then, Grider and the crowd pushed past the line of police to get to the House Chamber door.

They clamored directly outside of the House Chamber, with some banging on the door and all trying to get in.  At one point, a rioter yelled, "Use your helmet, use your kevlar!" and shortly thereafter, Grider held up his black helmet to the rioters in front of him.

Unable to get into the House Chamber at this door, a couple rioters beckoned the crowd away from the entrance and then a stream of people followed as they made their way toward the Speaker's Lobby.  Grider appeared to be among the first people to heed the call as he sprinted down the hallway.  He was one of the first rioters to arrive at the Speaker's Lobby door.  Grider, and other rioters, directly confronted the police officers guarding the door, agitating to get inside.

2

He told officers that "people are going to get hurt, just open the door man."  Then, as Grider looked on, another rioter punched the window to the right of the door.  The rioter appeared to have cracked, but not entirely broken that window.  Grider approached the rioter then, holding out his black helmet.  Grider appeared to knock on the top of the helmet, signifying that it was a hard instrument, and then handed it over to the rioter.

The three officers guarding the door appeared to move to the adjacent wall.  Seconds later, Grider moved in and attempted to push open at least one of the doors.  Chants could be heard of "Break it down!" and "Let's fucking go!"  Using Grider's helmet, the other rioter attacked the door and a window in the door.  The other rioter, again using Grider's helmet, then attacked the window to the right of the door.  Grider was at the door this entire time, observing everything that had been set in motion with his helmet.

A woman, later publicly identified as Ashli Babbitt, climbed through the emptied-out window frame.  At the same time, Grider backed away from the door as rioters in the crowd started screaming "gun."  As Babbitt was climbing through the window, she was shot by an officer on the other side of the door.  After the shooting, several rioters ran out of the hallway as police yelled for people to get out of the way.  But Grider remained and could be seen refusing to leave the area for nearly nine minutes after the shooting, despite multiple police officers' entreaties to him and others to clear the area.  At times, Grider leaned over the railing to get a better glimpse of Babbitt bleeding on the floor, at other times, he appeared to speak with officers, and at yet other times, he appeared to be capturing video or pictures of Babbitt lying on the floor.

After refusing to leave the scene, he exited the building and told people outside the Capitol building about a woman getting shot.  Later that evening, Grider gave a televised interview, apparently via videoconference from Washington, D.C., to KWTX-TV News 10, a

local news media station in Waco, Texas.  He appeared to have provided the news station with footage he had taken of Babbitt.  During the interview, he admitted to being inside the United States Capitol Building that day when it was breached by large crowds as Congress convened in a Joint Session to affirm the Electoral College vote in the 2020 Presidential Election.  He also described witnessing Babbitt being shot.

Grider stated on camera, "The president asked people to come and show their support… I feel like it's the least that we can do, it's kind of why I came from central Texas all the way to DC."  The accompanying article additionally quoted Grider as saying, "The Capitol Police started pepper-spraying people and they were firing rubber bullets, and then after that started, that's when people started pushing to get into the Capitol building to be heard" and reported that "Grider said … there were many protesters, like himself, who were protecting monuments and art from the crowds."[1]

Based on this conduct, Grider was charged with Civil Disorder under 18 U.S.C. § 231(a)(3) (Count One); Obstruction of an Official Proceeding under 18 U.S.C. §§ 1512(c)(2) and 2 (Count Two); Destruction of Government Property under 18 U.S.C. § 1361 (Count Three); Entering and Remaining in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(1) (Count Four); Disorderly and Disruptive Conduct in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(2) (Count Five); Engaging in Physical Violence in a Restricted Building or Grounds under 18 U.S.C. § 1752(a)(4) (Count Six); Disorderly Conduct in a Capitol Building under 40 U.S.C. § 5104(e)(2)(D) (Count Seven); Act of Physical Violence in the Capitol Grounds or Buildings under 40 U.S.C. § 5104(e)(2)(F) (Count Eight); and Parading,

---

[1] The interview can be viewed at https://www.kwtx.com/2021/01/07/central-texas-man-witnessed-deadly-shooting-as-trump-supporters-stormed-us-capitol/.

Demonstrating, or Picketing in a Capitol Building under 40 U.S.C. § 5104(e)(2)(G) (Count Nine).

## II.     THE GOVERNMENT'S PROOF

With this filing, the government aims to streamline the presentation of evidence in the trial and focus the legal issues before this Court. To prove the general events that took place during the riot, the government plans to present stipulated testimony from United States Capitol Police (USCP) Captain Carneysha Mendoza and from United States Secret Service (USSS) Inspector Lanelle Hawa.  The government will also present testimony from Paul McKenna and Kyle Yetter, a USCP sergeant and former USCP officer, respectively; Kevin McCumber, the Deputy Clerk of the U.S. House of Representatives; and Michelle Ball, Special Agent with the Federal Bureau of Investigation (FBI).  This presentation will prove the charged offenses beyond a reasonable doubt.

