IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>*Plaintiff*,<br><br>v.<br><br>CHRISTOPHER RAY GRIDER.<br><br>*Defendant*. | Criminal Action No. 21-22 (CKK) |

**DEFENDANT'S RESPONSE TO
GRAY MEDIA GROUP, INC.'S MOTION TO QUASH**

TO THE HONORABLE COLLEEN KOLLAR-KOTELLY, UNITED STATES DISTRICT COURT JUDGE FOR THE DISTRICT OF COLUMBIA:

CHRISTOPHER RAY GRIDER, the Defendant in the above styled and numbered cause, by and through undersigned counsel, submits the following response to the Motion to Quash and Memorandum of Points and Authorities in Support Thereof Filed on by Gray Media Group, Inc. (hereafter Gray) on December 2, 2022.

**I.  Introduction & Background: Rissa Shaw is more than just a reporter; she is Mr. Grider's friend and can testify as to the central issue in his upcoming trial**

From the outset, this Court should take heed of the fact that this is not a typical situation of a defendant attempting simply to obtain discovery from some disconnected reporter whose only connection to Mr. Grider is that she gathered information from him on January 6, 2021 during the course of her employment as a news reporter.

What Gray's motion explicitly fails to point out is that, prior to January 6, Rissa Shaw and Mr. Grider maintained a personal relationship and friendship. Mr.

1

Grider proffered as much before the Magistrate Judge for the Western District of Texas, Austin Division at his detention hearing where Ms. Shaw voluntarily appeared and was willing to answer questions of the magistrate regarding that relationship:

> She would proffer and testify that she knows and has a relationship with Mr. Grider and Mrs. Grider. She has done previous stories on their winery there in Bruceville-Eddy. And she has always been just incredibly impressed by Mr. Grider and what he is and who (sic) he does.
>
> She would testify that in getting to know Mr. Grider and his wife that they are Texans through and through, and they are in no way a flight risk or a danger to the community. They -- she would testify that he know -- she knows him to be -- provide people many opportunities in the greater Houston area. I think you probably already read about some of those people that he's helped out in the Waco area.
>
> She's seen firsthand former public school teachers -- Mr. Grider helping former school teachers, helping troubled teens from broken homes, bringing him out to his business, bringing them out to his property to help them earn a living. And she would testify that she believes that he is -- that he is a respectful person and that he believes in the institutions of our country. She would respectfully request just based on everything that she actually saw and observed, she would assure this court that she does not believe that Mr. Grider is a danger to the community in any way.

Exhibit B to Gray's Motion to Quash (Detention Hearing Transcript) at 15–16; *see also* ECF Dkt. 10-2[1] at 16–18 (Exhibit A to Defendant's Motion to Revoke Detention Order).

Their motion also downplays the significance of Ms. Shaw's connection to Mr. Grider on January 6, 2021 and the critical necessity of her testimony regarding that

---

[1] To permit the Court to quickly and easily access other documents filed in ECF, Mr. Grider is incorporating hyperlinks into this and future filings.

connection. There is no doubt that Mr. Grider entered the Capitol building on January 6, 2021 and, as he has represented in previous filings, intends to stipulate that he unlawfully and knowingly entered and remained in restricted areas, and plead guilty to the allegation that he unlawfully paraded and demonstrated within a Capitol Building. *See* ECF Dkt. 133 at 4 (Objections to Government's Proposed Jury Instructions). The primary (and possibly only) issue before this Court at his upcoming bench trial will be what his intent was, what he knew, and what his mental state was as it pertains to each of the remaining, contested allegations in the superseding indictment. To say that Ms. Shaw can provide this Court with critical evidence and insight as to this issue is an understatement.

Ms. Shaw was one of the first persons to speak with Mr. Grider after he left the Capitol grounds. *See* ECF Dkt. 10-2 at 14 (12 in original). He described things and explained to her what occurred immediately after he perceived it. *Id.* at 16. He also made statements to her related to his then-existing state of mind. *Id.* at 16–17. She asked him questions and he ultimately agreed to allow her to "interview" him. She gave him a list of questions about what occurred at the Capitol; Mr. Grider videorecorded himself using his cell phone making a series of "raw" videos that responded to those questions and sent those to her. Those videos were then used by her to produce her story that she ultimately published for her employer, KWTX-TV, the television station owned and operated by Gray. *See* Rissa Shaw, "Central Texas man witnessed deadly shooting as Trump supporters stormed US Capitol," KWTX-TV (Jan. 6, 2021), https://www.kwtx.com/2021/01/07/central-texas-man-witnessed-deadlysho-

oting-as-trump-supporters-stormed-us-capitol/.

