# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| |
|---|
| UNITED STATES OF AMERICA, |
| v. |
| CHRISTOPHER RAY GRIDER, |
| Defendant. |

Criminal Action No. 21-022 (CKK)

## FINDINGS OF FACT AND CONCLUSIONS OF LAW
(December 21, 2022)

A six-day bench trial in this criminal matter concluded on December 19, 2022.

Defendant is charged by indictment with:  (1) Civil Disorder, in violation of 18 U.S.C. §

231(a)(3); (2) Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18

U.S.C. § 1512(c)(2); (3) Destruction of Government Property, in violation of 18 U.S.C. § 1361;

(4) Entering and Remaining in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(1); (5)

Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation 18 U.S.C. §

1752(a)(2); (6) Engaging in Physical Violence in a Restricted Building or Grounds, in violation

of 18 U.S.C. § 1752(a)(4); (7) Disorderly Conduct in a Capitol Building, in violation of 40

U.S.C. §  5104(e)(2)(D); (8) Act of Physical Violence in the Capitol Grounds or Buildings, in

violation of 40 U.S.C. § 5104(e)(2)(F); and (9) Parading, Demonstrating, or Picketing in a

Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G).  On the first day of trial, Defendant

entered an open plea, which the Court accepted, to Counts Four and Nine, both misdemeanor

charges.  Remaining for resolution are Counts 1, 2, 3, 5, 6, 7, and 8.

In support of its case as to the remaining Counts, the Government introduced testimony

from four witnesses:  (1) Sergeant Paul McKenna of the United States Capitol Police

Department; (2) Kevin McCumber, Deputy Clerk of the United States House of Representatives;

(3) Special Agent Kyle Yetter of the Federal Bureau of Investigation and former Officer of the

1

United States Capitol Police Department; and (4) Special Agent Michelle Ball of the Federal Bureau of Investigation.  Additionally, the Court admitted 390 exhibits into evidence, including the trial testimony of Inspector Lanelle Hawa of the United States Secret Service and Captain Carneysha Mendoza of the United States Capitol Police from *United States v. Rivera*, No. 21-cr-60 (CKK) (D.D.C.).

At the close of the Government's case, Defendant moved for a judgment of acquittal as a matter of law.  That motion remains pending before the Court.  Defendant also presented evidence, calling one witness, himself.

 The Court finds Defendant Christopher Ray Grider **GUILTY** on Counts 1, 2, 3, 5, 6, 7, and 8, the Government having carried their burden beyond a reasonable doubt as to each element of each charge.

For the same reasons herein that the Court finds Defendant guilty on each charge, the Court **DENIES** Defendant's Rule 29 motion by separate order.

In reaching a decision on the following findings of fact and conclusions of law, the Court has considered the pleadings, the record, testimony, the parties' stipulations, the demeanor of the witnesses while testifying, the reasonableness of or unreasonableness of the testimony, the probability or improbability of the testimony, and all reasonable inferences to be drawn therefrom, among all other matters bearing on the credibility of the witnesses and the facts, and exhibits in evidence.  Unless otherwise stated, the Court credits the following testimony and evidence as undisputed and/or unrebutted.

## I.      Findings of Fact

"It was meant to happen," Grider told his wife the evening of January 6, 2021.  Upon entering the Capitol earlier that day, Grider made "it" happen——the disruption of Congressional

proceedings to, in his words, "stop the steal."  By dismantling a police barricade, attempting to

shut down power to the Capitol building, shoving through a police line, and assisting a fellow

insurrectionist in breaking down the door to the Speaker's Lobby, the Court finds beyond a

reasonable doubt that Grider obstructed, with guilty mind, the certification of the electoral vote

on January 6, 2021.

A. <u>Security Preparations at the Capitol for the Certification of the Electoral College Vote
and the Insurrection's Destruction of Protective Lines</u>

The Court restates the testimony of Inspector Lanelle Hawa and Captain Carneysha in

*Rivera*, to which the parties have stipulated.  The findings in this section are based on this

stipulated testimony unless otherwise stated.

The Court finds that the Capitol, guarded 24 hours a day, was open only to those with

official business (along with Members and staff) from March 2020 to January 6, 2021 due to the

COVID-19 pandemic.  Had the Capitol been open to the public, all members of the public would

be required to enter through the Capitol Visitor's Center, show identification, go through a metal

detector, scan their belongings through an x-ray machine, and be otherwise subject to search by

United States Capitol Police ("Capitol Police") officers.  During the Capitol's closure to the

public, members of the media were permitted to enter the Capitol building only after they had

been vetted by their company, vetted by the Capitol Police, and issued official badges by the

Sergeants-at-Arms.  Were someone to enter the Capitol without passing through security, Capitol

Police would find and detain that person; if necessary, Capitol Police would lock down portions

of the Capitol in such a way that could include stopping certain Congressional proceedings.

There were additional safeguards in place on January 6, 2021.  In preparation for Vice

President Michael R. Pence's visit to preside over the counting of the votes of the Electoral

College on January 6, Inspector Hawa coordinated with the Capitol Police.  In partnership with

the Capitol Police, the United States Secret Service ("Secret Service") set up a protective perimeter around the entire grounds of the United States Capitol. Only those with credentials or with permission from either agency were permitted beyond that point. The security perimeter is standard for visits by heads of state, which includes the Vice President, but was also implemented in light of security concerns arising from then-President Donald J. Trump's scheduled "Stop the Steal" rally near the White House. At various places, the protected area had successive lines of barriers made of snow barriers, interconnected bike racks, or mesh fencing. *See, e.g.*, Gov.'s Exs. 10, 19. Most of these barriers included at regular intervals "Area Closed" signs printed in large font. *See, e.g.*, Gov.'s Exs. 8, 10.

