UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    )
                            )
        Plaintiff,           )
                            )
vs.                          ) Criminal Action No. 21-022 (CKK)
                            ) Washington, DC
CHRISTOPHER RAY GRIDER,      ) Monday, December 12, 2022
                            ) 9:24 o'clock a.m.
        Defendant.           ) Volume 1 of 5

Before the
HONORABLE JUDGE COLLEEN KOLLAR-KOTELLY


TRANSCRIPT OF PLEA HEARING TO COUNTS IV AND IX, AND
BENCH TRIAL, DAY 1

APPEARANCES:
FOR THE GOVERNMENT:      United States Attorney's Office
                         By:  Cindy J. Cho
                         Detailed to the U.S. Attorney's Office
                         for the District of Columbia
                         10 West Market Street, Suite 2100
                         Indianapolis, Indiana 46204

                         Department of Justice
                         Criminal Division, Appellate Section
                         By:  Francesco Valentini
                         950 Pennsylvania Avenue NW
                         Washington, DC 20530

FOR THE DEFENDANT:       Mayr Law P.C.
                         By:  Brent Mayr
                         5300 Memorial Drive, Suite 750
                         Houston, Texas 77007

ALSO PRESENT:            The Defendant in person.

COURT REPORTER:          Jean A. Knepley, RDR, CRR, CRC, FCRR
                         Detailed to the U.S. District Court
                         for the District of Columbia
                         46 East Ohio Street, Room 301
                         Indianapolis, Indiana 46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

Vol. 1 -   2

1                          I N D E X

2   PLEA HEARING                                6
    OPENING STATEMENT by the Government         37
3
    PAUL McKENNA
4
    Direct Examination by Ms. Cho ..................50
5   Cross-Examination by Mr. Mayr .................109
    Redirect Examination by Ms. Cho ..............147
6
    KEVIN FRANCIS McCUMBER
7
    Direct Examination by Ms. Cho .................153
8   Cross-Examination by Mr. Mayr .................186
    Redirect Examination by Ms. Cho ..............187
9
         Certificate of Court Reporter ............193
10

11                      INDEX TO EXHIBITS

12  DESCRIPTION                           RECEIVED

13  1 ............................................53
    2 ............................................53
14  3 ............................................53
    4 ............................................53
15  5 ............................................53
    6 ............................................53
16  7 ............................................53
    8 ............................................53
17  9 ............................................53
    10 ...........................................53
18  11 ...........................................53
    12 ...........................................53
19  13 ...........................................53
    14 ...........................................53
20  15 ...........................................53
    16 ...........................................53
21  17 ...........................................53
    18 ...........................................53
22  19 ...........................................53
    20 ...........................................53
23  21 ...........................................53
    22 ...........................................53
24  23 ...........................................53
    24 ...........................................53
25  25 ...........................................53
    26 ...........................................53

27 ......................................................53
28 ......................................................53
29 ......................................................53
30 ......................................................53
31 ......................................................53
32 ......................................................53
33 ......................................................53
34 ......................................................53
35 ......................................................53
36 ......................................................53
37 ......................................................53
38 ......................................................53
39 ......................................................53
40 ......................................................53
41 ......................................................53
42 ......................................................53
43 ......................................................53
44 ......................................................53
45 ......................................................53
46 ......................................................53
47 ......................................................53
48 ......................................................53
49 ......................................................53
50 ......................................................53
51 ......................................................53
52 ......................................................53
53 ......................................................53
54 ......................................................53
55 ......................................................53
56 ......................................................53
57 ......................................................53
58 ......................................................53
59 ......................................................53
60 ......................................................53
61 ......................................................53
62 ......................................................53
63 ......................................................53
64 ......................................................53
65 ......................................................53
66 ......................................................53
67 ......................................................53
68 ......................................................53
69 ......................................................53
70 ......................................................53
71 ......................................................53
72 ......................................................53
73 ......................................................53
74 ......................................................53
75 ......................................................53
76 ......................................................53

77 ...........................................................53
78 ...........................................................53
79 ...........................................................53
80 ...........................................................53
81 ...........................................................53
82 ...........................................................53
83 ...........................................................53
84 ...........................................................53
85 ...........................................................53
86 ...........................................................53
87 ...........................................................53
88 ...........................................................53
89 ...........................................................53
90 ...........................................................53
91 ...........................................................53
92 ...........................................................53
93 ...........................................................53
94 ...........................................................53
95 ...........................................................53
96 ...........................................................53
97 ...........................................................53
98 ...........................................................53
99 ...........................................................53
100 ...........................................................53
101 ...........................................................53
102 ...........................................................53
103 ...........................................................53
104 ...........................................................53
105 ...........................................................53
106 ...........................................................53
107 ...........................................................53
108 ...........................................................53
109 ...........................................................53
110 ...........................................................53
111 ...........................................................53
112 ...........................................................53
113 ...........................................................53
114 ...........................................................53
115 ...........................................................53
116 ...........................................................53
117 ...........................................................53
118 ...........................................................53
119 ...........................................................53

1          *(In open court.)*

2          THE COURT:  Good morning, everyone.

3          Give me a minute to get organized.  Let's call the

4     case.

5          THE CLERK:  Criminal Case 21-022, the United States v.

6     Christopher Ray Grider.  Counsel, would you please identify

7     yourself for the record starting with the Government.

8          MS. CHO:  Thank you, Your Honor.  Cindy Cho for the

9     United States.  With me at counsel table is Mr. Francesco

10    Valentini, Special Agent Michelle Ball with the FBI, and

11    Paralegal Tiffany Robinson.

12         THE COURT:  All right.  Good morning, everyone.

13         MR. MAYR:  Good morning, Your Honor.  Brent Mayr on

14    behalf of Mr. Grider.

15         THE COURT:  Good morning, and good morning, Mr.

16    Grider.  All right.

17         So let me go over the COVID procedures again.  In

18    terms of the people in the well of the Court, I would ask you

19    have a test in the morning to make sure there aren't any

20    issues.  If you don't have the test equipment, the Court does

21    and I can provide that to you.  That includes obviously the

22    Defendant, all counsel, counsel tables, witnesses as well.  It

23    does not include those that are in the courtroom; however, you

24    all have to wear masks.  If you are not wearing a mask, you

25    can't stay.

1    Do you have a mask?  If you don't, you can't stay.  We
2    do have, I think we have an extra mask, which we can give you.
3    All right.  So everybody in the courtroom needs to have a mask
4    at all times.  As I understand it, there are no objections were
5    filed after our discussion on Friday.

6    Whoever is in the back needs a mask on.  You see the
7    sign on the door?

8    So I assume that all the objections relating to
9    exhibits were resolved one way or another?

10    MR. MAYR:  That is correct, Your Honor.

11    THE COURT:  Okay.  And so the plea, as I understand
12    it, then, is to both Counts IV, which is entering and remaining
13    in a Restricted Building or Grounds; and Count IX, which is
14    parading, demonstrating, or picketing in a Capitol Building; is
15    that correct?

16    MR. MAYR:  That is correct, Your Honor.

17    THE COURT:  All right.  Then, let me just see.  Okay.
18    He did sign it.  All right.  I am ready to proceed with, with
19    the plea if he is.

20    MR. MAYR:  We are ready, Your Honor.

21    THE COURT:  Okay.  Then, he can — he can either stand
22    there, or he can stay seated and talk into the microphone,
23    whichever works.

24    MR. MAYR:  I was going to have him stand here next to
25    me at the podium if that is okay with the Court.

1        THE COURT:  Fine.  That works.

2        MR. MAYR:  You can lower your mask.

3        THE COURT:  You can take the mask off if we are having

4   trouble hearing.  So if the court reporter would let us know if

5   you are having difficulty with the masks, if the people leave

6   their masks on.  All right?  We need to swear Mr. Grider in.

7            (Defendant sworn.)

8        THE COURT:  All right.  I just want to make sure you

9   understand that you have been administered an oath, and that

10   you are now under oath.  And if you don't answer my questions

11   truthfully, you can be prosecuted for perjury or for making a

12   false statement; do you understand that?

13        THE DEFENDANT:  Yes, Your Honor.

14        THE COURT:  All right.  So let me just go over, this

15   is not an agreement with the Government, so there is no plea

16   agreement as such.  It is a plea to two counts in the

17   indictment itself.  My questions or — we will go over what is

18   in the indictment, what you are pleading to.  A few background

19   questions that I ask as part of a plea.

20        We will go over your constitutional rights that you

21   are giving up by pleading guilty.  We will go over the factual

22   proffer, in terms of what evidence there would be, which I am

23   assuming what was presented to me is what the defense believes

24   the Government has, as the evidence, and that the Government

25   has indicated they have as evidence.

1          MR. MAYR:  That is correct, Your Honor.  I have — I
2     did send what I submitted.

3          THE COURT:  I have it.

4          MR. MAYR:  I sent that to opposing counsel, and they
5     were satisfied with the factual representations that were set
6     out therein.

7          THE COURT:  Okay.  All right.  So then, we will go
8     over the proffer.  You have to admit conduct that meets the
9     elements of the two offenses that you are pleading guilty in
10    order for me to accept it, and the evidence has to be based on
11    the proffer beyond a reasonable doubt.  I will, then, go
12    through the consequences, which is basically the statutory
13    penalties for each of the cases, and, and then some other
14    questions that go to the voluntariness.  Let me just check one
15    thing.

16         Are they both the six month?  I didn't realize we were
17    going to have the second one.

18         MS. CHO:  No, Your Honor.  Count IV is a one-year
19    statutory maximum penalty.

20         THE COURT:  All right.  Give me five minutes to go
21    back and fix this.  I will be back.

22         MR. MAYR:  I apologize.  I just realized that.

23         THE COURT:  That is why I asked to have it on Friday
24    or on the weekend and not Monday morning.  I will take a
25    moment.  I will be right back.  Give me ten minutes.

1          MR. MAYR:  Thank you.

2          (Brief recess.)

3                        AFTER RECESS

4          THE COURT:  Since I wasn't aware that you were adding

5     it to -- which is fine, but obviously, it has sentencing

6     guideline ranges.

7          MR. MAYR:  Right.

8          THE COURT:  Can you tell me what the sentencing

9     guideline range is, and does the Government, would they agree,

10    or are they going to be asking for something else?  If he is

11    going to plead guilty he should know what you think the

12    guidelines are, and if there is some dispute about some

13    additional enhancement, he should be aware of that, as well,

14    before this goes forward.  So since we didn't discuss this, can

15    you tell me what you think the base offense is?

16         MR. MAYR:  My, my reading of, of the sentencing

17    guidelines is I believe that the appropriate guideline --

18          THE COURT:  You start with the base offense.

19         MR. MAYR:  Base offense level which would apply is

20    2B2.3, Subsection A with a base offense level of four.  There

21    is a specific offense characteristic under (b)(1)(A) that adds

22    two levels because of the location of where it took place.

23    There is a special offense characteristic for using a dangerous

24    weapon, which I do not believe will apply in this case;

25    however, I have discussed that with my client.

 1                But my reading and interpretation of the guidelines is
 2     that if he were to receive acceptance of responsibility, that
 3     would bring it back down to a total offense level of four as to
 4     Count IV.
 5                THE COURT:  Hold on one second.  Base offense is four,
 6     according to you, two additional because of the location in the
 7     Capitol.  Is the Government thinking of asking for the weapon?
 8     I mean, is it something that should be discussed?
 9                MS. CHO:  It is, Your Honor.  It is certainly not off
10     the table at this point.
11                THE COURT:  So how many points would that add?
12                MR. MAYR:  That would add an additional two levels to
13     a —
14                THE COURT:  Okay.  So we would potentially have an
15     eight.
16                MR. MAYR:  Correct.
17                THE COURT:  Total offense level.  Would the Government
18     agree with that, or is there something else you would add?
19                MS. CHO:  The Government would agree with that.
20                THE COURT:  Minus two puts it at six.
21                MR. MAYR:  That is correct.  As I have explained to
22     Mr. Grider, it, it could be best case scenario, four; worst
23     case scenario, six, provided that the Court awards him two
24     levels for accepting responsibility on that particular count.
25                THE COURT:  All right.  So let me take another five

Vol. 1 -  11

1   minutes, get this ready, and --

2          MR. MAYR:  Your Honor, if I may.

3          THE COURT:  One other thing?

4          MR. MAYR:  This, even though this was exchanged, we

5   caught one error, even though we referenced Count IV, and even

6   though the elements and the factual basis all relates to Count

7   IV; in the citation to a statute, it erroneously refers to A2

8   when it should refer to A1.

9          THE COURT:  Okay.  Where is that?

10          MR. MAYR:  I am making those corrections, and I can

11   forward chose to chambers, but there are -- let me make sure.

12          THE COURT:  Is this in the plea proffer that you

13   filed?

14          MR. MAYR:  That is correct.  In other words, in the

15   proffer that we submitted, I mistakenly cited to A2 of the

16   statute as opposed to Subsection A1.

17          THE COURT:  What page is that?

18          MR. MAYR:  The first place, it be would be referenced

19   twice on page 1, the introductory paragraph; and again, in the

20   heading.

21          THE COURT:  So we are talking about Count IV?

22          MR. MAYR:  Correct.

23          THE COURT:  Okay.

24          MR. MAYR:  And then, again, on page 4 under the

25   factual basis.

1      THE COURT:  Okay.  On the top there.  I see it.

2      MR. MAYR:  Okay.

3      THE COURT:  Okay?  He —

4      MR. MAYR:  Last one would be the prayer, on page 6.

5      THE COURT:  Okay.  I will — let me do my — it just

6  makes it easier to have the plea form have everything in it

7  exactly as it is supposed to.  Let me give you another five

8  minutes.  I do think he needs to re-sign it.

9      MR. MAYR:  Yes.

10      THE COURT:  It doesn't have the right statute.

11      MR. MAYR:  I have, I have, I have no —

12      THE COURT:  Let me, let me, let me make the last

13  corrections.  Let me make one, one additional correction to my

14  notes, and then, I will be right back.  This is why I had

15  you-all do things in advance.

16      (Brief recess.)

17                        AFTER RECESS

18      THE COURT:  All right.  Let's see if we can all agree

19  on this in terms of the sentencing guidelines for Count IV.

20      Count IV, statutory is the one year.  The advisory

21  sentencing guidelines basis offense is four.  Location,

22  everybody has agreed to, would be an additional two points.

23  There may be a dispute about the use of the weapon.  So it will

24  either be eight minus two for acceptance of responsibility,

25  should I give it to him, which puts it at six.  Or if there is

1   no weapon, it would be at four.

2          For either, either the six or four total offense level

3   of zero to six months; supervised release is a maximum year;

4   probation one to five years; the fine varies either from 500 to

5   9500 or 1,000 to 9500, and the Court can order restitution.  So

6   is that, does everybody agree that that seems to be correct?

7   Best as I —

8          MS. CHO:  Yes, Your Honor.

9          MR. MAYR:  Yes, Your Honor.

10          THE COURT:  Is that something that you discussed with

11   your client?

12          MR. MAYR:  I have, Your Honor.

13          THE COURT:  Okay.  All right.  I think we have covered

14   everything.

15          Let's get Mr. Grider to come up again, and we will

16   pick up.

17          (Complied.)

18          THE COURT:  So Mr. Grider, I was in the middle of

19   going over what was going to be discussed with you when we got

20   to the consequences.  The consequences or the statutory

21   penalties, and in the one count that you're pleading guilty to,

22   the advisory sentencing guidelines, I, then, will go over

23   certain questions that get to the voluntariness of, of your

24   plea, okay?

25          So you can consult your lawyer at any time, and if I

1    ask questions differently than you have discussed, I don't have
2    any problem with your talking, speaking with him.  I also want
3    to make sure that this is actually what you want to do because
4    we are here, ready for trial.  So I need to make sure that this
5    is, you know, a firm decision on your part.  You can't come
6    back later and say, you know, I changed my mind.

7         We also need to make sure that if you think there is
8    something that is part of the agreement that I don't talk about
9    today, then, you need to make sure you bring it up, okay?
10   Because as I said, we are going to trial on the rest.  So if
11   this doesn't work, we will just include the count in the trial
12   itself; do you understand?

13        THE DEFENDANT:  Yes, Your Honor.

14        THE COURT:  Okay.  All right.  So in terms of the
15   indictment itself, let me go through the charges.  Count I,
16   civil disorder; Count II is obstruction of an official
17   proceeding; Count III is destruction of Government property;
18   Count IV is entering and remaining in a Restricted Building or
19   Grounds; Count V is disorderly and disruptive conduct in a
20   Restricted Building or Grounds; Count VI is engaging in
21   physical violence in a Restricted Building or Grounds; Count
22   VII is disorderly conduct in a Capitol Building; Count VIII is
23   act of physical violence in the Capitol Grounds or Building;
24   Count IX is parading, demonstrating, or picketing in a Capitol
25   Building.

1          So you're going to be pleading to two counts; one is

2 Count IV, which is entering and remaining in a Restricted

3 Building or Grounds.  And Count IX is parading, demonstrating,

4 or picketing in a Capitol Building, only the building.  The

5 other counts, we are going forward to trial on them.  And as I

6 indicated, there is no specific agreement with the Government.

7 So we don't need to go over that.  So if I could begin with a

8 couple of background questions, sir.  How old are you, sir?

9          THE DEFENDANT:  Forty-one, Your Honor.

10          THE COURT:  What is your date of birth?

11          THE DEFENDANT:  October 4, 1981.

12          THE COURT:  And how far have you gone in school?  What

13 is the highest level of education?

14          THE DEFENDANT:  I have a master's degree.

15          THE COURT:  And what did you study?

16          THE DEFENDANT:  I studied photography, art, and studio

17 art.

18          THE COURT:  Okay.

19          And where were you born?

20          THE DEFENDANT:  Cape Girardeau, Missouri.

21          THE COURT:  Okay.

22          Have you taken any kind of alcohol or drugs or

23 medication in the last 48 hours?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  Which one?

 1          THE DEFENDANT:  I have taken some medication and some
 2    alcohol.
 3          THE COURT:  How long ago was the alcohol?
 4          THE DEFENDANT:  Um —
 5          THE COURT:  Approximately.  Talking about yesterday,
 6    Saturday?
 7          THE DEFENDANT:  At dinner yesterday, Your Honor.
 8          THE COURT:  Okay.
 9          All right.  And the medications, do you take them in
10    of the morning, evening?
11          THE DEFENDANT:  I take one medication in the morning
12    every day for acid reflux, Your Honor.  Then, I took a steroid.
13    I had a little Prednisone, antibiotic for a little problem with
14    the throat.
15          THE COURT:  Obviously, the reason I am asking about
16    the medication is to make sure that your mind is clear, and
17    sometimes medications make you a little fuzzy or tired or
18    whatever.  Do you have any of those effects this morning?
19          THE DEFENDANT:  No, Your Honor.
20          THE COURT:  Mr. Mayr, do you have any concerns?
21          MR. MAYR:  None whatsoever, Your Honor.
22          THE COURT:  Have you ever received any treatment for
23    any type of mental illness or emotional disturbance?
24          THE DEFENDANT:  No, Your Honor.
25          THE COURT:  Now, are you — you received a copy of the

1    indictment presumably at the time of arraignment.  Have you had

2    enough time to discuss those, all of the charges with your

3    counsel to make the selection about which ones you want to go

4    forward to trial and which ones you want to plead?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  All right.  And are you completely

7    satisfied with the services of your lawyer in this case?

8            THE DEFENDANT:  Yes, Your Honor.

9            THE COURT:  And have you had enough time to talk with

10   him about the case, the plea, and whether or not you should go

11   to trial?

12           THE DEFENDANT:  Yes, Your Honor.

13           THE COURT:  All right.

14           So in terms have your constitutional rights, what I am

15   going to do is go over and indicate what rights you have and

16   what you are giving up by pleading guilty.  I am just going to

17   ask you as we go through whether you understand the particular

18   rights, and then, I ask you at the end.

19           Now, you have a right to plead not guilty and have a

20   trial.  In Count IX, it would be a bench trial where the Judge

21   would be making these decisions about your guilt or innocence

22   supplying the elements of the offense to the evidence.  For

23   Count IV, it would be a jury trial, and for a jury trial, we

24   would have citizens from the District of Columbia come to the

25   courtroom.  They would be asked questions through your counsel

1    and myself to pick a jury that is fair and impartial, and it

2    would make decisions based only on the evidence presented in

3    the courtroom.  And they would decide your -- 12 of them would

4    decide your guilt or innocence based on the evidence that was

5    presented in the courtroom, applying the jury instructions; do

6    you understand your rights?

7                THE DEFENDANT:  Yes, Your Honor.

8                THE COURT:  Do you understand if you went forward to

9    trial you would have a right to be represented by a lawyer at

10   the trial, and if you couldn't afford one, one would be

11   appointed?

12               THE DEFENDANT:  Yes, Your Honor.

13               THE COURT:  Do you understand that at a trial you have

14   a right through your lawyer to confront and cross-examine any

15   witnesses against you?

16               THE DEFENDANT:  Yes, Your Honor.

17               THE COURT:  Do you understand that you have the right

18   to present your own witnesses and have the right to subpoena

19   them; in other words, to require them to come and testify in

20   your defense?

21               THE DEFENDANT:  Yes, Your Honor.

22               THE COURT:  Do you understand if you went forward to

23   trial you would have the right to testify, present evidence on

24   your own behalf, if you wanted to, but you wouldn't have to

25   testify or present any evidence if you did not want to?  And

1  that is because you can't be forced to incriminate yourself;

2  that is, to present evidence of your own guilt.  Now, if it

3  were a jury trial, I would tell the jury they could not infer

4  any guilt or hold it against you that you were asserting your

5  constitutional right; but do you understand all of that?

6          THE DEFENDANT:  Yes, Your Honor.

7          THE COURT:  Do you understand that unless and until I

8  accept your guilty plea, you are presumed by the law to be

9  innocent because it is the Government's burden to prove your

10  guilt beyond a reasonable doubt, and until it does, you cannot

11  be convicted at trial?

12          THE DEFENDANT:  Yes, Your Honor.

13          THE COURT:  Do you understand that if you went forward

14  to trial and were convicted, you would have a right to appeal

15  your conviction to a higher Court, the Court of Appeals, which

16  would have three judges.  And again, you could have a lawyer

17  help you prepare your appeal, and one could be appointed if you

18  could not afford one?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  So do you understand that by pleading

21  guilty, you're giving up your rights to appeal in terms of the

22  trial procedures.  You can appeal your conviction if you

23  believe it was somehow unlawful, involuntary, the legal rulings

24  the Court has made can be taken up, or if there is some other

25  fundamental defect in the proceedings that was not provided to

1  you?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  You also have a statutory right to appeal

4  your sentence under certain circumstances, particularly, if you

5  think the sentence was contrary to the law or illegal, and your

6  notice of appeal would have to be filed within 14 days of

7  judgment.  And again, if you couldn't afford to file one, one

8  could be done without cost to you or an attorney, cost to you,

9  but you preserve all your other rights that the Court has made

10  in terms of the legal rulings.  But you obviously, you are

11  giving up your rights to certain, the trial and the things that

12  are connected to a trial; do you understand?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  All right.

15          So do you understand if you pled guilty in this case

16  as to those two counts and I accept your guilty plea, you'll be

17  giving up the rights I have explained to you because there is

18  not going to be any trial, and the appeal will be around the

19  issues that I have just laid out?

20          THE DEFENDANT:  Yes, Your Honor.

21          THE COURT:  All right.  Do you want to plead guilty in

22  this case, give up your rights to a trial, right to appeal that

23  I have just explained to you?

24          THE DEFENDANT:  Yes, Your Honor.

25          THE COURT:  All right.  What I am going to do now is

1    the proffer.  The Court needs to have a statement of offense.

2    What I will do is I will read what has been provided to me, and

3    which has background information to put it into context.  And

4    then, I will ask you if you agree with the statements.  I need

5    to find that the evidence presented meets the elements of each

6    of the offenses you are pleading guilty to, and I need

7    admissions on your part that you're admitting to the conduct

8    that also meets those elements of the offense in order for me

9    to accept it; do you understand?

10            THE DEFENDANT:  Yes, Your Honor.

11            THE COURT:  All right.  So let me just read into the

12   record:

13            The U.S. Capitol, which is located at First Street

14   Southeast in Washington, DC is secured 24 hours a day by the

15   U.S. Capitol Police.  Restrictions around the U.S. Capitol

16   include permanent and temporary security barriers and posts

17   manned by U.S. Capitol Police.  Only authorized people with

18   appropriate identification are allowed access inside the U.S.

19   Capitol.

20            On January 6, 2021, the exterior plaza of the U.S.

21   Capitol was closed to members of the public.  On January 6,

22   2021, a Joint Session of the U.S. Congress convened at the U.S.

23   Capitol, and elected members of the U.S. House of

24   Representatives and the U.S. Senate met in separate chambers of

25   the United States Capitol to certify the vote count of the

Electoral College of the 2020 Presidential Election, which had taken place on November 3, 2020.  The Joint Session began at approximately 1:00 p.m.

Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.

Vice President Mike Pence was present and presiding first in the Joint Session; and then, in the Senate chamber. As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the U.S. Capitol.  As noted above, temporary and permanent barricades were in place around the exterior of the U.S. Capitol, and U.S. Capitol Police were present and attempting to keep the crowd away from the Capitol Building and the proceedings underway inside.

At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades. And officers of the U.S. Capitol Police and the crowd advanced to the exterior facade of the building.  The crowd was not lawfully authorized to enter or remain in the building and prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by U.S. Capitol Police officers or other authorized security officials.

At such time, the certification proceedings were still underway, and the exterior doors and windows of the U.S.

1   Capitol were locked or otherwise secured.

2            Members of the U.S. Capitol Police attempted to

3   maintain order and keep the crowd from entering the Capitol.

4            However, shortly after 2:00 p.m., individuals in the

5   crowd forced entry into the U.S. Capitol, including by breaking

6   windows and by assaulting members of law enforcement as others

7   in the crowd encouraged and assisted those acts.

