UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,   )
                          )
        Plaintiff,    )
                          )
vs.                   ) Criminal Action No. 21-022 (CKK)
                       ) Washington, DC
CHRISTOPHER RAY GRIDER,   ) Tuesday, December 13, 2022
                       ) 9:16 o'clock a.m.
         Defendant.   ) Volume 2 of 5

Before the
HONORABLE JUDGE COLLEEN KOLLAR-KOTELLY

TRANSCRIPT OF BENCH TRIAL, DAY 2

APPEARANCES:
FOR THE GOVERNMENT:    United States Attorney's Office
                      By:  Cindy J. Cho
                      Detailed to the U.S. Attorney's Office
                      for the District of Columbia
                      10 West Market Street, Suite 2100
                      Indianapolis, Indiana 46204

                      Department of Justice
                      Criminal Division, Appellate Section
                      By:  Francesco Valentini
                      950 Pennsylvania Avenue NW
                      Washington, DC 20530

FOR THE DEFENDANT:     Mayr Law P.C.
                      By:  Brent Mayr
                      5300 Memorial Drive, Suite 750
                      Houston, Texas 77007

ALSO PRESENT:          The Defendant in person.

COURT REPORTER:       Jean A. Knepley, RDR, CRR, CRC, FCRR
                      Detailed to the U.S. District Court
                      for the District of Columbia
                      46 East Ohio Street, Room 301
                      Indianapolis, Indiana 46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

Vol. 2 - 195

I  N  D  E  X

KYLE YETTER

Direct Examination by Mr. Valentini ...........197
Cross-Examination by Mr. Mayr ................243
Redirect Examination by Mr. Valentini .........279

MICHELLE BALL

Direct Examination by Ms. Cho ................286
Cross-Examination by Mr. Mayr ................364

        Certificate of Court Reporter ............406


I N D E X   O F   E X H I B I T S

DESCRIPTION                              RECEIVED

120 .........................................333
121 .........................................333
118 .........................................337
121 .........................................357

1          *(In open court.)*

2               THE COURT:  Good morning, everyone.

3               We should just indicate that the public line is on,

4     and let's go ahead and call it.

5               (Call to the order of the Court.)

6               THE CLERK:  Counsel, would you please identify

7     yourself for the record, starting with the Government.

8               MR. VALENTINI:  Good morning, Your Honor.  My name is

9     Francesco Valentini.  Here at counsel table with me is my

10    cocounsel Miss Cindy Cho and Special Agent Michelle Ball, as

11    well as our paralegal, Miss Tiffany Robinson.

12              THE COURT:  Good morning.

13              MR. MAYR:  Good morning, Your Honor.  Brent Mayr on

14    behalf of Mr. Grider.

15              THE COURT:  Good morning to both of you.  All right.

16    We are ready to proceed at this point with the Government's

17    next witness.

18              MR. VALENTINI:  Yes, Your Honor.  The Government calls

19    Special Agent Kyle Yetter.

20              THE COURT:  That is Y-E-T-T-E-R.

21              You step up over here, please.  If you remain

22    standing, we are going to swear you in.

23              THE WITNESS:  Yes, ma'am.

24              (Witness sworn.)

25              THE COURT:  You can take your mask off in speaking if

1   that is easier for you.

2         THE WITNESS:  Thank you, Your Honor.

3         THE COURT:  Ms. Patterson is going to show you how to

4   do the screen so if you want to point to something or circle

5   something on the screen, she is showing you how to do it and

6   how to erase it afterwards.  If you are looking at a video and

7   they ask you where are you, and you circle it, that's the way

8   you do it, and then, you can get rid of it.

9         THE WITNESS:  Yes, Your Honor.  Thank you.

10        THE COURT:  You need to speak in a very loud, clear

11  voice, not too quickly so the court reporter gets a record.

12  Let counsel finish their question before you start to answer,

13  even if you know what they are asking you so that we have a

14  record and I can hear both things.

15         If you see counsel start to stand or stand or you hear

16  the word "objection," if you haven't answered, don't.  If you

17  are in the middle of your answer, please stop, let me hear the

18  objection, and then I will rule and let you know whether to

19  answer, all right?

20        THE WITNESS:  Thank you, Your Honor.

21        THE COURT:  Okay.  Go ahead.

22        **KYLE YETTER, GOVERNMENT'S WITNESS, SWORN**

23                    **<u>DIRECT EXAMINATION</u>**

24  BY MR. VALENTINI:

25  Q   Good morning.

1   A   Good morning, sir.

2   Q   In a loud, clear voice, will you please state and spell

3   your name for the record.

4   A   Kyle Yetter, K-Y-L-E, Y-E-T-T-E-R.

5   Q   Where do you currently work?

6   A   I am a Special Agent with FBI.

7   Q   And Special Agent Yetter, how long have you been with the

8   FBI?

9   A   For four months.

10  Q   And where did you work before joining the FBI?

11  A   U.S. Capitol Police.

12  Q   When did you join the U.S. Capitol Police?

13  A   Around December of 2017.

14  Q   And so were you employed as a U.S. Capitol Police in

15  January 2021?

16  A   Yes.

17  Q   And which division or section within the U.S. Capitol

18  Police were you assigned to in January 2021?

19  A   House Division, Section 3.

20  Q   And what was your title?

21  A   Police officer.

22  Q   Were you on duty on January 6, 2021?

23  A   Yes, sir.

24  Q   And at what time was your shift scheduled to begin on

25  January 6, 2021?

1  A    My shift was scheduled to start at 3:00 p.m.

2  Q    And approximately what time did you report for duty on

3  January 6, 2021?

4  A    A little around 2:00 p.m.

5  Q    And where geographically within the Capitol complex did you

6  report for duty on January 6th?

7  A    I reported to duty at the Longworth House Office Building.

8  Q    Did you drive to work that day?

9  A    Yes.

10  Q    And where did you park?

11  A    I parked on the Senate side of the Capitol on the north

12  side of the Hill.

13  Q    And did you notice anything unusual as you were arriving to

14  work that day?

15  A    Very heavy traffic and protesters everywhere.

16  Q    And when you say "traffic," do you mean vehicle traffic or

17  foot traffic?

18  A    Both vehicle and foot, foot traffic.

19  Q    Could you describe for the Court what you did when you

20  first arrived at work.

21  A    Upon parking at the Senate side of Capitol Hill I began to

22  walk across the truck tunnel area at the Capitol in which

23  officers who worked the truck tunnel assignment stepped out of

24  the kiosk and told me to not cross the plaza and to turn on a

25  radio if I had one, and that there was a current event going

1   on.

2   Q   Did you have a radio on you?

3   A   I did not have a radio on me.

4   Q   So where did you go?

5   A   I went under the truck tunnel entrance.  It is where trucks

6   make deliveries inside the Capitol Building.

7   Q   And did there come a time shortly thereafter where you

8   entered the main Capitol Building?

9   A   Can you repeat the question again.

10  Q   Did you go from there to the main Capitol Building?

11  A   I went from there, through the truck tunnel, and eventually

12  made my way to the Longworth House Office Building.

13  Q   From the Longworth House Building, where did you go?

14  A   I reported to the locker room where I quickly got dressed

15  and then reported to the Longworth House detail where my

16  official offices were.

17  Q   Did you receive an assignment when you arrived at your

18  detail office?

19  A   I did not receive a formal assignment.  Events were very

20  quickly playing out, and I was told to get as many officers

21  around me as possible and respond to the Capitol Building.

22  Q   And where did you — where in the Capitol Building did you

23  respond to?

24  A   From the Longworth Office detail, I responded with several

25  other officers through the Cannon Tunnel into the south side of

1    the Capitol Building.

2    Q   Okay.  Do you remember the area within the south side of

3    the Capitol Building where you reported to?

4    A   The first location that I entered through the south of the

5    Capitol Building was the Memorial Door.

6    Q   And which floor of the Capitol Building is the Memorial

7    Door on; if you recall?

8    A   I don't recall.

9    Q   Okay.  Let me —

10         MR. VALENTINI:  Let's pull up Exhibit 16.

11   BY MR. VALENTINI:

12   Q   Special Agent Yetter, does Exhibit 16 appear to be a floor

13   plan of the Capitol Building?

14   A   Yes, sir.

15   Q   Does it appear to be the floor plan of the first floor of

16   the Capitol Building?

17   A   I, I don't recall.

18   Q   Okay.  Moving on.  You reported to the Memorial Door within

19   the U.S. Capitol Building?

20   A   Yes.

21   Q   And could you describe for the Court the scene that you

22   encountered when you arrived at the Memorial Door?

23   A   Myself and other officers noticed a very heavy crowd of

24   protesters and rioters advancing through the Memorial Door

25   hallway.

1  Q    Okay.  How many rioters did you see at the scene?

2  A    They filled the entire hallway, 40 plus.

3  Q    And how many Capitol Police officers were at the scene at

4  that point?

5  A    Maybe seven.

6  Q    If you were to estimate without guessing the ratio of

7  rioters to police officers?

8  A    One to 50.

9  Q    Okay.  What did you try to accomplish when you arrived at

10  the Memorial Door?

11  A    The officers there, along with myself, attempted to

12  establish a police line to push back the protesters and

13  rioters.

14  Q    Were you successful in doing that?

15  A    No.

16  Q    Did there come a time when you were at the Memorial Door

17  that you fell to the ground?

18  A    Yes.

19         MR. MAYR:  Your Honor, at this time I would like to

20  lodge an objection as to relevance, as well as 403.  Some

21  background as to where he was at that day is understandable,

22  but because there is no evidence that Mr. Grider was anywhere

23  in the vicinity of the Memorial Door, I would suggest that

24  there is limited relevance to this testimony.  So I object to

25  any further inquiry into what took place at this particular

1  location.

2         THE COURT:  I see no reason why he can't give what he

3  did that day and where he went.

4         MR. MAYR:  Okay.

5         THE COURT:  Where he wound up with.  So as long as you

6  don't take too long, I will overrule it.  Go ahead.

7         MR. VALENTINI:  I will be brief.

8  BY MR. VALENTINI:

9  Q   Could you please describe the circumstances when you fell

10 to the ground at the Memorial Door?

11 A   I was sprayed in the face with a fire extinguisher and

12 then, shoved to the ground.

13 Q   Did you fear for your safety when you were at the Memorial

14 Door?

15 A   Yes.

16 Q   Were you able to get up from the ground of the Memorial

17 Door?

18 A   Yes.

19 Q   What did you do next?

20 A   We attempted to take protesters from that area and then,

21 get them out through the Memorial Door to the outside of the

22 Capitol Building.

23 Q   Were you successful in clearing the Memorial Door?

24 A   No.

25 Q   Did there come a time when you moved on to a different

1  assignment?

2  A    Yes, sir.  We were outnumbered, so we tried to find more

3  work.

4  Q    And where did you go to find more work after the Memorial

5  Door?

6  A    We went up the nearest staircase around Memorial Door.

7  Q    And where did you go from there?

8  A    From there, I ended up responding to the Speaker's Lobby.

9  Q    When you responded to the Speaker's Lobby, were you

10  responding to an order to go to the Speaker's Lobby?

11  A    No.  Throughout that day the radio calls were — you

12  couldn't understand the radio.  So there was no formal

13  assignments given.  It was constant, just respond where you

14  think you could help.

15  Q    Why is it that you could not understand the radio

16  communications?

17  A    There were hundreds of officer down calls, as well as

18  people requesting assistance, but it was all too much to

19  comprehend.

20  Q    On an average day outside of January 6, how many calls

21  would you hear on the radio on a daily basis?

22  A    Maybe 20.

23  Q    How many calls did you hear — do you estimate that you

24  heard on that day on January 6th?

25  A    Hundreds.

1  Q   Was — were you able to use the radio communication system

2  effectively?

3  A   I, myself, was unable to use the radio the entire day.

4  Q   Okay.  When you say you went to the Speaker's Lobby area

5  after the Memorial Door.

6  A   Yes.

7  Q   Special Agent Yetter, did you go there alone?

8  A   I did not go alone, no.

9  Q   Who did you go with?

10  A   I responded with Officer Lanciano.

11  Q   And which side of the Capitol Building is the Speaker's

12  Lobby?

13  A   The south side of the Capitol Building.

14  Q   And that would be the House side or the Senate side?

15  A   The House side.

16  Q   And is the — is the Speaker's Lobby in the general

17  vicinity of the House Chamber?

18  A   Yes, sir.

19  Q   I would like to show you Exhibit 35 — 38, I am sorry,

20  which is already in evidence.

21       MR. VALENTINI:  And we are going to go.  We are going

22  to go to time mark 1:18.

23     (The video was played for the Court.)

24       MR. VALENTINI:  Let me stop right there.

25  BY MR. VALENTINI:

1    Q    And Special Agent Yetter, do you see the time mark on the

2    video?

3    A    Yes, sir.

4    Q    And what is the time mark at this point?

5    A    1:25.

6    Q    And in the frame, do you -- did you see in this clip two

7    Capitol Police officers?

8    A    Yes.

9    Q    Do you recognize them?

10   A    I do.

11   Q    Could you please identify them for the Court.

12   A    The one with the hat with the Capitol Police logo on the

13   back is Officer Lanciano, and the one behind him is myself.

14          MR. VALENTINI:  And if you could go back just maybe a

15   second or two in the clip.

16       (The video was played for the Court.)

17          MR. VALENTINI:  Can we stop there.  Okay.

18   BY MR. VALENTINI:

19   Q    As you watch this clip, did you see anything unusual about

20   the uniform of the officer that you identified as yourself?

21   A    Yes.

22   Q    What did you see?

23   A    I am covered in whatever substance was sprayed out of the

24   fire extinguisher.

25          MR. VALENTINI:  Can we play the same clip for another

1   15 seconds until time mark 1:39, please.

2        (The video was played for the Court.)

3            MR. VALENTINI:  Stop right there.

4   BY MR. VALENTINI:

5   Q   Did you see a group of individuals walking the same

6   direction as you just did in this clip?

7   A   Yes, I did.

8   Q   And do you see an individual who is wearing a

9   motorcyclist's-style hat?

10  A   Yes, I do.

11  Q   Are these individuals, do they appear to follow the same

12  path that you and Officer Lanciano took in the last segment of

13  this exhibit?

14  A   Yes.

15  Q   And before, when we are looking at the frame of you and

16  Officer Lanciano, the time stamp was about 2:40:23, correct?

17  A   Can you ask the question again.

18  Q   Yes.

19            MR. VALENTINI:  If we can go back maybe 15 seconds?

20       (The video was played for the Court.)

21            MR. VALENTINI:  Stop right there.

22  BY MR. VALENTINI:

23  Q   Do you see a time stamp at the top left corner of the

24  screen?

25  A   Yes, I do, 1:27.

1   Q   1:27.

2           MR. VALENTINI:  Could you play the clip again.

3       (The video was played for the Court.)

4           MR. VALENTINI:  Can you stop, please.

5   BY MR. VALENTINI:

6   Q   Do you see the time stamp at this point?

7   A   Yes, I do.

8   Q   And what does the time stamp say?

9   A   The time stamp at the top left is 2:40.

10  Q   And in the bottom left?

11  A   1:39, roughly 20 seconds.

12  Q   Roughly 20 seconds.  Well, before you said it was 1:27,

13  right?

14  A   Yes.

15  Q   And now it is...

16  A   1:39.

17  Q   How many seconds have lapsed, more or less?

18  A   Hardly any seconds.

19  Q   Twelve seconds.

20          MR. VALENTINI:  Can we continue playing the exhibit,

21  please.

22      (The video was played for the Court.)

23          MR. VALENTINI:  Stop right there.

24  BY MR. VALENTINI:

25  Q   Kyle Yetter —— Special Agent Yetter, do you see an

1   individual who appears to wear a yellow flag around his neck in

2   this picture?

3   A   I do.

4   Q   What is the time stamp at this point?

5   A   2:38.

6   Q   And does this individual appear to be walking in the same

7   direction as you and Officer Lanciano walked in the earlier

8   frame of this exhibit?

9   A   Yes.

10          MR. VALENTINI:  Let's go just one, one more second.

11      (The video was played for the Court.)

12          MR. VALENTINI:  Stop, stop.  All right.  Can we go

13   back about three or four seconds to time stamp 2:38.  Can we go

14   back to time stamp 2:38, please.

15          THE COURT:  If you want them to show on the record

16   where the time stamps are, you need to speak up.  It is useful,

17   I think, for us later on —

18          MR. VALENTINI:  Of course.

19          THE COURT:  — to be able to find out what it is,

20   where you are stopping.

21          MR. VALENTINI:  Absolutely.

22          THE COURT:  Speak up a little bit more.

23          MR. VALENTINI:  Can we go back to time stamp 2:38 on

24   this exhibit, please.  Can we hit play and then, stop it.

25   Stop.

1          (The video was played for the Court.)

2     BY MR. VALENTINI:

3     Q    Did you see in this couple of seconds we just played, did

4     you see if the gentleman in the yellow flag was carrying

5     anything in his right hand?

6     A    Yes, I did.

7     Q    What was he carrying?

8     A    It appeared to be a black helmet.

9     Q    Did you — once you arrived at the Speaker's Lobby Door,

10    did you meet up with any other officers?

11    A    Yes.

12    Q    Who did you meet up with?

13    A    We met up with a Sgt. Lively.

14    Q    Any other officers?

15    A    No.

16    Q    Could you describe the scene when you first arrived at the

17    Speaker's Lobby Door?

18    A    Upon making contact with Sgt. Lively outside of the

19    Speaker's House Lobby Door, we might have had ten to 20 seconds

20    before this group of people we are looking at now swarmed that

21    hallway in front of the door.

22    Q    Let me stop you right there.  So when you first arrived at

23    the Speaker's Lobby Door, were there any rioters there already?

24    A    I don't remember.

25    Q    And did the scene change after you arrived?

1   A    Yes.

2   Q    And how long after you arrived did the scene start

3   changing?

4   A    Very shortly after.

5   Q    And how many rioters do you estimate arrived in the first,

6   say, 30 — first minute that you were at the Speaker's Lobby

7   Door?

8   A    A small number that quickly grew in size.

9   Q    Were these rioters yelling at you?

10  A    Yes.

11  Q    Were they making demands of you?

12  A    Yes.

13  Q    And of the other officers too?

14  A    Yes.

15  Q    Did any of these rioters ask you to open the doors?

16  A    Yes.  I wouldn't say ask, though.

17  Q    Excuse me?

18  A    I wouldn't say they asked.

19  Q    How would you describe what the demand —

20  A    I would say they demanded us to open the door for them.

21  Q    What was your objective at this point in dealing with these

22  rioters?

23  A    At this time it was myself and two other officers to just

24  hold a police line.

25  Q    Okay.  As the scene was evolving, did you become

1   increasingly worried about your safety?

2   A    Yes.

3   Q    How about Sgt. Lively's safety?

4   A    Yes.

5   Q    How about Officer Lanciano's safety?

6   A    Yes.

7   Q    Special Agent Yetter, at any point when you were at the

8   Speaker's Lobby Doors, did you draw your weapon?

9   A    No.

10  Q    Why not?

11  A    Once the hallway was filled with 40-plus protesters and

12  rioters, there is third-party considerations as far as the

13  rounds of the firearm hitting multiple people, as well as being

14  over powered.  If we were to draw our guns, they could easily

15  outnumber us and then, take our weapons from us.

16  Q    If I can ask you to orient us a little bit more precisely.

17  As you and your colleagues stood by the Speaker's Lobby Door,

18  which way were you facing?  Were you facing towards the door or

19  away from the door?

20  A    Once we established our police line, we were facing away

21  from the door with the door to our backs.

22  Q    And do you recall if the doors have any glass insets in

23  them?

24  A    I do.  They did.

25  Q    So as you were facing the rioters, you were not able to see

1   behind you?

2   A    Correct.

3   Q    But the rioters were facing you, correct?

4   A    Yes.

5   Q    And so they would have had a direct line of sight into the

6   door?

7   A    Yes, sir.

8   Q    You said there were glass insets in that door?

9   A    Yes.

10   Q    Okay.  The glass was clear?

11   A    Yes.

12        MR. VALENTINI:  Can we pull up Exhibit No. 43, which

13   is already in evidence but not play.

14   BY MR. VALENTINI:

15   Q    Special Agent Yetter, do you recognize the image that we

16   see in this exhibit?

17   A    I do.

18   Q    And can you identify the two officers in the foreground in

19   this image?

20   A    That is Sgt. Lively to the right and myself to the left.

21   Q    Do you see furniture stacked immediately behind those

22   doors?

23   A    Yes, I do.

24   Q    Was that furniture already there when you arrived at the

25   Speaker's Lobby Doors?

1   A   Yes.

2   Q   And if –– may I ask you to look at the glass insets that

3   you just referenced.  Is that the glass inset that you just

4   referenced?

5   A   Yes.

6   Q   And does it look to be shattered at this point?

7   A   No.

8         MR. VALENTINI:  If we may play the exhibit until time

9   mark eight seconds into the exhibit, please.

10        (The video was played for the Court.)

11  BY MR. VALENTINI:

12  Q   What do you see in, in the background in this exhibit?

13  A   In that hallway it appears to be staff, Congressional

14  members and Congressional staff.

15  Q   And do these Congressional members and staff appear to be

16  on — on the side of the doors that you were on or on the other

17  side of the doors?

18  A   On the other side of the doors.

19  Q   And based on your experience that day, what do these

20  members and staffers appear to be doing?

21  A   Getting out of the building as quickly as possible.

22  Q   Would evacuating be a correct characterization of what they

23  were doing?

24  A   Yes.

25  Q   And in the next segment of this Exhibit 43, I would ask you

1   to please pay attention to the doors' glass inset.

2           MR. VALENTINI:  And we can play the exhibit to the

3   end.

4       (The video was played for the Court.)

5   BY MR. VALENTINI:

6   Q   Did you see in this portion of Exhibit 43, that the doors'

7   glass inset became shattered at some point?

8   A   Yes, I did.

9   Q   Special Agent Yetter, can you tell us how that glass came

10  to be shattered?

11  A   The individual wearing that furry motorcycle hat punched

12  the glass.

13  Q   Based on this exhibit, is it your understanding that

14  Congressional members and staff were still evacuating behind

15  the glass door at the time that the windows became shattered?

16  A   Yes.

17  Q   Do you recall if the individual who shattered that window

18  shattered only one window?

19  A   He, he shattered multiple windows.

20          MR. VALENTINI:  Let's pull up Exhibit No. 43, which is

21  already in evidence.  Let's play the first 23 seconds of the

22  exhibit.

23      (The video was played for the Court.)

24  BY MR. VALENTINI:

25  Q   So first of all, Special Agent Yetter, do you see a

1   gentleman who appears to be wearing a red hat and a yellow flag

2   around his neck?

3   A   Yes, I do.

4   Q   Can you identify for the Court the three officers that are

5   standing in front of the door in this clip?

6   A   That would be myself, Sgt. Lively, and then, Officer

7   Lanciano, who is out of frame.

8   Q   And how close do you estimate the gentleman wearing the

9   yellow flag is to you and your colleagues at this point in the

10  clip?

11  A   Within 3 feet.

12  Q   And how close do you estimate he is to the Speaker's Lobby

13  Door?

14  A   Within 4 to 5 feet.

15  Q   Do you remember this gentleman wearing this yellow flag

16  talking to you on January 6th?

17  A   I do not.

18  Q   So you also -- do you remember saying anything to the

19  gentleman on January 6th?

20  A   I do not.

21          THE COURT:  So is it your best memory that you -- that

22  there was no conversation, or you are not sure one way or the

23  other?

24          THE WITNESS:  I am unsure that I had a direct

25  conversation with him, as I was speaking to the general

1  protesters and rioters the entire day.  I didn't address one

2  single person as I remember.

3  BY MR. VALENTINI:

4  Q   And as you stand here today, you don't have an independent

5  recollection of speaking to this gentleman in particular?

6  A   I do not remember speaking to this individual at all.

7  Q   But it is possible that you spoke to him, along with other

8  members of the mob?

9  A   Yes.

10  Q   Okay.

11        MR. VALENTINI:  If we can play this exhibit until time

12  mark 1:02 into the exhibit.

13     (The video was played for the Court.)

14  BY MR. VALENTINI:

15  Q   What area of the Capitol is immediately behind this glass

16  door; if you know?

17  A   Behind the Speaker's Lobby glass door here is the entrance

18  to the House Chambers.

19  Q   And had the rioters breached that door at this point, would

20  they have had direct access to the Speaker's Lobby?

21  A   Yes, they would.

22  Q   And that is adjacent to the House Chamber, you just said?

23  A   Yes, sir.

24  Q   And at this point were there still staffers and members of

25  Congress in the Speaker's Lobby area?

 1  A    Yes.
 2            MR. VALENTINI:  Let's play the exhibit until 1:15.
 3        (The video was played for the Court.)
 4  BY MR. VALENTINI:
 5  Q    First of all, did you notice that the video skipped a
 6  little bit at the beginning?
 7  A    Yes, I did.
 8  Q    So it appears to be a compilation of videos in this
 9  exhibit?
10  A    Yes.
11  Q    Did you see in this last portion of the clip that we just
12  played, an individual with a fur hat?
13  A    Yes, I did.
14  Q    And what did he do?
15  A    He, he punched the glass on the door.
16  Q    And did you see how many glass panes he shattered?
17  A    Two.
18  Q    How, how close to your face did this gentleman punch the
19  glass doors?
20  A    Right next to my face.
21  Q    What was going through your mind when this gentleman
22  punched these glass panes next to your face?
23  A    What the heck is going on?
24  Q    Did you fear for your safety at that point?
25  A    Yes, I did.

1  Q    Did you fear for Sgt. Lively's safety at that point?

2  A    Yes.

3  Q    How about Officer Lanciano's safety?

4  A    Yes.

5  Q    Did you consider whether the mob would have been able to go

6  through you and your colleagues if they wanted to?

7  A    Yes, absolutely.

8  Q    Did you consider that to be a possibility and a risk?

9  A    Absolutely, yes.

10         MR. VALENTINI:  Can we play from 1:15 to 1:55, please.

11     (The video was played for the Court.)

12  BY MR. VALENTINI:

13  Q    Special Agent Yetter, do you see a man wearing a yellow

14  flag around his neck in this frame?

15  A    Yes, I do.

16  Q    And how far is this gentleman from the gentleman in the

17  fur-trimmed coat who previously punched the windows?

18  A    Right next to him.

19  Q    And how far are they from the police line?

20  A    Three to 4 feet.

21         MR. VALENTINI:  Can we pull up Exhibit 40, which is

22  already in evidence.

23  BY MR. VALENTINI:

24  Q    As we play the first portion of this exhibit, Special Agent

25  Yetter, I would ask you to pay attention to the audio.

1        MR. VALENTINI:  Can we start until 9 seconds into the

2   exhibit, please.

3        (The video was played for the Court.)

4   BY MR. VALENTINI:

5   Q   Did you hear any sound in this exhibit?

6   A   Yes.

7   Q   Did you hear a voice scream out a command?

8   A   Yes, I did.

9   Q   What was the command?

10  A   They were screaming to open the door.

11  Q   Okay.

12       MR. VALENTINI:  I would ask you to continue paying

13  close attention to the sound, and we are going to play the

14  exhibit until time stamp 25 seconds into it.

15       (The video was played for the Court.)

16  BY MR. VALENTINI:

17  Q   Did you hear a voice in this portion of the exhibit?

18  A   Yes, I did.

19  Q   Did this person seem to make a statement several times?

20  A   Yes.

21  Q   What was the statement?

22  A   That they had possession of a knife.

23  Q   And can you identify the location of this recording based

24  on what you have seen so far?

25  A   Within that same hallway that myself, Sgt. Lively, and

1  Officer Lanciano were in.

2  Q   So that would be outside the Speaker's Lobby, Speaker's

3  Lobby Door?

4  A   Yes, sir.

5          MR. VALENTINI:  You can continue to play the exhibit

6  until time mark 35 seconds into the exhibit, please.

7      (The video was played for the Court.)

8  BY MR. VALENTINI:

9  Q   Okay.  Special Agent Yetter, did you hear a voice in this

10  portion of the exhibit?

11  A   Yes.

12  Q   What did the voice say?

13  A   The voice saying, "They are leaving."

14  Q   Did you recognize the three officers at the Speaker's Lobby

15  Door in this frame?

16  A   Yes, I do.

17  Q   These are still you and Sgt. Lively and Officer Lanciano?

18  A   Yes, sir.

19  Q   At this point in the exhibit the glass panes appear to

20  already have been shattered?

