UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,   )
                            )
            Plaintiff,      )
                            )
vs.                         ) Criminal Action No. 21-022 (CKK)
                            ) Washington, DC
CHRISTOPHER RAY GRIDER,     ) Wednesday, December 14, 2022
                            ) 9:05 o'clock a.m.
            Defendant.      ) Volume 3 of 5

Before the
HONORABLE JUDGE COLLEEN KOLLAR-KOTELLY

TRANSCRIPT OF BENCH TRIAL, DAY 3

APPEARANCES:

FOR THE GOVERNMENT:     United States Attorney's Office
                        By:  Cindy J. Cho
                        Detailed to the U.S. Attorney's Office
                        for the District of Columbia
                        10 West Market Street, Suite 2100
                        Indianapolis, Indiana 46204

                        Department of Justice
                        Criminal Division, Appellate Section
                        By:  Francesco Valentini
                        950 Pennsylvania Avenue NW
                        Washington, DC 20530

FOR THE DEFENDANT:      Mayr Law P.C.
                        By:  Brent Mayr
                        5300 Memorial Drive, Suite 750
                        Houston, Texas 77007

ALSO PRESENT:           The Defendant in person.

COURT REPORTER:         Jean A. Knepley, RDR, CRR, CRC, FCRR
                        Detailed to the U.S. District Court
                        for the District of Columbia
                        46 East Ohio Street, Room 301
                        Indianapolis, Indiana 46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

Vol. 3 - 408

1                    I   N   D   E   X

2    CHRISTOPHER RAY GRIDER

3    Direct Examination by Mr. Mayr ................416

4         Certificate of Court Reporter ............490

5

6                I N D E X   O F   E X H I B I T S

7

DESCRIPTION                                    RECEIVED

8    200 ..........................................464
     201 ..........................................464
9    202 ..........................................464
     203 ..........................................464
10   204 ..........................................464
     205 ..........................................464
11   206 ..........................................464
     207 ..........................................464
12   208 ..........................................464
     209 ..........................................464
13   210 ..........................................464
     211 ..........................................464
14   212 ..........................................464
     213 ..........................................464
15   214 ..........................................464
     215 ..........................................464
16   216 ..........................................464
     217 ..........................................464
17   218 ..........................................464
     219 ..........................................464
18   220 ..........................................464
     221 ..........................................464
19   222 ..........................................464
     223 ..........................................464
20   224 ..........................................464
     225 ..........................................464
21   226 ..........................................464
     227 ..........................................464
22   228 ..........................................464
     229 ..........................................464
23   230 ..........................................464
     231 ..........................................464
24   232 ..........................................464
     233 ..........................................464
25   234 ..........................................464
     235 ..........................................464

236 .............................................464
237 .............................................464
238 .............................................464
239 .............................................464
240 .............................................464
241 .............................................464
242 .............................................464
243 .............................................464
244 .............................................464
245 .............................................464
246 .............................................464
247 .............................................464
248 .............................................464
249 .............................................464
250 .............................................464
251 .............................................464
252 .............................................464
253 .............................................464
254 .............................................464
255 .............................................464
256 .............................................464
257 .............................................464
258 .............................................464
259 .............................................464
260 .............................................464
261 .............................................464
262 .............................................464
263 .............................................464
264 .............................................464
265 .............................................464

1                        *(In open court.)*

2           THE COURT:  Good morning, everyone.  I am glad I take

3     it that you called up to get you out of the line?

4           MR. MAYR:  Actually, Tiffany was —

5           THE COURT:  You should — I don't have any problem, on

6     and off we have very long lines either for juries or various

7     other things.  So if you are stuck in the line, you are

8     supposed to, as a lawyer, go to the front and present your

9     credentials, they are supposed to let you through.  But if you

10    have any issues, always call chambers, and we will go and get

11    you.

12          MR. MAYR:  I appreciate that.

13          THE COURT:  But thank you for rescuing him.

14          All right, if we can go ahead and call the case.

15          (Call to the order of the Court.)

16          THE CLERK:  Counsel, would you please identify

17    yourself for the record, starting with the Government.

18          MS. CHO:  Good morning, Your Honor, Cindy Cho for the

19    United States; and again, with me at counsel table is Francesco

20    Valentini, Special Agent Michelle Ball, and Paralegal Tiffany

21    Robinson.

22          THE COURT:  All right.  Good morning.

23          MR. MAYR:  Good morning, Your Honor.  Brent Mayr on

24    behalf of Mr. Grider.

25          THE COURT:  Good morning Mr. Mayr and Mr. Grider.

1          THE DEFENDANT:  Good morning, Your Honor.

2          THE COURT:  All right.

3          We — I received an e-mail last evening that indicated

4   that Mr. Grider had decided to testify?

5          MR. MAYR:  That is correct, Your Honor.

6          THE COURT:  If I could just do a very short colloquy

7   with Mr. Grider.

8          MR. MAYR:  Absolutely.

9          THE COURT:  If you could come up.

10         This is not in any way to influence you in terms of

11   what your decision is.  That, that is totally yours, but I just

12   want to make sure that you understand your rights.  I do this

13   in every single case so this isn't just something in your case.

14         So obviously, you know from your plea that you have a

15   constitutional right to — not to testify, not to present any

16   evidence, not to do anything, that the Government has the

17   burden throughout the trial to prove you guilty on each of

18   these counts beyond a reasonable doubt.  Now, so you do have

19   this complete right.

20         You can decide to testify.  You also have that right

21   if you want to, to do so.  Unlike some other decisions where

22   your lawyer is going to make legal decisions based on his

23   knowledge of the law, legal procedures, obviously he is going

24   to consult with you about strategy, but he controls more of

25   that.  This is a decision you completely control.

 1          You should talk to your lawyer, get his advice.  You

 2   should talk to whomever else you trust and want to hear from,

 3   but ultimately it is your decision.  So I want to make sure you

 4   understand that and that you are making your own decision, that

 5   you know what you are doing, that you thought through what your

 6   rights are, and I went over them in terms of, for your plea, so

 7   you know, you know, your rights not to testify and actually,

 8   what you are giving up if you didn't testify, as well as what

 9   happens, of course, when you do, when you do testify.

10          So do you have any questions, or do you understand

11   what your rights are?

12               THE DEFENDANT:  I understand, Your Honor.  Thank you.

13               THE COURT:  And so what decision have you made?

14               THE DEFENDANT:  I would like to testify.

15               THE COURT:  All right.  Then, go ahead and sit down.

16   And Mr. Mayr, are you going to do an opening statement at this

17   point?

18               MR. MAYR:  I would like to make a very brief opening

19   statement.

20               THE COURT:  All right.

21               MR. MAYR:  If the Court is ready, I would like to

22   proceed.

23               THE COURT:  Yes.  Go ahead.  Let me just say before

24   you start, I do have a hard stop at 11:30 because I do have

25   this other commission meeting, and we have a very tight

1  schedule there as well.

2       MR. MAYR:  Right.

3       THE COURT:  So I want to make sure, you know, we,

4  obviously, had planned on having the trial go on for the rest

5  of the week anyway.  So I —— you know, we cleared our

6  schedules, etc.  So if it doesn't, at all, finish this morning,

7  we will, obviously, pick up tomorrow.  But I do need to, to

8  stop.  So you should consider where you are with your

9  questioning, so you know, before you go into a new area, if you

10  want to stop a little early so we are not, you know, you can

11  plan where you want to stop in terms of the testimony in terms

12  of it being picked up, assuming that that is still going on

13  tomorrow.

14       MR. MAYR:  I, I exercise that —— I have exercised

15  that, that ——

16       THE COURT:  Good.

17                    **OPENING STATEMENT**

18       MR. MAYR:  You heard the facts, and now it is time for

19  you to hear the truth.  The Government, as you know, bears the

20  burden of proof, and they have to prove their case beyond a

21  reasonable doubt, but inherent in that is an obligation for

22  this Court to also seek the truth.

23       The Government's case, their arguments, their

24  position, up until this point, has not been the truth.  It is

25  their interpretation of the evidence.  It is a conclusion that

1  they have jumped to from the evidence that they have available

2  and that they have presented to this Court.  It is undoubtedly

3  their firm belief, but as we as a society have learned,

4  especially, over the almost past two years, it is not so much

5  about what we believe.  It, ultimately, comes down to the

6  truth.

7          And the truth, Your Honor, is going to come from this

8  man today (indicating).  You are going to hear him open up and

9  share with the Court everything that he can about himself,

10  where he came from, what brought him here to Washington, DC and

11  the thoughts and the mental processes that are going through

12  his head on that fateful day.

13          The truth is, prior to coming to Washington, DC, Mr.

14  Grider had no intent to disrupt, impede, impair, or destroy

15  anything.  The truth is, when he was inside of the United

16  States Capitol, in his mind, he had no intent to disrupt,

17  impede, impair, or destroy anything.  And the truth is, is

18  after he left Washington, DC, everything he did indicates that

19  he did not have an intent to impede, disrupt, impair, or

20  destroy everything.

21          He is ashamed of his actions.  That is the truth.  He

22  has tried to grapple and recall and think as much as he can

23  about what took place that day, but what the truth is, is just

24  like Special Agent Yetter is unable to remember details because

25  it was the worst day of his life.  The truth is, that Mr.

1    Grider, for him, he recognizes this was the worst day of his
2    life.
3             In watching videos, you are going to hear about there
4    are times where even until this day, two years later after
5    reflecting on videos, he can't understand some of the things
6    that he is doing, but he knows deep down inside that it is not
7    his intent to disturb, impede, or destroy anything.  When you
8    hear this evidence, when you hear the truth, this Court will
9    have to make decisions whether the Government has met their
10   burden of proof, but the Court will have the benefit of the
11   truth from this man in making that decision.  And we hope that
12   after you hear that, you will realize that he is not guilty of
13   the counts that remain pending before this Court.
14             THE COURT:  All right.  So at this point, Mr. Grider?
15             MR. MAYR:  I would like to call Mr. Grider to the
16   stand.
17             THE COURT:  Step up over here.  If you could stand
18   now, Mr. Grider, so we can swear you in.
19             (Witness sworn.)
20             THE COURT:  All right, Mr. Grider.  You know you need
21   to speak in a loud, clear voice into the microphone.  You have
22   to speak right into the head of the microphone.
23             THE DEFENDANT:  Yes, Your Honor.
24             THE COURT:  You can take your mask off if you wish in
25   terms of speaking.  We need to be able to hear you.  Miss

1    Patterson, if you could show him how to use the marker on the

2    screen, that would be helpful.

3              (Complied.)

4              THE COURT:  Mr. Mayr, go ahead.

5              MR. MAYR:  Thank you, Your Honor.

6         **CHRISTOPHER RAY GRIDER, DEFENDANT'S WITNESS, SWORN**

7                        **DIRECT EXAMINATION**

8    BY MR. MAYR:

9    Q    Please state your full name for the record, please.

10   A    Christopher Ray Grider.

11   Q    How old are you, Mr. Grider?

12   A    Forty-one.

13   Q    Are you married?

14   A    Yes.

15   Q    And who is your wife?

16   A    Crystal Grider.

17   Q    How long have you been married?

18   A    Almost 21 years.

19   Q    Do you have any children?

20   A    Yes, sir.

21   Q    Who are they, and how old are they?

22   A    Austin Grider, he is 15 years old.  I have Houston Grider,

23   he is 12 years old; Travis Grider, who is five years old, and

24   Christy Ann, who is on the way.

25   Q    Where do you live, Mr. Grider?

1    A    In Cego, Texas.

2              THE COURT:  Can you speak up just a little bit more?

3              THE WITNESS:  In Cego, Texas.

4    BY MR. MAYR:

5    Q    How big is Cego, Texas?

6    A    Maybe 50 people.

7    Q    Where is it located in proximity to Waco, Texas?

8    A    It is just south of Texas — south of Waco 30 miles or so.

9    Q    All right.  How long have you lived there?

10   A    About eight years.

11   Q    All right.  What do you do for a living, Mr. Grider?

12   A    My wife and I are small business owners, in addition to we

13   run a small amount of cattle.