### A.  Stipulated Testimony

This Court has heard testimony in a previous Capitol riot trial.  *See United States v. Jesus Rivera*, Case No. 1:21-cr-60-CKK (June 14, 2022).  This trial featured testimony from USCP Captain Mendoza and USSS Inspector Hawa.  Both parties recognize that this Court has recently heard such evidence and found it to be credible. To save time, and to focus on the facts that will be in dispute, the government plans to offer into evidence transcripts of these two witnesses' testimony, along with key pieces of evidence that each witness had testified about. The government has discussed this plan with defense counsel, and defense counsel does not object to it – the parties have executed a stipulation to this effect.  *See* Stipulations, Dkt. 128.

The testimony and evidence presented through these stipulated witnesses is relevant to prove several key elements of the offenses.  As this Court found in *Rivera* (*see* Dkt. 62 at 3–6, No.

1:21-cr-60-CKK (June 14, 2022)), the stipulated portions of the testimony of Captain Mendoza and Inspector Hawa – together with the corresponding exhibits– establish the following facts:[2]

- Security restrictions taken at the Capitol before January 6, 2021.
    - The Capitol is guarded 24 hours a day.  Between March 2020 to January 6, 2021, the Capitol was open only to those with official business.  Had the Capitol been open to the public, all members of the public would still be required to enter through the Capitol Visitor's Center.  Aside from Members of Congress, anyone seeking to enter the Capitol must show identification, go through a metal detector, put their belongings through an x-ray machine.  During the closure to the public, members of the media were permitted to enter the Capitol building only after they had been vetted by their company, vetted by the Capitol Police, and issued official badges by the Sergeants-at-Arms.

- Preparations for Vice President Pence's visit.
    - In partnership with the Capitol Police, before January 6, 2021, the United States Secret Service set up a protective perimeter within the grounds of the U.S. Capitol.  Only those with credentials or with permission from either agency were permitted beyond that point.  At various places, the protected area had successive lines of barriers made of snow barriers, interconnected bike racks, or mesh fencing. *See* Gov. Ex. 7.  Most of these barriers included at regular intervals "Area Closed" signs printed in large font.  *See* Gov. Ex. 11.

- Proceedings at the Capitol on January 6, 2021.
    - Vice President Pence arrived approximately at 12:30 p.m. with his wife and daughter. Inspector Hawa and other agents escorted the Vice President and his family to the Vice President's Ceremonial Office in the Capitol.  At some point after 1:15 p.m., the Secret Service learned of breaches to its protective area, *i.e.*, the mob had made its way through barriers and onto the Capitol grounds by that time.  At around 2:30 p.m., when the rioters first breached the Senate side of the Capitol itself, the Secret Service evacuated the Vice President and his family to a more secure location in the Capitol.  Shortly thereafter, with multiple police lines overrun and the several entrances to the Capitol breached, the Senate recessed for its own safety; the House shortly followed.  The Vice President and his family did not leave the restricted area until proceedings resumed later that evening.[3]

- Breaches at the Capitol on January 6, 2021.

---

[2] Where the Court relied on an exhibit in making the factual finding in *Rivera*, the Government has provided for the Court's ease the corresponding expected exhibit number, where that exhibit is expected to be introduced.

[3] While this was not expressly noted in the Court's findings, it is supported by Inspector Hawa's testimony at Gov. Ex. 1, Tr. 43:5-24.

o On the west side of the Capitol, the farthest edge of the security line was Peace Circle. That line was breached at around 12:55 p.m. *See* Gov. Ex. 7. Around the same time, the mob began to tear down fencing across the West Front of the Capitol. In response, additional Capitol Police officers were dispatched to support the surviving police lines. At some point, officers of the Metropolitan Police Department ("MPD") joined Capitol Police on these lines in stages. Over the course of the following hour, various sections of the police line broke in the face of heavy violent resistance, including the northwestern stairway on the West Front leading from the Lower Terrace to the Upper Terrace at 2:09 p.m. A few minutes later, the rioters smashed through the Senate Wing Door and its windows. Ultimately, the Capitol Police officers were unable to keep the rioters from breaking the successive police, and the focus of the Capitol Police shifted to convincing rioters to leave the Capitol and stemming particularly severe acts of violence. Law enforcement and the National Guard were unable to secure the Capitol and the safety of the Vice President, Members of Congress, and staff until several hours later. Congressional proceedings, with Vice President Pence presiding, did not resume until approximately 8:00 p.m., after all of the rioters had been removed.