For Gray to come before this Court now and complain that one of its employees should not be able to testify as to things any other person would be able to testify to as a friend and confidant of an accused citizen is abhorrent to our system of criminal justice. There is no First Amendment and common law interest in a journalist's privilege to protect confidential sources at stake here. As should have been obvious by the news story published by Ms. Shaw, Mr. Grider has no desire to keep his identity nor anything he said to her protected. What Mr. Grider desires is to present the most effective and compelling defense to this Court to establish that he did not act with the criminal intent or consciousness of wrongdoing alleged in the multiple counts of the superseding indictment. Mr. Shaw's testimony is absolutely essential to meet that goal.

Based on this and the following, this Court should deny Gray's Motion to Quash.

II. **There is nothing unreasonable about Mr. Grider's request to bring Ms. Shaw before this Court; her testimony is absolutely essential to Mr. Grider's defense**

Gray begins its motion by arguing that this Court should grant its motion to quash just as Judge Contreras did in *United States v. Kyle Fitzsimons*. *See* ECF Dkt. 91 in Case No. 21-cr-00158-RC. It further points to several cases that discuss Rule 17(c) of the Federal Rules of Criminal Procedure and the necessity for a subpoena seeking discovery of documents to show they "'are evidentiary and relevant' and that the subpoena 'is not intended as a general 'fishing expedition.'" Gray Motion to Quash at 5 (citing *United States v. Nixon*, 418 U.S. 683, 699–700 (1974); *Cheney v. U.S. Dist.*

4

*Ct. for D.C.*, 542 U.S. 367, 386–87 (2004)).

This Court should quickly dispel this argument by noting that the primary purpose of Mr. Grider's subpoena is not to obtain documents pursuant to Rule 17(c), but to obtain the material and essential testimony of Ms. Shaw pursuant to Rule 17(a). *See* FED. R. CRIM. P. 17(a). The demand in her subpoena to bring any notes or records related to her interview with Mr. Grider was simply to afford her the opportunity to have those materials available with her when she appeared to testify to refresh her memory and provide those records to the Government upon request as they are entitled under Rule 612 of the Federal Rules of Evidence. *See* FED. R. EVID. 612(b).[2] With this in mind, *Fitzsimons* is wholly distinguishable where the defendant there sought "[a]ny and all raw footage from an interview with Capitol Police Officer Aquilino Gonell" and "[t]he published version of that interview discussed Sgt. Gonell's experience defending the Capitol in general terms but did not reference Mr. Fitzsimons either directly or indirectly." *Fitzsimons*, ECF Dkt. 91 at 2.

Gray patently misrepresents Mr. Grider's position by stating that he has "no reason to believe that a journalist's testimony about their long-distance communication—made *after* all of the conduct in Washington for which he is charged—or unpublished newsgathering materials related to those communications could possibly be exculpatory." Gray Motion to Quash at 7 (emphasis in original). As Mr. Grider

---

[2] If dispositive, Mr. Grider is willing to withdraw his request for Ms. Shaw to provide any notes or records of her conversation. However, in the event that the Government requests any writings that she uses to refresh her memories before testifying pursuant to Rule 612 and she is unable to produce those immediately, Mr. Grider wants this Court to be aware that he went to this effort to have this witness bring those writings to court with her.

proffered to the Magistrate Judge at his detention hearing, Ms. Shaw would testify that, based on her communications with him, "she did not think he was engaged in violent acts," that it "never even really crossed her mind that he was committing any crime," that "there was never any indication of him acting maniacally, or espousing radical reviews (sic), or anything of the sort." ECF Dkt. 10-2 at 14.