Although it is unclear exactly what time Inspector Hawa arrived, the Court infers from her testimony that she arrived at the Capitol in the morning on January 6 to coordinate the Vice President's visit that day. Vice President Pence arrived approximately at 12:30 p.m. with his wife and daughter, at which point Inspector Hawa escorted the Vice President and his family to the Vice President's Ceremonial Office in the Capitol. *Id.* The Joint Session for the count of the Electoral College votes began at 1:00 p.m. with Vice President Pence presiding. Gov.'s Ex. 5. Fifteen minutes later, the two Houses of Congress retired to their respective chambers to debate the certification of the votes from the state of Arizona. *Id.*

After 1:15 p.m., which was fifteen minutes after the Vice President returned to the Senate, the Secret Service learned of breaches to its protective area, i.e., the mob had made its way through barriers and onto the Capitol grounds by that time. The Secret Service began to discuss moving the Vice President and his family to a more secure location. At around 2:30 p.m., when the rioters first breached the Senate side of the Capitol itself, the Secret Service evacuated the Vice President and his family to a more secure location in the Capitol. Shortly

thereafter, with multiple police lines overrun and the several entrances to the Capitol breached, the Senate recessed for its own safety; the House shortly followed. *See also* Gov.'s Ex. 5.

On the west side of the Capitol, the farthest edge of the security line was Peace Circle. That line was breached at approximately 12:55 p.m. Gov.'s Ex. 1. The mob began to tear down fencing across the West Front of the Capitol at that same time. Gov.'s Ex. 6. When these initial breaches occurred, Captain Mendoza and other Capitol Police officers surged to support surviving police lines, mainly on the Upper and Lower Terraces on the West Front of the Capitol. *Id.* Officers of the Metropolitan Police Department ("MPD") joined Capitol Police on these lines in stages. Over the course of the following hour, various sections of the police line broke in the face of heavy violent resistance, including on the northwestern stairway on the West Front leading from the Lower Terrace to the Upper Terrace at 2:09 p.m. Just a few minutes later, the rioters smashed through the Senate Wing Door and its windows. Capitol Police officers briefly reclaimed the Senate Wing Door, only for rioters to overwhelm that police line at 2:49 p.m. Meanwhile, another door with access to the Senate side of the Capitol, the Parliamentarian Door, was breached at 2:42 p.m. For some period of time after 1:00 p.m. and before 2:42 p.m., MPD deployed chemical spray (pepper spray or something similar) in an attempt to disperse the insurrectionists who had yet to join the rioters who had captured the Upper West Terrace.

When rioters entered the Capitol, they were met with loud messages over the public address system urging Capitol visitors and staff to take shelter due to an incursion into the Capitol. Although Capitol Police officers "engaged in combat" with rioters to prevent them from further breaking police lines, the officers were ultimately unsuccessful. At that point, the focus of the Capitol Police shifted from protecting broken police lines to attempting to convince rioters to leave the Capitol and stemming particularly severe acts of violence. Law enforcement and the

National Guard were unable to secure the Capitol and the safety of the Vice President, Members of Congress, and staff until several hours later.  Congressional proceedings, with Vice President Pence presiding, only resumed at approximately 8:00 p.m. when all of the rioters had been removed.

    B.  Grider's Participation

    The Court finds that Defendant traveled to Washington, DC on the morning of January 6, 2021, at least in part, to attend then-President Trump's "Save America" speech on the Ellipse. Grider missed that speech, instead watching the vast majority of it via YouTube livestream on a smartphone.  As other courts have explained, including this Court, then-President Trump claimed baselessly to his crowd of supporters that the 2020 Presidential Election had been "stolen" from him and exhorted his followers to march to the Capitol in an effort to persuade members of Congress to object to the electoral votes of several States.  *E.g.*, *United States v. Grider*, Crim. A. No. 21-022 (CKK), 2022 WL 3030974, at *1–2 (D.D.C. Aug. 1, 2022); *Thompson v. Trump*, 590 F. Supp. 3d 46, 66–67 (D.D.C. 2022) (APM).  At the conclusion of then-President Trump's address, Defendant walked from the Washington Monument down the National Mall to the Capitol.

    By this time, Grider was wearing a yellow "Don't Tread on Me" flag affixed around his neck like a cape and a red "Make America Great Again" hat.  Def.'s Ex. 204.  Grider first pierced the restricted area at Peace Circle.  *See* Def.'s Ex. 212.  He entered through a gap in two bike racks.  *See id.*; Def.'s Ex. 213.  On one rack, an "AREA CLOSED" sign in large font was clearly visible.  Def.'s Ex. 212.  In front of him were demonstrators that had clambered on top of the monument at Peace Circle.  *Id.*  Undeterred, Defendant continued forward to the Capitol Building itself, arriving at the foot of the northwestern stairway on the West Front leading from

the Lower Terrace to the Upper Terrace at approximately 1:59 p.m.  Gov.'s Ex. 30.  Several rows

of rioters in front of him, Capitol Police were battling to keep the mob outside of the Capitol

building.  *Id.*; Def.'s Ex. 219.  As Defendant watched a thin line of police struggle to keep the

mob back, Defendant was tear gassed.  *See* Def.'s Ex. 214.  Around him, members of the mob

shouted at the police, "Fuck You!" and deployed their own chemical spray at police officers.

Def.'s Ex. 30.

At this time, Grider also assisted other rioters in dismantling police barricades.  With the

help of at least two other rioters, Grider lifted a bike rack down the stairs, turning it into a ladder

that he and other members of the mob used to climb onto a wide stone railing adjoining the

stairs.  Def.'s Exs. 221, 227.  At approximately 2:10 PM, Grider ascended onto a large pool of

blood on the railing.  Def.'s Ex. 231 (blood), Gov.'s Ex. 30 (time).  Not only did Grider continue

onwards, but he lifted his fists jubilantly as he made his way up the railing.  Gov.'s Ex. 30.  On

two occasions, he also beckoned the crowd behind him to move forward.  *Id.*

Shortly afterwards, Defendant arrived on the Upper West Front, moments after the

Capitol building itself was first breached.  *See* Def.'s Ex. 238.  There, he stole a case of bottled

water meant for police officers and offered waters to fellow rioters, some of whom had also been

sprayed with chemical irritants.  *See id.*  Grider also picked up a discarded black helmet, which

by its shape, color, and placement the Court infers to have been a helmet for Capitol Police riot

officers.  *E.g.*, Gov.'s Ex. 34.