8            So do you agree or not dispute what I have read so

9   far, which is really the background information?

10           THE DEFENDANT:  I agree, Your Honor.

11           THE COURT:  All right.  In terms of from your

12  perspective, Mr. Grider entered the U.S. Capitol Building at

13  approximately 2:00 p.m. through the Senate Wing Door.  Upon

14  entering, he paraded through various areas of the U.S. Capitol

15  Building, including the Crypt, the Rotunda, and Statuary Hall

16  before ultimately ending up at a barricaded door to the

17  Speaker's Lobby.  A hallway that connected, that connects to

18  the House of Representatives' chamber in the U.S. Capitol

19  Building.

20           The doorway with the words "Speaker's Lobby," visible

21  at the top, was being guarded by three Capitol Police officers.

22  Chairs were among the items visible through the door's glass

23  panels as being used to barricade the door from the outside.

24           At approximately 2:55 p.m., Mr. Grider exited the U.S.

25  Capitol Building through the Upper House Door.

 1          All right.  Do you agree that you entered the Capitol

 2    around 2:15 through the Senate Wing Door?

 3          THE DEFENDANT:  Yes, Your Honor.

 4          THE COURT:  And then, you paraded through the various

 5    areas of the Capitol, which included the Crypt, the Rotunda,

 6    and the Statuary Hall before winding up in front of the

 7    Speaker's Lobby, which is a hallway that connects the House of

 8    Representatives' chamber in the Capitol Building; is that

 9    correct?

10          THE DEFENDANT:  Yes, Your Honor.

11          THE COURT:  And was the door to the Speaker's Lobby

12    barricaded?

13          THE DEFENDANT:  Yes, Your Honor.

14          THE COURT:  And, did you see the words "Speaker's

15    Lobby" visible at the top?

16          THE DEFENDANT:  Yes, Your Honor.

17          THE COURT:  And was it being guarded by three Capitol

18    Police officers?

19          THE DEFENDANT:  Yes, Your Honor.

20          THE COURT:  And were there chairs among the items

21    visible through the door's glass panels as being used to

22    barricade the door from the inside, not the outside?

23          THE DEFENDANT:  Yes, Your Honor.

24          THE COURT:  Okay.  And did you know that you were not

25    authorized to parade in the restricted area, which in this

case, was the Capitol?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And did you — knowing that, nevertheless, paraded in the Capitol?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  All right.  And did you also know that you weren't authorized to be on the Capitol Grounds in addition to the Capitol itself, which are restricted areas?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And did you do that anyway?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  So in terms of the elements, so in terms of the Count IV, the Defendant entered or remained in a Restricted Building without lawful authority to do so, and you've agreed that you knew you should not — you were not authorized to be in a restricted area in this case, the Capitol; is that correct?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  But you went ahead and entered and remained in the Capitol even though it was restricted and you were not authorized to be there?

THE DEFENDANT:  Yes, Your Honor.

THE COURT:  And you knew that you were not authorized to be there?

THE DEFENDANT:  Yes, Your Honor.

1        THE COURT:  And knowing that, you went ahead and

2    entered and remained in there, in the Restricted Building?

3        THE DEFENDANT:  Yes, Your Honor.

4        THE COURT:  All right.  And in Count IX, in terms of

5    parading, presumably, terms of — you participated with others

6    in a public display, feelings towards a cause; would that be an

7    accurate description?

8        THE DEFENDANT:  Yes, Your Honor.

9        THE COURT:  All right.  And did you do this knowingly

10    and willfully; in other words, knowing it was unlawful to do

11    so, but nevertheless knowing this, went ahead and paraded in

12    the restricted area?

13        THE DEFENDANT:  Yes, Your Honor.

14        THE COURT:  All right.  I will find that there is —

15    let me just ask, is the Government satisfied, or is there

16    anything additional?

17        MS. CHO:  No, no further points from the Government,

18    Your Honor.

19        THE COURT:  All right.  Then, I will find that there

20    is evidence beyond a reasonable doubt based on his proffer and

21    his admissions to meet the elements of the offense of Count IV,

22    which is entering and remaining in a Restricted Building or

23    Grounds, which would be the Capitol Grounds and the Capitol;

24    and Count IX, which is parading or demonstrating or picketing

25    in a Capitol Building.

1          Now, in terms of consequences, which is really sort of

2     the penalties, there was not a mandatory restitution, but the

3     Court does have discretion to impose restitution.  There is no

4     agreement at this point, but I am just putting you on notice;

5     do you understand that?

6                THE DEFENDANT:  Yes, Your Honor.

7                THE COURT:  All right.

8          So Count IX, the statutory penalties are a maximum of

9     six months in jail.  There is no supervised release.

10    Supervised release would be — you could, after, if I sentence

11    you to a period in jail, I could sentence you to be in the

12    community but supervised by the probation office with certain

13    conditions.  There is no provision for that, for that

14    particular offense.

15         There is a provision that you could be sentenced to

16    probation to a maximum of five years, and the maximum fine is

17    $5,000.  You also need to pay a special assessment of $10, and

18    the advisory sentencing guidelines do not apply to that

19    particular offense; do you understand and agree?

20               THE DEFENDANT:  Yes, Your Honor.

21               THE COURT:  Now, Count IV, which has a maximum of a

22    year of jail time, a maximum of supervised release of a year,

23    one to five years for probation, and depending on the advisory

24    sentencing guidelines, can be 500 to 9500 or a thousand to

25    9500; and again, there would be another $10 special assessment;

1  do you understand?

2          THE DEFENDANT:  Yes, Your Honor.

3          THE COURT:  All right.  The advisory sentencing

4  guidelines, the commission has set up by Congress to come up

5  with different numbers associated with different offenses; and

6  then, you can add particular points if there are enhancements,

7  particular characteristics of an offense, and you could also

8  deduct points for acceptance of responsibility.

9          So in the case of Count IV, the base offense is four.

10 I believe there is an agreement between the Defense and the

11 Government that an additional two points would be added based

12 on the location being the Capitol, the Capitol, and the

13 potential of an additional two points, if the Government asks

14 that it be added as a weapon, assuming that is the helmet?

15         MS. CHO:  Yes, Your Honor.

16         THE COURT:  Or, and your counsel has indicated that

17 you may object to that, but just so you know, that is a

18 possibility.  So if all of those enhancements would be a total

19 of eight, if you accepted responsibility, minus two, puts you

20 in a base offense level of six, or if the weapon enhancement is

21 not imposed, then it would be four.

22         Whether the offense level, total offense level is four

23 or six, the jail time under the advisory sentencing guidelines

24 would be zero to six months under both of them, a year of

25 supervised release, one- to five-years' probation, and as I

1   have indicated, the fine, depending on whether it is the lower

2   number or the higher is 500 to 9500, 1,000 to 9500; do you

3   understand and agree?

4           THE DEFENDANT:  Yes, Your Honor.

5           THE COURT:  All right.  In terms of the sentencing,

6   there is a statute, 3553(a).  It sets out very broad factors

7   that the Court has to consider:  The seriousness of the

8   offense, your background, if you have any rehabilitation needs,

9   just punishment, deterrence to you, deterrence to others, those

10  kinds of things that the Court needs to consider.

11          The Court would order a presentence report, which

12  probation provides.  They would set out, since there is one

13  count that does have the advisory sentencing guidelines, they

14  would do that calculation.  They would set out the statement of

15  offense.  They would give background information about your

16  personal family, education, employment, any substance abuse

17  issue, mental health physical issues, your financial condition

18  to consider as to whether a fine is appropriate, and they can

19  make recommendations.

20          You and your counsel and the Government counsel will

21  receive it before I get it.  You can make objections to it.

22  They will either change them, they are either factual or you

23  disagree with the calculation, or if they don't, they will

24  indicate the objection, why they didn't change it, and I will

25  resolve that objection before we go forward to sentencing.

1          Now, you should just be aware that under the advisory

2     sentencing guidelines before, besides doing the range, that

3     they do have what they call departures, which are allowed under

4     the advisory sentencing guidelines.  They are very narrow

5     because the idea is the commission has considered everything a

6     judge should consider in making the decisions about the

7     numbering for the offense characteristics, but there are narrow

8     areas that you can depart either up or down, where you can ask

9     for, you know, a different sentence, a lower sentence, for

10    instance.

11         They are advisory.  So they are not mandatory on the

12    part of the Court.  I do need to make the calculation on the

13    one count.  I am required to do so, and I would have to explain

14    a departure.  And if I decide to do a variance, which is

15    different from a departure, it basically is giving you a

16    different sentence.  I have to under the Court of Appeals'

17    rules, give a very specific information of why I am not

18    sentencing you under the guidelines but doing a separate

19    sentence, but do you understand all of that?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  Is this something that you discussed with

22    your counsel?

23         THE DEFENDANT:  Yes, Your Honor.

24         THE COURT:  Okay.  So in terms of the guidelines that

25    I have gone over, is that what you have discussed, or is there

1    anything else that I have —— that you have discussed that I

2    have not gone over, and Mr. Mayr, if there is something in

3    particular?

4           THE DEFENDANT:  That sounded very, very accurate, Your

5    Honor.  Very good.

6           THE COURT:  All right.  The other question that I have

7    about the proffer, is there a particular defense, specifically,

8    as to those two counts that he would have raised that I need to

9    have him waive?

10          MR. MAYR:  No —— well.

11          THE COURT:  Just as to those two counts, not anything

12   else.

13          MR. MAYR:  Not, not at the trial, not at the trial

14   that the Court would have permitted.

15          THE COURT:  Okay.  I want to make sure you understand

16   that I won't be able to determine the advisory guideline

17   sentence in your case until after I get the presentence report,

18   after you, your counsel, the Government has had an opportunity

19   to object to the facts or conclusions the officer has made.

20   And so, it may be a different calculation than what I have just

21   gone over; do you understand?

22          THE DEFENDANT:  Yes, Your Honor.

23          THE COURT:  One thing I should add also in terms of

24   the one count, Count IV, does allow for supervised release.  If

25   you at some point and you only impose that, if I have given you

1   jail time, would you have supervised release, that is connected

2   to a period of jail time.

3          If you violated that supervised release, either based

4   on conditions you didn't follow through, report, or whatever or

5   you committed a new offense, it could be a — the violation

6   could be enough, and it could be revoked.  And the important

7   part is you would get a new sentence calculated under the

8   advisory guidelines, as well as the statute.  But the important

9   part from your perspective is you wouldn't get credit for the

10  time you have already served; in other words, your new sentence

11  wouldn't be reduced based on the fact that you have already

12  served under the original sentence; do you understand that?

13         THE DEFENDANT:  Yes, Your Honor.

14         THE COURT:  All right.  And as I said, after I have

15  decided on the guideline, I have the authority, in some

16  circumstances, to impose a sentence that is more severe or less

17  severe than in the guidelines, and those are those count

18  departures that I have spoken about; do you understand and

19  agree?

20         THE DEFENDANT:  Yes, Your Honor.

21         THE COURT:  All right.  Has — just some questions on

22  voluntariness.  Has anyone, your attorney, law enforcement, the

23  prosecutor, anybody else you have come in contact with since

24  your arrest, promised or suggested to you that just by pleading

25  guilty you are necessarily guaranteed a lighter sentence?

1  Obviously, the Court takes it into account with acceptance of

2  responsibility, should you continue to do so; but do you

3  understand that?

4            THE DEFENDANT:  I understand, Your Honor.

5            THE COURT:  Has anyone made such a promise?

6            THE DEFENDANT:  No, Your Honor.

7            THE COURT:  Has anyone forced, threatened, or coerced

8  you in any way into entering this plea of guilty?

9            THE DEFENDANT:  No, Your Honor.

10           THE COURT:  Do you understand that the — okay, that

11  doesn't actually apply.

12           Any promises that have been made to you in connection

13  with your guilty plea other than the ones that we have just

14  gone over?

15           THE DEFENDANT:  No.  No one has, Your Honor.

16           THE COURT:  Anyone made any promises to you as to what

17  sentence I will impose on those two counts?

18           THE DEFENDANT:  No, Your Honor.

19           THE COURT:  And do you now understand that I don't

20  know what sentence I will impose until after I have heard from

21  probation and the lawyers?

22           THE DEFENDANT:  I understand, Your Honor.

23           THE COURT:  Okay.  Are you entering this plea of

24  guilty as to those two Counts, Counts IV and IX, voluntarily

25  and of your own free will?

1          THE DEFENDANT:  Yes, Your Honor.

2          THE COURT:  And are you entering the plea of guilty

3    because you are guilty as to Counts IV and IX?

4          THE DEFENDANT:  Yes, Your Honor.

5          THE COURT:  Anything you don't understand?  Anything

6    you wanted to ask me or your counsel?

7          THE DEFENDANT:  No, Your Honor.

8          THE COURT:  All right.  Christopher Ray Grider, how do

9    you plead to Count IV, entering and remaining in a Restricted

10   Building or Grounds, guilty or not guilty?

11         THE DEFENDANT:  Guilty, Your Honor.

12         THE COURT:  And how do you plead to Count IX,

13   parading, demonstrating, or picketing in a Capitol Building?

14         THE DEFENDANT:  Guilty, Your Honor.

15         THE COURT:  All right.  I am satisfied that the

16   Defendant, Christopher Ray Grider, is fully competent, capable

17   of making a decision, understands the nature and consequences

18   of what he is doing, acting voluntarily of his own free will,

19   adequate factual basis for his plea; therefore, the plea is

20   accepted, and the Court finds Christopher Ray Grider guilty of

21   Count IV, entering and remaining in a Restricted Building or

22   Grounds; and Count IX, parading, demonstrating, or picketing in

23   a Capitol Building.

24         All right.  Let me sign the waiver.  I am just going

25   to add above my signature as to Counts IV and IX so it is clear

1    the waiver relates to those.

2         MR. MAYR:  Thank you, Your Honor, and I apologize for

3    not including that.

4         THE COURT:  No.  We all know which counts.  It is

5    always helpful to make sure every detail is put in.  All right.

6    Then, I think we are ready to proceed to trial, and is

7    everybody ready?  Do we need a break, or are you ready to do

8    opening statements?

9         I notice the public line, Dorothy, is not on.  You

10   need to put it on, the public line.

11        MR. MAYR:  Does Mr. Grider need to sign the revised

12   waiver and proffer?

13        THE COURT:  That is –– well, the waiver is okay, but

14   we –– the, the proffer, do you have that?  Does that –– did we

15   print it out?  I don't know.  Is Dorothy going to do it?

16        Do you have a copy of it?  You have to send it to us

17   to print it out.

18        MR. MAYR:  I am assuming that the Court made some

19   revisions.  My understanding ––

20        THE COURT:  Okay.  As I had indicated to you, we have

21   been –– sorry I didn't notice it earlier.  I would have put it

22   on when we first started.  Do you want me to simply print out

23   another one involving the changes and just put initials next to

24   it?

25        MR. MAYR:  I don't feel that it is necessary.  We've

1    acknowledged the changes, really, the additions in the oral

2    admonitions.  But Mr. Grider had signed that waiver back on

3    Friday, so I am satisfied with that if the Court is satisfied.

4    However, if you would like us to sign a modified version of

5    that, we are willing to do that as well.

6         THE COURT:  I do need to have a version that is

7    accurate.  So what I can do is either print out the one I have,

8    and I can mark next to it my initials and the date to indicate.

9    On the record, we have it, or you can print it out again and

10   just make the change.  Give me one that has it, and we will

11   print it.

12        MR. MAYR:  I am satisfied with the first proposed

13   resolution where you initial the changes that you made.

14        THE COURT:  Does that work for the Government?

15        MS. CHO:  It does, Your Honor.

16        THE COURT:  Okay.  So what we will do is, we will, we

17   will send it to Miss Patterson at some point.  When she gets a

18   chance, she can print it out.  The one I have that I printed

19   out has a bunch of markings on it.  So I need to have a clean

20   copy, and then, I will just initial and put the date.

21        It is better to have the copy so I don't have to read

22   the transcript to figure out that we have made the correct

23   change.  All right.  Is everybody — you can go ahead and sit

24   down.

25        MR. MAYR:  Thank you, Your Honor.

1        THE COURT:  Everybody ready to proceed at this point?

2        MS. CHO:  We are, Your Honor.

3        THE COURT:  All right.  Then, let's — I will ask the

4   Court Reporter, if they have trouble hearing if they leave

5   their mask on, then please let me know.  I prefer, basically,

6   since we already had a little issue that people stay behind,

7   people stay behind the plexiglass.  We will have to figure out

8   what to do if we need bench conferences.  Hopefully we won't.

9   I am not used to doing it over here, but we can potentially

10  move it.  All right.  Then, let's proceed.

11       MS. CHO:  Thank you, Your Honor.

12       Before I begin, I wanted to confirm that the Court had

13  received our paper copies of our exhibit binders this morning.

14  We provided two copies to the courtroom deputy.

15       THE COURT:  All right.  I have it, and I do have

16  the — I do have also the testimony that you have stipulated

17  to.  So I have reviewed that over the weekend.

18       MS. CHO:  Thank you, Your Honor, and I did want to

19  verify with the courtroom deputy that the display is set to the

20  Government's counsel table.  Thank you, Your Honor, and thank

21  you, Ms. Jones-Patterson.

22                    **OPENING STATEMENT**

23       MS. CHO:  Christopher Grider was determined.  He knew

24  why he went to the Capitol on January 6th.  His actions and

25  those of one or two other people with him led to one of the

1  most pointed and devastating confrontations at the Capitol that
2  day.

3        Mr. Grider planned his January 6th trip to Washington
4  ahead of time and said he was going in order to support Former
5  President Trump.  As his steady march through the Capitol that
6  day will show, he was determined to join with others and to use
7  the force and violence of a mob to get to the people who
8  mattered most to the reason why he was there, the people who
9  were certifying the election result that would remove President
10  Trump from office.

11        Those people carrying out that solemn task were inside
12  the House Chamber.  Crossing police line after police line from
13  one restricted area to another through one door after another,
14  Christopher Grider almost made it to his goal.  At the last and
15  fateful barrier, he armed an obviously violent rioter with a
16  helmet in order to break the Speaker's Lobby door down and get
17  to the people inside the House Chamber.

18        When the rioter was armed and passed through that
19  area, something terrible happened.  A third rioter was shot and
20  killed as she attempted to be the first one through the broken
21  entryway.  If not for that, it is hard to know what would have
22  stopped Mr. Grider on January 6th, but let's start at the
23  beginning.

24        Mr. Grider traveled with a friend to DC early on the
25  morning of January 6th, boarding a 6:00 a.m. flight from Dallas

1  and arriving in Baltimore at 10:45.  He had stayed up late the

2  night before texting back and forth with his friend about the

3  violence they might encounter in Washington, DC the next day.

4  He was headed to DC to support former President Trump, and you

5  will see from the evidence that he anticipated violence in

6  doing so.

7      He ended up being right.  As early as 1:50 p.m., he

8  joined other rioters on the Lower West Terrace of the Capitol

9  Building where he was already trespassing.  He knew he was

10  trespassing because he and other rioters were getting tear

11  gassed and pepper-sprayed.  Just ten minutes later by around

12  2:00 p.m., he advanced towards scaffolding on the northwest

13  side of the Lower West Terrace.

14      Police formed a police line in front of that

15  scaffolding but were quickly overwhelmed by the crowd Mr.

16  Grider had joined.  This was the first of several police lines

17  that Mr. Grider pushed through that day.  Once he entered into

18  the --

19      THE COURT:  Let me just ask.  Is he, is he in here or

20  not or do you know?  If you don't know -- I assume that you

21  will mark if you think he is in there.

22      MS. CHO:  That's correct.  The evidence will show,

23  Your Honor, that he is in that very crowd.

24      THE COURT:  Okay.

25      MS. CHO:  Once he entered the scaffolding he had

access to the terrace stairs that went up to a door in the
Senate Wing of the Capitol Building.  He climbed onto the
railing of the terrace stairs and raised his arms in
celebration.  He continued walking up the railing of the
stairs, filming as he went along, and waving other rioters up
towards the building with him.

By the time he made it to the Upper West Terrace of
the building, he had acquired a black helmet, and you see him
holding the helmet as he walked up to the building.  Then, he
walked through the door to the Senate Wing with a crowd of
other rioters at 2:15, just two minutes after the first breach
of the building at that very door.

After several minutes in the Senate Wing of the
building, he turned around and began his determined path to the
other side of the building where the House Chamber is.  First,
he went to the Crypt, and within the Crypt, he again joined a
crowd of rioters.  They were screaming, "Our house," and they
were pushing at a police line until they trampled that police
line.  You could see the terror in the officers' eyes.

From the Crypt he continued his path, parading through
Statuary Hall and eventually arriving at another police line
that had formed in the Statuary Hall Connector.  This is a
hallway directly in front of the House Main Door, one of
several entrances to the House Chamber.  A handful of officers
stood between the mob and the House Main Door, one of the doors

1    to the House Chamber, and the crowd of rioters swelled over the
2    course of five minutes.
3            Mr. Grider, standing in the middle front of that
4    crowd, waved move people in and toward the House Chamber.
5    Eventually that crowd overwhelmed the police line and made
6    their way to the House Main Door.  Now, the House Main Door was
7    the only barrier between Mr. Grider and the mob on one side and
8    the House Chamber on the other.
9            Inside the House Chamber, members and staff were stuck
10   on the third floor gallery while others on the second floor
11   were just beginning to evacuate the chamber.  You will hear
12   from Kevin McCumber, the Deputy Clerk of the House of
13   Representatives, who will testify that he heard this mob
14   banging on that door, the House Main Door.  That he grabbed his
15   phone and started recording as members and staff in the
16   chambers began to panic, with the congressmen jumping on a
17   chair.
18           Mr. McCumber will tell you about the tense moments
19   during the Joint Session that led up to this moment, how at
20   around 2:15 security details began ushering the House —
21           THE COURT:  You are going too fast.
22           MS. CHO:  Sure.  Security details began ushering
23   high-ranking House officials out of the Chamber; first, Speaker
24   Nancy Pelosi; then, Congressman Jim Clyburn; then, Congressman
25   Steny Hoyer.  And that is when Mr. McCumber realized, he will

1    tell you, that the Joint Session would not move forward anytime

2    soon, that they might all be in real danger, and that the House

3    Chamber might be ransacked by rioters.

4         He will tell you about the quick thinking he and his

5    staff engaged in, grabbing historic pieces of the Democratic

6    process as they had rushed out the doors, trying to ensure that

7    they didn't fall into the wrong hands.  Mr. McCumber's

8    experience in these items underscore both the seriousness of

9    the proceeding that was occurring that day and the special

10   reasons the House Chamber was a location of interest for Mr.

11   Grider that day.

12        The mob not only banged on the House Main Door, they

13   screamed, "Stop the Steal."  They made their desire to get into

14   the House Chamber known, screaming, "Use your helmet."  "Use

15   your Kevlar."  "Knock the windows out with Kevlar."  You will

16   see and hear that the crowd's intent was to break that door

17   down and get at the members of Congress.

18        Mr. Grider was determined to play his part, and here,

19   offered up his own helmet to his fellow rioter.  After a fluid

20   impasse, that they were unable to penetrate the House Main

21   Door, a number of rioters turned.  They ran down the hallway

22   towards an alternate route to the House Chamber, the Speaker's

23   Lobby.  Again, Mr. Grider was determined.  He ran down the

24   hallway, intent on getting to members through one entry or

25   another.

1          By 2:41 p.m., he was one of the first to arrive

2     outside of the Speaker's Lobby.  This, you will hear, is a

3     lounge area and hallway that ran around the length of the House

4     Chamber.  The area was clearly marked, and in front of the

5     doors to the lobby were the last line of police that Mr. Grider

6     and the mob would overcome, just three officers remaining to

7     guard this door, the last barrier between Mr. Grider and the

8     mob on one side and the House on the other.

9          Members of Congress were visible through the glass of

10    the door that Mr. Grider stood in front of.  Capitol Police

11    Sgt. Paul McKenna will tell you about how he was assigned to

12    the House Chamber that day, and shortly after he got in to

13    work, he will tell you that he heard reports of breaches, that

14    he and his fellow officers then began barricading the doors

15    near the House Chamber with any furniture they could find,

16    hoping to slow down any rioters that might come.

17         Former Capitol Police Officer Kyle Yetter is the young

18    man pictured right here (indicating).  On that day, he had

19    begun his shift a little after 2:00 p.m., he will tell you.  He

20    will testify about how he first got sprayed with a fire

21    extinguisher, pushed to the ground as rioters overwhelmed him

22    at a different entryway to the building and how he, then, ended

23    up here at the Speaker's Lobby where he encountered Mr. Grider

24    and the mob.

25         Mr. Grider was stationed at the very front of the mob

1   in front of Officer Yetter and the other officers, and at this
2   door Mr. Grider pleaded with Officer Yetter and these officers
3   to let them in.  His fellow rioters screamed, "Let me in."  The
4   rioters screamed, "Break it down" again and again, all
5   clambering to get to the members and the staff trying to
6   evacuate behind the door.

7         They screamed, "Fuck the blue."  They said, "We don't
8   want to hurt you".  As the mob grew increasingly more violent,
9   Mr. Grider looked on at a rioter with a black furry-trimmed hat
10  pictured here (indicating) punched the window behind Officer
11  Yetter and the other officers.  Officer Yetter will tell you
12  that he vividly remembered the rioter, these punches barely
13  inches from his own head and that he feared for his own life
14  and the lives of the two officers next to him.

15        Those initial punches from this rioter are an
16  important part of Mr. Grider's story that day.  You will see
17  that he decided to help that puncher in his effort to break
18  down the barrier separating the mob from their target.  You
19  will see Mr. Grider team up with that puncher.  You will see
20  Mr. Grider arm the puncher with Mr. Grider's own helmet,
21  showing the puncher that it was hard enough to crack a window.

22        Once Officer Yetter and the other officers moved away
23  from the door, fearing for their lives and anticipating the
24  arrival of a SWAT team, Mr. Grider moved in immediately and
25  pushed at the door with his hand.  Unable to get the door

1   opened himself, he, then, let the puncher take over.  Using the
2   helmet Mr. Grider had armed him with, the puncher began busting
3   out the windowpanes in the door.