21  A   Yes.

22  Q   But the glass itself is still within the window?

23  A   Yes.

24  Q   How does the scene as you see at this point compare to the

25  scene when you first arrived at the Speaker's Lobby Door?

KYLE YETTER – DIRECT/VALENTINI      Vol. 2 – 222

1   A    At this time, this entire hallway is filled with people,

2   wall-to-wall people.

3   Q    Does it seem more chaotic than you first found it?

4   A    Yes, absolutely.

5   Q    How did your danger assessment evolve from the time you

6   first got to the door until this point in the exhibit?

7   A    Progressively getting worse.

8            MR. VALENTINI:  Let's play the next four seconds of

9   the exhibit until time stamp 39 into the exhibit, please.

10       (The video was played for the Court.)

11  BY MR. VALENTINI:

12  Q    Do you see the individual I have highlighted in yellow

13  wearing a yellow flag around his neck?

14  A    Yes, sir, I do.

15  Q    Which direction does he appear to be facing?

16  A    Facing towards the door.

17  Q    So does it appear to you that this gentleman has a direct

18  line of sight to the glass door?

19  A    Yes, sir.

20  Q    And is this around the same time where, in Exhibit 43, we

21  saw there were still members of Congress on the other side of

22  the door?

23  A    Yes, it is.

24           MR. VALENTINI:  If we can play the next portion of the

25  exhibit until time stamp 1:01 into the exhibit, please.

1    (The video was played for the Court.)

2  BY MR. VALENTINI:

3  Q   Does this image at time stamp 1:01 into the exhibit reflect

4  the very front of the mob at this point?

5  A   Yes, it does.

6  Q   Do any of the individuals in this frame stand out in your

7  mind?

8  A   From that day, the individual that stood out the most to me

9  is the one wearing the fur motorcycle hat.

10  Q   That is the same individual who punched the glass windows

11  next to your face?

12  A   Yes.

13  Q   Do you also see another individual in the forefront wearing

14  a yellow flag around his neck?

15  A   I do.

16  Q   Based on your knowledge of the, of the area, how far is the

17  gentleman in the yellow flag from the Speaker's Lobby Door at

18  this point?

19  A   Still within 4 to 5 feet of the door.

20  Q   For the next portion of the clip, I would ask that you

21  please pay attention to these two gentlemen that you just

22  identified.

23        MR. VALENTINI:  And we can play this exhibit until

24  time mark 1:13 into the exhibit, please.

25        (The video was played for the Court.)

1  BY MR. VALENTINI:

2  Q   Which direction is the gentleman in, wearing the yellow

3  flag around his neck facing now?

4  A   It appears he is facing the opposite direction.

5  Q   Okay.

6       MR. VALENTINI:  If we can maybe go frame by frame,

7  just one second further into the exhibit.

8       (The video was played for the Court.)

9       MR. VALENTINI:  Stop.

10  BY MR. VALENTINI:

11  Q   What, if anything, is the gentleman in the yellow flag

12  holding in his left hand?

13  A   He, he is holding a black helmet.

14  Q   Did you see the gentleman do anything to that, with his

15  right hand to the black helmet?

16  A   Yes.

17  Q   What did he do?

18  A   He made a gesture, knocking on the helmet to identify that

19  it was a hard surface.

20       MR. MAYR:  Your Honor, I will object to the form of

21  the question, as well as the testimony.  It is unclear whether

22  he is testifying based on his recollection or based on what is

23  depicted in the video.

24       THE COURT:  My assumption is the way that it was

25  asked, that it — but let me not make an assumption.  Is this

1   based on something else or based on what you see or is it based

2   on what you remember seeing?  You need to clarify the testimony

3   relating to the helmet that you have just spoken about.

4              MR. MAYR:  Thank you, Your Honor.

5   BY MR. VALENTINI:

6   Q   Sitting here today, do you have any independent

7   recollection of seeing this gentleman knock, knock on the black

8   helmet that day?

9   A   No.

10  Q   But reviewing this exhibit today, did you see the gentleman

11  in the yellow flag knock on the helmet?

12  A   Yes.

13  Q   How did you interpret what the gentleman in the yellow flag

14  do to the helmet?

15  A   He, he is knocking on the helmet to gesture that it is a

16  hard surface.

17             MR. MAYR:  I am going to object to --

18             THE COURT:  I think in terms of what the purpose is,

19  that the person with the yellow flag on his neck is doing -- I

20  don't think he can decide what it is, okay?  But he is, he is

21  testifying to knocking on the helmet, which obviously indicates

22  it, it is a hard object.  Go ahead.

23  BY MR. VALENTINI:

24  Q   In the next short clip I would ask you to pay close

25  attention to the gentleman in the fur hat and the gray

1  backpack.

2          MR. VALENTINI:  You can play.

3      (The video was played for the Court.)

4          MR. VALENTINI:  Can we play maybe a couple more

5  seconds.

6      (The video was played for the Court.)

7  BY MR. VALENTINI:

8  Q   By this point in the exhibit, does the gentleman in the

9  yellow flag still have possession of the helmet?

10  A   No.

11  Q   Did the gentleman in the yellow flag pass the helmet to

12  someone else?

13  A   Yes, they did.

14  Q   Whom did they pass it to?

15  A   The person who was wearing the, the fur motorcycle hat.

16  Q   And you say was wearing the fur motorcycle hat?  Why do you

17  say that?

18  A   It appears in the frame that he looks like he took it off.

19  Q   But he still —

20          THE COURT:  Can you speak a little more clearly into

21  the microphone?  You need to move it over.

22          THE WITNESS:  Sorry.  Sorry, Your Honor.

23          THE COURT:  That is okay.  You can actually move the

24  microphone.  There you go.

25

1    BY MR. VALENTINI:

2    Q    But he still — the same gentleman is still wearing a gray

3    backpack?

4    A    Yes.

5    Q    Okay.  Special Officer Yetter, was the situation at the

6    Speaker's Lobby Doors tense at this point?

7    A    Yes, incredibly.

8    Q    Could you give a sense to the Court of how many rioters

9    there were at this point at that scene versus officers?

10    A    There were three officers in that entire hallway.  It was

11    filled, so 40-plus rioters and protesters.

12    Q    If the rioters attempted to go through you, was there any

13    way you could have stopped them?

14    A    There is no way that the three of us could hold off such a

15    large number of people.

16    Q    Did there come a time when you moved away from the

17    Speaker's Lobby Door?

18    A    Yes.

19    Q    How did you come to that decision?

20    A    Sgt. Lively told me at a certain point that we would stage

21    to the wall and eventually go down and — that a CERT Team, the

22    Capitol Emergency Response Team, would respond forward up the

23    stairs and replace us.

24          MR. VALENTINI:  Can we play this exhibit until time

25    mark 1:35 into the exhibit.

1      (The video was played for the Court.)

2  BY MR. VALENTINI:

3  Q    In this segment of the video, did you see the three

4  officers leave the Speaker's Lobby Door?

5  A    Yes.

6  Q    What is the very first thing that you see in the video

7  happen after the officers leave the scene?

8  A    People advance on the door, and the gentleman in the yellow

9  flag pressed against the door.

10 Q    And who is the first member of the mob who makes contact

11 with the door?

12 A    The one wearing the yellow flag.

13     MR. VALENTINI:  Let's continue playing this exhibit

14 until 1:46 into the exhibit.

15     (The video was played for the Court.)

16 BY MR. VALENTINI:

17 Q    What just happened in this portion of the exhibit?

18 A    Multiple individuals began breaking the glass further and

19 attempting to gain access to the door.

20 Q    Do you see a gentleman wearing a yellow flag in this frame?

21 A    Yes.

22 Q    Approximately how far is it from the rioters who are trying

23 to break the door?

24 A    Right next to them.

25     MR. VALENTINI:  Let's continue playing this exhibit

1  until time mark 1:52 into the exhibit.

2       (The video was played for the Court.)

3  BY MR. VALENTINI:

4  Q   Special Agent Yetter, what does the gentleman in the gray

5  backpack do in this portion of the exhibit?

6  A   He is using the helmet to punch the glass.

7  Q   And is that the same helmet that the man in the yellow flag

8  passed to him just some seconds earlier in the exhibit?

9  A   Yes.

10  Q   And is that the same helmet that the gentleman in the

11  yellow flag knocked on a few seconds earlier in the exhibit?

12  A   Yes, it is.

13  Q   And can you still see the gentleman in the yellow flag in

14  this frame as the gentleman in the gray backpack is using the

15  helmet to break down the window?

16  A   Yes.

17  Q   How far is it?

18  A   Three to 4 feet.

19       MR. VALENTINI:  Let's continue playing the exhibit

20  until time mark 1:58 into the exhibit, please.

21       (The video was played for the Court.)

22  BY MR. VALENTINI:

23  Q   In the segment of the exhibit could you hear someone in the

24  mob yell out, "There is a gun"?

25  A   Yes.

1   Q   Do you see a gun in the video?

2   A   Yes, I do.

3   Q   Which side of the Speaker's Lobby Door does the gun appear

4   to be on?

5   A   If you are facing the door, to the left side.

6   Q   So that would be on the — the far side of the Speaker's

7   Lobby Door that you and the other officers were on?

8   A   Yes.

9   Q   On the other side of the door that the rioters were on?

10   A   The — yes, the other side, not the side that the rioters

11   were on.

12          MR. VALENTINI:  Let's continue playing this exhibit

13   until time mark 2:10 into the exhibit, please.

14      (The video was played for the Court.)

15   BY MR. VALENTINI:

16   Q   In the recording that we just played, did you hear what

17   appeared to be a gun being fired?

18   A   Yes, I did.

19   Q   Did you see what appeared to be a gun being fired?

20   A   Yes.

21   Q   And that was a little bit before time mark 2:10 in this

22   exhibit; is that correct?

23   A   Yes, sir.

24   Q   I am going to ask you to remember that time stamp as we

25   continue to review this exhibit.  Now, thinking back in your

KYLE YETTER – DIRECT/VALENTINI      Vol. 2 – 231

1  memory on January 6, do you remember hearing a gun being fired

2  at the Speaker's Lobby Door at about this time?

3  A   Yes, I do.

4  Q   Where were you when you heard this gun being fired?

5  A   Right by the stairs that are to the left of that door.

6  Q   So would you say you were nearby?

7  A   Yes, very close.

8  Q   What did you do when you heard the gun being fired?

9  A   Myself, Sgt. Lively, and Officer Lanciano responded back

10 up.

11 Q   When you say "back up," it is because you had come down

12 some portion of the staircase that you just referenced, right?

13 A   Yes.

14 Q   What became the priority at that point for you?

15 A   To, again, see, see what we could do to better the

16 situation.

17 Q   Was one of your priorities rendering aid to anyone who may

18 have been wounded?

19 A   Yes, of course.

20 Q   And how does the presence of rioters in this area affect

21 your and the other officers' ability to render aid?

22 A    It makes it incredibly difficult, as well as it makes it

23 difficult for medical personnel to respond in while the event

24 is still active.

25 Q   Okay.

1         MR. VALENTINI:  Can we please play the — continue

2    playing the exhibit until time mark 2:28 into the exhibit,

3    please.

4         (The video was played for the Court.)

5    BY MR. VALENTINI:

6    Q    Special Agent Yetter, do you recall additional officers

7    appearing at the scene shortly after the gun was fired?

8    A    Yes, I do.

9    Q    Are those the officers visible in this frame in this

10   exhibit?

11   A    Yes.

12   Q    And what is your understanding of what the officers were

13   trying to accomplish?

14   A    This is the Capitol Emergency Response Team.  They were

15   attempting to establish a more secure perimeter.

16   Q    And based on your experience that day, was the presence of

17   rioters interfering with the officers' performance of their

18   duties at this point?

19   A    Yes.

20         MR. VALENTINI:  Let's continue playing this exhibit

21   until time mark 2:37 into the exhibit, please.

22         (The video was played for the Court.)

23   BY MR. VALENTINI:

24   Q    Do you see an individual wearing a yellow flag around his

25   neck?

1   A    Yes, sir.

2   Q    And could you please identify the time stamp at this point?

3   A    2:37.

4   Q    Based on your knowledge of that area, how far do you

5   estimate this individual was from the person who was wounded

6   when the gun was fired?

7   A    Five feet.

8   Q    What is the person wearing the yellow flag holding in his

9   right hand?

10  A    A cell phone.

11  Q    What does he appear to be doing with his cell phone?

12  A    Recording.

13  Q    And you testified before that the gun was fired at

14  approximately time stamp 2:10 into this exhibit?

15  A    Yes.

16  Q    And the image at this point is about 2:37?

17  A    Yes.

18  Q    So that is approximately 27 seconds after the gun was

19  fired?

20  A    Yes.

21  Q    Based on your experience as a police officer and that day,

22  was the presence of the gentleman in the yellow flag

23  interfering with the officers' ability to perform their duties

24  at this point?

25  A    Yes.

1  Q   Okay.

2          MR. VALENTINI:  Can we play, continue playing this

3  exhibit from time stamp 2:47 to 3:31.

4          (The video was played for the Court.)

5  BY MR. VALENTINI:

6  Q   You testified before that after hearing the gunshot, you

7  returned to the area.

8  A   Yes.

9  Q   Did Officer Lanciano also return to the area?

10 A   Yes, he did.

11 Q   Can you identify any of the officers in the mid to right

12 portion of this exhibit?

13 A   Officer Lanciano is center in the frame currently, then I

14 am to the right of Officer Lanciano.

15 Q   What were you trying to accomplish at this point?

16 A   Clear people out of the way so that the CERT Team could

17 render aid, as well as continue to just hold the police line

18 and push people back.

19 Q   Were you successful in clearing that area?

20 A   No.

21         MR. VALENTINI:  Can we go maybe one more second into

22 the exhibit.

23         (The video was played for the Court.)

24         MR. VALENTINI:  Play the exhibit until time

25 stamp 5:20.

1      (The video was played for the Court.)

2  BY MR. VALENTINI:

3  Q   Did you just hear your voice in the exhibit?

4  A   Yes, I did.

5  Q   And what were you doing at this point in the exhibit?

6  A   Telling everyone to give us space.

7  Q   Was that a priority at that time?

8  A   Yes, absolutely.

9  Q   Was that your top priority at that time?

10 A   Yes.

11      MR. VALENTINI:  We can continue until time stamp 5:20.

12      (The video was played for the Court.)

13 BY MR. VALENTINI:

14 Q   Do you see the gentleman in the yellow flag in this portion

15 of the exhibit?

16 A   Yes.

17 Q   And what is the time stamp that you are looking at?

18 A   5:20.

19 Q   Based on your understanding of the area, how far is the

20 gentleman in the yellow flag from the location where the

21 person, the person was shot in this frame?

22 A   5 to 6 feet.

23 Q   Did the presence of a rioter within five to 6 feet of a

24 scene interfere with the officer's ability to carry out their

25 mission?

1   A    Yes.

2   Q    How about the ability to render aid to the person who was

3   shot?

4   A    Yes.

5   Q    Now, before I ask you to remember the time when the gun

6   appears to be shot in this exhibit, do you remember what that

7   time was?

8   A    2:10.

9   Q    And now, the time mark is — what is the time mark now

10  again?

11  A    5:20.

12  Q    So that is more that three minutes after the gun was fired?

13  A    Yes.

14  Q    And was the presence of the gentleman in the yellow flag

15  interfering with your ability at this point, three minutes

16  after the gun was fired?

17  A    Yes.

18       MR. VALENTINI:  Let's continue playing this exhibit

19  until time stamp 7:18, please.

20       (The video was played for the Court.)

21  BY MR. VALENTINI:

22  Q    What is the time stamp at this point in the exhibit?

23  A    7:18.

24  Q    And is the gentleman wearing the yellow flag around his

25  neck still at the location of the shooting at this point?

1    A    Yes.

2    Q    And based on your understanding of the area, how far is he

3    at this point from the site of the shooting?

4    A    He is still at the site of the shooting.

5    Q    Does it appear that any other rioters are closer than the

6    gentleman wearing the yellow flag around his neck at this point

7    of the exhibit to the site of the shooting?

8    A    No.

9    Q    You said before that the gun was fired at approximately

10   time stamp 2:10 into this exhibit?

11   A    Yes, sir.

12   Q    So this is over five minutes after the gun appears to have

13   been shot?

14   A    Yes.

15          MR. VALENTINI:  Can we continue playing the exhibit

16   until time mark 10:48, please.

17       (The video was played for the Court.)

18   BY MR. VALENTINI:

19   Q    As we stop now for a second, could you identify the time

20   stamp?

21   A    7:54.

22   Q    Time stamp 7:54, the gentleman in the yellow flag is still,

23   of all the rioters, the one who is the closest to the police

24   line?

25   A    Yes.

1         MR. VALENTINI:  May we continue.

2         (The video was played for the Court.)

3    BY MR. VALENTINI:

4    Q   Special Agent Yetter, after the shooting, were several of

5    the officers assigned to just keep the rioters away from the

6    scene of the shooting?

7    A   Yes.

8    Q   And did that prevent officer resources from other

9    functions?

10   A   Yes.

11   Q   Including potentially rendering additional aid to the

12   person who was shot?

13   A   No.

14   Q   Did the resources, however, from other functions such as

15   securing other portions of the Capitol?

16   A   Yes.

17   Q   At time mark 10:48, does it appear that the gentleman in

18   the yellow flag is still in the area of the shooting?

19   A   Yes.

20   Q   And based on your knowledge of that location, how far would

21   you estimate that the gentleman in the yellow flag was from the

22   site of the shooting?

23   A   He is still at the site of the shooting.

24   Q   Was that close enough to interfere with the officers' work?

25   A   Yes.

1    Q    Did there come a time when additional officers arrived in

2    the general vicinity of the Speaker's Lobby Doors?

3    A    Yes.

4    Q    Do you recall whose agency those officers work for?

5    A    Metropolitan Police Department.

6    Q    And were they able to eventually clear the area from

7    rioters?

8    A    Yes, that immediate area.

9              MR. VALENTINI:  Let's play this exhibit until the end.

10         (The video was played for the Court.)

11             MR. VALENTINI:  We can take down that exhibit, and if

12   we may publish Exhibit 61, please, which is already in

13   evidence.

14         (The video was played for the Court.)

15             MR. VALENTINI:  Let's play the first nine seconds of

16   this exhibit, if we may.

17         (The video was played for the Court.)

18   BY MR. VALENTINI:

19   Q    Special Agent Yetter, can you identify again the general

20   location of this exhibit?

21   A    Yes.  This is right outside the Speaker's Lobby Door.

22   Q    And could you identify again the officers who are visible

23   in this exhibit?

24   A    Center in frame is Sgt. Lively.  To the left, cut out, is

25   myself, and then, Officer Lanciano.

1   Q   How many rioters did you see in the first nine seconds of

2   this exhibit?

3   A   Can you play it again?

4           MR. VALENTINI:  Okay.

5       (The video was played for the Court.)

6   BY MR. VALENTINI:

7   Q   How many rioters did you see in this portion of the

8   exhibit?

9   A   It appears to be three to five.

10  Q   And does the glass appear, glass in the lobby door appear

11  to be intact at this point in the exhibit?

12  A   Yes.

13  Q   Based on your recollection of the events of the day, does

14  this appear to be very early on when you arrived at the

15  Speaker's Lobby Door?

16  A   Yes, it does.

17  Q   Does the area look particularly crowded to you at this

18  time?

19  A   No.

20          MR. VALENTINI:  Can we continue to play this exhibit

21  until time stamp 18 seconds into the exhibit, please.

22      (The video was played for the Court.)

23          MR. VALENTINI:  Let's play another six seconds until

24  time stamp 24 seconds into the exhibit.

25      (The video was played for the Court.)

1    BY MR. VALENTINI:

2    Q    Did you hear a voice referencing people getting crushed?

3    A    Yes.

4    Q    Okay.  Based on your recollection of events at this point,

5    was there any danger at this point that people will be crushed

6    at that area?

7    A    I don't understand the question.

8    Q    Okay.  Was the area crowded at this point?

9    A    This area?  No.

10   Q    Okay.  Did it look to you like people were getting crushed

11   at the Speaker's Lobby Doors at this point?

12   A    No.

13   Q    Did it look to you like opening the doors to the Speaker's

14   Lobby Door was necessary to prevent people from getting crushed

15   at this point?

16   A    No.

17   Q    Okay.  Special Agent Yetter, on January 6th, did there come

18   a time where you were afraid for your life?

19   A    Yes.

20   Q    Were you afraid for Sgt. Lively's life?

21   A    Yes, of course.

22   Q    How about Officer Lanciano's life?

23   A    Absolutely.

24              MR. VALENTINI:  Brief indulgence.

25              No further questions.

1        THE COURT:  All right.  Why don't we take our morning

2   break.  It is 10:30.  So I will see you back at 10:45, and I

3   would just ask that you not talk about your testimony, okay?

4   We will see you back at 10:45.

5        (Brief recess, 10:31 a.m. - 10:54 a.m.)

6                       AFTER RECESS

7        THE COURT:  Good morning again.  We will begin with

8   the cross-examination.

9        MR. MAYR:  Your Honor, before I begin, over the break

10  the Government and I conferred, and I have an exhibit —

11       THE COURT:  You need to speak into the microphone a

12  little more carefully.

13       MR. MAYR:  Thank you.  Over the break the Government

14  and I conferred, and we agreed to stipulate.  We agreed to

15  stipulate to an exhibit that I am going to move to offer as

16  soon as I get the thumb drive back.  It is going to be

17  Defendant's Exhibit 273, and at the lunch break I will provide

18  an amended exhibit list to the Court —

19       THE COURT:  Okay.

20       MR. MAYR:  — with reference to this, but that —

21       THE COURT:  All right.

22       MR. MAYR:  For the record, I have placed the video on

23  a thumb drive, and I can tender that to your law clerk at this

24  time.  But both parties have it and are going to be publishing

25  it from our computers.

1          THE COURT:  Is that accurate from the Government?

2          MR. VALENTINI:  Yes.  We just received the exhibit

3   over the last break.  Yes.

4          THE COURT:  Okay.  And are you agreeing to it being

5   admitted?

6          MR. VALENTINI:  Yes.  We have no objection to that.

7          MR. MAYR:  Just for the record, it was provided in

8   discovery.  It just was not used.  So I didn't want the Court

9   to think that this wasn't anything that the Government wasn't

10  aware of prior to this, if that makes sense.

11         THE COURT:  Yes.

12         MR. MAYR:  Okay.  Thank you.

13         May I proceed, Your Honor?

14         THE COURT:  Yes.

15         MR. MAYR:  Thank you.

16                       **CROSS-EXAMINATION**

17  BY MR. MAYR:

18  Q   Good morning, Special Agent Yetter.

19  A   Good morning, sir.

20  Q   To start off, I would like to reiterate this.  I would like

21  to talk a little bit more about how you don't have any

22  independent recollection of anything that Mr. Grider said or

23  did on January 6th when he was there at the Speaker's Lobby

24  Door in front of you; is that correct?

25  A   Yes.

1    Q    And to put that, to kind of put this in the context for the

2    Court, immediately -- well, not immediately, but shortly after

3    this incident as part of sort of the aftermath of this, you

4    were interviewed by multiple individuals, including Special

5    Agent Michelle Ball, who has been working with the Government

6    on this case, correct?

7    A    Yes.

8    Q    And in those interviews you describe your recollections at

9    that time just weeks after this took place, right?

10   A    Yes.

11   Q    And they, they pressed you on remembering all that you

12   could about what took place there at the Speaker's Lobby Door?

13   A    Yes.

14   Q    They showed you photographs of Mr. Grider with his red hat

15   and the yellow flag tied around his neck?

16   A    Yes.

17   Q    And just as you are unable today here in court to have --

18   be able to recall anything about him, even then, you were

19   unable to recall anything that stood out in terms of what he

20   said?

21   A    Yes.

22   Q    As well as in terms of what he did?

23   A    Yes.  That's correct.

24   Q    Now, undeniably, there were other individuals that you were

25   able to remember and that you probably will never be able to

1    forget, like the crazed individual in the fur-lined hat or the

2    motorcycle hat or whatever we want to call it, correct?

3    A    Yes, sir.

4    Q    He stands out in your mind because he was undeniably,

5    unquestionably, without any doubt, intent on getting through

6    those doors, right?

7    A    Yes.

8    Q    Based on what you observed?

9    A    Yes, sir.

10   Q    As well as based on what you heard that day?

11   A    Yes.

12   Q    Were there any other individuals, based on your

13   recollection that stood out to you that moment right before the

14   shooting takes place at the Speaker's Lobby Door?

15   A    No.

16   Q    We know, because we have seen in Government's Exhibits 40

17   and 42, that there obviously are two individuals who are

18   standing there filming or video recording everything that is

19   taking place; is that correct?

20   A    Yes, sir.

21   Q    And on some of these exhibits, particularly, Government's

22   Exhibit No. 40, which we all refer to as the JaydenX video, at

23   points you can hear JaydenX actually trying to talk with you;

24   do you remember that?

25   A    No, I do not.

1   Q   Let me, let me make it a little bit more clear for you and

2   for the Court.  You don't have any recollection from that day,

3   in your memory, of JaydenX trying to speak with you; is that

4   right?

5   A   I don't recall at all.

6            THE COURT:  Can we ask, do you know who JaydenX is?

7   Do you remember who he is?

8            THE WITNESS:  No.

9            MR. MAYR:  Let me publish, if I can have the screen,

10  Ms. Patterson, please.

11            For the record, I am going to publish Government's

12  Exhibit 40.

13      (The video was played for the Court.)

14            MR. MAYR:  I am going to start at the 1:23 mark of

15  this video, and let you watch it for a moment.

16            (The video was played for the Court.)

17            MR. MAYR:  I am sorry, let me back it up to the 1:00

18  mark.  Playing Government's 40 at the 1:00 mark.

19      (The video was played for the Court.)

20            MR. MAYR:  I will stop it right there at the 1:25.

21  BY MR. MAYR:

22  Q   You were able to see on that video that -- we call him

23  JaydenX, but the person who is making the recording that is

24  Government's Exhibit 40, we see that person engaged in a

25  dialogue with you, correct?

1  A   Yes.

2  Q   And we see you actually —

3        THE COURT:  Can you point out on the video who you are

4  talking about, Special Agent?

5        MR. MAYR:  Judge, we are talking about —

6        THE COURT:  No, I am asking him.  You are asking him

7  if he knows where he is.  I would like to know on the video who

8  we are talking about.

9        MR. MAYR:  Oh.  Okay.

10       THE COURT:  So is this person on the video you are

11  looking at now?

12       THE WITNESS:  Your Honor, the, the recording is of the

13  person speaking to me who, who is not in the frame.

14       THE COURT:  So is the person on the video or not?

15       THE WITNESS:  Their voice is.  Their physical presence

16  is not.  I am sorry.

17       THE COURT:  It is the voice but not the physical

18  presence.

19       THE WITNESS:  Yes, Your Honor.

20       THE COURT:  Okay.

21  BY MR. MAYR:

22  Q   What — I want to make sure we are on the same

23  understanding, and then, make sure the Court understands this.

24  This video that we are looking about, the person I am talking

25  about is the person holding the camera making this recording,

1  correct?

2  A   Yes, sir.

3  Q   That -- you understand that that is the person I am asking

4  you the questions about, right?

5  A   Yes.

6  Q   The person that is holding and recording this video that is

7  Government's 40.  The video recorder, the person doing the

8  video recording is engaged in a dialogue with you, correct?

9  A   Yes.

10      MR. MAYR:  I will back it up here just to the 1:15

11  mark.  Let's go back to the 1:05 mark on Government's 40.

12      (The video was played for the Court.)

13  BY MR. MAYR:

14  Q   That person we hear say, "We don't want you to get hurt.

15  There are people coming up here."  That is the actual

16  photographer or videographer.  That is the person who is making

17  this video, correct?

18      MR. VALENTINI:  Objection.  Lack of foundation.  How

19  is the witness supposed to know?

20      THE COURT:  I am sorry?  I need to hear your objection

21  again.

22      MR. VALENTINI:  Lack of foundation.  How is the

23  witness supposed to know who is saying what on the video?

24      THE COURT:  I am having a little trouble here at least

25  based on -- maybe there is another way of doing it.  Obviously,

1    somebody is taking the video of this.

2              MR. MAYR:  Right.

3              THE COURT:  It is not clear to me how he knows who

4    this person is or that that, the person speaking is the one

5    doing the video.  That is the little nexus that is missing

6    here.