14   Q    What sort of business do you and your wife own and operate?

15   A    It is a winery.

16   Q    What is the name of that winery?

17   A    Kissing Tree Vineyards.

18   Q    Where were you born and raised, Mr. Grider?

19   A    Cape Girardeau, Missouri.

20   Q    Raised by your parents?

21   A    Yes.  Also, you know, my — they had a divorce.

22   Q    Okay.  Let's talk about that.  Who is your mother?

23   A    Dana Barry.

24   Q    And who is your father?

25   A    My biological father is Raymond Grider.

1    Q    At some point in your youth they divorced?

2    A    Yes, sir.

3    Q    And your mom remarried?

4    A    Yes, sir.

5    Q    And who is she married to?

6    A    John Barry.

7    Q    And your father remarried as well?

8    A    Yes, sir.

9    Q    All right.

10        Cape Girardeau, Missouri, how long were you raised there?

11   A    Until about 11 years old, sir.

12   Q    After that, where, where did your family move to?

13   A    To Dallas, Texas.

14   Q    All right.  What part of Dallas, Texas did you-all move to

15   and where you continued to — where you were continued to be

16   raised?

17   A    In South Central Dallas.

18   Q    Okay.  The area that you grew up, an affluent area, sort of

19   a middle class area?  How would you describe the neighborhood?

20   A    It is probably the poorest neighborhood in all the

21   metroplex.

22   Q    You were living there with your mother or with your father?

23   A    My mother and my stepfather.

24   Q    Okay.  What were they doing for a living at that point?

25   A    My mother was taking care of my younger sisters, and my

1  father was a phlebotomist at the local, at Parkland Hospital.

2  Q  You mentioned your sisters, one of whom just walked into

3  the courtroom.  Would you tell the Court who your sisters are.

4  A  Hannah Barry, Linda Barry, and Michele Barry.

5  Q  Do you have any other siblings besides them?

6  A  No.

7  Q  Okay.  Growing up, were you involved in any organizations,

8  Boy Scouts, or anything like that involved in the community?

9  A  I joined the Civil Air Patrol.

10  Q  Could you explain to the Court, just briefly, what that is.

11  A  It is an Air Force auxiliary.  It is a volunteer part of

12  the Air Force.  Its main purpose is search and rescue, looking

13  for downed aircraft and survivors from aircraft that, that are

14  lost or missing.

15  Q  How old were you when you joined the Civil Air Force?

16  A  I joined the Civil Air Patrol, I believe, 12, as a cadet.

17  Q  And why was it that you decided to join an organization

18  like that?

19  A  It, I, I felt like, you know, it was a patriotic thing to

20  do, and you know, thought it would be fun.

21  Q  Going up in airplanes and helping others, helping serve the

22  community; is that right?

23  A  Yes, sir.

24  Q  All right.

25        THE COURT:  Can you move the microphone a little, just

1  the head of it?  You can move the whole thing, the wand.  No,

2  you need to move it a little closer to you.

3         MR. MAYR:  Mr. Grider, if you can move your seat up a

4  little bit to help you a little bit.

5         THE WITNESS:  I am afraid of being too loud.

6         THE COURT:  No.  There is no such thing.

7         THE WITNESS:  All right.

8         MR. MAYR:  We will back you off if we need to, but

9  thanks for doing that.

10  BY MR. MAYR:

11  Q   So at the young age, you felt this call.  What else would

12  you do as a young child?  Were you involved in any sports or

13  other extracurricular activities?

14  A   I was also — worked support missions.  I remember, you

15  know, I would sell stationery and raise money, sell apples, you

16  know, eventually, saved up enough to go on a missions trip and,

17  you know, my own, what I raised.

18  Q   That raises my — leads to my next question.  Were you

19  active, or were you active in a church or in organized religion

20  at a young age?

21  A   Yes, sir.

22  Q   Can you tell the Court just briefly about that.

23  A   My parents went to Bible college, and I was — I was active

24  with that, active with the church, as well, that we went to or

25  churches that we visited.

1   Q   Okay.  Now, as far as your education goes, were you going

2   to public schools at that young age, or what were you doing for

3   education?

4   A   No, sir.  I was homeschooled for most of that time.

5   Q   All right.  Now, at some point did you enroll in a public

6   high school there in the oak -- there in South Dallas?

7   A   I went to a private school.  My grandmother paid for me to

8   go for a year.

9   Q   And what happened then?

10  A   I was working outside the — working, and I was offered,

11  when I turned 16, right before I turned 16, offered a full-time

12  commission, sales spot if I would agree to drop out of high

13  school.

14  Q   Selling what?

15  A   Suits.

16  Q   Suits.  Where at?

17  A   JCPenney.

18  Q   And did you decide to drop out and take that employment

19  opportunity?

20  A   Yes, sir.  It was way more money than I ever imagined.

21  Q   At least that is how it felt at the time?

22  A   Yes, sir, at the time.

23  Q   How long did you do that for?

24  A   I think two years, approximately —

25  Q   And then, what did you do after that?

1  A   -- almost.  I was offered a job selling new, new Dodge

2  vehicles, youngest, just before I turned 18.  I was the

3  youngest salesman that Dodge had ever had.

4  Q   This was a full-time job?

5  A   Very full time.

6  Q   All right.  How long did you do that for?

7  A   About three months.

8  Q   All right.  And so what happened after that?

9  A   Didn't meet my sales quota.  So I had to find different

10  employment, but I, I became a security guard.

11  Q   And tell the Court a little bit about why you decided to

12  become a security guard at that point.

13  A   It was just something that I felt like is in line with,

14  with some of my goals.  You know, I eventually wanted to become

15  a police officer, and I think at the time I had also joined,

16  had already joined the National -- Army National Guard at 17.

17  Q   Okay.  Let's go ahead and talk about that now.  So you

18  start working in security, but then, at some point you enlisted

19  in the Army National Guard; is that correct?

20  A   Yes, sir.  While I was in the suit sales I had already

21  enlisted.

22  Q   And how old -- when was that and how old were you?

23  A   That was in 1999 during the Clinton administration, and I

24  was 17.

25  Q   1999, okay, during the Clinton administration, and you were

1    19?

2    A    Seventeen.

3    Q    Seventeen, all right.

4         Why did you enlist in the Army National Guard?

5    A    It seemed like a very next step, very patriotic.  You know,

6    it might be fun, and I was offered, you know, one weekend a

7    month and two weeks out of the year, and I can serve my

8    country, and, and so it made me feel proud.

9    Q    Why?  Why was it that you wanted to serve your country?

10   A    It just — I always felt that way.  I always, I kind of

11   always felt like I was destined to do that.

12   Q    What was your position within the Army National Guard?

13   A    I was what is called a forward observer.  It is,

14   essentially, an artillery scout.

15   Q    Now, being in the National Guard, that is not a full-time

16   commitment.  So you were continuing to work while also serving

17   in the Army National Guard?

18   A    Yes, sir.

19   Q    How often would — what was the commitment that was

20   required of you at that point?

21   A    I —

22   Q    In terms of time.

23   A    Every weekend.  Every — one weekend every month and two

24   weeks in the summer.

25   Q    All right.

1   A   Usually summer.

2   Q   You started working -- let's go back to employment, now.

3   You were working in security.  Did you eventually change

4   positions or occupations?

5   A   Yes, sir.  I had, I had to spend about six months active

6   status with the Army National Guard, but before leaving the

7   security job, I was recruited by a department store chain.

8   They asked me to come and work for them as soon as I returned.

9   Q   What, what store, what chain was that?

10  A   It is called Feliz department stores.

11  Q   So the position that you were offered, what were you doing

12  in that capacity?

13  A   I was undercover, undercover security.  I worked undercover

14  investigator for the, the corporation.

15  Q   All right.  Catching shoplifters, internal theft?  What

16  were you doing?

17  A   At that time, my, my main assignments were external theft,

18  mainly shoplifting.

19  Q   All right.  How long did you remain in that position?

20  A   I would say about a year, year and a half.

21  Q   What changed, or how did that employment opportunity come

22  to an end?

23  A   September 11th happened, and I, I asked my guard unit, are

24  we doing something?  Are we going?  They said, "We just have to

25  sit and wait.  We are sitting and waiting."  I, I felt like I

1  wanted to do something more, sooner.  I just felt, I didn't

2  know.  I felt kind of helpless if I couldn't do anything.  So

3  I, I decided to go active duty and see and, and serve that way.

4  Q   Now, did you stay — when you say you wanted to "go active

5  duty," did you stay in the Army, or did you switch to another

6  branch?

7  A   I originally went to the Army and asked if I could go

8  active duty.  I always still had this — I wanted to become a

9  police officer, eventually, was my, my final goal, career goal.

10 And I asked the, the Army to retrain me for active duty.  I

11 didn't want to necessarily be an artillery scout.  I didn't

12 think it helped later on.  I asked — I wanted to be a military

13 police officer, and they said they weren't going to spend the

14 money.  And so...

15 Q   So you — what happened then?

16 A   I went outside of that door, and then, went next door to

17 the very next door, which turned out to be the United States

18 Air Force.

19 Q   When you say the next door, what are you referring to?

20 A   It was in the shopping center.  So they had, I think, one

21 from every branch lined up in the shopping center.  It was in

22 poor neighborhoods.  It is prime territory for the armed

23 forces.

24 Q   You go next door to the Air Force, and you will enlist in

25 that branch?

1  A   Yes, sir.

2  Q   All right.  And once you enlist, where are you assigned?

3  A   Lackland Air Force Base in San Antonio, Texas.  I was

4  assigned there for police academy, and then, later that ended

5  up being my final duty station as, as they call it a security

6  forces in the Air Force.  But it is military police.

7  Q   And I think this was — I don't know if you said this or

8  not.  Where was Lackland located?

9  A   San Antonio, Texas, sir.

10 Q   You are assigned there, and how long are you assigned, are

11 you working there at Lackland in San Antonio?

12 A   At two and a half years, sir.

13 Q   Okay.  You are working as a military police officer?

14 A   Yes, sir.

15 Q   And what are your duties in that position and capacity?

16 A   My primary duties was entry control to the base.

17 Q   What else would you do?

18 A   Guard high-value objects for the military.

19 Q   How did it feel to be a military police officer in the Air

20 Force during those years?

21 A   I felt very proud, sir.

22 Q   Proud of what?

23 A   Proud to serve my country.

24 Q   During that period of time, is that when you — what is it

25 that you, you get married, that you and Crystal get married?

1    A    2002, sir.

2    Q    All right.  You-all are there.  She is living with you in

3    San Antonio in this position; is that right?

4    A    Yes, sir.

5    Q    You serve for two and a half years.  What brings your

6    military career to an end?

7    A    Preparing, preparing for deployment to Afghanistan.  We

8    were going through a training exercise in an area that is kind

9    of ecologically dubious would be a very kind thing to say.  My

10   unit got into the — the little detachment I was in, in the

11   training, we crawled into something.  We don't know — they

12   don't know what it is, but we all had some type of respiratory

13   reaction, and I have never recovered.

14   Q    What — were you discharged, and under what circumstances

15   were you discharged?

16   A    I received a medical discharge due to the injury and an

17   honorable medical discharge.

18   Q    What, what was the medical condition that ultimately

19   resulted in that?