As it did in *Rivera*, the Court may conclude from the above testimony and evidence that the government has proved the following elements of the charges in this case beyond a reasonable doubt:

- Counts Four, Five, and Six (18 U.S.C. § 1752(a)(1), (a)(2), (a)(4))

  o The testimony of Inspector Hawa and Captain Mendoza establishes that the Capitol building and grounds were a "restricted building or grounds" on January 6, 2021. *See* Dkt. 62 at 10, No. 1:21-cr-60-CKK (June 14, 2022).

- Count Five (18 U.S.C. § 1752(a)(2)

  o The testimony of Captain Mendoza establishes that entering the Capitol Building without authorization is inherently disruptive and disorderly, proving that the defendant "engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds." *See* Dkt. 62 at 11-12, No. 1:21-cr-60-CKK (June 14, 2022).

  o The testimony of Captain Mendoza establishes that the probable and natural consequence of breaking into the U.S. Capitol is the disruption of Congressional business and proceedings, proving that the defendant had the "intent to impede or disrupt the orderly conduct of Government business or official functions." *See* Dkt. 62 at 12, No. 1:21-cr-60-CKK (June 14, 2022).

  o The testimony of Captain Mendoza establishes that the Congressional proceedings could not recommence until the entire building was secured and cleared of rioters, proving that "defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of

Government business or official functions." *See* Dkt. 62 at 13, No. 1:21-cr-60-CKK (June 14, 2022).

- Count Seven (40 U.S.C. § 5104(e)(2)(D))

  o The testimony of Captain Mendoza establishes that entering the Capitol Building without authorization is inherently disruptive and disorderly, likewise proving that the defendant "engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings." *See* Dkt. 62 at 14, No. 1:21-cr-60-CKK (June 14, 2022).

  o The testimony of Captain Mendoza establishes that the probable and natural consequence of breaking into the United Capitol is the disruption of Congressional business and proceedings, proving that the defendant had the intent to "impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress." *See* Dkt. 62 at 14, No. 1:21-cr-60-CKK (June 14, 2022).

In addition, although these charges were not before the Court in *Rivera,* the testimony and evidence described above also tend to prove the following elements of the charges in this case:

- Count One (18 U.S.C. § 231(a)(3))

  o The testimony of Captain Mendoza regarding the role of the Capitol Police in security preparations prior to January 6, 2021, the breaches of Capitol Police lines on January 6, 2021 by rioters, and police attempts to resecure the building, proves that officers from the Capitol Police on the U.S. Capitol Grounds and in the U.S. Capitol building on January 6, 2021 were engaged in the lawful performance of their official duties incident to and during a civil disorder.

  o The testimony of Captain Mendoza and Inspector Hawa regarding the security preparations prior to January 6, 2021 and arrangements for the visit of the Vice President and his family on January 6, 2021 proves a "federally protected function"—specifically, the United States Capitol Police's protection of the U.S. Capitol and the Capitol grounds, and the United States Secret Service's protection of the Vice President of the United States and immediate family members of the Vice President.

  o The testimony of Captain Mendoza regarding the effect of the breaches on Capitol Police lines and the testimony of Inspector Hawa on the Secret Service's evacuation of the Vice President in response to the breaches to the protective area proves that the events on the Grounds of the U.S. Capitol and in the U.S. Capitol building on January 6, 2021 "adversely affected" a federally protected function.

- Count Two (18 U.S.C. § 1512(c)(2))

8

    o   The Court's finding based on Captain Mendoza's testimony that proceedings could not recommence until the entire building was secured and cleared of rioters also tends to prove that defendant attempted to or did obstruct or impede an official proceeding.

    o   The Court's finding based on Captain Mendoza's testimony that the probable and natural consequence of breaking into the United Capitol is the disruption of Congressional business and proceedings also tends to prove that the defendant acted knowingly, with awareness that the natural and probable effect of his conduct would be to obstruct or impede the official proceeding.

**B.  Testimony from USCP and former USCP Witnesses**

USCP Sergeant Paul McKenna was working at the Capitol on January 6, 2021, and assisted with protecting and evacuating members of the House of Representatives and staff that afternoon. He will be able to testify regarding the actions he took behind the Speaker's Lobby door, while rioters were on the other side of that door, in order to keep the rioters from reaching the House Chamber.  He will also be able to testify to other locations within the Capitol building where Grider traveled.

Former USCP Officer Kyle Yetter was also working at the Capitol on January 6, 2021, and defended the building against rioters at the Memorial Doors before he headed to the Speaker's Lobby door.  He was standing in front of the Speaker's Lobby door as rioters were trying to break through and reach the House Chamber.