While Gray states that testimony from Ms. Shaw as to Mr. Grider's state of mind is inadmissible, Gray Motion to Quash at 7–8, it fails to grasp the entirety of her anticipated testimony and how that testimony is admissible under the Rules of Evidence. First, and foremost, Ms. Shaw is not being called to testify about just some "inchoate" state of mind of Mr. Grider with no basis for it. Gray Motion to Quash at (citing *United States v. Brown*, 938 F.2d 1482, 1488 (1st Cir. 1991)); *cf. Brown*, 938 F.2d at 1488 (where court noted a law enforcement officer was not permitted to testify about whether a cooperating witness believed they would be facing more time if charged federally). Under Rule 701(a), a lay witness can testify as to their opinion when it is "rationally based on the witness' perceptions...." FED. R. EVID. 701(a). "Rationally based" means that the lay opinion is based upon the witness' personal knowledge. *United States v. Saulter*, 60 F.3d 270, 276 (7th Cir. 1995); FED. R. EVID. 602. Personal knowledge upon which a lay witness' testimony rests may be "gained during the course of [the witness'] investigation." *United States v. Weaver*, 281 F.3d 228, 231 (D.C. Cir. 2002); *see also United States v. Kilpatrick*, 798 F.3d 365, 384 (6th Cir. 2015) ("when an agent relies on his or her personal knowledge of a particular

6

investigation, the agent's opinion may be lay opinion testimony under Rule 701). Further, and more importantly, lay witnesses may offer their interpretations of their conversations. *United States v. Gilbertson*, 970 F.3d 939, 951 (8th Cir. 2020) (citing *United States v. Lomas*, 826 F.3d 1097, 1106–08 (8th Cir. 2016) (holding that a lay witness may offer an opinion about the meaning of a conversation if the witness participates in it); *United States v. Fregoso*, 60 F.3d 1314, 1326 (8th Cir. 1995) ("Where a witness is in a position to know what the other party meant, a district court does not abuse its discretion in admitting testimony as to her understanding of the meaning of the words used by the other party.")).

Ms. Shaw spent a considerable amount of time engaged in a dialogue with Mr. Grider in the hours after his departure from the Capitol Building. This was not the first time she had spoken with him. Their pre-existing relationship gave her a basis to understand his normal mannerisms and demeanor much better than someone speaking to Mr. Grider for the first time. In sum, she is going to be able to offer this Court incredible insight into his state of mind as she perceived it immediately after Mr. Grider's alleged actions within the Capitol, provide context regarding her dialogue with him, and most importantly, testify that he did not appear to be some maniacal insurrectionist who was hell-bent on overturning the 2020 presidential election.

As to Mr. Grider's statements and responses to Ms. Shaw's questions, contrary to Gray's position that his statements to her are *inadmissible hearsay*, his statements are, in fact, excluded from the rule against hearsay as they qualify as statements of

then-existing state of mind under Rule 803(3) and thus, do not require him to "*waive*[] *his Fifth Amendment privilege* and subject himself to cross-examination at trial" like Gray maintains in their motion. Gray Motion to Quash at 7–8 (emphasis in original); *see* FED. R. EVID. 803(3) (excluding those statements, regardless of whether the declarant is available as a witness); *cf. Bailey v. Commonwealth*, 62 Va. App. 499, 505, 749 S.E.2d 544, 546 (2013) (considering state rule of evidence that required unavailability of witness as a predicate for application of statement-against-penal-interest exception). As the rule itself provides, statements of a declarant's then-existing state of mind can be used to establish things "such as motive, intent, or plan" and are not subject to the rule excluding hearsay evidence. *See* FED. R. EVID. 803(3), n.3 ("The rule of *Mutual Life Ins. Co. v. Hillmon*, 145 U.S. 285, 12 S. Ct. 909, 36 L. Ed. 706 (1892), allowing evidence of intention as tending to prove the doing of the act intended, is, of course, left undisturbed.").

For instance, when Mr. Grider said, "The President asked people to come and show their support. *I feel* like it's the least we could do. That's kind of why I came from Central Texas to D.C.," he was describing his then-existing state of mind, as opposed to a statement of memory or belief to prove a past fact (which the rule prohibits). *See* Shaw, https://www.kwtx.com/2021/01/07/central-texas-man-witnessed-deadlyshooting-as-trump-supporters-stormed-us-capitol/ (emphasis added); FED. R. EVID. 803(3). As a further example, there is one video Mr. Grider sent to Ms. Shaw that he intends to offer through her but was not entirely included in her published news story: Defendant's Proposed Exhibit 265, a video file, IMG_1907.mp4. In that

8

video, Mr. Grider continues, after commenting about a "nothing-to-see-here attitude," by stating, "no one wants to look into it, no one wants to investigate, no one wants to see if possibly people were disenfranchised by fictitious ballots being added to the count. It's being treated like a non-story. There's no curiosity from the press. And so it's something I think that, you know, we needed to raise awareness." Again, this reflected his then-existing state of mind. *See United States v. Lawal*, 736 F.2d 5, 8 (2d Cir. 1984) (citing *United States v. DiMaria*, 727 F.2d 265 (2d Cir.1984)) (both holding that statements reflecting what defendant was presently thinking was admissible).