At 2:14 PM, mere minutes after the building was first breached, Grider entered the

Capitol through the Upper West Front doors.  Gov.'s Ex. 30.  At this point, the doors had been

heavily damaged, with glass strewn across the floor.  *See id.*; Def.'s Ex. 239.  Upon entering,

Grider could also hear an emergency siren blaring.  *See* Def.'s Ex. 239.  Approximately thirty

seconds after entering, Grider notices an exposed circuit breaker box and yells to others, "Turn the power off!" *Id.* Grider then works his way through fellow rioters to the breaker itself, where he begins flipping switches. *Id.* Grider asks someone next to him, "Is it off?" and heeds another rioter's instruction to Grider to "keep trying." *Id.* A third rioter shouts at Grider, "Cut the main [power line]! Cut the whole fucking main!" Grider pleads with this rioter, "Help me! Help me!" *Id.* Eventually, the group, including Grider, realizes that their attempts to cut power to the Capitol building have been unsuccessful and give up. *See id.* After abandoning the circuit breaker box, Grider can be heard later on telling other rioters "Don't break anything," notwithstanding Grider's earlier efforts to cut power to the Capitol building. Def.'s Ex. 240.

From there, Grider advances to the Crypt, arriving at approximately 2:19 PM, five minutes after he entered the Capitol. Gov.'s Ex. 30. Shortly before Grider arrived in the Crypt, Capitol Police established a new police line in an effort to block insurrectionists from reaching the second floor of the Capitol building where the Senate and House Chambers are located. *See id.*[1] Grider can be seen steadily advancing through the mob in the Crypt, eventually advancing such that one row of rioters, if that, separated him from the police line. Def.'s Ex. 241. There, he can see other rioters scuffle with the police officers and plead with the officers to let them through. The officers refuse to do so and attempt to hold their ground. At approximately 2:25 PM, however, the mob heeds the calls of a rioter to "Push them [the police] back! Push them back!" Gov.'s Ex. 25 (timestamp); Gov.'s Ex. 30 (audio).

The mob, including Grider, shoves their way through the police line, breaking it. Gov.'s Ex. 30; Def.'s Ex. 241. Faced with such an onslaught, the police line stood for no more than a

---

[1] The Court also credits the testimony of Sergeant McKenna and Agent Yetter for this proposition.

few minutes.  Gov.'s Ex. 30.   Despite having just muscled through a police line, Grider expresses concern about a police officer pinned to a wall in the Crypt, telling another rioter, "He's going to get hurt."  Def.'s Ex. 241.  The rioter advises Grider to "leave him [the officer]," which Grider does, shouting moments later, "Stop the Steal!"  *Id.*

After Grider exits the Crypt, moving from the Senate side of the Capitol to the House side of the Capitol on the first floor, he encounters a map of the Capitol building.  Gov.'s Ex. 30; Def.'s Ex. 243; *see also* Def.'s Ex. 242 (photograph of map).  Defendant takes a photo of the map on his phone after spending several moments studying it.  *See* Gov.'s Ex. 30.  He even engages with another rioter about the map, pointing to it and conversing.  *Id.*  Grider then takes a few steps forward before returning to the map, looking at it again in an apparent effort to orient himself in the building, and then turning around and heading back down the hallway from which he just came.  *See id.*  Grider then ascends to the second floor, briefly entering the Rotunda. Def.'s Ex. 243.  Grider turns around, beckoning other rioters to join him.  "We gotta get into the Chamber! This way, this way, this way!," Grider exclaims.  *Id.*  The Chamber, as Grider would know from the map he studied and from the various signs indicating offices for Members of the House—including one for Speaker of the House Nancy Pelosi that he zoomed in on in his video footage—was the House Chamber.  *See id.*

By the time Grider reached the hallway to the House Main Door at approximately 2:32 PM, an *ad hoc* police line had formed to keep rioters from the door.  *See* Gov.'s Ex. 32.  Grider's presence, as a member of the collective mob, had already disrupted Congressional business by that point.  House leadership had been evacuated from the House Chamber at 2:16 PM, and, at 2:18 PM, the House recessed under a procedural rule to be used only when the House's safety is at stake.  Gov.'s Ex. 5.  Although the House attempted to resume business at 2:26 PM, it again

recessed for its safety at 2:29 PM, three minutes before Grider's arrival at the hallway to the House Main Door. *See id.*  As the mob gathered in that corridor, plainclothes Capitol Police officers instructed House Members to don protective "evacuation hoods" designed to protect against gas and other chemical aerosols. *See* Gov.'s Ex. 45.[2]  The officers also began to barricade the interior of the House Main Door. *See id.*

Meanwhile, Grider worked his way toward the makeshift police line in front of the House Main Door.  In the front of the mob, a rioter falsely assured others that police would let the mob into the House Chamber if they behaved peacefully.  Gov.'s Exs. 32, 34; Def.'s Ex. 243.  This rioter was within Grider's sightline and wearing a black "Trump" beanie and a grey sweatshirt; at points he spoke through a red bullhorn.  Gov.'s Exs. 32, 34; Def.'s Ex. 243.  The rioter's address failed to calm the mob and, as it grew rowdier, Grider encouraged rioters behind him to advance forward.  Gov.'s Ex. 31.  When Grider is approximately three rows from the police line, a fellow rioter shouts "Push!", at which point Grider joins the mob in pushing through the police line and shouting "Stop the Steal!"  Gov.'s Exs. 32, 34; Def.'s Ex. 243.

By this point, the mob had reached the House Main Door, with some rioters banging on the door itself and others crowded into an antechamber located in front of it.  Def.'s Ex. 243; Gov.'s Exs 35, 36.  While in the antechamber, Grider brandishes his helmet for the crowd, lifting it up above his head.  Gov.'s Ex. 36.  Shortly thereafter, a rioter near Grider yells, "Use your helmet! Use your Kevlar!" before saying, "We need to use our Kevlar to knock out those windows," referring to the two windows on the House Main Door.  Gov.'s Exs. 35, 36.  The rioter again pleads, "Knock the windows out with Kevlar," at which point Grider again brandishes his police helmet, holding it above his head and offering it up to rioters at the front of

---

[2]  The Court mainly relies on Deputy Clerk McCumber's testimony for this proposition.

the mob.  Gov.'s Exs. 35, 36.  Grider remains for approximately a minute longer and incorrectly

informs others that the "cops [behind the door] are leaving."  Gov.'s Exs. 35, 36.