4           Rioters began yelling that there was a gun.
5   Sgt. McKenna, who had barricaded the door, will tell you that
6   he came out of the House Chamber at that moment, saw a gun
7   drawn, saw the screaming mob, and drew his own gun in order to
8   protect the members and staff who were still inside the Chamber
9   at that moment.  And even as rioters yelled that there was a
10  gun, the puncher continued to break out the windows, and Mr.
11  Grider continued to look on.

12          Once the last window and the door had been busted,
13  another rioter, a woman, climbed through the broken-out window
14  frame.  As she climbed through, she was shot and fell
15  immediately backward into the crowd of rioters.  Even after
16  this terrible moment, you will see that Mr. Grider refused to
17  heed police officers' pleas to follow orders and clear the area
18  in order to try to save the woman's life.

19          As Officer Yetter and other officers begged, pushed,
20  and yelled at rioters to clear the area, Mr. Grider remained
21  for merely ten minutes; at times, filming; at times, insisting
22  on speaking to these police officers, impeding their ability to
23  do their jobs, even after the mob's actions had just culminated
24  in someone's death.

25          Your Honor, in addition to the witnesses and video

1  described so far, you will hear testimony from FBI Special

2  Agent Michelle Ball.  She will tell you about the video photos

3  and messages on Mr. Grider's Facebook account and his phone

4  that corroborate his presence in all of these locations at the

5  Capitol that day and his intentions surrounding his trip to the

6  Capitol.

7       You will also review stipulated testimony and exhibits

8  from Captain Mendoza with the Capitol Police and Inspector Hawa

9  with Secret Service, both of whom testified during the trial of

10 *United States v. Jesus Rivera*.  All of this evidence will

11 establish Mr. Grider's guilt on all counts beyond a reasonable

12 doubt.

13      And just to run through those counts briefly, Your

14 Honor, in Count I, he is charged with civil disorder.  The

15 stipulated testimony and exhibits from both Inspector Hawa and

16 Captain Mendoza not only prove the existence, not only prove

17 the existence of the civil disorder, but they will prove the

18 civil disorder's adverse effect on two federally protected

19 functions.  First, the Secret Service's protection of the Vice

20 President and his family; and second, the Capitol Police's

21 protection of the Capitol and members of Congress.

22      Live testimony from Sgt. McKenna, who barricaded the

23 Speaker's Lobby Door, and from Officer Yetter, guarding that

24 door, along with video from that scene, will establish that Mr.

25 Grider committed acts to obstruct law enforcement during that

civil disorder.  Videos from other areas of the building will
establish the same.

In Count II, Mr. Grider is charged with obstructing
the Electoral College vote certification.  The evidence will
establish that he impeded that process.  After all, while he
and the mob surrounded two different entry points to the House
Chamber, members of the Congress certainly could not continue
with their Joint Session.

While not explicitly voiced in text messages or social
media, you will see that the evidence, as a whole, establishes
his corrupt intent to impede that certification.  You will see
his intent not only in his preparation but also in his posture,
in his progress, and in his persistence.

You will hear that he was at the Capitol to support
the former President in the carefully chosen words he
videotapes himself saying while preparing for an interview with
a local Texas TV station later on the evening of January 6th.
You will see from the evidence on his phone that he had looked
at videos of Trump supporters crashing violently with others
during a recent past protest of the election results and during
other pasts protests, and that he, then, immediately searched
the Internet regarding whether he could bring a gun to DC.

He was prepared for violence.  You will see that he
was prepared to not only trespass, despite the police's use of
tear gas and pepper spray to deter him.  You will see that he

1    overran the many police lines set up in front of him that day.

2    You will see that he teamed up with the most vocal and violent

3    rioter in the mob so that they could finally break through to

4    the room with people who mattered, the members of Congress.

5          You will hear a video in which he admits that he knew

6    members were evacuating behind that door.  He was willing to

7    engage in violence to get to them, and he did.  All of this

8    evidence will add up to one conclusion, he obstructed members

9    of Congress as they were trying to certify a vote that would go

10   against the President he supported.

11         In Count III, Mr. Grider is charged with destruction

12   of Government property.  The video and testimony will show that

13   he aided and abetted the destruction of the windows in the

14   Speaker's Lobby Door when he teamed up with the puncher to use

15   his helmet to break the glass, and Mr. Grider has stipulated

16   that the cost of replacing that glass was well over $1,000.

17         This evidence will also prove that he engaged in

18   disorderly conduct and an act of physical violence, all

19   elements of the misdemeanors charged in Counts V through VIII.

20         The stipulated testimony and exhibits from the *Rivera*

21   trial will also establish that the Capitol Building and Grounds

22   where Mr. Grider trespassed were a restricted area that the

23   Vice President was visiting that day, elements of those same

24   counts.

25         In addition to the disorderly conduct charged in Count

1   V, we will more than prove that he, in fact, impeded the

2   orderly conduct of Government business with the videos and the

3   testimony, again, showing his multiple attempts to breach the

4   House Chamber.

5           And after the conclusion of the evidence, we ask that

6   the Court return a verdict of guilty on all counts.  Thank you,

7   Your Honor.

8           THE COURT:  All right.  Mr. Mayr, do you wish to give

9   an opening statement at this point, or do you want to wait?

10          MR. MAYR:  With the Court's permission, I would like

11  to wait until the conclusion of the Government's case.

12          THE COURT:  That is fine.

13          MR. MAYR:  Thank you.

14          THE COURT:  All right.

15          We are going to be calling your first witness?  Let me

16  just — the court reporter doesn't need a break so I think we

17  should go forward.  Would you call your first witness.

18          MS. CHO:  Thank you, Your Honor.  The Government calls

19  Sgt. Paul McKenna.

20          (Witness sworn.)

21          THE COURT:  All right, make yourself comfortable.

22  Make sure you speak directly into the microphone so we can hear

23  it.  If you want to take your mask off, I don't have a problem

24  while you are speaking to make sure that we can hear you.

25          THE WITNESS:  Yes, ma'am.

1          THE COURT:  I ask that you not speak too quickly so we

2    can be sure we have a record.  If you see either counsel when

3    you are being questioned stand, they are objecting, or if they

4    are starting to stand, they are objecting.  If you haven't

5    started to answer, don't.  If you are in the middle of your

6    answer, just stop, let me hear what the objection is, and then,

7    I will tell you whether to answer.  All right?  Go ahead.

8          MS. CHO:  Thank you, Your Honor.

9          **PAUL McKENNA, GOVERNMENT'S WITNESS, SWORN**

10                   <u>**DIRECT EXAMINATION**</u>

11   BY MS. CHO:

12   Q    Could you please state and spell your name for the record.

13   A    Paul McKenna, P-A-U-L, M-C-K-E-N-N-A.

14   Q    And Mr. McKenna, what do you do for a living?

15   A    I am a sergeant with the United States Capitol Police.

16   Q    Within the United States Capitol Police, are you assigned

17   to a particular division?

18   A    As of right now I am assigned to the communications

19   division.

20   Q    How long have you been with the communications division?

21   A    Since October.

22   Q    And what, generally, does the communications division do?

23   A    We monitor all the alarms across the Hill, and we also

24   dispatch to any of those alarms or any calls that come in.

25   Q    Now, you testified that you have been there since October.

1   What did you do before October?

2   A   I was a sergeant with the House Chamber section.

3   Q   What does the House Chamber section do?

4   A   They provide security for the House Floor.

5   Q   And is that the House of Representatives?

6   A   Yes.

7   Q   How long were you with the House Chamber division?

8   A   I will say about two years.

9   Q   Okay.  How long have you been with the Capitol Police in

10  total?

11  A   I just started my 21st year in June.

12  Q   So before the House Chamber division, where were you with

13  the Capitol Police?

14  A   I was the first responder unit, third shift.

15  Q   What do they do?

16  A   They are responsible for the security right outside of the

17  Capitol Building.

18  Q   What is the overall mission of the Capitol Police?

19  A   To ensure the safety and the safe proceedings of Congress,

20  so the safety of Congress people so they are able to do their

21  job for the American people, and also for any visitors that

22  come up to the Capitol, we are also responsible for their

23  safety.

24  Q   Were you working on January 6, 2021?

25  A   Yes, ma'am.

1  Q   Where were you working?

2  A   I was working in the House Chamber section.

3  Q   Do you have some familiarity with the Grounds of the

4  Capitol Building?

5  A   I do.

6  Q   And do you also have some familiarity with the interior of

7  the Capitol Building?

8  A   Yes, ma'am.

9  Q   Let's start with the Grounds.  Was there a perimeter set up

10  around the building Grounds that day?

11  A   Yes, there was.

12  Q   And let's look at Exhibit 15.  Sgt. McKenna, do you see

13  something on the screen?

14  A   I do.

15  Q   Is that a fair and accurate description of the perimeter

16  setup on that day?

17  A   Yes, ma'am.

18          MS. CHO:  I move to admit Exhibit 15.

19          THE COURT:  Is this one of the stipulated ones?

20          MR. MAYR:  These are all stipulated, Your Honor.  So

21  for purposes of moving, moving along, I will — if we need to

22  do this one by one, I am okay with that.  But again, we already

23  stipulated.

24          THE COURT:  The ones that are stipulated, why don't

25  you just tell us now.

1      MS. CHO:  Yes.

2      THE COURT:  As to this witness we can just admit all

3  of them, and then, we don't have to go through each one.

4      MS. CHO:  If I am correct, Your Honor, I would move to

5  admit Government's Exhibits 1 through 119 at this time.  I

6  understand there is no objection to any of those exhibits.

7      MR. MAYR:  That would be the easiest way to proceed,

8  Your Honor.  We certainly have no objection to any of those

9  exhibits being admitted at this time.

10      THE COURT:  So it is 1 to — I am sorry, what was the

11  last number?

12      MS. CHO:  119.

13      THE COURT:  All right.  So as I understand, those are

14  stipulated for without objection to being admitted.  So I will

15  admit Government's Exhibits 1 through 119.

16      MS. CHO:  Thank you, Your Honor.

17      THE COURT:  You don't have to keep asking each time to

18  have them admitted.

19      (Government's Exhibits 1 – 119 were received in evidence.)

20  BY MS. CHO:

21  Q   Sgt. McKenna, can you orient us on the map what direction

22  is north?

23  A   North would be at the top of the map.

24  Q   And in general —

25      THE COURT:  You can point if you wish, on the screen,

1    if you want to.

2            THE WITNESS:  Yes.  So north is at the top of the

3    screen here.

4            THE COURT:  Dorothy, do you want to have so he can

5    mark it?  Don't you have, there is a way of doing the —

6            THE CLERK:  Yes.

7            THE COURT:  Can you touch it?  There.  Okay.

8            MS. CHO:  Thank you.

9    BY MS. CHO:

10   Q    What barriers were used to create this perimeter in real

11   life?

12   A    Bicycle racks and also officers standing at those bicycle

13   racks.

14   Q    Now, in anticipation of the inauguration later in the

15   month, was there construction on the Capitol Grounds?

16   A    Yes.  They were building the platform they were going to

17   use to swear in the President.

18   Q    Okay.  Let's take a look at previously admitted

19   Exhibit 108.  Sgt. McKenna, does this look like a fair and

20   accurate model of the Capitol Building and construction on its

21   Grounds on January 6th?

22   A    Yes, ma'am.

23   Q    So could you point out for us by circling on the screen

24   where the constructive stage was that day?

25   A    So this is the stage area right in here (indicating).

1   Q    Okay.  And once again to orient us, what direction is
2   north?
3   A    North would be to our left over here (indicating).
4   Q    And then, just to give us another marker, where is Peace
5   Circle located in relation to this particular model?
6   A    Peace Circle is not shown on the screen, but it is down in
7   this area here if you follow this walkway down, you will be at
8   Peace Circle (indicating).
9   Q    Have you just gestured to the lower left-hand corner of the
10  exhibit?
11  A    Yes, ma'am.
12  Q    Now, you indicated where the stage was.  Was there also a
13  scaffolding being used on that day?
14  A    Yes.
15  Q    Where is the scaffolding on this diagram of the building?
16  A    Looks like these areas in here (indicating) where you can
17  see some of the higher points is where the scaffolding was to
18  hold up some of the construction as they built the stage area.
19  Q    So were they projecting out of the stage area on each side
20  of the stage?
21  A    Yes.
22  Q    Now, can you also, just to orient us, point us to where the
23  House Chamber is within the building?
24  A    The House Chamber would be on your right-hand side of the
25  building in this area here (indicating).

1   Q    Where is the Senate Chamber?

2   A    Senate Chamber is on the exact opposite side on your left.

3   Q    Thank you.

4            MS. CHO:  We can take that down.

5   BY MS. CHO:

6   Q    Now, you said you were working on the House Floor on

7   January 6th.  How long have you been working in the House

8   Chamber division by that time?

9   A    Not very long.  I just transferred in there right –– well,

10  right before COVID, I transferred in.  So it was that June of

11  2019, maybe?

12  Q    Okay.  So when January 6th rolled around, your familiarity

13  with the House Chamber was somewhat new; is that fair to say?

14  A    Yes.

15  Q    Understanding that, what was scheduled to occur at the

16  Capitol that day?

17  A    They were having a vote on the Electoral College.

18  Q    So what time did you arrive?

19  A    I believe I –– my timeline is kind of fuzzy, but I believe

20  it was around 12:00 o'clock.

21  Q    When you were driving in, did you notice anything out of

22  the ordinary at that point?

23  A    I did not, no.

24  Q    Which side of the building did you come in through?

25  A    I came in on the House side of the building, which is the

1   south side.

2   Q    Where did you go when you first arrived?

3   A    I parked in the Rayburn Garage and walked over to the

4   Capitol through the subway and came up into the Capitol

5   division office.

6   Q    Once you got to your office, were you sent anywhere upon

7   your arrival?

8   A    Yes.  I ran into one of my fellow sergeants who works the

9   Chamber, Sgt. McCree, and he asked me to step up early up into

10  the Chamber and help him to set up the Chamber and make sure

11  the officers were all in the right areas.

12  Q    So in terms of setting up the Chamber and making sure

13  officers were in the right areas, did you do that?

14  A    Yes.

15  Q    What did it entail?

16  A    Just making sure that they were on their fixed posts.

17  Q    Let's look at previously admitted Exhibit 17.  Is this a

18  map of the second floor of the Capitol Building, Sergeant?

19  A    Yes, ma'am.

20  Q    Again, where is north on this map?

21  A    North would be on your right-hand side.

22  Q    Okay.  And where is the House Chamber on this map?

23  A    House Chamber is on your left-hand side.

24  Q    So could you indicate by drawing, making a mark, where

25  officers were positioned when you went to get these officers

1  set up?

2  A   Yes.  We had officers set up in the — this area here is

3  the Speaker's Lobby.  So we had officers, two officers set up

4  on the east side, two officers set up on the west side of the

5  Speaker's Lobby.  You also had the Republican Door has two

6  officers.  The House Main Door also has two officers.  The

7  Republican Door here has two officers (indicating), and the,

8  what they call the Upper House Door at the top of the House

9  stairs here that also has two officers.

10 Q   I think you mentioned a Republican Door twice?

11 A   Did I?  I am sorry.  This is the Democrat Door.

12 Q   I didn't know for sure if they each got a door.  They do,

13 in fact, each have a door?

14 A   Yes, ma'am.

15 Q   Okay.  Thank you.  Now, let's pause in your narrative of

16 your day and walk through some videos.  In preparation for

17 testimony today, did you review video from January 6th?

18 A   Yes.

19 Q   Were some of these videos events you were personally

20 familiar with?

21 A   Yes.

22 Q   Were other videos something you were not personally

23 familiar with?

24 A   Yes.

25 Q   In the videos in which you had no personal familiarity,

1    were you able to see parts of the building or people with whom
2    you are familiar?
3    A    Yes.
4    Q    We asked you to follow the path of a particular person in
5    the videos highlighted in yellow; is that right?
6    A    Yes.
7    Q    You didn't recognize him at all, did you?
8    A    No.
9    Q    Let's look at previously admitted Exhibit 30.  This --
10           THE COURT:  One thing we can do is, we can show him a
11   little better how he can mark the screen.  So let me ask my law
12   clerk to show you how to do it, and then, we will make it a
13   little easier.
14           Go ahead, Ms. Cho.
15           MS. CHO:  Thank you, Your Honor.
16           If we can play Exhibit 30 from the beginning.
17       (The video was played for the Court.)
18   BY MS. CHO:
19   Q    Sergeant, do you recognize this area?
20   A    Yes.  This is the west front of the Capitol.
21   Q    Is that the scaffolding that you had pointed out in the
22   prior exhibit?
23   A    Yes.
24   Q    Let's keep going, and did you also see the man highlighted
25   in yellow?

1    A    Yes.

2    Q    You didn't notice — you don't recognize this man; is that

3    right?

4    A    No, I do not.

5    Q    For purposes of testimony here today with the understanding

6    that you don't know who he is, I am going to refer to him as

7    Mr. Grider.

8              MS. CHO:  Let's keep going.

9         (The video was played for the Court.)

10             MS. CHO:  Let's pause right there.

11   BY MS. CHO:

12   Q    Do you see police officers at this frame at 1:20?

13   A    Yes, ma'am.

14   Q    Do you recognize what agency they are with?

15   A    They are the Capitol Police.

16   Q    What does it appear that they are doing?

17   A    They have formed a police line.

18   Q    Okay.

19             MS. CHO:  Let's keep going.

20        (The video was played for the Court.)

21   BY MS. CHO:

22   Q    Do you see Mr. Grider again?

23   A    Yes.

24   Q    And what happened to the police line?

25   A    They pushed past the — the crowd pushed past the police

1   line.

2          MS. CHO:  Let's keep going.

3      (The video was played for the Court.)

4          MS. CHO:  Let's hit pause right there.

5   BY MS. CHO:

6   Q   Sergeant, where are we here in this portion of the video at

7   one minute and —

8          THE COURT:  What number is this video?

9          MS. CHO:  Exhibit 30.  Your Honor, this is all one

10   video at this point.

11          THE COURT:  All one video?

12          MS. CHO:  Yes.

13          Just to give the Court and the Defense a sense of what

14   we are doing here, there are a number of exhibits that we have

15   compiled into one.  This is a compilation of a number of

16   underlying Capitol Police and other third-party videos, which

17   we can explain at the conclusion of our evidence.  We were

18   trying to put on a more efficient presentation of the videos.

19          THE COURT:  That is not a problem.  I just want to

20   make sure that the record includes whatever exhibit we are

21   actually looking at that he is talking about.

22          MS. CHO:  Yes.

23   BY MS. CHO:

24   Q   Sergeant, where are we here at 1:27?

25   A   This is the north side of the stairs going up onto the

1   Upper West Terrace.

2   Q   Are we still on the west side of the Capitol Building here?

3   A   Yes.

4   Q   And what is the time?

5   A   Looks like 2:10 p.m.

6        MS. CHO:  Let's keep going.

7       (The video was played for the Court.)

8   BY MS. CHO:

9   Q   Sergeant, do you see the person we are referring to as Mr.

10  Grider?

11  A   He appears — the man in the yellow flag there.

12  Q   Yes.  Do you see a person who fits that description?

13  A   Yes.

14  Q   Where does he appear to be?

15  A   He looks like he is on the top of the stairs.  I don't know

16  what we would call that.  He is not on the stairs itself, but

17  he is on the, the arm of the stairs; is that the correct...

18  Q   Would it be a railing?

19  A   A railing, yes.

20  Q   Do you see him advancing further up the railing, Sergeant?

21  A   Yes.

22       MS. CHO:  Let's hit pause right there.

23  BY MS. CHO:

24  Q   What did he just do in that frame, Sergeant?

25  A   I am sorry, I didn't — can we rewind it a little bit?

1         MS. CHO:  Sure.  Could you rewind it by just about ten

2    seconds?  That is good.

3         (The video was played for the Court.)

4         THE WITNESS:  He appears to be waving the crowd

5    forward.

6    BY MS. CHO:

7    Q   Okay.

8         MS. CHO:  Let's keep going.

9         (The video was played for the Court.)

10   BY MS. CHO:

11   Q   Where does it appear Mr. Grider is heading, Sergeant?

12   A   He is moving up the stairs towards the Upper West Terrace.

13        MS. CHO:  Now, let's hit pause here.  We are still

14   within Exhibit 30.

15   BY MS. CHO:

16   Q   What is being pictured here at a minute and/or --

17        THE COURT:  Keep talking into the microphone because

18   when you move, to the side, it is harder to hear you.

19   BY MS. CHO:

20   Q   What location are we in here, Sergeant?

21   A   We are now at the top of the Upper West Terrace on the

22   Senate side.

23   Q   Is there an entryway into the building visible here?

24   A   Yes.  Right at the center of the picture is a -- it is an

25   emergency exit door.

1   Q   What floor of the Capitol does that entryway allow entry

2   into?

3   A   The first floor.

4   Q   Okay.

5           MS. CHO:  Let's keep going in the video, Exhibit 30.

6       (The video was played for the Court.)

7   BY MS. CHO:

8   Q   Do you see the man highlighted in yellow, Mr. Grider?

9   A   Yes.

10  Q   Where is he headed, Sergeant?

11          MS. CHO:  Let's pause right there.

12          THE WITNESS:  He is moving towards the emergency door

13  we just talked about on the Senate side.

14          MS. CHO:  Now, let's take a break from Exhibit 30 and

15  pull up previously admitted Exhibit 22.  It is a video.

16          (The video was played for the Court.)

17          THE COURT:  Can we get it right side up?

18          MS. CHO:  Unfortunately, Your Honor, this is the way

19  this video came.

20          THE COURT:  Okay.

21          MS. CHO:  If we can begin at 6:30, please.

22  BY MS. CHO:

23  Q   Now, Sgt. McKenna, I know this is sideways, but are you

24  able to identify where, what we are looking at?

25  A   It looks like the west front of the Capitol.

1  Q   So does this look like the same area we saw depicted in the

2  previous portion of Exhibit 30?

3  A   Yes.

4  Q   Okay.

5         THE COURT:  You're moving away from the microphone.

6  If you are going to leave your mask on, which is fine, but you

7  need to speak into the microphone.

8  BY MS. CHO:

9  Q   Do you see the man with a yellow flag tied around his neck

10 here?

11 A   I do not.

12 Q   Okay.  Would you keep your eyes peeled for him as we keep

13 on going?

14 A   Yes.

15        MS. CHO:  Let's keep on playing.

16     (The video was played for the Court.)

17 BY MS. CHO:

18 Q   Are you able to see him now?

19 A   This is him right here (indicating).

20 Q   Okay.

21        MS. CHO:  Let's keep going.

22     (The video was played for the Court.)

23        THE COURT:  We need to figure out — either Dorothy,

24 or we need to show him how to — maybe the way to do it is my

25 law clerk will show you how to erase it.  You can get rid of

1    it.

2              (Complied.)

3              THE COURT:   All right.  Let's proceed.

4    BY MS. CHO:

5    Q   So we are at 7:26 in Exhibit 22, Sergeant.  Do you see the

6    man with the yellow flag?

7    A   Yes, right in the center.

8              MS. CHO:  Let's keep on playing.

9         (The video was played for the Court.)

10   BY MS. CHO:

11   Q   What did Mr. Grider just do?

12   A   I am not sure what he grabbed, but he, he was — was that

13   water?

14   Q   Whatever you observed.

15             MR. MAYR:  I object.  I will object to the

16   speculation.  I will object to speculation.

17             THE COURT:  All right.  I will sustain it.

18             MS. CHO:  Let's keep going.

19        (The video was played for the Court.)

20   BY MS. CHO:

21   Q   Sgt. McKenna, do you see Mr. Grider again here?

22   A   Yes.

23   Q   And if you will look closely, is there something black next

24   to his body?

25   A   I can't make out what it is.

1    Q    Okay.

2             MS. CHO:  Let's keep on playing.

3        (The video was played for the Court.)

4    BY MS. CHO:

5    Q    Do you see something black hanging from his hand?

6    A    Yes.  He has a helmet.

7             MS. CHO:  Let's take that one down, and let's go back

8    to Video Exhibit 30.

9    BY MS. CHO:

10   Q    And again, where did Mr. Grider appear to be headed in that

11   last frame of Exhibit 22?

12   A    Walking towards the emergency door for the Senate side of

13   the Capitol.

14   Q    Okay.

15            MS. CHO:  Let's start at 4:07 in Exhibit 30, and hit

16   play.

17       (The video was played for the Court.)

18            MS. CHO:  Let's just pause really quickly.

19   BY MS. CHO:

20   Q    Sergeant, do you see Mr. Grider in this frame?

21   A    Yes.

22   Q    What time is it?

23   A    2:15.

24   Q    And where are we pictured here?

25   A    We are on the Senate side of the Capitol in the main

1  hallway on the first floor.

2       MS. CHO:  Let's keep on playing.

3     (The video was played for the Court.)

4  BY MS. CHO:

5  Q   Now, Sergeant, what direction is Mr. Grider heading within

6  the building at this point?

7  A   He is heading towards the north side of the building, which

8  would be the Senate side of the building.

9  Q   What is the time?

10 A   2:15:35.

11      MS. CHO:  Let's keep going.

12     (The video was played for the Court.)

13 BY MS. CHO:

14 Q   Now, Sgt. McKenna, we have paused again.  Is Mr. Grider

15 heading in the opposite direction now?

16 A   Yes.

17 Q   What direction in the building is he headed now?

18 A   He is heading towards the House side.

19 Q   What time is it here?

20 A   2:17:58.

21 Q   Okay.  So about how long was he headed towards the Senate

22 side of the building?

23 A   Maybe a minute or two.

24      MS. CHO:  So let's briefly take this exhibit down and

25 look at Photo Exhibit 27.

1    BY MS. CHO:

2    Q   Here in this photo, do you recognize where we are,

3    Sgt. McKenna?

4    A   Yes.  He is –– if you, if you could move the picture over

5    to the right-hand side, you would see the entrance where

6    everybody was coming in through that emergency door.  So he is

7    just, basically, 25 feet further north inside the building.