7              MR. MAYR:  Let me try to connect that here.

8              THE COURT:  Okay.

9    BY MR. MAYR:

10   Q   Would you agree that the -- again, backing up.

11             MR. MAYR:  We will watch it again here starting at the

12   1:07 mark.

13        (The video was played for the Court.)

14   BY MR. MAYR:

15   Q   Okay.  We saw you look at him, and you kind of blinked your

16   eyes.  Is that the person who is video -- making this video

17   recording?

18   A   Yes.

19   Q   All right.

20             THE COURT:  You know it is this particular video that

21   he is making?

22             THE WITNESS:  Yes, Your Honor.

23             THE COURT:  Okay.  All right.  I just want to make

24   sure we are clear.  Go ahead.

25             MR. MAYR:  I hope it is clear with the Court as well.

 1          THE COURT:  I understand what you are asking.

 2          MR. MAYR:  Thank you.

 3  BY MR. MAYR:

 4  Q   He is, obviously –– well, let's start with your own

 5  independent recollection, and then, we will talk about what is

 6  depicted on the exhibit.  From the, from the exhibit, from the

 7  video, we know that you had this dialogue with him, right?

 8  A   Yes, sir.

 9  Q   But separate and apart from that, there was nothing that

10  stood out in your mind about that conversation with him that

11  day?

12          THE COURT:  Can I just ask, you made an assumption

13  there is a conversation.  I haven't –– did you say something

14  back?  You have indicated you, you recognized the person with

15  the video speaking to you.  Did you say something back?  There

16  is nothing on the video that says if you did.  I want to know

17  that.  I want to know one way or the other because that is a

18  conversation.  If you didn't say anything, there is no

19  conversation.

20          THE WITNESS:  As Your Honor spoke, it, it wasn't a

21  real conversation.  Throughout the entire day of January 6th, I

22  repeated the phrase, "You need to leave."  "You are not allowed

23  to be here," and you, "You can't be here."  And then, on the

24  other side, protesters, members of the media, rioters repeated

25  phrases that this person was saying, like, "We don't want to

1    hurt you."  "You are going to get hurt."  "Get out of our way."

2    "Open the door."  So that −− the conversation and what he was

3    saying didn't stick out to any one particular protester as it

4    was said throughout the day.

5    BY MR. MAYR:

6    Q   Because obviously, the photographer or the videographer

7    making this video, who −− he is standing here right next to

8    you, right?

9    A   Yes, sir.

10   Q   He is not doing anything that appears to be using force

11   against you, right?

12   A   No.

13   Q   In fact, quite the opposite.  He has expressed that he

14   doesn't want to see you get hurt, right?

15   A   Yes.  He expressed that he didn't want to see us get hurt.

16   Q   Okay.  And to take what you had just said, in this group of

17   individuals that are present, there are lots of different

18   individuals saying lots of different things, correct?

19   A   Yes.

20   Q   The ones who were agitated and were yelling in your face

21   like the gentleman in the fur−lined hat stick out in your mind,

22   right?

23   A   Yes, the gentleman in the fur−lined hat.

24   Q   But you can acknowledge and affirm that there were other

25   individuals there that did not act in an agitated manner, fair

1   to say?

2   A   No, sir.  I, I would say that regardless of someone's

3   words, their presence of being in a building that they are not

4   authorized to be in.

5   Q   Sure.

6   A   It is one thing to say we are not going to hurt you.  It is

7   another thing to remain on site.

8   Q   I don't disagree with you on that, but there are different

9   levels of actions — there are different levels of actions

10   between all the people who are standing there at the Speaker's

11   Lobby Door, correct?

12   A   Yes, sir.

13   Q   And there is — some people are yelling and shouting, and

14   other people are standing there not saying anything or just

15   recording what is taking place?

16   A   Yes.

17   Q   Thank you.

18        MR. MAYR:  Let's go, and I would like to publish

19   Government's Exhibit 61 at this time.

20        (The video was played for the Court.)

21        MR. MAYR:  I am going to stop at the 1:00 mark on that

22   exhibit.  Were you able to hear on that exhibit the individual

23   making this recording trying to talk with you and with the

24   Sergeant at Arms officer that was there, was there with you-all

25   as well?

1   A   I am not sure who the Sergeant at Arms person is.

2   Q   There was another non-Capitol Police officer who had a

3   walky-talky.  Do you remember that individual being up there at

4   the Speaker's Lobby Door with you-all?

5   A   From the video, yes.  Not in my recollection.

6   Q   Not in your recollection?

7   A   Through the video, I, I saw that someone had a walky-talky.

8   Q   But you don't have any independent recollection of this

9   other individual being ––

10  A   No, no.

11  Q   Okay.  But you hear the person making this recording saying

12  things about people getting crushed, right?

13  A   Yes, I do.

14  Q   What else do you remember hearing that voice saying?

15          MR. VALENTINI:  Objection.  Can we clarify whether the

16  Defense counsel ––

17          THE COURT:  Since he hasn't identified him and has no

18  recollection.  So he is going by the video, and you are asking

19  your question, it is not clear whether you are saying the

20  person who is doing the video or whether you are talking about

21  the person with the walky-talky.

22          MR. MAYR:  Fair enough.

23          THE COURT:  If you can clarify that, I would

24  appreciate it.

25

1  BY MR. MAYR:

2  Q   Let's go back and start again and watch and listen to

3  what — listen to the different voices that you hear on this

4  recording, okay?  I am going to go back to the 45-second

5  mark — actually, let me go back to the 30-second mark.

6      (The video was played for the Court.)

7  BY MR. MAYR:

8  Q   We hear lots of different voices on that video, right?

9  A   Yes, sir.

10 Q   You hear someone shouting, "This is our house," right?

11 A   Yes.

12 Q   Do you, do you remember who was shouting that at that

13 moment?

14 A   No.

15 Q   Okay.  Do you remember that the individual in the fur-lined

16 hat was shouting and yelling multiple things throughout this

17 entire episode?

18 A   Yes, absolutely.

19 Q   Okay.  But there is a different voice that we hear on this

20 recording talking about officers being crushed; did you hear

21 that?

22 A   Yes, sir.

23 Q   I would like you to listen.  I will start at 55 seconds.  I

24 would like you to listen, and other than shouting and yelling,

25 I would like to ask you whether you hear anything that is

1    distinctly said from this point forward on this video.

2          (The video was played for the Court.)

3              MR. MAYR:  Stopping there at the 1:35 mark.

4    BY MR. MAYR:

5    Q    You can see and hear our fur-hatted gentleman yelling out,

6    "Hey, hey," right?

7    A    I don't know if through the video I could determine that

8    that is him.

9    Q    Okay.

10             MR. MAYR:  Let me continue playing on — let me back

11   up to the 1:25 mark and play from there.

12         (The video was played for the Court.)

13             MR. MAYR:  I will stop right there at the 2:20 mark.

14   BY MR. MAYR:

15   Q    In this entire time have you been able to clearly hear

16   anything that is being said on this video?

17   A    It, it just sounds like yelling.

18   Q    Okay.  At the very end right before I stopped at the 2:20

19   mark, you do hear some loud banging; is that right?

20   A    Yes, sir.

21   Q    Based on your recollection of having been there that day

22   and listening to this video, would you agree that that is,

23   indeed, the sound of the fur-hatted individual smashing the

24   glass on the Speaker's Lobby Door?

25             MR. VALENTINI:  Objection.  Calls for speculation.

 1              THE COURT:  I will sustain it.

 2              MR. MAYR:  Okay.

 3              Let's go back to Government's Exhibit 40.

 4         (The video was played for the Court.)

 5    BY MR. MAYR:

 6    Q    I am going to start at the 1:10 mark and have you watch

 7    from here and watch what the individual that we all can see as

 8    Mr. Grider here in the yellow flag and what he is doing with

 9    the individual in the fur-lined hat.

10         (The video was played for the Court.)

11    BY MR. MAYR:

12    Q    Okay.  Right here at the 1:20 mark, I have stopped the

13    video.  Immediately prior to that, did you see where the

14    fur-hatted individual took his fur hat off?

15    A    Yes.

16    Q    And he has done that after Mr. Grider has given him the

17    helmet, correct?

18    A    Yes, sir.

19    Q    Mr. Grider, at this point, at 1:26, is looking back, is

20    looking back at the crowd that is behind him in front of

21    you-all, correct?

22    A    Yes.

23    Q    All right.

24              MR. MAYR:  I am going to continue playing at the 1:26

25    mark.  We will continue to watch.

1      (The video was played for the Court.)

2           MR. MAYR:  I am going to stop here at the 1:48 mark.

3  BY MR. MAYR:

4  Q   We see Mr. Grider right here in the yellow flag.  What does

5  he appear to be doing right here?

6  A   Standing in front of the door.

7  Q   Okay.  Is he facing -- is his head facing the door to where

8  he can see what is taking place?

9  A   Yes, sir.

10 Q   This individual right here (indicating), this is

11 Sgt. Lanciano, correct -- I am sorry, Sgt. Yetter?  I am

12 sorry -- Sgt. Lively.  I apologize.  That is Sgt. Lively that

13 is right here in the blue mask, correct?

14 A   Yes, sir.

15 Q   He is also looking at this door, correct?

16 A   Yes.

17 Q   And this other masked individual who is in a suit, he is

18 also looking at the door, correct?

19 A   Yes.

20      MR. MAYR:  Continue playing from here at the 1:48

21 mark.

22      (The video was played for the Court.)

23      MR. MAYR:  Let me back it up.  Let's look again.  I

24 would like to focus on the people that you see actually

25 striking the door, inflicting the damage on the door.  Let's go

1    back.  I would like you to note who of these individuals you

2    see striking the door.  Starting at the 1:36 mark.

3         (The video was played for the Court.)

4              MR. MAYR:  I will stop at the 1:55 mark.

5    BY MR. MAYR:

6    Q   Were you able to see and identify individuals that were

7    actually inflicting some damage on the door?

8    A   Yes, sir.

9    Q   Who were they?

10   A   The gentleman who is wearing the fur motorcycle hat.

11   Q   Okay.  Who else?

12   A   Person wearing a red jacket.

13   Q   That is at the 1:50 mark is right here in the foreground;

14   is that correct?

15   A   Yes, sir.

16   Q   Who else?

17   A   There was one other person.  I, I don't remember what they

18   were wearing from watching the video.

19   Q   But Mr. Grider, in the yellow flag, has not approached the

20   door and not done anything to inflict any damage on the door

21   based on what you have seen, correct?

22   A   Yes, correct.

23   Q   All right.

24              MR. MAYR:  I am going to run this up to the 1:55 mark

25   and then ask you some questions about this.

1          (The video was played for the Court.)

2     BY MR. MAYR:

3     Q   All right.  At the 1:55 mark, that is where we see Lt. Bird

4     on the other side draw his firearm, correct?

5     A   I am not sure who that is that drew their firearm.

6     Q   I apologize.  You see a firearm drawn by someone on the

7     other side of the door?

8     A   Yes, sir.

9     Q   All right.  You were asked some questions by Mr. Valentini

10    about your decision to use weapons at this point.  Were you

11    armed with a firearm?

12    A   Yes.

13    Q   You testified that you did not draw your weapon; is that

14    correct?

15    A   Yes, sir.

16    Q   In your training to be a United States Capitol Police

17    officer, you are trained on, on various use-of-force models; is

18    that correct?

19    A   Yes.

20    Q   Could you explain to the Court just briefly what that

21    means?

22    A   Can you rephrase the question?

23    Q   Sure.  I would just like –– you know what a use-of-force

24    model is.  I would like for you to explain to the Court briefly

25    what that is.

1   A    Police officers and many members of law enforcement are

2   trained on when to appropriately apply deadly force and use

3   their firearm.

4   Q    Okay.  And based on certain circumstances, it is proper in

5   other — under other circumstances, it is not permitted; is

6   that right?

7            MR. VALENTINI:  Objection.  Relevance.

8            THE COURT:  Since he never pulled it, he never pulled

9   it.  I am not sure where this is going.  He should not be

10  opining about somebody else using it.

11           MR. MAYR:  It is really directed to what he is

12  perceiving on his side of the door where Mr. Grider is

13  standing.

14           THE COURT:  As to why he did or did not pull out a

15  gun, is that what you are getting at?

16           MR. MAYR:  That is correct.

17           THE COURT:  All right.  I will allow it for limited

18  questioning.

19  BY MR. MAYR:

20  Q    At this point, based on what you are seeing there, based on

21  your training, you don't believe it is necessary to draw your

22  firearm, correct?

23           MR. VALENTINI:  Objection.  It seems to be calling for

24  expert testimony.

25           THE COURT:  I — this is getting beyond.  I mean, if

1   you are putting it in the context of professionally his

2   training and how he would do it, that, I think I would sustain

3   the objection.  If you want to ask him why he didn't do it

4   under those circumstances, you know, he is trained; and

5   therefore, he made a decision —

6                MR. MAYR:  Sure.

7                THE COURT:  — not to do it, I don't have a problem.

8   I don't see getting into the rest of it there.

9                MR. MAYR:  That is fair enough.  Let me just ask it

10  simply.

11  BY MR. MAYR:

12  Q   What was the reason that you chose not to draw your firearm

13  at that point?

14  A   For third-party considerations, and as well as the safety

15  of our officers being outnumbered.  If being on that side of

16  the door, if one of us were to draw our guns, we would have

17  easily been outnumbered, and our firearms would have been

18  taken; and then, who knows from that point.

19  Q   Okay.  Okay.  Now, at this time what I would like to do,

20  Special Agent Yetter, is I would like to publish what we have

21  agreed to admit as Defendant's Exhibit 273.

22       (The video was played for the Court.)

23                MR. MAYR:  I am going to stop here at the 31-second

24  mark and just figure out, identify who is who.

25  BY MR. MAYR:

1    Q    We see Mr. Grider over here on the right-hand side with the

2    yellow flag and the red hat; is that correct?

3    A    Yes.

4    Q    Right here, this is Officer Lanciano, correct?

5    A    Yes, sir.

6    Q    This is Sgt. Lively?

7    A    Yes.

8    Q    And we will see you over here to the right of Sgt. Lively

9    on the left-hand side of the screen, correct?

10   A    Yes.

11   Q    All right.

12        MR. MAYR:  I am going to continue publishing from the

13   31-second mark and ask you just to observe what is occurring.

14        (The video was played for the Court.)

15   BY MR. MAYR:

16   Q    This woman right here at the one-minute mark that we see

17   standing up against the wall (indicating), this is the woman

18   who was ultimately shot; is that correct?

19   A    Yes.

20        MR. MAYR:  Continue playing at the one-minute mark.

21   BY MR. MAYR:

22   Q    Up until this point, have you seen Mr. Grider engage in any

23   sort of dialogue or trying to speak with the woman who is

24   depicted here at the one-minute mark?

25   A    Can you ask the question again.  I am sorry.

1  Q   Have you seen up until this point in the video where Mr.

2  Grider has —— appears to be engaged in a dialogue with this

3  woman?

4          MR. VALENTINI:  Objection.

5          THE COURT:  What is the objection?

6          MR. VALENTINI:  Can we find out what he is asking

7  about the witness's independent recollection or whether he has

8  seen it on the video?

9          THE COURT:  It sounds like he asking about the video.

10  Are you talking about all of the videos or this particular

11  video or what?

12          MR. MAYR:  Just this particular video, what we have

13  seen up until the point.  I am trying to establish whether he

14  has ——

15          THE COURT:  I know, but you can't give him the answer.

16  So I am assuming what you are asking is related to just this

17  video that we have been watching, and then, ask the question

18  what you want as to what is there or not there in this video.

19  BY MR. MAYR:

20  Q   In the portion of this video, does it appear that Mr.

21  Grider, in the yellow flag, is engaged in a dialogue with this

22  woman depicted here at the one—minute mark?

23  A   I can't tell.

24  Q   Okay.  Fair enough.

25          MR. MAYR:  Let me continue playing at the one—minute

1    mark.

2         (The video was played for the Court.)

3              MR. MAYR:  I will stop at the 1:40 mark.

4    BY MR. MAYR:

5    Q    Were you able to see where you, Sgt. Lively, Officer

6    Lanciano are working your way down the stairs as the CERT Team

7    moves in?

8    A    Yes, sir.

9    Q    Not only is that what is depicted in the video, that was

10   your independent recollection of what took place, right?

11   A    Yes.

12   Q    All right.

13             MR. MAYR:  I am going to continue at the 1:40 mark.  I

14   would like you to pay attention to what Mr. Grider, red hat,

15   yellow flag, and what he is doing after this point.

16        (The video was played for the Court.)

17             MR. MAYR:  I will stop at the 2:10 mark.

18   BY MR. MAYR:

19   Q    Were you able to see what Mr. Grider was doing immediately

20   before the woman was shot as she went through the broken

21   window?

22   A    Yes.  He was standing in front of the door.

23             MR. MAYR:  Watching again at the 1:47 mark.

24        (The video was played for the Court.)

25

1   BY MR. MAYR:

2   Q   He appears to be moving away from the door immediately

3   before the shot is fired, correct?

4   A   I am sorry, could you play the video one more time?

5        MR. MAYR:  No worries.  I appreciate this, and I

6   appreciate you letting me know if you need to see it.  I will

7   start again at the 1:50 mark.

8      (The video was played for the Court.)

9   BY MR. MAYR:

10  Q   At the 1:50 mark you can clearly see the woman up in the

11  broken window frame climbing through, correct?

12  A   Yes, sir.

13       MR. MAYR:  I am going to go back to the 1:46 mark.

14     (The video was played for the Court.)

15  BY MR. MAYR:

16  Q   At 1:49, he is facing away from the door; is that right?

17  A   Yes, sir.

18  Q   A few frames later we actually see his hand on the back of

19  one of the other individuals, correct?

20  A   Yes.

21  Q   And as we continue going frame by frame, we see him trying

22  to push that person and move out of the way, right?

23  A   Yes.

24  Q   And then, as the woman falls back after having been shot,

25  we see him not looking back at her but continuing to move away

1   from the door, correct?

2   A   Yes.

3   Q   I am going to start, and I want you to listen for any

4   commands that are given by any -- any commands that appear or

5   sound to be given by one of your fellow officers.

6        (The video was played for the Court.)

7   BY MR. MAYR:

8   Q   You hear one of the CERT officers telling people to back

9   up, correct?

10  A   Yes, sir.

11  Q   Now, in the seven seconds or so of the video, before he

12  gives that command, do you see Mr. Grider anywhere in this

13  video?

14  A   Could you play the seven seconds again.  I am sorry.

15       MR. MAYR:  Certainly can.

16       (The video was played for the Court.)

17       MR. MAYR:  I went well beyond that to the 2:24 mark.

18  BY MR. MAYR:

19  Q   And he is not depicted anywhere, correct?

20  A   Yes, sir, correct.

21       MR. MAYR:  Now, let's go to -- let's go back to

22  Government's Exhibit 40.

23       (The video was played for the Court.)

24  BY MR. MAYR:

25  Q   Okay.  We see right here at the 3:58 mark an individual

1    holding a camera recording what is taking place, correct?

2    A    Yes.

3    Q    Is this person interfering with your duties at that point?

4    A    Yes.

5    Q    All right.  How, specifically, is this person doing the

6    video recording interfering with your duties?

7    A    Specifically, with this person, they are in the area — all

8    people in the Capitol Building who are not Congressional staff,

9    Capitol Police are not authorized to be there; therefore, they

10   are impeding on medical personnel responding in to deal with

11   the situation.

12   Q    Okay.  So it is your opinion, Agent Yetter, if I understand

13   this correctly, that the presence of these individuals, in and

14   of itself, is the interfering act; is that correct?

15   A    Yes.

16   Q    Okay.

17          MR. MAYR:  I am going to continue publishing

18   Government's 40 at the 3:58 mark.

19       (The video was played for the Court.)

20   BY MR. MAYR:

21   Q    I am going to go back to that confusing person, the person

22   that is holding the camera making this video recording.  You

23   would agree that that person is also interfering with your

24   duties at this point; is that correct?

25   A    Yes.

1   Q   All right.

2       (The video was played for the Court.)

3           MR. MAYR:  Now, stopping here at the 4:47 mark.

4   BY MR. MAYR:

5   Q   We have just heard Officer Lanciano yell out, "Get the fuck

6   out," right?

7   A   Yes.

8   Q   And, but here is a woman who is in his face, and she is

9   pointing at him and trying to tell him something, right?

10  A   Yes.

11          MR. MAYR:  I am going to continue at the 4:47 mark.

12      (The video was played for the Court.)

13          MR. MAYR:  I am stopping here at the 5:09 mark.

14  Actually, let me continue publishing at the 5:09 mark.

15      (The video was played for the Court.)

16          MR. MAYR:  I am going to stop at the 5:45 mark.

17  BY MR. MAYR:

18  Q   You have heard some things up, right up until that point.

19  I am going to back it up, and I want you to listen again

20  starting at the 5:40 mark, some of the things that you are

21  hearing on this video — actually, to help you, start at the

22  5:35 mark.

23      Before I get to that, this individual here at the 5:35 mark

24  in the blue jacket; do you know who that is?

25  A   Not specifically, no.

1   Q   Okay.  But this is a — he is obviously, or he is wearing a

2   Capitol Police officer jacket, correct?

3   A   Yes.

4   Q   All right.

5        MR. MAYR:  I am going to start playing at 5:35.

6        (The video was played for the Court.)

7   BY MR. MAYR:

8   Q   Were you able to hear some dialogue along the lines of, "I

9   have video," and then, someone say, I need — "I want to get

10  that from you"; did you hear that?

11  A   No.  I am sorry.

12  Q   You didn't, that is okay.

13       MR. MAYR:  Let's continue watching from the 5:40 —

14  5:46 mark.

15       (The video was played for the Court.)

16  BY MR. MAYR:

17  Q   All right.  Right here at the 6:20 mark we see an officer

18  with some sunglasses on, and he is, obviously, using some force

19  to push people out of that area; is that correct?

20  A   Yes.

21  Q   All right.  And certainly, that is permissible in an effort

22  to clear this area so that you-all can treat the woman, right?

23  A   Yes, absolutely.

24       MR. MAYR:  I am going to continue at the 6:20 mark.

25       (The video was played for the Court.)

1            MR. MAYR:  I am going to stop at the 7:13 mark.

2    BY MR. MAYR:

3    Q   This individual over here on the left with the black hat

4    and the black mask, this is also another Capitol Police

5    officer, correct?

6    A   Yes.

7    Q   Do you know who it was?

8    A   No.

9    Q   Would you agree that he appears to be talking with one of

10   these civilian individuals that are in this area?

11   A   I don't know through watching the video if he was talking

12   to this individual or not.

13           MR. MAYR:  Let me back it up to the 7:00 mark and have

14   you watch.

15       (The video was played for the Court.)

16           MR. MAYR:  I am going to stop at the 7:20 mark.

17   BY MR. MAYR:

18   Q   Are you able to see a distinction between individuals who

19   are not helping the situation that other officers are trying to

20   remove?

21   A   All people in the Capitol Building who are not

22   Congressional staff, Capitol Police officers are not helping

23   the situation.

24   Q   I am asking at this point on the video, you're able to

25   see –– we saw that Capitol officer with the blue jacket, very

1  animated, yelling at one of the individuals, trying to push

2  them back and get them to back off, correct?

3  A   Yes.

4  Q   And we saw even before that, the officer with the

5  sunglasses using some force to push some people back, correct?

6  A   Yes.

7  Q   But that is not the case for everyone who is standing here

8  in this area, correct?

9  A   Yes.

10 Q   Some individuals, Officer Lanciano, right here

11 (indicating), you're over here on the left (indicating),

12 Sgt. Lively, back over here (indicating).  There is one, two,

13 three, four, five, six Capitol officers depicted at this point,

14 correct?

15 A   Yes.

16 Q   And none of –– none of you-all are using any sort of, that

17 same kind of force to push these people back, right?

18 A   Yes.

19 Q   And just like I will ask you again, this long-haired blonde

20 individual, were you able to see that he appeared to be talking

21 with the officer with the black mask on?

22 A   He is wearing a mask.  So I don't know if he was talking to

23 them specifically or not.

24 Q   Okay.  Are you aware at this point –– you're aware at this

25 point that this has potentially turned into a scene of a

1  homicide; would you agree with that?

2  A   Yes.

3  Q   And although an unusual situation for a Capitol Police

4  officer, you understand the need and the importance to document

5  and gather any evidence that is pertinent to that

6  investigation, correct?

7  A   Yes.

8  Q   And so like with any crime scene, if individuals come up to

9  a police officer and say, "I witnessed what took place.  I want

10 to share with you what I witnessed," there is nothing unusual

11 about that, right?

12 A   Can you ask the question again.  I am sorry.

13 Q   If an individual witnesses a crime and comes up to you, as

14 a police officer, and tells you, "I witnessed what just

15 occurred.  I have information relevant to that," there is

16 nothing unusual about that?

17 A   At the time of this instant — instance, the priority is

18 treating the medically wounded and clearing a path so that

19 medical personnel can reach this person.

20 Q   I understand that, Agent Yetter, but I am also asking you

21 when a person comes up and tries to give you information

22 regarding something that —

23         THE COURT:  Let me ask it this way.  Are you asking in

24 a more generalized way, or are you asking specifically?  He has

25 answered in the particular situation, his view.

1          MR. MAYR:  I am —

2          THE COURT:  So are you just asking a general opinion

3    and general any crime?  You know, witnesses?

4          MR. MAYR:  That is, indeed, what I am asking.

5          THE COURT:  Are you objecting or not?

6          MR. VALENTINI:  There is no foundation that that

7    question was asked in this case, Your Honor.

8          THE COURT:  I, I don't see this line in terms of a

9    more generalized thing.  I think you need to get it more

10   specifically to what you are talking about here.  You are

11   making an assumption, frankly, in your question, which I don't

12   think we have as a foundation.  I will put it that way.

13         MR. MAYR:  Let me — okay.  I appreciate that.  Let me

14   try this.

15   BY MR. MAYR:

16   Q   In order to understand what your conclusions are, Agent

17   Yetter, I want to step back and look at a different situation.

18   When you're investigating an offense, if individuals come up to

19   you and say, "I witnessed what occurred," as a police officer,

20   you're going to be interested in what they have to say,

21   correct?

22   A   Yes.

23   Q   In fact, nothing about that is impeding your duties.  It is

24   actually assisting your duties as a police officer, correct?

25   A   In this particular —

1  Q   I am asking just in a general context, and then, we will go

2  specific here.  When a person comes up to provide you with

3  information, they are not impeding your duties, they are

4  assisting your duties, correct?

5  A   Yes.

6  Q   Okay.  Now, in this particular context, there is no

7  question that the priority is to render aid to the woman?

8  A   Yes, sir.

9  Q   Okay.  And I don't doubt that, but you would agree with me,

10  that even though it is not the priority, that in your duties as

11  a police officer, there is going to be a need for either you or

12  your fellow officers to gather information from individuals who

13  have witnessed what has just occurred, correct?

14  A   Yes.

15  Q   If individuals have video recordings, that is going to be

16  extremely relevant to determine exactly what just occurred,

17  correct?

18  A   Yes.

19        MR. MAYR:  I am going to continue publishing here at

20  the 7:21 mark, Government's Exhibit 40.

21     (The video was played for the Court.)

22        MR. MAYR:  Sorry.  Stopping at the 8:30 mark, back up

23  to the 8:00 mark and publish at the 8:00 mark again.  And I

24  would like you to pay attention to what Mr. Grider is doing at

25  this point and who he is in close contact with.

1            (The video was played for the Court.)

2     BY MR. MAYR:

3     Q   Did you see there —

4            MR. MAYR:  I have stopped at the 8:10 mark.

5     BY MR. MAYR:

6     Q   Did you see where an individual handed a cell phone to the

7     officer in the blue jacket?

8     A   They handed something.  I don't know what it was, though.

9     Q   I will go back to the —

10           MR. MAYR:  Let you watch it again.

11          (The video was played for the Court.)

12           MR. MAYR:  I stopped at the 8:20 mark.

13    BY MR. MAYR:

14    Q   The officer in the blue jacket, if you recall, he was the

15    same officer who earlier had been yelling at one of the

16    individuals, correct, and pushing them back, right?

17    A   Yes, sir.

18    Q   In this 20 seconds or so that Mr. Grider is standing

19    directly in front of him, do you see him directing Mr. Grider

20    to leave or using any force to push him back?

21    A   Can you ask the question again.

22    Q   In this 20 seconds that we have watched where Mr. Grider is

23    standing directly in front of your fellow officer in the blue

24    jacket, do we ever see him appear to be verbally commanding him

25    to get back or using force to push him to get back?