20   A    Asthma.

21   Q    All right.  How did that make you feel to have your

22   military career come to an end like that?

23   A    I felt like I lost my family.

24   Q    What do you mean by that?

25   A    I — you can't, once you are medically separated, you can't

1  go back.  It is a feeling of you can never go home again.

2  Q   What did you decide was going to be the next step in your

3  life at that point?

4  A   I was going to try to continue on to my goal of maybe being

5  a police officer in some capacity.

6  Q   So what did you do?

7  A   I applied to a number of different jobs, ended up being

8  hired as corporate security for a military insurance and

9  banking conglomerate.

10  Q   You are working corporate security for an insurance

11  company.  Were you doing anything else for employment at that

12  point?

13  A   I also worked full-time at the time selling cell phones.

14  Q   Were you getting paid a salary for that?

15  A   Straight commission.

16  Q   Okay.  Were you doing anything else?

17  A   I was also a — my apartment complex's evening, what they

18  call a courtesy officer.

19  Q   Doing what?

20  A   If there is a disturbance at the apartments, somebody got

21  locked out, there was an emergency, I was supposed to respond

22  to that first.

23  Q   You were, like, a security officer or —

24  A   Yes.  Usually it is a reserve for a police officer.  I

25  would return to that position when I was military police.

1  Q   So you basically have three jobs that you are doing at that

2  point; is that right?

3  A   Yes, sir.

4  Q   All right.  You're continuing on with this desire.  We see

5  that you, you start in loss prevention.  You work in the

6  military police.  You go back into corporate security.  What is

7  your motivation, Mr. Grider, for, for wanting to do this?  You

8  said that you felt like -- what is your motivation to continue

9  on in this, on this career path?

10  A   It is something I felt drawn to over my life.

11  Q   Why?

12  A   I felt like it was something I could definitely make a

13  difference in.  You know, when I was a kid, you know, living

14  in, in an area called Oak Cliff, South Central Dallas, I -- you

15  know, every day my life depended on these police officers or

16  security, security officers.  You know, every day you never

17  know what is going to happen next with the different -- anyway.

18  Q   How long -- you have got your three jobs, you have your

19  wife at home.  How long do you continue doing that for?

20  A   About six months.

21  Q   Okay.  What happens next?  What leads to change?

22  A   My apartment complex was sold, and the new owner didn't

23  want to pay for the extra security position.  And then, I, I

24  was really good at selling cell phones, and I really made more

25  money there than I did my full-time security job.  And so the

1   company I was with transferred me to a failing store and wanted

2   me to turn it around.  I am commission.  I was going from the

3   best store to the worst store.  I, I wouldn't be able to, to

4   sustain my standard of living.

5   Q   Just wasn't making enough money at that point?

6   A   Yes, sir.

7   Q   And so what did you-all do next?

8   A   Moved back to Oak Cliff.

9   Q   Back in the Dallas area?

10  A   Dallas.

11  Q   Did you get your own place, or where do you move to up

12  there?

13  A   My mother-in-law let me move in with her.

14  Q   Okay.  All right.

15      You and — what year was this that you-all moved back?

16  A   2005.

17  Q   2005.  So now that you are back up there, what do you do

18  for employment?

19  A   I went to — applied to Neiman Marcus to their flagship

20  store in downtown Dallas.

21  Q   That is a department store?

22  A   Department store chain.

23  Q   In what capacity do you work there?

24  A   Originally, they — I applied for loss prevention, but they

25  hired me for sales.

1  Q   But did you eventually work your way back into loss
2  prevention?
3  A   Yes, loss prevention department for the corporation
4  recruited me into the, into loss, into loss prevention.
5  Q   And what were you doing in that capacity?
6  A   My, my primary duties was monitoring the, the cameras, but
7  the majority of the time, internal theft, internal fraud,
8  external fraud.
9  Q   Was that a full-time job?
10  A   Yes, sir.
11  Q   Were you doing any — were you doing anything else with
12  your life about that time when you moved back to Dallas?
13  A   Yes, sir.  I started going to college full time.
14  Q   Where were you going to college?
15  A   Dallas Baptist University.
16  Q   Now, I think you said earlier that — I think what you told
17  the Court is you dropped out of high school.  So how did you go
18  from dropping out of high school to enrolling in —
19  A   When I — at 17, I wanted to go, be — join the Army
20  National Guard.  They told me I wasn't going to be permitted
21  because I, I didn't have a high — I didn't finish high school,
22  but I could take the GED, they said.  And so I went and took
23  the GED one afternoon.
24  Q   Passed it, and that is how you were ultimately able to
25  enroll; is that right?

1  A   Yes, sir.

2  Q   Where did you enroll?

3  A   Dallas Baptist University.

4  Q   What did you decide to study there?

5  A   Originally, photography — or communication but

6  photography.

7  Q   Okay.

8  A   And then —

9  Q   Up to this point, you have committed your life to serving

10  as — wanting to be a police officer and serving in various

11  positions to enforce the law.  So why study something like

12  photography or art?

13  A   I, with my medical condition, you know, kind of the future

14  in that career maybe wasn't looking as bright.  But also, you

15  know, I kind of got tired also of, of being, like an enforcer.

16  Q   What do you mean by that?

17  A   I got tired of being the guy that everybody meets on the

18  worst day of their life.

19  Q   Okay.  You decide to study art, photography.  Do you

20  complete your degree there from Dallas Baptist?

21  A   Yes, sir.  Later I double majored, added an art major to

22  the photography, communication.

23  Q   All right.  When did you graduate, and under what status

24  did you graduate?

25  A   2008 cum laude.

1  Q   Cum laude.  Were you still living with your mother-in-law,

2  or are you still living there in Dallas with your mother-in-law

3  this entire time?

4  A   When I -- Neiman Marcus give me the last job, it came with

5  a significant raise, and I was able to move into a, a high-rise

6  there a couple of blocks away.

7  Q   Okay.  So just so we are clear, you were going to school

8  while also maintaining your full-time job in loss prevention at

9  Neiman Marcus?

10  A   Yes, sir.

11  Q   Were you doing anything else at that point in your life?

12  A   Yes, sir.  At night when I got off for working for Neiman

13  Marcus, there was a winery that had opened, Urban Winery on the

14  ground floor of my apartment building.  I met the owner one

15  day, and I told him how much I loved wine, told him how much I

16  missed living in San Antonio, which is next to Texas' wine

17  country, told him about all the different wines that I make

18  myself.  I was making wine on the ninth floor.

19      My aunt, on my Italian side of the family, had taught me,

20  kind of got me into making wine.  My dad was working for a,

21  part time for a winery in Southern Illinois.  Something I had

22  really become interested in, and the gentleman offered me a job

23  there.

24  Q   Okay.  And what were you doing there?

25  A   At night I would go -- after the winery was closed, I would

1   go in and maintain the different — do different filtering

2   processes, bottling, things like that.

3   Q   Just so we are all on the same page.  You are working

4   full-time at Neiman Marcus in loss prevention, you are

5   attending Dallas Baptist, working on your degrees, and you are

6   also doing this after-hours position at this winery right?

7   A   Yes, sir.

8   Q   Your first child is born when?

9   A   2006, sir.

10  Q   That would be Austin?

11  A   Yes, sir.

12  Q   All right.  And this is when you are doing all these other

13  things as well; is that right?

14  A   Yes, sir.

15  Q   What is your wife doing at that point?

16  A   She is the tasting room manager for that winery.

17  Q   She is working there as well?

18  A   Yes, sir.

19  Q   Is she working there full time?

20  A   Almost full time, sir.

21  Q   After you graduate with your degree from Dallas Baptist, do

22  you do anything else to further your education?

23  A   After about, about a year afterwards, I, I applied to —

24  U.T. Dallas and start working on my MFA.

25  Q   Your Master's of Fine Arts?

1   A   Yes, sir.

2   Q   Why did you want to do that?

3   A   I wanted to be -- one day I would like to be a, a professor

4   of art, and I wanted to be better at making art.

5   Q   Okay.  Now, prior to that, let me back up a little bit

6   here.  You got your three jobs, you've got Austin at home.  Do

7   you at some point decide that after you graduate to change

8   careers and do something different?

9   A   Yes, sir.  I got tired of being, you know, this guy that,

10  you know, I, you know.  At work — professionally, you know, if

11  someone has to meet me, it is not good for them, you know.

12  I — it just weighs on you after a while.  I wanted to change,

13  do something different, something more positive.

14      So I, I decided to become an art teacher, imagined it would

15  be something like, you know, Bob Ross every day and come in,

16  you know, "Hey, kids, how you doing?"  "Hey, teacher."  "Let's

17  paint some happy trees today," you know?  And anyway, that is

18  what I — I switched careers.

19  Q   So you took a position as a teacher where?

20  A   Dallas Independent School District.

21  Q   You said that you were an art teacher.  What grades were

22  you teaching?

23  A   I taught sixth and seventh and eighth.

24  Q   And you're teaching there in Dallas.  Are you — do you

25  stay there in Dallas teaching there the entire time, or where

1  do you go from there?

2  A   I taught in Dallas for three years, most of the time in my

3  old neighborhood of Oak Cliff.  Then, we — I moved to a

4  different neighborhood in Dallas that had better schools for my

5  son, and eventually, I stopped commuting and received a

6  position in that neighborhood.

7  Q   What were you teaching there?

8  A   Art.

9  Q   Okay.  And so while you are teaching to kind of go back to

10  where we are at, you decide to go work on your MFA at U.T.

11  Dallas; is that right?

12  A   Yes, sir.

13  Q   How long does that take you to complete?

14  A   Three years.

15  Q   Do you actually complete and earn your Master's of Fine

16  Art?

17  A   Yes, sir.

18  Q   All right.  And after that, what do you do?

19  A   I still was working in special projects for Neiman Marcus

20  and still teaching, but also I received an offer to be a, an

21  instructor at U.T. Dallas for a short time.

22  Q   I am sorry?

23  A   I received an offer to be an instructor at U.T. Dallas for

24  a time.

25  Q   Like an adjunct professor or what?

1    A    Yes, sir.

2    Q    How long did you do that for?

3    A    Two semesters.

4    Q    While also still teaching art to middle schoolers up in

5    McKinney?

6    A    Yes, sir.

7    Q    What is next for you, Mr. Grider?

8    A    The, the housing market seemed to recover, and I saw maybe

9    an opportunity.  My wife and I had, had always wanted to,

10   always wanted to — we worked at the winery.  We had talked

11   about wouldn't it be neat to retire one day and start a winery,

12   finish, you know, teaching.  So we, at the time, we were going

13   to teach.

14       And, you know, when — during the housing, I could move

15   or — during the housing crash, you know, didn't think I could

16   move or do anything like that.  But when it seemed that houses

17   were selling again, we realized we could sell our house and pay

18   off our debt and try, attempt to pursue this, this dream.

19   Asked my mother-in-law how she felt about us moving to a

20   family's property there in Cego, Texas, and starting a winery.

21   And she, she embraced the idea and supported us and that is

22   what we did.

23   Q    So you stopped teaching, and you moved down to Cego to

24   start your winery; is that right?

25   A    Yes, sir.  I still taught.  The winery doesn't — there

1    wasn't enough.  I was so young.  There is not —— the way you

2    start a winery, it takes a while to make the wine.  So you

3    don't have this cash flow in the front so I still taught.

4    Q   Okay.  Let's back up.  When was it that you move from the

5    Dallas area down to Central Texas and to Cego?

6    A   2014.

7    Q   Are you teaching —— where are you teaching at at that

8    point?

9    A   I was teaching in North Waco.

10   Q   Okay.  So you would teach.  What were you teaching there?

11   A   High school art.

12   Q   Teaching there but also starting to build up and get your

13   winery off of the ground?