**C.  Testimony from House of Representatives**

Deputy Clerk Kevin McCumber, with the House of Representatives was working at the Capitol on January 6, 2021, and was facilitating the vote certification process in the House Chamber before he was evacuated.  He will provide a brief overview of the vote certification process that day, and his own experiences as part of that process.

**D.  Testimony from FBI**

Special Agent Michelle Ball is the FBI agent assigned to this matter. She worked together with other agents to secure the arrest warrant for Grider in January 2021. She also obtained warrants to search Grider's Facebook account and his cell phone. Agent Ball also has reviewed USCP and third-party video footage of Grider in the Capitol building. Given this foundation, Agent Ball will discuss the following: text messages that Grider sent shortly before, on, and after January 6, 2021; web searches and websites visited by Grider on his phone shortly before and on January 6, 2021, relating to "proud boys dc"; as well as Facebook posts and messages from Grider before, on, and after January 6, 2021.

### E.  Elements of the Crimes Alleged

The government previously submitted proposed jury instructions to the Court, and incorporates the elements here. *See* Dkt. 127. In his objections to these instructions, *see* Dkt. 133, Grider renews the arguments raised in his previous Motion to Dismiss Counts One, Two, and Four through Six of the Superseding Indictment (Dkt. 101) and in other prior motions to dismiss the obstruction of official proceeding charge (*see, e.g.*, Dkt. 69), all of which this Court has denied (*see* Dkt. 78, 114).[4]    Grider further argues that the proposed instructions for attempt and accomplice liability on count 2 (the obstruction of official proceeding charge) should include an additional element that the defendant act "corruptly."  *See* Dkt. 133 at 3. The government's proposed version of those instructions – which track the Third and Seventh Circuits' pattern instructions – correctly state the elements for attempt and accomplice liability.  The additional language Grider requests is unnecessary and unwarranted.  *See* Dkt. 127 at 3 n.8 (earlier count), 10 n.13.

---

[4] Should the Court reach the issue, Grider's argument that the Court should not consider the "federally protected function" prong of the third element of Count One in its instructions, Dkt. 133 at 2, is incorrect for the reasons previously described in the government's opposition brief at Dkt. 109 at 12–17.

### III.    THE PARTIES' EVIDENCE AND ANTICIPATED DEFENSES

The parties are mutually committed to trying the case expeditiously and without lengthy arguments about objections.  The government has met and conferred with defense counsel about the evidence it plans to present.  Based on that meeting, the government expects that all, or nearly all, of its evidence will be admitted without objection.  In addition, the government anticipates that Grider will admit guilt to Count 9 (the picketing and parading charge); and that he will admit guilt to Count 4 (the restricted area entry charge) with the stipulation that he does not waive any arguments or objections set forth in his earlier-filed Motion to Dismiss Counts One, Two, and Four through Six of the Superseding Indictment, *see* Dkt. 101.

The government anticipates that Grider will not be raising any new legal claims, or disputing the facts that the government presents, but will instead dispute that he possessed the requisite *mens rea* for the majority of the charges.  However, the videos showing Grider's steady progression from the west side of the Capitol grounds, into the Senate wing, through the Crypt, to the House Main Door, and finally to the Speaker's Lobby, together with his text messages and his Facebook account, show that he was determined to disrupt the electoral count certification, even if it meant aiding and abetting in the destruction of property and interfering with law enforcement who were trying to protect the Capitol and its members during a riot.

### IV.    CONCLUSION

The disruption and interference that Grider and others caused in front of the House Main Door and the Speaker's Lobby, along with their desire to get to the House members on the other side of the door, ultimately culminated in someone's death.  This case, and Grider's conduct, provides a distilled view of the deep dangerousness of the crimes the government will prove

beyond a reasonable doubt that he committed: civil disorder, obstruction of an official proceeding,

destruction of government property, and other related charges.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar Number 481052

By:

__/s/ Cindy J. Cho_____
CINDY J. CHO
Assistant United States Attorney
Member of NY Bar
Detailed to the U.S. Attorney's Office for the
District of Columbia
10 W. Market St., Ste 2100
Indianapolis, IN 46204
(317) 246-0107
Cindy.Cho@usdoj.gov

FRANCESCO VALENTINI
Trial Attorney
D.C. Bar No. 986769

MICHAEL BARCLAY
Assistant United States Attorney
Member of NY Bar

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 5, 2022, I caused a copy of the foregoing motion to be

served on counsel of record via electronic filing.

\_\_/s/ Cindy J. Cho_____
Cindy J. Cho
Assistant United States Attorney