To that end, Mr. Grider's statements to Ms. Shaw are also not hearsay because they are not being offered for the truth of the matter asserted. *See* FED. R. EVID. 801(c). For instance, in the previously referenced statement by Mr. Grider, he is not seeking to prove the fact that no one "wants to look into," "investigate," or "see if possibly people were disenfranchised by fictitious ballots being added to the count," but to establish what his state of mind was that prompted him to act as he did that day and what his intentions were.

In sum, Ms. Shaw's testimony as to both the statements made by Mr. Grider on January 6, 2021 and her perception of those statements are exculpatory, relevant, material, and necessary to Mr. Grider's defense of the allegations against him.

Separate and apart from those opinions and statements, however, there is something equally important that Ms. Shaw can also offer this Court — not as a news

reporter, but as a friend and acquaintance of Mr. Grider's. As set out in the Introduction and Background section to this response, prior to her interactions with him on January 6, 2021, Ms. Shaw had developed a friendship and relationship with Mr. Grider and his wife. *See* ECF Dkt. 10-2 at 16–18. She spent time with the Griders along with others in their community and can gauge what his reputation is for being peaceful, law-abiding, and respectful of government institutions. Therefore, she can also offer relevant, admissible, and helpful opinion testimony to this Court regarding that reputation. *See id*; FED. R. EVID. 404(a)(2)(A) & 405.

With all this in mind, this Court should take comfort in knowing that there is nothing unreasonable about permitting Mr. Grider to call Ms. Shaw to testify on his behalf. More importantly, given their unique relationship and unique interactions on January 6, 2021, there is no concern that permitting her to testify in this limited capacity would "expose a host of media organizations to similar speculative subpoenas in similar January 6 prosecutions," as Gray posits in their motion. Gray Motion to Quash at 9. Mr. Grider seeks to call Ms. Shaw as a friend and confidant. That she happened to also be a news reporter who shared his account of what took place and what his mental impressions were should not change her ability to be called to testify as a witness on his behalf.

## III. Gray's Concerns About the First Amendment and the Common Law Reporter's Privilege are Misplaced Here

Gray's motion to quash Ms. Shaw's subpoena also argues that her testimony and materials that she is requested to bring to testify are subject to a qualified reporter's privilege. Gray Motion to Quash at 10. In doing so, however, it relies on cases

that are inapplicable and distinguishable from the unique circumstances present in this case. It also fails to recognize the significance of Ms. Shaw having already agreed to appear before a magistrate and offer testimony in Mr. Grider's case.

Gray begins its argument by stating that "[t]he D.C. Circuit has made it clear that, absent extraordinary circumstances, news organizations cannot be compelled to disclose information created in the course of his (sic) newsgathering." Gray Motion to Quash at 10. A closer look at the caselaw from this circuit shows quite the opposite.

In 1977, relying on *Branzburg v. Hayes*, 408 U.S. 665, 92 S. Ct. 2646, 33 L. Ed. 2d 626 (1972), the court held that a reporter "can claim no general immunity, qualified or otherwise, from grand jury questioning. On the contrary, like all other witnesses, he must appear and normally must answer. If the grand jury's questions are put in bad faith for the purpose of harassment, he can call on the courts for protection." *In re Possible Violations of 18 USC 371, 641, 1503*, 564 F.2d 567, 571 (D.C. Cir. 1977).

In *United States v. Ahn*, 231 F.3d. 26 (D.C. Cir. 2000) — the case used most prominently by Gray in their motion — the issue before the court of whether the trial court erred in granting reporters' motion to quash was only a non-dispositive issue within a greater issue. The defendant's primary complaint in that case had to so with his desire to withdraw his plea due to an alleged breach of his plea agreement with the Government. *Id.* at 36. More specifically, the defendant complained that there was "an implied promise by the Government that it would maintain the secrecy of his