Grider eventually abandons his efforts to breach the House Main Door, heeding an earlier

call by another rioter to "find an alternate way."  *Id.*  As he exits the antechamber, he sees other

rioters down the hall beckoning others in that direction.  Gov.'s Ex. 37.  Grider then runs down

the hall, following the rioter to the Speaker's Lobby Door on the southern (Democratic) side of

the House.  *Id.*  It takes Grider only ten seconds to run from the antechamber to the Speaker's

Lobby Door.  *See id*.  Throughout his time outside and within the Capitol building, Grider had

multiple opportunities to leave.  Instead, he made repeated, concerted decisions to push forward.

Agent Yetter testified that Grider was met by a police line, including then-Capitol Police

Officer Yetter, the intact Speaker's Lobby Door, and furniture stacked behind the Door to

prevent entry.  Shortly after Grider's arrival at the Speaker's Lobby Door, he can see through the

Door's windows the further evacuation of House Members and staff.  Gov.'s Ex. 36.  Grider

nevertheless remains, and pleads with the officers to open the Speaker's Lobby Door and/or the

House Main Door because law enforcement officers by the House Main Door were, Grider

claimed, getting injured by the mob (of which he was a member just moments prior).  Gov.'s Ex.

41.  The officers do not yield.  *Id.*

Grider then watches as another rioter clad in a black fur-trimmed hat, Zachary Alam,[3]

violently punches with his bare fists the windows of the Speaker's Lobby Door.  *Id.*  After

watching Alam attempt to break down the door, Grider places his hand on Alam's back and

---

[3]  The Government has alleged in a separate case that this rioter is a man named Zachary Alam.
*See* ECF No. 1-1, *United States v. Alam*, Crim. A. No. 21-cr-190 (DLF) (D.D.C. Jan. 25, 2021)
(affidavit in support of complaint).  For ease of reference, the Court refers to this rioter as
"Alam," but does not make any factual findings as to the rioter's identity.  This rioter should be
presumed innocent until proven guilty.

converses with him.  *Id.*; Gov.'s Ex. 40.  During this conversation, Grider knocks on his helmet to illustrate that it is a hard object, and can be used as a weapon, and hands it to Alam.  Gov.'s Ex. 40.  Grider appears to make additional comments to Alam, but they cannot be heard in any of the exhibits in evidence.  *Id.*  Alam then examines the helmet himself, removes his hat and drops it.  *Id.*  At that point, the three Capitol Police officers leave in order to make room for a more heavily armored group of Capitol Police officers ascending nearby stairs.  *Id.*  Grider attempts to shove the Speaker's Lobby Door open with his hand.  *Id.*  Alam then uses the helmet to smash in the door, succeeding in breaking the rightmost window, leaving a gap in the door through which rioters could jump into the Speaker's Lobby.  *Id.*; *see also* Gov.'s Ex. 41. Once in the Speaker's Lobby, the rioters would have direct access to the House Floor and the trapped Members and staff in the House Gallery.

As Sergeant McKenna testified, the House Floor had mostly been evacuated at this time, although Capitol Police remained.  Additionally, scores of House Members were sheltering in the House Gallery, one floor above the House Floor.  When Sergeant McKenna saw the door being broken down, he drew his service weapon and took a position of cover, ready to use lethal force to protect Members of Congress from violent rioters.  His Lieutenant, then the closest officer to the door, also did so, and discharged one round when the first rioter clambered through the door, mortally wounding her.  When Grider saw the Lieutenant's gun and heard others shout "He's got a gun!", and before the shot was fired, Grider briefly began to flee and ducked down.  Def.'s Ex. 273.  Rather than further retreating, however, Grider remained by the rioter's body for several minutes.  *Id.*  As now-Agent Yetter testified, Grider's continued presence, particularly so close to the rioter's body, impeded officers from rendering medical assistance, removing the rioter's body, and restoring order to the area.

Grider was one of the last rioters at the Speaker's Lobby Door, who were forcibly removed by armored officers of the Metropolitan Police Department.  *See* Gov.'s Ex. 44.  After exiting the Capitol building, Grider identified with the rioters who broke down the door, telling others gathering on the steps of the Capitol, "*we* busted down the window."  Gov.'s Ex. 83 (emphasis added).  Afterwards, Grider joined his friend Jesse Bowen at a nearby cigar bar.  Grider left the District of Columbia the following day.

    C.  <u>Grider's Testimony and Mental State</u>

As noted above, Grider took the stand in his own defense.  His testimony forms almost the entirety of the facts in dispute; i.e., the parties only really dispute whether Grider acted with the requisite mental state for each offense to which he has not pleaded guilty.  Grider offered two main theories as to his mental state.  First, he claimed that he thought the events at the Capitol, up to and including his time in the Crypt, were merely a continuation of then-President Trump's rally and might feature addresses by then-President Trump, Senator Rafael E. Cruz of Texas, and others.  Similarly, he claimed that his only purpose for being in the Capitol—other than protesting, evidently—was to watch historic events unfold.  As such, he claimed that he was trying to enter the House Chamber because he thought it was the Senate Gallery and he intended to observe the proceedings.  For a variety of reasons, the Court does not find these accounts credible.  More generally, the Court did not find Grider's testimony as to his mental state on January 6, 2021 credible.

Before turning to the factual disputes and credibility issues, the Court briefly summarizes some portions of Grider's testimony.  Grider stated that he served as a military police officer in the United States Air Force, guarding an air base, after having served in the Army National Guard.  Before and after that role, Grider was a security guard and salesperson in various

department stores, often supervising efforts to stop shoplifting.  Grider eventually earned a

bachelor's degree and master's degree in fine arts, specializing in photography.  With those

degrees, he taught grade-school arts classes.  He also became a successful business owner; he

currently operates a winery with his wife.  Between then-candidate Trump's 2015 decision to run

for President of the United States and January 6, 2021, Grider attended two separate Trump

rallies, which he recalls as having been peaceful.  In advance of January 6, 2021, Grider planned

with his friend, Bowen, to travel to the District of Columbia for then-President Trump's rally.

Grider was concerned (incorrectly) that at least some of the vote counts in some states might

have been unlawfully altered through some sort of criminal election interference.