8    Q   And what does it look like the man with the yellow flag is

9    in front of?

10   A   Looks like one of our electrical panels.

11   Q   Okay.

12        MS. CHO:  Let's go back to Exhibit 30, the video, and

13   continue playing.

14       (The video was played for the Court.)

15        MS. CHO:  Let's hit pause just briefly.

16   BY MS. CHO:

17   Q   Sergeant, was the photo we just looked at, Exhibit 27, of

18   the electrical closet area, is it around this area of the

19   building that is pictured here in Exhibit 30?

20   A   It is not in this picture, it is further to the right-hand

21   side of the picture.

22   Q   So would it appear that Mr. Grider is walking away from

23   that area that was in the picture?

24   A   Yes.

25        MS. CHO:  Let's keep going with Exhibit 30.

1        (The video was played for the Court.)

2             MS. CHO:  So let's, let's hit pause.

3    BY MS. CHO:

4    Q    Sergeant, where are we here?

5    A    This is the Crypt area.  This is the center part of the

6    building now where the, if you would be able to look up through

7    the ceiling, you would see the dome of the Capitol.

8    Q    What is the time?

9    A    2:19:37.

10            MS. CHO:  Let's keep playing.

11        (The video was played for the Court.)

12   BY MS. CHO:

13   Q    Do you see the highlight in yellow?

14   A    Yes.

15   Q    Okay.  Sergeant, do you see police along the back of the

16   frame of the picture?

17   A    Yes.

18   Q    Do those look like Capitol Police?

19   A    I can't tell from here.

20   Q    Okay.

21            MS. CHO:  Let's keep going.

22        (The video was played for the Court.)

23   BY MS. CHO:

24   Q    Sergeant, we have paused at 6:38.  Does this look like

25   another view of the Crypt?

1   A    Yes.

2   Q    Do you see police in this frame as well?

3   A    Yes.

4   Q    What does it look like they are doing?

5   A    Right now they look like they are trying to form a

6   perimeter, but they really don't have enough officers.

7            MS. CHO:  Let's keep going.

8        (The video was played for the Court.)

9   BY MS. CHO:

10  Q    We have paused here at 6:48.  What does it look like is

11  happening here, Sergeant?

12  A    It looks like the group is starting to push the officers

13  out of the way and move forward.

14           MS. CHO:  Let's keep going.

15       (The video was played for the Court.)

16  BY MS. CHO:

17  Q    We have paused here at 6:56.  Do you see Mr. Grider?

18  A    Yes.

19           MS. CHO:  Let's keep going.

20       (The video was played for the Court.)

21  BY MS. CHO:

22  Q    Sergeant, now we have a different view of this camera.

23  Where are we here?

24  A    I am actually not sure.  I am just seeing this picture

25  here.

1   Q   In your prior review of this video, were you able to

2   determine where this took place?

3   A   If I could see more, I probably could.

4   Q   Okay.

5            MS. CHO:  Let's keep playing —

6   BY MS. CHO:

7   Q   Sorry.  Before we go on, do you see a man in a red hat with

8   a surgical mask on there?

9   A   Yes.

10  Q   And yellow peeking out underneath?

11  A   Yes.

12           MS. CHO:  Let's keep going.

13      (The video was played for the Court.)

14  BY MS. CHO:

15  Q   So we paused here at 8:02.  Do you now know where we are?

16  A   Yes, ma'am, we are in the Crypt.

17  Q   What are some of the things that you heard the crowd

18  chanting in this clip?

19  A   USA.

20  Q   Did you see any police officers, again, in this view of the

21  Crypt?

22  A   Yes.

23           MS. CHO:  Let's keep going.

24      (The video was played for the Court.)

25  BY MS. CHO:

1   Q    Sergeant, did you see the police lined up in front of the

2   crowd in the past 30 seconds?

3   A    Yes.

4   Q    What happened to that police line?

5   A    They pushed past it.

6   Q    Who is they?

7   A    The crowd.

8   Q    And do you see the man we have been referring to as Mr.

9   Grider here in this frame?

10  A    Yes.

11          MS. CHO:  Let's keep going.

12      (The video was played for the Court.)

13          MS. CHO:  We are paused at 9:51.

14  BY MS. CHO:

15  Q    Do you see Mr. Grider here, Sergeant?

16  A    Yes.

17  Q    Does he appear to be talking to a police officer?

18  A    I can't tell if he is talking to him or not.

19  Q    And upon watching more of this video, are you able to

20  identify which agency these police officers are with?

21  A    Yes.

22  Q    Which agency?

23  A    The Capitol Police.

24          MS. CHO:  Let's keep going.

25      (The video was played for the Court.)

1             MS. CHO:  We paused at 9:59.

2    BY MS. CHO:

3    Q   Sergeant, what does this police officer's expression look

4    like to you?

5    A   He looks nervous.

6             MS. CHO:  Let's keep going.

7         (The video was played for the Court.)

8             MS. CHO:  So we have paused here within Exhibit 30 at

9    10:14.

10   BY MS. CHO:

11   Q   Where are we here, Sergeant?

12   A    This is the House Wing of the Capitol.  That door you see

13   right there is basically a mirror image of the door that they

14   broke into on the Senate side.

15   Q   So here, are we on the second or the first floor of the

16   building?

17   A   We are still on the first floor.

18   Q   Okay.  What is the time here?

19   A   2:28:31.

20            MS. CHO:  Let's keep playing.

21        (The video was played for the Court.)

22   BY MS. CHO:

23   Q   Do you see Mr. Grider highlighted in yellow?

24   A   Yes.

25            MS. CHO:  Let's just pause briefly.

1  BY MS. CHO:

2  Q   Do you happen to know what it is he is looking at here?

3  A   There are some displays on that side of the wall there, so

4  it appears that he is looking at the displays.

5          MS. CHO:  Let's keep going.

6      (The video was played for the Court.)

7          MS. CHO:  And let's keep going through later on.

8      (The video was played for the Court.)

9  BY MS. CHO:

10 Q   Sergeant, what direction was Mr. Grider heading at the end

11 of that frame?

12 A   Looked like they were heading back towards the Crypt.

13 Q   Okay.

14         MS. CHO:  Let's keep going.

15     (The video was played for the Court.)

16         MS. CHO:  Let's hit pause.

17 BY MS. CHO:

18 Q   Do you see Mr. Grider in this frame?

19 A   Yes.

20 Q   Where are we here?

21 A   This is Statuary Hall, and we are up on the second floor.

22 Q   Where is Statuary Hall located in reference to the hallway

23 we were just in that you said he was heading back towards the

24 Crypt?

25 A   Directly above.

1    Q    And what is the time here?

2    A    The time is 2:32:39.

3              MS. CHO:  Let's keep going.

4         (The video was played for the Court.)

5    BY MS. CHO:

6    Q    Sergeant, we have gone through a couple different areas of

7    the Grounds and the building of the Capitol.  I would like to

8    pull up Exhibit 16, first of all, and get oriented to the path

9    that we just took.

10        Sergeant, in looking at Exhibit 16, is this a map of the

11   first floor of the Capitol Building?

12   A    Yes.

13   Q    Can you mark on the map where the stairs, the terrace

14   stairs you had testified earlier that we saw Mr. Grider on are?

15   A    These are the terrace stairs right here (indicating).

16   Q    Thank you.  Now, you also testified earlier that in the

17   video, we saw Mr. Grider entering through an emergency door in

18   the Senate Wing on the third floor of the building; is that

19   right?

20   A    Yes.

21   Q    Can you mark that door?

22   A    Right here (indicating).

23             MS. CHO:  Let the record reflect that the terrace

24   stairs were marked as the stairs on the right side top of this

25   exhibit.  The Senate Wing Door was marked as the doors to the

1    right side of the exhibit outside of the Senate Wing.

2    BY MS. CHO:

3    Q   Now, you also testified earlier that Mr. Grider went toward

4    the Senate Wing; is that correct, at first?

5    A   Yes.

6    Q   Can you indicate with an "S" where the Senate Wing is?

7    A   (Indicating.)

8         MS. CHO:  Let the record reflect that he has marked

9    the right side of the building as the Senate Wing.

10   BY MS. CHO:

11   Q   And then, you also testified earlier that he headed towards

12   the House Chambers; is that correct?

13   A   Yes.

14   Q   And that he passed first through the Crypt; is that

15   correct?

16   A   Yes.

17   Q   Can you mark the Crypt on Exhibit 16 with a "C?"

18   A   (Indicating.)

19   Q   Now, from there, Sergeant, you also reviewed video where

20   Mr. Grider went to Statuary Hall; is that correct?

21   A   Yes.

22   Q   Now, is Statuary Hall on this particular exhibit?

23   A   No.

24   Q   Where is it?

25   A   It is up on the second floor.

1  Q   Where is it in location to where you have marked the Crypt?

2  A   Statuary Hall would be in this area right here

3  (indicating).

4  Q   This area right there, and you have gone left of the Crypt

5  on this exhibit and one floor above; is that correct?

6  A   That is correct.

7        MS. CHO:  So let's remove the marks from the screen,

8  Sergeant, and let's pull up Exhibit 17.

9  BY MS. CHO:

10  Q   Now, is this a map of the second floor of the Capitol

11  Building?

12  A   Yes, it is.

13  Q   Could you mark where the Crypt would be if it were in

14  relation to this second floor of the building?

15  A   Directly below the Rotunda.

16  Q   Now, Statuary Hall, is that correctly marked on this map?

17  A   Yes.

18  Q   Okay.  Now, could you also mark the House Chamber by using

19  an "H" on this exhibit.

20  A   (Indicating.)

21        MS. CHO:  Let the record reflect he has placed an "H"

22  on the left side of Exhibit 17.

23  BY MS. CHO:

24  Q   Okay.

25        MS. CHO:  We can take that down and clear the screen,

1    Sergeant.  Let's watch a few more videos of this path within

2    the building, if we can pull up Video Exhibit 32.

3              So let's pause right there.

4    BY MS. CHO:

5    Q    Sergeant, where are we here in Exhibit 32?

6    A    This is the connector between Statuary Hall and the

7    building that holds the House Floor.

8    Q    So is it, essentially, a hallway?

9    A    Yes.

10   Q    And is the House Chamber on one end?

11   A    Yes.

12   Q    And the Statuary Hall on the other end of the hallway?

13   A    Yes.

14             MS. CHO:  Let's keep going.

15        (The video was played for the Court.)

16   BY MS. CHO:

17   Q    Do you see Mr. Grider highlighted in yellow?

18   A    Yes.

19        (The video was played for the Court.)

20   BY MS. CHO:

21   Q    So we have got a second video here, Sergeant.  Does that

22   appear to be video of the same area that is depicted on the

23   left?

24   A    Yes.

25   Q    Is there now just audio?

1    A   I am sorry?

2    Q   Did you hear audio for this video?

3    A   I did.

4          MS. CHO:  Let's keep going.

5          (The video was played for the Court.)

6    BY MR. CHO:

7    Q   Sergeant, did you see Mr. Grider there?

8    A   Yes.

9    Q   What was he doing?

10   A   He was waving his arms.

11   Q   And the crowd, how would you describe the crowd in this

12   scene?

13   A   A little rowdy with others trying to keep people quiet.

14   Q   Did that prove -- did that seem like it was effective?

15   A   No.

16          MS. CHO:  Let's keep going.

17          (The video was played for the Court.)

18   BY MS. CHO:

19   Q   Do you hear people yelling, "Let's go," Sergeant?

20          THE COURT:  Can you talk more in the microphone?  You

21   are turning to the side.  You can keep the mask on as long as

22   you talk directly into it.

23          MS. CHO:  Okay.  Thank you, Your Honor.

24          Let's move on to Exhibit 34.

25          (The video was played for the Court.)

1  BY MS. CHO:

2  Q   We paused at 19 seconds on this exhibit.  Is this the same

3  location as we just saw in the last video?

4  A   Yes.

5  Q   Who are those people lined up here at 19 seconds?

6  A   Those are Capitol Police officers.

7  Q   What do they appear to be doing?

8  A   Forming a police line.

9  Q   If you can orient us.  The crowd that we were just seeing

10  in Exhibit 32, where are they in location to the line of

11  police?

12  A   They are behind us, meaning, I guess, to the left.

13  Q   Okay.  And what is to the right or to the backs of the

14  police pictured here?

15  A   That doorway leads onto the House Floor, the House Main

16  Door.

17  Q   So that door would be behind the police backs is called the

18  House Main Door?

19  A   Yes.

20        MS. CHO:  Let's keep going.

21     (The video was played for the Court.)

22  BY MS. CHO:

23  Q   Move to 4:05.  Sergeant, did you hear the crowd yelling

24  "Stop the Steal"?

25  A   Yes.

1           MS. CHO:  Now, let's start playing at 4:05.

2       (The video was played for the Court.)

3    BY MS. CHO:

4    Q   So we paused, Sergeant, at 5:07.  Has this crowd, now,

5    based on your viewing of these videos, been in this connector

6    hallway for a few minutes now?

7    A   Yes.

8    Q   And you have seen some of the members of the crowd

9    interacting with police officers?

10   A   Yes.

11   Q   Is this crowd supposed to be in this hallway, at all, by

12   this time?

13   A   No.

14   Q   Now, I want you to look, now, at the screen.  Do you see

15   Mr. Grider there in the middle of the crowd?

16   A   Yes.

17           MS. CHO:  Let's keep going.

18       (The video was played for the Court.)

19           MS. CHO:  Please keep going.

20           We are paused here at 5:57.

21   BY MS. CHO:

22   Q   Sergeant, I don't know if you can see him, but can you see

23   Mr. Grider here again?

24   A   No, I cannot.

25           MS. CHO:  Can we go to 5:56, maybe a moment earlier,

1    Miss Robinson, and then hit play?

2         (The video was played for the Court.)

3    BY MS. CHO:

4    Q   In any case, Sergeant, do you see right here in the front

5    of the frame there is a black hat and furry trim?

6    A   Yes.

7    Q   Did you see the rioter who was wearing that hat?

8    A   I am sorry.  Can you repeat?

9    Q   Did you see the rioter earlier in the video who was wearing

10   that hat?

11   A   Yes.

12   Q   Was he yelling very loudly?

13   A   Yes.

14   Q   Was he walking around saying "hey?"

15   A   Uh-huh.  Yes, he was.

16        MS. CHO:  Let's keep going.

17        (The video was played for the Court.)

18        MS. CHO:  So we have paused here.

19   BY MS. CHO:

20   Q   Did you hear that same rioter with the black furry-trimmed

21   hat yelling?

22   A   Yes.

23   Q   And up until now, has the police line you described

24   earlier, has it held so far?

25   A   Yes.

1        MS. CHO:  Let's keep going.

2    (The video was played for the Court.)

3    BY MS. CHO:

4    Q   What is happening to the police line here?

5    A   They are pushing past the police line.

6        MS. CHO:  Let's keep going.

7    (The video was played for the Court.)

8    BY MS. CHO:

9    Q   So by the end of that video, Sergeant, what had happened

10   with the rioters in that hallway?

11   A   They had pushed past the police line and into the House

12   Main Door.

13       MS. CHO:  So if we could just briefly go back to

14   exhibit — let's pull up Exhibit 18.

15   BY MS. CHO:

16   Q   Sergeant, is Exhibit 18 a close-up of the second floor map

17   that we viewed in Exhibit 17?

18   A   Yes.

19   Q   Does it focus on the House side of that map?

20   A   Yes.

21   Q   Now, is it correctly labeled with the Speaker's Lobby Door

22   and the House Main Door?

23   A   It is labeled with the House Main Door correctly and the

24   Speaker's Lobby, but it is not showing the Speaker's Lobby

25   Doors.

1   Q   We will get to that in just a moment.  I did misspeak.

2   Could you circle on this map where the rioters are, according

3   to the last video at this point?

4   A   Yes.  They have entered this area right here (indicating).

5   Q   And that hallway that was filled with rioters, where is

6   that hallway on this map?

7   A   Right here (indicating).

8   Q   So you've circled the space in between what is labeled

9   Statuary Hall and the House Main Door; is that correct?

10  A   That's correct.

11  Q   Now, the House Main Door, once that door is opened, are you

12  on the House Floor?

13  A   There is another inner door that they have to get through

14  before they get onto the House Floor.

15          MS. CHO:  Let's take that exhibit down and clear the

16  markings.

17          Then, let's put up Video Exhibit 36.

18      (The video was played for the Court.)

19          MS. CHO:  Pause right there.

20  BY MS. CHO:

21  Q   Sergeant, you had said there were, there is a House Main

22  Door and an inner door.  Using this Exhibit 36, can you

23  identify those two sets of doors you just testified about?

24  A   Yes.  So this is the door in this area right —— here is the

25  outer door, and then, the inner door is, you can see the glass

1    of the inner door right there.

2    Q    Thank you.  So the inner door is just past the outer door

3    you have indicated on this exhibit?

4    A    Correct.

5          MS. CHO:  Now, let's, let's just minimize that for a

6    moment and clear the markings.

7    BY MS. CHO:

8    Q    And I want to cut back and return again to your day on

9    January 6th.

10          In watching these videos, were you in and out of the House

11   Chamber shortly before this point that day?

12   A    Yes.

13   Q    And you had talked about setting up officers at different

14   doors around the House Chamber; is that right?

15   A    Yes.

16   Q    At some point did you hear about anything unusual going on?

17   A    Yes.  You could hear the radio traffic about the crowd

18   making their way into the building.

19   Q    So upon hearing that, what did you do first?

20   A    I got with my lieutenant and also the Sergeant at Arms'

21   office, and they were speaking about what we should do if the

22   crowd should get into the chamber area.

23   Q    As a result of that conversation, then, what did you and

24   your officers do?

25   A    We started to barricade the lobby doors on both sides of

1  the Speaker Lobby, and also, the House Main Door was also

2  barricaded from the inside using furniture that was in the

3  area.

4  Q   While you and these officers were barricading those three

5  doorways, did you see any rioters?

6  A   No.

7  Q   So let's look again at Exhibit 18, and if you could mark

8  the areas where you set up the furniture barricades.

9  A   So the furniture barricade was set up inside the House Main

10  Door here, the Speaker's Lobby east here, and also the

11  Speaker's Lobby west.

12  Q   Thank you.  What exactly is a Speaker's Lobby?

13  A   It is an area where members of Congress can go during

14  votes.  There is a — if you can see right here, this is

15  basically a hallway through here, but in this area right here

16  they have a lot of chairs.  And it is couches, and it is a

17  lounge area for members of Congress between each vote.

18  Q   Is that the area from which you pulled furniture to

19  barricade?

20  A   That is correct.

21      MS. CHO:  Let's clear the markings and go to Video

22  Exhibit 36 again.

23      (The video was played for the Court.)

24  BY MS. CHO:

25  Q   Is it fair to say, Sgt. McKenna, that you and your officers

1    barricaded this particular door before this crowd had appeared?

2    A    Yes.

3    Q    Okay.

4         MS. CHO:  Let's keep going.

5         (The video was played for the Court.)

6    BY MS. CHO:

7    Q    Do you see Mr. Grider here, Sergeant?

8    A    Yes.

9    Q    And did you see officers stationed in front of that inner

10   House Main Door?

11   A    Yes.

12   Q    As we continue on with the video, I want you to listen

13   carefully and take note if you hear any indications from the

14   crowd regarding their intentions about the door, and I will ask

15   you about that the next time I hit pause on the video.

16        MS. CHO:  Let's keep going.

17        (The video was played for the Court.)

18   BY MS. CHO:

19   Q    Sergeant, do you see an officer stationed here at a little

20   after 1:26?

21   A    Yes.

22   Q    What does he appear to be doing?

23   A    They have formed -- the two officers that are there formed

24   a police line, trying to block the crowd from heading down that

25   hallway.

1  Q   What would happen if the crowd headed down the hallway that

2  he is standing in front of?

3  A   At the end of the hallway, you can make a left and go down,

4  and the Republican Door is there to the House Floor.  And then,

5  also the west side of the lobby is a little further down.

6  Q   Okay.  Thank you.

7          MS. CHO:  Let's keep going.

8      (The video was played for the Court.)

9  BY MS. CHO:

10 Q   Did you hear anyone yelling, "Let us in," Sergeant?

11 A   Yes.

12 Q   Did you hear any other indications about the crowd's desire

13 regarding the door?

14 A   I did hear somebody just talk about a crowbar.

15         MS. CHO:  Let's keep going.

16     (The video was played for the Court.)

17 BY MS. CHO:

18 Q   Sergeant, did you hear anyone yelling "Push"?

19 A   Yes.

20         MS. CHO:  Let's keep going.

21     (The video was played for the Court.)

22 BY MS. CHO:

23 Q   Sergeant, did you hear someone yell, "Use your helmet"?

24 A   Yes.

25 Q   Did you hear someone yell, "Use your Kevlar"?

1  A   Yes.

2  Q   Do you see the man that we have been calling Mr. Grider —

3            THE COURT:  You are talking off the —

4            MS. CHO:  I am sorry, Your Honor.  Let, let's keep

5  going just a few seconds.

6       (The video was played for the Court.)

7  BY MS. CHO:

8  Q   Sergeant, do you see Mr. Grider in this frame?

9  A   No.  I do not.

10 Q   Do you see on the far left corner there is a red hat, a

11 surgical mask, and a yellow scarf?

12 A   Yes.

13           MS. CHO:  Let's keep going.

14      (The video was played for the Court.)

15 BY MS. CHO:

16 Q   What is the crowd chanting at this point, Sergeant?

17 A   "Stop the Steal."

18           MS. CHO:  Let's keep going.

19      (The video was played for the Court.)

20 BY MS. CHO:

21 Q   What did somebody just yell, Sergeant?

22 A   Something about Kevlar.

23 Q   Did you hear, "Knock the windows out with Kevlar"?

24 A   I did not.  I just heard Kevlar.

25           MS. CHO:  Let's go back.

1            THE COURT:  You need, you need to speak more into the

2    microphone so that we can actually hear what the answers are.

3        (The video was played for the Court.)

4    BY MS. CHO:

5    Q   Did you hear someone yell, "Knock the windows out with

6    Kevlar"?

7    A   Yes.

8            MS. CHO:  Let's keep going.

9        (The video was played for the Court.)

10   BY MS. CHO:

11   Q   Sergeant, do you see Mr. Grider here?

12   A   Yes.

13   Q   What does he appear to be doing?

14   A   Looks like he is trying to pass a helmet.

15           MS. CHO:  Let's keep going.

16       (The video was played for the Court.)

17   BY MS. CHO:

18   Q   So we paused at 4:36, Sergeant.  Do you still see Mr.

19   Grider in roughly the same spot that we last spotted him in?

20   A   Yes.

21   Q   Is he within the same crowd?

22   A   Yes.

23           MS. CHO:  Let's keep going.

24       (The video was played for the Court.)

25   BY MS. CHO:

1    Q    Do you hear rioters yelling, "Make a path," Sergeant?

2    A    Yes.

3              MS. CHO:  Let's keep going.

4         (The video was played for the Court.)

5    BY MS. CHO:

6    Q    Did you hear Mr. Grider yell, "The cops are leaving, the

7    cops are leaving"?

8    A    Yes.

9    Q    Does it appear to you that any cops are leaving?

10   A    I don't see any at this point.

11             MS. CHO:  Let's keep going.

12        (The video was played for the Court.)

13   BY MS. CHO:

14   Q    Did you hear somebody ask, "They are giving us the

15   building"?

16   A    Yes.

17   Q    Did you see Mr. Grider nod his head?

18   A    I did.

19   Q    Do you see any cops appear to be giving the rioters the

20   building?

21   A    No.

22             MS. CHO:  Let's keep going.

23        (The video was played for the Court.)

24             MS. CHO:  We are paused at 5:18.

25   BY MS. CHO:

1   Q   What is the crowd yelling at this point?

2   A   "Break it down."

3   Q   Did you see Mr. Grider appearing to leave his spot by the

4   door?

5   A   Yes.

6        MS. CHO:  So let's keep going.

7        (The video was played for the Court.)

8   BY MS. CHO:

9   Q   So Sergeant, by the end of this video exhibit at 36, where

10  do the rioters appear to be going?

11  A   They were heading around towards the East Lobby.

12  Q   So if we could pull up the map, Exhibit 18.  I believe,

13  Sergeant, you testified earlier that the rioters were at the

14  House Main Door, which isn't located on this map.  If you could

15  mark on the map which direction they were just headed by the

16  end of that video.

17  A   (Indicating.)

18  Q   Thank you.

19       MS. CHO:  And let the record reflect that he has made

20  a downward pointing arrow from the House Main Door.

21  BY MS. CHO:

22  Q   You also testified earlier about that one shorter officer

23  who had been standing off to the side.  Can you mark the area

24  that he was guarding on this map?

25  A   He was in this area right here (indicating).

1   Q   So is that just above the House Main Door on this map?

2   A   Yes.

3   Q   Okay.

4          MS. CHO:  Now, let's take that down and remove the

5   markings.  Let's take a look at Video Exhibit 37.

6          (The video was played for the Court.)

7          MS. CHO:  So if we could hit pause.

8   BY MS. CHO:

9   Q   Sergeant, we are looking at a different video this time.

10  Where are we here?

11  A   That is the hallway where I just drew the arrow.

12  Q   So toward the back where the crowd is, where is that?

13  A   That is the House Main Door.

14  Q   And closer to the front of the frame, where is that?

15  A   You mean closer to the front of the frame, meaning where

16  that woman is standing?

17  Q   Yes.

18  A   That is the hallway that heads towards the Democrat Door,

19  and then if you go on from there, you will be at the East Lobby

20  Door.

21  Q   And could you note the time for us?

22  A   2:41:06.

23          MS. CHO:  Let's keep going.

24          (The video was played for the Court.)

25          MS. CHO:  And let's hit pause.

1   BY MS. CHO:

2   Q    Did you see Mr. Grider, Sergeant?

3   A    Yes.

4   Q    Was he running?

5   A    Yes.

6          MS. CHO:  Let's keep going.

7      (The video was played for the Court.)