1  A   I didn't see any force, and I don't know if I am able to

2  depict through the video what that officer is saying.

3  Q   Understood.

4       MR. MAYR:  I am going to continue at the 8:19 mark.

5       (The video was played for the Court.)

6       MR. MAYR:  Now, I am going to stop at the 10:00 mark.

7  BY MR. MAYR:

8  Q   Would you agree at this time that we have watched, again,

9  you, nor any other officers have, appear to have directed or

10 used any force to clear any of the individuals out from this

11 area?

12 A   Yes.

13 Q   It does not appear that way?

14 A   Can you ask the question again.

15 Q   It does not appear that you or any of your other fellow

16 officers have directed or used any force to remove any of these

17 individuals?

18      MR. VALENTINI:  Objection.  Can we clarify which

19 portion of the video you are referencing?

20      MR. MAYR:  From the portion that we have just watched

21 from the 8:10 mark all the way up to the 10:00 mark.

22 BY MR. MAYR:

23 Q   Have you seen yourself or any of your other fellow officers

24 use any force to clear or move these individuals back?

25 A   Throughout this whole scenario at the House Door we

1   commanded these individuals to leave.

2   Q   But in this two-minute segment here, have you used any

3   force to push any of these individuals back?

4   A   I did not see myself use force in this instance.

5   Q   Did you see any of your fellow officers use any force to

6   push any of these individuals back over this two-minute

7   timespan?

8   A   Yes.

9   Q   Have you seen any of them use force towards Mr. Grider to

10  try to push him back away from this area?

11  A   No.

12          MR. MAYR:  I am going to continue at the 10:00 mark of

13  Government's 40.

14      (The video was played for the Court.)

15          MR. MAYR:  Stopping at the 11:00 mark.

16  BY MR. MAYR:

17  Q   What we see depicted in Exhibit 40 is that, this is where

18  Metro Police officers have now come in and are actually using

19  force to push people out of the area, correct?

20  A   Yes, sir.

21          MR. MAYR:  And let's watch immediately after what

22  happens to Mr. Grider and the other individuals that are

23  standing in this area in the foreground of the exhibit,

24  publishing at, publishing at the 11:00 mark.

25      (The video was played for the Court.)

1          MR. MAYR:  Stopping at the 12:00 mark.

2     BY MR. MAYR:

3     Q   It appears that over this one minute that individuals are

4     complying with the commands of the Metro Police officers and

5     exiting the area, correct?

6     A   Yes, some, some.

7     Q   Some.  There are obviously some other individuals that are

8     engaged in fisticuffs, for lack of a better word, with some of

9     these other officers, correct?

10    A   Yes.

11    Q   All right.  Having no independent recollection of Mr.

12    Grider that day, you cannot tell this Court anything that he

13    did specifically, individual actions that he did specifically

14    that interfered with your duties as a Capitol Police officer,

15    correct?

16          THE COURT:  Based on his memory.

17          MR. MAYR:  Based on his memory, that is correct.

18          THE WITNESS:  Based on my memory, that is correct.

19          MR. MAYR:  All right.  May I just have a moment, Your

20    Honor?

21          THE COURT:  Okay.

22          MR. MAYR:  Thank you.

23          Thank you, Agent Yetter.

24          I have no further questions, Your Honor.

25          THE COURT:  All right.  Redirect?

1          MR. VALENTINI:  Thank you, Your Honor.

2                  **REDIRECT EXAMINATION**

3    BY MR. VALENTINI:

4    Q    Special Agent Yetter, why is it so difficult to remember

5    many details about that day?

6    A    That was the worst day of my life, the most chaotic, and

7    the most stressful.

8    Q    You were asked a few questions about different rioters

9    interfering with the duties of the officers at the Speaker's

10   Lobby Door; do you remember those questions?

11   A    Yes.

12   Q    Some of the rioters — strike that.  You testified that all

13   of the rioters who were not lawfully allowed to be there

14   interfered with the officers' functions?

15   A    Yes, correct.

16   Q    But is it also true that some rioters interfered more than

17   others?

18   A    Yes, sir.

19   Q    And those rioters who stayed longer, everything else being

20   equal, interfered more than those who left the Speaker's Lobby

21   Door right away?

22   A    Yes, all people — I keep repeating myself.  All people

23   present who are not Congressional staff, Capitol Police, are

24   not authorized to be there.

25   Q    Someone who — a rioter who is right up against the police

1    line interfere, comparatively, more than someone who is far

2    back?

3    A   Yes.

4    Q   I would —

5           MR. VALENTINI:  If we could pull up — start with

6    Exhibit, Defense Exhibit 273.  If we can go to time stamp 1:40.

7    BY MR. VALENTINI:

8    Q   Actually, before we start with this exhibit, do you

9    remember before I asked you some questions about the moments

10   right before the gun was fired?

11   A   Yes, sir.

12   Q   And do you remember that in the video there was a voice

13   that said loudly at that point, "There is a gun, there is a

14   gun"?

15   A   Yes.

16   Q   That was before the gun was fired; is that correct?

17   A   Yes, sir.

18           MR. VALENTINI:  Can we play the video.

19       (The video was played for the Court.)

20   BY MR. VALENTINI:

21   Q   So by the time the gun was fired, someone who was in that

22   area could have heard the screams, "There is a gun.  There is a

23   gun"?

24   A   Yes.

25   Q   And before the gun was fired, Mr. Grider, the gentleman in

1  the yellow flag, was also facing the doors; is that correct?

2  A   Yes.

3  Q   So he had a direct line of sight to the glass panes,

4  correct?

5  A   Yes, sir.

6  Q   And it appeared from the videos we saw before that the gun

7  was on the other side of the glass panes?

8  A   Yes.

9       MR. VALENTINI:  If we could go to Government

10  Exhibit 40, please.  If we go to time stamp about 1:11 into the

11  exhibit.

12  BY MR. VALENTINI:

13  Q   Now, before we play the exhibit, if I may ask you, you

14  dealt with many rioters on January 6th?

15  A   Yes.  That would be an understatement.

16  Q   Did you view any of them as concerned about your

17  well-being?

18  A   No.

19  Q   Did you view them as a threat?

20  A   Yes.

21  Q   You were asked some questions --

22       MR. VALENTINI:  Actually, let's play at 1:11.

23     (The video was played for the Court.)

24       MR. VALENTINI:  Just play five seconds.

25       Let's keep playing.

1  BY MR. VALENTINI:

2  Q   You were asked some questions about someone telling,

3  appearing to tell you, "I don't want you to get hurt"?

4  A   Yes.

5  Q   In the context that you were facing on January 6th at the

6  Speaker's Lobby Door, does that statement come — did you

7  perceive that statement as an expression of concern?

8  A   That statement means nothing because their presence there

9  means they refused multiple commands from dozens of officers

10  just to be there.

11  Q   In fact, could that statement even imply a threat?

12  A   Yes.

13       MR. VALENTINI:  Can we go to time stamp 1:48 in this

14  exhibit?  Let's do 1:47.

15  BY MR. VALENTINI:

16  Q   So you were — Special Agent Yetter, you were asked some

17  questions about Mr. Grider staring towards the door at this

18  point in this video; do you recall that?

19  A   Yes, sir.

20  Q   You were also asked some questions about Sgt. Lively and

21  another gentleman facing the door at this point?

22  A   Yes.

23  Q   And you were asked, well, they are just looking, right?

24  A   Yes.

25  Q   Now, Sgt. Lively was allowed to be there at that point?

1   A   Yes.

2   Q   In fact, it was his job to be there?

3   A   Yes.

4   Q   Mr. Grider was not allowed to be there as far as you know?

5   A   Yes, correct.

6   Q   Okay.  You were also asked some questions about the use of

7   a firearm at some point at the Speaker's Lobby Door?

8   A   Yes, sir.

9   Q   And you were asked why you did not use your firearm?

10  A   Yes.

11  Q   Now, the firearm, the firearm that was used was on the

12  other side of the doors; is that correct?

13  A   Yes.

14  Q   It was used by a different officer, certainly not you?

15  A   Yes.

16  Q   And you don't know what the assignment of that officer was,

17  correct?

18  A   Correct.

19  Q   And also, that officer had a set of barricaded doors

20  between him and the rioters?

21  A   Yes.

22  Q   And was on a — is it fair to say that it was on a more

23  sensitive side of the House?

24  A   Yes, absolutely.

25          MR. VALENTINI:  Can we pull up Exhibit 61, please.

1     (The video was played for the Court.)

2         MR. VALENTINI:  If we can go to time stamp 1:07 — six

3    seconds into the exhibit, please.

4    BY MR. VALENTINI:

5    Q   Before we start playing, you were asked some questions

6    about this exhibit.  You were asked whether you heard a voice

7    saying people are getting crushed.

8    A   Yes.

9    Q   Okay.

10        MR. VALENTINI:  Let's just play the exhibit, please,

11   for three or four seconds.

12        (The video was played for the Court.)

13   BY MR. VALENTINI:

14   Q   Did you hear a voice say, "Just open the door, man"?

15   A   No.  I am sorry.

16        MR. VALENTINI:  Can we play again.  Can we go back to

17   1:07.  If we can play the exhibit, please.

18        (The video was played for the Court.)

19   BY MR. VALENTINI:

20   Q   Special Agent Yetter, did you hear the voice say, "Just

21   open the door, man"?

22   A   Yes.

23   Q   And at that point there was no reference to people being

24   crushed?

25   A   Correct.

1          MR. VALENTINI:  Brief indulgence?  Thank you.

2          We have no further questions.

3          THE COURT:  All right.  Can he be excused altogether?

4          MR. VALENTINI:  Altogether, permanently, yes.

5          MR. MAYR:  I have no objection, Your Honor.

6          THE COURT:  All right.  You are excused.  Thank you.

7          THE WITNESS:  Thank you, Your Honor.

8                         *(Witness excused.)*

9          THE COURT:  So it is ten after 12:00.  We want to move

10   to the next witness.  I generally break for lunch at 1:00, but

11   it is up to you or we can break now.  We can finish -- I don't

12   know how long her testimony is, as to whether you want to come

13   back and do it afterwards or you want to start it now?

14          MS. CHO:  Your Honor, her testimony will likely be

15   over an hour.

16          THE COURT:  All right.  Then, why don't -- if there is

17   no objection, we will go to lunch now, come back, and do the

18   next -- last Government witness, as I understand.

19          MS. CHO:  Thank you.  Yes, that's correct.

20          THE COURT:  All right.  So it is ten after 12:00.

21   Come back at 1:10.  We will pick up at that point.

22          (Lunch recess, 12:11 p.m. - 1:18 p.m.)

23                         AFTER RECESS

24                    **AFTERNOON SESSION**

25          THE COURT:  Good afternoon, everyone.

1        All right.  If you would call your next witness.

2            MS. CHO:  The United States calls Michelle Ball.

3            THE COURT:  All right, if you would step up.

4            (Witness sworn.)

5            THE COURT:  All right.  Dorothy, if you could show

6    her -- Ms. Patterson is going to show you if you want to mark

7    it and how to also get rid of it.

8            THE WITNESS:  I practiced a little bit during the

9    break.

10           THE COURT:  So if you know how to do it, then, we

11   won't bother.

12           THE WITNESS:  Okay.  Watch me mess it up now.

13           THE COURT:  Thank you.  Thanks, Ms. Patterson.

14      **MICHELLE BALL, GOVERNMENT'S WITNESS, SWORN**

15              **<u>DIRECT EXAMINATION</u>**

16   BY MS. CHO:

17   Q   Could you please state and spell your name for the record.

18   A   Michelle Ball, M-I-C-H-E-L-L-E; Ball, B-A-L-L.

19   Q   What do you do for a living?

20   A   I am a special agent with the Federal Bureau of

21   Investigation.

22   Q   Where are you employed with the FBI?

23   A   I am assigned to the Washington field office.

24   Q   How long have you been with the FBI?

25   A   Since September of 2015.

1   Q   What do you do in the role of a special agent?

2   A   On a typical day I am assigned to work federal public

3   corruption and election crimes, but as a special agent, anytime

4   things, big things happen, we could be asked to work other

5   types of cases as well.

6   Q   What kind of training, briefly, did you undergo to become

7   an FBI special agent?

8   A   Approximately four, four and a half months of an FBI

9   academy where we learn about all the different types of

10  investigations that we conduct.

11  Q   What types of investigations, if you could give a sampling.

12  A   Sure.  We work criminal investigations such as anything

13  from violent crimes, white collar crimes.  We work

14  counter-terrorism investigations, we work criminal — I mean,

15  cyber investigations, and counterintelligence investigations.

16  Q   Okay.  Did you have a career before you became an FBI

17  agent?

18  A   I did.

19  Q   What was it?

20  A   I was a news reporter.

21  Q   How long were you a news reporter?

22  A   Approximately seven and a half years.

23  Q   Okay.  So let's talk a little bit about the specifics of

24  this investigation, but before we do, I want to very briefly

25  ask you just a few questions about January 6, 2021, itself.

1  Were you at the Capitol that day?

2  A   Yes, I was.

3  Q   Why?

4  A   Approximately — well, let me start out.  So I was working

5  from home that day watching the news.  I saw what happened, and

6  so I was — kept looking at my e-mails to see.  Because a lot

7  of times if there is big events we will be called in for

8  different things.  So at approximately 3:00 p.m., I received

9  word that we were all being called in.  So I, I went to the

10  Capitol, I arrived and was on the Capitol grounds at

11  approximately 5:00 p.m. that evening.

12  Q   Let me just stop you there.  What, in short, did you do

13  once you arrived at the Capitol Grounds?

14  A   I was assigned to assist MPD officers who were holding a

15  line outside of the Capitol to continue to move forward in

16  order to get protesters to leave.

17  Q   Were you aware of a curfew that day?

18  A   Yes, I was.

19  Q   How were you aware of a curfew?

20  A   I was aware of the 6:00 p.m. curfew.  I think I received

21  alerts on my phone when I was watching the news, and I saw it

22  as well.  And, and I was made aware of that whenever I arrived

23  for duty and headed to the Capitol, that there was a 6:00 p.m.

24  curfew.

25  Q   Who or what issued the curfew?

1    A    It is my understanding the mayor of DC issued the curfew.

2            MS. CHO:  I would like to put up on the screen

3    Exhibit 57.

4            THE COURT:  Can you slow down just a little bit?

5            MS. CHO:  Yes.

6    BY MS. CHO:

7    Q    Before you came here today, Special Agent Ball, are you

8    familiar with Safeway?

9    A    Yes, I am.

10   Q    What is Safeway?

11   A    It is a grocery store chain.

12   Q    And before you came in for testimony today, did you review

13   business record certification from an employee of Safeway?

14   A    Yes, I did.

15   Q    Now, I have put up on the screen Exhibit 57.  Is that the

16   business record certificate that you reviewed?

17   A    That is.

18   Q    And what, in short, did it set forth?

19   A    It set forth that the records that were turned over, based

20   on a subpoena, were accurate and correct and attested to by an

21   employee at Safeway.

22   Q    How many records does it indicate are covered by this

23   certificate?

24   A    Three.

25   Q    Did you review those three records?

 1   A   I did.

 2          MS. CHO:  Then, let's look at Exhibit 54.

 3   BY MS. CHO:

 4   Q   Is this one of those three records that you reviewed?

 5   A   Yes, it is.

 6   Q   What is it, generally?

 7   A   It is an e-mail that discusses the curfew that was put in

 8   effect for Washington, DC on January 6, 2021.  The curfew was

 9   from 6:00 p.m. to 6:00 a.m. and notified that night crews would

10   not be working because of the curfew.

11   Q   And just to be clear, you didn't have any personal or even

12   case-based knowledge of this set of documents before you

13   prepared for testimony today; is that right?

14   A   I did not.

15          MS. CHO:  Let's move on to Exhibit 55.

16   BY MS. CHO:

17   Q   Is this the second of three documents that you reviewed

18   attached to that certificate?

19   A   Yes, it is.

20   Q   And what — do you see in the top left-hand corner the

21   title of the document?

22   A   It is warehouse shipments.

23   Q   What is underneath that?

24   A   Lancaster, Pennsylvania, to Washington DC stores.

25   Q   Does the rest of the exhibit appear to be numbers and

1    different figures?

2    A    Yes.

3             MS. CHO:  Let's go to Exhibit 56.

4    BY MS. CHO:

5    Q    Is this the third of the three documents that you reviewed

6    that were attached to the certificate?

7    A    Yes, it is.

8    Q    And what was — let's look at the first page.  What is the

9    date on this first page?

10   A    It is January 5, 2021.

11   Q    What did you understand this page to be indicating in, in

12   whatever amount of detail you are able to?

13   A    I, after reviewing the document, was able to determine that

14   these are the different Safeways located in Washington, DC, and

15   that it was showing the projected sales and actual sales.  And

16   all the way to your right-hand side would show the percentage

17   between the actual and projected sales.

18            MS. CHO:  Now, let's go to the second page of the

19   exhibit.

20   BY MS. CHO:

21   Q    What was this page about?

22   A    This page appears to be the same chart but for January 6th

23   of 2021.

24   Q    What was the difference, if any, between Tuesday and

25   Wednesday?

1  A   From what I can tell from the numbers, on Wednesday, all of

2  the stores except Capitol Hill, because that one doesn't have a

3  number, were in the negatives; meaning, that the actual

4  predicted versus the projected, it was less.  It was all in the

5  negatives.

6       MS. CHO:  Let's go to the next page of the exhibit.

7  BY MS. CHO:

8  Q   What is the date on this page?

9  A   January 7, 2021.

10  Q   What did you infer from the information on this page?

11  A   That on January 7th, the sales, the predicted and actual

12  sales were all in the positive that day.

13  Q   Okay.  Thank you.

14       MS. CHO:  Let's take those down.

15  BY MS. CHO:

16  Q   Now, Special Agent Ball, I would like to turn to the

17  investigation at hand.  Were you involved in the investigation

18  and arrest of Christopher Grider?

19  A   I was.

20  Q   How did he first come to your attention?

21  A   After January 6th, the Washington field office was working

22  around the clock.  We were being assigned different cases, and

23  the name Christopher Grider was given to me based on a tip that

24  the FBI received that that individual was possibly at the

25  Capitol that day.

1   Q   Did you receive a number of tips relating to Christopher

2   Grider?

3   A   We did, on — from I would say January 7th on, we received

4   numerous tips regarding Christopher Grider.

5   Q   Did any of those tips contain videos or other information

6   in addition to simply sort of a, an attempt to identify the

7   person?

8   A   Yes.  Several of the tips included a link to a news story

9   from a local Texas news station that Christopher Grider was on

10  the evening of January 6th discussing what had happened at the

11  Capitol.

12  Q   Did you access and view that link?

13  A   I did.

14          MS. CHO:  Let's pull up video Exhibit 107.

15  BY MS. CHO:

16  Q   And before we hit play, Special Agent Ball, can you see the

17  beginnings of this exhibit?

18  A   Yes.

19  Q   Does this look like the link, the video at the link that

20  you reviewed?

21  A   Yes, it is.

22  Q   And based on just looking at this, when was the interview

23  published?

24  A   On January 6, 2021, at 8:11 p.m. Eastern Time.

25          MS. CHO:  Let's go ahead and hit play.

1        (The video was played for the Court.)

2   BY MS. CHO:

3   Q   Special Agent Ball, after viewing this clip, did you open

4   an investigation on Chris Grider?

5   A   After viewing this clip, we attempted to get other photos

6   of the individual through driver's license photos —

7            MR. MAYR:  Your Honor, I have to object to

8   nonresponsiveness.  The question was whether she opened an

9   investigation only.

10           THE COURT:  Well, I assume — is this what you are

11  answering in terms of the opening investigation?

12           THE WITNESS:  Yes, ma'am, Your Honor.

13           THE COURT:  I will let her go forward.

14           MR. MAYR:  That is fine.

15           THE WITNESS:  So once we were able to confirm that

16  that was actually who he said he was, then, we did open an

17  investigation.

18  BY MS. CHO:

19  Q   What was it about the interview that led you to conduct

20  further investigation?

21  A   Based on the interview, we knew that he, Christopher

22  Grider, was inside the U.S. Capitol on January 6, 2021.

23  Q   Was this interview just a few hours after many of the

24  events that you — well, let me back up.  Did you review open

25  source and Capitol surveillance video of the riot on

1  January 6th at the Capitol?

2  A    I did.

3  Q    How quickly after those events or during those events did

4  this video appear to have taken place?

5  A    Say that one more time, please.

6  Q    How quickly was this interview taking place on January 6th?

7  A    So I looked at the local news station to find out that they

8  had a 10:00 p.m. newscast, which was likely when it aired that

9  day.  The clips appeared to match open source clips of what

10 happened inside the Capitol on January 6th, as well, and on

11 that video, it said in the news clip, provided by or courtesy

12 of Christopher Grider, which gave the indication that the video

13 was received by the reporter from Christopher Grider that he

14 would have taken himself.

15 Q    And did the clip itself indicate that it was published at

16 8:11 p.m.?

17 A    It did.

18 Q    So even earlier than 10:00 o'clock news?

19 A    8:11 Eastern Standard Time, yes.

20 Q    What would that translate to?  Where was this newscast

21 based out of, if you recall?

22 A    Central Texas.

23 Q    What time would it have been in Central Texas?

24 A    In Central Texas it is an hour behind.  So it would have

25 been 7:11 p.m.

1      THE COURT:  Can you just slow down.  You are going a
2  little too fast.
3      THE WITNESS:  Okay.
4  BY MS. CHO:
5  Q   So were you able to positively identify the person in
6  Exhibit 107 as Christopher Grider?
7  A   Yes, we were.
8  Q   Did you use the clothing he was wearing in that interview
9  to contribute to that identification?
10 A   Yes, we did.
11 Q   And the video footage that you indicated that you reviewed
12 in the course of your investigation, what, if anything, did you
13 see the person you identified as Chris Grider wearing at the
14 Capitol?
15 A   He was wearing a black puffy jacket with a yellow flag
16 around his neck, a Trump hat, which was red, and a face mask
17 for most of the day.  He also had a backpack on, a black
18 backpack, and jeans.
19 Q   Did you eventually obtain an arrest warrant for Mr. Grider
20 based on his involvement at the riot at the Capitol?
21 A   I did.
22 Q   When was that, approximately?
23 A   On January 20, 2021.
24 Q   Where did Mr. Grider live at that time?
25 A   In Texas.

1    Q   Did you coordinate with special agents in Texas in order to

2    execute the arrest warrant you had obtained?

3    A   Yes, I did.

4    Q   Did agents arrest Mr. Grider at his home?

5    A   No, they did not.

6    Q   How was he arrested?

7    A   Christopher Grider turned himself in to the FBI office in

8    Austin, Texas, on January 21, 2021.

9    Q   Was it your understanding that he had done so after being

10   informed that there was an arrest warrant for him?

11   A   That's correct.

12   Q   At that point did you continue to coordinate with agents in

13   Texas?

14   A   I did.

15   Q   At the time of his arrest, was the FBI able to recover any

16   of the clothing that you had described him wearing on

17   January 6th?

18   A   Not at the time of his arrest.  The only items seized at

19   the time of his arrest was his cell phone.

20   Q   At some point did the FBI execute a search warrant at his

21   Texas home?

22   A   Yes.

23   Q   When did that happen?

24   A   That happened on January 27, 2021.

25   Q   And let me back up a little bit.  You had testified that

1   you obtained the arrest warrant on January 20th.  When was Mr.

2   Grider — when did Mr. Grider show up at the FBI office to

3   surrender?

4   A   The following day, January 21, 2021.

5   Q   Okay.  And so how many days after he is arrested was his

6   home searched?

7   A   Six days.

8   Q   So once the home is searched, did the FBI find anything of

9   evidentiary value at the home?

10  A   Yes.

11  Q   What?

12  A   A black backpack that appeared to be the same backpack he

13  was wearing, based on videos and pictures on January 6th; and

14  also, a black jacket, which appeared to be the same black

15  jacket that he wore on January 6th.

16  Q   If you will give me just a moment, Your Honor, I am going

17  to step away.

18      Special Agent Ball, I am holding up physical item of

19  evidence, Exhibit 116.  What is this?

20  A   That is the black backpack that appears to be the same

21  black backpack that Christopher Grider brought to Washington,

22  DC and wore on January 6, 2021.

23  Q   Where was this backpack found?

24  A   In his house.

25  Q   Okay.  Now, you had testified that Mr. Grider was also

1  wearing a yellow flag tied around his neck.  Was that found at

2  his home?

3  A   No, it was not.

4  Q   You also testified about a red Trump hat that he was

5  wearing on January 6th.  Was that found at his home?

6  A   No, it was not.

7  Q   Did the FBI ever find those items?

8  A   Yes.

9  Q   How?

10  A   On January 27, 2021, while the FBI was conducting a search,

11  they spoke with Crystal Grider, Mr. Grider's wife, and she

12  advised that the flag and hat, she had given to their neighbor

13  after Christopher Grider had received a letter from the U.S.

14  Attorney's Office.  Christopher Grider asked Crystal Grider to

15  get rid of those items.

16  Q   So did the FBI -- how did the FBI eventually obtain those

17  items?

18  A   Based on what Crystal Grider had told agents, that David

19  McLean, their neighbor and friend, received those items.  The

20  FBI issued -- was able to get a Grand Jury subpoena, and days

21  later, on February 3, 2021, they went to Mr. McLean's house in

22  order to serve the subpoena.  However, his wife mentioned that

23  he no longer had those items in his possession, that he had

24  given them back to Crystal Grider.

25          THE COURT:  Whose wife did you -- you said his wife

1  had said.

2          THE WITNESS:  Apologies.  David —— Mr. David McLean's

3  wife ——

4          THE COURT:  Okay.

5          THE WITNESS:  —— was home when they went to serve the

6  subpoena.  Mr. David McLean was at work, and she advised that

7  David McLean had given the items back to Crystal Grider.  So

8  agents went to the Grider's residence, and Crystal Grider

9  provided the hat and flag to agents.

10          MS. CHO:  So I will step away from the podium again

11  for a moment.

12  BY MS. CHO:

13  Q   I am going to show you first Government's Exhibit 117.  Is

14  this the hat that FBI obtained from Mrs. Grider?

15  A   That is the hat.

16  Q   Is it consistent with the videos of Mr. Grider at the

17  Capitol?

18  A   It is.

19  Q   Now, I am going to show you Government's Exhibit 115.  What

20  is this?

21  A   That is a Don't Tread on Me flag, yellow, which appeared to

22  be the same one that he wore around his neck on January 6,

23  2021.

24          MS. CHO:  Just a moment, Your Honor.  Okay.

25  BY MS. CHO:

1   Q    You mentioned that when Mr. Grider turned himself in or was

2   arrested at the FBI office, that his phone was seized; is that

3   right?

4   A    That's correct.

5   Q    Did the FBI search the contents of that phone?

6   A    They received a warrant and did search the contents of the

7   phone.

8   Q    Was it searched using standard cell phone extraction

9   procedures and programs?

10  A    Yes, it was.

11  Q    So just to put this in regular people's language, what does

12  it look like?  What does the output of a search of a phone look

13  like, in general?

14  A    The electronic devices that are seized by the FBI are

15  usually exploited, meaning, they take the information from the

16  phone and put it into a program in order for it to be viewed.

17  This is usually done by what we call CART agents.  They are a

18  Computer Analysis unit, and this particular phone was put into

19  a program called Cellebrite in order for myself to be able to

20  view what was on the phone and mark what was pertinent to our

21  investigation.

22  Q    So is that the process and program used —— was it the

23  process and program used for Mr. Grider's cell phone?

24  A    Yes, it was.

25  Q    Have you reviewed the report from the Cellebrite program?

1  A   Yes, I have.

2  Q   Now, just to give an idea of what, what this information

3  looks like, do many items from the phone have time stamps in

4  the Cellebrite report?

5  A   Yes, they do.

6  Q   What time zone are the time stamps for most of the items in

7  Mr. Grider's phone in?

8  A   The extraction of the cell phone was done in Texas, and

9  because of that, it was set to Central Standard Time.  So the

10  majority of the items will be Central Standard Time on the

11  Cellebrite report.

12  Q   Okay.  When you reviewed that Cellebrite report, was there

13  information relating to Mr. Grider's presence at the Capitol on

14  January 6th?

15  A   Yes.

16  Q   What kind of information, generally, before we start

17  looking at them, specifically, was there relating to his

18  presence there?

19  A   There were text messages, there were pictures, and there

20  were videos all from January 6th that appeared to be either

21  related to or in Washington, DC.