14   A   Yes, sir.

15   Q   All right.  And at what point —— do you continue to do

16   both, or what happens next?

17   A   In 2016, I was unable to —— we opened up a brick and

18   mortar, when we opened the brick and mortar outlet.  It was

19   known as a tasting room.  I wasn't able to do both.  Both jobs

20   were too demanding for the other.  I either had to run the

21   business or teach.  I couldn't —— teaching was, had —— was

22   demanding to the point where I couldn't, I couldn't effectively

23   run the business anymore.

24   Q   So you stopped teaching when?

25   A   2016.

1   Q   And you start running the winery full time?

2   A   Yes, sir.

3   Q   How big is this winery when you first start off?  Is it

4   just you?  Do you have employees?  What can you tell us?

5   A   I think we had — was my mother-in-law, my wife, and I.

6   And I think we had, when we started, maybe one employee.

7   Q   Take, take us through what happens next with your company

8   and how it sort of gets off the ground.

9   A   We were kind of surprised at how successful it was, how

10  much the demand there was for it.  And you know, it, we were

11  able to, you know, start growing the business.  We added — we

12  had to have other employees, and anyway...

13  Q   Is it just about the company, or are you doing other

14  things?  Are you doing other things to, to sort of support the

15  community around you where you are operating your business and

16  where you are living?

17  A   It really did.  I was able to give, give some jobs to

18  people in the area, a lot of young folks that didn't have

19  opportunities, former students of mine, friends of theirs, was

20  able to give them jobs, and other folks in the community that,

21  that didn't have work, obviously, you know.

22  Q   You had that experience growing up and through your early

23  20s of wanting to serve as a police officer, to help, to help

24  enforce laws.  So do you do anything — do you continue to have

25  any involvement in law enforcement or do anything with law

1  enforcement?

2  A   When our business opened we did some fundraisers in

3  different, just, social events for the local police officers,

4  local law enforcement in our town.  When the police officer —

5  the local law enforcement lost their, their dog handler, he,

6  he, hired by different, a larger city.  The dog that he left

7  behind wouldn't cooperate with the officers.  He would bite the

8  officers, and he would — they weren't able to use him.  So we,

9  when that happened my wife, mother-in-law, and I, we offered to

10  buy the city a replacement drug dog.

11  Q   Was it Cego, or what city is this?

12  A   Eddy, Texas.

13  Q   Eddy, Texas.  That is just another small community south of

14  Waco there, right?

15  A   Yes, sir.

16  Q   Is that where you were operating your business?

17  A   Yes, sir.

18  Q   You've been operating and continue to operate that business

19  until today; is that right?

20  A   Yes, sir.

21  Q   I want to switch gears now, Mr. Grider, and I want to talk

22  to you a little bit about your political beliefs.

23      On the spectrum of conservatism to liberalism, where would

24  you place yourself?

25  A   Conservative, sir.

1   Q   What do you — why is that?  What do you attribute that to?

2   A   Definitely religious upbringing.

3   Q   Okay.  Your family?  Raised — are they, are they

4   conservative, liberal?  How would you classify them?

5   A   Conservative.

6   Q   All right.  Your political affiliation, Republican,

7   Democrat?

8   A   I would be Republican.

9   Q   All right.  And have you been that way your entire life?

10  A   Yes, sir.

11  Q   Okay.  Have you always — are you just one — have you

12  always supported Republicans, or have you had any exposure for

13  anyone on the other side of the aisle, if you would?

14  A   When I was 11, or ten or 11 in that range, I think it would

15  have been ten.  During the, I think it would be '92 election,

16  my parents worked for, or the Democrat campaign.  I don't know

17  what you call it, like, ran the office for a particular

18  candidate, Democrat candidate in our town.

19      He was a candidate for Lt. Governor, and he had strong

20  religious convictions and strong ideas about how he was going

21  to marshal volunteerism to — and religious volunteerism,

22  specifically, to support state services.  And I think that is

23  why our family was so much drawn to him, and I think it is

24  probably why my parents got hired.  I, I worked, helped —

25  being homeschooled, I was there in his office all the time,

1    helped, you know, made signs, passed out flyers, things like

2    that.

3    Q    Let's talk about your support of former President Donald J.

4    Trump for a minute.  What -- explain to the Court how you came

5    to, how you came to support him in his candidacy for President

6    back in 2016.

7    A    No.  Originally I thought -- originally, I thought it was a

8    joke.  I thought it was a mean candidacy I think is what --

9    just, I didn't think he was real.  I didn't think he was

10   sincere.  I thought he was trying to do some sort of publicity

11   stunt.  I was a Ted Cruz voter.  He is my Senator from Texas.

12   Q    So what, ultimately, drew -- what ultimately changed and

13   drew you to him?

14   A    He seemed to, to be taking more and more legitimate, you

15   know, actual criticism in responding to it.  I thought, you

16   know, he might actually be a serious candidate because it seems

17   to be, he is not getting anything out of this.  And so, then, I

18   started paying attention to, actually, what he was saying.

19   Q    And what, what was he saying that grew you even closer to

20   him and, ultimately, led to you wanting to support him.

21   A    I would definitely describe myself as a single-issue voter

22   for most of my life, which is abortion.  I, I don't, I don't

23   agree with it, and I wasn't really sure whether he was sincere

24   about that.  And I guess I eventually felt he was sincere about

25   that topic, but I was still more for Ted Cruz.  But then,

1    something he added that, that no other candidate was adding

2    that really spoke to me.  It was something that my beliefs had

3    been developing on, is, he seemed to be anti-war.

4    Q   Okay.  You say "anti-war," you served in the military, so

5    why is it that you are drawn to him by his anti-war positions?

6    A   During the Bush administration, I was very, very pro Bush,

7    very pro -- I was in the military, very pro everything we were

8    doing in the Middle East.  I was for it.  I was just all in.

9    I, I was, I was a military police officer.  I just felt this

10   was just, you know, I was -- then, later on, I had a lot of

11   doubts about the legitimacy of us even being in Iraq,

12   specifically.

13        And later on I kind of felt like I had been duped.  I have

14   been lied to about, about what went on, maybe even betrayed by

15   what I -- in seeing the personal friends of mine, the

16   different, you know, things that they experienced with,

17   suffered in the war, I, I felt like it was, it wasn't worth it.

18   And anyway...

19   Q   So all of this is what sort of swayed you to wanting to

20   embrace this anti-war position that the candidate, Donald J.

21   Trump, was promoting; is that what it was?

22   A   Yes.

23   Q   Okay.  Did you vote for him?

24   A   (No response.)

25            THE COURT:  Do you need a break, Mr. Grider?

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  All right.  It is 10:00.  We will come

3   back at 10:15.

4          MR. MAYR:  Yes, Your Honor.  Thank you.

5          THE COURT:  You can sit down, sir.  We are on a break.

6          (Brief recess, 10:00 a.m. - 10:18 a.m.)

7                         AFTER RECESS

8          THE COURT:  Mr. Grider, if you would resume the stand.

9          (Complied.)

10          THE COURT:  All right.  We are in the middle of the

11   direct of Mr. Grider.  Go ahead, Mr. Mayr.

12          MR. MAYR:  Thank you, Your Honor.

13   BY MR. MAYR:

14   Q   Obviously, the, the anti-war stance was important to you.

15   You ultimately decide — do you ultimately decide to throw your

16   support behind Donald Trump?

17   A   Yes.

18   Q   We are still in 2016.  When you decide to do that, do you

19   ever go to any of his rallies or do anything else to support

20   him politically?

21   A   Yes.

22   Q   What do you do?

23   A   I went to one of his rallies in Austin, Texas.

24   Q   Just that one?

25   A   Yes.

1    Q   What was that like for you, that experience of going to one

2    of his rallies?

3    A   Donald Trump is an interesting character.  He has this kind

4    of celebrity about him.  He is, like, a comedian, celebrity,

5    rock star, you know, kind of all, you know, and politician all

6    rolled into one.

7    Q   What did it feel like to be there at one of his rallies?

8    What was it like for you?

9    A   You know, it, it was kind of, to me, I thought it was

10   patriotic, and I felt like I was participating in the political

11   process.  It was — well, also kind of, like, going to see a, a

12   rock — a rock band or a comedian, or it is not really one

13   thing.  It is all kind of rolled together.

14   Q   Lots of positive emotions; is that fair to say?

15   A   Definitely.

16   Q   All right.  He is elected in 2016, and you're satisfied

17   with having him as the President of the United States; is that

18   fair to say?

19   A   Yes, sir.

20   Q   Let's move ahead to 2020 when he is running for reelection.

21   Obviously, you decide to continue to support him in his run for

22   reelection; is that safe to say as well?

23   A   Yes, sir.

24   Q   Do you go to any of his rallies or do anything else to

25   support him politically in the lead-up to the 2020 election?

1    A   Yes, sir.

2    Q   What do you do?

3    A   I went to the 2020 Dallas rally at the American Airlines

4    Arena.

5    Q   That is where?

6    A   That is in Dallas where the Mavericks, the Stars hockey

7    team plays.

8    Q   When you go to this rally, what is that experience like for

9    you?

10   A   A lot of the similar, it was a much, much larger

11   attendance, I think, much larger stadium.  So many people, we,

12   we couldn't get inside.

13   Q   How did it make you feel to be there supporting your

14   President there, the summer or whenever it was of 2020?

15   A   Again, patriotic, and felt like I was, you know, a part of

16   something.

17   Q   All right.  Let's talk about the Presidential Election in

18   November of 2020.  Okay.

19       Take us through your experience as, as you watch the

20   results of that election.

21   A   Originally, I was — originally it looked like the results

22   were, were favorable.  He just looked like the, you know, he

23   had a really good lead, and I went to bed thinking that he, he

24   had won.

25   Q   Then what happened next?

1    A    In the morning, it seemed like all, all the votes are being

2    counted.  There was almost no Trump votes coming in to

3    different races that were still undecided, and I thought that

4    was peculiar.  I thought that was peculiar that there was no --

5    there was almost no -- seemed not to be very few Trump votes.

6    Q    Did it make you feel angry, upset?  Were there any other

7    emotions you were feeling?

8    A    No.  It made me feel skeptical.

9    Q    Okay.

10   A    Disappointed.

11   Q    Do your feelings, your emotions change, or do you

12   continue -- did the suspicions or the skepticism, does it grow?

13   Does it minimize?  What happens?

14   A    I would say, I guess, a skepticism grew.  Of course, a

15   disappointment grew.

16   Q    All right.  What happens?  Does it continue to grow?  Do

17   you just get more and more, or what ultimately happens?

18   A    I mean, I -- skeptical, but what can you do?  It just -- he

19   looks like he lost.

20   Q    Okay.  What do you mean by that, or what do you -- what

21   does that mean when you say it looks like he lost?

22   A    It looks like he, he didn't get more votes than Biden.

23   Q    How did it make you feel?

24   A    Disappointed.

25   Q    Did it make you feel angry?

A Really disappointed and suspicious.

Q Okay. What did you think was going to take place, or what did you think was going to happen from that point forward?

THE COURT: From what point forward?

MR. MAYR: From the point that he, he began to -- he realized that he had lost.

THE COURT: Okay.

BY MR. MAYR:

Q What did you begin to think, or what did you think would be done about it?

A I didn't think, really, anything could be done. I felt like -- I did know that there was some talk of objections could be raised. I would never -- at some point, by, by the Senators, is what I thought.

Q When -- did you understand when those objections would take place or where they would take place?

A They would take place, I guess, when they counted the -- when they were certifying the electoral, the, the Electoral College.

Q Okay. How much did you know or understand about the electoral certification process in that period of time after you began to realize that, then, President Trump had lost the election?