11

arrest" and that the Government breached its agreement by leaking the circumstances of his arrest to two television reporters. *Id.* at 37. To establish this alleged breach, the defendant sought to subpoena the reporters to divulge their sources; the trial court quashed the reporter's subpoenas on their motion. *Id.* at 37. Before turning to that issue, the court held that, as the trial court found, there was never an implied promise in the first place by the Government not to disclose the arrest and thus, no breach of a plea agreement. *Id.* at 36–37. In dicta, the court nevertheless addressed the issue regarding the reporters' subpoena *arguendo* and held that the trial court did not err or abuse its discretion in granting the reporters' motion to quash, noting simply that the defendant there failed to demonstrate that the reporters' qualified privilege should be overcome because "the reporters' testimony was not 'essential and crucial' to [the defendant's] case and was not relevant to determining [his] guilt or innocence." *Id.* at 37. In short, *Ahn* does not endorse the principal that news organizations cannot be compelled to disclose information created in the course of their newsgathering. *See United States v. Libby*, 432 F. Supp. 2d 26, 45 (D.D.C. 2006) ("This Court therefore cannot accept the proposition that the Circuit Court, by merely concluding that "Ahn failed to carry his burden," established that in criminal cases a news reporter has a qualified First Amendment reporters' privilege that can only be defeated by balancing the public interest in protecting a reporter's sources with a defendant's private interest in compelling disclosure.").

To the contrary, six years later, in *In re: Grand Jury Subpoena, Judith Miller*, 438 F.3d. 1141 (D.C. Cir. 2006) *superseding* 397 F.3d 964 (D.C. Cir. 2005), the D.C.

Circuit reaffirmed the principal stated close to 30 years prior in *In re Possible Violations of 18 USC 371, 641, 1503* that the First Amendment did not afford journalists a constitutional right to conceal their confidential sources from grand jury subpoenas. *Id.* at 1147 ("The Highest Court has spoken and never revisited the question. Without doubt, that is the end of the matter."). Regarding the reporters' claim that there was a federal common law privilege, as noted in the majority opinion, "The Court is not of one mind on the existence of a common law privilege," and only one judge, Judge Tatel, would hold that such a privilege exists. *Id.* at 1150.[3]

In almost all these cases (and many of those from other circuits cited by Gray in its motion), there is a common theme that is not present in the case of Mr. Grider's subpoena for Ms. Shaw to appear and testify at his trial: the reporters were attempting to protect confidential sources of information for their story. *See, e.g., Branzburg*, 408 U.S. at 667–679; *Ahn*, 231 F.3d at 37; *Miller*, 438 F.3d at 1142. As discussed *supra*, Mr. Grider obviously has no desire to keep his identity or his account of what took place on January 6 to remain confidential. *See Hutira v. Islamic Republic of Iran*, 211 F. Supp. 2d 115, 120 (D.D.C. 2002) ("courts have also recognized that 'the absence of confidentiality may be considered in the balance of competing interests as a factor that diminishes the journalist's, and the public's, interest in non-disclosure'"; *but see Miller*, 438 F.3d at 1177 (Tatel, J., concurring).

In sum, in light of the current precedent binding this Court, this Court should

---

[3] But, even though he believed there was a privilege, Judge Tatel still supported the trial court's decision to deny the motion the motion to quash and compel the reporters to testify. *See Miller*, 438 F.3d at 1183 (Tatel, J., concurring).

deny Gray's Motion to Quash. Only further supporting that decision is the fact that Mr. Grider does not seek any confidential information nor desires for anything he did or said to remain confidential.

WHEREFORE, PREMISES CONSIDERED, Mr. Grider respectfully requests that this Court deny Gray's Motion to Quash the subpoena compelling Rissa Shaw to appear and testify before this Court.

Date: <u>December 6, 2022</u>          Respectfully Submitted,

**MAYR LAW, P.C.**

by: <u>/s/ T. Brent Mayr</u>
T. BRENT MAYR
Texas State Bar Number 24037052
D.C.D.C. Bar ID TX0206
bmayr@mayr-law.com

5300 Memorial Dr., Suite 750
Houston, TX 77007
Telephone:  713-808-9613
Fax:  713-808-9991

ATTORNEY FOR THE DEFENDANT,
CHRISTOPHER RAY GRIDER

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of this motion was sent to Counsel for Gray, Charles Tobin and Maxwell Mishkin, counsel for Ms. Shaw, Michael Scanlon, Michael Lambert, and Catherine Robb, and counsel for the Government, Cindy Cho, Francesco Valentini, and Michael Barclay, on December 6, 2022, via ECF and email.

<u>/s/ T. Brent Mayr</u>
T. BRENT MAYR