Grider disputes whether he acted with the requisite mental state beginning with his entry

into a restricted area.  Although Grider admitted at the guilty plea proceeding, under penalty of

perjury, that he knew his presence in the Capitol *and* on Capitol grounds was unlawful, he

testified during trial that he only knew it was unlawful to be inside the Capitol.  Moreover, his

answer for *when* he understood it to be unlawful inside the Capitol shifted over time.  First, he

could not identify any particular time.  When pressed on cross-examination and after much

equivocating, he finally admitted that he understood he was present unlawfully when outside

Speaker Pelosi's office.  Then, in response to the Court's questions and again after much

equivocation, he pointed to his time in the Crypt, which he had previously testified he thought

might be the location of the second portion of then-President Trump's rally.  By changing his

story so many times, the Court is not inclined to find any particular story credible.

Grider's credibility issues as to whether he knew he was unlawfully on Capitol property

do not stop there.  For example, Grider testified that he thought the two bike racks with an "Area

Closed" sign on Peace Circle allowed him entrance as a Trump supporter and were not aimed at

keeping people off the Capitol grounds.  Given Grider's background in guarding restricted areas, such an explanation is particularly specious.  Even more specious is Grider's insistence that he thought he was lawfully present on the Lower West Terrace when he saw rioters battling police lines and when he himself was tear gassed by police.  *Cf. United States v. Rivera*, --- F. Supp. 3d ---, 2022 WL 2187851, at *6 (D.D.C. June 17, 2022) (being tear gassed by law enforcement sure sign one is not lawfully present).  On the other charge to which Grider pled guilty, unlawfully protesting in a Capitol building, Grider also could not admit on cross-examination the requisite mental state at times.  For example, when the Government asked why Grider shouted "Stop the Steal" while in the Capitol, he responded that he did so only because others around him were doing so.  Similarly, his explanation for shouting "Our House!" in the Capitol was that it was the "People's House," and not because, as he agreed under oath in his guilty plea, he intended to protest.  Given Grider's agreement during his guilty plea, under penalty of perjury, that he possessed the requisite mental states, his subsequent refusal to admit to such states in cross-examination calls into question the entirety of his testimony related to his mental state before and on January 6, 2021.

For other culpable conduct, Grider could offer no explanation on direct or cross-examination.  For example, Grider could not explain why he tampered with a circuit breaker box and could not explain why he thought he was lawfully present in that area after entering through a broken door with an emergency siren blaring.  Again, the Court simply cannot square Grider's professed mental state with the video exhibits and Grider's professional background.

Additional explanations Grider offers do not comport with video evidence of his statements and conduct.  For example, Grider testified that he thought the rioter with the bullhorn outside the House Main Door was a police officer and/or that police were in fact allowing Grider

on to what he says he believed to be the Senate Gallery. This account of his mental state runs totally contrary to the video evidence. Grider can clearly be heard shouting, "Let us in or we'll go in!" and "Let us in!". He also joins in the stampede for the House Main Door when the police line breaks. These are neither the statements nor conduct of someone who thought he would be permitted in the Senate Gallery to observe proceedings. Believing that one would be permitted into the Senate Gallery without passing through any security screenings whatsoever, and while a member of a mob, also strains credulity—particularly so for a former military police officer.

Although there are additional examples illustrating why the Court finds Grider's testimony incredible, the Court shall stop here for the sake of brevity. Suffice it to say that the Court discounts any of Grider's self-serving statements, finding only his inculpatory statements credible because they are supported by other evidence.

## II.        Conclusions of Law

### A.  Count One

To find a defendant guilty of obstructing officers during a civil disorder, in violation of 18 U.S.C. § 231(a)(3), the Court must find the following beyond a reasonable doubt: (1) the defendant committed or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers; (2) that the defendant did so knowingly; (3) that, at the time of the actual or attempted act, the law enforcement officer(s) were engaged in the lawful performance of their official duties incident to and during a civil disorder; and (4) that the civil disorder in any way obstructed, delayed, or adversely affected any federally protected function or commerce within the District of Columbia or interstate commerce. As to the proscribed conduct, for the purposes of this statute, the Court need not find that the defendant's actions *in fact* obstructed law officer officers. Rather, the Court need only

find that the defendant committed or attempted to commit an act with the *specific intent* to

obstruct law enforcement officers. *See United States v. McHugh*, 583 F. Supp. 3d 1, 24–25

(D.D.C. 2022) (JDB) (collecting cases).

In neither his case-in-chief nor closing argument did Defendant dispute that the events of

January 6, 2021 constitute a civil disorder.  For the purposes of section 231, a "civil disorder" is

any "public disturbance involving acts of violence by groups of three or more persons" which,

among other things "causes an immediate danger of injury to another individual." *Id.* § 232(3).

Thousands of individuals rioted that day, injuring others.  As such, Grider was clearly involved

in a civil disorder.  It is equally clear that the insurrection hindered both a federally protected

function and commerce within the District of Columbia. *See United States v. Nordean*, 579 F.

Supp. 3d 28, 55 (D.D.C. 2021) (TJK) (the Secret Service's protection of Vice President is a

"federally protected function"); Gov.'s Ex. 54 (all Safeway stores in the District of Columbia

closed due to insurrection and ensuing curfew); Gov.'s Ex. 56 (detailing resulting decrease in

Safeway sales).  Nor can Defendant dispute, relying on the stipulated testimony, that law

enforcement was engaged in their official duties while battling insurrectionists. *See* Gov.'s Ex. 6

at 69:14–77:2 (stipulated).

The Court further finds that Grider committed multiple acts with the intent to obstruct

law enforcement officers while attempting to quell a civil disorder.  These actions began even

before Grider entered the building when he removed a police barricade and placed it on a railing

to assist other rioters in accessing the Upper West Terrace and, ultimately, the interior of the

Capitol building.  As discussed above, multiple exhibits show Defendant watching Capitol Police

officers battling rioters nearby in an effort to keep them out of the building.  Grider would have

known, therefore, that the bike racks near those officers were acting as barricades to assist those

officers in crowd control.  If that were not enough, the police deploying tear gas at Grider and those around him should have clearly placed Grider on notice that he was not welcome on the Lower West Terrace.  Yet, rather than leaving, or even simply remaining, he took concerted efforts with others to afford rioters another means of ingress to barrel past police lines.  By removing police barricades in an effort to defeat a police line, the Court finds beyond a reasonable doubt that Grider intended to interfere with law enforcement officers guarding the Lower West Terrace.