8   BY MS. CHO:

9   Q    And Sergeant, does it appear that the majority of the crowd

10  is now following suit?

11  A    Yes.

12     (The video was played for the Court.)

13         MS. CHO:  Now, let's pull up Video Exhibit 42.

14     (The video was played for the Court.)

15         MS. CHO:  We pause at 13 seconds.

16  BY MS. CHO:

17  Q    Sergeant, could you orient us once again.  Where are we

18  here?

19  A    This is the entrance to the Speaker's Lobby on the east

20  side of the building.

21  Q    So in the beginning of this video, did we follow the path

22  that we just saw taken in the last exhibit?

23  A    That is correct.

24         THE COURT:  Excuse me a minute.  Do you have a mask

25  on?

1          A VOICE:  I apologize.

2          THE COURT:  You have got to put one on.  We can hand

3    them out.  Go ahead.

4    BY MS. CHO:

5    Q    Sergeant, so does this appear to be a group of rioters that

6    have rounded that corner that we saw on the last set of videos?

7    A    Yes.

8    Q    Do you see Mr. Grider pictured here at 13 seconds?

9    A    Yes.

10   Q    Do you also see police officers in this frame?

11   A    Yes.

12   Q    Can you note whether they are Capitol Police or not?

13   A    The one on the right-hand side appears to be Capitol Police

14   because I can see his jacket.  The other two I cannot see at

15   this time.

16         MS. CHO:  Let's keep going.

17         (The video was played for the Court.)

18         MS. CHO:  So we paused at 25 seconds.

19   BY MS. CHO:

20   Q    I know it is hard to see, but does it look like there are

21   people at the other end of the hallway behind the door?

22   A    Yes.

23   Q    Just to orient us, what end of the Speaker's Lobby hallway

24   are those people at the other side located on?

25   A    On the west side.

1    Q    And where -- do you see Mr. Grider here on the screen?

2    A    Yes.

3    Q    What end of the Speaker's Lobby hallway is he located on?

4    A    East end.

5    Q    At this point do you see any cracks in the windows of this

6    door?

7    A    No.

8              MS. CHO:  Let's play until 32 seconds.

9         (The video was played for the Court.)

10             MS. CHO:  We can take that down for a moment.

11   BY MS. CHO:

12   Q    Now, Sergeant, I want to return again to your memory of the

13   day's events.  We left off talking about officers barricading

14   the doors; do you remember that?

15   A    Yes.

16   Q    And is the Speaker's Lobby Door one of those barricaded

17   doors?

18   A    Yes.

19   Q    After barricading the doors, what did you do that day?

20   A    I was going back and forth in between the Speaker's Lobby

21   and the, inside the chamber itself and just making sure my

22   officers were okay.

23   Q    At some point did you receive a command that prompted you

24   to begin evacuating members from inside the House Chamber?

25   A    Yes.

1    Q    What led up to that?

2    A    That was a, a decision that was made above my head.  It, it

3    comes from the, from the Sergeant at Arms' office.

4    Q    Okay.  When you began evacuating members, how many members

5    would you estimate and staff were inside the House Chamber?

6    A    I don't think I could put a number on it.

7    Q    What about this.  How many floors are there within that

8    House Chamber?

9    A    How many what?

10   Q    Floors.

11   A    Floors?  Two.

12   Q    And were there —— so what floors of the building do those

13   include?

14   A    It would be the second and the third floor.

15   Q    Were there members and staff on the third floor when you

16   began evacuating?

17   A    Yes.

18   Q    Were there members and staff on the second floor when you

19   began evacuating?

20   A    Yes.

21   Q    What floor, if any, did you begin evacuating with?

22   A    The second floor.

23   Q    As you evacuated members from that second floor, what ——

24            MS. CHO:  Let's pull up Exhibit 18.

25   BY MS. CHO:

1    Q   What door did those members leave the chamber through?

2    A   We used the -- we used the west side right here, and they

3    exited down the staircase, which is right here (indicating).

4    Q   What was the demeanor of the members as you evacuated them?

5    A   Members were very frightened.  I did notice quite a few of

6    them looking down the hallway towards the east door and to look

7    at the rioters that were at that door.

8    Q   So let's back up there.  Did you see rioters at the east

9    end of the Speaker's Lobby hallway?

10   A   Yes.

11   Q   Was that the first time you had seen rioters that day?

12   A   Yes.

13   Q   And is it fair to say the frame we just left off on, on the

14   last exhibit, that was the door that you were looking through?

15   A   Yes.

16   Q   What else did you notice about that doorway and the rioters

17   you were seeing?

18   A   I am sorry?

19   Q   Did you hear any noise from the rioters?

20   A   Yeah.  There was lots of screams, lots of shouts.  I

21   couldn't -- I can't really remember what exactly was said.

22   Q   So if we look at Exhibit 18 that is still up here, you have

23   already noted with an X where members are being evacuated, and

24   that is at the top of the Speaker's Lobby.  Where were the

25   rioters located?

1    A   On the east side right here (indicating).

2    Q   At the time that you began evacuating members, did you see

3    any cracks in the windows, if you remember?

4    A   I don't remember in the beginning there being any cracks in

5    the windows.

6    Q   Do you remember how big the crowd was?

7    A   It progressively got bigger.

8    Q   Okay.  During the process of your evacuation of these

9    members, were you going in and out of the Speaker's Lobby and

10   the Chamber?

11   A   Yes.

12   Q   Do you remember how long the process — well, let me back

13   up a bit.  At some point did you hear a loud noise when you

14   were inside the House Chamber?

15   A   Yes.

16   Q   What did that loud noise sound like?

17   A   Gunshot.

18   Q   Is it possible it was also breaking glass?

19   A   Yes.

20           MR. MAYR:  Objection.  Calls for speculation.

21           THE COURT:  I will sustain it.

22   BY MS. CHO:

23   Q   Well, let me back up a little bit.  Before you began the

24   process of evacuating members, what was the atmosphere inside

25   the House Chamber?

1    A    Members were very frightened.

2    Q    Could you hear any unusual sounds while you were inside the

3    Chamber before you began the evacuation?

4    A    At the House Main Door there was a lot of banging.

5    Q    Did that prompt any action on the part of you or people

6    inside the House Chamber?

7    A    I believe the banging on the House Main Door is what pushed

8    the decision to get the members out of there.

9    Q    The House Main Door was the video we watched earlier where

10   the people were yelling, "Use your Kevlar" and "Use your

11   helmet"; is that correct?

12   A    Yes, yes.

13   Q    So once that prompted the decision to evacuate and you

14   began that evacuation, did you return outside to the Speaker's

15   Lobby Door at any point to see your lieutenant?

16   A    Yes.  When I moved outside from the House Floor into the

17   Speaker's Lobby, I saw my lieutenant standing within cover, and

18   if I may, in this area right here (indicating) I also saw

19   Officer Tyson in an area cover -- I can't really remember, but

20   he was either here or here (indicating).  And I came out of

21   this door and took an area, took cover in this area right here

22   (indicating).

23   Q    Okay.

24          MS. CHO:  So let the record reflect that you have

25   marked that the lieutenant was closest to the Speaker's Lobby

1    Door to the south — to the —

2         THE WITNESS:  East.

3         MS. CHO:  — east side, thank you.  And that you were

4    to the west side.

5         Now, let's take a look at Video Exhibit 40, and clear

6    those markings.

7      (Complied.)

8      (The video was played for the Court.)

9    BY MS. CHO:

10   Q   So we paused at 39 seconds, and we are at the Speaker's

11   Lobby Door; is that right, Sergeant?

12   A   Yes.

13   Q   And at this point, are there cracks in the window?

14   A   Yes.

15   Q   So does this video appear to be at a different time than

16   the video we just watched?

17   A   Yes.

18   Q   Do you see Mr. Grider pictured here?

19   A   I do.

20        MS. CHO:  Let's keep going.

21      (The video was played for the Court.)

22        MS. CHO:  So we are pausing here at 1:02.  Do you see

23   the same rioter with the same black fur-trimmed hat that we saw

24   earlier?

25   A   Yes.

1   Q    Over the course — do you also see Mr. Grider?

2   A    Yes.

3   Q    Over the course of the next 20 seconds or so, I will ask

4   you to observe Mr. Grider carefully, and when I pause again, I

5   am going to ask you what he has done.

6              MS. CHO:  Let's keep going.

7         (The video was played for the Court.)

8              MS. CHO:  We have paused at 1:21.

9   BY MS. CHO:

10  Q    Did you see Mr. Grider tap the helmet?

11  A    Yes.

12  Q    Did you see him hand the helmet over to the rioter with the

13  black fur-trimmed hat?

14  A    Yes.

15             MS. CHO:  Let's keep going.

16        (The video was played for the Court.)

17             MS. CHO:  We have paused at two minutes.

18  BY MS. CHO:

19  Q    Sergeant, do you see a gun in this frame?

20  A    Yes.

21  Q    Did you hear rioters yelling something about a gun?

22  A    Yes.

23  Q    Do you also see yourself in this frame?

24  A    Yes.  I just walked out of the House Floor.

25  Q    Could you circle yourself?

1  A   (Indicating.)

2  Q   So you circled yourself back towards the end of the

3  hallway, and you were testifying earlier, this is when you came

4  out of the House Chamber?

5  A   Yes.

6  Q   Now, the gun, did you see that gun when you came out of the

7  House Chamber that day?

8  A   I did.

9  Q   Who was holding it?

10  A   Lieutenant Bird.

11  Q   So you already talked about when you were evacuating

12  members and what you saw down the hallway.  What did you see

13  with the rioters this time when you came out into the Speaker's

14  Lobby?

15  A   I saw they had most of the windows were busted out of the

16  door.  One of the windows actually fell out of the door at that

17  time.

18  Q   What did you see next?

19  A   I saw one of the rioters, a female rioter being helped up

20  through the window where the glass had fallen out.

21  Q   At this point, were there still members and staff inside

22  the House Chamber?

23  A   Yes.

24  Q   Where, within the chamber, if you remember?

25  A   We had -- most of the members were still up on the third

1    floor in the galleries.  We had a few members, I believe it was

2    either two or three, that stayed on the House Floor.

3    Q    When you came out, what did you do?

4    A    I pulled out my weapon and took a position of cover.

5    Q    Why did you pull out your weapon?

6    A    Because it appeared that the rioters were about ready to

7    enter the floor, and I was tasked with protecting members of

8    Congress.  And I knew that the only way to do that would be

9    that we would have to use deadly force.

10   Q    What was running through your mind as you saw that crowd?

11   A    I was scared, nervous, a whole slew of emotions.

12   Q    Did you fear for the safety of the officers in front of

13   you?

14   A    I did.

15   Q    Did you fear for your own safety?

16   A    Yes.

17   Q    Did you fear for the safety of the members and staff of the

18   Chamber behind you?

19   A    Yes.

20   Q    What happened to the woman who climbed through the window?

21   A    She was shot and killed.

22   Q    And what happened after she was shot and —

23   A    You could see in the crowd that they did not expect, I

24   guess, because of all, they had come so far, and no one had

25   used any weapons yet.  That, that was not going to happen.  So

1  it — you could see the shock on their faces and the, some of

2  them even held their hands up and stepped back like they were

3  done at this point.

4  Q   Were you able to see whether that woman received any

5  assistance?

6  A   Yes.  She received assistance.  Right away there was a

7  Sergeant at Arms person right, right there at, at the stairs

8  who helped provide aid.  And also, our CERT team was at the

9  bottom of the stairs.  They came up immediately and saw to

10  render aid to her.

11  Q   What is a CERT team?

12  A   It is our SWAT team, our Special Tactics, Weapons and

13  Tactics Team.

14  Q   What did you do after the shooting?

15  A   We made sure that all the officers were okay.  Lieutenant

16  Bird was distraught by what he had to do.  We tried to talk to

17  him and get him.  I also at that time, if I can remember

18  correctly, I left that area and walked.  If I can circle, I

19  went through this doorway here (indicating) and went around the

20  hall.  There is a west grand staircase where other CERT teams

21  or other agencies had started to gather up the crowd and move

22  them down the stairs, and I helped guide the rest of the

23  rioters down the stairs towards the exit.

24  Q   Just to be clear, when you exited the other end of the

25  Speaker's Lobby Door, were there rioters when you got through

1  that door?

2  A    Through the west side?

3  Q    Yes.

4  A    Yes.  Once I got to the grand staircase, but they were in

5  custody.

6  Q    And then, what did you do in relation to those rioters?

7  A    We were, we were having them move down the stairs towards

8  the first floor so we could get them out of the building.

9  Q    How else did the rest of your day proceed at that point?

10  A    We rounded up, once everything was clear, we got the rest

11  of the members out -- off the House Floor.  Lieutenant Bird

12  took the rest of the unit that was left.  We walked through the

13  Rayburn subway over to the Rayburn Building where we have

14  awaited our, our investigation team because of the shooting.

15  We knew that we would be questioned and investigated about the

16  shooting.

17  Q    And why did you know that to be the case?

18  A    That is just standard procedure.

19  Q    Standard procedure for who?

20  A    For police officers in a shooting.

21  Q    Okay.  What time were you able to eventually go home that

22  day?

23  A    I believe it was late, maybe 11:00, 12:00 o'clock,

24  somewhere in there.

25  Q    On that day, did you observe other officers being impeded

1    in their ability to protect the Capitol?

2    A    Yes.

3    Q    Were you impeded in your ability to protect the Capitol?

4    A    I don't know if impeded is the right word.  I am not sure

5    how to describe it, but we definitely could not move on with,

6    with what Congress wanted to move on with.

7              MS. CHO:  Just a moment, Your Honor.

8              THE COURT:  Uh-huh.

9              MS. CHO:  No further questions, Your Honor.

10             THE COURT:  All right.

11             It is 12:35.  My suggestion would be to simply break

12   for lunch and come back.  That will give the court reporter a

13   break.  So we come back in an hour, 1:40, and we will pick up

14   the testimony.  And I will just simply ask that you not discuss

15   your testimony during the lunch break.

16             THE WITNESS:  Yes, ma'am.

17                         (Witness excused.)

18             THE COURT:  Okay.  Parties are excused.  See you back.

19             (Lunch recess, 12:36 p.m. - 1:46 p.m.)

20                         AFTER RECESS

21                     **AFTERNOON SESSION**

22             THE COURT:  Good afternoon, everyone.  If we could get

23   the witness to return.  Sir?

24             All right.  We are ready for cross-examination.

25             MR. MAYR:  May I proceed, Your Honor?

1        THE COURT:  Yes.  Go ahead.

2        MR. MAYR:  Thank you very much.

3                    **CROSS-EXAMINATION**

4    BY MR. MAYR:

5    Q   Good afternoon, Sergeant.

6    A   Good afternoon, sir.

7    Q   I would like to go back and talk with you about some of the

8    exhibits that you went over with the Government, specifically

9    some of the videos just to ask you a little bit more about the

10   context and what you see and observe.  For the record, I would

11   like to start by looking at what was previously admitted as

12   Government's Exhibit No. 30.

13        (The video was played for the Court.)

14   BY MR. MAYR:

15   Q   If you recall right here at the very beginning, you

16   testified that this area that is depicted here is in front of

17   the scaffolding along with north side of, of this big staging

18   area that we are looking at right here; is that correct?

19   A   Well, we are looking at the center, actually, of that area,

20   the — there is a fountain in this area right here

21   (indicating).  That is basically the center of the west front.

22   Q   Sure.

23   A   This staircase to your left, that they were going up, is on

24   the west — or on the north side of the Capitol.

25   Q   Got it.  Okay.  Now, I would like to point out something

1    about this particular video.  Obviously, we see here below ––

2              THE COURT:  You need to speak into the microphone.

3              MR. MAYR:  Yes.

4    BY MR. MAYR:

5    Q   We see here below hundreds of people standing in front of

6    what appears to be another line of officers that are in that

7    main area; is that right?

8    A   Looks that way, yes.

9    Q   Okay.  Now, this particular video that is being produced,

10   if you would, would you –– this may be stating the obvious, but

11   would you agree that it appears whoever is making this

12   recording is shooting it from a high angle like this, Sergeant,

13   if you look up here (indicating)?

14   A   Yes.

15   Q   As opposed to something like down here, right?

16   A   Yes.

17   Q   And so, it is safe to say that for a person who is standing

18   down here in the crowd, they do not have the same point of view

19   as this video depicted unless this person was seven and a half

20   feet tall, right?

21   A   Yes.

22   Q   All right.  Now, I am going to go ahead and start playing

23   at the 5-second mark.

24       (The video was played for the Court.)

25   BY MR. MAYR:

1   Q   This is the first point where we see ––

2       (The video was played for the Court.)

3           MR. MAYR:  Back that up.

4   BY MR. MAYR:

5   Q   So right here at this 15-second mark is the first time that

6   we see Mr. Grider, correct ––

7   A   Yes.

8   Q   –– in this video?  And he is standing next to this

9   individual who has got something attached to him that has ––

10  almost looks like antenna or something like that going up from

11  his back and they are connected; do you see this right here

12  (indicating)?

13  A   I do see something there, yes.

14  Q   I am going to go ahead and continue playing at the

15  15-second mark.

16      (The video was played for the Court.)

17          MR. MAYR:  Let me back up and do this.

18  BY MR. MAYR:

19  Q   Now, can you –– you were also able to see that Mr. Grider

20  is holding his cell phone and appears to be, appears to be

21  recording or using the camera function on his phone; would you

22  agree with that here (indicating)?

23  A   Yes.

24      (The video was played for the Court.)

25          MR. MAYR:  I will stop here at the 27 mark.

BY MR. MAYR:

Q   We see the video is now depicting this younger male, and he has got a water bottle in his hand.  He is wearing a red flannel jacket, correct?

A   Yes.

    (The video was played for the Court.)

BY MR. MAYR:

Q   Now, what I would like to do right here at the 35-second mark, now we are actually looking up at the line where your officers are guarding the stairs that go up underneath the scaffolding, correct?

A   Yes.

Q   From where this video is at, there appears to be a good number of people in front of where this camera is at; is that also fair to say?

A   Yes.

        MR. MAYR:  Now, I would like to stop with Government's Exhibit 30, and I would like to jump over and publish Government's Exhibit 59, which has been previously admitted.

    (The video was played for the Court.)

BY MR. MAYR:

Q   Okay.  Do you recognize this video?  I am sorry, do you recognize this video, or have you reviewed this video prior to testifying?

A   I don't know if I could tell you yes or no since I have

1    seen so many videos.

2    Q   Understood.

3              THE COURT:  Can you show a little more?  I mean, you

4    have just stopped at one point, and you went very, very quickly

5    across the beginning of it.

6              MR. MAYR:  I will go back to the beginning and let you

7    take a look.

8    BY MR. MAYR:

9    Q   First of all, right here at the very beginning, this

10   appears to be that same area that is depicted in Government's

11   Exhibit No. 30 that we were just looking at, correct?

12   A   Yes.

13   Q   I am going to let it — play it from the beginning and let

14   it go for a little bit.

15      (The video was played for the Court.)

16              MR. MAYR:  Now, I am going to pause it right there at

17   the 52-second mark of Government's Exhibit No. 59.

18   BY MR. MAYR:

19   Q   And that is that same young man with the water bottle

20   wearing the red flannel jacket, correct?

21   A   Yes, sir.

22   Q   In this entire 50 seconds, we hear some, some people

23   shouting, "Put their guns down," correct?

24   A   Yes.

25   Q   Watching this video, you're unable to say that it, it was

1  this person or this person, it, it is coming from somewhere;

2  would you agree with that?

3  A   Yes.

4        THE COURT:  Are you talking about the statement?

5        MR. MAYR:  The statements, yes.

6        THE COURT:  Okay.

7        MR. MAYR:  Okay.

8  BY MR. MAYR:

9  Q   We see this young man.  This is who we had previously seen

10  in Government's Exhibit 30, correct?

11  A   Yes.

12  Q   All right.  Now, this is —— you don't know, you're not

13  aware that this is the video that Mr. Grider was actually

14  recording and publishing to Facebook, do you?

15  A   No.

16  Q   Okay.  But would you agree that this video is being taken

17  in the vicinity of where we had seen Mr. Grider in Government's

18  Exhibit 30 holding his phone up as if he was recording?

19  A   Yes.  It is in the same general area.

20  Q   I am going to let it continue publishing at the 53-second

21  mark of Government's Exhibit 59.

22      (The video was played for the Court.)

23        MR. MAYR:  I am going to stop at the 1:47 mark.

24  BY MR. MAYR:

25  Q   What we —— what you hear is someone say, "I am going to

1  slide over," and you see it appears that they are moving over

2  towards, away from that scaffolding that we were looking at

3  previously.  And they are moving over towards the center —

4  A   Yes.

5  Q   — is that what appears to be taking place here?

6  A   Yes.

7       MR. MAYR:  I will continue at the 1:47 mark,

8  publishing Government's 59.

9       (The video was played for the Court.)

10      MR. MAYR:  We are now approximately two and a half

11 minutes into this video.

12 BY MR. MAYR:

13 Q   And other than some shouting, we have not seen any pushing

14 or any other acts of violence by this point; would you agree

15 with that?

16 A   Yes.

17 Q   All right.

18      MR. MAYR:  Skipping ahead to just the 4-minute mark,

19 publishing Government's Exhibit 59.

20      (The video was played for the Court.)

21 BY MR. MAYR:

22 Q   These are, these are part of the Capitol — these are

23 Capitol Police officers up here on the terrace; is that

24 correct?

25 A   Yes.

1    Q   But the individual who is recording this is, is standing

2    there just doing that.  They are not going up to any officers

3    or appear to be confronting any officers; would you agree with

4    that?

5    A   From the video?  Yes.

6             THE COURT:  You need to speak up a little bit more.

7             THE WITNESS:  From the video, yes.

8             THE COURT:  Thank you.

9        (The video was played for the Court.)

10            MR. MAYR:  We are going to go to 6:10 mark and just

11   run it to the end of this video.

12       (The video was played for the Court.)

13            MR. MAYR:  The video ends right there at that mark.

14   Now, I am going to go back to Government's Exhibit 30.

15       (The video was played for the Court.)

16   BY MR. MAYR:

17   Q   Okay.  At the 40-second mark, this is where we begin to

18   see, as you describe it, your words were, "The crowd pushed

19   past the police line."  That is what you recall seeing at this

20   point in the video, correct?

21   A   Yes.

22   Q   Now, when you say that you saw the crowd push past the

23   police line, does this person right here in this blue helmet

24   that I am circling right here that has this American flag, do

25   you recall seeing him actually pushing forward on the people

1  moving forward?

2  A   No.

3  Q   What about this gentleman with the red and the white hat,

4  do you remember seeing him push anyone forward?

5  A   No.

6  Q   Are you able to, from watching this video, identify whether

7  everyone is using some positive force against these officers or

8  not?

9  A   I am sorry, can you rephrase the question?

10 Q   Are you able to say that everyone that is depicted here at

11 the 40-second mark, right before the line — the crowd pushes

12 past the police line, are you able to say that all of them are

13 exerting or using positive force?

14 A   No.  I cannot say that.

15 Q   All right.

16     (The video was played for the Court.)

17 BY MR. MAYR:

18 Q   Now, we see, like, this individual right here at the

19 44-second mark, we see him holding his video up above his head,

20 and you can actually see on his screen what he is recording,

21 correct?

22 A   No.  I cannot see what he is recording.

23 Q   Let me do this.  How about this other gentleman right here

24 in this black hat, are you able to see that (indicating)?

25 A   I can see something on his screen, but I can't say what

1    that is.

2    Q   Let me see if this will help.  Looking at it zoomed in like

3    that, are you able to see that he is recording this very area

4    that is above him?

5    A   I couldn't say for sure.

6    Q   Okay.  Fair enough.  But you would agree with me that

7    someone who is video recording, it is almost like a periscope,

8    right?  They are able to see ahead of them by looking up at

9    what is depicted on their screen, right?

10   A   Yes.

11   Q   As opposed to, as opposed to someone who is not up here but

12   is down amongst the crowd, there is people that are in front of

13   them that are, that are presumably blocking the view of what is

14   ahead of them, right?

15   A   Yes.

16   Q   And so certainly, you can't say anything or offer an

17   opinion as to what this person or this person behind them is

18   able to see in front of them, correct?

19   A   Correct.

20         MR. MAYR:  Continuing at the 44-second mark.

21      (The video was played for the Court.)

22         MR. MAYR:  I am going to stop here right at the 1:00

23   mark in this video.

24   BY MR. MAYR:

25   Q   At the 1:00 mark in the video, we can see that a number of

1    individuals are already up this first flight of stairs leading

2    to this first landing up here; is that right?

3    A    Yes.

4    Q    And it is at this point, continuing to go frame by frame.

5         (The video was played for the Court.)

6    BY MR. MAYR:

7    Q    First of all, here is that gentleman that we saw earlier

8    with the antenna-looking thing attached to his back, correct?

9    A    Correct.

10        MR. MAYR:  And then, continuing on at the 1:00 mark.

11        (The video was played for the Court.)

12   BY MR. MAYR:

13   Q    That is the first time that we see Mr. Grider, correct?

14   A    The first time?

15   Q    In this particular video.

16   A    In this particular video?  Yes.

17        MR. MAYR:  Now, I am going to go through this slowly

18   again.

19   BY MR. MAYR:

20   Q    Now, at this point, you cannot tell what Mr. Grider is

21   actually doing and where his attention is focused; is that fair

22   to say?

23   A    Yes.

24   Q    All right.

25        MR. MAYR:  Continuing on.

1    (The video was played for the Court.)

2         MR. MAYR:  As we continue on looking at Government's

3    30, I am going to move up to the 4:00 mark.

4         (The video was played for the Court.)

5    BY MR. MAYR:

6    Q   And then, at 4:12, when we are looking at the Senate Wing

7    Door, we see Mr. Grider entering, correct?

8    A   Yes.

9    Q   And for the record, I am going to state the obvious.  He is

10   one of hundreds of people that are pouring through that door,

11   correct?