22  Q   Does a Cellebrite report also, if the data is available and

23  downloadable, allow you to see the Web browser history for the

24  cell phone user?

25  A   Yes, it does.

1   Q   Does it allow you to see, you know, again, depending upon

2   the phone and the extraction, the user's calendar?

3   A   Yes, it does.

4   Q   Were those items visible to you in the Cellebrite report as

5   well?

6   A   Yes, they were.

7   Q   So I am going to show you what has been admitted as

8   Exhibit 68.

9        THE COURT:  Can you give me the number again.

10       MS. CHO:  Sixty-eight.

11       THE COURT:  Sixty-eight?

12       MS. CHO:  Yes.

13       That doesn't look quite right.  Well, let me do this.

14   Let's take that down for a moment.

15   BY MS. CHO:

16   Q   Were you able to review Mr. Grider's calendar entries in

17   his phone?

18   A   I was.

19   Q   And did you see a calendar entry relating to his trip to

20   Washington, DC on January 6th?

21   A   I did.

22   Q   What did it show you?

23   A   It showed me that on January 6th he took a flight from

24   Dallas to BWI, which is in Baltimore, Maryland, with a layover

25   in Atlanta.  And on January 7th, he took a flight from DCA,

1    which is Washington Dulles, had a layover in North Carolina,
2    before landing back in Texas on the 7th.
3    Q    So going back to the flight out of Texas, do you recall
4    generally what time the flight out of Texas was?
5    A    It was very early in the morning.
6    Q    Does around 6:00 a.m. sound correct?
7    A    Yes.
8    Q    So let's get a sense of the timeline.  Were you able to
9    review any evidence that showed you where Mr. Grider might have
10   gone upon landing at BWI?
11   A    Yes, I was.
12   Q    And give us an idea of what that evidence was.
13   A    Based on the phone extraction, I was able to tell that
14   Christopher Grider took an Uber from Baltimore, Maryland to the
15   National Mall area of Washington, DC.
16   Q    What, from your investigation of this case, did you
17   understand the significance of the National Mall area to be?
18   A    That is near the –– the National Mall is across from the
19   White House where President Trump was going to give a speech at
20   the Ellipse that afternoon.
21   Q    And I think you mentioned that you knew that from an Uber
22   ride.  Can you explain how the phone report might talk to you
23   about an Uber ride?
24   A    It showed, within the phone, that Uber had been accessed,
25   and it showed location.  It provides longitude, latitude, which

1    was able -- I was able to use to determine that it started in

2    Baltimore and ended near the National Mall in Washington, DC.

3    Q   And approximately what time did that latitude, longitude

4    data place the cell phone user near the National Mall?

5    A   Approximately between 12:00 and 1:00 p.m.

6    Q   All right.  We will pause there in our timeline, and I want

7    to ask you about some of the text messages that you viewed from

8    Mr. Grider's phone.  How does Cellebrite display text messages?

9    A   There are various ways to view it within the program.  One

10   way is to look at it as you would look at it on a phone.  That

11   way you are able to see the messages based on the order that

12   they went in with certain individuals, and that is usually my

13   preference for viewing text messages so you can see everything

14   as it was on their phone.

15   Q   Okay.  And in preparation for your testimony, did you focus

16   in particular on items in his phone, including text messages

17   that begin, that begin on the evening of January 5th and went

18   through to sort of the early, mid-January 7th?

19   A   Yes.

20   Q   Okay.

21        MS. CHO:  So let's start with Exhibit 69.

22   BY MS. CHO:

23   Q   So if you want to take a look at the first page, Special

24   Agent Ball, what are these?

25   A   These are text messages between Christopher Grider and

1    David McLean.

2    Q   Who is David McLean?  I think you mentioned this earlier,

3    but just to refresh.

4    A   He is Christopher Grider's neighbor and friend.

5    Q   So could you tell us using the colors on these text bubbles

6    which color is associated with Mr. Grider and which color is

7    associated with Mr. McLean?

8    A   Yes.  The green text messages mean that they were sent from

9    Christopher Grider, and the blue text messages were sent from

10   David McLean.

11   Q   What is the first message there from Mr. Grider?

12   A   It says, "tomorrow," and provides a YouTube link.

13   Q   What time is that message sent?

14   A   January 5, 2021 — thank you, at 8:31 p.m., Central

15   Standard Time.

16   Q   So is that just the evening before he flew out to DC?

17   A   Yes.

18   Q   Now, what does it look like is underneath the message

19   "tomorrow"?

20   A   It is a link to a YouTube video.

21   Q   Were you able to access that link on the Internet yourself?

22   A   Yes, I was.

23   Q   What did you find?

24   A   If I can please refer to the —

25   Q   Yes.  Let me back up a moment.  Would there be something

1  where you — I shouldn't have interrupted you.  Is there

2  something that would help you remember what you viewed?

3  A   Yes.

4  Q   Did you prepare a chart of some of the links that are

5  included in these text messages, along with the description of

6  what you found when you were able to access the links?

7  A   Yes.

8  Q   Okay.

9       MS. CHO:  I would like to publish Exhibit 119.  We can

10  do it next to Exhibit 69, Miss Robinson, if that is possible?

11  Maybe the text is too little, then, but we will try.

12       THE COURT:  I am assuming that Mr. Mayr has seen this?

13       MR. MAYR:  I have, Your Honor.  While we are at this

14  breaking point I will add, as the exhibit comes up, for

15  purposes of best evidence, the videos that the agent is going

16  to be testifying to are — some of them are still on YouTube.

17  I don't have any objection to the Court going and viewing these

18  videos themselves, and I would ask — I would actually ask

19  under the best evidence rule that the Court, in fact, do that,

20  to watch the videos and understand fully what they involve.

21       THE COURT:  All right.  But I think this is being done

22  strictly to refresh her recollection at this point; am I

23  correct, 119?

24       MS. CHO:  Yes, but she will provide a general

25  description of what she viewed in the video.

1     THE COURT:  Okay.

2     MR. MAYR:  Okay.

3   BY MS. CHO:

4   Q   So Special Agent Ball, have you had a moment to refresh

5   your recollection regarding what was found at the link with the

6   tomorrow message?

7   A   Yes.

8   Q   And what, generally, did you see at that video link?

9   A   Would you mind zooming in a little bit for me?  Thank you.

10  The link was to a YouTube video that was titled, "Far-right

11  marchers clash with antifascists in Portland," and that was put

12  on YouTube by *Guardian News*.

13     MS. CHO:  Let's minimize that and go back to

14  Exhibit 69 — the whole thing.  Yeah.

15  BY MS. CHO;

16  Q   What was Mr. McLean's response to that text from Mr.

17  Grider?

18  A   "Tomorrow will be the start of shit hitting the fan."

19  Q   So now, let's take a look — what was tomorrow at that

20  point?

21  A   January 6, 2021.

22     MS. CHO:  Let's turn to Exhibit 70.

23  BY MS. CHO:

24  Q   If you want to take a quick look at that, Special Agent

25  Ball, and then let us know what we are looking at.

1          THE COURT:  Can you make it any bigger?

2          Thank you.  That is much better.

3          THE WITNESS:  This is a text message sent from

4    Christopher Grider with another YouTube link.

5    BY MS. CHO:

6    Q    Do we know who he is sending this set of messages to?

7    A    It does not show on this page, but I believe based on

8    reviewing the phone, that it was to an individual named Jesse

9    Bowen.

10   Q    And we can note that phone number and come back to this

11   later to verify that this is Jesse Bowen; is that correct,

12   based on your review of the phone?

13   A    Yes.

14   Q    Who is Jesse Bowen?

15   A    Jesse Bowen is an individual who was a friend of

16   Christopher Grider's, I understand, from college, and they

17   traveled together to Washington, DC on January 6, 2021.

18   Q    So looking now, turning to the text in front of us, what

19   time was this text message sent?

20   A    This text message was sent on January 5, 2021, at 8:36 p.m.

21   Central Standard Time.

22   Q    So is that just five minutes after the last text message we

23   saw Mr. Grider sending his neighbor, Mr. McLean?

24   A    Yes, it is.

25   Q    Were you able — what was in this text message?

1   A    A YouTube link to a video.

2   Q    Were you able to access — is it one link or more than one

3   link?

4   A    It is — it just shows one link at the top.

5   Q    Okay.  Were you able to access this link?

6   A    Yes.

7   Q    What did you find with this one?  Would you like

8   Exhibit 119 to refresh your memory?

9   A    Please.

10          MS. CHO:  Your Honor, if I may approach the witness, I

11   am going to just give her a hard copy.

12          THE COURT:  I think that is easier.

13          THE WITNESS:  Thank you.

14   BY MS. CHO:

15   Q    Does that refresh your recollection?

16   A    Yes.

17   Q    What was at this link in this text message?

18   A    It was a video, which was titled, "Watch as Downtown

19   Sacramento, CA, California, Trump rally turns into a brawl."

20   It was posted by *The Sacramento Bee*.

21          MS. CHO:  If we can go back to Exhibit 70.

22   BY MS. CHO:

23   Q    So that was the first message in Exhibit 70; is that right?

24   A    That's correct.

25          MS. CHO:  Let's go to the second page, please, and

1  blow up the next message — the green one, the next message in.

2  BY MS. CHO:

3  Q   So what does this message appear to be?

4  A   This appears to be a different YouTube video that

5  Christopher Grider sent to Jesse Bowen.

6  Q   Were you able to access this YouTube video?

7  A   Yes, I was.

8  Q   What is the time on this message that Mr. Grider sends?

9  A   January 5, 2021, 8:36 p.m., Central Standard Time.

10 Q   So essentially, immediately after the last YouTube video?

11 A   That's correct.

12 Q   What was this link?

13 A   This was the same link that Christopher Grider sent to

14 David McLean titled, "Far right marchers clash with

15 antifascists in Portland" by *The Guardian News*.

16 Q   So he sent this, now, to two people; is that what your

17 review indicated?

18 A   That's correct.

19 Q   How does Jesse respond, if we can go to the rest of the

20 message?

21 A   Jesse responds, "Bro, they knocked the guy off a

22 wheelchair.  Looks like they smacked the perp pretty good."

23 Q   Do you know — do you have any idea what he is talking

24 about based on your review of the evidence?

25 A   Yes.  In the video of the Sacramento, California video, an

1    individual who was in a wheelchair was in the middle of a bunch

2    of people fighting and was knocked out of his wheelchair.

3    Q    What is Mr. Grider's response on the next page?

4    A    The next text message from Christopher Grider is another

5    YouTube video.

6    Q    What time is this message?

7    A    This is at 8:40 p.m. Central Standard Time.

8    Q    So just four minutes after sending the last two clips with

9    the brawl you mentioned?

10   A    That's correct.

11   Q    And what — were you able to access this link?

12   A    Yes, I was.

13   Q    What was there?

14   A    It is Les Miséra- — can you help me with the

15   pronunciation?

16   Q    It is — I am no French scholar myself.

17   A    Me neither.

18            MR. MAYR:  We will stipulate that it is Les Mis.

19            THE WITNESS:  Thank you.  I appreciate that.  Clearly

20   I am not very familiar, but it is a musical.  And the scene is

21   *One Day More* scene.  So it is a video from the play where they

22   are singing *One Day More*.

23   BY MS. CHO:

24   Q    And understanding that you are not familiar, do you have

25   some baseline familiarity with what Les Mis is about?

1  A   It is based on a failed revolution.

2  Q   Can you read Mr. Grider's next set of text messages?

3  A   Christopher Grider sends a message saying, "Bro, the memo

4  is all black."

5  Q   And let's go to the next one as well.

6  A   "Wear black."

7  Q   And what time are these messages coming in at?

8  A   This one is at 8:41 p.m. Central Standard Time.

9        MS. CHO:  Let's go to the next page.  Let's maximize

10  the top message.

11  BY MS. CHO:

12  Q   What does that one say?

13  A   "With a red hat, of course."

14  Q   What is the significance, if any, of Mr. Grider's comment

15  about the memo to wear black?

16  A   Before January 6, 2021, Proud Boys put out a statement

17  asking people and stating that they were going to wear all

18  black to blend in with Antifa.

19        MR. MAYR:  I am going to object.

20        THE COURT REPORTER:  I'm sorry, microphone.

21        MR. MAYR:  Yes.  Your Honor, I am going to object to

22  the hearsay that is being testified to.

23        THE COURT:  If it is being admitted for the truth of

24  the matter, I think it is hearsay, unless you come up with an

25  exception.

1          MS. CHO:  We can, we can move on.

2          THE COURT:  Okay.

3          MR. MAYR:  I would ask that the Court disregard any

4    part of —

5          THE COURT:  If I sustained it, I am not considering

6    it.

7          MR. MAYR:  Thank you, Your Honor.

8    BY MS. CHO:

9    Q   So these messages were at 8:41, and I would like to turn,

10   now, to another portion of the phone report that you had

11   discussed, the website history.  What, if anything, can the

12   Cellebrite report show you about the phone user's use of a Web

13   browser?

14   A   You can see, based on the extraction — usually, you can

15   see what individuals are searching on their cell phones, and

16   you can tell what time and date things were accessed.

17          MS. CHO:  So let's take a look at Exhibit 63.

18   BY MS. CHO:

19   Q   Can you tell us what this is?

20   A   This is part of the Cellebrite report of Christopher

21   Grider's cell phone.  It shows that the browser Safari was used

22   to access Proud Boys and Antifa clashes Trump supporters

23   protest election result in Washington, which was on YouTube on

24   January 5, 2021, at 8:49 Central Standard Time.

25   Q   So is the timing of this, his access of this YouTube video,

1   around the same time that he is sending these messages to

2   Mr. McLean and Mr. Bowen?

3   A    Yes.

4   Q    Okay.  Have you watched the video that was linked here as

5   well?

6   A    Yes, I have.

7   Q    What, generally, did you see in the video?

8   A    I saw a bunch of protesters protesting in the streets and

9   fighting.

10  Q    Did it seem to indicate different groups who were fighting?

11  A    Yes.

12  Q    What groups?

13  A    It was Antifa and groups that are pro Trump.

14  Q    Did the clip also reference Proud Boys?

15  A    Yes, it did.

16        MS. CHO:  Let's look at Exhibit 71.  It is going back

17  to text messages.

18  BY MS. CHO:

19  Q    Now, the last set of text messages we had read, Special

20  Agent Ball, who was Mr. Grider texting with?

21  A    He was texting with Jesse Bowen.

22  Q    Did he text further into the evening beyond even 8:41 p.m.?

23  A    Yes, he did.

24        MS. CHO:  So let's look at Exhibit 71.

25  BY MS. CHO:

1    Q    What is this?

2    A    These are additional text messages between Jesse Bowen and

3    Christopher Grider on January 5, 2021.

4          MS. CHO:  So let's highlight the first blue and green

5    text message on this page.

6    BY MS. CHO:

7    Q    What do these text messages say?

8    A    From Jesse Bowen.  It says, "Bad.  When are you rolling

9    out?  Asking for nugget."  And then, Christopher Grider

10   responded minutes later with a link to another YouTube video.

11   Q    Were you able to access that YouTube video?

12   A    I was not.

13   Q    Okay.  And do you have any idea based on your training and

14   experience and in speaking with agents who conduct forensic

15   analyses of phones why you might not have been able to access

16   that video?

17   A    This video appears to be taken down from the Internet.

18   Q    Okay.

19         MS. CHO:  Let's keep going to the next page.  Is that

20   the next page?  Let's blow up the first two messages on the

21   page.

22   BY MS. CHO:

23   Q    Special Agent Ball, what is the first message on this page?

24   A    It says, Christopher Grider says, "I'm bringing the

25   colors."

1   Q   What did you understand that to mean?

2        MR. MAYR:  Objection.  Lack of personal knowledge.

3   Calls for speculation.

4        THE COURT:  You are going to have to give foundation

5   for that.

6        MS. CHO:  Sure.

7   BY MS. CHO:

8   Q   Special Agent Ball, you have reviewed the contents of Mr.

9   Grider's cell phone; is that right?

10  A   Correct.

11  Q   You've also reviewed multiple videos of his time at the

12  Capitol on January 6th; is that right?

13  A   Correct.

14  Q   Have you also reviewed the records from his Facebook

15  account?

16  A   Yes, I have.

17  Q   Are you able to come to some inferences, understanding that

18  you are not in his mind, regarding what Mr. Grider might be

19  meaning based only on those pieces of evidence that you had

20  reviewed as part of your investigation?

21        MR. MAYR:  I, I would renew my objection, Your Honor,

22  as to lack of proper foundation.  It is speculative and -- it

23  is speculative.

24        THE COURT:  I think "it might be," makes it somewhat

25  speculative.  I think you can lay out, and the Court can come

1    to its own conclusions.  But I think, otherwise, she is

2    basically somewhat guessing or making suppositions.

3              MS. CHO:  We can move on.

4    BY MS. CHO:

5    Q   Let's look —

6              MS. CHO:  Just one moment, please.

7              THE COURT:  In other words, you can — instead of

8    having her indicate what she made the decisions, if you want to

9    show me what she would have relied on, I am not precluding you

10   from doing that.

11             MS. CHO:  Yes.  Thank you, Your Honor.  Just one

12   moment.  I want to make sure I have got the right exhibit here.

13             I am sorry, Your Honor.  If we may just take two

14   minutes to pull up a different set of exhibits.

15             THE COURT:  That is fine.  No problem.

16             MS. CHO:  Thank you so much.

17             MR. MAYR:  No problem with that.

18             THE COURT:  We will just take a short break.  While

19   she is doing that, I will ask that if the parties could provide

20   the YouTube videos in some way.  We are evidently having some

21   trouble trying to access them.  They seem to be locked.  If you

22   want me to look at them, you have to give them to me so I can

23   see or have some other way of accessing.

24             I am raising the issue.  You don't need to respond

25   right this instance.  Go ahead.  You need to change exhibits.

1        MS. CHO:  Yes, thank you.  Actually, I think we are

2   all set.  Let's pull up Exhibit 71.

3        THE COURT:  Okay.

4   BY MS. CHO:

5   Q   Special Agent Ball, do you see the last blue message on

6   this page?

7   A   Yes.

8   Q   What does it say?

9   A   It is from Jesse Bowen, and it says, "They are trying to

10  charge 34 bucks for the seats.  What if I don't pick a seat?"

11       MS. CHO:  Then, let's move forward.

12  BY MS. CHO:

13  Q   How does Mr. Grider respond?

14       THE COURT:  Can you enlarge these so I can see what

15  you are talking about?

16       THE WITNESS:  He responds saying, "Don't pick a seat."

17       MS. CHO:  Now, let's keep going.

18  BY MS. CHO:

19  Q   What does Mr. Grider say next?

20  A   Mr. Grider sends a YouTube video to Jesse Bowen.

21  Q   What time is that YouTube video sent?

22  A   On January 5, 2021, at 9:00 p.m. Central Standard Time.

23  Q   Were you able to access this YouTube video?

24  A   Yes, I was.

25  Q   What was it?

1  A   It is a clip from the movie *Fight Club* where they say, "The

2  first rule of Fight Club is:  Not to discuss Fight Club.  And

3  the second rule is:  Not to discuss Fight Club outside of Fight

4  Club."

5  Q   Okay.

6        MS. CHO:  Let's continue on.

7  BY MS. CHO:

8  Q   Have you seen the movie*, Fight Club*?

9  A   If I have, it has been a very long time ago, which I think

10  I have.

11  Q   Fair enough.

12        MS. CHO:  Let's look at Mr. Grider's text at 9:25 p.m.

13  BY MS. CHO:

14  Q   What does Mr. Grider say there?

15  A   "Live, live, live in DC."

16  Q   What does he say next?

17  A   Christopher Grider sends a YouTube link to a video.

18  Q   Were you able to look at this video?

19  A   Yes.

20  Q   And what time did Mr. Grider send this video?

21  A   This was on January 5, 2021, at 9:25 p.m. Central Standard

22  Time.

23  Q   What was the link at this — what was the video at this

24  link?

25  A   The video is titled, "Watch live patriots march to BLM

1   Plaza."

2   Q    Where did this video appear to take place?

3   A    In Washington, DC.

4   Q    How does Mr. Bowen respond to Mr. Grider?

5   A    Mr. Bowen says, "Guys are having a blast."

6   Q    What time did Mr. Bowen send that message?

7   A    At 9:35 p.m. Central Standard Time.

8            MS. CHO:  Let's turn to Government Exhibit 66.

9   BY MS. CHO:

10  Q    What is Exhibit 66?

11  A    This is a part of the Cellebrite report from Christopher

12  Grider's phone.  It shows that using the Safari browser.  It

13  was accessed, District of Columbia concealed carry gun laws:

14  CCPL and reciprocity, and this was on January 6, 2021, at

15  12:11 a.m. Central Standard Time.

16  Q    So is that just a few hours after the last set of text

17  messages we read?

18  A    Yes.

19           MS. CHO:  Let's look at Exhibit 64.

20  BY MS. CHO:

21  Q    What is Exhibit 64?

22  A    This is another part of the Cellebrite report from Mr.

23  Grider's cell phone.  It shows that using Safari, that the

24  individual using the phone searched Google for Proud Boys DC on

25  January 6, 2021 at 12:13 a.m. Central Standard Time.

1    Q   Is that just two minutes after going to the Web page

2    concerning gun laws?

3    A   Yes, it is.

4         MS. CHO:   Now, let's look at Exhibit 67.

5    BY MS. CHO:

6    Q   What is 67?

7    A   Sixty-seven is another Google search.  This time, for can

8    you carry a gun in Washington, DC?  It was conducted on

9    January 6, 2021, at 12:12 a.m. Central Standard Time.

10   Q   So again, is this around the same time as the other

11   searches and websites visited we have been discussing?

12   A   Yes, it is.

13        MS. CHO:   Let's look at Exhibit 65.

14   BY MS. CHO:

15   Q   What is 65?

16   A   This is another piece of the extraction from Christopher

17   Grider's phone.  It shows that on January 6, 2021, at

18   12:26 a.m. Central Standard Time, that the website contact us

19   Proud Boys page of the proudboysusa.com website was accessed.

20   Q   Okay.  So is it fair to say all these websites are somewhat

21   just shortly after midnight on January 6th?

22   A   Yes.

23        MS. CHO:   Now, let's go back to some text messages,

24   and go to Government's Exhibit 72.

25   BY MS. CHO:

1  Q   And what does this look like, if you can tell from what
2  you're seeing?
3  A   This is a text message from Christopher Grider sent on
4  January 5, 2021, at 10:12 p.m. Central Standard Time.
5  Q   Were you able to determine — and what was this text
6  message?
7  A   It was a screenshot.  However, it is not able to be viewed.
8  Q   And based on your understanding of the Cellebrite report
9  and phone extraction, what are the possibilities for why this
10 photo might not have been able to be viewed by you?
11 A   There are two possibilities.  One is that it was not
12 extracted from the phone by the program used for the
13 extraction.  The other scenario would be that the screenshot
14 was deleted from the phone.
15 Q   Now, you don't know which of those situations applied here,
16 do you?
17 A   I cannot say with 100 percent certainty.
18 Q   Okay.
19        MS. CHO:  Let's keep on going down the page.
20 BY MS. CHO:
21 Q   What does Mr. Grider say next?
22 A   Mr. Grider says, "Yeah, I'll sleep here."
23 Q   What time is that message?
24 A   That is on January 5, 2021, at 10:13 p.m. Central Standard
25 Time.

1   Q   And what does — who responds?

2   A   Jesse Bowen.

3   Q   What does he say?

4   A   He says, "Okay, I will call you at 2:00."

5          MS. CHO:  Let's keep going in the exhibit.

6   BY MS. CHO:

7   Q   What is the next message?

8   A   It is sent from Jesse Bowen and appears to be weather in

9   Washington, DC; however, the file was also not able to be

10  shown.

11         MS. CHO:  Let's keep going.

12  BY MS. CHO:

13  Q   What is the next message?

14  A   Christopher Grider says, "Are you bringing a bag to DC?"

15  Q   What is Mr. Bowen's response?

16  A   He says, "Nah, for 36 hours, laugh out loud."

17         MS. CHO:  Let's keep going.

18  BY MS. CHO:

19  Q   What are the next messages?

20  A   Jesse Bowen says, "Bad."  And Christopher Grider responds,

21  "Are we still going?"

22  Q   What time is Mr. Grider's message?

23  A   It is on January 6, 2021, at 2:50 a.m. Central Standard

24  Time.

25  Q   So just a few hours after the Web searches that we just

1  reviewed regarding guns and carrying a gun to DC?

2  A   Correct.

3          MS. CHO:  Let's keep going.

4  BY MS. CHO:

5  Q   What is the next message?

6  A   It is from Christopher Grider.  It says, "LOL."

7  Q   So that is directly after he says, "Are we still going?"

8  A   Correct.

9          MS. CHO:  Let's keep going.

10  BY MS. CHO:

11  Q   What is the next set of messages?

12  A   Jesse Bowen says, "Ha, ha.  Sleep is so good."

13  Q   What does he say next?

14  A   He says, "But I sleep with one eye open," and then, a word

15  that has been redacted.

16  Q   Do you know what that word was?

17  A   Yes.

18  Q   Was it a word that is inappropriate for court?

19  A   Yes.

20          MS. CHO:  Let's keep going.

21  BY MS. CHO:

22  Q   What is Mr. Grider's response?

23  A   Christopher Grider says, "Democrats took the two GA Senate

24  seats.  Not good."

25  Q   What did you understand "GA Senate seats" to refer to?

1    A    The Georgia runoff election.

2           MS. CHO:  And let's turn to the last page —— wait.

3    Let's stop there.

4    BY MS. CHO:

5    Q    What is Mr. Grider's next message to Mr. Bowen?

6    A    Those are screenshots, and if you zoom in, they are of

7    airline tickets, what you can scan to get on the plane.

8    Q    Okay.

9           MS. CHO:  Let's keep on going through the exhibit.

10   BY MS. CHO:

11   Q    Let's go —— does Mr. Grider send another message?

12   A    Yes, he does.

13   Q    Were you able to access that file?

14   A    No, I was not.

15          MS. CHO:  Let's go to the next message.

16   BY MS. CHO:

17   Q    Now, were you able to access that file?

18   A    No, I was not.

19          MS. CHO:  And let's keep going.

20   BY MS. CHO:

21   Q    Finally, what is on the last page?

22   A    It is from Christopher Grider, and it is a link to a

23   Twitter page.

24   Q    What time does he send this link?

25   A    On January 6, 2021, at 6:00 o'clock a.m. Central Standard

1    Time.

2    Q    Were you able to review the information at this link?

3    A    Yes, I was.

4    Q    What was this?

5    A    It was a video posted on Twitter, the Twitter site

6    BGOnTheScene, and the video or caption underneath the video was

7    called "Chaotic scene in BLM Plaza as police clash with Trump

8    supporters trying to rush the line, #DC, #WashingtonDC,

9    #January6th."

10   Q    What did — did you review that video itself?

11   A    I did.

12   Q    What did it appear to show?

13   A    A bunch of individuals fighting.

14   Q    Were they in Washington, DC?

15   A    Yes.

16   Q    Did it appear to be the night before January 6, 2021?

17   A    Yes, it did.

18        MS. CHO:  Now, let's look at Exhibit 73 —

19   BY MS. CHO:

20   Q    So before we turn away from that, you said that was at

21   6:00 a.m.  Was that shortly before you believe Mr. Grider

22   boarded his flight from Texas to DC?

23   A    Yes.  His flight was around 6:00 a.m.

24   Q    Okay.

25        MS. CHO:  Let's turn to Exhibit 73.  If you could

1   just, Miss Robinson, scroll through just a moment so that

2   Special Agent Ball can see.  Thank you.

3   BY MS. CHO:

4   Q    Special Agent Ball, now that you have had a chance to

5   review this exhibit, what is it?

6   A    These are text messages between Christopher Grider and his

7   wife, Crystal Grider.

8   Q    Let's see.

9        MS. CHO:  Just a moment.  I am sorry.

10  BY MS. CHO:

11  Q    Let's start from the top.  Can you read us the first

12  message?

13  A    The first message is an image, picture that Christopher

14  Grider sent.

15  Q    Were you able to recover the image that was attached here?

16  A    I am not — I do not recall.

17       MS. CHO:  Let me show you Exhibit 81.

18  BY MS. CHO:

19  Q    And how would you go about finding this image?

20  A    So in the extraction, they have attachments, which would

21  include all the attachments within this PDF document.  So I

22  would search image_1849.

23  Q    Because that is the — that is what is listed within this

24  text message; is that right?