A Probably about the same as anyone else.

Q Could you tell us more about that?

1   A   Well, I knew he had to get 270 votes — or Electoral

2   College votes, right, to win.  And I knew that the, you know,

3   it had to be officially certified, and there was a, a chance

4   that some Senators that were skeptical might raise some

5   objections.  And that could possibly send things back to the

6   states where the objections could be properly investigated.

7   Q   Okay.  And that was your understanding of it at that point,

8   right?

9   A   Yes, sir.

10  Q   All right.  So now, let's switch gears and talk about the

11  decision to make the decision to possibly come up here to

12  Washington, DC.  When was it that you first decided or

13  considered the possibility of coming up here to Washington, DC?

14  A   First considered it — I guess the first time I heard Trump

15  invite people to come.

16  Q   And where did you hear that?

17  A   I don't remember.

18  Q   Okay.

19  A   Social media or something, probably.

20  Q   When you first heard that — was this the rally, or what do

21  you remember hearing at that point?

22  A   I, I just remember that I had heard that he wanted people

23  to come to some event or rally or speech on January 6th.

24  Q   And when you heard that, what do you remember you doing

25  about it?

1    A    Absolutely nothing.

2    Q    I am sorry?

3    A    Absolutely nothing.

4    Q    Why?

5    A    I just — life.  I had other things I was doing.  Just, DC

6    in the dead of winter doesn't sound like fun.

7    Q    Okay.  When was —

8    A    No offense to the people of DC.

9    Q    When about — when was — you don't remember when this was?

10   A    Probably sometime in December, I guess.  I don't know.

11   Q    Did you talk with anyone about the possibility of coming up

12   here?

13   A    Later on, a friend of mine, Jesse Bowen, and I had been

14   given the green light by our wives to go on a guy trip, and

15   then, so we started talking about where we would go.  Jesse

16   Bowen brought up, said he, you know, Trump had asked us to go

17   to DC to his rally.  Let's go.  The same things I said earlier,

18   not interested, really, in going to DC in the winter.  And I

19   had other places I would really rather go.

20   Q    Where was that?

21   A    I wanted to go to California.

22   Q    Where in California?

23   A    I wanted to camp in Joshua Tree and make art.  Jesse also,

24   he went to — he also has MFA, went to U.T. Dallas with me.  We

25   have been making art together for years.  So I, I wanted us to

1    go paint in the Joshua Tree desert.

2    Q    And do what else?

3    A    After that, I wanted to go to Lodi and maybe explore some

4    business possibilities and drink some wine.

5    Q    Business opportunities related to your winery?

6    A    Yes, sir.

7    Q    What do you — okay.  So you want to go there.  What

8    ultimately happened as far as the decision-making process, what

9    ultimately happens?

10   A    He, he had already just come back from California.  He

11   wasn't interested in going back right then, and we kind of

12   agreed to disagree.  And, you know, we still are going to go

13   somewhere, we just didn't know where or when.

14   Q    When, what is this — approximately, when is this taking

15   place in that period of time from the election all the way up

16   to January 6th?

17   A    I would say this was late December, back — I say late

18   December.

19   Q    So you-all agree to disagree about where you are going to

20   go.  Any time, do you resolve that objection, and do you,

21   ultimately, make a decision about where you are going to go?

22   A    No.  Still kind of going back and forth about it, but I was

23   speaking with my neighbor.  I — I realized Jesse wanted to go,

24   and January 5th, it was January 5th.  I don't know how we got

25   on the topic, but if we were going to go, this was the last

1   possible chance or moment to decide whether to go or not.

2       And, you know, a conversation I had with my neighbor I

3   talked about, is the last, this is the last time that, that

4   Trump would, you know, this is it.  You know, and in one day he

5   is going to be gone, you know.  It is all — my neighbor said,

6   "It is all going to be over."  It is kind of akin to having

7   your favorite band, I guess, no longer — favorite band on the

8   final concert tour.  This is it.  They are retiring.

9       So I was like, you know, you are right.  It would be fun to

10  go to his last Trump rally, you know, or whatever or whatever

11  you want to call it.  So I called Jesse and said, "Okay, okay,

12  I will go.  I will go."

13  Q   And this takes place when?

14  A   Evening of January 5th.

15  Q   All right.  In your discussions with your neighbor, with

16  Jesse, your internal reflections, do you — what else do you

17  think — what else do you think about doing here in Washington,

18  DC in coming up here for President Trump's rally?

19  A   Jesse and I are cigar aficionados, and so we were kind of

20  excited that maybe we would come across some cigars in DC that

21  they didn't have in Texas, thought that, you know, he doesn't

22  drink.  But, you know, I do.  I thought I might be able to see

23  some wine or some, some bourbon that wasn't available in Texas.

24  And so we were — anyways, that was the idea.

25  Q   You put this plan together on January 5th.  Take us what

1   the plan, what the itinerary is going to be in your mind when

2   you come up here the following day.

3   A   We would go to Trump's rally.  We knew we would be a little

4   late based on our, when the tickets that were left.  Earlier

5   tickets were already all sold out.  So the earliest ticket we

6   could get for January 6th, but that would put us coming a

7   little bit late.  Trump's rallies, he is always late getting

8   there.

9       They always have, like, an opener, usually a band, a couple

10  of opening speakers.  And then, Trump shows up, and then Trump,

11  Trump is very long winded.  Even if we miss the first few

12  minutes, we thought at this rally, we would get most of it.

13  And anyway...

14  Q   So that — you were going to do that?

15  A   Oh, yeah.

16  Q   What were you going to do after that?

17  A   Then, after the rally, we maybe go to cigar lounge, and

18  then, maybe another cigar lounge.  And then, dinner, and then,

19  you know, next day, do some photography maybe.  Or, or go to

20  brunch, you know, go see the sites, you know, photograph, and,

21  and go home.

22  Q   Fly back?

23  A   Yes.

24  Q   You booked your flights to fly into the Washington, DC area

25  early on the morning of January 6th?

1    A    Yes.

2    Q    And then, when did you book your, your return flight back

3    to Texas?

4    A    January 7th, if I, if I, you know, January 7th.

5    Q    Later in the morning, afternoon?  When was it?

6    A    Afternoon, I believe.

7    Q    Now, you had — did you book any hotels or anything like

8    that?

9    A    Not yet.

10   Q    What was the plan with that?

11   A    We would see kind of what was available when we got there.

12   Q    All right.  Is that sort of how you operate, Mr. Grider, in

13   terms of traveling last minute like this?

14   A    Yes.  It drives my family crazy.

15   Q    Okay.  All right.  Again, in your discussions with your

16   friend Jesse, with your neighbor Mr. McLean, and your internal

17   reflections, did you ever think that when you came here that

18   you would be going to the United States Capitol grounds and the

19   United States Capitol Building?

20   A    No.

21   Q    We — the Court, as you know, has seen these text messages

22   that are being sent to your neighbor and friend Mr. McLean, to

23   your friend Jesse Bowen, with various websites related to

24   protest and violence at these protests.  Can you take the Court

25   through what is going through your mind when, that is leading

1  you to look at these things and why you are looking at these

2  things?

3  A    Anti-protesters and often violent, often violent

4  anti-protesters.

5  Q    How do you know that?

6  A    From watching news and reading news articles, social media

7  are often a staple of Trump events, which is a rally, a

8  campaign event.  Often they will wait in the parking lot or at

9  the exits for an event, and as Trump supporters go to their,

10  their cars, they will have their cars vandalized and often are

11  beaten in the parking lot or on the road.  Anyway, and so I was

12  concerned that we might fall victim to that in DC.

13  Q    So why, what is the reason behind looking at these videos

14  and sending, sending them to your friends?

15  A    After we booked the flight, I started thinking, what have I

16  got myself into here?  And so I heard rumors that maybe Antifa

17  would be there.

18  Q    Where?  Where did you hear those rumors?

19  A    Just on the news or social media.  I can't tell you where

20  exactly.  So I kind of wanted to see, hey, what do these guys

21  really do?  And that is why we went to start, I guess,

22  researching the Internet.

23  Q    And you see these videos of these violent protests, and

24  does that help relieve the concerns you have, or what does it

25  do?

1   A    No.  It, it starts feeding into it, and I start digging

2   more and looking at more stuff, kind of, anyway, you know.  You

3   know, then, I start having kind of doubts of, you know,

4   maybe -- I don't know.  We might get it handed to us there.  I

5   was -- I knew that DC had voted, you know, something like 92 to

6   8 percent, you know, for Biden.  And I was concerned that maybe

7   because of that, we might see the biggest crowd yet of

8   anti-protesters or anti-protesters -- or anti-Trump protesters.

9   So I started having a little bit of a concern.

10  Q    We see you, or we know that you search for the Proud Boys,

11  inquiring to their involvement here.  What is the purpose

12  behind that?

13  A    I had heard of the Proud Boys.  I had heard that they are

14  sometimes at Trump events and almost kind of protect attendees.

15  Q    Where did you hear that?

16  A    Social media, news, you know, open source, you know, news

17  sources.

18  Q    Let me stop you there for a second.  Prior to that, had you

19  ever considered joining them or supporting them or having any

20  involvement with them?

21  A    No.

22  Q    All right.  So your -- we know that you are searching for

23  this.  Again, you said that -- I know that they had been at

24  events.  So connect us to why you are searching for them right

25  before you come here to Washington DC.

1  A  I was curious if they were going to be acting in some type

2  of security, if there would be any security, basically, if they

3  would be acting in some kind of way to protect attendees to

4  this rally.

5  Q  And then, we see and know that you searched regarding

6  conceal handgun laws, and can you carry a weapon in DC.  What

7  is the purpose behind that?

8  A  I am taking a flight.  I am not taking a gun to DC.  I

9  don't know why exactly I searched for that.  Might have been

10  something that Jesse said, or might have just been wondering,

11  you know, are these people going to be carrying guns here, the

12  anti-, anti-Trump people?  I don't know exactly.

13  Q  Okay.

14  A  I don't know exactly.

15  Q  Did you at any point ever think that you were going to

16  engage in any sort of violent acts yourself when you came here

17  to Washington, DC?

18  A  No.  I thought I might fall prey to it.  Jesse and I joked,

19  I remember.  You know, I am good for one punch, you know,

20  meaning, you know, I can be there and go and hear Trump.  The

21  moment I get socked in the eye or whatever, once, I am out.

22  Q  Take us through the travel or the flight coming here.  Take

23  us through step by step how you ultimately end up here in

24  Washington, DC.

25  A  I don't remember exactly the logistics of getting to the

1   airport in Dallas.  We flew to — I think they had a layover

2   somewhere.  I don't even remember the layover, at all, where it

3   was at.

4        Then, once we got to DC, we were concerned that we, we were

5   going to maybe miss a larger portion of the rally than we

6   thought.  We got a taxi at the airport, and I don't remember

7   the brand.  But it was some brand of taxi, and we watched the,

8   the — pulled up the rally, I think, on YouTube or something

9   like that on Jesse's phone.  It was a live streaming on, on his

10  phone.  And I used my phone as kind of a map, and so that, that

11  is how we got — we, we got to DC from BWI.

12  Q   Okay.  So you land at BWI in Baltimore.  You get in a cab,

13  you are on your phone — actually, you are on Jesse's phone

14  watching a live feed of the rally; is that right?

15  A   Yes, sir.

16  Q   And do you see and hear President Donald Trump speaking at

17  that rally?

18  A   Yes, sir.

19  Q   While you are in the cab?

20  A   Yes, sir.

21  Q   En route down here to Washington, DC?

22  A   Yes, sir.

23  Q   Take us through what happens.  You are watching — what do

24  you remember about watching him speak at that rally?