Grider next intended to obstruct law enforcement officers by attempting to cut power to the Capitol building.  After passing a collapsed police line and stealing an abandoned police helmet, Grider entered the Capitol building through a broken door, over broken glass, and with an emergency siren blaring.  Grider knew that law enforcement was attempting to keep rioters out of the building, partially through an emergency siren, and knew that power was critical to law enforcement's efforts.   Nevertheless, Grider worked with others to cut power.  *Supra* at 8. When a rioter shouts at Grider to "Cut the line! Cut the line!," Grider attempts to do exactly that. *Id.*  Although ultimately unsuccessful, *attempting* to shut down power to the Capitol building during a civil disorder is still "an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers."

Grider's most egregious violation of this statute came at the Speaker's Lobby Door, where he provided the helmet as a weapon to smash the Door.  *Supra* at 12-13.  There, Grider assisted Alam in breaking down the Speaker's Lobby Door which, Grider surely understood, had been barricaded by law enforcement to keep rioters out of the House Chamber.  *Id.*  Grider could also see that the three law enforcement officers, under sustained pressure by the mob, had stepped aside to allow a greater number of armored officers to replace the prior police line.  *Id.*

18

Similarly, Grider knew Alam was inclined to break down the Speaker's Lobby Door, having just watched Alam attempt to break the windows in the Speaker's Lobby Door with his bare hands. *Id.* The Court therefore finds that by handing Alam the helmet that Grider had stolen, Grider intended to interfere with law enforcement efforts to keep the Speaker's Lobby Door intact and secure.

On these grounds, the Court therefore finds Defendant **GUILTY** on Count One.

B.  Count Two

To find a defendant guilty of corruptly obstructing an official proceeding, the Court must find:  (1) the defendant attempted to or did obstruct an official proceeding; (2) the defendant specifically intended to obstruct a particular proceeding; (3) that the defendant acted knowingly and with the natural and probable effect that his conduct would in fact obstruct that official proceeding; and (4) that the defendant acted corruptly.  *See* 18 U.S.C. § 1512(c)(2).  For the same reasons stated in *United States v. Grider*, 585 F. Supp. 3d 21, 28–29 (D.D.C. 2022) (CKK), the Court again concludes, like every other court of this jurisdiction to have addressed the issue, that the quadrennial certification of the electoral vote was an "official proceeding."  *See, e.g.*, *United States v. Reffitt*, --- F. Supp. 3d ---, 2022 WL 1404247, at *3 (D.D.C. May 4, 2022) (DLF).

As to the requisite mental state required for the fourth element of the charge, the parties dispute the meaning of "corruptly."  The Government proposes that the Court apply the same jury instruction that has been given in prior January 6 cases:  "corruptly" means to act with consciousness of wrongdoing and through unlawful means *or* unlawful purpose.  *See, e.g.*, *Reffitt*, 2022 WL 1404247, at *4; ECF No. 106 at 22, *United States v. Fitzsimons*, Crim. A. No. 21-158 (RC) (D.D.C. Oct. 27, 2022) (transcript of bench verdict) ("Corruptly means that the

defendant used an unlawful means or had a wrongful or unlawful purpose or both.").[4]  Defendant argued at closing that the unlawful means must be particularly malign or blameworthy, relying on Judge Dabney L. Friedrich's opinion in *United States v. Sandlin*, 575 F. Supp. 3d 16, 32–33 (D.D.C. 2021).  Defendant's position is not without support, but the Court need not decide the issue, for the Court finds that Grider acted "corruptly" even under Defendant's stricter definition.

First, it is clear that Grider in fact obstructed an official proceeding.  No Congressional proceeding could continue with a mob besieging its doors, and Grider's presence and willing assistance in assaulting the House Main Door and the Speaker's Lobby Door squarely meets those requirements.  As the Court explained in *Rivera*, even mere unauthorized presence in the Capitol building may obstruct Congressional proceedings.  2022 WL 2187851, at *6.[5]

Second, the Court finds that Grider specifically intended to obstruct the counting of the electoral votes on January 6, 2021.  Grider was clearly aware that Congress was meeting to certify the election.  Grider admitted during direct testimony that he was aware Congress must certify a presidential election before it takes irrevocable legal effect and that Congress was meeting to do so on January 6, 2021.  Moreover, throughout then-President Trump's address at the Ellipse, to which Grider listened in real time, then-President Trump said as much repeatedly. *Grider*, 2022 WL 3030974, at *2.  Then-President Trump also directed his supporters to march

---

[4]  The application of such an instruction is not universal, however.  In *United States v. Brock*, for example, Judge John D. Bates defined "corruptly" as "requir[ing] a showing of dishonesty, an improper purpose, [or] consciousness of wrongdoing."  ECF No. 81 at 398, Crim. A. No. 21-140 (JDB) (D.D.C. Dec. 6, 2022) (citing *United States v. Puma*, Crim. A. No. 21-454 (PLF), 2022 WL 823079, at *10 (D.D.C. Mar. 19, 2022)) (transcript of bench verdict).
[5]  *Accord Brock*, ECF No. 81 at 393–94.  That said, the Court does not rely exclusively on Grider's presence to find that he *in fact* obstructed Congressional proceedings on January 6, 2021.

to the Capitol to "cheer on . . . senators, [] congressmen and women" who would object to the certification of the electoral votes of several States. *Id.*

As Grider admitted on cross-examination, Grider was attempting to enter the House Chamber to "be heard." In these circumstances, to "be heard" is to silence Members of Congress themselves; i.e., to disrupt the proceedings themselves. More fundamentally, however, the Court finds that Grider intended the probable and natural consequences of his actions. *See Rivera*, 2022 WL 2187851 at *6. Supporting others in the antechamber of the Main House Door as they tried to enter the House Chamber would obviously cause Congressional proceedings to stop and lawmakers to flee for their safety. Aiding a violent rioter in breaking down the Speaker's Lobby Door would do the same. As such, the Court finds beyond a reasonable doubt that Grider specifically intended to obstruct an official proceeding and did so knowingly and with the natural and probable effect that his conduct would in fact obstruct that official proceeding.