12   A   Correct.

13        MR. MAYR:  I am going to continue playing from 4:24 on

14   Government's 30.

15        (The video was played for the Court.)

16   BY MR. MAYR:

17   Q   You see Mr. Grider looking around and actually moving back

18   towards the door; is that correct?

19   A   Yes.

20        MR. MAYR:  Now, I am going to jump forward on

21   Government's 30, up to the video from the Crypt at 6:45.

22        (The video was played for the Court.)

23   BY MR. MAYR:

24   Q   Again, just remind the Court what we have here is, there is

25   two security camera views of the Crypt.  Beginning here at

1  approximately six minutes, we have a camera view from behind

2  where the group is congregated, correct?

3  A   Yes.

4  Q   The — if we continue playing forward to about the 6:30

5  mark, this is a video camera that is on the opposite side of

6  the Crypt; is that right?

7  A   Correct.

8         MR. MAYR:  Now, if we go up to the 6:45 mark — well,

9  let me back up first.  Let's talk about this.

10  BY MR. MAYR:

11  Q   At some point you said that there — there is a line of

12  officers that are, that are holding these people at bay in the

13  Crypt, correct?

14  A   Yes.

15  Q   You testified, however, that there was not enough officers,

16  in your opinion?

17  A   I was — I was actually concentrating on the officers that

18  were behind here.  I didn't really notice the officers in the

19  front on the line there until I saw them all get pushed back.

20  Q   Okay.  And I will get to that, those officers that are at

21  the front, which you obviously saw later?

22  A   Yes.

23  Q   When — publishing Government's 30 at 6:30 in, we can see

24  that over here to the right side, this is where the group of

25  individuals appear to be pushing officers back, correct?

1  A   Yes.

2  Q   Almost like a flank maneuver, because you can see that --

3  well, individuals are coming around from the right side of the

4  camera, there are still a number of individuals that are sort

5  of falling back from the left, right?

6  A   Correct.

7  Q   Okay.  Now, you had testified that you — the words that

8  you used was that the crowd pushed past the officers.  There

9  are hundreds, probably, almost close to a thousand people in

10 the Crypt by now; would you agree with that?

11 A   I couldn't tell you the exact numbers, but it is a lot.

12 Q   Now, when you say the crowd pushed through, are you able to

13 specify which of these individuals are doing the pushing?

14 A   No, sir.

15 Q   When you say the crowd pushed through, you are just sort of

16 talking about them collectively, right?

17 A   Generally, yes, sir.

18 Q   But if we continue watching on, especially down here —

19 well, down here at the bottom, none of these people who are

20 walking through appear to be pushing anyone, right?

21 A   Correct.

22 Q   All right.  Now, if we go back to the point where Mr.

23 Grider was at, he is certainly not right at the front where the

24 officers are backing away from the encroaching individuals,

25 right?

1   A   I agree.

2   Q   Okay.

3         MR. MAYR:  I am going to move forward now to the

4   9:45 — I am sorry.  Let's talk here for a second.

5   BY MR. MAYR:

6   Q   Beginning at the 7:29 mark on Government's 30, we now have

7   a view from down on the floor of the Crypt, correct?

8   A   Yes.

9         MR. MAYR:  I am going to publish that at 7:32.

10        (The video was played for the Court.)

11  BY MR. MAYR:

12  Q   Now, you hear people shouting, "Our house, our house,"

13  correct?

14  A   Yes.

15  Q   But obviously you are not able to tell from the video which

16  individual is shouting and which ones aren't, right?

17  A   Right.

18  Q   The same thing here at the 8:00 mark of the video, we see,

19  obviously, a very aggressive-looking individual who appears to

20  be saying something, correct?

21  A   Yes.

22  Q   We have another individual standing right next to him who

23  just appears to be standing there, and I will let it run for a

24  couple of seconds for you to observe.

25        (The video was played for the Court.)

1   BY MR. MAYR:

2   Q   You agree with that representation?

3   A   I agree.

4   Q   All right.

5       (The video was played for the Court.)

6   BY MR. MAYR:

7   Q   And obviously, you are able to see, too, the Capitol

8   officers that are standing there in front of them, preventing

9   them from going further into the Crypt, right?

10  A   Yes.

11          MR. MAYR:  I will stop here at the 8:35 mark.

12  BY MR. MAYR:

13  Q   Now, you have a very clear view of several Capitol officers

14  that are standing there, forming a line and holding the crowd

15  at bay, correct?

16  A   Correct.

17  Q   And these individuals, really, at this point, no one

18  appears to have any –– be making any physical contact with any

19  of the officers?

20  A   At this point, yes.

21  Q   Okay.  And they are, essentially, holding the line while

22  the –– all these individuals over here, the crowd that has

23  accumulated are sort of just sitting –– they are standing there

24  and not making any forward progress or trying to push through,

25  correct?

1   A   Yes.

2        (The video was played for the Court.)

3   BY MR. MAYR:

4   Q   It is at this point at 9:15 that the person who was making

5   this video is, is right up at the front of that line, and we

6   see that this is where it starts to break and the crowd makes

7   it past the line of officers, correct?

8   A   Correct.

9        (The video was played for the Court.)

10        MR. MAYR:  Continuing on for that nine —— continuing

11   on at the 9:21 mark.

12   BY MR. MAYR:

13   Q   We see Mr. Grider, but there is also several individuals in

14   front of him; is that correct?

15   A   Yes.

16   Q   Now, looking at this video, are you able to tell whether

17   Mr. Grider is using any physical force to push the people ahead

18   of him?

19   A   No.

20        (The video was played for the Court.)

21        MR. MAYR:  All right.  I am going to stop it at the

22   9:50 on Exhibit 30.

23   BY MR. MAYR:

24   Q   Do you know who this Capitol officer is right here?

25   A   I do.

1    Q    Who is it?

2    A    Sgt. Cereesa.

3    Q    Sergeant — could you spell his name, if you know how to

4    spell it?

5    A    I couldn't.

6    Q    That is okay.  We will get that to the court reporter

7    afterwards.  Sgt. Cereesa.  Did you have an opportunity to talk

8    with him about his experience in the Crypt?

9    A    No.

10   Q    All right.  But here, we see Mr. Grider is almost face to

11   face with Sgt. Cereesa, right?

12   A    Yes.

13        (The video was played for the Court.)

14   BY MR. MAYR:

15   Q    Obviously, he looks distressed, but you see Mr. Grider's

16   interactions with him, correct?

17   A    I can't tell if they are interacting or not.

18        MR. MAYR:  Let's look at what the video depicts,

19   beginning at the 9:49 mark.

20        (The video was played for the Court.)

21   BY MR. MAYR:

22   Q    Mr. Grider doesn't appear to be in Sgt. Cereesa's face,

23   confronting him or yelling at him?

24   A    No.

25   Q    Okay.  He obviously doesn't appear to be using any sort

1  of — isn't trying to strike at him or push him or anything

2  else like that?

3  A   No.

4  Q   Once the crowd gets through the Crypt, going, let's see,

5  okay.  At the 10:11 mark of Government's 30, that is when we

6  now see the crowd entering the House Wing.  Still on the first

7  floor, correct?

8  A   Yes.

9  Q   All right.

10      (The video was played for the Court.)

11  BY MR. MAYR:

12  Q   At the 10:33 mark is where we first see Mr. Grider walking

13  through here, correct?

14  A   Yes.

15  Q   He appears to be holding his camera in his hand right

16  there, right?

17  A   Yes.

18  Q   And whatever he is looking at there, he is looking at it

19  for more than just a few seconds?

20  A   There is a tourist display there.  So there is some writing

21  and things like that that he could be reading, yes.

22  Q   You don't know what it was, though, right?

23  A   I don't know, no.

24  Q   At the 11:25 mark, we then go to the Statuary Hall video

25  with Mr. Grider walking through there between the velvet ropes,

1    right?

2    A    Yes.

3    Q    You agree it is ironic that this crowd of individuals that

4    had been — pushed their way through the Crypt is here walking

5    through Statuary Hall within velvet ropes, right?

6    A    It is an interesting video, yes.

7    Q    There is — we see a cameraman over here setting up some

8    equipment.  You see that over here to the right-hand side?

9    A    Yes.

10   Q    Do you know what the purpose of that was or who that was?

11   A    I don't know who that was.  I think the purpose was the

12   direction that they are walking from is where the Senators

13   would walk in order to come onto the House Floor for the vote.

14   Q    Safe to say that this person here is probably some member

15   of the staff or the media that is authorized to be there and

16   record; is that right?

17   A    Yes, yes.

18   Q    All right.  But there is no dispute here at this point that

19   Mr. Grider and all these other individuals have no permission

20   to be inside —

21   A    That is correct.

22   Q    — the Capitol Building?

23   A    That is correct.

24         THE COURT:  Let him finish his question before you

25   start to answer so you don't both have it at the same time.

1          THE WITNESS:  Yes, Your Honor.

2          MR. MAYR:  The video concludes at the 11:44 mark, and

3   now, I would like to change and publish Government's

4   Exhibit 32.

5       (The video was played for the Court.)

6   BY MR. MAYR:

7   Q   We are now — we passed through the Statuary Hall, and we

8   are now in this Statuary Hall Connector area where already a

9   large number of individuals have gathered with officers

10  standing up here, again, holding a line; is that right?

11  A   Yes.

12          MR. MAYR:  The video appears to start at the, at

13  2:32:37 in the p.m.

14      (The video was played for the Court.)

15  BY MR. MAYR:

16  Q   Mr. Grider walks in at the 15-second mark on the video, and

17  according to the time stamp, the 2:32:46 mark in the p.m.; is

18  that right?

19  A   Yes.

20      (The video was played for the Court.)

21  BY MR. MAYR:

22  Q   Now, from this vantage point we can see that Mr. Grider

23  is — I will let you give the approximation.  About how far

24  back would you say that he is from this line of officers that

25  are standing in this archway right here?

1   A   I couldn't give a measurement, but I would say he is about

2   halfway through the connector right now because the chandelier

3   is almost directly under him.

4   Q   And you're familiar with that hall, and so are we talking

5   about, about 6 feet, about 10 feet?  I am not looking for an

6   exact measurement but just a general estimation with your

7   familiarity of that entryway.

8   A   At 12 feet, maybe.

9   Q   Twelve feet?  Okay.

10          THE COURT:  So that is 12 feet from the police line,

11  you are indicating?

12          THE WITNESS:  Yes, from the area where we see these

13  police officers on the bottom, standing.

14          THE COURT:  I just wanted to make sure I understood.

15          THE WITNESS:  Yes, ma'am.

16  BY MR. MAYR:

17  Q   Okay.  All right.

18          MR. MAYR:  Now, let me stop at this moment right here,

19  and I would like to publish Government's Exhibit 34.

20          (The video was played for the Court.)

21  BY MR. MAYR:

22  Q   Now, just before we get into this video, the person

23  recording this, they are standing right at the front of the

24  line where the officers are at; is that correct?

25  A   By where the sergeant is right there, yes.

1    Q    All right.

2         (The video was played for the Court.)

3              MR. MAYR:  I would like to, in this particular Exhibit

4    No. 34, move up to the 4:00 mark.  Let me start at the 3:45

5    mark on the video.

6         (The video was played for the Court.)

7              MR. MAYR:  All right.  Let's stop there at the 4:07

8    mark.

9    BY MR. MAYR:

10   Q    We can see your fellow Capitol officers standing here, and

11   in front of them is this gentleman with what appears to be a

12   hoody on, and he is yelling at the crowd, trying to get their

13   attention, correct?

14   A    Yes.

15   Q    This isn't necessarily a bad thing for your officers to

16   have someone who is trying to gain control of the crowd; would

17   you agree with that?

18   A    Yes.

19   Q    They are certainly permitting him to do this to try to gain

20   control and try to calm the crowd down, right?

21             THE COURT:  Who is they?  Who is the "they" in your

22   question?

23             MR. MAYR:  The officers.  Thank you, Your Honor.

24   BY MR. MAYR:

25   Q    Your officers are permitting him to try to calm the crowd

1   down, right?

2   A    Yes.

3   Q    There is nothing impermissible or wrong about that.  That

4   is a good thing in trying to diffuse the situation?

5   A    Under those circumstances, yes.

6   Q    All right.

7        MR. MAYR:  Let's continue watching how this plays out.

8        (The video was played for the Court.)

9   BY MR. MAYR:

10  Q    He is talking about being able to calmly and quietly sit

11  down in this room, correct?

12  A    Yes.

13  Q    Now, I think it is probably safe to say, and we all

14  probably know this, that you, nor any officers, are going to

15  actually allow individuals into the Chambers; is that fair to

16  say?

17  A    That is correct.

18  Q    Okay.  But while you know that, what this individual is

19  conveying to the crowd is something different than that; would

20  you agree with that?

21  A    Yes.

22  Q    All right.

23       (The video was played for the Court.)

24       MR. MAYR:  If you will excuse me, Your Honor.  I have

25  got to skip forward to get —

1    THE COURT:  That is fine.

2    MR. MAYR:  I have to hear something to know exactly

3    where it is at.

4    THE COURT:  That is fine.  Take your time.

5    MR. MAYR:  Thank you, Your Honor.

6    (The video was played for the Court.)

7    BY MR. MAYR:

8    Q   Now, it is at this point right here where, as Ms. Cho had

9    pointed out, you can see Mr. Grider.  He is now in the center

10   of that room, correct?

11   A   Yes.

12   (The video was played for the Court.)

13   BY MR. MAYR:

14   Q   Earlier when we heard the crowd shouting "Stop the Steal,"

15   Mr. Grider had not entered this entry hallway; is that correct?

16   A   I don't recall.

17   Q   Okay.

18   (The video was played for the Court.)

19   MR. MAYR:  All right.  I am going to stop at the 5:44

20   mark on Exhibit 34.

21   BY MR. MAYR:

22   Q   We can see that one of the individuals that is part of the

23   group has a, a small megaphone, correct?

24   A   Yes.

25   Q   And is trying to continue talking with the crowd; is that

1    right?

2    A    Yes.

3            MR. MAYR:   I am going to continue publishing at the

4    5:44 mark.

5        (The video was played for the Court.)

6    BY MR. MAYR:

7    Q    "We can go into this room if we go in calmly and commit to

8    no violence," right?

9    A    You are asking me what he said?

10   Q    That is correct.

11   A    Yes.

12   Q    This gentleman, who is standing at the front of the line,

13   next to other Capitol Police officers, is giving these

14   instructions and commands to everyone that is in this –– in

15   this hallway; is that fair to say?

16   A    Trying to give direction?  Yes.

17   Q    All right.

18       (The video was played for the Court.)

19   BY MR. MAYR:

20   Q    It is right here at about the 7:18 mark when, as you

21   testified, they are pushing past the police line, correct?

22   A    Yes.

23   Q    But when you say they are, you cannot specify which one of

24   these individuals are the ones doing the pushing, correct?

25   A    Correct.

1  Q   It just seems like sort of a collective of individuals,

2  right?

3  A   Yes.

4  Q   And this is at the front of the line, whereas Mr. Grider is

5  approximately, in your estimation, about 12 feet back from us;

6  is that right?

7  A   Yes.

8  Q   And you know from seeing the videos that he has — that

9  there is about a hundred people that are in front of him,

10 correct?

11 A   Yes.

12 Q   And you, from looking at the video, you can't say

13 conclusively whether Mr. Grider is able to see what is

14 happening at the front of the line or not, correct?

15 A   Yes.

16 Q   Thank you.  Okay.

17        MR. MAYR:  Now, I would like to publish Government's

18 Exhibit 68 and ask you some questions about this.

19     (The video was played for the Court.)

20 BY MR. MAYR:

21 Q   Again, to set this up.  Now, in this particular video,

22 we — this is where we have moved from that hallway between the

23 Statuary Hall and the entrance to the House Chamber, and now we

24 are at the House Chamber Doors, correct?

25 A   Yes.

1        MR. MAYR:  Before we get into this exhibit, let me go

2   back to Government's 34, and actually —

3        (The video was played for the Court.)

4        MR. MAYR:  Let me go back to Government's Exhibit 32.

5   I apologize.  This is the actual closed-circuit television

6   recording of the hall where we see Mr. Grider walking in at the

7   2:32 mark.

8   BY MR. MAYR:

9   Q   Now, down here in the lower right-hand corner, at the

10  26-second mark, I am going to zoom in.  We see that same

11  gentleman who was trying to speak to the crowd, the gentleman

12  in the white hoody.  We see him right down over here; is that

13  correct?

14  A   Yes.

15       (The video was played for the Court.)

16  BY MR. MAYR:

17  Q   Now, again, to put this in a context with Government's 32,

18  we are now at the portion of the video, about a minute in,

19  where there is now a second video that has audio recording

20  taken by someone who is actually in that crowd, right?

21  A   Yes.

22  Q   All right.

23       (The video was played for the Court.)

24       MR. MAYR:  We are at the — I will go back to the 1:25

25  mark.

1    BY MR. MAYR:

2    Q   And I would like for you to pay attention to what is being

3    said and what other people in the crowd are doing.

4        (The video was played for the Court.)

5            MR. MAYR:  Stopping right there at the 2:00 mark.

6    BY MR. MAYR:

7    Q   You are able to hear that same gentleman with the

8    microphone talking about being able to go in as long as we

9    commit to not using violence, correct?

10   A   On this video, no.  I can't really hear it that well, but I

11   did on the other video.

12           MR. MAYR:  Let me, let me back it up and let you

13   listen one more time.

14       (The video was played for the Court.)

15   BY MR. MAYR:

16   Q   Right there at 2:23 mark, that is where we see Mr. Grider

17   waving people to come in, correct?

18   A   Yes.

19   Q   After, after the speaker grabbed everyone's attention,

20   quieted down, and talked about being able to go in if everyone

21   is calm and agrees not to use any violence, right?

22   A   I agree with every statement except for the quiet down part

23   because the crowd did not quiet down.

24   Q   Relatively speaking, there was — there was still some

25   commotion, but it was a lot quieter at that point as that

1  individual was speaking to them, correct?

2  A    I believe he was speaking over the crowd, not that the

3  crowd quieted down.

4  Q    But clearly what we see is, it is immediately after he is

5  speaking out.  That is when Mr. Grider is motioning for people

6  to come in, right?

7  A    Yes.

8  Q    All right.

9         MR. MAYR:  Now, we can jump back to Government's 36.

10        (The video was played for the Court.)

11        MR. MAYR:  There is Mr. Grider at the 14-, 14-,

12  15-second mark, and now, I am going to go up to the 2:33 mark

13  in Government's 36.

14        (The video was played for the Court.)

15  BY MR. MAYR:

16  Q    All right.  So right there where that 2:30 mark, we see a

17  captioning in reference to Kevlar, and then, you hear again,

18  reference to Kevlar; is that right?

19  A    Yes.

20  Q    Now, it is safe to say that you're not familiar enough with

21  Mr. Grider to know what his voice sounds like; is that correct?

22  A    That is correct.

23  Q    You cannot tell this Court that that is Mr. Grider who is

24  talking about the use of Kevlar, right?

25  A    I cannot.

1   Q   All right.

2       (The video was played for the Court.)

3   BY MR. MAYR:

4   Q   Now, we hear several people shouting "Stop the Steal," but

5   we have this individual right here (indicating) who doesn't

6   appear to be saying anything.  And would you agree that the

7   video, as you continue watching it, shows people clearly

8   yelling out, but there are others that are in this very limited

9   area that are standing there just looking around and watching

10  and not saying anything; would you agree with that?

11  A   Are you going to play a video?

12  Q   Yes.

13  A   Okay.

14      (The video was played for the Court.)

15          THE WITNESS:  Yes, I agree with your statement.

16          MR. MAYR:  Okay.  I am going to move up to the 5:00

17  mark.  Actually, I am going to back up here.  Let's start at

18  the 4:40 mark and watch what happens here.

19      (The video was played for the Court.)

20  BY MR. MAYR:

21  Q   Okay.  You hear the message being passed along.  We first

22  see a gentleman up at the front saying, kind of motioning back

23  and saying, "Move out of the way.  The cops are leaving," and

24  then, we hear Mr. Grider after that same comment; is that

25  correct?

1   A    Yes.

2   Q    And at this point, obviously, no one is rushing in there.

3   They are actually trying — they appear to be moving out of the

4   way; is that right?

5   A    Yes.

6        (The video was played for the Court.)

7   BY MR. MAYR:

8   Q    All right.  At the 5:15 mark on Government's 36, you see

9   where Mr. Grider, who is on the left side of this video, turns

10  around and walks away from the House Chamber Door; would you

11  agree with that?

12  A    Sorry.  Can you play that again for me?

13        MR. MAYR:  I can.  I will back it up to the 5:10 mark.

14      (The video was played for the Court.)

15        MR. MAYR:  And I will stop at the 5:25 mark.

16        THE WITNESS:  Yes.  He did walk away.

17  BY MR. MAYR:

18  Q    And not only did he walk away, he is walking away when we

19  hear others yelling, "Break it down," correct?

20  A    Yes.

21        MR. MAYR:  Continuing at the 5:25 mark.

22      (The video was played for the Court.)

23  BY MR. MAYR:

24  Q    And now, at the 5:34 mark, the camera has panned out and is

25  looking down the hallway towards the Speaker's Lobby, and

1  clearly, we don't see Mr. Grider anywhere here in this area by

2  the House Chamber Door?

3  A   Yes.

4  Q   I now would like to publish State's [sic] Exhibit 42, which

5  you were asked some questions about —— I am sorry, Government's

6  Exhibit 42.  I was really trying not to do that.  All right ——

7  Government's 42.

8       (The video was played for the Court.)

9  BY MR. MAYR:

10 Q   And we see Mr. Grider there (indicating).

11      (The video was played for the Court.)

12 BY MR. MAYR:

13 Q   Now, you saw him there talking with who you know to be

14 Officer Yetter; is that correct?

15 A   Yes.

16 Q   In the middle is Sgt. Lanciano?

17 A   Lively.

18 Q   Lively.  To the right of him is ——

19 A   Officer ——

20 Q   —— Lanciano.  Have you had an opportunity to speak with any

21 of those officers regarding their interactions outside of the

22 Speaker Lobby Door?

23 A   No.

24 Q   Just so we are clear, you are inside when all of this is

25 taking place, bouncing back and forth between the Chamber and

1    the Lobby, right?

2    A    Correct.

3    Q    Now, what I would like to do is, I would like to publish

4    what has been previously admitted as Government's Exhibit 61

5    and let you take a look and listen to what is occurring and

6    what is being said, all right?

7    A    Okay.

8         (The video was played for the Court.)

9         MR. MAYR:  I am going to stop it at the 2:30 mark.

10   BY MR. MAYR:

11   Q    You know what the sound — you hear that sound breaking.

12   You know what that sound is, correct?

13   A    Yes.

14   Q    Those are other individuals, not Mr. Grider, smashing the

15   windows to the door right before Ashli Babbitt jumps through,

16   correct?

17   A    Yes.

18        MR. MAYR:  Let's back up.  Let's go back to the

19   beginning of this exhibit here.

20   BY MR. MAYR:

21   Q    Now, you would agree that looking at the video that we just

22   saw immediately previous to this, Government's Exhibit 42, this

23   video is Mr. Grider approaching Officer Yetter, Sgt. Lanciano

24   —

25   A    Sgt. Lively and Officer —

1   Q   Thank you, and Officer Live- --

2   A   Yes.

3   Q   -- Officer Lively?

4   A   Yes.

5           THE COURT:  Let him finish his question before you

6   start to answer so you are not stepping on each other's lines.

7   Also, you don't give anybody an opportunity to object if they

8   want to.  Make sure he finishes, then, you pick up so I hear

9   everything.

10          MR. MAYR:  I appreciate you helping me with the names.

11  Going back to the beginning of this exhibit.

12      (The video was played for the Court.)

13  BY MR. MAYR:

14  Q   This is Officer Yetter, this is Sgt. Lively?

15  A   Yes.

16  Q   And then, over here to the left of him, the right of us,

17  that is Officer Lanciano?

18  A   Yes.

19  Q   We hear Mr. Grider talking, and then, we see him, then,

20  talking to a nonuniformed individual who has, appears to have,

21  like, a walky-talky?

22          THE COURT:  Are you asking him because that is not

23  what is shown here.  Are you asking him whether he has seen

24  this on another video or what?

25          MR. MAYR:  Let me — why don't I just let it play, and

1    then, I will ask the question.

2         THE COURT:  Okay.

3       (The video was played for the Court.)

4         MR. MAYR:  Stopping at the 20-second mark.

5    BY MR. MAYR:

6    Q   You hear him say, "These people are going to get crushed";

7    do you hear that?

8    A   Yes.

9    Q   Continuing at the 22-second mark on Government's 61.

10       (The video was played for the Court.)

11   BY MR. MAYR:

12   Q   "These people are going to get crushed.  There are two cops

13   over there."  You hear that on there, right?

14   A   Yes.

15   Q   This individual who is holding the walky-talky, and you

16   have seen him in other videos, that is -- is that someone from

17   the Sergeant at Arms' office?

18   A   That's correct.

19   Q   Do you know who that is?

20   A   I don't know his name.

21   Q   All right.

22       (The video was played for the Court.)

23         THE COURT:  In terms of doing this, it is not clear

24   who you are ascribing different comments by.  So we need to be

25   very careful in terms of your saying "somebody saying" as to

who is saying it, whether it is Mr. Grider or this other
individual with the walky-talky or whatever in terms of getting
any answers.

MR. MAYR:  Understand, Your Honor.  I will make sure
to keep it, keep it clear as to who.

THE COURT:  As to who you think is saying.  So when he
answers, is he answering he agrees or he doesn't agree with who
is saying whatever they are saying.

MR. MAYR:  Understood.

BY MR. MAYR:

Q   It sounds like the person who is holding the video is
saying these things about officers being crushed or people
being crushed, agree or not agree?

A   Agree.

Q   Thank you.

(The video was played for the Court.)

BY MR. MAYR:

Q   Now, at this point, you would agree that it is difficult to
hear anything other than just shouting and yelling, correct?

A   Correct.