25  A    Correct.  That is the filename of the picture.

1   Q   So let's look at Exhibit 81.

2   A   This is the picture that was sent.

3   Q   And how did you know that?

4   A   Because the picture in the attachment was labeled

5   image_1849, which is the same image that the Cellebrite report

6   shows was sent to Crystal Grider.

7   Q   Okay.

8           MS. CHO:  Now, let's turn back to Exhibit 73 itself.

9   BY MS. CHO:

10  Q   And what time did Mr. Grider send that photo?

11  A   On January 6, 2021, at 1:10 p.m. Central Standard Time.

12  Q   What is the next message?

13  A   Crystal Grider wrote, "Oh, my God.  What happened?"

14  Q   What does she say next?

15  A   "Did the tear gas y'all?"

16  Q   What is next?

17  A   "What happened?"

18  Q   What was her next message?

19  A   "Are you okay?"

20  Q   And next?

21  A   Christopher Grider responds, "Yes."

22  Q   What time is that text message?

23  A   1:20 p.m. Central Standard Time.

24  Q   Okay.

25          MS. CHO:  Now, let's turn to Exhibit 74.

1    BY MS. CHO:

2    Q    What is 74?

3    A    Seventy-four are text messages between Crystal Grider and

4    Christopher Grider.

5    Q    Could you start reading from the top, these text messages?

6    A    "People need to know the truth.  The media is already

7    twisting it.  One was saying that Trump was speaking in code,

8    telling y'all to storm and be violent."

9    Q    What is the response?

10   A    Christopher Grider writes, "There was no violence."

11   Q    What time does he say that?

12   A    On January 6, 2021, at 4:44 p.m. Central Standard Time.

13   Q    Let's keep reading.

14   A    Crystal Grider writes, "The news media is depicting y'all

15   as being a dangerous, violent, crazy bunch of bandits."

16   Q    What is Mr. Grider's response?

17   A    Christopher Grider says, "Questions:  One, what did you see

18   happen?  Two, what's it like out there in DC right now?  Chaos?

19   Three, what made you go all the way from CTX to DC?  Four, why

20   was it so important for you to be there?  Five, anything you

21   want Central Texans to know?"

22   Q    What time did Mr. Grider send this message?

23   A    January 6, 2021, at 4:48 p.m. Central Standard Time.

24   Q    Let's keep reading.

25   A    Christopher Grider writes, "From Rissa."

1    Q    What does he say next?

2    A    "Should I answer?"

3    Q    What did you understand these messages — did you review

4    other messages on Mr. Grider's phone that gave you context for

5    what these messages meant?

6    A    Yes, I did.

7    Q    And what context did you gather?

8    A    I was able to see text messages between Christopher Grider

9    and an individual named Rissa, who is Rissa Shaw.  She is a

10   news reporter at the local Texas station, which did an

11   interview with Christopher Grider on the night of January 6th,

12   and based on the text messages between Rissa Shaw and

13   Christopher Grider, she sent those same exact questions to

14   Christopher Grider.

15   Q    Okay.

16         MS. CHO:  Let's keep reading.

17   BY MS. CHO:

18   Q    What does Mrs. Grider respond?

19   A    She says, "Um, she wants you to take a video of yourself

20   answering these.  Do you have video footage of anything for

21   her?"

22   Q    Let's continue.

23   A    "Be honest.  Speak your heart.  Stay away from things that

24   could be construed as whacky extremism or turned against you."

25   Q    Okay.

1          MS. CHO:  Let's pause right there, and I would like to
2     return in time a bit.
3     BY MS. CHO:
4     Q   We have gone now -- what time were those messages
5     exchanged?
6     A   The last message that I read was at 4:52 p.m. Central
7     Standard Time on January 6, 2021.
8     Q   Okay.  Now, let's go back in time, and I should have gone
9     through these with you earlier.  I want to look at Exhibit 120.
10    Did you also review text messages between Mr. Grider and --
11         THE COURT:  Excuse me.  120 is not on the list.  Do
12    you have any objections to this?
13         MR. MAYR:  Sorry about that.  That's correct, Your
14    Honor.  No, I have no objections to -- well, let me just make
15    sure.
16         MS. CHO:  I did provide these at the beginning of the
17    day to the Court, two copies, and to Mr. Mayr.
18         THE COURT:  It is not part of the stipulation.  That
19    is why I am raising it.
20         MR. MAYR:  That's correct.  I have no objections to
21    Government's 120 and 121.
22         THE COURT:  Okay.  Are you asking to have them
23    admitted if you are going to be showing them?
24         MS. CHO:  I am, Your Honor.
25         THE COURT:  All right.  I will admit 120 and 121 since

1    there is no objection.

2         *(Government's Exhibit 120 was received in evidence.)*

3         *(Government's Exhibit 121 was received in evidence.)*

4         MR. MAYR:  Your Honor, if I may interject at this

5    point.  Can we take a very short recess?

6         THE COURT:  Sure.

7         MR. MAYR:  Thank you.

8         THE COURT:  Why don't we take — why don't we take a

9    15-minute break?  It is very hard to do short breaks as a

10   practical matter with this many people.

11        MR. MAYR:  Sure.

12        THE COURT:  It is 2:30.  We will come back at quarter

13   until 3:00.

14        MR. MAYR:  Thank you very much, Your Honor.

15        THE COURT:  If you wouldn't talk about your testimony.

16        THE WITNESS:  Sure.  Thank you, Your Honor.

17        THE COURT:  Thank you.

18        (Brief recess, 2:32 p.m. – 2:50 p.m.)

19                        AFTER RECESS

20        THE COURT:  Good afternoon, again.  We will resume the

21   testimony.

22        MS. CHO:  Thank you, Your Honor.

23   BY MS. CHO:

24   Q   Special Agent Ball, I would like to actually go back to

25   Exhibit 74 that you were testifying about before the break.

1          MS. CHO:  And if we could pull that up.

2     BY MS. CHO:

3     Q    Do you remember this set of text messages?

4     A    Yes, I do.

5     Q    And do you remember a text message from Mrs. Grider talking

6     about giving videos to a Rissa?

7     A    Yes, I do.

8     Q    Did you find videos in Mr. Grider's phone that he appeared

9     to have filmed of himself?

10    A    Yes, I did.

11    Q    And based on your review of the other portions of the

12    phone, did he send them to someone named Rissa, the reporter?

13    A    Yes, he did.

14         MS. CHO:  I would like to put up Exhibit 110.

15    BY MS. CHO:

16    Q    So before we play this video, does it look like one of the

17    videos you reviewed?

18    A    Yes, it does.

19    Q    Does it look, based on the positioning of the video camera,

20    that he had took it of himself?

21    A    It appears that way.

22         MS. CHO:  Let's play Exhibit 110.

23         (The video was played for the Court.)

24         THE COURT:  Is there supposed to be a voice or not?

25         MS. CHO:  There is, Your Honor.  We are working on the

1    volume.

2            MR. MAYR:  The only thing, Your Honor, is at the very

3    beginning, it, it is slightly quieter, and then, the volume

4    picks up on these videos.

5            THE COURT:  Okay.

6            MS. CHO:  We need to let it play a moment to make sure

7    it is not a mechanical error versus the video itself.

8            MR. MAYR:  Sure.

9        (The video was played for the Court.)

10           MS. CHO:  Just a moment, Your Honor.

11           THE COURT:  One thing we could do, if you have other

12   questions, I can call our courtroom IT person.  He may be able

13   to assist you.

14           MS. CHO:  Let's try this, this one more item, and we

15   will take you up on that offer, Your Honor, if this, if this

16   does not work.

17           MR. MAYR:  I have one other suggestion.  The

18   Government has provided me with copies of their exhibits, and

19   mine is playing perfectly fine on my laptop.

20           THE COURT:  Okay.  If you play it on his, then, we can

21   hear it that way.

22       (The video was played for the Court.)

23           THE COURT:  Let's start at the beginning.

24           MS. CHO:  Yes, and as Mr. Mayr indicated, some of

25   these videos, the beginning, the audio is inaudible that is

1   embedded, that is part of the video.  So I believe this one now

2   works.  The beginning will not have the audio, even though he

3   is speaking, and we understand that to be the video itself.

4           THE COURT:  Okay.  Not an electronic problem.

5           MR. MAYR:  Right.

6       (The video was played for the Court.)

7   BY MS. CHO:

8   Q   Special Agent Ball, did you hear Mr. Grider mention pepper

9   spray?

10  A   Yes, I did.

11  Q   Did you hear him mention tear gas?

12  A   Yes, I did.

13  Q   Did you hear him mention rubber helmets [sic]?

14  A   Rubber bullets?

15  Q   Rubber bullets, sorry, yes.

16  A   Yes, I did.

17  Q   Did you hear him mention people pushing to get inside?

18  A   Yes, I did.

19  Q   Now, were you able to look at and determine when this video

20  was taken, according to the phone data?

21  A   Yes.

22  Q   When, approximately, was the video taken?

23  A   On January 6, 2021.

24  Q   And do you remember the approximate time frame?

25  A   Offhand?  No, but I do know that it was later in the

1  afternoon.

2          MS. CHO:  If I may approach, Your Honor?

3          THE COURT:  All right.

4          What are you giving her?

5          MS. CHO:  I am handing you ——

6          THE COURT:  Wait until you get back to the microphone.

7          MS. CHO:  I am handing the agent what has been

8  previously admitted as Exhibit 118.

9          THE COURT:  Okay.  I don't have it as admitted,

10 frankly.  Is it one that —— it is not part of the stipulation.

11 Is it agreed to?

12         MR. MAYR:  It is, Your Honor.

13         THE COURT:  All right.  Then, I will admit 118.

14    *(Government's Exhibit 118 was received in evidence.)*

15 BY MS. CHO:

16 Q   Special Agent Ball, once you have reviewed Exhibit 118,

17 will you let me know if that refreshes your memory regarding

18 when, approximately, this video was taken or created?

19 A   Yes, it does.

20 Q   And what is 118?

21 A   One hundred eighteen is taken from the Cellebrite report,

22 and it shows images and videos, the metadata to include the

23 name of the item, and then, when it was created, and what it

24 was created from, such as a camera or a device.

25 Q   Now, is Exhibit 18 a full list of metadata for every file

1    on Mr. Grider's phone?

2    A    No, it is not.

3            THE COURT:  118?

4            MS. CHO:  Yes.

5            THE COURT:  Go ahead.

6            THE WITNESS:  No, it is not.

7    BY MS. CHO:

8    Q    Does it include Exhibit 110, the video that we just

9    watched?

10   A    Yes, it does.

11   Q    Okay.  And what time, approximately, was that exhibit —

12   was that video created?

13   A    This video was created on January 6, 2021, at 4:57 p.m.

14   Central Standard Time.

15           MS. CHO:  Now, let's look at Exhibit 113.

16       (The video was played for the Court.)

17   BY MS. CHO:

18   Q    Did you review a number of videos that appeared the same in

19   setting?

20   A    Yes, I did.

21   Q    Did they contain different content?

22   A    Yes.

23           MS. CHO:  So let's play 113 now.

24       (The video was played for the Court.)

25

1  BY MS. CHO:

2  Q   Special Agent Ball, did you hear Mr. Grider say something

3  about "nefarious things with the election"?

4  A   Yes, I did.

5  Q   Did you talk about fictitious ballots?

6  A   Yes.

7       MS. CHO:  Let's pull up Exhibit 114.

8       (The video was played for the Court.)

9  BY MS. CHO:

10 Q   Special Agent Ball, in reviewing that video, did you hear

11 Mr. Grider acknowledge that he was on the second floor of the

12 Capitol Building?

13 A   Yes.

14 Q   Did you hear him talk about the Speaker's Chamber?

15 A   Yes.

16 Q   Did you hear him note that the door was barricaded with

17 furniture?

18 A   Yes.

19 Q   Did you hear him note that he could see through the door?

20 A   Yes.

21 Q   Did you hear him say that people were trying to get in?

22 A   Yes.

23 Q   Did you hear him say that people were trying to get in to

24 be heard?

25 A   Yes.

1   Q   Did you hear him say that the glass was busted?

2   A   Yes.

3   Q   Now, how does this set of videos compare to the earlier

4   exhibit we watched, which was the TV interview of Mr. Grider by

5   Miss Rissa Shaw?

6   A   Pieces of the — several videos that Christopher Grider

7   sent to Rissa Shaw were used to create the story that we

8   watched earlier today.

9   Q   But based on your review of these, the text messages

10  between Mr. Grider and his wife, as well as the text messages

11  between Mr. Grider and Rissa Shaw, were all of the videos we

12  just viewed created for the purpose of sending to the TV

13  reporter?

14  A   Yes.

15  Q   Now, here today, did we look at all the videos that he sent

16  to Miss Shaw?

17  A   No, we did not.

18  Q   Were there other videos that, at least in part, duplicate

19  what was contained in Miss Shaw's TV interview that we already

20  reviewed?

21  A   In Rissa's?  Yes, it does.

22          MS. CHO:  Let's move back to some text messages, and

23  we are going to go back to the drive, Miss Robinson, and

24  Exhibit 75.  If you could scroll down, Miss Robinson, so that

25  Special Agent Ball can see.

1  BY MS. CHO:

2  Q   Do you recognize what 75 is, Agent Ball?

3  A   These are text messages between Crystal Grider and

4  Christopher Grider.

5  Q   If you could start by reading the first set of text

6  messages.

7  A   Crystal Grider said, "Are you okay?"  Christopher Grider

8  responded, "Yes."

9  Q   What time are these text messages?

10  A   January 6, 2021, 6:41 p.m., Central Standard Time, and

11  6:42 p.m. Central Standard Time.

12  Q   So what is the time frame of these text messages between

13  Mr. Grider and his wife versus the creation of the videos that

14  we just watched?

15  A   The videos were created between —— around approximately

16  5:00 p.m. Central Standard Time, and these are approximately an

17  hour and 40 minutes after the videos.

18  Q   Okay.

19       MS. CHO:  Let's keep going in this exhibit.

20  BY MS. CHO:

21  Q   What does Mr. Grider say next?

22  A   All the guys are going to a cigar bar.

23       MS. CHO:  Let's keep going.

24       THE WITNESS:  Christopher Grider says, "Sounds good."

25  Crystal Grider responds, "Okay.  Just as long as it is safe.  I

1    thought there was a curfew.  Are you still in DC?"

2    BY MS. CHO:

3    Q    What time does Mrs. Grider send that message?

4    A    At 6:43 p.m. Central Standard Time.

5              MS. CHO:  Let's keep going.

6    BY MS. CHO:

7    Q    What does Mrs. Grider say next?

8    A    "Are you gonna stay with the strangers or get a hotel?  Can

9    you please answer me?"

10   Q    What time does she send that message?

11   A    6:46 p.m. Central Standard Time.

12             MS. CHO:  Let's keep going.

13             THE WITNESS:  Christopher Grider responds, "They are

14   cool."

15             MS. CHO:  Let's keep going.

16             THE WITNESS:  Crystal Grider says, "Are you still in

17   DC, or, like, a suburb?"  Christopher Grider responds, "Heart

18   of DC."

19   BY MS. CHO:

20   Q    What time does Mr. Grider send that message?

21   A    That message is sent on January 6, 2021, at 6:49 p.m.

22   Central Standard Time.

23             MS. CHO:  Let's keep going.

24   BY MS. CHO:

25   Q    What are these next messages?

1   A   Crystal Grider says, "Okay.  Are you gonna do the Rissa

2   interview and the FOX one?"  Christopher Grider responds, "Did

3   Rissa."

4   Q   What is the next message?

5   A   Christopher Grider says, "Not sure about FOX."

6   Q   What time is that last message sent?

7   A   6:53 p.m. Central Standard Time.

8   Q   Okay.

9        MS. CHO:  Let's take a look at Exhibit 76 again from

10   the drive, Miss Robinson.

11   BY MS. CHO:

12   Q   Special Agent Ball, what is 76?

13   A   These are text messages between Crystal Grider and

14   Christopher Grider.

15   Q   What is the first message?

16   A   The first message is Crystal Grider saying, "I think so.

17   Of course, it is at the top of the headlines right now.  I wish

18   she would have said something about how y'all were peacefully

19   walking up the stairs and that y'all peacefully entered the

20   building.  People think y'all broke into the building."

21   Q   What time did Mrs. Grider send this message?

22   A   On January 7, 2021, at 12:34 a.m. Central Standard Time.

23   Q   Is that after Mr. Grider's interview aired in Texas?

24   A   That's correct.

25        MS. CHO:  Let's keep going.

1   BY MS. CHO:

2   Q   What are the next messages?

3   A   Christopher Grider said, "Some people did, and so the doors

4   were opened."  Then he said, "They let people in on a different

5   sided of the building."

6           MS. CHO:  And going up.

7   BY MS. CHO:

8   Q   What, what is being referred to by "some people did"?

9   A   Crystal Grider had said, that, something about people

10  breaking in.

11  Q   Okay.

12          MS. CHO:  Let's keep going.

13          THE WITNESS:  Christopher Grider said, "But yes,

14  peaceful walking through the halls, not damaging things, but

15  then, tens of thousands of people poured in and made it hard to

16  move or not move."

17  BY MS. CHO:

18  Q   Did you mean "But then, thousands of people"?

19  A   Yes.

20  Q   Okay.  Thank you.  What is the next message?

21  A   Christopher Grider says, "I was pinned too tight at times

22  that I couldn't breathe."

23          MS. CHO:  Let's keep going.

24          THE WITNESS:  Crystal Grider responded, "Wow."

25          MS. CHO:  Let's look at Exhibit 77.

BY MS. CHO:

Q    What is Exhibit 77?

A    Text messages between Crystal Grider and Christopher
Grider.

Q    Let's start with this first one that is up.

A    Crystal Grider says, "Honey, an arrest warrant has been
issued for you."

Q    What is the date and time on that message?

A    January 21, 2021, at 1:59 p.m. Central Standard Time.

Q    So how does —

        THE COURT:  There is somebody in the courtroom without
a mask on.  Please put a mask on.  If you don't have one, there
is one outside.  I have left masks in the vestibule so people
can pick them up if they don't have one.

BY MS. CHO:

Q    Special Agent Ball, at the date of this text message, had
an arrest warrant, in fact, issued for Mr. Grider?

A    Yes.

Q    Is that the arrest warrant that you swore out and obtained?

A    Yes.

        MS. CHO:  Let's keep going.

BY MS. CHO:

Q    What is the next message?

A    Crystal Grider sent a link to an article on kwtv.com
titled, "Arrest warrant issued for area business owner who

1   entered U.S. Capitol on January 6th."

2   Q   Were those files accessible?

3   A   I was able to go to the link and read the story.

4   Q   And what was it generally about?

5   A   Stating — it was the same news outlet as the one that did

6   the original story with Christopher Grider, and it stated that

7   an arrest warrant — with Christopher Grider, and it stated

8   that an arrest warrant had been issued for Christopher Grider.

9            MS. CHO:  Let's keep going.

10  BY MS. CHO:

11  Q   What is Mr. Grider's response?

12  A   He says, "Thanks for sending me this.  Now I know what they

13  are thinking."

14  Q   What is next?

15  A   "I am going into the lions' den.  I pray that the Lord

16  shuts their mouth."

17  Q   What is the time on these messages?

18  A   These are on January 21, 2021, at 2:04 p.m. and 2:05 p.m.

19  Central Standard Time.

20  Q   How does the timing of this match — how does the timing of

21  these messages compare with when Mr. Grider showed up at the

22  FBI office in Texas?

23  A   Just before he showed up at the FBI office.

24           MS. CHO:  Let's keep going.

25  BY MS. CHO:

1  Q   What is Mrs. Grider's response?

2  A   "You pushed on a stupid door, and they are going to arrest

3  you for it.  You didn't break the door."

4  Q   What is his response?

5  A   Christopher Grider says, "Just think, that still shot was

6  the absolute best day to get of me."

7  Q   Now, I want to pause there.  What is a still shot?

8  A   A still shot is, I take it, as a picture, likely from a

9  video because the video is moving, and so they take a still

10 shot of a moving video.

11 Q   Were there still shots in the complaint and affidavit that

12 accompanied the arrest warrant?

13 A   Yes.

14         MS. CHO:  Let's keep going.

15 BY MS. CHO:

16 Q   What does Mr. Grider say next?

17 A   Christopher Grider said, "If they had a more menacing image

18 of me, they would have used it.  That's the worst they can do."

19 Q   Is that just a few minutes later?

20 A   Yes.

21 Q   What does Mrs. Grider say?

22 A   "It is ridiculous.  You barely pushed on a door.  Was that

23 really the door to the Chambers?"

24 Q   What does Mr. Grider say?

25 A   Christopher Grider says, "I don't know.  Speaker's Chamber,

1   yes."

2   Q   Okay.

3        MS. CHO:  Let's keep going.

4   BY MS. CHO:

5   Q   What does he say next?

6   A   "I don't remember pushing on the door."

7   Q   And then, what does he say after that?

8   A   "But maybe I did.  Hell, who knows."

9        MS. CHO:  Let's keep going.

10        THE WITNESS:  Crystal Grider says, "You had a helmet."

11   BY MS. CHO:

12   Q   What did Mr. Grider say?

13   A   Christopher Grider said, "I found it on the ground outside,

14   was worried that whenever we left that the black-suited Antifa

15   was going to beat the living shit out of us.  I picked it up

16   because I thought I might need it to save my life later on that

17   evening."

18        MS. CHO:  Let's keep going.

19        THE WITNESS:  Crystal Grider says, "Then, you handed

20   it to some guy, and that guy broke the window, not you."

21        MS. CHO:  Let's keep going.

22        THE WITNESS:  Christopher Grider said, "Yes."  And

23   then, he said, "I told him I would not."

24        MS. CHO:  Let's keep going.

25        THE WITNESS:  Crystal Grider said, "You didn't tell

1   him to break the window.  You told him you would not break it.

2   They have no right to arrest you."

3           MS. CHO:  Now, let's take that down.

4   BY MS. CHO:

5   Q   I would like to go back in time, and here — what was the

6   date of these last text messages we were reviewing?

7   A   They were January 21, 2021.

8           MS. CHO:  So let's go back, and I would like to pull

9   up previously admitted Exhibit 120.

10  BY MS. CHO:

11  Q   Do you recognize this exhibit?

12  A   Yes.  These are —

13  Q   What — sorry.  What is it?

14  A   These are text messages between a group of individuals that

15  include Mom, Christopher Grider, Michele, Linda, and Hannah.

16          MS. CHO:  Starting with the — let's start with the

17  next message.  I don't think that one is relevant here.

18  BY MS. CHO:

19  Q   Let's begin with this message.  Could you read this one for

20  us.

21  A   This is from Christopher Grider's mother.  It says, "Honey,

22  I love you and am proud of you.  I appreciate you standing for

23  what you believe, even representing those who may not have

24  the — may not have opportunity to make their wishes known.

25  Big picture, when one inquires, why get involved?  The answer

1  should be, because this one counts.  And one asks, who should
2  get involved?"  Sorry.
3      "The answer should always reflect those who would benefit.
4  When I look at the Texas senator who would have the case heard
5  concerning fraudulent votes, stating that the fraudulent votes
6  actually discounted his legal vote and actually being refused
7  to be heard, the next question is, where do we draw the line?
8  Well, the only thing I can say, you are a wonderful man,
9  created with purpose.  Do what your heart says to do.  Pray.
10  Pray for wisdom and protection.  Go for the boys, go for
11  Crystal.  Stay, stay within your rights.  Prepare for the
12  future.  I love you forever."
13  Q   What is the date on this message from Mr. Grider's mother
14  to Mr. Grider?
15  A   January 5, 2021, at 8:03 p.m. Central Standard Time.
16  Q   So if you can recall, what other phone activity did you
17  review around this same time the night before January 6?
18  A   Text messages between Christopher Grider and others
19  regarding going to DC on January 6th.
20      MS. CHO:  Now, let's look at the next message in this
21  Exhibit 120.
22  BY MS. CHO:
23  Q   What is this one?
24  A   From Christopher Grider's mother, says, "He may need more
25  help on the 20th."

1  Q   What happens on January 20th of 2021?

2  A   That is when the new President is set to be sworn in.

3  Q   Okay.

4          MS. CHO:  Let's go to the next page.

5  BY MS. CHO:

6  Q   Does Mr. Grider respond to his mother?

7  A   Yes, he does.

8  Q   What is his response?

9  A   His response is a YouTube link.

10 Q   Were you able to access that YouTube link?

11 A   No, I was not.  It was not on the Internet anymore.

12 Q   Does he, then, respond, though, with an actual message?

13 A   Yes.  He says, "Live."

14          MS. CHO:  Let's keep going.

15          THE WITNESS:  Then he says, "Crazy."

16          And then, the next message is the same YouTube video

17 link that we talked about that is no longer on the Internet.

18 BY MS. CHO:

19 Q   What time did he send these messages?

20 A   On January 5, 2021, at 10:28 p.m. Central Standard Time.

21          MS. CHO:  Let's keep going in the exhibit.

22 BY MS. CHO:

23 Q   What does his mother respond?

24 A   "Watching right now.  At 22:39 they are sing *God Bless*

25 *America*."

1    Q    And are those responses directly after Mr. Grider sent her

2    this YouTube link that you couldn't access?

3    A    Yes.

4    Q    Okay.  What does she say next?

5    A    "Welcome to come up and sleep on couch tonight to get a

6    head start on the morning.  Sorry I didn't say anything

7    earlier, not up to par."

8              MS. CHO:  Let's keep going.

9    BY MS. CHO:

10   Q    Was that the night before January 6th, that text?

11   A    Yes.

12   Q    Now, the message at the top, is that another message from

13   his mother?

14   A    Yes.

15   Q    Were you able to recover the attachment that appears to be

16   contained within it?

17   A    No.

18   Q    But what time was that message sent?

19   A    2:57 a.m. on January 6, 2021, Central Standard Time.

20   Q    And is that consistent in terms of timing that Mr. Grider

21   was active on his phone at that point in the evening?

22   A    Yes.

23             MS. CHO:  So let's move on to the next message.

24   BY MS. CHO:

25   Q    What is the date and time of this message?

1   A   January 6, 2021, 7:07 p.m. Central Standard Time.

2   Q   What does his mother say?

3   A   His mother says, "How are you doing?  Been watching all

4   day, but didn't get to see if Pence concluded procedure or if

5   there is still a chance to retake election.  Isn't there, like,

6   a 12-day period now to contest?"

7          MS. CHO:  Let's keep going.

8          THE WITNESS:  His mother says, "How are you doing?

9   Miss you.  Praying for you."

10  BY MS. CHO:

11  Q   Now, what is the date on that message?

12  A   January 7, 2021, 2:56 p.m. Central Standard Time.

13  Q   So now, we are moving into the day after January 6; is that

14  right?

15  A   Correct.

16         MS. CHO:  Let's keep going.

17         THE WITNESS:  His mother said, "You were smart not

18  going on FOX."

19  BY MS. CHO:

20  Q   What is the date and time of that message?

21  A   January 7, 2021, at 2:57 p.m. Central Standard Time.

22  Q   Did you see a reference to FOX in another text message we

23  had reviewed previously?

24  A   Yes.

25  Q   And what text message was that?

1    A    With Crystal Grider.

2    Q    And what was the context surrounding FOX in that set of

3    text messages?

4    A    I believe that she was asking if he was going to do the

5    interview with Rissa and the interview with FOX.

6    Q    So does it appear that his mother now here, on January 7th,

7    is also referencing FOX?

8    A    Yes.

9    Q    So although Mr. Grider didn't respond to her earlier text

10   messages, based on the fact that she is discussing FOX, your

11   understanding of another text message with FOX, can you infer

12   -- did you infer that he and his mother had had a conversation

13   in that intervening time frame?

14   A    Yes.  Likely they had some sort of conversation.

15         MR. MAYR:  Going to object to speculation, lack of

16   foundation.

17         THE COURT:  I don't think so.  The Court can either

18   infer or not.

19         MR. MAYR:  That -- okay.

20   BY MS. CHO:

21   Q    Let's keep going with this exhibit.  What does Mr. Grider's

22   mother say next?

23   A    "John and I are praying for you right now.  Timothy 1:7,

24   God has not given us a spirit of fear; but of power, love, and

25   a sound mind.  Love you, watching out for you."

1    Q   What does she say next?

2    A   "Man, I just got something.  Okay, you and Jess were

3    pepper-sprayed, and you told me about those two guys that just

4    so happened to have apt. you guys could go to.  Then, you go

5    back, and all goes down hill.  Where were the two guys, and how

6    did you just so happen to get placed at the front of the

7    action?  Were there plans?  You, their shield."