25  A   I remember just watching him, you know, talk and, you know.

1  He had a couple other guests up there.  I think Giuliani —

2  excuse me, Rudy Giuliani, the former mayor of DC [sic].  I

3  remember seeing him — DC, sorry, New York.

4      I remember seeing him speak at some point.  I — my memory

5  is correct, but yeah.  Just, just remember watching, worrying

6  that, oh, we wanted to get there before it was over.

7  Q   So you had a little bit of concern about we might miss it;

8  is that fair to say?

9  A   Yes.

10  Q   But you are able to hear and listen to what Donald Trump is

11  saying to the crowd; is that right?

12  A   Yes, sir.

13  Q   What are some of the things that you remember that stick

14  out in your mind about him saying?

15  A   Really, the only thing I remember is him saying that, "We

16  are going to go down Pennsylvania Avenue."  I remember

17  thinking, kind of what, what makes — I don't know how to

18  describe it — what makes Trump kind of endearing.  "I love

19  Pennsylvania Avenue."  He is like — it is stupid.  You know,

20  you laugh.  As you are laughing at him almost as much as with

21  him when he says stuff like that.  "I love Pennsylvania

22  Avenue."  It is like, whatever, you know.

23      But I remember saying, "I am going down.  I am coming with

24  you.  I am coming with you.  We are going down here," and

25  anyway.

1   Q   And so when you arrive, we heard testimony from Agent Ball

2   about you arriving in the area of the National Mall next to the

3   Washington Monument.  Do you remember arriving down there?

4   A   Yes, sir.

5   Q   Take us through once you arrive in the cab, what you-all do

6   next.

7   A   We got out of the cab, and we start walking.  We couldn't

8   get right to the mall because I think some streets were blocked

9   off.  I remember the cab driver saying, "This is as close as I

10  am going to get you."  And we had to walk, you know, a couple

11  of blocks.  And we continued watching as we walked, this live

12  stream on Jesse's phone.

13  Q   And as you get closer and closer, describe for us what you

14  see as you kind of approach the National Mall area.

15  A   We came up on the street.  On one side is the National

16  Monument.  You can see far, far, far, far, far away is the

17  Capitol.  By the time we reached that point, the rally was ——

18  we had missed the rally.  It was the shortest Trump rally

19  probably ever.

20       So then, people are saying, no, he is, he, he is going

21  down.  We saw it on the phone, and people say, "No, he is.  Go

22  down there.  He is coming.  He is coming with us."  So that

23  is —— after Trump told us to go down there, that is when we

24  decided, oh, I guess the rally is going to continue at the

25  Capitol.

1   Q   Was that the first time that you realized that you were

2   going to be going down to the United States Capitol Building?

3   A   Yes, sir.

4   Q   We had the opportunity to — you had the opportunity to

5   look at and familiarize yourself with Exhibits 200 through 265;

6   is that correct?

7   A   Yes, sir.

8   Q   What are Defendant's Exhibits 200 through 265?

9   A   My videos and photos.

10  Q   How — are those videos and photographs, are they videos

11  and photographs that you took that day?

12  A   Yes, sir.

13  Q   Are they all of the photos and videos that you were able to

14  recover and put in your possession from the moment you arrived

15  in DC to the very last moment?

16  A   Yes, sir.

17  Q   How were they made?

18  A   With an iPhone, sir.

19  Q   That was your personal iPhone?

20  A   Yes, sir.

21  Q   And was that iPhone in good working condition and capable

22  of making accurate recordings?

23  A   Yes, sir.

24  Q   Capturing both sound and video?

25  A   Yes, sir.

1    Q    Did you do anything -- with these particular exhibits, have

2    you done anything to alter or change them in any way?

3    A    No, sir.

4    Q    Do the exhibits have the -- does your iPhone have the

5    capability of recording the time and the location of where you

6    were recording these, you were making these photographs and

7    video recordings?

8    A    Yes, sir.

9    Q    And those were not -- were those altered in any way?

10   A    No, sir.

11          MR. MAYR:  Your Honor, having previously tendered

12   those to the Court and opposing counsel, at this time I would

13   offer into evidence Defendant's 200 through 265.

14          THE COURT:  Government?

15          MS. CHO:  May I ask just one question as follow-up in

16   voir dire?

17          THE COURT:  Yes.  Go ahead.

18   BY MS. CHO:

19   Q    As of what date were these items on your phone, Mr. Grider?

20   A    January 6th.

21   Q    What is the latest date that they existed on your phone?

22   A    I don't know what today's date is.

23   Q    Could you respond to the question, please.

24   A    Your Honor, I -- what is -- I don't --

25          THE COURT:  Today is December 14th.

 1            THE WITNESS:  December 14, 2022, I assume.

 2  BY MS. CHO:

 3  Q    So do I understand correctly that you are telling us that

 4  these items are on your current phone, which is the same phone

 5  you possessed on January 6th as of today?

 6  A    They are not on my current phone that I carry with me, but

 7  they are on the phone that I carried with me on January 6,

 8  2001.

 9  Q    So I am not clear.  How long did they exist on the phone

10  that you carried on January 6, 2021?

11  A    Since January — since January 6, 2021.

12  Q    That is the latest date they existed on that phone?

13  A    No, no.  That is when they first existed.  I apologize.  I

14  might be misunderstanding your question.

15  Q    Let me try again.

16            THE COURT:  Is it a different — you have a phone now,

17  I take it?

18            THE WITNESS:  Yes, Your Honor.

19            THE COURT:  Are those on that phone?

20            THE WITNESS:  No, Your Honor.

21            THE COURT:  What phone are they on?

22            THE WITNESS:  The phone I used on January 6th.

23            THE COURT:  Where is that phone?

24            THE WITNESS:  It is in the possession of the

25  Government, Your Honor.

1       THE COURT:  Okay.  Very well.

2       MS. CHO:  Yes.

3  BY MS. CHO:

4  Q   What is the latest date that the photos and videos you took

5  on January 6, 2021, existed on the phone that you used to take

6  those photos and videos?

7  A   The latest date I can attest to?  Because I don't know what

8  has been done to the phone since.  The latest date I can attest

9  to is the date I was arrested.  It would be January, I think,

10 21st of 2021.

11 Q   And do I understand correctly that when you gave the phone

12 to the FBI, these photos and videos were on it?

13 A   Definitely.

14       MS. CHO:  Thank you, Your Honor.  No objection to the

15 admission of Defense Exhibits 200 through 265.

16       THE COURT:  All right, then.  I will admit Defendant's

17 Exhibits 200 through 265 without objection.

18     (Defendant's Exhibits 200 - 265 were received in evidence.)

19 BY MR. MAYR:

20 Q   Let's — we were eventually going to get to this, but let

21 me just address this right now with you, Mr. Grider.

22     After you took these photographs, did they remain on your

23 phone, or did you do anything else with the photographs and the

24 videos that have now been admitted, 200 through 265?

25 A   They remained on my phone.  I did duplicate or make copies

1  and place them on my computer.

2  Q   And when you did that, did you delete them off of your

3  phone, or did they remain on your phone?  What was your

4  understanding of what you were doing?

5  A   My understanding what I was doing is copying, making an

6  additional copy for myself before I brought the videos and

7  photos on my phone into the Government that day.

8  Q   Okay.  And so an exact duplicate with all of the

9  information is placed onto your what?

10  A   It was a computer.

11  Q   All right.  And then, that is immediate -- that was on what

12  day?

13  A   January 21, 2021 -- 2000 -- yeah, 2021.

14  Q   Now, we heard and know that that same day you turned

15  yourself in after learning about the arrest warrant.  So when,

16  in proximity, were you doing these copies?

17  A   As soon as my attorney notified me that there was an arrest

18  warrant.  I wanted to preserve a copy for my defense in

19  addition to the copy I was planning to turn in that day.

20  Q   And so, then you take the phone with these photos and

21  videos with you to Austin?

22  A   Yes, sir.

23  Q   And you give that phone over to the agents who took you

24  into custody; is that right?

25  A   Yes, sir.

1    Q   All right.  All right.  All right.

2            MR. MAYR:  For the record, I will go ahead and start

3    by publishing Defendant's Exhibit 200, a file titled IMG_1835.

4    What I will do is, I will — using the photo application within

5    Microsoft Windows press the file info button.

6    BY MR. MAYR:

7    Q   And what do we see over here on the right-hand side of the

8    screen, Mr. Grider?

9    A   It is information about the file you have accessed.

10   Q   Okay.  And when does it show that this picture was taken,

11   date and time?

12   A   January 6, 2021, 12:58 p.m.

13   Q   All right.  Below that we see that the application actually

14   has a map with a big red dot; is that correct?

15   A   Yes, sir.

16   Q   And does this red dot, based on your recollection of the

17   events, show the area that you were in when you took this

18   photograph?

19   A   Yes, sir.

20   Q   For purposes of the record and for the Court's — for

21   purposes of the record and to inform the Court, looking at the

22   file properties, the actual digital file properties, Mr.

23   Grider, does it also show the date and time that the photo was

24   taken?

25   A   Yes, sir.

1    Q    And if we scroll down, it also contains the GPS, latitude,

2    longitude, and altitude information; is that right?

3    A    Yes, sir.

4    Q    Tell us, briefly, what is depicted here.  First of all,

5    what is Exhibit 200?  What is it?

6    A    It is a photo that I took on January 6th.

7    Q    What does it depict?

8    A    It depicts rally goers leaving the area, like, the, coming

9    from, like, the Washington Monument area and walking towards

10   the Capitol.

11   Q    Mr. Grider, can you do me and the Court and all of us a

12   favor?  As you are looking with your head turned to the screen,

13   the microphone is a little bit away from your face.  Do you

14   mind just bending it down towards you?

15   A    Yes, sir.

16   Q    Let's go to Defendant's 201, the next file, IMG_1836.  What

17   time is this photograph taken at?

18   A    1:00 p.m.

19   Q    Does it show the area that you took this photograph below?

20   A    Yes, sir.

21   Q    And does it show that you're moving in an eastward

22   direction towards the Capitol?

23   A    Yes, sir.

24   Q    And what is depicted here?

25   A    My friend Jesse Bowen and the crowd behind him.

1    Q    All right.

2         Defendant's Exhibit 202, IMG_1837.  What time is this taken

3    at?

4    A    1:00 p.m.

5    Q    What is this?

6    A    This is my friend Jesse Bowen.

7    Q    It is a photograph of him?

8    A    Yes, sir.

9    Q    All right.  And we see that he has a —— what does he have

10   wrapped around him at this point?

11   A    He has a Trump flag.

12   Q    Okay.

13        Let's go to Defendant's 203, next file, IMG_1838.  Let me

14   stop and talk with you about this, Mr. Grider.  Do you ——

15   understanding the photograph, the photograph and capabilities

16   of your iPhone, do you know, or does —— how does the

17   iPhone, when it takes a picture, does it give it a filename,

18   or how does that work?

19   A    It gives it a filename.

20   Q    And do you see how going from, say, 201, which is 1836 to

21   202, 1837, when the files are created, does the iPhone number

22   the filenames sequentially in this manner?

23   A    It appears so.

24   Q    That is how you know it to operate?

25   A    Yes, sir.

1   Q   All right.  Let's go to Exhibit 204, IMG_1839.JPG.  What is

2   this?

3   A   This is a photograph that Jesse Bowen took of me with my

4   phone.  Appears I am taking off my COVID mask for a moment.

5   Q   All right.  We see that this photograph is taken at what

6   time?

7   A   1:01 p.m.

8   Q   And we see, again, that you are continuing to make that

9   eastward path towards the Capitol based on the GPS data; is

10  that right?

11  A   Yes, sir.

12  Q   Let's go to Exhibit 205, the next file, IMG_1840.  What is

13  depicted here?