Third and finally, the Court finds that Grider acted corruptly. The Court need not rest only on Grider's unlawful entry and parading. Grider went much further by attempting to cut power to the Capitol and by assisting another rioter, Alam, in breaking down the Speaker's Lobby Door. Both criminal actions are particularly malign, and both are unlawful means (attempted or successful) to accomplish the suspension of Congressional proceedings. *Cf. Reffitt*, 2022 WL 1404247, at *4 ("le[ading] and encourag[ing] others who used 'obvious criminal means'" in effort to obstruct Congressional proceedings was sufficient to conclude defendant acted "corruptly").

The Court therefore finds Defendant **GUILTY** on Count Two.

C.  Count Three

To find a defendant guilty of injuring, damaging, or destroying Government property in violation of 18 U.S.C. § 1361, the Court must find beyond a reasonable doubt that:  (1) the defendant injured, damaged or destroyed property; (2) that the defendant did so willfully; and (3) that the property belonged to the United States.[6]  To find Grider guilty of a felony offense, as charged in the Superseding Indictment, the Court must find that the damage or attempted damage to the property at issue exceeded $1,000.  Broadly, as for element (2), a person acts "willfully" when they "'act[] with knowledge that [their] conduct was unlawful.'"  *Bryan v. United States*, 524 U.S. 184, 191–92 (1998) (quoting *Ratzlaf v. United States*, 510 U.S. 135, 137 (1994)); *see also United States v. Moore*, 612 F.3d 698, 703 (D.C. Cir. 2010) (Kavanaugh, J., concurring).

The Government proceeds mainly on an aiding-and-abetting theory as to the Speaker's Lobby Door.  To succeed on this theory, the Government must show beyond a reasonable doubt that:  (1) Grider knew that Alam was breaking down the Speaker's Lobby Door; (2) that Grider assisted Alam in doing so; and (3) that Grider did so knowingly and with the intent that Alam break down the door.  *See United States v. Raper*, 676 F.2d 841, 849 (D.C. Cir. 1982) (elements of aiding-and-abetting generally); *see also United States v. Montoya*, 85 F.3d 641, 1996 WL 229188, at *3-4 (10th Cir. 1996) (unpublished) (aiding-and-abetting as to 18 U.S.C. § 1361 specifically).

As discussed above, Grider was standing next to Alam as he began to break the glass on the Speaker's Lobby Door with his bare hands.  The video exhibits also make clear that Grider

---

[6]  A line of cases has held that the defendant need not be aware that the property belonged to the United States.  *E.g.*, *United States v. LaPorta*, 46 F.3d 152 (2d Cir. 1994); *United States v. Krause*, 914 F.3d 1122, 1127 (8th Cir. 2019).  The Court need not address that question here, for the Speaker's Lobby Door was indisputably Government property.

and Alam had a conversation in which they discussed the Speaker's Lobby Door. During this conversation, Grider looked to the door, back to Alam, and knocked on the helmet to signify to Alam that it was a hard object. Grider than handed the helmet to Alam, which Alam examined further himself. Then, Alam removed his hat, lifted the helmet, and began smashing the Speaker's Lobby Door after Grider attempted to push the door open with his own hand.

These facts establish beyond a reasonable doubt that Grider intended to assist Alam to further damage and break through the Door. Moreover, Grider was clearly aware of Alam's intentions, and the Court assumes that Grider intended the natural and probable consequence of handing Alam the helmet—that Alam would use it as a weapon to damage the door. *See supra* at 12. Moreover, Grider's own efforts to get through the Speaker's Lobby Door, attempting to convince the police officers to let the rioters through and then physically trying to push the door open, show that Grider intended to use Alam in his own effort to get through the Speaker's Lobby Door. *Id.* The Court therefore finds beyond a reasonable doubt that Grider knew that Alam was attempting breaking down the Speaker's Lobby Door, that Grider assisted Alam in doing so, and that Grider did so knowingly and with the intent that Alam break down the door.

Finally, the parties have stipulated that the damage caused to the door as a result of Alam's actions was $3,044, and the Court so finds.

The Court therefore finds Defendant **GUILTY** on Count Three, the Government having carried its burden beyond a reasonable doubt as to each element of this charge.

D. Count Five

To find a defendant guilty of Disorderly and Disruptive Conduct in a Restricted Building, in violation of 18 U.S.C. § 1752(a)(2), the Court must find the following beyond a reasonable doubt: (1) the defendant engaged in disorderly or disruptive conduct in, or in proximity to, any

restricted building; (2) the defendant did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions; and (3) the defendant's conduct occurred when, or so that, his conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

First, "disorderly" conduct is that which "tends to disturb the public peace, offend public morals, or undermine public safety."  "Disorderly," *Black's Law Dictionary* (9th ed. 2009); *see also* "Disorderly," *Oxford English Dictionary* (2nd ed. 1989) ("Not according to order or rule; in a lawless or unruly way; tumultuously, riotously.").  Conduct is "disruptive" if it "tend[s] to disrupt some process, activity, condition, etc."  "Disruptive," *Merriam-Webster.com Dictionary* (June 16, 2022).  As the Court concluded in *Rivera*, even mere presence in an unlawful mob or riot is both (1) "disorderly" in the sense that it furthers the mob's "disturb[ing] the public peace" and (2) "disruptive" insofar as it disturbs the normal and peaceful condition of the Capitol grounds and buildings, its official proceedings, and the safety of its lawful occupants.  Were it not, it must be said that continued presence in a mob that is being tear gassed and pepper sprayed is disorderly insofar as a person's continued presence clearly impedes law enforcement's efforts to regain control of a particular area.  Additionally, as Captain Mendoza explained, entering a Capitol building without authorization is necessarily "[n]ot according to order and rule," "unruly," and may "disrupt [Congressional] . . . activity" insofar as Capitol Police would seek out and detain anyone who enters a Capitol building without authorization.  Accordingly, the Court concludes that Grider "engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building."

Second, the Court infers that Grider intended the natural and probable consequences of his actions.  *See United States v. Meija*, 597 F.3d 1329, 1341 (D.C. Cir. 2010).  "The probable

and natural consequence of breaking into the United States Capitol is the disruption of Congressional business and proceedings." *Rivera*, 2022 WL 2187851, at *5; *see also* ECF No. 81 at 397, *United States v. Brock*, Crim. A. No. 21-140 (JDB) (D.D.C. Dec. 6, 2022) (transcript of bench verdict); ECF No. 106 at 21–22, *United States v. Fitzsimons*, Crim. A. No. 21-158 (RC) (D.D.C. Oct. 27, 2022) (same).  Membership in a mass of rioters is particularly likely to disrupt Congressional business.  Even a peaceful crowd standing on the Floor of Congress is likely to shut down Congressional proceedings.  *See Brock* at 8; ECF No. 38 at 3-4, *United States v. Allan*, Crim. A. No. 21-064 (CKK) (D.D.C. Aug. 11, 2022) (statement-of-offense for plea to section 1512(c)(2) where defendant nonviolently breached Senate Chamber).