Q   All right.  After the window to the Speaker's Lobby Door is
broken in and the woman who climbs through is shot, do you
recall seeing Mr. Grider anywhere near her at that point?

A   No.

THE COURT:  It is your best memory that you — that he

1    wasn't, or you don't know one way or the other whether he was?

2              THE WITNESS:  I do not recall seeing him.

3              THE COURT:  Okay.

4    BY MR. MAYR:

5    Q   Okay.  You don't actually go into, or you don't go into

6    that area where the woman is at and other officers are treating

7    her; is that correct?

8    A   Yes.

9    Q   All right.  In terms of what took place out there, you

10   don't have any personal recollection or knowledge of what took

11   place?

12   A   No.

13   Q   All right.  Not having personally witnessed Mr. Grider

14   outside of the Speaker's Lobby Door from your position on the

15   inside, you cannot say anything specifically about him that he

16   did to impede or interfere with your duties as a Capitol Police

17   officer, correct?

18   A   Correct.

19   Q   And there is nothing that you can say specifically that he

20   did outside of the doors that would have impeded or interfered

21   with the Congress members' ability to continue on with the

22   certification proceedings?

23   A   Correct.

24   Q   Okay.

25              MR. MAYR:  Sergeant, thank you.  I will pass the

1    witness, Your Honor.

2                THE COURT:  Redirect?

3                MS. CHO:  Thank you, Your Honor.

4                    **REDIRECT EXAMINATION**

5    BY MS. CHO:

6    Q    Let's pick up where we just left off, Sergeant.  You

7    reviewed a significant amount of video today and a little bit

8    before today where the individual we are referring to as Mr.

9    Grider was highlighted; is that right?

10   A    Yes.

11   Q    In those videos, did you see him inside the building on

12   January 6th?

13   A    Yes.

14   Q    Was he allowed to be in the building on that day?

15   A    He was not.

16   Q    In those videos, did you see him hand a black helmet to

17   another rioter?

18   A    Yes.

19   Q    Did you see that other rioter use the helmet to break the

20   glass in the Speaker's Lobby Door?

21   A    Yes.

22   Q    Was breaking the glass in the Speaker's Lobby Door the

23   reason why another rioter was able to climb through?

24   A    Correct.

25   Q    And what prompted lieutenant to have to shoot a rioter that

1  day?

2  A   We could not allow them to get past that door with members

3  of Congress still being on the Floor.

4  Q   Now, let's go to Government's Exhibit 32.  And do you

5  recall, Sergeant, answering questions about the scene in the

6  Statuary Hall Connector during your cross-examination?

7  A   Yes.

8          MS. CHO:  Now, if we go to 26 seconds in Exhibit 32.

9      (The video was played for the Court.)

10 BY MS. CHO:

11 Q   And Sergeant, do you see Mr. Grider here in that frame at

12 26 seconds?

13 A   Yes.

14 Q   Now, can you tell from just looking at the screen if you

15 can, over in the right —

16          THE COURT:  Can you speak in front of the microphone?

17          MS. CHO:  Yes.

18 BY MS. CHO:

19 Q   — over in the bottom right-hand corner how many minutes

20 long this exhibit appears to be?

21 A   Looks like 3:34.

22 Q   And assuming that Mr. Grider is present through this entire

23 clip, how long would you, then — do a little bit of math, and

24 apologies for putting you on the spot.  How long is he in this

25 crowd?

1  A   How long is he in the crowd the entire time he is in the

2  building or —

3  Q   In this crowd in this area, based on this clip alone.

4  A   Since I see him walking in, we will give it another, so

5  3:10.

6  Q   So when you matched this clip earlier, did this crowd

7  remain for about three minutes — a little over three minutes

8  in this area?

9  A   Yes.

10  Q   Were these rioters all sort of held in place for over three

11  minutes?

12  A   Yes.

13  Q   And then, at some point did the rioters all push through a

14  police line?

15  A   Yes.

16  Q   And how long would you estimate that took in the video

17  clips for the rioters to move from this area to the House Main

18  Door from the beginning of the push at the front through to

19  getting to the House Main Door?

20  A   A couple of seconds.

21  Q   Just to recap, they were held in place for over three

22  minutes, and then, just a few seconds in order to get from that

23  hold-in-place position to the House Main Door?

24  A   Yes.

25  Q   Now, let's talk a little bit about Exhibit 36 at the House

1  Main Door.

2      You also answered some questions about some individuals who

3  were using a loud speaker at the front of that crowd; do you

4  recall that?

5  A   Yes.

6  Q   Were, were either of the people you were questioned

7  regarding the loud speaker wearing Capitol Police uniforms?

8  A   No.

9  Q   Did one of the people using the loud speaker even say, we

10  can go, use the pronoun "we" to refer to whether they could go

11  in and sit quietly and calmly in the room?

12  A   Yes.

13  Q   And what did that "we" mean to you, sitting here today and

14  listening to that video, that he was part of the rioters or

15  with the Capitol Police?

16  A   He was part of the rioters.

17      MS. CHO:  Now, let's look at Exhibit 36, and let's go

18  to 4:55, and then pause before we play.

19  BY MS. CHO:

20  Q   Sergeant, do you recall answering some questions about

21  whether Mr. — when Mr. Grider walked away from this door?

22  A   Yes.

23  Q   And do you recall answering questions about how it was

24  shortly after the crowd started yelling, "Break it down"?

25  A   Yes.

1        MS. CHO:  Now, I would like — I would like to play,

2   beginning at 4:55, and hopefully I have hit the right minute

3   and second marker.  But let's begin playing, and if I need to

4   back up, I apologize, Your Honor.

5        (The video was played for the Court.)

6        MS. CHO:  Let's go to 4:20.

7        THE COURT:  You are talking — if you want it on the

8   record —

9        MS. CHO:  Sorry.

10       Let's go back to 4:10, please.

11       (The video was played for the Court.)

12   BY MS. CHO:

13   Q   Did you hear a rioter say, "Let's go"?

14   A   Yes.

15   Q   And I have not hit the minute marker quite right, but do

16   you happen to recall from your first viewing of this video clip

17   a rioter yelling something about "Another way"?

18   A   No.

19   Q   Okay.  Now, let's focus on the House Main Door itself here.

20   I asked you earlier, but throughout the entirety of this clip,

21   do you see Capitol Police officers leaving this door?

22   A   No.

23   Q   And do you recall where Mr. Grider goes from this location

24   and afterward?

25   A   Well, I can surmise that he left this way and went down the

1    hall and came around to the East Lobby Door.

2    Q    And do you know whether he ran or whether he walked?

3    A    We saw a video where he ran down the hallway.

4    Q    And where did that hallway lead him to?

5    A    That would make it around past the Democratic Door and into

6    the East Lobby area.

7    Q    Okay.

8              MS. CHO:  Just one moment, Your Honor.

9              No further questions, Your Honor.

10             THE COURT:  All right.  You can step down, sir.  Can

11   he be excused altogether, or is he on call?

12             MS. CHO:  Your Honor, we would request that he be

13   excused for permanently.

14             THE COURT:  All right.  Then, you're excused at this

15   time.

16             THE WITNESS:  Thank you, Your Honor.

17             THE COURT:  Unless you want to —

18             MR. MAYR:  I certainly have no objection to that, Your

19   Honor.  Thank you.

20                     *(Witness excused.)*

21             THE COURT:  All right.  Let's get the next witness.

22             MS. CHO:  Your Honor, the Government calls Kevin

23   McCumber.

24             (Witness sworn.)

25             THE COURT:  All right, sir.  You can take your mask

 1   off when you are speaking if it is more comfortable in terms of

 2   making sure we have a record.  You need to speak loudly and

 3   right into that microphone in terms of being able to do it.

 4           THE WITNESS:  Yes, ma'am.

 5           THE COURT:  I would ask that you let counsel finish

 6   their question even if you know what they are asking you before

 7   you start to answer.  Make sure they do the same so we make

 8   sure we have a record and I can hear both the question and the

 9   answer.

10           If you see them stand up or hear the word "objection,"

11   if you haven't started to answer, don't.  If you are in the

12   middle of your answer, if you would stop, let me hear what the

13   objection is, and make a ruling, all right?

14           THE WITNESS:  Yes, ma'am.

15           THE COURT:  Thank you.

16           MS. CHO:  Thank you, Your Honor.

17       **KEVIN FRANCIS McCUMBER, GOVERNMENT'S WITNESS, SWORN**

18                   **DIRECT EXAMINATION**

19   BY MS. CHO:

20   Q    Please state and spell your name for the record.

21   A    Sure.  Kevin Francis McCumber.  K-E-V-I-N, F-R-A-N-C-I-S;

22   McCumber, M-c-C-U-M-B-E-R.

23   Q    What do you do for a living, Mr. McCumber?

24   A    I am the Deputy Clerk of the House.

25   Q    And what do you do as a Deputy Clerk of the House?

1  A   We oversee the legislative proceedings in the House of

2  Representatives.  The Clerk is the chief legislative official

3  at the House, and I support her in those, in her

4  responsibilities.

5  Q   Does the Clerk's office have different parts, units, or

6  divisions?

7  A   Yes, ma'am.  It is made up of a number of divisions.  They

8  meet at office, the office of legislative operations,

9  legislative resource center, the legislative computer systems,

10 the office of art and archives, office of communications,

11 office of official reporters, about 240 staff members.

12 Q   Do you have any supervisory authority in your position as

13 Deputy Clerk?

14 A   I do.  I directly oversee the offices of legislative

15 operations, the office of official reporters, and the office of

16 legislative computer systems.

17 Q   So you have listed three different offices, and I would

18 like to take them just briefly in turn.  The first one,

19 legislative operations; is that right?

20 A   Yes, ma'am.

21 Q   What does that office —

22      THE COURT:  Move the microphone — you have to turn

23 the head a little bit so it is directly.  There we go.

24      THE WITNESS:  Okay.

25

1   BY MS. CHO:

2   Q   What does that office do?

3   A   So the office of legislative operations includes various

4   sections within the office.  The bill clerks, the tally clerks,

5   the reading clerks, the enrolling clerks, and the bill clerks.

6   So essentially processing legislation from introduction all the

7   way through passage.  So from the beginning to end, all

8   legislation goes through that office.

9   Q   Just quickly, what are bill and tally clerks -- excuse me,

10  the different clerks you sort of rattled off there?

11  A   Sure.  So the bill clerks handle bill introductions.  So

12  when a member of Congress has a bill they would like to see

13  introduced, they bring it down to the hopper where they

14  introduce it electronically, and the bill clerks process it

15  there.

16      The tally clerks operate the electronic voting system, and

17  they process all roll call votes on the floor.

18      The reading clerks, as the name might suggest, reads all

19  messages and bills before the House.  They are the most visible

20  clerk staff that we have if you watch C-SPAN.

21      The journal clerks keep the Journal of the House of

22  Representatives, which is kept in, mandated by the

23  Constitution, Article I, Section 5.  So those staff members

24  keep the official proceedings of the House.

25  Q   Okay.  You listed two other offices that you oversaw.

1   What, in summary, are those offices' rolls?

2   A   Sure.  So the office of official reporters includes our

3   stenographers who take down the transcripts verbatim on the

4   House Floor.  So every word that is said is compiled and

5   published into the Congressional Record every single day that

6   the House is in session, and then, the legislative computer

7   systems, they manage all of our electronic databases, all the

8   software that we use to run the electronic voting system.  They

9   run and operate, maintain the Legislative Information

10  Management System, which is our LIMS system, which we use to

11  process all the bills as they are introduced and go throughout

12  the legislative process.

13  Q   So how long have you been serving as Deputy Clerk?

14  A   I have been the Deputy Clerk since September of 2021, so 15

15  months now.

16  Q   What did you do before that?

17  A   Before that I was the chief of legislative operations, one

18  of the offices that I now supervise.

19  Q   Is that the position that you held on January 6, 2021?

20  A   Yes, ma'am.

21  Q   How many years total have you worked at the Capitol?

22  A   I first started in August of 2000, and I worked until

23  August of 2006, took a six-year break, and came back in January

24  of 2012.  So 16, 17 years.

25  Q   And during that time working at the Capitol, have you

 1  become familiar with the process for certifying the Electoral

 2  College vote?

 3  A    Yes, ma'am.

 4  Q    When does that process occur?

 5  A    On January 6th, following the Presidential election.

 6  Q    Have you personally participated in preparing for these

 7  certifications?

 8  A    Yes, ma'am.

 9  Q    How many Electoral College vote certifications have you

10  personally participated in?

11  A    Including the most recent, five.

12  Q    Okay.  Before 2021, how long had these certifications

13  typically taken, in your experience?

14  A    Forty, 45 minutes.

15  Q    Now, were you working at the Capitol on January 6, 2021?

16  A    Yes.

17  Q    And you will have to always give an oral response to any

18  question.

19  A    Yes, ma'am.

20  Q    What special preparations, if any, had you undertaken in

21  advance for the 2021 Electoral College vote certification?

22  A    So we reviewed as a staff.  We had asked the

23  Parliamentarian of the House to come down and just meet with

24  our staff and kind of review what the proceedings, what we can

25  expect during the proceedings if there are objections that are

1   raised.  Those are fairly uncommon, and so we wanted to make
2   sure we were as prepared as we could be.
3       That morning of the 6th in my morning e-mail that I sent to
4   staff every day, we had kind of a hybrid work structure.  We,
5   we were dealing with COVID.  Just to make sure all the staff
6   were on the same page, and in that morning e-mail, I included
7   video links to the 2005 proceedings that they could watch to
8   kind of refresh their memory.
9   Q   Why the 2005 proceedings?
10  A   That is the, the most recent time that we had objections
11  raised that were signed both by a House member and a Senate
12  member, and we had the Joint Session recessed, and both went
13  into their own Chambers to debate the objection.
14  Q   Had you personally participated in the certification in the
15  year 2005?
16  A   Yes.
17  Q   What rules, generally, govern the process for dealing with
18  these objections during an Electoral College vote
19  certification?
20  A   Yes, ma'am.  So the proceedings are dictated quite clearly
21  in Title 3, everything from where the Speaker sits to how long
22  debate is when the objections are raised.  So everything is
23  spelled out fairly clearly in that statute.
24  Q   What prompted you to undertake that advanced preparation
25  in, in reviewing the process for objections before January 6,

1    2021?

2    A   So we had heard media reports, and that the objections were

3    expected to be raised for as many as six states.  So we just

4    wanted to make sure that it was going to be the first time that

5    a lot of our staff had dealt with objections, and we wanted to

6    make sure they were as prepared as they could be.

7    Q   So on that day, January 6, 2021, what time did you get to

8    work?

9    A   Right around 7:00, 7:15 a.m.

10   Q   Is that your typical time to report to work?

11   A   It is.

12   Q   What were your expectations for the day at that point?

13   A   We were expecting a long day.  We had received what they

14   call "Dear Colleagues" the day before talking about expected

15   demonstrations and to — they requested all staff and members

16   or recommended that all staff and members arrive before

17   9:00 a.m. to stay underground that day.  And so, you know...

18   Q   So did the vote certification process begin?

19   A   It did.

20   Q   Where did it start?

21   A   It started at 1:00 o'clock in the House Chamber.

22   Q   What time did you go to the House Chamber?

23   A   12:45 or so.

24   Q   What was the purpose of going at that time?

25   A   So the, the House has a bell system, and 15 minutes before

1  we come out of a recess, the bells ring.  And that is our cue
2  to go upstairs and be prepared so that we are ready when the
3  time comes to gavel back into session.
4  Q   When you say "we," who are you talking about?
5  A   Me and my staff.
6  Q   And does that staff include those different types of clerks
7  you had talked about earlier?
8  A   Yes, ma'am.
9  Q   Have you watched a video of the House and Senate Chambers
10 during the 2021 vote certification process in preparation for
11 your testimony here today?
12 A   Yes, ma'am.
13 Q   Did that video also include quotes from the Congressional
14 Record?
15 A   It did, yes, ma'am.
16 Q   What is the Congressional Record?
17 A   So the Congressional Record is not the official
18 proceedings, but it is the proceedings as transcribed
19 verbatimly by our stenographers.  And it is just a verbatim
20 proceeding of the House.  It is published every day online,
21 congress.gov, as well as in a paper version that is delivered
22 to the Chambers.
23 Q   And in reviewing the footage from the House and Senate
24 Chambers, were you also included in that footage?
25 A   Yes, ma'am.

KEVIN FRANCIS McCUMBER - DIRECT/CHO    Vol. 1 - 161

1    Q    Let's pull up previously admitted Exhibit 5.

2              MS. CHO:  Let's go — let's let it play.

3         (The video was played for the Court.)

4              MS. CHO:  Let's hit pause.

5    BY MS. CHO:

6    Q    Mr. McCumber, what was the purpose of these two, the House

7    and Senate Chambers meeting earlier than 1:00 o'clock, the

8    appointed time you had talked about?

9    A    So the House gaveled into session at 12:00 noon.  It

10   appears the Senate gaveled into session at 12:30.  The House

11   was in recess shortly after gaveling in at 12:00 noon until

12   1:00 o'clock for the express purpose of, then, reconvening with

13   the Senate in the Joint Session to count the Electoral ballots.

14        So this was the Senate now gaveling in to then say,

15   pursuant to S Con Res 1, they were going to go over to the

16   House Chamber for the proceedings.

17   Q    Okay.

18             MS. CHO:  Let's keep going.

19        (The video was played for the Court.)

20   BY MS. CHO:

21   Q    And Mr. McCumber, who is entering into the House Chamber at

22   this point?

23   A    Members of the Senate.

24        (The video was played for the Court.)

25   BY MS. CHO:

1   Q   And who presides over the Joint Session itself?

2   A   The Vice President.

3   Q   Who was that at this time?

4   A   Mr. Mike Pence.

5   Q   Now, in this frame —

6           MS. CHO:  If you could pause for just a moment.

7           (The video was played for the Court.)

8   BY MS. CHO:

9   Q   Could you point out Mr. Pence in this frame?

10  A   Yes, ma'am.  He is directly below the flag to the, if you

11  are viewing it, to the left with the white hair.

12  Q   Who is that in purple next to him?

13  A   The Speaker of the House, Nancy Pelosi.

14  Q   Now, are they taking those positions because — for what

15  reason?

16  A   So the Vice President is the presiding officer of the Joint

17  Session, and so he actually takes the Speaker's chair and is

18  running the proceedings of the Joint Session, counting the

19  Electoral ballots.

20  Q   Is the seating arrangement dictated by law?

21  A   Yes, ma'am.

22  Q   Do you recall which law dictates that seating arrangement?

23  A   It is Title 3, United States Code.

24  Q   Okay.

25          MS. CHO:  And if we will just quickly minimize that,

1    and if we pull up Exhibit 49, please, document.  If you could

2    enlarge the text portion, Ms. Robinson.  Thank you.

3    BY MS. CHO:

4    Q   Mr. McCumber, is that a portion of Title 3, United States

5    Code?

6    A   Yes, ma'am.

7    Q   Which section is it?

8    A   Sixteen.

9    Q   Does that section, among other things, set forth the

10   seating arrangements for people at the Joint Session?

11   A   Yes, ma'am.

12   Q   And I think you might have mentioned.  What is the area of

13   the room –– let's go back to Government's Exhibit 5.  Let's not

14   play it just yet.  The area where the Vice President and the

15   Speaker were seated, what is that area called?

16   A   The rostrum.

17   Q   Okay.  So I would like to quickly get a sense of how this

18   view of the House Chamber orients to the rest of the building.

19   Do you see the door that is visible?  There are doors on either

20   side of what you just called the rostrum?

21   A   Yes, ma'am.

22   Q   Where do those doors lead to?

23   A   They lead into the Speaker's Lobby.

24         MS. CHO:  So if we pull up and minimize that again for

25   just a moment and go to Exhibit 18, which is another document.

1   BY MS. CHO:

2   Q   Mr. McCumber, does this look like a fair and accurate

3   close-up of a map of the House Chamber?

4   A   Yes, ma'am.

5   Q   Can you point out on this map where that rostrum is?

6          THE COURT:  You can use your finger to touch it or to

7   turn.

8          THE WITNESS:  (Indicating.)

9   BY MS. CHO:

10  Q   Is that toward the left of this particular exhibit within

11  the House Chamber?

12  A   Yes, ma'am.

13  Q   And the doors that we were discussing, where are they

14  located on this map?

15  A   There is one immediately above the -- I can point.  There

16  is one here, one here, one here, and one here (indicating).

17  Q   Okay.

18         MS. CHO:  Let's go back to Exhibit 5 and continue

19  watching.

20      (The video was played for the Court.)

21         THE COURT:  If you know how to get rid of it, he,

22  evidently, has not been told how to do it.  My law clerk will

23  show you how to get rid of it.

24         (Indicating.)

25

1  BY MS. CHO:

2  Q   So Mr. McCumber, are you familiar with the process that the

3  Vice President was just speaking of?

4  A   Yes, ma'am.

5  Q   Were you in the room at this point in time?

6  A   Yes, ma'am.

7  Q   What are the provisions of the Constitution that govern the

8  official proceeding?

9  A   It is in Article II, and it is in the 12th Amendment.

10        MS. CHO:  So let's minimize this exhibit for just a

11  moment and pull up Document Exhibit 47.

12        And while we are doing that — there we go.  Do you

13  see Exhibit 47, and if we go to the next page, please.

14  BY MS. CHO:

15  Q   Does that look like the provision you were just testifying

16  about?

17  A   Yes, ma'am.

18  Q   And did you also review Sections 15, 17, and 18 of Title 3,

19  United States Code?

20  A   Yes, ma'am.

21  Q   And what, generally, did those sections of the U.S. Code

22  set forth?

23  A   Established the date of the Electoral count, the time of

24  debate, if an objection is raised.  That is all I can recall at

25  the moment.

1  Q   Do any of them set forth the process for counting the votes

2  on January 6th?

3  A   Yes, ma'am.

4  Q   And do any of them set forth the process for Parliamentary

5  procedure during the proceeding?

6  A   Yes, ma'am.

7          MS. CHO:  Now, let's go back to Exhibit 5, the video.

8          Let's continue watching the proceeding.

9      (The video was played for the Court.)

10         MS. CHO:  Let's hit pause right there.

11  BY MS. CHO:

12  Q   Mr. McCumber, we didn't have audio for the beginning of

13  that portion, but what just happened there?

14  A   So immediately prior to this, a representative of —— a

15  Senator, they raised an objection to the counting of the

16  Electoral ballots for the State of Arizona.  So the Vice

17  President was just informing that this had happened.  It was

18  valid, and the two bodies would separate and go into their

19  respective Chambers for the two hours of debate.

20  Q   Okay.

21         MS. CHO:  Let's keep playing.

22     (The video was played for the Court.)

23  BY MS. CHO:

24  Q   Are we seeing a provision of the Congressional Record

25  relating to treatment of that objection, Mr. McCumber?

1    A    Yes, ma'am.

2    Q    Okay.

3         (The video was played for the Court.)

4    BY MS. CHO:

5    Q    So Mr. McCumber, we have paused now.  What has happened

6    here in the Senate Chamber?

7    A    So the Senate went into recess.

8    Q    What was happening in the House Chamber during this time?

9    A    We were still in debate on the Arizona objection.

10   Q    Just to make clear your knowledge of this time, time frame,

11   were you in the Senate Chamber during this time when the Senate

12   went into recess?

13   A    No, ma'am.

14   Q    Where were you?

15   A    In the House Chamber.

16   Q    Did you have some familiarity with what was occurring

17   before the Senate went into recess, however, based on your

18   experience as the Deputy Clerk?

19   A    As far as a similar debate occurring between the two, yes.

20   Q    Now, this here, this screen indicates that the recess is

21   subject to the call of the Chair; do you see that?

22   A    Yes, ma'am.

23   Q    It lists the President pro tempore.  Who was initially

24   presiding over this session of the Senate?

25   A    The Vice President.

1  Q  And then, who was more recently presiding over the session?

2  A  Mr. Grassley.

3  Q  Do you know why there was a change in the person who was

4  presiding over the session?

5  A  The Vice President was escorted out of the Senate Chamber.

6      MS. CHO:  Let's keep going.

7      (The video was played for the Court.)

8  BY MS. CHO:

9  Q  So we have paused here, Mr. McCumber.  Did you hear someone

10  yell something that day at this point in time?

11  A  Yes, ma'am.

12  Q  What was yelled?

13  A  "This is because of you."

14  Q  And what did you understand that to mean?

15  A  The Speaker was no longer in the Chamber.  There is a lot

16  of commotion going on.  We had received alerts leading up to

17  this point about demonstration activity and buildings being on

18  lockdown and meant that to be that we were in this situation

19  because of the narrative surrounding the 2020 election that all

20  of this is happening because of that and the objections that

21  were raised.

22  Q  Now, understanding that that is your impression.

23  A  Yes, ma'am.

24  Q  Let's first establish, what time is it here?

25  A  2:16.

1   Q   And how long would you estimate had you been sitting there

2   sort of receiving the information that you just described, that

3   the, the building might be — that people might be in the

4   building?

5   A   Forty-five minutes or so.

6   Q   When did you start, if at all, becoming alarmed?

7   A   Before the Joint Session started, a few minutes beforehand

8   there was an alert out about suspicious devices found down the

9   street; and then, it was shortly after that when the first

10  building was on lockdown.  And then, staff were asked to

11  evacuate underground to another building in one of the House

12  office buildings.  So a lot of buildup prior to this moment of

13  security actions taking place.

14  Q   Now, you said that Speaker Pelosi was no longer in the

15  room, what happened to her?

16  A   She also was evacuated out of the Chamber.

17  Q   And what is your understanding at the point when she is

18  evacuated as to why she is being evacuated?

19  A   That there is a real safety concern for her and then others

20  as, as we will see.

21          THE COURT:  Sir, you have to keep your voice up.

22          THE WITNESS:  Yes, ma'am.

23          THE COURT:  You are dropping it down.  We need to be

24  able to hear you.

25          THE WITNESS:  Thank you.

1          MS. CHO:  Let's keep on playing.

2      (The video was played for the Court.)