8    Q   What is the date and time on this message?

9    A   January 8, 2021, at 12:25 a.m. Central Standard Time.

10          MS. CHO:  Let's keep going.

11   BY MS. CHO:

12   Q   Now, on this next page of the exhibit, do you see that

13   there appears to be an attachment that contains in the filename

14   Facebook?

15   A   Yes.

16   Q   And going down further in the exhibit, do you see one more

17   attachment with the same characteristic?

18   A   Yes.

19   Q   And going down further, a third attachment with Facebook in

20   the filename?

21   A   Yes.

22   Q   Were you able to recover these attachments from Mr.

23   Grider's phone?

24   A   Not that I recall.

25   Q   And if you could, just, then, note the date and general

1    time of these messages.

2    A    January 8, 2021, 3:49 a.m. Central Standard Time.

3    Q    Okay.

4            MS. CHO:  Let's keep going.

5    BY MS. CHO:

6    Q    And do you see the second message where Mr. Grider's mother

7    says, "Maybe give your footage to Linda?"

8    A    Yes.

9    Q    What does she say after that?

10   A    "She probably knows how to store data properly."

11   Q    Okay.

12           MS. CHO:  Now, let's take that down.

13   BY MS. CHO:

14   Q    Did you review the records from Mr. Grider's Facebook

15   account?

16   A    I did.

17           MS. CHO:  And let's take a look at what has been

18   marked for identification as Exhibit 121.

19           And Your Honor, if I may –– I won't technically

20   publish this, but if I could show it to her for identification,

21   Mr. Mayr indicated he has no objection, I believe.

22           THE COURT:  Fine.

23           MS. CHO:  I will move for its admission.

24           MR. MAYR:  No objection, Your Honor.

25           THE COURT:  Okay.  There is a way of just showing it

1    to her.

2                MS. CHO:  Yes.

3                THE COURT:  That is not a problem.

4    BY MS. CHO:

5    Q    Special Agent Ball, do you recognize Exhibit 121?

6    A    Yes, I do.

7                THE COURT:  It shouldn't -- well.

8    BY MS. CHO:

9    Q    What is it?

10               THE COURT:  Dorothy, somebody has to not have it up.

11   All right, I just won't look at it.  I know, but my

12   understanding is you didn't want me to look at it; is that

13   correct?

14               MS. CHO:  Oh, yes, but now that I have moved for its

15   admission, I --

16               THE COURT:  It is not a problem.  All right.

17               Okay.  Let's see if I understand.  There is no

18   objection to 121, so it can be admitted; is that correct?

19               MR. MAYR:  That is correct, Your Honor.

20               THE COURT:  All right.  We will admit it.

21               MS. CHO:  Thank you.

22        (Government's Exhibit 121 was received in evidence.)

23   BY MS. CHO:

24   Q    What is 121?

25   A    This is part of the Facebook business record which was

1    given by Facebook pursuant to a search warrant and provided all

2    the data for Christopher Grider's Facebook account.

3              MS. CHO:  So let's move just down a little bit on this

4    page.  And stop — go up a little bit.  I am sorry.  Keep

5    going.  Stop.

6    BY MS. CHO:

7    Q    Special Agent Ball, do you see where it says at the very

8    top of the screen, author, Dana Barry?

9    A    Yes.

10   Q    Who do you understand Dana Barry to be?

11   A    Dana Barry is Christopher Grider's mother.

12   Q    Do you see the sent line?

13   A    Yes.

14   Q    What does that indicate?

15   A    That this message was sent on January 6, 2021, at 8:47 UTC

16   time.

17   Q    So now, we — I believe we have been looking primarily on

18   UTC minus six time zone; is that correct?

19   A    Correct.

20   Q    What is UTC time?

21   A    UTC is, for if you are converting it to Central Time, it

22   would be minus six hours.

23   Q    So what time would this be in Central Time?

24   A    2:47.

25   Q    A.m., p.m.?

1    A    A.m.

2    Q    Okay.  What does it look like the author, Dana Barry is

3    doing with this entry?

4    A    This appears to be a status update by Dana Barry to

5    Facebook.

6    Q    Were you able to see what this update was?

7    A    I was not.

8    Q    And then, what, what comes after that status update?

9    A    Christopher Grider writes, "We will get them out of the

10   creek all right and DC."

11   Q    What time does he say that?

12   A    8:49 UTC time.

13   Q    On what day?

14   A    On January 6, 2021.

15   Q    So what does that translate to in Central Time?

16   A    6:49 a.m.

17   Q    Did you mean 2:49?

18   A    Oh, 2:49.  I am sorry.

19   Q    That is okay.  What does Dana Barry respond?

20   A    "Good, and block their path so they can't come back."

21   Q    What time is that response?

22   A    That is at 8:50 UTC.

23   Q    What time in Central?

24   A    So 2:50 Central Time.

25   Q    Is that just hours before Mr. Grider leaves for Washington,

1    DC?

2    A   Yes, it is.

3          MS. CHO:  Let's keep going just a little bit further

4    on this same page.  Keep going, keep going, keep going.

5    BY MS. CHO:

6    Q   And do you see later on right there where Dana Barry says,

7    it looks like at 3:00 a.m. Central Time on January 6th,

8    "Couldn't sleep, so came out to sit on couch.  Looked over, and

9    here is my candle just glowing.  Forgot about it"?

10   A   Yes.

11   Q   There is some additional activity after that; do you see

12   that?

13   A   Yes.

14   Q   Something about U.S.A. products only?

15   A   Yes.

16          MS. CHO:  Let's keep going.

17   BY MS. CHO:

18   Q   Now, do you see —

19          MS. CHO:  Sorry.  Let's go up just a touch so we get

20   the bottom of the first page.

21   BY MS. CHO:

22   Q   Do you see where it says author, Christopher Grider?

23   A   Yes.

24   Q   And then, it continues on to the second page; is that

25   right?

1  A   That's correct.

2  Q   What does Mr. Grider say?

3  A   "Looks like Democrats are getting both Georgia Senate

4  seats."

5  Q   What time does he say that?

6  A   At 10:18 UTC time.

7  Q   Which would be what in Central Time?

8  A   4:18 a.m.

9  Q   Is that the night before he leaves for Washington, DC?

10 A   Yes.

11 Q   Is that the first or the second time that he has discussed

12 the Georgia Senate election?

13 A   Second time.

14 Q   Okay.

15      MS. CHO:  Let's take that down.  Actually, sorry.

16 BY MS. CHO:

17 Q   What does Miss Barry respond?

18 A   "How?  The numbers were looking good early on, but maybe

19 it's like I heard, Republicans vote early, Dems vote later."

20      MS. CHO:  Let's continue on.

21 BY MS. CHO:

22 Q   Did you review other photos, other photos from Mr. Grider's

23 phone and Facebook that were of scenes at the Capitol?

24 A   I did.

25 Q   And were those scenes, scenes that we viewed through other

1  videos and photos in this trial so far?

2  A   Yes.

3  Q   You also mentioned that you reviewed some, what we call

4  open source videos; is that right?

5  A   That's correct.

6  Q   How do you generally define open source?

7  A   Anything that is publicly available on the Internet is open

8  source videos, what I was referring to.

9  Q   Okay.

10       MS. CHO:  Let's pull up video Exhibit 83, and before

11  we hit play — well, let's go through, and we will pause at 55

12  seconds.

13       (The video was played for the Court.)

14       MS. CHO:  We paused at 55 seconds, Special Agent Ball.

15  BY MS. CHO:

16  Q   Where are we in this exhibit?

17       THE COURT:  Can I just ask what exhibit number this

18  is?  I missed it.

19       MS. CHO:  Eighty-three.

20       THE COURT:  Okay.

21       THE WITNESS:  This is outside the U.S. Capitol on the

22  stairs of the second floor of the building.

23  BY MS. CHO:

24  Q   Now, there appears to be a date and time at the top of this

25  video; is that right?

1    A    That's correct.

2    Q    What does it say?

3    A    January 6, 2021, at 1:43.

4    Q    Do you have reason to believe that that time is incorrect?

5    A    Yes.

6    Q    What is your reason?

7    A    The reason is, because this video, based on following a

8    bunch of videos was taken after Christopher Grider was —

9    walked outside of the Capitol, and that was at approximately

10   2:55 p.m.

11   Q    Okay.  Now, before we hit play again on the video, I want

12   you to listen very carefully to the next portion, and I will

13   pause again to ask you what you hear about busting a window.

14        MS. CHO:  So let's continue.

15        (The video was played for the Court.)

16   BY MS. CHO:

17   Q    What did you hear Mr. Grider say about busting the window?

18   A    He said, "They busted the window," and then he said, "We

19   busted the window."  And then, he said, "No, they busted the

20   window."

21   Q    So it sounded like he corrected himself?

22   A    Correct.

23        MS. CHO:  Let's keep playing.

24        (The video was played for the Court.)

25

1   BY MS. CHO:

2   Q   So we have paused at 1:39, Special Agent Ball, and I want

3   you to listen carefully to the next part and tell me what, if

4   anything, you hear about people being evacuated when I pause it

5   again.

6   A   Okay.

7           (The video was played for the Court.)

8               MS. CHO:  So we have paused at 1:52.

9   BY MS. CHO:

10  Q   Did you hear anything about people evacuating?

11  A   Yes.

12  Q   What did you hear?

13  A   That they could have taken her out of the doors that people

14  were evacuating from.

15  Q   Okay.

16              MS. CHO:  Let's keep going.

17          (The video was played for the Court.)

18              MS. CHO:  Thank you.  One moment, Your Honor?

19              No further questions.

20              THE COURT:  Okay.

21              Let's go ahead with the cross.

22              MR. MAYR:  Thank you, Your Honor.

23                    **CROSS-EXAMINATION**

24  BY MR. MAYR:

25  Q   Good afternoon, Agent Ball.

1   A   Good afternoon, sir.

2   Q   I would like to try to go through things chronologically.

3   There is a lot of evidence, and we were looking at different

4   evidence.  I am going to try to start and just go through this

5   hour by hour, day by day to the extent that I need to.  Let's

6   first start — let's start with January 5th.

7   A   Okay.

8   Q   In conducting your investigation regarding Mr. Grider, part

9   of your investigation is learning a little bit about his

10  background; is that correct?

11  A   Correct.

12  Q   In the course of your investigation, you learned that he is

13  an owner of a winery there in Central Texas just south of Waco,

14  correct?

15  A   Yes, sir.

16  Q   All right.  As far as Mr. Grider — you talked a lot about

17  the Web searches and videos that he has looked at.  Prior to

18  January 5th, did you see in your search of his cell phone and

19  his search history, anything where he discussed or promoted the

20  idea of trying to stop the certification proceedings?

21  A   I do not recall because my main focus was the time around

22  January 6th.

23  Q   Okay.  So you, in the course of your investigation, did not

24  locate any evidence to reflect that; is that fair to say?

25  A   I don't recall anything that stood out to me, but I was

1    focused on the immediate time frame of January 6th.

2    Q   You would agree that if Mr. Grider had been searching the

3    Web, sending text messages to others about going to Washington

4    to stop the certification proceedings, that certainly would

5    have been relevant information in the course of your

6    investigation?

7    A   Correct.  If he was to say "stop the certification," that

8    would be relevant to my investigation.

9    Q   In terms of his decision to travel to Washington, DC, in

10   reviewing the contents of his cell phone, did you see anything

11   that would have indicated that he was planning on coming to

12   Washington, DC?  He was making the plan prior to January 5th?

13   A   Not that I recall.

14   Q   Okay.  In other words —

15         THE COURT:  Can I ask it this way?  Is it your best

16   memory that there wasn't anything, or you are not sure one way

17   or the other?

18         THE WITNESS:  It is my best memory.  I know for sure

19   that he was planning on January 5th.  Prior to that, I don't

20   recall, like, I don't remember if anything was mentioned.

21   BY MR. MAYR:

22   Q   Okay.  In terms of the text messages — and the Court has

23   the exhibits, so I am going to try to just — if you need me to

24   show you the exhibit, let me know, but the Court has the

25   exhibits and can review them.  The text messages between Mr.

1    Grider and his friend Jesse Owens [sic], who he traveled to
2    Washington with, did you see any discussions between them prior
3    to January 5th saying let's go up there to do whatever?
4    A    I do not specifically recall that.  I just want to mention
5    that the phone was very large.  So I won't recall every single
6    thing that was in the phone, but no, I do not specifically
7    recall them discussing this prior to January 5th.
8    Q    All right.  Were you able to search for any travel records
9    to show — we had seen some text messages where the ticket was
10   purchased and screenshotted and sent by Mr. Grider to his
11   friend Jesse Owen [sic], like, the morning of their flight,
12   right?
13   A    I don't know that that was a receipt, but he did send,
14   like, a picture of what you would use to board a flight that
15   morning, correct.
16   Q    Okay.  In terms of the receipt showing when the ticket was
17   purchased, did you make any effort to determine when those
18   ticketings were actually purchased?
19   A    We did.
20   Q    And what were you able to find out?
21   A    I did not find out anything from the phone.  However, when
22   agent spoke to Crystal Grider, she said that he had purchased
23   the tickets on the 5th.
24   Q    Okay.  So by all accounts, this was, indeed, a last-minute
25   trip; would you agree with that?

1  A   Correct.

2  Q   All right.

3      Give me a moment, because I want to make sure as we go step

4  by step that I don't leave anything off.

5      On direct examination with Ms. Cho, there was a lot of

6  discussion regarding the text messages that he was having

7  really, with three people, late into the evening of the 5th and

8  the early morning hours of the 6th, it was some messages with

9  his neighbor David McLean, right?

10 A   True, yes.

11 Q   His mother, Dana?

12 A   Correct.

13 Q   And of course, with Jesse, his friend?

14 A   Yes, sir.

15 Q   All right.

16     Let me start by showing you Government's 69, the text

17 messages between Mr. Grider and his neighbor David McLean.

18     This first video, this first YouTube video that Mr. Grider

19 sends the link to his neighbor, Government's 119, you testified

20 that this video was "Far-right marchers clashing with

21 antifascists" --

22         THE COURT:  You are, you know, the court reporter

23 can't do that with your talking, especially with the mask on.

24         MR. MAYR:  I realize that the split second you said

25 that.  I apologize, Your Honor.

BY MR. MAYR:

Q   Okay.  That video, that link to a YouTube video, far-right marchers clashing with antifascists in Portland, correct?

A   Yes, sir.

Q   And that video is essentially, two groups of private citizens clashing against one another, correct?

A   Yes, sir.

Q   Did the video reflect what they were marching about?

A   Not that I recall, other than what is in the title.

Q   Okay.  If we go — well, there is nothing in that video that is antigovernment; would you agree with that representation?

A   I didn't see any wording that was antigovernment in the video.  There was a lot of yelling, if I recall correctly.  I don't remember exactly what was being yelled.

Q   Nothing in that video that is supportive of trying to stop the electoral certification proceedings, right?

A   I would agree.

Q   All right.  Let's go to Government 70, the text messages between Mr. Grider and his friend Jesse Owens [sic], who he traveled to Washington, DC with.

    The first video Mr. Grider texts to him is a video which you testified is — the description is given in Government's 119 is, watch as downtown Sacramento, California, Trump rally turns into a brawl, correct?

1    A    Correct.

2    Q    In that particular video, is there —— is there any

3    confrontation with law enforcement, or is that, again, a

4    protest involving private individuals?

5    A    I believe there were law enforcement officers in most of

6    these videos trying to stop the violence, but the violence was

7    initiated by different groups.

8    Q    Okay.

9    A    Before law enforcement would step in.

10   Q    And I want to —— I want to make sure that is clear.  When

11   you say "different groups," this video right here, the title

12   is, watch as a Trump rally turns into a brawl.  But what the

13   videos show is that there is some people that appear to be

14   supporting Trump, but there are other people that are,

15   essentially, counterprotesters that are also engaged in

16   violence; would you agree with that?

17   A    Yes.

18   Q    All right.  And then, when we go back to Government 70 and

19   we go to the next video that Mr. Grider —— the link of which

20   Mr. Grider sends to his friend, this video is that same

21   "Far-right marchers clashing with antifascists in Portland,"

22   right?

23   A    Correct.

24   Q    The Les Misérables video is sent, and then, there is these

25   text messages about all black, wear black with a red hat, of

1    course, right?

2    A    Correct.

3    Q    All right.  Mr. Grider asks at 8:44, "Tennis shoes or

4    cowboy boots," right?

5    A    Yes, sir.

6    Q    You know that Mr. Grider chose to wear tennis shoes, right?

7    A    Correct.

8    Q    I am going to come back and ask some more questions about

9    that later on, but we see the text message where he is

10   deliberating between those two, right?

11   A    Correct.

12   Q    Now, if we go to Government 71, this link that is depicted

13   here to the YouTube that is sent at 9:25 p.m. Central Time,

14   this is the video of patriots marching to Black Lives Matter

15   Plaza or the BLM Plaza; is that right?

16   A    Yes, sir.

17   Q    Now, nothing in this video reflects that they are —— that

18   anyone is protesting or doing any damage to any Government

19   buildings, correct?

20   A    I recall it being just people fighting.

21   Q    In the streets?

22   A    Correct.

23   Q    This video depicted here is unavailable, and that is it as

24   far as 71.

25        Here at 4:09 we have this text message from Mr. Grider

1  where he mentions "Democrats took the two Georgia Senate seats,

2  not good," correct?

3  A   Yes, sir.

4  Q   He doesn't say anything else after that related to that or

5  those election results, correct?

6  A   Not on this chain of messages, correct.

7  Q   All right.  Now, let's go to the messages that he has with

8  his mother that were previously admitted under Government's

9  Exhibit 120.

10          MR. MAYR:  I don't have the digital version of this to

11  show on my laptop, Your Honor.  May I approach the witness —

12          THE COURT:  Yes.  Go ahead.

13          MR. MAYR:  — just to ask her a few brief questions

14  about this?

15          THE COURT:  Go ahead.

16          MR. MAYR:  Thank you.

17          THE COURT:  Or they can put it up, if that is easier.

18          MS. CHO:  Yes, we can.

19          MR. MAYR:  I just have a real brief question.

20          I can just use —

21          THE COURT:  Are you using the ELMO?

22          MR. MAYR:  I am.

23          THE COURT:  Miss Patterson needs to put it on.

24          MR. MAYR:  Oh, sorry.  It is just waiting for the

25  video.

1           Miss Patterson, why don't we just go to the

2    Government's monitor.  We will use theirs.  Thank you.  I

3    appreciate that.

4    BY MR. MAYR:

5    Q   If you will scroll down, Ms. Cho asked you about this

6    lengthy message that --

7           THE COURT:  In front of the microphone.

8           MR. MAYR:  Thank you.

9    BY MR. MAYR:

10   Q   Okay.  Ms. Cho asked you about this lengthy message that

11   Mr. Grider's mother sent to him giving her thoughts about what

12   was happening and what should take place, correct?

13   A   Yes.  She asked me to read these messages from his mother.

14   Q   And it shows that it was sent at --

15          MR. MAYR:  Could you scroll down just a little bit,

16   please.

17   BY MR. MAYR:

18   Q   It shows that it was sent at -- we can see in the bottom

19   right-hand corner it was sent at 8:03:05, and then, if we go

20   back to the left-hand side, we can see that it was read at

21   8:03:28, correct?

22   A   Yes, sir.

23   Q   Now, Mr. Grider does not respond to that message, right?

24   A   No, sir.

25   Q   Okay.

1        MR. MAYR:  If you could scroll down, please.  If you

2   will go to -- if you can keep scrolling.  Keep scrolling.  Go

3   to the fourth page, please.  And right there in the middle.

4   Okay.

5   BY MR. MAYR:

6   Q   Right there in the middle we see his mom sent another text

7   message.  "Been watching all day but didn't get to see if Pence

8   concluded the procedure or if there is still a chance to retake

9   the election."  That is sent at 7:07.  We see that, correct?

10  A   Yes, sir.

11  Q   Read at 8:51, correct?

12  A   Yes, sir.

13        MR. MAYR:  And if you could scroll down.

14        THE COURT:  Communicate whether it is a.m. or p.m. for

15  the record.

16        MR. MAYR:  I will.  I apologize.  At 8:51 p.m.

17        THE WITNESS:  Yes, sir.

18  BY MR. MAYR:

19  Q   And again, there is no response from Mr. Grider, correct?

20  A   Correct.

21  Q   All right.

22        MR. MAYR:  We can, we can take that exhibit down, and

23  if I can get my screen back.

24        Actually, I have got to ask about Government's

25  Exhibit 121.  So if I could -- could we get that up, please.

1   Thank you.  If you could scroll down, please.

2   BY MR. MAYR:

3   Q   Government's 121 is the Facebook messages.  So essentially,

4   what is happening is that Mr. Grider is getting messages sent

5   to — he is sending messages to his mother and receiving

6   messages both via his text messaging app, as well as through

7   Facebook Messenger, right?

8   A   Correct.

9   Q   And we see Mr. Grider says, at 8:49 a.m. UTC, which again,

10   is 2:49 Central Time in the morning, a.m.  He says, "We will

11   get them out of the creek all right and DC," right?

12   A   Yes, sir.

13   Q   His mother replies shortly thereafter saying, "Good, and

14   block their path so they can't come back," correct?

15   A   Yes, sir.

16   Q   Mr. Grider does not respond or reply to that, correct?

17   A   No, sir.

18   Q   No heck, yes.  I am going to go in there and stop them.

19   Nothing to that effect, right?

20   A   Not on here, no, sir.

21        MR. MAYR:  You could keep scrolling down.

22   BY MR. MAYR:

23   Q   We see right there, Mother sends him another video.  Then,

24   we see her send a message about not being able to sleep.

25        MR. MAYR:  Keep scrolling down, please.  And if will

1  you keep scrolling down, what we see are a number of messages

2  sent by Dana Barry but no response by Mr. Grider?

3          THE WITNESS:  Correct.

4  BY MR. MAYR:

5  Q   All right.  Mr. Grider lands at Baltimore, travels to the

6  National Mall, and the Court -- and we have all heard the

7  evidence about generally where he goes as he works his way into

8  the Capitol Building, correct?

9  A   Yes, sir.

10 Q   I want to talk -- I asked you about the shoes that he was

11 wearing.  You knew that he was wearing tennis shoes, correct?

12 A   Yes, sir.

13 Q   I want to talk to you about some of the conclusions that

14 you have come to in this particular case.  Actually, I am going

15 to hold off on that because I want to continue just making sure

16 we have got everything through the timeline.  Now, we are on

17 January 6th.  We know he enters at approximately 2:15, correct?

18 A   Yes, sir.

19 Q   All right.  Let's talk about what happens immediately after

20 he leaves.  After he leaves or -- I am sorry, let me back up.

21 When he is inside the Capitol, he began sending text messages

22 to Miss Rissa Shaw, who is the reporter who ultimately reported

23 his story, correct?

24 A   Yes.  That is the reporter.  You are saying that he sent

25 text messages to her as soon as he got into the Capitol?

1    Q   Not as soon as he got in but at some point when he was

2    inside the Capitol, do you remember if he tried sending her

3    text messages?

4    A   I don't recall if it was while he was in the Capitol.  I

5    know he talked to her later that day.

6    Q   Okay.  Let me show you — let me — we know from the text

7    messages that he reaches out to her, and she sends questions to

8    him that she wants him to answer, correct?

9    A   I saw that she sent questions to him to answer, correct.

10   Q   And the videos that the Court saw earlier, Government's

11   110 — really, Government's 109 through 114, each one of those

12   videos are videos answering each one of those questions,

13   correct?

14   A   Yes, sir.  They appear to be.

15   Q   At some point after Mr. Grider leaves Washington, DC on the

16   7th of January, did you learn in the course of your

17   investigation that he had retained or — retained legal counsel

18   to represent him?

19   A   Yes, sir.

20   Q   Okay.  And shortly thereafter, within less than a week, did

21   you, in the course of your investigation, know that the lawyer

22   that Mr. Grider had retained had reached out to —

23           MS. CHO:  Objection.  Hearsay.

24           THE COURT:  I am sorry?

25           MS. CHO:  Objection.  Hearsay.

1          THE COURT:  I mean, if you are getting into what the

2     lawyer did or how she knows it, I think that is hearsay.

3          MR. MAYR:  Sure.

4          THE COURT:  I am not sure what relevance there is

5     either, but I will hold off on relevance.  But it clearly is,

6     whatever she is going to say, is going to be hearsay.

7          MR. MAYR:  Sure.

8     BY MR. MAYR:

9     Q   Was — early on in this case, was there, was a decision

10    made to send a proffer letter to Mr. Grider's attorney?

11         MS. CHO:  Objection.  Hearsay.

12         THE COURT:  I would agree.  I mean, you are getting

13    into some other attorney — I assume some other attorney but

14    maybe not, sending things back and forth.

15         MR. MAYR:  Yes.

16         THE COURT:  She wouldn't know that unless she had

17    heard it from somebody else.  All of this is —

18         MR. MAYR:  The relevance that I am trying to

19    establish, Your Honor, and, and it — I am trying to think if

20    it is really offered for the truth of the matter asserted or

21    not — is efforts made for Mr. — whether or not there was a

22    discussion about Mr. Grider potentially cooperating with the

23    Government in their investigation.  And so I guess I could just

24    ask the question —

25         THE COURT:  Can I ask what that — cooperating or not

1    cooperating, what that has to do at this point?

2         MR. MAYR:  I think it is extremely relevant as to what

3    Mr. Grider's intent is.  If the Government is alleging that he

4    is operating with this, with this corrupt consciousness of

5    wrongdoing, the counter to that is, if someone is not only

6    reaching out to a source in the media but is reaching out to

7    the Government to cooperate and provide them with information,

8    that negates any sort of culpable mental state.

9         It also negates this intent to obstruct or interfere

10   with police officers if he is, in fact, trying to cooperate

11   with them immediately thereafter.

12        THE COURT:  Let me put it this way.  You have got a

13   major hearsay problem, but apart from that, people cooperate

14   for lots of different reasons.

15        MR. MAYR:  Understood.

16        THE COURT:  So frankly, without something more, I

17   don't see necessarily your conclusion being the reason why

18   somebody would decide to do so.

19        MR. MAYR:  Okay.

20        THE COURT:  Or as the only reason why one would decide

21   to do so, but I think the bigger problem, frankly, is you are

22   discussing things that she had heard through clearly, hearsay,

23   and would have no personal knowledge of.  And you are asking,

24   it seems to me, for me to consider them for the truth of the

25   matter asserted that that is what he did and that is what his

1    intention was.

2              MR. MAYR:  Sure.

3              THE COURT:  I think it is a problem.

4              MR. MAYR:  Okay.  Let me ask this.

5    BY MR. MAYR:

6    Q   Do you know whether or not a letter was sent by — nope.

7              MR. MAYR:  That is not going to work either.  Let me

8    move on from this, and I will reevaluate, Your Honor.

9              THE COURT:  Okay.

10   BY MR. MAYR:

11   Q   Based on all the information that you gathered from videos,

12   from tips, from your own investigation, you apply for and

13   obtain an arrest warrant for Mr. Grider, correct?

14   A   Yes, sir.

15   Q   You were the affiant on the affidavit in support of

16   probable cause to issue the complaint and arrest warrant?

17   A   Yes, sir.

18   Q   In that, you took what evidence you had available, and you

19   made conclusions about what Mr. Grider did — what he did

20   inside of the Capitol, correct?

21   A   Yes, sir, based on what I saw.

22   Q   And you came to the incorrect conclusion that Mr. Grider

23   had kicked the door to the Capitol; isn't that correct?

24   A   I don't know that it was incorrect based on certain views

25   of the different angles that I was able to look at.  I think

1  that it, it is not 100 percent positive at this point, but it
2  wasn't out of the question because I can see the flag go up
3  with — once a leg goes up to hit, and I mean, I have watched
4  several videos multiple times.
5  Q   Do you know that Christopher Grider was wearing light
6  colored tennis shoes, correct?
7  A   I do, yes, sir.
8  Q   I am going to show you Government's Exhibit 38.
9      (The video was played for the Court.)
10 BY MR. MAYR:
11 Q   Do you recognize this to be closed-circuit television from
12 inside the Capitol at the East Stairs, correct?
13 A   I can't say East Stairs.  I know that, like, if you play
14 it, I can probably tell.  I am not, like, an expert on.
15 Q   Okay.
16      MR. MAYR:  Let me play here starting at the
17 five-second mark, and I will fast-forward up to —
18      (The video was played for the Court.)
19 BY MR. MAYR:
20 Q   Do you recognize this video, after seeing it for a few
21 seconds?
22 A   Yes, sir.
23 Q   This is the hallway leading over to the Speaker's Lobby; is
24 that right?
25 A   Yes.  Looking forward is headed towards the Speaker's

1   Lobby, yes, sir.

2            MR. MAYR:  I am at the 1:49 mark on the exhibit, and

3   publishing from there.