14  A   That is me in a photograph.

15  Q   What time is this taken at?

16  A   1:01 p.m.

17  Q   The next Exhibit, 206, IMG_1841.  What is this?

18  A   It is me with a Don't Tread on Me flag in the photograph.

19  Q   Okay.  So this is a photograph.  Let's talk about that

20  flag.  Where did you get this flag?

21  A   I don't recall.

22  Q   All right.  Did you get it here when you arrived in DC, or

23  do you remember bringing it here with you?

24  A   I believe I brought it with me.

25  Q   Defendant's 207.  What is this exhibit?

1   A   It is a photograph.

2   Q   And what is depicted here?

3   A   It looks like a — the crowd from the rally is relocating

4   to the Capitol.

5   Q   All right.  What time is this taken at?

6   A   1:14 p.m.

7   Q   And below the map shows the area where this photograph was

8   taken; is that right?

9   A   Yes, sir.

10  Q   All right.  And this location is where, is approximately

11  where you remember taking this photograph, correct?

12  A   Yes, sir.

13  Q   What are you thinking, Mr. Grider, as you see these

14  hundreds, if not thousands of people walking down towards the

15  Capitol?  What is going through your mind the best that you can

16  remember?

17  A   It was kind of a very lighthearted, jovial atmosphere,

18  carnivalesque at points.  It was — I remember being surprised

19  that — I didn't think there was going to be this many people

20  there.

21  Q   Let's go to Defendant's Exhibit 208, IMG_1843.  This is a

22  photograph.  Can you tell us — is this a photograph?

23  A   Yes, sir.

24  Q   What is depicted here?

25  A   It is a Trump impersonator.

1   Q   You're also in it as well, right?

2   A   Yes, sir.

3   Q   Was this a selfie that you were taking, or was Jesse

4   taking?  What do you remember about this particular photograph?

5   A   I don't remember if it was a selfie or if Jesse took it.

6   Q   Okay.  What time does it show to have been taken at?

7   A   1:15 p.m.

8   Q   Again, moving a little bit more eastward towards the

9   Capitol, correct?

10   A   Yes, sir.

11   Q   Can you — what was the purpose behind taking this

12   photograph?  Can you take us what, what this experience was

13   like running into this character?

14   A   At the time, it just kind of falls in the whole, I don't

15   know, encapsulates the whole thing, you know.  I thought it was

16   funny.

17   Q   All right.  You obviously are smiling in this picture; is

18   that right?

19   A   Yes, sir.

20   Q   Let's go to 209 IMG_1844.  Tell us, is this a photograph?

21   A   Yes, sir.

22   Q   What is depicted here?

23   A   The Capitol is in the background, the middle ground.  You

24   see a lake or a pond; and then, also in the background, you see

25   very large crowds.  In the foreground you see a large crowd.

1   Q   Do you remember, sitting here today, do you remember

2   standing here and seeing this, what is depicted in this image?

3   A   I don't remember standing in that spot, no, but I remember

4   seeing large crowds.

5   Q   All right.  This was taken at what time?

6   A   1:21 p.m.

7   Q   Below on the map it shows, again, moving closer towards the

8   United States Capitol, right?

9   A   Yes, sir.

10   Q   Based on the GPS data from the photograph; is that right?

11   A   Yes, sir.

12   Q   Exhibit 210, is this also a photograph?

13   A   Yes, sir.

14   Q   Does it also depict that area that you were standing in, in

15   front of the reflecting pool?

16   A   Yes, sir.

17   Q   Exhibit 211 —

18        MR. MAYR:  One moment here.

19      (The video was played for the Court.)

20   BY MR. MAYR:

21   Q   Exhibit 211, is this a video?

22   A   Yes, sir.

23   Q   All right.  And it also has audio we, we can hear?

24        MR. MAYR:  Your Honor, are you able to hear the audio

25   okay?

1    THE COURT:  I can, somewhat, yes.

2    MR. MAYR:  Thank you.

3    BY MR. MAYR:

4    Q   So this video, this is a video that you made with your

5    iPhone; is that right?

6    A   Yes, sir.

7    Q   And what is depicted in this, in this video?

8    A   It is a large crowd around that lake.

9    Q   Around the reflecting pond?

10   A   Yes, sir.

11   Q   Let me point out a couple of things here about this.  Now,

12   over here on the date and time information within this

13   application that we are watching or we are using to watch this

14   video, it shows January 21, 2021, at what time?

15   A   11:45 a.m.

16   Q   Okay.  Now, did you make this video on January 21, 2021, at

17   11:45 a.m.?

18   A   That is when I made a copy.

19   Q   All right.  So if we go to the file information, the file

20   properties for IMG_1846.  Well, have you previously looked at

21   that to confirm that this is the video that was, that was

22   recorded and made on January 6th?

23   MS. CHO:  Objection.  Previously looked at what?  It

24   is very unclear what he is asking that the witness has looked

25   at, and I am not sure that I know what he is asking that the

1    witness has looked at.

2           THE COURT:  What are you —

3           MR. MAYR:  Let me — one moment.  Okay.  There we go.

4    Let me start — let me go again.  So —

5           MS. CHO:  Objection.  Your Honor, I am not sure what

6    these properties draw from.  They were not part of the exhibits

7    that were provided.  At least, you know, these files, I don't

8    know if they were native.  I don't know what format they are

9    in, and if Mr. Mayr intends on publishing this type of data

10   that is associated with a given electronic file, I think that

11   we should have a copy of the data that is part of it,

12   especially, since there is questions about the date of

13   creation.

14           I don't doubt that they are authentic files that were

15   created, but I do have some reservations regarding creation

16   dates.  It seems like that is where we are going with this line

17   of questioning.

18           THE COURT:  Well, let me ask this.  In terms of — I

19   take it you have seen the photographs or video, whatever.  What

20   you haven't seen is the back information that he has provided.

21           MS. CHO:  That is exactly right.

22           THE COURT:  I think that is a problem if you haven't

23   provided it.

24           MR. MAYR:  I am absolutely 100 percent confident that

25   I did provide it to them.  What I — I am not —

1          THE COURT:  Did you provide it, you know, how?  In

2    paper form, otherwise, electronically, or what?

3          MR. MAYR:  These are all electronic files, and I

4    provided them exact duplicates of what was taken off of — it,

5    it starts with the telephone.  It is transferred in the exact

6    condition to the computer, and then, it is transferred onto a

7    thumb drive, which is then transferred to the Government.

8          THE COURT:  Do you want to —

9          MR. MAYR:  I don't mind — sorry.

10          THE COURT:  What we need to know is whether they

11    actually have it.

12          MS. CHO:  Your Honor, the problem is even if you look

13    at the properties right here that is up on the screen, it says

14    the location is Brent Mayr, law PC Dropbox, there is a size.

15    It is unclear to the Government what the point is here

16    regarding where the file came from because from this

17    information, which is perhaps embedded in the electronic file

18    but was not provided independent of the picture itself.  It

19    is — when I look at this, this doesn't look like it comes from

20    somebody's camera.  It looks like it comes from Brent Mayr's

21    laptop.

22          THE COURT:  I guess the question is, are these the

23    copies from the laptop that you are showing or the original —

24    the laptop, excuse me?

25          MR. MAYR:  Because these —

1    THE COURT:  There is a laptop, I take it, because he

2    has already given the phone?

3    MR. MAYR:  That is correct.  So the, the file that I

4    am publishing for the Court happens to be on my laptop.

5    THE COURT:  No, no, no, no, no.  She is asking whether

6    it is -- he said he had the phone, and he put things, made

7    copies on his laptop.

8    MR. MAYR:  Right.

9    THE COURT:  What is it that you have?

10   MR. MAYR:  Copies of those files.

11   THE COURT:  Of what was on his laptop?

12   MR. MAYR:  Right.

13   MS. CHO:  Your Honor, I don't see how that particular

14   data is relevant, then.  The picture, I have no objection to,

15   but this exploration of creation date is irrelevant if the

16   creation date data comes from Mr. Mayr's laptop, which comes

17   from Mr. Grider's laptop, which I guess comes from Mr. Grider's

18   old cell phone.

19   MR. MAYR:  That is not the case.  If I may explain by

20   showing what is depicted on what is being published from the

21   exhibit.

22   THE COURT:  Let me ask what the relevance is because

23   they are obviously having some issues with this.  So my

24   question is, what is the relevance of showing all of the

25   back -- they don't seem to have a problem with the actual

1   photos.  The rest of it it does seem to have went from the

2   phone, to his laptop, to you, and now, we are being shown.

3       MR. MAYR:  So what I am publishing on the screen, Your

4   Honor, if you will look, is, is sort of a history of how the

5   file gets from there to this, this device that is standing

6   right here in front of me.  It shows, if you can see, the

7   modification date is when it was actually initially created,

8   Wednesday, January 6th, at 1:22 p.m.  And it went —

9       THE COURT:  Let me — hold on.  Do you need this

10  information?  Do you have a concern about actually being able

11  to see when these things were created, and you know, when they

12  were put on different laptops and stuff or not?

13      MS. CHO:  We do have a concern that these files were

14  not, were not on the phone when the phone was turned over to

15  the FBI.  So frankly, all of this discussion regarding creation

16  date is relevant to that question, but Mr. Mayr is not the

17  appropriate witness to testify to this type of information.

18      I don't understand him to have those expert

19  qualifications.  I haven't heard that testimony from Mr.

20  Grider; and again, we have no objection to the picture, but the

21  underlying what is now bordering on expert testimony regarding

22  its provenance, Mr. Grider has told us what he generally

23  believes this comes from.

24      And we don't have a problem with that, but all of this

25  more technical explanation regarding why the creation date that

1  is listed on that photo that he just showed us is different

2  than January 6th.  I have not heard a reason why that is

3  relevant or why anyone here is equipped to give that testimony.

4          MR. MAYR:  Mr. Grider is -- if I may respond, Your

5  Honor?

6          THE COURT:  Go ahead.

7          MR. MAYR:  Mr. Grider is, what I am trying to elicit

8  from him is, how — he is a photographer.  He has got a degree

9  in photography.  So he is explaining how, when he takes the

10  photograph, he has testified that this video was taken at this

11  time.  And what we are trying to show and what he knows, based

12  on his knowledge, is that this modification date that is

13  highlighted on the screen, that is embedded into the file, is

14  when the file was created, when he actually made the video

15  recording.

16          THE COURT:  All right.  So do you see some relevance

17  to this, or do you want to have this information?  It doesn't

18  sound like you have it or that you — or that you were provided

19  enough of an explanation to figure out what you have got,

20  assuming you have got it.

21          MS. CHO:  If Mr. Grider simply explains what he is

22  able to explain, there is no problem with that.

23          THE COURT:  It does seem to me, Mr. Mayr, that you

24  have been testifying about how this all happened, which doesn't

25  go anywhere.  So my suggestion is, since we are now at almost

1    11:15, is you want to elicit some testimony from Mr. Grider as

2    to what his understanding of his phone and what he did in terms

3    of these photographs, that is fine.

4            You will have an opportunity this afternoon, Ms. Cho,

5    to look at whatever it is he gave you or didn't given and see

6    if there are any issues.  When we resume tomorrow, since

7    clearly we are not going to be done, you can, if there is an

8    issue, then, let me know this evening, our usual procedure.

9    Maybe there is nothing, maybe there is, but why don't you

10   elicit, at least at this point, what Mr. Grider's understanding

11   is of how it works.

12           MR. MAYR:  Okay.

13   BY MR. MAYR:

14   Q   Mr. Grider, what is your — on Exhibit 211, the digital

15   file, are you able to — are you aware that you're able to

16   access the properties of how that file came to be on whatever

17   device we are viewing it on today?