Third, Grider was *in fact* disruptive.  "Even the presence of *one* unauthorized person in the Capitol is reason to suspend Congressional proceedings," and disruption grows with the mob. *Rivera*, 2022 WL 2187851, at *6.  In other words, Grider's mere presence disrupted Congressional business, not to mention his more culpable conduct that day.  To reiterate a metaphor the Court presented in *Rivera*, "just as heavy rains cause a flood in a field, each individual raindrop itself contributes to that flood.  Only when all of the floodwaters subside is order restored to the field." *Id.*  Again, the same idea applies with even more force here.  Many rioters collectively disrupted Congressional proceedings, and each individual rioter contributed to that disruption.  Some, of course, contributed more than others.

Finally, for the same reasons stated in *Grider*, 2022 WL 3016775, at *14, the Court finds that the Capitol buildings and grounds were a "restricted area" for the purposes of each offense charged under section 1752(a).

Altogether the Court finds that the evidence shows, beyond a reasonable doubt, that Grider knowingly, and with the intent to impede or disrupt the orderly conduct of Government

business or official functions, engaged in disorderly or disruptive conduct in, or in proximity to,

any restricted building that in fact impeded or disrupted the orderly conduct of Government

business or official functions.  The Court therefore finds Defendant **GUILTY** on Count Five.

 E.  Count Six

 In order for the Court to find Defendant guilty of Engaging in Physical Violence in a

Restricted Building, in violation of 18 U.S.C. § 1752(a)(4), the Court must find the following

beyond a reasonable doubt:  (1) Grider engaged in an act of physical violence against any person

or property in any restricted building or grounds; and (2) the defedant did so knowingly.  As in

Count Five, the Court finds that the Capitol buildings and grounds were a "restricted area."

Additionally, for the same reasons as the Court discussed as to Count Three, the Court finds that

Grider aided and abetted Alam in breaking down the Speaker's Lobby Door and that he did so

knowingly.

 Before continuing, however, the Court must pause to address Defendant's objection on

this charge to liability based on a theory of aiding-and-abetting, which was belatedly raised

during closing argument.  There, defense counsel argued that relying on such a theory would

violate Defendant's due process rights, for neither the Superseding Indictment nor the

Government's proposed jury instructions advanced such a theory.  That argument fails.

 As an initial matter, an indictment need not include aiding-and-abetting liability in an

indictment for the factfinder to consider such a theory.  *United States v. Kegler*, 724 F.2d 190,

201 (D.C. Cir. 1983).  Although the United States Court of Appeals for the District of Columbia

Circuit has not addressed this issue, most federal Courts of Appeals hold that a factfinder may

rely on an aiding-and-abetting theory so long as the factfinder's reliance on such a theory does

not result in an "unfair surprise" to the defendant.  *United States v. Galiffa*, 734 F.2d 306, 312

(7th Cir. 1984) (collecting cases). Defendant cannot show an unfair surprise here, much less any kind of surprise. The Superseding Indictment cited aiding-and-abetting liability for Count 3, the Government's Trial Brief stated that the Government would rely on this theory as to multiple counts, *see* ECF No. 136 at 11, and the Court has implicitly discussed this theory in its prior opinions in this case, *e.g.*, 2022 WL 3016775, at *2 ("The Affidavit also alleges that Grider handed a black helmet to another rioter to assist the rioter in breaking open the windows on the [Speaker's Lobby Door]"). As such, Defendant's due-process challenge to this Count (and Count 8) fails.

As the Government has otherwise carried its burden beyond a reasonable doubt on this charge, the Court finds Defendant **GUILTY** on Count Six.

F. Count Seven

In order for the Court to find Defendant guilty of Violent Entry and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D), the Court must find the following beyond a reasonable doubt: (1) Grider engaged in disorderly or disruptive conduct in any of the United States Capitol buildings; (2) Grider did so with the intent to impede, disrupt, or disturb the orderly conduct of a joint session of Congress or a House of Congress; and (3) Grider acted willfully and knowingly. As discussed above, a person acts "willfully" when they "'act[] with knowledge that [their] conduct was unlawful.'" *Bryan*, 524 U.S. at 191-92. As the Court has already concluded that Grider knew that his continued presence was disruptive and nevertheless continued to remain on Capitol grounds with the intent to disrupt Congressional business, the Court has found that Grider acted willfully for this charge as well. For the same reasons the Court found Grider guilty on Counts 5, the Court finds that the Government has

carried its burden beyond a reasonable doubt on this charge and finds Defendant **GUILTY** on Count Seven.

G.  Count Eight

To find a defendant guilty of an Act of Physical Violence in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(F), the Court must find the following beyond a reasonable doubt: (1) the engaged in an act of physical violence in any of the United States Capitol buildings; and (2) the defendant acted willfully and knowingly.  As in Counts 2 and 6, an "act of physical violence" includes violence against property.  Because this charge mirrors Count 6 in its entirety, for the same reasons the Court found Defendant guilty on Count 6, the Court finds Defendant **GUILTY** on Count Eight, the Government having carried its burden beyond a reasonable doubt.

### III.    Conclusion

Grider was a leader, not a follower, during the insurrection of January 6, 2021.  At each key interval, Grider beckoned fellow rioters onward, all in an effort to disrupt the constitutionally-consecrated certification of the Presidential Election of 2020.  Even more reprehensibly, he wielded a police officer's helmet against officers themselves, turning shield into sword.  For his efforts to further the insurrection, the Court finds Christopher Ray Grider **GUILTY** on Counts 1, 2, 3, 5, 6, 7, and 8, the Government having carried their burden beyond a reasonable doubt as to each element of each charge.

Dated: December 21, 2022

                                    /s/

                              COLLEEN KOLLAR-KOTELLY
                              United States District Judge