3  BY MS. CHO:

4  Q   Did you recognize, were there other people leaving the

5  Chamber as well?

6  A   Yes, ma'am.  The gentleman just exiting through the door in

7  the gray suit is the Majority Whip, Mr. Clyburn.  He was

8  escorted out, and then, the gentleman heading that way towards

9  the door with the white hair in the blue suit, Majority Leader

10  Steny Hoyer.  And then, his security detail with his arm — one

11  of the guy's with his arm on his back.

12  Q   Was it unusual for you to see members of Congress being

13  escorted out of the Chamber in this manner?

14  A   Yes, ma'am.

15  Q   Why?

16  A   The security details typically remain in the back of the

17  Chamber, and this is the first time I have seen them actively

18  escorted along out of the Chamber.

19          MS. CHO:  Let's keep watching.

20      (The video was played for the Court.)

21          MS. CHO:  We have hit pause here, Mr. McCumber.

22  BY MS. CHO:

23  Q   What is happening now in the House Chamber?

24  A   The House went into an emergency recess.  The 12(b)

25  citation that the Chair, Chairman McGovern, referenced allows

1   the House to go into recess in an emergency manner, and so this

2   was our first going into recess.

3   Q   You referenced Chairman McGovern.  Did he replace Speaker

4   Pelosi presiding over the session?

5   A   Yes, ma'am.

6   Q   Going back to that 12(b) rule that you cited, how often are

7   recesses declared under this provision of law?

8   A   It is very, very rare.

9   Q   At this point was the debate on the objection finished?

10  A   No.

11  Q   Are you here, pictured in this frame?

12  A   Yes, ma'am.

13  Q   Could you circle yourself?

14  A   (Indicating.)

15        MS. CHO:  So let the record reflect that Mr. McCumber

16  has circled someone on the left side of the rostrum; is that

17  correct?

18        THE WITNESS:  Yes, ma'am.

19  BY MS. CHO:

20  Q   What were you doing up there?

21  A   So the, the gentleman to my immediate right, seated, is the

22  journal clerk.  And then, the lady next to him is the tally

23  clerk.  So I was up there checking in on them, obviously

24  looking at my phone, looking at e-mails and things that were

25  coming in, and just checking in on them to see, see how they

1  were.

2  Q    Why were you checking in on them?

3  A    There is a lot of activity with the Speaker and other

4  members of leadership being escorted out, and I just wanted to

5  make sure that they were doing okay.

6  Q    Did you have a feeling that they might not be doing okay?

7  A    Yes, and also preparing for what might come, right?  Are we

8  going to go in a lockdown where we are locked inside the

9  Chamber?  Are we going to have to evacuate.  Probably just

10  discussing some of those preparations.

11         MS. CHO:  Let's keep going.

12      (The video was played for the Court.)

13         MS. CHO:  So we have hit pause there again,

14  Mr. McCumber.

15  BY MS. CHO:

16  Q    What is happening now?

17  A    So we came back into recess, we are back from — we came

18  back into session from a recess for three minutes, and then, we

19  have just went back into an emergency recess.

20  Q    What was the atmosphere inside the Chamber at this point?

21  A    A lot of anxiety.  Everybody is kind of nervous about what

22  was happening, what was going on.  You could tell there was a

23  lot of tension still in the room, just a lot of uncertainty.

24  Q    Was this recess, for example, called in an organized

25  manner, in your view, as the Deputy Clerk?

1   A   No.  As you can see on the screen, the person went to

2   Clause 12(b) of Rule I.  The Speaker McGovern and Chairman

3   McGovern didn't say 12(b) this time.  He was kind of very much,

4   "We are going to go into recess right now."  So it was very,

5   very kind of in haste.

6   Q   Is the failure to cite the provision significant to you as

7   a Deputy Clerk?

8   A   Just is another example of the — we have just got to get

9   into recess-type atmosphere.

10  Q   Okay.

11       MS. CHO:  You can take that exhibit down for the

12  moment.

13  BY MS. CHO:

14  Q   So with this second recess, how long, approximately, did

15  the House remain in recess?

16  A   The one that was declared at 2:29?

17  Q   Yes.

18  A   Until 9:02, so a little less than seven hours, six and a

19  half hours.

20  Q   And what happened first after this 2:29 p.m. recess began?

21  A   So Lt. Bird from the Capitol Police came into the chamber

22  from the Speaker's Lobby up to the rostrum and made an

23  announcement, which is typical in our exercises.  It is what we

24  have exercised to expect, made an announcement about tear gas

25  or pepper spray being released in the Rotunda, that we were on

1   lockdown.

2        I had taken an evacuation bag that we have for the Journal

3   out of the drawer that we keep it in and walked up to the first

4   chair of the rostrum, similar to where I was in the video or

5   right where I was in the video previously and began to — Lt.

6   Bird had instructed or informed members, I should say, that

7   there were hoods, evacuation hoods, gas masks, if you will, for

8   members underneath their seats.

9        And that is when I went into the bag that we have ours

10  stored in for rostrum staff and began distributing to rostrum

11  staff.  At that point we are still just in a lockdown

12  situation.

13  Q   Let me pull that apart just a little bit.  You testified

14  that Lt. Bird came in and gave updates to you and members

15  within the chambers; is that right?

16  A   Yes, ma'am.

17  Q   Were there — were there gas masks for all of the members

18  inside the chamber?

19  A   Yes, ma'am.

20  Q   Were there gas masks for you and your staff as well?

21  A   Yes, ma'am.

22  Q   Now, you said you went up to the rostrum, and it was to do

23  what?

24  A   It was to get our bag of gas masks, hoods out of the bag

25  that we keep them in and distribute them to staff, check on

1    staff.  Listen to the updates, trying to figure out what next

2    steps were, let them know that I had the evacuation bag with me

3    in the event that we were told to evacuate and kind of went

4    through what needed to happen to make sure that we were

5    evacuating and leaving the Chamber in a good, good place.

6    Q   You had testified earlier something to do with exercises.

7    What did you mean by that?

8    A   That Lt. Bird coming in and making an announcement is

9    exactly how we had exercised either shelter in places or

10   preparing for a lock — evacuations.  So it was — it went off

11   just as we had, you know, expected it to go.

12   Q   Now, just to be clear, you hadn't expected this particular

13   event to happen; is that right?

14   A   Correct.  Right.  No, ma'am.  No.  Whether it is for an

15   aircraft evacuation or some other active shooter situation, or

16   it is just the standard protocol we would expect to happen is

17   for the lieutenant in the Speaker's Lobby to come in and make

18   an announcement.

19   Q   So let's go back to you at the rostrum.  While you are at

20   the rostrum, do you hear anything unusual?

21   A   Yes, ma'am.

22   Q   What do you hear?

23   A   Banging on the House Doors, the Main Doors.

24        MS. CHO:  Let's pull up document Exhibit 18.

25   BY MS. CHO:

1    Q   And if you could circle on Exhibit 18, Mr. McCumber, which

2    door you heard banging on.

3    A   (Indicating.)

4    Q   Where were you when you heard the banging?

5    A   Right there on the first tier of the rostrum.

6    Q   Did you hear any other unusual noises besides banging on

7    the door?

8    A   The noises of all the hoods that had been activated.  So

9    when the seal is broken and the hood is brought out and

10   expanded there is, like, a buzzing noise.  So it sounded just

11   like a bunch of -- like a bee hive, just a bunch of buzzing.

12   Q   When you heard the banging on the door, did you see

13   anything through the door window?

14   A   No.

15   Q   Now, is that door on the full opposite side of the room

16   from where you are standing?

17   A   Yes, ma'am.

18   Q   Okay.  At this point, how many people would you say, if you

19   could, were inside the House Chamber?

20   A   Those on the Floor, maybe a hundred or so.

21   Q   When you say "the Floor," could you more specifically tell

22   us what you mean by that?

23   A   Sure.  So on the -- the House Floor itself is on the second

24   floor of the Capitol, and so, where the seats are.  There were

25   probably 100 people, members and staff total, and then, in the

1    galleries which were, which are located on the third floor,

2    they were open for members only.  During COVID there was a —

3    they tried to limit them, attendance in the hall.  And by

4    opening the galleries to members for these proceedings, it

5    allowed more members to participate in, and, well, participate

6    in the session.

7    Q   Was that due to social distancing, creating the need for

8    more space to fit more people?

9    A   That's right, yes, ma'am.

10   Q   So you were saying on the galleries.  How many people would

11   you estimate were in the galleries on the third floor?

12   A   Maybe another 75, 100.

13   Q   Between the House Floor and the galleries, have we covered

14   the entirety of the Chamber?

15   A   Yes, ma'am.

16   Q   Okay.  Now, what did you do after you heard the banging on

17   that House Main Door?

18   A   I grabbed my phone, and I recorded what was happening.

19          MS. CHO:  Let's pull up Video Exhibit 45.

20          THE COURT:  Was that 25 or 45?

21          MS. CHO:  Forty-five, and start it from the beginning.

22      (The video was played for the Court.)

23   BY MS. CHO:

24   Q   It happened quickly, but what did we see there,

25   Mr. McCumber?

1  A   You could hear the buzzing, first of all, which is what I

2  first heard.  But the tension towards those Main Doors, and

3  then, at the very tail end, Congressman Gallego standing up on

4  the chair, and he is an Iraq war veteran.  He was standing on

5  the chair saying, "Pepper spray will not kill you.  You cannot

6  die from pepper spray," trying to reassure people in the

7  Chamber.  But it had the opposite effect for some by standing

8  up and screaming it.

9  Q   So by this time, what concerns, if any, were running

10  through your mind?

11  A   I was concerned for my safety, the staff safety, how many

12  people are out there, what do they want?  What are they going

13  to do if they get in here, all of those types of things.  We

14  were pretty isolated in the Chamber, you know, beginning a few

15  minutes before 1:00 o'clock.  So yes, we had our updates on our

16  e-mails.  But we, inside, didn't know the full extent of how

17  many people were in the Rotunda or how many people were outside

18  those doors or what exactly the intent was.

19  Q   So with that in your mind, what did you -- what did you do?

20  A   So at that point, the evacuation order had come in, and it

21  wasn't anything on my phone that I recall.  It was just a

22  direction from the Capitol Police to evacuate.  And so my team

23  and I, I, again, I had the, to-go backpack that we kept the

24  House Journal in.  So we put the Journal in the backpack.  I

25  grabbed the bill hopper, which is the wooden box that hangs on

1    the rostrum for members to introduce bills in.

2    Q    Let me just stop you there.  When you said you put the

3    House Journal in the to-go backpack, is the House Journal an

4    official document of the House of Representatives?

5    A    Yes, ma'am.  It is kept in accordance with the

6    Constitution.  So it, it, it is imperative that it goes with

7    us.

8    Q    Can you describe what it looks like?

9    A    Sure.  It is a very large book, bunch of blank pages that

10   are completed by the journal clerks.  It is, essentially, the

11   minutes of the proceedings.  So if you think of a board or

12   something, it is not verbatim like the Congressional Record.

13   It is the motions that are made, the votes that are occurring,

14   different objections that are raised, those types of things.

15   Q    Then, you also mentioned, I think, a hopper; is that

16   correct?

17   A    Right.  The wooden hopper that the bill clerks take custody

18   of that members and staff introduce bills and legislation and

19   cosponsors and things.  It hangs on the first tier of the

20   rostrum.

21   Q    What else did you take?

22   A    So we had staff that locked up the drawers, and then, the

23   journal clerks, since I had the Journal and the backpack on my

24   back, thought to grab the ink stand which sits to the -- left

25   of the Speaker on the dais, and it is the oldest artifact in

1    the House collection.  So he had the wherewithal to think to

2    take that with us.

3    Q   Why were these items important to you and your staff?

4    A   For us, it is the House, right?  So we wanted to make sure

5    that whoever was banging on that door, if they got in, they

6    wouldn't be able to damage it or take anything.  And that we,

7    you know, preserved our records and part of the House history

8    and our, our artifacts.

9    Q   So what did you do after you and your team packed up these

10   items?

11   A   We started to evacuate, like, the rest of the members and

12   staff.

13            MS. CHO:  If we could pull up Exhibit 18, the map once

14   more.

15   BY MS. CHO:

16   Q   Mr. McCumber, what door did you evacuate through, if you

17   could indicate on this map?

18   A   (Indicating.)

19   Q   Where did that take you out to?

20   A   It took us out into the Speaker's Lobby.

21   Q   When you were in the Speaker's Lobby, what did it look

22   like?

23   A   In front of me, heading up or further west, there were a

24   bunch of members and staff in front of me, and behind me, I, I

25   looked, and it was empty, except for the, all the furniture

1   that is usually in the Speaker's Lobby.  Well, it was still in

2   the Speaker's Lobby.  It was just piled up in front of the

3   double doors opposite where we were evacuating from.

4   Q   Did you take a picture of the furniture piled up?

5   A   I did.

6        MS. CHO:  Let's pull up Exhibit 46.

7   BY MS. CHO:

8   Q   Is that the picture that you took, Mr. McCumber?

9   A   Yes, ma'am.

10  Q   Now, did you — could you see anyone at the end of that

11  hallway beyond the door?

12  A   No.

13  Q   Could you hear anything out of the ordinary once you were

14  in this hallway?

15  A   No.

16  Q   Were there others still remaining in the House Chamber

17  after you had evacuated?

18  A   Yes, ma'am.

19  Q   So is it fair to say that the evacuation was not complete

20  when you were evacuating and when you took this photo?

21  A   That's correct.

22  Q   If you could, what percentage would you estimate of the

23  chamber had evacuated before you had?

24  A   Of those on the floor?  I would say 80 percent, maybe.

25  Seventy-five, 80 percent.

1   Q   What about those in the gallery?

2   A   All of the ones that were — well, no one was able to

3   evacuate the gallery.

4           MS. CHO:  So let's take a look at Exhibit 42, which is

5   a video.  Let's let it play, please.

6       (The video was played for the Court.)

7   BY MS. CHO:

8   Q   So Mr. McCumber, we have hit pause in Exhibit 42.  You had

9   no familiarity with the events we have just so far seen up

10  until this point; is that right?

11  A   That's correct.

12  Q   But looking here, are you able to see the Speaker's Lobby

13  Door where the furniture was barricaded, or did you see it in,

14  in the video we just —

15  A   Yes, ma'am, uh-huh.

16  Q   Was that the same door where you had seen furniture

17  barricaded?

18  A   Yes, ma'am.

19  Q   Now, looking at the still here, do you recognize any people

20  who appear to be on the other side of that Speaker's Lobby Door

21  with the furniture?

22  A   Yes, ma'am.

23  Q   Can you circle and identify anyone that you recognize?

24  A   Sure.  So this gentleman here is Mr. McGovern, Chairman

25  McGovern from Massachusetts.  He was in the chair when the

1   Speaker was evacuated.  Behind him is Don Sisson.  He is the

2   Staff Director of the Rules Committee, which Chairman McGovern

3   is the Chairman of.  And then, this guy here is Keith Stern,

4   and he is the Speaker of the House's Director of Floor

5   Operations.

6   Q   Were they in the House Chamber with you on January 6th?

7   A   Yes, ma'am.

8   Q   Did they evacuate before or after you?

9   A   After.

10          MS. CHO:  So we can take that down, and Mr. McCumber,

11   if you could clear the screen.

12          (Complied.)

13          MS. CHO:  Thank you.

14   BY MS. CHO:

15   Q   From the time you heard the loud banging on the House Main

16   Door to the time you left the House Chamber to evacuate, how

17   long would you estimate that time frame was?

18   A   Five minutes or so.

19   Q   Where did you go, in general, from the House Chamber?

20   A   Through the underground tunnels to a safe room that was

21   previously identified.

22   Q   Were you able to return to the House Chamber again at some

23   point?

24   A   Yes, ma'am.

25   Q   What time, approximately, was that?

1    A    So about 7:30 we were notified that the intent was to

2    reassemble and complete our work, and so the, the Clerk had

3    asked me and several others to go into the Chamber ahead of

4    that time to make sure that even though we had learned that no

5    one had breached the Chamber and gone inside, to make sure that

6    everything was still in order.  So myself and the Deputy Clerk

7    at the time were escorted back into the Capitol, up to the

8    Floor, and we did checks on the electronic voting system,

9    unlocked our drawers, just made sure everything was in good

10   order ahead of the reconvening.

11              THE COURT:  You say 7:30.  Is that p.m.?

12              THE WITNESS:  Yes, ma'am.

13              THE COURT:  Okay.

14   BY MS. CHO:

15   Q    Why were you escorted up?

16   A    Everybody required an escort at that point just to even get

17   back into the Capitol.  They were still clearing the hallways.

18   I remember when we first got there, going up to the second

19   floor where the Chamber is, just a hallway full of FBI agents,

20   and then, while we were doing our checks on the Floor, they

21   were still inside the Chamber itself.

22   Q    Who is "they"?

23   A    I am sorry, the FBI agents.

24   Q    As you made your way back to the Houser Chamber from your

25   secure location, what were your impressions of the building?

1   A   It had been ransacked.  There, there was broken glass,

2   debris in the hallways, and then, after we did our checks and I

3   went back down to legislative operations to check on the four

4   staff members who were there barricaded in the, in the office

5   the entire time that we were separated from.  There was just a

6   haze of what, dust, like, all over the floors and the walls,

7   more garbage.  It was just, it was torn up.

8   Q   So did the vote certification process resume?

9   A   Yes, ma'am.

10  Q   What time did it end?

11  A   We adjourned at 3:48 a.m. on the morning of the 7th.

12  Q   What time were you able to go home that day?

13  A   About 4:30, 5:00 o'clock.

14          MS. CHO:  Your Honor, just one moment, please.

15          No further questions.

16          THE COURT:  All right.  I assume you're going to be

17  asking questions?

18          MR. MAYR:  Maybe three minutes, if that, of questions.

19          THE COURT:  Can you wait three minutes, or do you want

20  to take a break?  All right.  Go ahead.

21          MR. MAYR:  May I proceed, Your Honor?

22          THE COURT:  Yes.  I won't hold you to the three

23  minutes.

24

25

### CROSS-EXAMINATION

BY MR. MAYR:

Q   Good afternoon, Mr. McCumber.  Thank you for being here.  I just have a few brief questions about the proceedings themselves.  During the certification proceedings, then, and on January 6th of 2021, either in the Joint Session or when the House is meeting, is there ever any testimony given or received by any members of the House?

A   Yes.

Q   Okay.  By witnesses or by — when I say testimony, how would you describe that testimony?  Sorry.

A   I defined testimony as the members of Congress speaking on behalf of their objections or speaking to the Speaker.

Q   Contrast that against a committee hearing where witnesses are brought in to give sworn testimony.  Is there anything like that during the certification proceedings on January the 6th?

A   No, ma'am — no, sir.  Excuse me.

Q   It is okay.  In your experience in the past with certification proceedings, is there ever an occasion where someone would give — a witness would come in and give testimony regarding anything having to do with the proceedings?

A   No, sir.

Q   In terms of documents or evidence to support the objections, is there anything that is offered or presented in support of the objections in terms of evidence, a piece of

1    document or anything else like that?

2    A    So members themselves have an opportunity to ask unanimous

3    consent to insert things into the record, whether it is

4    newspaper clippings or letters from groups or in support of

5    their claim or not.  That happens quite regularly.  I don't

6    recall if it — to what extent it happened on the 6th, but

7    it — there would be out there.  It would be included in part

8    of the Congressional Record.

9    Q    Okay.  But as far as when the objections are occurring,

10   everything that is being considered is being presented by the

11   legislators; is that correct?

12   A    Correct.

13   Q    All right.

14          MR. MAYR:  Again, thank you for being here.  I have no

15   further questions.

16          THE WITNESS:  Thank you.

17          THE COURT:  Do you have anything you want to add, ask

18   on redirect?

19          MS. CHO:  Just one question, Your Honor.

20          THE COURT:  Go ahead.

21          MS. CHO:  Or one set of questions.

22                    **REDIRECT EXAMINATION**

23   BY MS. CHO:

24   Q    Mr. McCumber, are the Electoral College ballots documents?

25   A    Yes.

1    Q    Are they part of the proceeding?

2    A    Yes, ma'am.

3              MS. CHO:  No further questions, Your Honor.

4              THE COURT:  Can he be excused altogether, or do you

5    want him potentially on recall?

6              MS. CHO:  No.  We would request to have him excused

7    altogether.

8              THE COURT:  All right.  You are excused at this time.

9    Thank you.

10             THE WITNESS:  Thank you.

11                          *(Witness excused.)*

12             THE COURT:  All right.  We will take a break until 20

13   after 4:00.  I do want to go ahead and pick up the next witness

14   after that.  We probably won't finish, but at least we can

15   start since we lost some time this morning.

16             MS. CHO:  Yes, Your Honor.

17             THE COURT:  We are on a break.

18             (Brief recess, 4:04 – 4:23 p.m.)

19                          AFTER RECESS

20             (The courtroom gallery is cleared of people.)

21             THE COURT:  Let me just indicate that we have cleared

22   the courtroom, other than Mr. Grider and counsel and of course,

23   the Court staff.

24             MR. MAYR:  Is the public line open or closed?

25             THE COURT:  Let me — close it off, Dorothy, please.

1    It is off.

2        MR. MAYR:  Your Honor, over the recess, I learned from

3    Mrs. Grider, Mr. Grider's wife, that she is in her second

4    trimester, and she has started bleeding.  She is very worried

5    and concerned about her health and well-being.  She did not

6    want to delay or do anything, but Mr. Grider has found out

7    about this, and he very much desires to get to his wife and

8    help her seek appropriate medical care.

9        THE COURT:  Okay.  So you want — you want to,

10   basically, break for this evening?

11       MR. MAYR:  I am just worried that even if we try to

12   proceed, that Mr. Grider —

13       THE COURT:  No, that is okay.  I will say to you we do

14   have a nurse's station downstairs.  In the meantime, if you,

15   you know, you are making arrangements to take her someplace?

16       MR. MAYR:  They were currently looking to figure that

17   out right now so I can pass that information along.

18       THE COURT:  The reason I suggest that is they can call

19   an ambulance, or they can actually tell you where to go.

20   Dorothy, can you call down to the nurse's station and tell them

21   she is coming?

22       MR. MAYR:  She might have already left the courthouse.

23       THE COURT:  Okay.

24       MR. MAYR:  I assume she found out about this, she was,

25   like, I need to get somewhere.  She was going to go back to the

1    hotel and figure out where, but I --

2           THE COURT:  Okay.  I mean, I was going to say, if she

3    is still in the courthouse, they would make arrangements and if

4    she needed an ambulance or needed someplace or would tell her

5    where to go.

6           MR. MAYR:  With your permission, I would like to

7    contact her.

8           THE COURT:  Yes.  Go ahead.  Go ahead.  Go ahead and

9    do so.

10          (Mr. Mayr steps out of the courtroom.)

11          THE COURT:  Unless we hear differently, we will see

12   you tomorrow at 9:00.  Go ahead.

13          (The Defendant steps out of the courtroom.)

14          THE COURT:  We will wait until Counsel comes back.  We

15   will just adjourn.  We have what, two other witnesses?

16          I have excused him.  Actually, unfortunately, the

17   nurse's station is closed right now.

18          MR. MAYR:  She already left, departed the courthouse,

19   and she is on the phone.  She was actually on the phone with

20   her doctor to get some guidance from her doctor back in Texas

21   about what she should do.  I apologize, but I appreciate the --

22          THE COURT:  No, no, no.

23          MR. MAYR:  -- Court's consideration for this.

24          THE COURT:  It is not a problem.

25          MR. MAYR:  There hasn't been any problems or any

 1   issues.  Everything has been kind of — everything has been

 2   okay.

 3            THE COURT:  All right.  Then — I think I will excuse

 4   you for this evening, and I will see you tomorrow at 9:00

 5   unless I hear something, you know, if you send me an e-mail or

 6   something else going on.

 7            MR. MAYR:  Would the Court want to start a little bit

 8   earlier than normal to make up for this time?  I mean, we are

 9   here at your —

10            THE COURT:  Let's leave it at 9:00.  I think in terms

11   of getting the marshals — get everybody to, to do things.  We

12   seem to be sort of a moving forward.  I am just hoping to get

13   it done tomorrow since we are only going to have half a day on

14   Wednesday.  We seem to be moving fairly well.

15            MR. MAYR:  We will just make sure that we are here and

16   ready to start right at 9:00.

17            THE COURT:  9:00 o'clock, and we will get the next

18   witness.

19            MR. MAYR:  Thank you so much, Your Honor.

20            THE COURT:  Make sure you get your test.  Do you have

21   kits or do you want me to try and get —

22            MR. MAYR:  We will go get — we will get some kits and

23   test ourselves tomorrow morning.  We have plenty of places.

24            THE COURT:  The Court actually has some if you don't.

25            MR. MAYR:  We will save them for emergency use.  We

1    appreciate that, Your Honor.

2              THE COURT:  All right.

3              MR. MAYR:  Okay.

4              THE COURT:  I am assuming there is nothing we need to

5    talk about?  This is an opportunity if there is objections or

6    anything else that I am going to get tonight.  This is the time

7    to discuss it.

8              MR. MAYR:  I don't anticipate any with the

9    Government's witnesses that are going to be testifying.  We

10   have already agreed to the admission of exhibits.  So I think

11   we are —

12             THE COURT:  Okay.  That is fine.  Just take the

13   chance.  Okay.  All right.  Everybody take care.  Be well.

14             (Adjourned, 4:29 p.m.)

15                            – – –

16

17

18

19

20

21

22

23

24

25

1

CERTIFICATE OF COURT REPORTER

2

3          I, Jean A. Knepley, hereby certify that the

4    foregoing is a true and correct transcript from reported

5    proceedings in the above-entitled matter.

6

7    /S/ Jean A. Knepley              December 26, 2022
     JEAN A. KNEPLEY, RDR/CRR/CRC/FCRR   Date
8    Official Court Reporter
     Southern District of Indiana
9    Indianapolis Division
     Detailed to the U.S. District Court
10   for the District of Columbia

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25