4        (The video was played for the Court.)

5            MR. MAYR:  I am, actually, going to go up to the 2:33

6   mark and publish from there.  Okay.  I will pause right here.

7        (The video was played for the Court.)

8   BY MR. MAYR:

9   Q   At the 2:38 mark we can see Mr. Grider rounding the corner,

10  correct?

11  A   Yes, sir.

12  Q   And you can clearly see that he is wearing tennis shoes?

13  A   Yes, sir.

14  Q   And because of the quality of the video, you can clearly

15  see that they appear to be a gray color?

16  A   Yes, sir.

17  Q   And you can clearly see that he has white soles on those

18  tennis shoes, correct?

19  A   Yes, sir.

20  Q   Now, I am going to go over to Government's Exhibit No. 40.

21       (The video was played for the Court.)

22  BY MR. MAYR:

23  Q   Okay.  I am at the 1:35 mark of Government's Exhibit No. 40

24  where we have seen that Mr. Grider has just placed his hand on

25  the door, correct?

1  A   Yes, sir.

2  Q   You wouldn't characterize that as a punch, or it is

3  certainly not a punch, right?

4  A   I would say it is a push.

5  Q   Okay.  Let's watch from this point forward.

6       (The video was played for the Court.)

7           MR. MAYR:  I will stop it right at the 1:39 mark.

8  BY MR. MAYR:

9  Q   This individual right here, you know that this is the fur

10 -- the gentleman who had the fur hat on, correct?

11 A   Yes, sir.

12 Q   Watching this frame by frame, there is no doubt that he is

13 the one kicking at that door right there, correct?

14 A   For the first kick, yes, sir.

15          MR. MAYR:  For the record, I am just going to go frame

16 by frame here.

17       (The video was played for the Court.)

18 BY MR. MAYR:

19 Q   When you are watching this video, Agent Ball, do you have

20 the ability to look at it as we are looking at it here in the

21 courtroom frame by frame?

22 A   Yes, sir.

23 Q   And you have the ability to stop it and make a screenshot

24 and put that into your affidavits, correct?

25 A   Yes, sir.

1   Q   As we continue to go frame by frame, we see another kick at

2   the door, correct?

3   A   Yes, sir.

4   Q   That appears to be a dark, a dark-colored shoe, correct?

5   A   I can't tell — I know it has the white around the bottom.

6   Q   There is another kick at the door there, but you also can't

7   tell who is kicking, right?

8   A   Not from this video, no, sir.

9   Q   Okay.

10          MR. MAYR:  One moment.  Let me keep going here, make

11   sure there is nothing else.

12       (The video was played for the Court.)

13   BY MR. MAYR:

14   Q   Okay.  After this, there is — no one is seen kicking from

15   the 1:44 mark, right?

16   A   Yes, sir, but if you look down, you can't tell what color

17   shoes he has on right now.

18   Q   But you could certainly see that from other videos,

19   correct?

20   A   Yes, sir.  What color?  Yes, sir.

21   Q   So now we are talking about the conclusion to the

22   representations that you are putting into your affidavit.  You

23   get the arrest warrant, and we see that Mr. Grider learns about

24   it and then turns himself in immediately, correct?

25   A   He —

1   Q   Well, I say immediately, at least within 12 hours of

2   notification, right?

3   A   Yes, sir, that is accurate.

4   Q   And were you aware of the circumstances in terms of --

5   well, strike that.  When Mr. Grider turns himself in, he brings

6   his cell phone, and he voluntarily turns it over to the agents,

7   correct?

8   A   He brings his cell phone in and agents seize it.

9   Q   Right.  And he had driven himself down to Austin to turn

10  himself in.  He left his vehicle there at the FBI office; were

11  you aware of that?

12  A   Yes, sir.

13  Q   Now, you talk about, at the beginning of your testimony, a

14  little bit about going to execute the search at his home on the

15  27th of January, correct?

16  A   Yes, sir.

17  Q   You weren't present for that?

18  A   No, sir.

19  Q   But at that time, the backpack and the black jacket that

20  were previously admitted were seized, correct?

21  A   Yes, sir.

22  Q   Now, you testified that not you, but agents spoke with Mr.

23  Grider's wife, Crystal, correct?

24  A   Yes, sir.

25  Q   And in regards to the flag and the hat that he had, you

1  testified that she gave the flag and the hat to the neighbor,

2  correct?

3  A   Yes, sir.  That is what she said.

4  Q   Okay.  Now, when you told this Court that she said after

5  Mr. Grider told her to get rid of those things, you never

6  personally listened to the context of that conversation,

7  correct?

8  A   I read the 302 and spoke with the agent.  The 302 is — let

9  me break that down, is how — is what the FBI uses to document

10  interviews.  The interview was not recorded.  So the only thing

11  we have to go off of is that 302 —

12  Q   Sure.

13  A   — which is where I got that from.

14  Q   But when she says to this other agent who then says to you,

15  Mr. Grider said to get rid of it.  There was — was there any

16  clear indication that that was to destroy that evidence?

17  A   The 302 says that Mr. Grider told her to get rid of it, and

18  she gave the items to Mr. McLean, and that it was after a

19  letter was received from the U.S. Attorney's Office.

20  Q   Okay.  But nothing more beyond what the neighbor or anyone

21  was supposed to do with the evidence, correct?

22  A   That's correct.

23  Q   And what actually ends up happening is, the agents go out

24  to, to his neighbor's home.  Mr. McLean tells — I am sorry,

25  Mr. McLean's wife says, "We returned those items to

1   Mrs. Grider," right?

2   A   Correct.

3   Q   And then, the agents go over there, and she has them

4   waiting to give to them, correct?

5   A   I know that she has them and gives them to, to agents, yes,

6   sir.

7   Q   Okay.

8   A   I don't know about waiting.

9   Q   There is no indication that anyone has made any attempts to

10  destroy or conceal those pieces of evidence from you-all; is

11  that correct?

12  A   The fact that they weren't there in the first place in that

13  she said that Christopher Grider asked her to get rid of them

14  implies that they wanted them gone.

15  Q   But that could -- he could have wanted them gone for a

16  number of other reasons other than to keep it from you-all in

17  your investigation, correct?

18  A   That is correct, but it said after he received a letter.

19  Q   Right.  A letter that he received through his attorney,

20  correct?

21  A   I am not aware.

22  Q   Okay.

23          MR. MAYR:  If I may just have a moment, Your Honor?

24          THE COURT:  Go ahead.

25          MR. MAYR:  That is all I have.  Thank you, Agent Ball.

 1              THE WITNESS:  Thank you.

 2              THE COURT:  Redirect?

 3         MS. CHO:  None, Your Honor.

 4              THE COURT:  All right.  You can step down and go back.

 5              THE WITNESS:  Thank you.

 6              THE COURT:  You can take -- if you take the piece of

 7    paper, I appreciate it.

 8              THE WITNESS:  Thank you, Your Honor.

 9              THE COURT:  And give them back.

10                        *(Witness excused.)*

11         THE COURT:  All right.  That is, I believe, the last

12    of the witnesses, or is there something?

13         MS. CHO:  No, Your Honor.  We do just have one

14    remaining item, and that is the stipulations that the parties

15    agreed to in this case.  I am happy to read those into the

16    record or incorporate them by reference to the docket entry,

17    whichever the Court prefers.

18              THE COURT:  If they are written out and you both have

19    signed them?  If it was a jury, you would read it to the jury,

20    but I don't see taking extra time to do that.  If you both have

21    signed them, we will simply have them admitted.  We can do it

22    as — along with the exhibit, frankly.

23         MS. CHO:  Yes.  Your Honor --

24              THE COURT:  Unless you want to have them read into the

25    record for a particular purpose.  Let me just ask one question.

1    If the stipulations are to the two, the testimony from the two

2    witnesses, we have that.  If they are stipulations about the

3    exhibits, then, I definitely would not read them into the

4    record.  I think just presenting them is sufficient.

5            If there is some factual content in there that you

6    want put into the record at this time, I am not stopping you

7    from doing it.  It is up to you what you want to choose.

8            MS. CHO:  Your Honor, I think that both parties are

9    satisfied by simply incorporating Docket Entry 147, which is

10   the stipulation that has been signed by both the Defendant's

11   attorney and attorneys for the Government.

12           THE COURT:  All right.  That, that works.

13           MR. MAYR:  For the record, that is acceptable with me.

14           THE COURT:  Okay.  So the question at this point is,

15   whether you have any further evidence.

16           MS. CHO:  We do not.  The Government rests at this

17   time.

18           THE COURT:  All right.  I, I probably would not — so

19   my question to you, Mr. Mayr, is as I understand it, there are

20   two — leaving aside whatever Mr. Grider decides to do, unless

21   he has already decided.  But I usually do a, some small little

22   short colloquy about his rights to testify, not testify just so

23   we don't have any issues.  As I understand it, there are two

24   witnesses, and I don't know whether you want to do your opening

25   statement.  If you do, this is the time to do it.

1          MR. MAYR:  I would like a moment to confer with my
2     client about, about -- it will depend on my conversation with
3     my client.
4          THE COURT:  Okay.  All right.  Then, my suggestion
5     would be if you would let me know at least his tentative
6     decision one way the other this evening.
7          MR. MAYR:  Yes.
8          THE COURT:  We will start at 9:00 promptly.  As I
9     indicated to you, I have this commission meeting that I am
10    chairing that I need to do.  We need to stop at 11:30, a hard
11    stop.  Because I have -- we are moving to a Zoom commission
12    meeting with seven other people.
13         So it will be whatever the morning.  I am hoping that
14    we would be able to finish a good portion, if not all of the
15    defense case; and then, presumably the next day we would do
16    closings.  I may have some questions for you for the closings
17    in terms of some legal questions, but at this point, we don't
18    need to discuss it.  I am just trying to do scheduling from
19    your perspective.
20         MR. MAYR:  Just so I am clear, when you say that we
21    have to stop at 11:45 sharp --
22         THE COURT:  11:30.
23         MR. MAYR:  11:30.  We would not be returning for the
24    remainder of the day?
25         THE COURT:  No, no.  It will take most of the

1  afternoon, and to be frank, I have a plea at the end which

2  needs to be taken care of.

3          MR. MAYR:  I had not — I had a little bit of a

4  misunderstanding about that from last week when you were

5  discussing this conflict that you had, and I just wanted to be

6  abundantly clear that we are not coming back.

7          THE COURT:  We are not coming back in terms of being

8  able — ordinarily I wouldn't have set the plea, but we had

9  problems with scheduling.  As I said, usually I don't, but I

10  was already going to be out for most of the afternoon with the

11  commission hearing.  And to be frank, those meetings are very

12  hard to calculate the timing of.  They usually go until 4:30,

13  3:00, 4:30, something like that.

14          MR. MAYR:  How much time do I have before I need to

15  inform the Court and the Government about my plan moving

16  forward?

17          THE COURT:  Well, it would be helpful this evening to

18  at least know if, you know, his tentative decision in terms —

19  but I understand no matter what he decides, you still have two

20  witnesses, or am I wrong about that?

21          MR. MAYR:  Again, that — you are.

22          THE COURT:  If that is still in the mix, I am not

23  pushing you to say anything.  I just had understood that

24  they — you were definitely calling them.  If that is not your

25  decision, that is fine also.

1    MR. MAYR:  I can tell you that they — as I have

2    informed the Government, there is not going to be any other

3    additional witnesses.  The two witnesses that were previously

4    listed on the witness list are not being called to testify.

5    THE COURT:  Okay.  So the issue really is going to be

6    whether Mr. Grider decides to testify?

7    MR. MAYR:  That is correct.

8    THE COURT:  Okay.  So it would be helpful this evening

9    —

10   MR. MAYR:  Yes.

11   THE COURT:  — to let us know what his tentative

12   decision is.

13   MR. MAYR:  Yes.

14   THE COURT:  Okay.  Tomorrow I will do, you know, the

15   inquiry.  Obviously, if he wants to testify, we will go

16   forward.  If he decides not to testify, then, we would stop.

17   What I may do then, depending on what you say this

18   evening, I just — there are a few — I am going to let you

19   argue your closings as you wish.

20   MR. MAYR:  Sure.

21   THE COURT:  But if he testifies, I probably will not

22   make you do closings.  Trying to testify and do closings

23   tomorrow morning probably isn't going to work.

24   MR. MAYR:  Right.

25   THE COURT:  Even if there is a little bit of time in

1    there, I would probably move it over.  If he is not going to

2    testify, and then, it would seem to me we could go forward to

3    closings.  I will, this evening, figure out.  I have a few,

4    just legal questions around some of the elements that I want to

5    clarify with you about some of the charges.

6              MR. MAYR:  Okay.

7              THE COURT:  You should know what they are, you know.

8    You have been looking at the instructions, etc.  There are no

9    surprises here.

10             MR. MAYR:  Okay.

11             THE COURT:  If I look it over and I think there are, I

12   will send you something this evening to alert you as to, you

13   know, what I want to have addressed.

14             MR. MAYR:  Okay.

15             THE COURT:  Okay?

16             MR. MAYR:  And forgive me for asking this question.

17             THE COURT:  Sure.

18             MR. MAYR:  Only because I want to make the most

19   efficient use of my time, how late of this evening could I

20   notify the Court as to what the plan is tomorrow?  In a perfect

21   world I would notify you by 5:00 o'clock, but I have a feeling

22   that given the discussions that we have —

23             THE COURT:  You are probably going to need more time.

24   Could we have something by 7:00?

25             MR. MAYR:  I can do that for you, Your Honor.

 1          THE COURT:  If early would be great, but by 7:00 so we

 2   would know, and I will look through the legal stuff anyway.

 3          MR. MAYR:  Great.

 4          THE COURT:  That work?

 5          MR. MAYR:  Works for me.

 6          THE COURT:  Government?  You have any questions?

 7          MS. CHO:  Your Honor, if the Court does have any

 8   additional questions beyond the legal issues you have

 9   mentioned, if the Court would be willing to provide those

10   questions —

11          THE COURT:  Yes.  My feeling is closing arguments, you

12   tell me what your arguments are and what you view as your best

13   evidence.  If I have questions, this is the time to ask them.

14   So if it looks like it is useful that you should know, you

15   know, I will go ahead and do so.

16          MS. CHO:  Thank you.

17          THE COURT:  There may be just a few — the legal ones

18   I might give you some idea of, sort of what I want you to focus

19   on just so you are prepared.  But let me sit down and see

20   whether I have that many or not.

21          MS. CHO:  Thank you.

22          MR. MAYR:  Thank you.

23          THE COURT:  I mean, since the thought of it was prior

24   to sort of where we are now.

25          MR. MAYR:  Okay.

1    THE COURT:  Okay?  So we will do it.  You will let me

2 know by roughly 7:00.  It is tentative.  He is going to make a

3 final decision in front of me on tomorrow morning.

4    MR. MAYR:  That is correct.

5    THE COURT:  At least so people, if it looks like he is

6 not, then, you are all preparing for closing, which will not be

7 lost anyway.

8    MR. MAYR:  Right.

9    THE COURT:  You will have to do closings at some

10 point.

11    MR. MAYR:  Right.

12    THE COURT:  If he decides to testify, then, the

13 closings just get put off.  All right?

14    The inquiry is basically to just let him know his

15 constitutional rights.  Has he discussed it, thought about it?

16 You know, it is his decision.  He gets advice, but he still

17 needs to make his own decision.  And that is really what — is

18 just to make sure there is no issue about his making a

19 voluntary decision and a knowing one.

20    MR. MAYR:  One more question, if I may —

21    THE COURT:  Sure.

22    MR. MAYR:  — regarding planning, as well as thinking

23 things ahead.

24    THE COURT:  Certainly.

25    MR. MAYR:  In terms of a verdict, thinking in lines of

1   the Court's procedure in the *Rivera* case, I know that the Court

2   did not issue a verdict immediately after closing arguments.

3            THE COURT:  I will be frank with you.  I will not do

4   it immediately afterwards.  I do want to go through the, some

5   of the other -- I have marked things that I need to go back and

6   take a look at.

7            MR. MAYR:  Okay.

8            THE COURT:  And I will get it out as quickly as

9   possible.  I generally have been doing in these cases, I know

10  some judges have read their decisions.  I have been generally

11  trying to write them out so that there is, you know, a record.

12  And a number of these cases the legal issues are still in flux,

13  so I want to make sure they are written out in such a way that

14  they are understandable so, you know, if stuff goes up on

15  appeal, I have got everything written out.

16           MR. MAYR:  Okay.

17           THE COURT:  But I will get them out quickly.

18           MR. MAYR:  Okay.

19           THE COURT:  Since some of these charges may require,

20  and I have to look at it, that you be -- your client be

21  present.  So I will have to take a look at that.  You know,

22  otherwise, I -- you know, if it was all misdemeanors we could

23  do Zoom.

24           MR. MAYR:  Right.

25           THE COURT:  But if it -- if that is not the case,

1    then, I am not sure he is in a position to waive it.

2           MR. MAYR:  Okay.

3           THE COURT:  Government?

4           MS. CHO:  Your Honor, we would follow up on that, and

5    we would request that the Defendant be in person for any

6    verdict, and whether that is reading the opinion or simply

7    rendering the guilty/not guilty verdict.

8           THE COURT:  My inclination would be to render it, and

9    he has to put something out and have him come and then, you

10   know, the judgment is basically, is, is done.  This assumes

11   that he is, you know, depending on what the verdict is.

12          MR. MAYR:  I understand, I understand.

13          THE COURT:  In terms of whether there is additional

14   things.  There may or may not be additional things that would

15   require his presence anyway, to be frank.

16          MR. MAYR:  I completely understand.

17          THE COURT:  Sure.  No problem, and I would obviously

18   coordinate something.

19          MR. MAYR:  All right.  Okay.  I think that is all I

20   have.  I appreciate the clarity.

21          THE COURT:  No problem.  If you think of something

22   else, send us an e-mail --

23          MR. MAYR:  Okay.

24          THE COURT:  -- and to chambers.

25          MR. MAYR:  Will do.

1         THE COURT:  From either one.  All right.

2         MR. MAYR:  Thank you.

3         MS. CHO:  Your Honor, just one more matter, and with

4 apologies, I think that we will need to provide chambers with

5 an updated thumb drive of the electronic exhibits.

6         THE COURT:  Yes.

7         MS. CHO:  Would it be possible to receive the thumb

8 drive we had previously provided and bring it back this evening

9 or tomorrow morning early?

10        THE COURT:  We can do that.  Not a problem.

11        MS. CHO:  Thank you.

12        THE COURT:  It would help —— we evidently had trouble

13 trying to look at the YouTube things.  So if we could have some

14 way of being able to look at those, that would be helpful or

15 which ones we ——

16        MR. MAYR:  For the record, I am going to —— I know I

17 previously proffered making those available, but downloading

18 them is actually more of a hassle.  I understand the

19 limitations that the Court has.  For the record, I am going to

20 withdraw what I ——

21        THE COURT:  It may be that I should look at them,

22 frankly.  As a practical matter, not to look at them means I

23 don't know what is in them.

24        MR. MAYR:  I certainly have no problem with the Court

25 looking at them.  I am just —— for my ——

1          THE COURT:  Can the Government?  It is Government

2     evidence.  I mean, can you set it up so that I can actually

3     look at them.

4          MS. CHO:  Your Honor, at the very least we can provide

5     a list of the links which we believe are still active at least

6     as of yesterday on the Internet, and they should be publicly

7     accessible to anybody.

8          MR. MAYR:  I think the problem is even though they are

9     publicly accessible, sometimes I know the Government agencies

10    have limitations on being able to view things.  Is that what

11    the problem is or —

12         THE COURT:  I — it is hard to tell.  We will have to

13    talk to our IT people.  I don't think so, though.  I don't

14    think that is it.

15         MR. MAYR:  All right.

16         THE COURT:  What I can do is, when we break in a few

17    minutes, if you can talk to my law clerk who has been, you

18    know, the IT person for me in terms of getting these things.

19    We have an excellent IT team at the Court.  So if there is

20    additional issues from them, we can get them, and they have

21    been very cooperative on these cases.  We have had some

22    interesting challenges.

23         MR. MAYR:  Okay.

24         THE COURT:  But I do think that if they could not, the

25    Government could not open them, obviously, I am not going to be

1    opening them.  So it would only be the ones, which are not that

2    many, frankly, that actually can be opened and that she has

3    appeared -- Miss Ball has appeared to have looked at.

4          MR. MAYR:  Okay.  One last thing that just popped into

5    my head is, I do want to make a Rule 29 motion for judgment of

6    acquittal.  Would you like me to do that now or you consider

7    that now or do that --

8          THE COURT:  I think you -- I will take it under

9    advisement.

10         MR. MAYR:  Okay.

11         THE COURT:  And I mean, I think that it would be

12   difficult to simply do it, frankly, on argument.  If you want

13   to preserve certain things as part of your Rule 29, obviously,

14   some of the earlier opinions that you had.  But I would take it

15   under advisement, I can tell you that, and so, I will render

16   whatever judgment.  And then, obviously, having taken it under

17   advisement, should the, the need be to file something, I will

18   allow you to file it in addition.

19         MR. MAYR:  Fair enough.  So then, let me go ahead and

20   for the purposes of the record, make my motion for an

21   acquittal, pursuant to Rule 29 of the Federal Rules of Criminal

22   Procedure as to Counts I, II, III, V, VI, VII, and VIII, and

23   argue that there is not -- there has not been legally

24   sufficient evidence presented to this Court to support each one

25   of those.  I will go one by one through each one of them.

1          Beginning with Count I on the civil disorder count,

2     there has been no specific testimony about any specific acts

3     that Mr. Grider did that interfered with the duties of officers

4     during the course of the civil disorder.  The Court has heard a

5     lot of general testimony, but as Special Agent Yetter

6     acknowledged, there was no way that he could testify as to

7     anything that Mr. Grider did specifically.

8          As to Count II on the obstruction count, there is no

9     evidence specifically to support either that Mr. Grider acted

10    with the specific intent to impede, disrupt, or impair an

11    official proceeding; but more importantly, no evidence to

12    support the element of him acting corruptly with the

13    consciousness of wrongdoing.

14         In fact, most of the evidence has indicated to the

15    contrary; and therefore, I would ask that that charge be

16    dismissed based on legal insufficiency.

17         As to Count III, obviously there is no evidence of Mr.

18    Grider actually causing damage to any Capitol property, but I

19    would argue, as I anticipate the Government arguing that he

20    aided and abetted in the commission, that the mere act of

21    handing a helmet to another individual, and that is all the

22    evidence that has been presented to this Court, is legally

23    insufficient to establish the critical element that he did so

24    with the intent to encourage that person to commit the offense

25    or with the intent that the person commit that offense.

1            In regards to the remaining misdemeanor counts,
2     because there is no evidence to support that he aided and
3     abetted in the destruction of Capitol property, there is no
4     legally insufficient evidence to establish that he committed an
5     act of violence that is required by those counts of the
6     indictment that require proof of that; and then, the final
7     counts related to disorderly conduct, I would argue that there
8     is no evidence that has been -- there is no legally sufficient
9     evidence that has been presented to the Court to establish that
10    he acted with the intent to disrupt, impede, or impair a
11    proceeding.

12            While there may be evidence that he was engaged in
13    disorderly conduct, stack both counts — both misdemeanor
14    counts require that specific intent, and there has been no
15    evidence supported to — there has been no legally sufficient
16    evidence to support those elements.  And that is it.

17            THE COURT:  Okay.

18            You want to respond?  Keeping in mind that I am taking
19    it under advisement, but if there are specific things you want
20    to bring to my attention.

21            MS. CHO:  I will keep it brief, Your Honor,
22    understanding that this is going under advisement.

23            The first argument that the Defendant raises, no
24    specific testimony of Mr. Grider obstructing police officers
25    during a civil disorder, I would submit that even accepting

1  that the videos are also evidence without testimony, showing

2  that Mr. Grider was obstructing law enforcement officers, he

3  was obstructing — the videos would show that he is outside of

4  the scaffolding where there is a police line.  He is part of

5  the crowd that pushes through that police line, and he goes

6  into the building.

7          And he enters the Crypt, where he is also part of the

8  crowd for several minutes before they push through the police

9  line; and certainly, that those are just two examples of other

10  conduct where he obstructs police's ability to do what they —

11  to carry out their mission, which is to protect the Capitol,

12  the building, and the people inside of it.

13          Second argument from the Defendant that there is no

14  evidence that he acted corruptly, there is evidence that he

15  planned for violence, that he was watching videos where people

16  were being violent; and then, once he got into the crowd at the

17  Capitol outside, he — there is evidence that he was tear

18  gassed and pepper-sprayed, and yet, he kept pushing forward,

19  and to go inside.

20          Mr. Grider, there is also evidence that he states that

21  he wanted to be heard, and the logical conclusion is that he

22  wanted to be heard by members of Congress or other people in

23  positions of authority.  And that, the corrupt portion was that

24  he trespassed and interfered with law enforcement officers in

25  order to accomplish that goal of being heard, but certainly

1    corrupt intent and, and means as well.

2           Third, Mr. Grider argues that he had no intent to

3    encourage the other rioters' violation of 1361, the destruction

4    of Government property; but again, we would submit that there

5    is evidence in the record to support that he did have that

6    intention.  Before he handed the helmet to the rioter he had

7    offered the helmet to the crowd at an earlier door, and it was

8    immediately after the crowd had yelled, "Use your Kevlar," "Use

9    your helmet," and the crowd had indicated in no uncertain terms

10   that they wanted to break down the door.

11          So he had prior knowledge that the helmet might be a

12   good item to use to break down the door, and that is enough to

13   support that he had the intention to encourage this other man

14   to use the helmet to break down the door.

15          THE COURT:  Slow down, slow down.  It is the end of

16   the day.

17          MS. CHO:  I am sorry.

18          In addition, there is evidence in the record that he

19   watched that other man, the other rioter engage in violent

20   behavior directly before he gave that rioter the helmet.  So

21   again, the inference can be made that he saw this rioter, who

22   is capable and has already engaged in violence, and he hands

23   him the weapon to inflict further violence on that property.

24          That would address many of the Defendant's arguments

25   relating to the remaining misdemeanors as well.  It would be --

1    that is an act of physical violence as well.  You could also

2    view some of the evidence before the Speaker's Lobby Door as

3    disorderly conduct.  Certainly, when he is part of the crowd

4    pushing through the police lines, and when he, when he offers

5    up his helmet, as well, at the earlier door.

6           So for all of those reasons, we would submit that

7    there is evidence in the record to overcome the low standard of

8    review for the Rule 29 motion at this time.

9           THE COURT:  Okay.  All right.  Well, as I have

10   indicated, I will take it under advisement, and so I will see

11   you tomorrow promptly at 9:00.  Do you have the test?  Because

12   I have, I have some if you need them.

13          MR. MAYR:  I will, I —

14          THE COURT:  We can give them to you so we can start

15   promptly at 9:00.

16          MR. MAYR:  I will buy one this evening.

17          THE COURT:  No, no, I would rather give them to you,

18   not have it be an issue for you.  The Court is giving them out,

19   so take advantage of it.

20          MR. MAYR:  Thank you, Your Honor.  I appreciate that,

21   and I will be in touch with the Court as soon as we make a

22   decision with our tentative plan for tomorrow.

23          THE COURT:  All right.  My law clerk is going to talk

24   to all of you about making sure that we can access the

25   exhibits, okay?  Parties are excused.

1   MR. MAYR:  Thank you, Your Honor.

2   (Court adjourned, 4:47 p.m.)

3   - - -

4   <u>CERTIFICATE OF COURT REPORTER</u>

5

6   I, Jean A. Knepley, hereby certify that the

7   foregoing is a true and correct transcript from reported

8   proceedings in the above-entitled matter.

9

10

11   /S/ Jean A. Knepley            December 29, 2022
     JEAN A. KNEPLEY, RDR/CRR/CRC/FCRR   Date
12   Official Court Reporter
     Southern District of Indiana
13   Indianapolis Division
     Detailed to the U.S. District Court
14   for the District of Columbia

15

16

17

18

19

20

21

22

23

24

25