18   A   Yes.

19   Q   All right.  And in looking at the, the, the file properties

20   that are contained within the digital file, is there some

21   reflection that it was, indeed, that something was done with

22   this file to reflect that it was made on January 6th at the

23   time we just discussed?

24   A   I really, I —

25   Q   That was a wordy question.  Let me just ask this.  What is

1  your understanding of when you made this exhibit, this video,

2  this video?

3  A   January 6, 2021.

4  Q   All right.  Let's move on to —

5       THE COURT:  But I, as I understand it, what we are

6  looking at is what you had on your computer; is that correct?

7       THE WITNESS:  It was on my phone first, and then, on

8  my computer.

9       THE COURT:  So it went from the phone, to a thumb

10  drive, to a computer?

11       THE WITNESS:  From my phone to my computer.

12       THE COURT:  Okay.

13       THE WITNESS:  Then, actually, I can't really testify

14  how Mr. Mayr got the files from my computer.  I wasn't present.

15  BY MR. MAYR:

16  Q   Well, but we did have an opportunity to review the original

17  files on your computer; is that correct, Mr. Grider?

18  A   Yes, sir.

19  Q   Okay.

20       THE COURT:  So what is, what he has been showing when

21  these files, etc., was that on your computer, or was that

22  something Mr. Mayr made?

23       THE WITNESS:  These were all on my computer.

24       THE COURT:  In the files — you know, in terms of the

25  way he has shown it, is that what was on your computer itself?

1          THE WITNESS:  Yes.

2          THE COURT:  Okay.

3          MR. MAYR:  All right.

4   BY MR. MAYR:

5   Q   Let's move to the next Exhibit, 212.  Is this a photograph?

6   A   Yes, sir.

7   Q   And what is depicted here?

8   A   Looks like a statue or a fountain and a crowd.

9   Q   Now, today, having familiarized yourself with the areas

10  around the Capitol, do you know what this location is?

11  A   It is referred to as Peace Circle.

12  Q   That day, on January 6th, did you know that this was the

13  Peace Circle?

14  A   No, sir.

15  Q   What time was this photograph taken at?

16  A   1:26 p.m. on January 6th.

17  Q   Does the GPS data reflect that it is, in fact, taken in the

18  area of the Peace Circle?

19  A   Yes, sir.

20  Q   Let's talk about this.  We see — tell us what we see here

21  in the foreground of this photograph.

22  A   It looks to be some type of barrier fencing.

23  Q   And is there a sign there?

24  A   Yes, sir.

25  Q   What does it say?

1    A    Area closed.

2    Q    The fencing, is it, is it linked, or is it open?

3    A    It is open.

4    Q    What is on the other side of this fencing?

5    A    That fountain and crowds.

6    Q    Large crowd, small crowds?

7    A    Very large crowds.

8    Q    Tell the Court what you were thinking as you are standing

9    there and you see these, these fences that show area closed,

10   but you see all these other people on the other side where it

11   has been opened.

12   A    I didn't really pay much attention to it.  I assumed it

13   was, you know, part of some part of reservation for the rally

14   that day.

15   Q    Can you — can you explain in more detail what you mean by

16   that?

17   A    Probably.  Trump had his rally there at the Capitol that

18   day, and I thought this was part of his, his rally, and this is

19   the area we were supposed to — we, I know it was the area we

20   were supposed to go as part of the rally after the President

21   said to go.

22   Q    Now, at the time, do you remember having any concerns about

23   seeing the sign and thinking that maybe you don't belong on the

24   other side of this fence?

25   A    No, sir.

1   Q   Why not?

2   A   Because of things I just —— the President said that we were

3   supposed to be there, that he was having the rally.  That is

4   where the rally was going to be continued.  Also, the presence

5   of, you know, large amounts, the rally attendees made me feel

6   like this is where the rally was to be continued at.

7   Q   Okay.  Let's go to Exhibit 213, IMG_1848.  Is this a

8   photograph?

9   A   Yes, sir.

10  Q   What is depicted in this photograph?

11  A   It is the Peace Circle Monument, also very large crowd,

12  thousands of people.

13  Q   Are you able to, at this point, see several or hundreds if

14  not thousands of people in front of you?

15  A   Definitely thousands of people in front of me.

16  Q   Okay.  Now, this —— this is the photograph that you took.

17  Did you —— do you remember doing anything with this particular

18  photograph, as far as sharing it with anyone at that time or

19  near that time?

20  A   I don't remember, exactly, no.

21  Q   Okay.  Let me show you Government's Exhibit ——

22      MR. MAYR:  For the record, I am going to publish ——

23  where do we go?  Well, let me ask you this.

24  BY MR. MAYR:

25  Q   Do you remember posting that photograph to social media?

1   A    No.

2   Q    Okay.  Let's go to Exhibit 214.  Now, this exhibit we saw

3   here in court yesterday, but this is the actual image that

4   you -- or copy of the image that you took and that was stored

5   on your iPhone; is that correct?

6   A    Yes, sir.

7   Q    And what time does it show that it was taken at?

8   A    1:48 p.m.

9   Q    Now, the application, we -- shows -- the application that

10  we are viewing this in, it shows, to be in this area.  Is this

11  the area, looking at this map, that you remember taking this

12  photograph?

13  A    No, sir.

14  Q    Where do you recall being at when you took this photograph?

15  A    I believe I was in front of the Capitol Building.

16  Q    If we were to slide this map over to where it shows the

17  Capitol, would it be closer to this area (indicating)?

18  A    Yes, sir.

19  Q    And that is what you recall from that day; is that right?

20  A    Yes, sir.

21          THE COURT:  Are you telling us that it is not

22  accurate, the map?

23          MR. MAYR:  The GP —

24          THE COURT:  He is answering.

25          MR. MAYR:  I am sorry.

1        THE WITNESS:  At some point, Your Honor, I think the

2    cell phone coverage of that area faltered.

3        THE COURT:  So the map —

4        THE WITNESS:  That map is not accurate, Your Honor.

5        THE COURT:  Okay.

6    BY MR. MAYR:

7    Q    Based on your recollection of where you were at?

8    A    Based on my recollection.

9    Q    Okay.  And you, obviously, had nothing to do with that in

10   terms of where it was showing the latitude and longitude, did

11   you?

12   A    No, sir.

13   Q    All right.  So let's talk about the image.  What do we see

14   happening here?

15   A    Just a direct — looking at the image, you can see my face

16   is red.  I think there is maybe a tear on the side of my face.

17   Looked to be in some pain.

18   Q    I am sorry?  Could you —

19   A    I look to be in some pain.

20   Q    Why is that?

21   A    I — tear gas canister exploded in my face.

22   Q    Was this the first time that you had been met with anything

23   like tear gas or any sort of use of force against you that day?

24   A    Yes, sir.

25   Q    And how did that make you feel?

1  A  Betrayed.

2  Q  Betrayed by who?

3  A  By the law enforcement who was there that day.

4  Q  Did it make you upset at them?

5  A  I think I was upset.

6  Q  All right.  Did you want to strike out or retaliate against

7  them at this particular point?

8  A  No.

9  Q  Why not?

10  A  That is stupid.

11  Q  All right.  Why is it stupid to you?

12  A  That -- I mean, you want me to list the ways?

13  Q  Yes.

14      THE COURT:  Keep your voice up, sir.

15      THE WITNESS:  You want me to list the ways?

16      MR. MAYR:  Yes.

17  BY MR. MAYR:

18  Q  Why do you think it is stupid to retaliate against -- you

19  are angry at them, so why do you not want to retaliate?  You

20  say it is stupid.  Why do you think it is stupid?

21  A  A, I am not, I am just not going to do that.  That is not

22  in my nature to do that, although I am upset with their poor

23  choice, maybe, I don't know, maybe unlawful choice that they

24  made that day.  It doesn't mean I am going to do something to

25  get back or retaliate.  I am not going to -- I just, first of

1    all, it is not in my nature to do that.

2    Q   Why is it not in your nature, Mr. Grider?

3    A   You know, having being former law enforcement myself, I

4    just, it is just not -- I have more respect than to do that.

5    Q   Okay.

6    A   It is just not also who I am.  I am not, I am not somebody

7    that -- I am not going to get in a fight with somebody.  You

8    know, the, you know, I also know it is highly illegal.  I mean,

9    if you want to, if you want a fast way to go to jail, I mean,

10   that is the quickest way to get there.

11   Q   You know that from where?

12   A   From being a law enforcement officer.

13   Q   All right.  Let's go to the next Exhibit, 215.

14           THE COURT:  I think after this one we should stop.

15           MR. MAYR:  Sure.  Thank you, Your Honor.  I figure you

16   would let me know.

17   BY MR. MAYR:

18   Q   Exhibit 215, IMG_1850.  Is this exhibit a photograph?

19   A   Yes, sir.

20   Q   What time is it taken at?

21   A   1:52.

22   Q   The GPS data here is inaccurate or accurate?

23   A   Inaccurate, sir.

24   Q   Where do you recall this photograph being taken?

25   A   To the right of the stage, the Capitol.

1   Q   All right.  Closer to the Capitol building, correct?

2   A   To the left — the Capitol's right, my left of the stage.

3   Q   And where — what is depicted, or what is shown here in

4   this photograph?

5   A   It is a crowd going up the stairs.

6   Q   And in — do they appear to be walking through anything?

7   A   There is some, like, some type of sheeting or whatever over

8   scaffolding of some kind.

9   Q   Okay.

10          MR. MAYR:  I think that is all the questions I have

11   about this exhibit.

12          THE COURT:  I think we should stop.  Mr. Grider, why

13   don't you go ahead and sit down, back at counsel table.

14                    *(Witness excused.)*

15          THE COURT:  We will stop at this point.  We will

16   resume tomorrow at 9:00, pick up the testimony.  What I would

17   ask is that, perhaps you, this afternoon or — my meeting is on

18   Zoom, it is chambers.  So I think — Dorothy, can they stay in

19   here for a bit if I use the chambers' Zoom, can they stay in

20   here?

21          (Off-the-record discussion.)

22          THE COURT:  It is not going to — I have something

23   later in the day, so certainly by 3:00 o'clock, which clearly

24   you will be out of here, at least I hope so.  I will be back —

25   having to use this.  You can stay a little bit longer while I

Vol. 3 - 489

1  go do my meeting.  If you want to just have a discussion here,

2  while you have got it set up so you can figure out what these,

3  if there are issues about the exhibits if you want to stay and

4  do it, I don't have a problem.

5           MR. MAYR:  Absolutely, Your Honor.

6           THE COURT:  If that would be helpful to you.

7           MS. CHO:  Thank you.

8           THE COURT:  For both of you.

9           MR. MAYR:  Absolutely.

10          THE COURT:  If there is a problem, but obviously, you

11  know, my procedure, please file something, hear something in

12  the morning.  But hopefully you can resolve matters.

13          MS. CHO:  Yes.

14          THE COURT:  Okay?  All right, parties are excused.

15  See you-all tomorrow at 9:00.

16          MR. MAYR:  Thank you, Your Honor.

17          (Adjourned, 11:27 a.m.)

18                        - - -

19

20

21

22

23

24

25

Vol. 3 - 490

1          <u>CERTIFICATE OF COURT REPORTER</u>

2

3          I, Jean A. Knepley, hereby certify that the

4    foregoing is a true and correct transcript from reported

5    proceedings in the above-entitled matter.

6

7    /S/ Jean A. Knepley              December 30, 2022
     JEAN A. KNEPLEY, RDR/CRR/CRC/FCRR  Date
8    Official Court Reporter
     Southern District of Indiana
9    Indianapolis Division
     Detailed to the U.S. District Court
10   for the District of Columbia

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25