UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,  )
                           )
          Plaintiff,       )
                           )
vs.                        ) Criminal Action No. 21-022 (CKK)
                           ) Washington, DC
CHRISTOPHER RAY GRIDER,     ) Friday, December 16, 2022
                           ) 9:04 o'clock a.m.
          Defendant.       ) Volume 5 of 5

Before the
HONORABLE JUDGE COLLEEN KOLLAR-KOTELLY

TRANSCRIPT OF BENCH TRIAL, DAY 5

APPEARANCES:
FOR THE GOVERNMENT:    United States Attorney's Office
                       By:  Cindy J. Cho
                       Detailed to the U.S. Attorney's Office
                       for the District of Columbia
                       10 West Market Street, Suite 2100
                       Indianapolis, Indiana 46204

                       Department of Justice
                       Criminal Division, Appellate Section
                       By:  Francesco Valentini
                       950 Pennsylvania Avenue NW
                       Washington, DC 20530

FOR THE DEFENDANT:     Mayr Law P.C.
                       By:  Brent Mayr
                       5300 Memorial Drive, Suite 750
                       Houston, Texas 77007

ALSO PRESENT:          The Defendant in person.

COURT REPORTER:        Jean A. Knepley, RDR, CRR, CRC, FCRR
                       Detailed to the U.S. District Court
                       for the District of Columbia
                       46 East Ohio Street, Room 301
                       Indianapolis, Indiana 46204

PROCEEDINGS TAKEN BY MACHINE SHORTHAND
COMPUTER-AIDED TRANSCRIPTION

Vol. 5 - 676

I  N  D  E  X

CHRISTOPHER RAY GRIDER

Cross-Examination (Continued) by Ms. Cho ......679
Redirect Examination by Mr. Mayr ..............761
Examination by The Court ......................788
Examination (Continued) by The Court ..........813

        Certificate of Court Reporter ............823

I N D E X   O F   E X H I B I T S

DESCRIPTION                          RECEIVED

(There were no exhibits produced or marked.)

1              (In open court.)

2          THE COURT:  Good morning, everyone.

3          MR. MAYR:  Good morning, Your Honor.

4          MS. CHO:  Good morning.

5          THE COURT:  All right.  Why don't we go ahead and call

6    the case.

7          (Call to the order of the Court.)

8          THE CLERK:  Counsel, would you please identify

9    yourself for the record, starting with the Government.

10         MS. CHO:  Good morning, Cindy Cho for the United

11   States with Francesco Valentini, Special Agent Michelle Ball,

12   and Paralegal Tiffany Robinson.

13         THE COURT:  Good morning.

14         MR. MAYR:  Good morning, Your Honor.  Brent Mayr with

15   Mr. Grider.

16         THE COURT:  All right.  Good morning as well.

17         So I did send out the two questions which should not

18   be a surprise in terms of what should be addressed in closings,

19   keeping in mind that this is not a jury trial, so your closings

20   can be slightly different in terms of what you need to say.  I

21   would like you to just focus on what, you know, what you view

22   is the most important.

23         I don't need to see the videos again.  You can tell me

24   which ones you want me to go back and look at so we can make

25   this more composite.  I thought it was 3:30, but it turns out,

1    something in the schedule that I can't change.  It is 3:00, so

2    we have until 3:00 o'clock.  So we will see where we are with

3    everything.  I would hope that we would be able to, you know,

4    have it finished by the end of the day, but if not, I am not

5    going to rush it.  We will go into next week.

6              All right.  Mr. Grider, you may come back up.

7              MR. MAYR:  Your Honor, while he is resuming the bench,

8    may I ask one quick question?  In light of the questions that

9    were sent, will we have a few minutes to prepare, sort of

10   readjust our closing?

11             THE COURT:  Yes.  Depending where we are, we can

12   figure out giving you a little bit of extra time.  I will not

13   go through at the end of his testimony, that is it, and then,

14   immediately into closings.  I will give you a break in there —

15             MR. MAYR:  Wonderful.

16             THE COURT:  — long enough in there for you to

17   reconstitute what you want to talk about.

18             MR. MAYR:  Reconstitute is a big word.  I think just

19   some minor changes make sure that we address.  Thank you, Your

20   Honor.

21             THE COURT:  All right.

22             MS. CHO:  Your Honor, before —

23             THE COURT:  Let me just say, Mr. Grider, for the

24   record, we are in the middle of the cross-examination.

25             (Witness resumes.)

1          THE WITNESS:  Yes, Your Honor.

2          THE COURT:  Go ahead.

3          MS. CHO:  Your Honor, I would also like to move for

4    the admission of Government Exhibits 122 and 123 at this time,

5    which I have provided to Mr. Mayr previously, and I have copies

6    for the Court as well.

7          THE COURT:  I assume there is no objection?

8          MR. MAYR:  That is correct, Your Honor.

9          THE COURT:  All right.  Then I will admit Government's

10   Exhibit 122 and 123.

11         MS. CHO:  May I approach with the Court copies?

12         THE COURT:  Yes.

13         (Complied.)

14         MS. CHO:  Good morning, again, Mr. Grider.

15         THE WITNESS:  Good morning.

16                    **CROSS-EXAMINATION CONTINUED**

17   BY MS. CHO:

18   Q    Do you recall we were talking about you were leaving the

19   Crypt?

20   A    Yes, ma'am.

21   Q    You had feared for Officer Cereesa's life?

22   A    I was concerned, yes, ma'am.

23   Q    You were panicking yourself?

24   A    Yes, ma'am.

25   Q    And I think you said yesterday that you couldn't go back in

1    to check on him, right?

2    A    Yes, ma'am.

3    Q    And that you just kept going into the building; is that

4    correct?

5    A    Yes, ma'am.

6          MS. CHO:  So let's pull up Exhibit 30.  Once we pull

7    up Exhibit 30 let's go to the 10:30 mark.

8    BY MS. CHO:

9    Q    Before we hit play, is this where you ended up shortly

10   after you left the Crypt?

11   A    It was after the Crypt.  I don't know how shortly.

12   Q    So what time is it here?

13   A    2:28:45 p.m.

14   Q    Does it sound correct that you were in the Crypt around

15   2:25 p.m.?

16   A    I think that is possible.

17   Q    All right.

18          MS. CHO:  Let's hit play.

19      (The video was played for the Court.)

20   BY MS. CHO:

21   Q    That is you right there, right?

22   A    Yes, ma'am.

23   Q    You have room to move, right?

24   A    Yes, ma'am.

25   Q    You could move forward, right?

1  A   Yes, ma'am.

2  Q   And you could move backward, right?

3  A   I am not sure.

4  Q   You are not sure if you could move backward?

5       MS. CHO:  Let's hit pause.

6  BY MS. CHO:

7  Q   You are saying you are not sure if you could move backwards

8  right here?

9  A   I could.  Yes.

10  Q   Okay.  There is a door right there, right?

11  A   Yes, ma'am.

12  Q   So you could have left?

13  A   No, ma'am.

14  Q   Why couldn't you have left through the door?

15  A   If you can play the video another second, ma'am.

16       THE COURT:  You have to keep your voice up.

17       MS. CHO:  Let's hit pause.

18  BY MS. CHO:

19  Q   So why couldn't you leave through the door?

20  A   It appears —

21  Q   At the time, why did you think you couldn't leave through

22  the door?

23  A   Which question do you want me to answer, the first or the

24  second one?

25  Q   The one that I just asked you.

1  A   Can you reask it.

2  Q   At the time, did you know — did you think that you could

3  leave through that door?

4  A   I don't remember thinking about it, ma'am.

5  Q   Okay.  So right here is where you find the map of the

6  building, right?

7  A   Yes, ma'am.

8  Q   I think you said you thought you might need it at some

9  point?

10  A   Yes, ma'am.

11  Q   But you couldn't tell us why?

12  A   No, ma'am.

13       MS. CHO:  So let's look at Defense Exhibit 241.  Let's

14  go — let's go to 6:00 minutes — no, let's go to 7:30.

15  BY MS. CHO:

16  Q   I would like you to focus once we get to it — this is your

17  video, right?

18  A   Yes, ma'am.

19  Q   I would like you to focus and listen very carefully once we

20  get to about the 8:10 mark and tell me what you hear.

21       MS. CHO:  Let's hit play.

22    (The video was played for the Court.)

23  BY MS. CHO:

24  Q   Did you hear someone say, "Here we go"?

25  A   Yes, ma'am.

1   Q   Did that sound like your voice?

2   A   Yes, ma'am.

3   Q   So you said, "Here we go," when you got to a map, right?

4   A   Yes, ma'am.

5   Q   And then you took a picture, not just a video of that map,

6   right?

7   A   Yes, ma'am.

8           MS. CHO:  Let's pull up the picture, Defense

9   Exhibit 242.

10  BY MS. CHO:

11  Q   On this map you can see the House Wing, right?

12  A   Yes, ma'am.

13  Q   You can see the Senate Wing?

14  A   Yes, ma'am.

15  Q   You knew why you needed a map, right?

16  A   No, ma'am.

17  Q   Well, what are maps for?

18  A   Directions, ma'am.

19  Q   To find your way to another place, right?

20  A   They can be used for that, ma'am.

21  Q   Is there anything else you use them for?

22  A   The possibilities, I guess, are infinite.

23  Q   Infinite, but you can't name any of those infinite

24  possibilities?

25  A   I don't want to look — I mean, I can start naming

1  possibilities for map uses, yes, ma'am, I could.

2  Q   That is okay.  You don't need to do that.

3  A   Thank you.

4          THE COURT:  You need to keep your voices up.  You are

5  very low, okay?  You also need to speak to the door.

6          THE WITNESS:  Yes, ma'am.  I am sorry.  I, I have to

7  keep remembering that.

8          THE COURT:  Miss Cho, you need to keep your voice up

9  as well.

10 BY MS. CHO:

11 Q   So once you took a picture of this map, you turned around,

12 right?

13 A   I, I don't recall.

14 Q   Should we go back to Exhibit 30 and play the video?

15 A   Yes, ma'am.

16         MS. CHO:  Let's go back to Exhibit 30.  We can go to

17 10:40.

18 BY MS. CHO:

19 Q   Mr. Grider, at 10:40, you're still next to the map, right?

20 A   Yes, ma'am.

21         MS. CHO:  Let's hit play.

22     (The video was played for the Court.)

23 BY MS. CHO:

24 Q   It looks like you took a picture, right?

25 A   Yes, ma'am.

1  Q   And by this point you had been heading the same direction

2  that all these other people are heading in the frame, right?

3  A   Yes, ma'am.

4  Q   And now?

5  A   Looks like I am standing there.

6  Q   Uh-huh.

7      (The video was played for the Court.)

8          MS. CHO:  Let's hit pause.

9  BY MS. CHO:

10 Q   At 11:20, does it look like you were turning back?

11 A   Could — I apologize.  I was looking at other parts of the,

12 of the frame.  I am sorry.  Can you, can you play it back.

13 Thank you.

14     (The video was played for the Court.)

15 BY MS. CHO:

16 Q   Now, do you see that you have turned around?

17 A   Yes, ma'am.

18 Q   So you turned around, and you start going to the House

19 Chamber, right?

20 A   I don't know where I go next.

21 Q   Did you end up at the House Chamber?

22 A   I now know that I did.

23 Q   Okay.  But in between getting to the House Chamber you

24 paraded through the Statuary Hall, right?

25 A   Yes, ma'am.

1  Q   And during that time did you have opportunities to turn

2  around or to leave?

3  A   I know for sure I could turn around and go back and forth.

4  Leaving, I wasn't confident on, ma'am.

5  Q   So you could have gone back at least in the Statuary Hall

6  too, right?

7  A   Back to — could you clarify for me?  What do you mean,

8  back?

9  Q   You could have gone back the way you had come, right?

10 A   Come — I just want to make sure I answer very precisely.

11 Q   You could turn around, right?

12 A   Yes, ma'am.

13 Q   And you could turn around in this hallway, right?

14 A   It appears that way, yes, ma'am.

15 Q   Well, could you or could you not?

16 A   Yes, ma'am.  It looks like the flow of people started

17 reversing.

18 Q   So as you go — as you make your way upstairs you get to

19 the Statuary Hall Connector, right?

20 A   Yes, ma'am.

21 Q   On your way up — they were spiral stairs, right?

22 A   Yes, ma'am.

23 Q   You yell, "USA"?

24 A   Yes, ma'am.

25 Q   You say, "We got to get to the Chamber"?

1  A  I think that was after the spiral staircase.  I am not

2  exactly sure what the room was.  Was it the Rotunda or

3  something of that nature?  We — I am sure we will come to it.

4  Q  Do you yell, "We got to get to the Chamber"?

5  A  Yes, ma'am.  It sounded like my voice.

6  Q  Do you yell, "This way, this way"?

7  A  Yes, ma'am.  It sounded like my voice.

8  Q  You also walk past a sign that says Speaker of the House,

9  Nancy Pelosi, right?

10  A  Yes, ma'am, I did.

11  Q  You take video of that?

12  A  I did.

13  Q  You zoom in on the sign, right?

14  A  Yes, ma'am, I did.

15  Q  On your way to the House Chamber?

16  A  Yes, ma'am.

17  Q  You knew where you were going at that point, right?

18  A  I was under the impression I was going to the Senate

19  Chamber.

20  Q  But you know — you know, what the House is and the Speaker

21  of the House, right?

22  A  Yes, ma'am.

23  Q  You know who Nancy Pelosi is, right?

24  A  Yes, ma'am.

25  Q  And you just walked past a sign that says Speaker of the

1  House, Nancy Pelosi, right?

2  A    Yes, ma'am.

3  Q    And you ended up at the House Chamber eventually, right?

4  A    Yes, ma'am.

5  Q    At that point were you worried about Officer Cereesa's life

6  anymore?

7  A    It was not present in my mind, that I recall, ma'am.

8  Q    So is that a yes or a no?

9  A    It would have to be a no at the time.

10  Q    Were you panicked about your own safety at that point?

11  A    No, ma'am.

12  Q    When you got to the Statuary Hall Connector, you said you

13  wanted to go into the chamber, right?

14  A    After I was told that they were going to — they were

15  inviting us in.

16  Q    We will get to that in a moment, but you said you wanted to

17  go in, right?

18  A    Yes, ma'am.

19  Q    You said you wanted to see your home Senator, Ted Cruz,

20  lodge an objection, right?

21  A    Yes, ma'am.

22  Q    To the Electoral College vote certification, right?

23  A    Yes, ma'am.

24  Q    You said you maybe wanted to see former President Trump?

25  A    Yes, ma'am.

1   Q   And then, when you got to Statuary Hall Connector, you said

2   someone told you you could go in that Chamber, right?

3   A   Yes, ma'am.  I believe it was the police.

4   Q   We will get there.  You saw a police line, right?

5   A   Yes, ma'am.

6   Q   You thought you were being allowed in by those police?

7   A   Yes, ma'am.

8           MS. CHO:  So let's pull up Defense Exhibit 243.

9   BY MS. CHO:

10  Q   Now, we talked about the person who was yelling that, you

11  know, something about being peaceful and going in, right?

12  A   Can you, can you clarify the word "we"?

13  Q   During this trial, you have — you have provided testimony

14  regarding a person that you thought said that you could go into

15  the Chamber, right?

16  A   Yes, ma'am.

17  Q   You thought that person was Capitol Police, right?

18  A   Yes, ma'am.

19          MS. CHO:  Let's start 243 at 2:15.

20      (The video was played for the Court.)

21  BY MS. CHO:

22  Q   So this is where you're entering the Statuary Hall

23  Connector, right?

24  A   Yes, ma'am.

25          MS. CHO:  And let's go and pause on 2:34, please.

1          (The video was played for the Court.)

2     BY MS. CHO:

3     Q    Did you hear someone starting to yell something about, go

4     in?

5     A    Yes, ma'am.

6              MS. CHO:  Your Honor, if I may use the podium to mark

7     on the screen for just a moment?

8              THE COURT:  Sure.

9              MS. CHO:  Thank you.

10             THE COURT:  I think Miss Patterson needs to switch

11    something here.

12    BY MS. CHO:

13    Q    Do you see up towards the front —

14             THE COURT:  We can't hear you.  You need to speak into

15    the mic.  You can move that mic around.

16    BY MS. CHO:

17    Q    Mr. Grider, do you see I have circled a blurry image of

18    what looks like a person wearing something black on top of

19    their head and a gray hood over that black top?

20    A    Yes, ma'am.

21    Q    Does he look like the person who was yelling about going

22    in?

23    A    I now know, yes, ma'am.

24    Q    And this is when you thought you were allowed to go in,

25    right?

1    A    I think it was the beginning of, of me learning that.

2    Q    That person doesn't look like a police officer, right?

3    A    It is hard to tell, ma'am.

4    Q    Do police off- –– did any of the police officers you saw

5    that day, were they wearing gray hoods over their uniforms?

6    A    No, ma'am.

7            MS. CHO:  Let's keep going and pause at 3:00 minutes.

8         (The video was played for the Court.)

9    BY MS. CHO:

10   Q    Did you hear someone yell, "Let us in"?

11   A    Yes, ma'am.

12   Q    That was you, right?

13   A    Yes, ma'am.

14           MS. CHO:  Let's keep playing for just five seconds.

15   Pause.

16   BY MS. CHO:

17   Q    And then you said, "Or we will go in," right?

18   A    Yes, ma'am.

19   Q    If you thought you could go in, why were you yelling, "Let

20   us in, or we will go in"?

21   A    I don't recall, ma'am.

22   Q    You knew you weren't allowed in, right?

23   A    No, ma'am.

24   Q    Okay.

25           MS. CHO:  Let's keep going.

1      (The video was played for the Court.)

2   BY MS. CHO:

3   Q   Do you hear that same megaphone-sounding voice coming over

4   the crowd?

5   A   I believe this is the first time it had a megaphone sound,

6   ma'am.

7   Q   Do you see where I have circled on the screen, looks like a

8   black hat with a gray top over it?

9   A   Yes, ma'am.

10  Q   Does that look like the same person?

11  A   It does look like the same person you circled, yes, ma'am.

12  Q   Does that person look like a police officer?

13  A   From here?  At this moment?  No, ma'am.

14          MS. CHO:  Let's keep going.

15      (The video was played for the Court.)

16  BY MS. CHO:

17  Q   Did you see that his black hat says Trump on it?

18  A   From this moment I do see it.

19  Q   Did you see any police officers that day wearing black hats

20  that said Trump on it?

21  A   Not black ones.

22          MS. CHO:  Let's keep going.

23      (The video was played for the Court.)

24  BY MS. CHO:

25  Q   Did you just yell, "Let us in, let us in"?

1   A   Yes, ma'am.  It sounds like me.

2   Q   If you thought you could go in, why were you yelling, "Let

3   us in"?

4   A   I don't recall yelling it.

5        MS. CHO:  I will return.  Just one moment.  Let's keep

6   going.

7        (The video was played for the Court.)

8   BY MS. CHO:

9   Q   Do you hear people saying, "Go, go, go"?

10  A   Yes, ma'am.

11  Q   And that was a stampede that you talked about?

12  A   Yes, ma'am.

13  Q   And I think you testified that after that you arrived

14  beyond the police line into the hallway past them?

15  A   Where the line was currently, the problem looks like the

16  line moved with the crowd.

17  Q   You, quote, arrived past them, right?

18  A   I don't know that I passed them.  I, I passed where they

19  were standing previously.

20  Q   You don't know a lot of things, right?

21  A   Yes, ma'am.

22  Q   You don't remember certain things, right?

23  A   Yes, ma'am.

24  Q   You don't remember, for example, when you were standing in

25  the crowd, and you waved people into the room?

1    A    I don't remember doing it.

2    Q    But you, of course, saw the video of you waving people into

3    the room?

4    A    Yes, ma'am.  It appeared that way.

5    Q    And you were in the Crypt just a few minutes before this,

6    right?  We talked about that?

7    A    Yes, ma'am.

8    Q    And in the Crypt you said you couldn't breathe once people

9    started pushing, right?

10   A    Yes, ma'am.

11   Q    That you were being crushed by hundreds of people behind

12   you?

13   A    Yes, ma'am.

14   Q    That you were being pinned against the wall and Officer

15   Cereesa, right?

16   A    Yes, ma'am.

17   Q    You were panicking?

18   A    Yes, ma'am.

19   Q    You felt like this rally was spiraling downward at that

20   point, right?

21   A    Yes, ma'am.

22   Q    You would agree that it is odd to wave people into a

23   crowded hallway if you have just been crushed by hundreds of

24   people and you were in a panic attack?

25   A    Yes, ma'am.

1   Q   But that is what you are saying you did?

2   A   It definitely appears like that, ma'am.

3   Q   Now, we are going to start talking about breaking the

4   windows in the Speaker's Lobby.

5           MS. CHO:  I want to show you another clip before we

6   get started.  Let's pull up Exhibit 83.

7       (The video was played for the Court.)

8   BY MS. CHO:

9   Q   Do you recognize this clip, Mr. Grider?

10  A   I believe you showed it previously.

11  Q   So is that a yes or a no?

12  A   Yes, ma'am.

13  Q   Is this the interview you said you gave to news crews after

14  you reunited with Jesse Bowen?

15  A   No, ma'am.

16  Q   It is a different interview?

17  A   Yes, ma'am.

18  Q   How many different interviews did you give that day?

19  A   May I have a moment?

20  Q   Of course.

21  A   I want to make sure that —— if you could make sure to

22  definitively define your definition of, of interview.

23  Q   I will allow you to define interview as you see fit, and my

24  question is simply how many interviews did you give that day?

25  A   I had, I would say, five interactions with media personnel

1    that may or may not be construed as interviews by you, but,

2    like, full question-and-answer interviews?  I think three.

3    Q   Is Exhibit 83 one of those interviews?

4    A   Yes.

5         MS. CHO:  Let's start at 44 seconds, please.  Let's

6    hit play.

7         (The video was played for the Court.)

8    BY MS. CHO:

9    Q   First you said, "They busted the window," right?

10   A   It sounded like that, yes, ma'am.

11   Q   Then you said, "We busted the window," right?

12   A   Yes, ma'am.

13   Q   So the big question is, which one is it, "we" or "they"?

14   A   They.

15   Q   Okay.

16   A   That is why I think I corrected myself --

17   Q   Oops, no.  I just asked for a very simple question.

18   A   I am sorry.

19   Q   Simple answer.

20   A   Yes, ma'am, you are right.

21   Q   Which one is it, "we" or "they"?  You said "they," right?

22   A   Yes, ma'am.

23        MS. CHO:  Let's keep going.  We don't need to keep

24   going with the video.  Sorry.

25

BY MS. CHO:

Q    You saw — let's go to the Speaker's Lobby Door.

A    Yes, ma'am.

Q    You saw when the man with the black furry-trimmed hat first punched the window, right?

A    I am sorry, repeat your question.

Q    Did you see the man punch the window with his bare fist?

A    Yes, ma'am.

Q    You agree that that was wrong, right?

A    Yes, ma'am.

Q    Punching a window in the Capitol is wrong?

A    Yes, ma'am.

Q    Maybe even highly illegal, a phrase that you used the other day?

A    Yes, ma'am.

Q    You stood there and watched him do that, right?

A    Yes, ma'am.

Q    You stood there and watched him do something highly illegal?

A    Yes, ma'am.

Q    Now, you also said that at the Speaker's Lobby Door you started, again, to feel crushed and to fear for your safety, right?

A    No, ma'am.

Q    You decided that you were going to leave with the police,

1  right?

2  A   Yes, ma'am, at one point.

3  Q   Because you felt like your own safety was going to be

4  compromised?

5  A   Yes, ma'am.

6  Q   I believe you said you felt compacted; is that not what you

7  said?

8  A   I don't recall saying that.

9  Q   You said you felt pushed here too?

10  A   Not — I don't recall saying that.

11  Q   Okay.  So you decide to leave with the police, but you said

12  before you did make that decision or after you made the

13  decision, you gave the man with the black furry-trimmed hat

14  your helmet, right?

15  A   I gave him the helmet.

16  Q   And you say you don't know why you gave him the helmet,

17  right?

18  A   I don't know exactly, no, ma'am.

19  Q   So you don't know why you gave him the helmet?

20  A   I have an idea why.

21  Q   Oh, what is the idea?

22  A   I was afraid that I — I do remember at one point being

23  afraid that if I had the helmet, the police may not let me

24  leave with them.

25  Q   Why did you think that?

1   A   I just didn't know if they would.  I don't want to be

2   identified as some of these people that came dressed like, in,

3   all this, I don't know what you call it, like, SWAT team gear,

4   civilian SWAT team gear.  I didn't want to be identified as one

5   of those people.

6   Q   But you had been around police all day before then, right?

7   A   Yes, ma'am.

8   Q   You didn't give up that helmet until then.

9   A   Yes, ma'am.

10  Q   And you didn't drop it on the ground, for example?

11  A   No, ma'am.

12  Q   You handed it to the man with the black fur-trimmed hat?

13  A   Yes, ma'am.

14  Q   Let's go on with your story.  You also said you weren't

15  sure what he was going to do with your helmet, right?

16  A   Yes, ma'am.

17  Q   And you said that even at that point, you, for some reason,

18  couldn't leave, right?

19  A   Yes, ma'am.

20  Q   So you, quote, had to muscle your way through the crowd; is

21  that right?

22  A   After the police didn't let me leave with them, I had the

23  thought that I might have to do that.

24  Q   And the police didn't let you leave with them.  How was

25  that communicated to you?

1   A   There was one particular SWAT team officer that turned

2   around and glared at me and almost seemed to be shaking his

3   head.

4   Q   And that is what you are interpreting as them telling you

5   that you couldn't leave?

6   A   Yes, ma'am.

7   Q   So you muscled your way through the crowd so you could get

8   away from that door, right?

9   A   I tried, ma'am.

10  Q   That is what your story is?

11  A   Yes, ma'am.

12  Q   Okay.  And then, as you were trying to get away a shot is

13  fired; is that your story?

14  A   Yes, ma'am.

15  Q   Let's take that apart.

16       MS. CHO:  Let's pull up Exhibit 40, and let's begin at

17  1:02, please.

18       (The video was played for the Court.)

19  BY MS. CHO:

20  Q   So you see the man with the black fur-trimmed hat here,

21  right?

22  A   Yes, ma'am.

23  Q   There you are right behind him, right?

24  A   Yes, ma'am.

25  Q   There is at least an arm's length in between the two of

1    you?

2    A    Not quite.

3    Q    There is room to move, right?

4    A    Yes, ma'am.

5    Q    Okay.

6              MS. CHO:  Let's hit play.

7         (The video was played for the Court.)

8    BY MS. CHO:

9    Q    Now, of course you have seen this footage before, right?

10   A    Yes, ma'am.

11   Q    You are having after conversation with the man with the

12   black fur-trimmed hat, right?

13   A    It does appear that way.

14   Q    And you knock on your helmet, right?

15   A    It looked that way.

16   Q    You are telling him the helmet is hard, right?

17   A    I don't know what I said to him.

18   Q    Why were you knocking on the helmet?

19   A    I don't know why.

20   Q    You don't know why?

21   A    No, ma'am.

22   Q    Another thing.  You certainly had room to hand over the

23   helmet, right?

24   A    Yes, ma'am.

25   Q    You had room to stand around there, right?

1    A    Yes, ma'am.

2    Q    You are not muscling your way through any crowd at this

3    point, right?

4    A    No, ma'am.

5         MS. CHO:  In fact, let's go and pause at 1:27.

6         (The video was played for the Court.)

7    BY MS. CHO:

8    Q    At 1:27, do you see yourself here?

9    A    Yes, ma'am.

10   Q    You are still standing in roughly the same spot, right?

11   A    Yes, ma'am.

12   Q    You still haven't moved?

13   A    No, ma'am.

14   Q    Certainly haven't muscled your way through any crowds yet?

15   A    No, ma'am.

16   Q    Do you see there is a man behind you, his back to us?  He

17   is wearing a black jacket, a red cap, and an olive backpack?

18   A    Yes, ma'am.

19   Q    If you will watch him, and when I hit pause next, tell me

20   whether he seems like he is able to get away.

21        (The video was played for the Court.)

22   BY MS. CHO:

23   Q    Did it look like he was going down the stairs?

24   A    Yes, ma'am.

25   Q    So he could go down the stairs, right?

1    A    Yes.  He went down the stairs.  I don't know if he could go

2    down the stairs.  He went down some stairs, I should say.  I

3    don't know where he ended up.

4    Q    Now, another one of the things that you don't remember is

5    whether you pushed on this door, right?

6    A    I don't.

7    Q    I am sorry.  Do you remember, or do you not?

8    A    I don't remember.  I don't remember if I remember, but I --

9    we can see that I pushed on the door, ma'am.

10   Q    So after you handed the man with the black hat and furry

11   trim, a black furry-trimmed hat, you didn't leave, right?  You

12   are here?

13   A    Yes, ma'am.

14   Q    In fact, you moved closer to the door, right?

15   A    Yes, ma'am.

16   Q    And you push on the door?

17   A    Yes, ma'am.

18   Q    And then, the man starts breaking the glass in the door

19   with the helmet, right?

20   A    He does eventually, ma'am.

21   Q    You would agree that is also highly illegal?

22   A    Yes, ma'am.

23   Q    And you are the one who gave him the helmet, right?

24   A    Yes, ma'am.

25   Q    After you watched him do something else highly illegal?

1   A   Yes, ma'am.

2   Q   You didn't run away?

3   A   No, ma'am.

4   Q   You didn't try to stop him?

5   A   No, ma'am.

6   Q   You stood and watched?

7   A   Yes, ma'am.

8   Q   You had tried to give your helmet to break a window before

9   this, right?

10  A   No, ma'am.

11  Q   Well, you were at the House Main Door before this, right?

12  A   Yes, ma'am.

13  Q   And you lifted your helmet up in the air?

14  A   I did see a photo of that, ma'am.

15  Q   Did you or did you not?

16  A   Did —

17  Q   Did you lift your helmet up in the air while you were at

18  the House Main Door?

19  A   Yes, ma'am.

20  Q   You did?

21  A   Yes, ma'am.

22  Q   And you lifted it up after people yelled to use your

23  Kevlar, right?

24  A   If I remember — was it Monday or Tuesday when you showed

25  that?  I don't remember.  I remember thinking that it was

 1  after, or maybe it was when I looked at discovery.

 2  Q   Sir, is it a yes-or-no answer?

 3  A   What?  Go ahead.

 4  Q   Did you lift your helmet up in the air after someone in the

 5  crowd yelled to use your Kevlar?

 6  A   I think I did it before.

 7  Q   Okay.  Well, we will take a note of that.

 8      Did you lift your helmet in the air after someone yelled,

 9  "Use your helmet"?

10  A   I don't — I am not sure.

11  Q   Did you lift your helmet in the air after someone yells,

12  "Knock the windows out with Kevlar"?

13  A   Before or after?  Say it again.

14  Q   Did you lift your helmet up in the air after someone

15  yelled, "Knock the windows out with Kevlar"?

16  A   We will have to rewatch the video.

17  Q   Okay.  We will rewatch the video.

18          MS. CHO:  Let's pull up Exhibit 36, and let's begin at

19  2:10.

20      (The video was played for the Court.)

21  BY MS. CHO:

22  Q   This is the House Main Door, right?

23  A   I have come to know that, ma'am, yes.

24  Q   You are standing there sort of to the left of this frame,

25  right?

1  A   Maybe in the center at this moment, but eventually I think

2  I was on the left side of the hallway, if that is what you

3  meant.

4          MS. CHO:  Let's keep going and pause on 2:30.

5      (The video was played for the Court.)

6  BY MS. CHO:

7  Q   Did you hear a person yell, "Use your helmet, use your

8  Kevlar"?

9  A   Yes, ma'am.

10         MS. CHO:  Let's keep going.

11     (The video was played for the Court.)

12 BY MS. CHO:

13 Q   Did you hear someone yell, "Knock the windows out with

14 Kevlar"?

15 A   Yes, ma'am.

16         MS. CHO:  Let's keep going.

17     (The video was played for the Court.)

18 BY MS. CHO:

19 Q   And now, do you see you are lifting your helmet in the air?

20 A   Yes, ma'am.

21 Q   So we will go back to my question.  Did you lift your

22 helmet up in the air after people yelled, "Use your Kevlar,"

23 Use your helmet," "Knock the windows out with Kevlar"?

24 A   I don't know if it was the first or second time I raised

25 the helmet.

1    Q    So maybe you put your helmet up two times?

2    A    Yes, ma'am.

3    Q    Okay.

4    A    It wasn't clear from the discovery.

5    Q    So I want to return to your testimony regarding why you

6    left the House Main Door.  I think that you said yesterday you

7    were feeling pushed in this area; is that right?

8    A    Yes, ma'am.

9    Q    And it was your testimony that you left this door because

10   someone told you to get off them; is that right?

11   A    Yes, ma'am.  I remember someone telling me to get off them.

12   Q    You also said you left the door because you were worried

13   about these two officers who were in front of the door, right?

14   A    In addition to some elderly people, yes, ma'am.

15   Q    The elderly people also.  Do you see the elderly people in

16   this frame?

17   A    Not this frame, ma'am.

18   Q    But you saw elderly people getting crushed?

19   A    Yes, ma'am.

20   Q    Did you point them out for us during your direct

21   examination here?

22   A    I did not point them out during direct examination.

23   Q    Okay.  So you left this door because you were going to go

24   get help for two officers, elderly people, and you, yourself,

25   were feeling crushed?

1    A    Yes, ma'am.

2            MS. CHO:  So let's begin playing.  Let's go to 3:47 --

3    yes, 3:47.  Sorry, let's begin at 3:47.

4        (The video was played for the Court.)

5            MS. CHO:  Can you back up to 3:40, please.

6        (The video was played for the Court.)

7    BY MS. CHO:

8    Q    Did you hear someone say, "Let's find an alternate way"?

9    A    I heard the word "way."

10   Q    Okay.

11           MS. CHO:  Let's keep going, and pause at 4:25.

12       (The video was played for the Court.)

13   BY MS. CHO:

14   Q    That is you there, right, at 4:33?

15   A    Yes, ma'am.

16   Q    And you have got room.  You are waving your arm around,

17   right?

18   A    I am sorry.  I wasn't looking at me at the time, ma'am.

19   Q    Does it look like you have some space in front of you

20   there?

21   A    No, ma'am.

22   Q    Okay.

23           MS. CHO:  Let's keep playing, and I will ask you

24   again.

25           THE WITNESS:  Yes, ma'am.

1    (The video was played for the Court.)

2  BY MS. CHO:

3  Q   You were just talking, and we are at 4:48, right?  Your

4  mouth was moving?

5  A   I wasn't looking at myself, ma'am.  I apologize.

6  Q   Do you want me to back up so that you can see?

7  A   Sure.

8        MS. CHO:  Let's go back to 4:35.

9    (The video was played for the Court.)

10  BY MS. CHO:

11  Q   Did you see your mouth moving?

12  A   Yes, ma'am.

13  Q   So you weren't so crushed that you couldn't speak, right?

14  A   Correct.

15  Q   You had breath enough to talk?

16  A   Yes, ma'am.

17  Q   And you've got a little space in front of you now, right?

18  A   I wouldn't say that.

19  Q   Okay.

20        MS. CHO:  We will keep going.

21    (The video was played for the Court.)

22  BY MS. CHO:

23  Q   Did you hear you were saying, "The cops are leaving, the

24  cops are leaving," and somebody said, "They are giving us the

25  building," and you nodded your head?

1   A    I heard myself say —

2   Q    Yes or no?

3   A    Oh, yes, ma'am.

4   Q    You said, "The cops are leaving"?

5   A    Yes, ma'am.

6   Q    You said, "They are leaving the building" — or, "They are

7   giving us the building"?

8   A    Yes, ma'am.

9   Q    And you at least had room to wave your hand like this,

10  right?  I am waving my hand in an up-and-down gesture?

11  A    I accidentally, I think, just said, "Yes, ma'am, yes,

12  ma'am."  I stepped over you.  I said, "Yes, ma'am" on top of

13  what you were saying.  Could you —

14  Q    You had room enough to wave your hand around while you were

15  telling people that they were giving you the building?

16  A    Yes, ma'am.

17  Q    So at this point you haven't expressed any concern for

18  those two officers as far as this video goes, right?

19  A    I believe I was telling people to get back, ma'am.

20  Q    Did you say that?

21  A    I didn't hear myself say that.

22  Q    Did you say that?

23  A    No, ma'am, not from this video, no, not that I recall.

24  Q    Did you say that?  Simple question.

25  A    Reclarify that for me, again.

1  Q   You said you were telling people to get back.  Did you say

2  that?

3  A   It appeared that way, ma'am.

4  Q   It appeared to who?

5  A   Me, just now.

6  Q   Just you, right now?

7  A   Yes, ma'am.

8  Q   Certainly not in the video, right?

9  A   Can you replay the video for me?

10 Q   We are going to move forward.

11 A   Okay.

12 Q   You are actually telling people that the cops are leaving

13 the building here, right?

14 A   I said that they are leaving.

15 Q   They are leaving?

16 A   I don't think I said the word "building."

17 Q   You are saying the cops are leaving, but your story is that

18 you are going to get help for these two cops, right?  Right?

19 A   Yes, ma'am.

20 Q   You are able to talk clearly?

21 A   Yes, ma'am.

22 Q   Are you able to wave your hand around?

23 A   Yes, ma'am.

24 Q   You are not so crushed that you can't move or talk?

25 A   Not at that exact second, ma'am.

1  Q   And you also said your story was that someone told you to

2  get off them.  We haven't heard that person yet in this

3  recording?

4  A   No, ma'am.

5  Q   And did we hear it early?  Did we hear it when we listened

6  to this recording during your direct examination?

7  A   No, ma'am.

8  Q   Okay.  And you were certainly not so crushed that you

9  weren't able to actually leave this area, right?

10 A   No, ma'am.

11 Q   You left just 20 seconds after you said the cops were

12 leaving and giving you the building, right?

13 A   I would have to re- —

14 Q   Well, we can be approximate.

15 A   Yes, ma'am.

16 Q   Just very shortly after you said that.

17 A   If that is what you say, I will say yes, ma'am.

18 Q   I don't want to go off of what I say.  Is it fair to say

19 shortly after this scene here where you say the cops are

20 leaving you also leave?

21 A   It is fair, ma'am.

22 Q   Okay.  And it is your testimony that you left to go get

23 people help, right?

24 A   Yes, ma'am.

25 Q   Okay.

1    MS. CHO:  Let's play Exhibit 37.  Let's start at 20

2    seconds, please.

3         (The video was played for the Court.)

4         MS. CHO:  So let's hit pause.

5    BY MS. CHO:

6    Q   You see this guy in a red and black plaid jacket with a red

7    hat?

8    A   Yes, ma'am.

9    Q   Did you see he is waving at people, the crowd, down the

10   hallway?

11   A   Yes, ma'am.

12   Q   You see there is another man close by to him?  He is also

13   waving at the crowd down the hallway?

14   A   Yes, ma'am.

15   Q   Looks like he is yelling, maybe?

16   A   Yes, ma'am.

17        MS. CHO:  Let's keep on going.

18        (The video was played for the Court.)

19   BY MS. CHO:

20   Q   And then, you come running out of the crowd, right?

21   A   Yes, ma'am.

22   Q   Right after he starts waving at the crowd?

23   A   Yes, ma'am.

24   Q   You couldn't get into the House Main Door, right?

25   A   No, ma'am.

1    Q    And you wanted to get into it, right?

2    A    After I was told we could go in, ma'am.

3    Q    Yes or no, you wanted to get in?

4    A    Yes, ma'am.

5    Q    And then, somebody yelled, "Find an alternate path at that

6    door," right?

7    A    Someone did yell that at the door, ma'am.

8    Q    And then, you said, "The cops are leaving.  They are giving

9    us the building," right?  Yes or no?

10   A    No.

11   Q    You didn't say that?

12   A    No.

13   Q    You didn't say, "The cops are leaving"?

14   A    I did.

15   Q    And you didn't nod your head when they said, "They are

16   giving us the building"?

17   A    I saw me nod my head, ma'am.

18   Q    Okay.  And then, a man comes out and waves at the crowd,

19   right?

20   A    Yes, ma'am.

21   Q    And you come running?

22   A    Yes, ma'am.

23   Q    You wanted to find another path to the House Chamber,

24   right?

25   A    No, ma'am.

1   Q   So it is just a coincidence that these guys are waving you

2   towards the Speaker's Lobby Door, and you decided to run toward

3   them?

4           MR. MAYR:  Objection.  Argumentative and calls for

5   speculation, as well as lack of personal knowledge.

6           THE COURT:  No.  She has asked about him, not somebody

7   else.

8           MR. MAYR:  The question is, is it a coincidence that

9   these other people.  I mean, I don't know how --

10          THE COURT:  All right.  I didn't interpret it that

11  way, but anyway, go ahead.  Ask it in such a way that he

12  doesn't have to speculate about what other people are doing.

13  BY MS. CHO:

14  Q   So do you think that it was a coincidence that these guys

15  were waving you at the same time you were running toward them?

16          THE COURT:  That doesn't get to what they think.  It

17  is just what he thinks.

18          MR. MAYR:  That is why.

19          THE COURT:  I didn't hear an answer.

20          THE WITNESS:  Can you repeat the question.

21  BY MS. CHO:

22  Q   Do you think -- sorry.  Do you think that it was a

23  coincidence that these guys were waving towards you to come

24  over and that you came over at the same time?

25  A   I don't know, ma'am.

1   Q   And you also saw from this clip that the entire crowd also

2   follows along, right?

3   A   I haven't seen the rest of the clip, ma'am.

4   Q   Can you see the crowd in this frame?

5   A   I can see the crowd, ma'am.

6   Q   And I know you haven't seen the rest of the clip, but do

7   you know that they also follow you?

8   A   It seems like a large amount of the crowd is coming down

9   this hallway.

10  Q   So did you talk with all of them about how you-all needed

11  to go get help for those two officers?

12  A   No, ma'am.

13  Q   They all just started running at the same time as you?

14  A   Yes, ma'am.

15  Q   You said you were feeling desperate at this point, right?

16  A   Yes, ma'am or...

17  Q   That is?

18  A   Close to this point, yes, ma'am.

19  Q   Desperate to get help for the officers and the elderly,

20  right?

21  A   Yes, ma'am.

22  Q   And you were also worried about yourself?

23  A   I think later, yes, ma'am.

24  Q   And you say that when you get to the Speaker's Lobby Door,

25  you just told the officers that they needed to — and this is

1  paraphrasing — that they needed to open the door because two

2  officers were getting crushed at the other door, right?

3  A    No, ma'am.

4  Q    What did you say, then?

5  A    They needed to open the other door.

6  Q    The other door?  That is what you said?

7  A    Yes, ma'am.

8           MS. CHO:  Let's play Exhibit 61.

9       (The video was played for the Court.)

10          MS. CHO:  Let's go to the 18−second mark, please.

11  Let's go to — let's just go to 15 seconds.

12      (The video was played for the Court.)

13  BY MS. CHO:

14  Q    You are saying that you were — you said, "If you don't

15  open the other door" there?

16  A    I don't know.  It is hard for me to hear exactly what was

17  said there, that I knew, I knew, I think what I meant.

18  Q    So you meant to say, "The other door"; is that your

19  testimony?

20  A    I think I said that, "The other door" at that moment.  That

21  is what it appears to me here.

22          MS. CHO:  Let's keep going.

23      (The video was played for the Court.)

24  BY MS. CHO:

25  Q    Did you hear, "Better open the door, those people are going

1    to get crushed"?

2    A   It sounded to me, "You need to open that door."

3    Q   But not "the other door," right?

4    A   No.  That is, that —

5    Q   Let me, let me ask the questions, please.  You didn't say,

6    "The other door," right?

7    A   I am having a hard time understanding what you meant.  Are

8    you saying did I use the English word "other," or are you

9    saying was my statement about "the other door"?

10   Q   Mr. Grider, have we been speaking English this whole time?

11   A   Yes, ma'am.

12   Q   So isn't it natural to assume that I am speaking the

13   English language with you?

14   A   Yes, ma'am.

15   Q   Okay.  So my question is, just now, did you say, "Better

16   open the other door"?

17   A   I don't think that is what I heard.

18            MS. CHO:  Let's keep going.

19        (The video was played for the Court.)

20   BY MS. CHO:

21   Q   Did you hear yourself saying, "There are two cops that are

22   getting crushed and a bunch of old people because they won't

23   open the door"?

24   A   I know I was saying something to that extent, but I, I

25   wouldn't mind listening to it again if you would indulge me.

1  Q   Did you hear yourself then say, "Gotta open the door"?

2  A   I would love to hear it again if you would like to play it

3  again, ma'am.

4          THE COURT:  Go ahead and play it again.

5          MS. CHO:  Let's go back to 35 seconds, please.

6      (The video was played for the Court.)

7  BY MS. CHO:

8  Q   Did you hear yourself say, "There are two cops that are

9  getting crushed and a bunch of old people because they won't

10 open the door"?

11 A   I think that might have been what I said.

12 Q   And then, did you hear yourself say, "Gotta open the door"?

13 A   I am not totally sure that that is what I said, but I — it

14 sounded something to that nature.

15 Q   You didn't say, "Gotta open the other door," right?

16 A   If I had been speaking about the other door, I imagine I

17 was continuing to speak about the other door.

18 Q   So it was implicit in your statement; is that what you're

19 testifying?

20 A   It sounded implicit to me.

21 Q   Because it wouldn't make sense, right?

22          MR. MAYR:  Your Honor, I am going to object.  This is

23 repetitive.  The video speaks for itself.  He says, "over

24 there" at one point in the video.  The question — this is —

25 it is repetitious.

1          THE COURT:  I think part of the –– in terms of,

2    obviously, what she, what she is doing is seeing whether he is

3    agreeing, not agreeing, whether he is giving some other

4    explanations.  He gave an explanation, and she is pursuing –– I

5    think, Ms. Cho, at this point you have made your point.  Let's

6    move.

7          MS. CHO:  I am happy to move forward, Your Honor.

8    BY MS. CHO:

9    Q   You didn't call 911 for the crushed cops, right?

10   A   Cell phones weren't working, ma'am.  No.

11         THE COURT:  You need to speak up.

12         THE WITNESS:  The cell phones were not working, ma'am,

13   no.  I didn't feel like I needed to because there was cops

14   here.

15   BY MS. CHO:

16   Q   If you will just recall that they are yes–or–no questions,

17   I would really appreciate it.

18   A   I apologize.  I am very –– I am sorry.  No.

19   Q   Instead, you ask police officers to open the door, right?

20   A   I ask the police officers to open the, the other door, yes,

21   ma'am.

22   Q   And let's just –– well, we won't go on.

23         You, certainly, didn't try to go back to the other door,

24   right?

25   A   No, ma'am.

1   Q   All right.  Now, I want to talk about your testimony

2   regarding why -- when you stepped away from the door here at

3   the Speaker's Lobby Door, do you recall testifying about that?

4   A   I did testify about that, ma'am, yes, ma'am.

5   Q   You said you were trying to get away.  You had made a

6   decision to get away, and you were in the process of trying to

7   get away --

8   A   Yes, ma'am.

9   Q   -- when the shot was fired?

10  A   Yes, ma'am.

11        MS. CHO:  Let's go to Exhibit 42, and let's go to 12

12  seconds, please.

13      (The video was played for the Court.)

14  BY MS. CHO:

15  Q   So it is your testimony here today that you couldn't get

16  away from the door at that point?

17  A   No, ma'am.

18  Q   So what is it?

19  A   I was speaking to the police officers, ma'am.

20  Q   At what point are you unable to get away from the door?

21  A   Continue to take a moment to reflect?

22  Q   Of course.

23  A   Upon sitting here and reviewing the videos, I don't see a

24  point.

25  Q   At no point were you unable to leave the door, right?

1   A   Yes, ma'am.

2   Q   Now, let's talk about what happens after the shooting.  The

3   officers told you to leave, right?

4   A   I think they did, ma'am.

5   Q   Is it a yes or a no?

6   A   That is not particularly what I recall.

7   Q   Did you watch the video where officers were yelling at

8   people to leave?

9   A   Yes, ma'am.

10  Q   Were you in the same videos where they were telling people

11  to leave?

12  A   At times, ma'am, yes, ma'am.

13          THE COURT:  Keep your voices up.

14  BY MS. CHO:

15  Q   You said that you felt your presence was vital, right?

16  A   Yes, ma'am.

17  Q   You knew they were planning to take her out a way that was

18  too crowded, right?

19  A   I didn't know that, ma'am.  I suspected it.

20  Q   Okay.  And you wanted to make sure that they didn't do

21  that, right?

22  A   Yes, ma'am.

23  Q   That is why you stayed in the hallway?

24  A   One of the reasons, ma'am.

25  Q   The other reason was that you wanted to document this woman

1   dying, right?

2   A   One of the other reasons, ma'am.  Yes, ma'am.

3   Q   You wanted to take a video of someone dying?

4   A   I believe I was preserving evidence, ma'am.

5   Q   Sorry?

6   A   I was collecting evidence.

7   Q   Because you were a police officer that day, right?

8   A   No, ma'am.

9   Q   You weren't a police officer?

10  A   No, I was not.

11  Q   You were trespassing in the Capitol Building that day,

12  right?

13  A   Yes, ma'am.

14  Q   You heard -- they told you to leave, right?

15  A   I recall they, from the videos, they told the people to

16  leave.

17  Q   You didn't leave, right?

18  A   No, ma'am.

19  Q   You disregarded their order to tell you to leave?

20  A   I am not sure they told me specifically to leave.

21  Q   Did you hear them yell, "Back up"?

22  A   Yes, ma'am, from the video.

23  Q   So you heard police yell, "Back up"?

24  A   Yes, ma'am.

25  Q   And you heard them yell, "Give us space right now," right?

1   A   These things I hear from the video, yes, ma'am.

2   Q   You have heard them.  You heard them yell, "You have got to

3   get back.  They have got to get to her"?

4   A   I heard that in the videos played, yes, ma'am.

5   Q   So did you hear it, or did you just hear it in the video?

6   A   I don't remember if I heard it or if I was there, but I do

7   remember seeing it in the videos that were played.

8   Q   And you saw yourself in the videos, right?

9   A   At some point, yes, ma'am.

10  Q   But you didn't go away right away, did you?

11  A   I think I did, ma'am.

12  Q   Did you come back, then, according to your story line?

13  A   From the video it appears I did, ma'am.

14  Q   And you were there for a while, right?  You said you were

15  essential.  So did you stay because you are essential, or did

16  you leave because you are so essential?

17  A   I returned, I believe.

18  Q   And you remained because you were essential to that

19  situation you thought, right?

20  A   Yes, ma'am.

21  Q   Vital, I think you said?

22  A   I don't recall saying that.

23  Q   And that is why you remained on the scene?

24  A   Yes, ma'am.

25  Q   So you didn't leave?

1   A    No, ma'am.

2   Q    You substituted your judgment for the judgment of those

3   police officers?

4   A    Yes, ma'am.

5   Q    Just like you disregarded the tear gas that they had thrown

6   at you while you were in a crowd trespassing on the Grounds?

7   A    Yes, ma'am.

8   Q    Just like you disregarded the alarm going off when you

9   walked into the building?

10  A    Yes, ma'am.

11  Q    Just like you disregarded the police lines that you walked

12  past?

13  A    No, ma'am.

14  Q    You didn't stop until the day was over and a woman was

15  shot, right?

16  A    No, ma'am.

17  Q    Let's talk a little bit more about your version of the day

18  itself.  You testified that you thought the events at the

19  Capitol were the second part of President Trump's rally, right?

20  A    Yes, ma'am.

21  Q    You said you were excited to see speakers?

22  A    Yes, ma'am.

23  Q    You thought you would see a Senator?

24  A    Yes, ma'am.

25  Q    You thought you would get to hear from the President?

1    A    Yes, ma'am.

2    Q    But that at times things started to spiral, right?

3    A    Yes, ma'am.

4    Q    And you were confused about why they were spiraling?

5    A    Yes, ma'am.

6    Q    But you were sometimes excited because you were maybe going

7    to get to hear speakers, right?

8    A    Yes, ma'am.

9    Q    But you weren't confused when you were getting ready to go

10   to DC, right?

11   A    You — I don't know what you mean by "confused."

12   Q    Did you experience any of these confusion emotions and

13   feelings when you were getting ready to go to DC?

14   A    Yes, ma'am.

15   Q    What were you confused about?

16   A    I was worried there would be some counterprotesters.

17   Q    Okay.  Let's look at — let's talk more about that.  Back

18   up a little bit.  You said you didn't decide to go to DC until

19   the day before, right?

20   A    Yes, ma'am.

21   Q    It wasn't your idea to go in the first place?

22   A    Yes, ma'am.

23   Q    It was Jesse Bowen's idea?

24   A    Yes, ma'am.

25   Q    But that after you talked to your neighbor Mr. McLean, you

1  felt like it was maybe the last time you would get to see

2  President Trump, right?

3  A   Yes, ma'am.

4  Q   You said it was like a favorite band on a final concert

5  tour?

6  A   Yeah.

7  Q   So you called Jesse the night of January 5th and said you

8  would go?

9  A   Yes, ma'am.

10 Q   Then you got worried about Antifa?

11 A   I think I have been worried for a while, ma'am.

12 Q   You started looking up Antifa on the Internet?

13 A   Yes, ma'am.

14 Q   I think you said you were concerned about what could happen

15 if a big crowd of Trump supporters ran into a big crowd of

16 Antifa, right?

17 A   I think I was more worried about a small crowd of Trump

18 supporters running into a large crowd of Antifa.

19 Q   You started looking up the Proud Boys, you said?

20 A   I did.

21 Q   You were wondering if they might provide protection in DC

22 on January 6th?

23 A   Yes, ma'am.

24 Q   Let's look at what I have marked —

25         MS. CHO:  Let's look at Exhibit 122.  Let's zoom in on

1    the green message, please.

2    BY MS. CHO:

3    Q   Mr. Grider, do you see that that is your phone number at

4    the top of this message?

5    A   Yes, ma'am.

6    Q   It is after the from?

7    A   Yes, ma'am.

8    Q   Do you see that this message appears to contain a YouTube

9    video link?

10   A   Yes, ma'am.

11   Q   And I don't expect you to, but do you recognize what that

12   link is?

13   A   No, ma'am.

14   Q   Would it surprise you if it were a link to a Proud Boys

15   Antifa clash video?

16   A   No, ma'am.

17   Q   Is it fair to say it is likely one of the videos that we

18   have looked at during the course of this -- or we have

19   discussed in the course of this trial previously?

20   A   Can you repeat the question.  I am sorry.

21   Q   Is it -- would it be fair to say that this video is one

22   that we have discussed during the course of this trial already?

23   A   If you tell me it is, I believe you.

24   Q   Well, I certainly am not going to tell you what things are.

25   So let's look at -- if you could note for us the last five

1    characters of that YouTube link.

2        Let me shortcut this.  Do you see the last five characters

3    are 23h2Q?

4    A   Yes, ma'am.

5    Q   And if we look back at Government's Exhibit 119 —

6    A   Would you like for me to clear the screen, ma'am?

7            MS. CHO:  Please.

8    BY MS. CHO:

9    Q   Do you see the top line in the chart on 119, the last five

10   characters of the Exhibit 69 video link is 23h2Q?

11   A   Yes, ma'am.

12   Q   Do you see the description of the video, Far-right Marchers

13   Clash with Antifa Fascists in Portland/*Guardian News*?

14   A   Yes, ma'am.

15   Q   Let's go back to 122 and focus in on that same message.  So

16   does it look like you are sending somebody that same video?

17   A   Yes, ma'am.

18   Q   What is the date on that?

19   A   January 2nd, ma'am.

20   Q   Okay.  Let's see what the response is.  Do you see that

21   this is Jesse responding?

22   A   Yes, ma'am.

23   Q   Is this Jesse Bowen?

24   A   Yes, ma'am.

25   Q   Do you see that he says, "I'm ready to rumble with those

1   A-holes.  We could fly into Boston"?

2   A    Yes, ma'am.

3   Q    That is also on January 2nd, right?

4   A    Yes, ma'am.

5   Q    Maybe it is a little bit earlier than January 5th that you

6   start talking about going to DC, right?

7   A    It was, ma'am.

8   Q    At that point you don't respond to Jesse, "No, I'm

9   concerned about Antifa violence," right?

10  A    Not in these text messages, ma'am.

11  Q    You don't write back, I am sending you this link because I

12  am worried that we might encounter violence or anything to that

13  effect, right?

14  A    After these messages that he sent me, ma'am?

15  Q    You don't respond after these messages he sends you

16  expressing concern about the video link you sent him?

17  A    No, ma'am.

18  Q    And then —

19  A    Well, let me rephrase that, ma'am.  Could you show me the

20  next text messages that were sent, ma'am?

21  Q    Yes.

22          MS. CHO:  Let's go to the next page.

23  BY MS. CHO:

24  Q    Is there anything you want to add to your answer?

25  A    Can I continue seeing the text messages, ma'am?

1    Q    Of course.  At least at this time —

2    A    Can, can, can you reshow me the next text message, the

3    previous ones you showed me to remind me?

4    Q    Sure.

5    A    These, these, these are 10:00 p.m.  It doesn't look like I

6    responded, ma'am.  I, I appreciate you indulging me.

7              MS. CHO:  Let's keep going.

8    BY MS. CHO:

9    Q    You also texted that link to that Antifa clash video to

10   your neighbor David McLean, right?

11   A    If you say I did, I did.  I don't remember doing it.

12   Q    Again, I would ask you to simply answer the question based

13   on what you know.

14   A    I don't know, ma'am.

15             MS. CHO:  So let's look at Exhibit 69.  Let's focus on

16   the first green message.

17   BY MS. CHO:

18   Q    That is you again, right?

19   A    Yes, ma'am.

20   Q    You're texting David McLean?

21   A    Yes, ma'am.

22   Q    The video link ends in 23h2Q?

23   A    Yes, ma'am.

24   Q    This time you have a message, right?

25   A    Yes, ma'am.

1   Q   It says, "Tomorrow"?

2   A   Yes, ma'am.

3   Q   This is on January 5th, the evening, right?

4   A   Yes, ma'am.

5   Q   Do you remember what Mr. McLean says?

6   A   No, ma'am.

7   Q   Let's look at his response.  What does he say?

8   A   "Tomorrow will be the start of the shit hitting the fan,"

9   exclamation point, three times.

10  Q   You don't say anything about being concerned about your

11  safety, right?

12  A   Not through text message, ma'am.

13  Q   You don't say, "Dave, look, I sent you this link because I

14  am worried about Antifa violence"?

15  A   No, I did not say that.

16  Q   So this is around 8:33 p.m. the night before, right?

17  A   Yes, ma'am.

18          MS. CHO:  Let's go back to now Exhibit 70.  Let's go

19  back to some text messages with Jesse, and let's blow up the

20  first message.

21  BY MS. CHO:

22  Q   So here, this is you again, right?

23  A   Yes, ma'am.

24  Q   And you're sending another web link to Jesse; is that

25  right?

1   A   Yes, ma'am.

2           MS. CHO:  And then, let's see what Jesse's response

3   is.  I guess you sent another message — my apologies.  Let's

4   blow that up.

5   BY MS. CHO:

6   Q   This is you again, right?

7   A   Yes, ma'am.

8   Q   And this is another link ending in —— it is the same link,

9   right?

10  A   Yes, ma'am.

11  Q   What is the date on your sending Jesse this link, again?

12  A   January 5th, ma'am.

13  Q   You send him the link twice, right?

14  A   Yes, ma'am.

15  Q   After he said, "I am ready to rumble with those A-holes"?

16  A   Yes, ma'am.

17          MS. CHO:  Let's keep going.

18  BY MS. CHO:

19  Q   And what is Jesse's response?

20  A   "Bro, they knocked the guy off a wheelchair," exclamation

21  points added.  "Looks like they smacked the perp pretty good,"

22  more exclamation points.

23  Q   You don't at this point voice your concern about the

24  Antifa, right?

25  A   Not through text message, if I remember correctly from

1   seeing these earlier this week.

2   Q   Okay.  Instead, you go on to tell Jesse, "Bro, the memo is

3   all black"?  Do you remember that?

4   A   I remember saying that in these text messages.

5   Q   You said, "Wear black," right?

6   A   I remember seeing that in these text messages.

7   Q   So you had read about Antifa and Proud Boys on social media

8   and the news, right?  I think that is what you testified?

9   A   Yes, ma'am.

10  Q   You read or saw that the Proud Boys were telling people to

11  wear black on January 6th, right?

12  A   I don't know, ma'am.

13  Q   You don't know?

14  A   No, ma'am.

15  Q   Okay.  You read or saw that the Proud Boys said that so

16  that people could blend in with Antifa, right?

17  A   No, ma'am.

18  Q   No?  So you don't know whether you read about Proud Boys

19  telling people to wear black on January 6th, but you definitely

20  didn't read about the reason being to blend in with Antifa?

21  Yes or no?

22  A   Neither one, ma'am.

23  Q   Neither one, what?

24  A   I don't remember any of that, ma'am.

25  Q   You don't remember any of that?

A    Yes, ma'am.

Q    So which one is it, you don't know, you don't remember, which one?

A    Ma'am, I don't want to be disrespectful, but I am not sure if your questions are clear.  So it seems like my answer would be the same no matter what I answer.

Q    Well, either you don't know what happened, what you read, what you saw, or you don't have a memory of what you saw.

A    I do not remember seeing that.

Q    Okay.  But you read about Proud Boys?

A    I have read about Proud Boys just like anyone else in the news over the years.

Q    You read about them the night before January 6th, right?

A    It appears that way through these text messages.

Q    Yes or no?

A    Yes, ma'am.

Q    You wanted to be like the Proud Boys?

A    No, ma'am.

Q    Well, let me back up a little bit.  You, you own a gun, right?  You owned a gun, at least?

A    Yes, ma'am.

Q    And you have maybe owned several guns, right?

A    Yes, ma'am.

Q    And after you read about the Proud Boys, then, you started Googling about concealed carry gun laws in DC, right?

1  A    I don't know the sequence, ma'am.

2  Q    Sorry?

3  A    I don't know the sequence that you showed me the other day,

4  ma'am.

5  Q    Would it be fair to say based on your memory of the

6  evidence that you began Googling concealed carry laws in DC

7  after looking at Proud Boys?

8  A    No, ma'am.  I don't remember the precise sequence.

9          THE COURT:  You don't remember Googling, or you don't

10  remember looking up concealed weapons laws?

11          THE WITNESS:  I don't remember Googling or looking

12  up — both, ma'am.  I don't remember either.  I don't remember

13  the sequence she talked about.  I do remember her showing it to

14  us in court.

15  BY MS. CHO:

16  Q    So are you trying to say that you didn't do those things?

17  A    No, ma'am.

18  Q    So what are you trying to say?

19  A    I am saying I don't remember it, and I am saying I did not

20  memorize the sequence that you presented the evidence on here

21  the last time you were here.  You asked me a question about the

22  sequence of your evidence presentation, and I told you I did

23  not remember.

24          MS. CHO:  So let's look at 65.

25  BY MS. CHO:

1  Q   Do you see that 65 has a line at the top that says,

2  "Contact us, Proud Boys"?

3  A   Yes, ma'am.

4  Q   Do you see there is a date January 6, 2021, 12:26:15 a.m.?

5  A   Yes, ma'am.

6        MS. CHO:  Let's go to 66.

7  BY MS. CHO:

8  Q   Do you see District of Columbia concealed carry gun laws?

9  A   Yes, ma'am.

10 Q   This one has a time of 12:11 a.m. on January 6th, right?

11 A   Yes, ma'am.

12 Q   That is a little bit before the Proud Boys' search?

13 A   Yes, ma'am.

14        MS. CHO:  Let's look at 67.

15 BY MS. CHO:

16 Q   And this one is, "Can you carry a gun in Washington, DC,"

17 right?

18 A   Yes, ma'am.

19 Q   That is a search from your phone, right?

20 A   That is how you have represented it, ma'am, I believe you.

21 Q   Sir, is it a search from your phone or not?

22 A   Yes, ma'am.

23 Q   And that is from around 12:12 a.m., January 6?

24 A   Yes, ma'am.

25 Q   So I will correct myself.  Was it all around the same time

1    that you were searching Proud Boys, searching whether you could

2    carry a gun in DC?

3    A    Yes, ma'am.

4    Q    Because you wanted a revolution on January 6th?

5    A    No, ma'am.

6    Q    That was what was on your mind that night, right?

7    A    No, ma'am.

8    Q    No?

9    A    No.

10   Q    You weren't thinking about a revolution on January 5th?

11   A    No, ma'am.

12           MS. CHO:  Let's look at Exhibit 70.  Let's go to

13   page 3.  Let's blow up the first green message.

14   BY MS. CHO:

15   Q    Do you see that this is one of the YouTube links that you

16   sent to Jesse?

17   A    Yes, ma'am.

18   Q    What is the date and time of this link?

19   A    January 5th at 8:40.

20   Q    And you can see that the link ends in 3SVS8, right?

21   A    Yes, ma'am.

22   Q    And you said that is at 8:40 the night before, right?

23   A    Yes, ma'am.

24   Q    You sent the same link to your wife, right?

25   A    I don't recall, ma'am.

1          MS. CHO:  Let's look at Exhibit 123, and — oops,

2    sorry.  Let's blow up the first message on top.

3    BY MS. CHO:

4    Q   Does that look like a message from Crystal?

5    A   Yes.

6    Q   That is your wife, right?

7    A   Yes.

8          MS. CHO:  And then, let's look at the next message.

9    BY MS. CHO:

10   Q   Does that look like a message from you again?

11   A   Yes, ma'am.

12   Q   And is the YouTube link the same ending in SVS8?

13   A   Yes, ma'am.

14   Q   What time is this message?

15   A   8:41.

16   Q   Just almost exactly the same time you are texting Jesse the

17   same link?

18   A   Yes, ma'am.

19         MS. CHO:  And then, let's keep going.

20   BY MS. CHO:

21   Q   What does Crystal say to you?

22   A   "I'm headed home."

23   Q   Okay.

24         MS. CHO:  Let's take a look at the link.

25   BY MS. CHO:

1    Q    You sent it to both Crystal and Jesse, right?

2    A    Yes, ma'am.

3    Q    I assume you have seen the movie *Les Mis*?

4    A    Yes, ma'am, many times.

5    Q    And you sent them a clip from that movie, right?

6    A    Yes, ma'am.

7    Q    Okay.

8         MS. CHO:  Let's pull up, and this is in the Grider

9    cross folder?

10        THE COURT:  You have to talk — if you want this on

11   the record, you need to talk into the microphone.

12        MS. CHO:  I am going to play for you the clip ending

13   in SVS8.

14   BY MS. CHO:

15   Q    Before we hit play, Mr. Grider, this is the clip that you

16   sent your wife and the friend that you were going to DC with,

17   right?

18   A    Yes, ma'am.

19   Q    And people are singing a song, right?

20   A    Yes, ma'am.

21   Q    It is about the night before a revolution?

22   A    The name of the song is *One Day More*.

23   Q    So is it about the night before a revolution?  If you are

24   not sure —

25   A    Yes.  I think it is.

1    Q    Okay.  So we are going to listen to this clip that you

2    sent your wife and Jesse because it is a message that you sent

3    them, right?

4    A    Yes, ma'am.

5    Q    And I want to pay close attention to the words that people

6    are singing, and I am going to ask you about some of them after

7    we are done.

8    A    Yes, ma'am.

9              MS. CHO:  Let's hit play.

10         (The video was played for the Court.)

11   BY MS. CHO:

12   Q    So Mr. Grider, is that the clip you sent your wife and the

13   guy you were going to DC with the night before January 6th?

14   A    Yes, ma'am.

15   Q    And in the song they sing things like, "*The time is here,*

16   *the day is here, one day more, one day more to revolution,*"

17   right?

18   A    Yes, ma'am.

19   Q    "*One day to a new beginning, raise a flag of freedom high,*

20   *every man will be a king*"?

21   A    Yes, ma'am.

22   Q    "*There is a new world for the winning.  There is a new*

23   *world to be won*"?

24   A    Yes, ma'am.

25   Q    And the next day, on January 6, you joined with the crowd,

1  right?

2  A    Yes, ma'am.

3  Q    At the Capitol?

4  A    Yes, ma'am.

5  Q    At one point you yelled, "Hold the line"?

6  A    I don't recall, but if you would like to show me I can

7  comment on it.

8  Q    Did you testify yesterday that you said, "Hold the line" in

9  a video?

10  A    I don't recall it.

11  Q    Okay.  You yelled, "Our house"?

12  A    Yes, ma'am.

13  Q    You yelled, "Stop the Steal"?

14  A    Yes, ma'am.

15  Q    You yelled something about "reinforcements"?

16  A    Yes, ma'am.

17  Q    You yelled, "Let us in, or I will go in"?

18  A    Yes, ma'am.

19  Q    Like you were in a battle?

20  A    No, ma'am.

21  Q    You knew what was going on at the Capitol that day?

22  A    Bit by bit, ma'am.

23  Q    Sorry?

24  A    I learned like everyone else, ma'am.

25  Q    Well, you knew that Senators and Congressmen would be

1  there, right?

2  A    Yes, ma'am.

3  Q    You knew they were counting votes that day?

4  A    Yes, ma'am.

5  Q    You thought Ted Cruz might be there, for example?

6  A    Yes, ma'am.

7  Q    Objecting to the vote, right?

8  A    Yes, ma'am.

9  Q    You knew Nancy Pelosi was there?

10  A    Suspected it, ma'am.

11  Q    Well, you did see the sign for Nancy Pelosi's office,

12  right?

13  A    Yes, ma'am.

14  Q    At that point did you suspect that Nancy Pelosi had an

15  office in that building?

16  A    Yes, ma'am.

17  Q    And that she might be there counting votes too?

18  A    I wasn't sure that it was, that, that the House — I

19  thought it was just the Senate doing it, ma'am.

20  Q    You knew that the Senate would be there counting votes?

21  A    Yes, ma'am.

22  Q    You saw that Steny Hoyer had an office there, right?

23  A    Yes, ma'am.

24  Q    You knew he would be there?

25  A    I, I didn't know for sure, ma'am.

1   Q   And your story has been that you wanted to hear some of

2   these people speak, right?  You thought there might be speakers

3   like at a rally?

4   A   Yes, ma'am.

5   Q   But you didn't go there to hear anyone speak.

6   A   I did.

7   Q   You went there to be heard, right?

8   A   That is what Trump said, ma'am.

9   Q   You're saying you didn't say you went there to be heard?

10  A   No.  I want to be heard, yes, ma'am.

11  Q   You said you went there to be heard, right?

12  A   Yes, ma'am.

13  Q   And being heard is the opposite of listening to other

14  people speak, right?

15  A   Not — not necessarily.

16  Q   Okay.  But you wanted to be heard that day?

17  A   Yes, ma'am.

18          MS. CHO:  So let's take a look at Exhibit 14 — I am

19  sorry, 114.  Let's play through 37 seconds.  Before we go — I

20  am sorry.

21  BY MS. CHO:

22  Q   This is a video that you took of yourself, right?

23  A   Yes, ma'am.

24  Q   And it — does around 5:00 p.m. on January 6th sound like

25  the correct time or approximate time at which you took this

1  video?

2  A   It could have been, ma'am.

3  Q   Was it at least after you had left the interior of the

4  Capitol Building?

5  A   Yes, ma'am.

6  Q   But no later than the next day, right?

7  A   Yes, ma'am.

8        MS. CHO:  Let's play until 37 seconds.

9     (The video was played for the Court.)

10       MS. CHO:  Hit pause.

11  BY MS. CHO:

12  Q   So first of all, in this video you didn't say anything

13  about how you had gone to the Capitol thinking that it was an

14  extension of the rally, right?

15  A   No, ma'am.

16  Q   And you didn't say anything about how things spiraled, and

17  you questioned whether it was really a permitted rally anymore,

18  right?

19  A   No, ma'am.

20  Q   You didn't say anything about how you had been hoping to

21  hear from speakers?

22  A   No, ma'am.

23  Q   How you thought you would hear from Senator Cruz or

24  President Trump?

25  A   No, ma'am.

1  Q   And you didn't talk about that version of your story in any

2  of the texts with your wife, right, that you wanted to hear

3  people speak, and you thought it was the rally, Part 2?

4  A   I don't recall, ma'am.

5  Q   We will get to that in a minute.  You didn't talk about

6  that version of your story in text messages with Jesse, right,

7  that you thought that the rally was continuing at the Capitol

8  but that it spiraled?  You were hoping to see speakers?  You

9  didn't talk about that in your text with Jesse?

10 A   I don't recall that, ma'am.

11 Q   You didn't talk about those with your mom, either, right,

12 in your texts with your mom?

13 A   I don't recall, ma'am.

14 Q   Now, going back to the video itself and what you did say,

15 you said thousands of people were trying to get through to be

16 able to come in and be heard, right?

17 A   Yes, ma'am.

18 Q   That they were trying to get through the second floor,

19 Speaker's Chamber, right?

20 A   You would have to replay it for me.

21       MS. CHO:  Let's go back.

22    (The video was played for the Court.)

23 BY MS. CHO:

24 Q   Did you hear that now?

25 A   I said, there was a girl or something to that effect

1    outside the Speaker's Chamber.

2    Q    You knew at least right after you left the building that

3    you had been at the Speaker's Chamber, right, or you thought

4    you had?

5    A    Yes, ma'am.

6            MS. CHO:  And let's keep going.

7        (The video was played for the Court.)

8    BY MS. CHO:

9    Q    And that is when you said thousands of people trying to get

10   through and be heard?

11   A    Yes, ma'am.

12   Q    That included you, right?

13   A    At one time, ma'am.

14   Q    You wanted to be heard?

15   A    Yes, ma'am.

16   Q    And you wanted to be heard by somebody, right?

17   A    Yes, ma'am.

18   Q    You wanted to be heard by someone with authority?

19   A    Yes, ma'am.

20   Q    Someone who might have input on the election vote count?

21   A    Yes, ma'am.

22   Q    Someone who mattered, right?

23   A    Yes, ma'am.

24   Q    You wanted to be heard by members of Congress?

25   A    Yes, ma'am.

1   Q   Because they were counting the votes that day?

2   A   Yes, ma'am.

3   Q   And whoever was behind the Speaker's Lobby door, right?

4   A   No, ma'am.

5   Q   Well, you had just walked past Nancy Pelosi's office,

6   right?

7   A   Yes, ma'am.

8   Q   You had walked past Steny Hoyer's office, right?

9   A   Yes, ma'am.

10  Q   You already said you thought Ted Cruz might be there,

11  right?

12  A   Yes, ma'am.

13  Q   You knew they worked in that building, right?

14  A   Yes, ma'am.

15  Q   You saw people who appeared to work at the Capitol on the

16  other side of the door, right?

17  A   Yes, ma'am.

18  Q   You saw them being evacuated?

19  A   Yes, ma'am.

20  Q   You saw them trying to get away from you?

21  A   I don't know exactly who, ma'am.

22  Q   You saw people, you will agree, who appeared to work at the

23  Capitol, right?

24  A   Yes, ma'am.

25  Q   You saw them getting away from you?

1    A    I didn't know who, ma'am.

2    Q    The people that appeared to work at the Capitol, they were

3    trying to get away from you, right?

4    A    I am not sure.  You will have to ask them, ma'am.

5    Q    Were they walking away from you, Mr. Grider?

6    A    They were walking away from where I was at, ma'am.

7    Q    You, right?  Where you are at is you?

8    A    Yes, ma'am.

9    Q    Okay.

10         THE COURT:  We should probably stop at some point in

11   here for the morning break.  You tell me at what point you are

12   entering your inquiries.

13         MS. CHO:  Yes.

14         I want to play Exhibit 83.  Well, you know, what?

15   Let, let's put that down.

16   BY MS. CHO:

17   Q    You thought there were nefarious things with the election,

18   your words, right?

19   A    Yes, ma'am, or -- possible nefarious things, ma'am.

20   Q    Possible.

21         MS. CHO:  Let, let's pull up Exhibit 113, then.  And

22   let's play from the beginning.  This is another one of your

23   videos, right, Mr. Grider?

24         THE WITNESS:  Yes, ma'am.

25         MS. CHO:  Again, taken very shortly after you leave

1   the building?

2            THE WITNESS:  Yes, ma'am.

3        (The video was played for the Court.)

4   BY MS. CHO:

5   Q    You were also worried about the possibility of fictitious

6   ballots being added to the count, right?

7   A    I didn't know if it was.  I was curious, ma'am.

8   Q    But you talked about fictitious ballots being added to the

9   count, right?

10  A    It was a possibility I had read about in the news.

11  Q    So did you talk about it?

12  A    Yes, ma'am.

13  Q    The count refers to the count of the Electoral College

14  votes, right?

15  A    Excuse me, ma'am?

16  Q    The count, when you say added to the count, you were

17  referring to the Electoral College vote, right?

18  A    No, ma'am.

19  Q    What were you referring to?

20  A    The actual vote on election day, ma'am.

21  Q    Okay.  Then, why were you talking about it in relation to

22  your day at the Capitol?

23  A    Because I think I was asked a specific question, and this

24  video is an answer to that question, ma'am.

25  Q    It is your testimony that your comment regarding added to

1   the count had nothing to do with January 6th?

2   A   No, ma'am.  It had to do with the original election, ma'am.

3   Q   Which relates to January 6 too, right?

4   A   Roundaboutly, I don't think that is what you meant, but

5   yes, ma'am, it has to.

6   Q   You testified that you knew that you needed 270 Electoral

7   College votes to win, and that it had to be officially

8   certified, right, you testified to that?

9   A   Yes, ma'am.

10  Q   The official certification of the votes occurs on

11  January 6th, right?

12  A   Yes, ma'am.

13  Q   Okay.  You were there because you wanted to help President

14  Trump, right?

15  A   Support, I believe is the word I used, ma'am.

16        MS. CHO:  Let's pull up Exhibit 120.  Let's blow up

17  the last message on 120.

18  BY MS. CHO:

19  Q   This appears to be a message from your mother, right?

20  A   Yes, ma'am.

21  Q   And it is dated January 5th at 10:22 p.m., right?

22  A   Yes, ma'am.

23  Q   She says, "He may need more help on the 20th," right?

24  A   Yes, ma'am.

25  Q   "He" refers to Donald Trump, right?

1    A    Yes, ma'am.

2    Q    Obviously on the 20th, what occurs?

3    A    Inauguration.

4    Q    Okay.  Then you responded a few seconds later, right?

5    A    I don't know, ma'am.  You have to show me.

6            MS. CHO:  Let's keep going.

7    BY MS. CHO:

8    Q    You sent her another YouTube link, right?

9    A    Yes, ma'am.

10   Q    Okay.  You also —

11           MS. CHO:  We can take that down.

12   BY MS. CHO:

13   Q    You also sent messages with your mother about getting them

14   out of the creek, all right, and DC; do you remember that?

15   A    I, I think I saw it in either discovery or something that

16   you showed me.

17   Q    What was that about?

18   A    I don't know.

19   Q    And then, your mother responded, "Good, and block their

20   path so they can't come back"; do you remember that?

21   A    There was something to that effect, ma'am, from what I saw

22   in discovery or what you showed previously.

23   Q    It is your testimony that you don't know what you were

24   talking about?

25   A    No, ma'am.  Would you like to show it again, ma'am?

1  Q   I will ask the questions.

2  A   I apologize.

3  Q   I want to look back at Exhibit 123.  These are the text

4  messages with your wife.

5          THE COURT:  I think this might be —

6          MS. CHO:  Oh, I —

7          THE COURT:  One more question?  Go ahead.

8          MS. CHO:  I am almost done, Your Honor.  I think I

9  will have about five minutes.

10          If we look at Exhibit 123, and we will start on

11 page 8.  If we could focus on the first set of messages that we

12 can.

13 BY MS. CHO:

14 Q   Do you see these messages from your wife?

15 A   Yes, ma'am.

16 Q   And the first one begins at January 6, 1:15 p.m., right?

17 A   Yes, ma'am.  I, is that — yes, ma'am.

18 Q   She says, "Oh, my God, what happened?"

19 A   Yes, ma'am.

20 Q   "Did the tear gas y'all?"

21 A   Yes, ma'am.

22 Q   "What happened?"

23 A   Yes, ma'am.

24 Q   "Are you okay?"

25 A   Yes, ma'am.

1          MS. CHO:  And then, let's go down to the bottom.

2     BY MS. CHO:

3     Q    You respond, "Yes," at 1:20 p.m., right?

4     A    Yes, ma'am.

5     Q    So this is while you are at the Capitol on January 6th,

6     right?

7     A    Yes, ma'am.

8     Q    She is worried about you?

9     A    Yes, ma'am.

10         MS. CHO:  Let's go on to the next page.  Let's, again,

11    focus on the first set.

12    BY MS. CHO:

13    Q    She goes on to say, "My heart is racing, and I feel so

14    helpless.  Did they attack you"; is that right?

15    A    Yes, ma'am.

16    Q    Okay.  "They did pepper spray y'all.  I hope you have an

17    inhaler."  Did she say that?

18    A    Yes, ma'am.

19    Q    "The police?"

20    A    Yes, ma'am.

21    Q    "This is not good.  You need to get out of there."

22    A    Yes, ma'am.

23    Q    You didn't get out of there at that point, right?

24    A    No, ma'am.

25    Q    And you do respond next, right?

1  A   Yes, ma'am.

2  Q   You say, "Police"?

3  A   Yes, ma'am.

4  Q   And that is at 3:03 on the 6th?

5  A   Yes, ma'am.

6          MS. CHO:  Let's keep going.  Let's see.

7  BY MS. CHO:

8  Q   Do you see where she asks, "They really killed her?"

9  A   Yes, ma'am.

10 Q   "Did you get it on video?"

11 A   Yes, ma'am.

12 Q   And then she says, "Holy shit, are you in the Capitol

13 Building?  You better get out of there."

14 A   Yes, ma'am.

15 Q   That is at 3:09 p.m., right?

16 A   Yes, ma'am.

17 Q   And she goes on.  She says, "Get out of there now.  They

18 are ordering the National Guard down on y'all.  Get out of

19 there now."  Is that what she says?

20 A   Yes, ma'am.

21 Q   Then, does she go on to say, "They are not going to stop

22 shooting people"?

23 A   Yes, ma'am.

24 Q   She keeps going, right?  She is worried about you?  Did she

25 say, "What the hell are you doing in the front?"

1   A   Yes, ma'am.

2   Q   "Get out of there"?

3   A   Yes, ma'am.

4   Q   And then, she says, "I just saw a video of it."

5   A   Yes, ma'am.

6   Q   She goes on, and she says, "Now, it's just going to get

7   more violent," right?

8   A   Yes, ma'am.

9   Q   "They are going to release more tear gas, and they are

10  going to fully enforce the 6:00 p.m. curfew."

11      And then, she goes on to say, "Please continue to let me

12  know how you are doing," right?

13  A   Yes, ma'am.

14  Q   That is at 3:55?

15  A   Yes, ma'am.

16  Q   And your response, "At 4:02 is leaving now," right?

17  A   Yes, ma'am.

18  Q   You say, "I'm in kinda shock"?

19  A   Yes, ma'am.

20  Q   She responds?  "Yes, me too.  Is Jesse with you?  Did y'all

21  find each other," right?

22  A   Yes, ma'am.

23          MS. CHO:  Then we keep going.

24  BY MS. CHO:

25  Q   You say, "We met some old guys who invited us off the

1   street and to their apartment.  We are done," right?

2   A   Yes, ma'am.

3   Q   You testified earlier, that you had stayed at an Airbnb

4   that Jesse had introduced the tenants to you of?

5   A   Yes, ma'am.

6   Q   Okay.  And then, your wife asked you some questions about

7   that.  "Okay.  Are you staying the night with them, or are you

8   getting a hotel?  Are you still close," right?

9   A   Yes, ma'am.

10  Q   You say, you don't know, right?

11  A   Yes, ma'am.

12  Q   She is worried about you still.  She asks, "Are they going

13  to murder you in your sleep," among other things?

14  A   What does it say?  I am sorry.

15  Q   Does she ask you if they are going to murder you in your

16  sleep?

17  A   Yes, ma'am.

18          MS. CHO:  Let's keep going.

19  BY MS. CHO:

20  Q   I would imagine that she was pretty stressed out about what

21  was going on with you that day, right?

22  A   Yes, ma'am.

23  Q   She was worried that you had been inside the Capitol?

24  A   Yes, ma'am.

25  Q   That you were at the front?

1   A   Yes, ma'am.

2   Q   So you keep on talking, and you say, "Probably not sleeping

3   here.  We had to get off the street," right?

4   A   Yes, ma'am.

5   Q   And then, she says, "I am so scared for you.  This has been

6   so nerve racking.  I wish you would not have gone," right?

7   A   Yes, ma'am.

8   Q   And your response?  "I was meant to happen."  Do you see

9   that?

10  A   Yes, ma'am.

11  Q   What time is it?

12  A   4:40, ma'am.

13  Q   And just so that we are clear, let's go to the next page.

14  A   I believe probably it was meant to happen.

15          THE COURT:  You are dropping your voice.

16          THE WITNESS:  It was probably —— it was meant to

17  happen, a typo.

18  BY MS. CHO:

19  Q   And let's just —— she says, "Okay," right?

20  A   Yes, ma'am.

21  Q   And then, your next response, you correct your typo, right?

22  A   Yes, ma'am.

23  Q   So what you said was, "It was meant to happen"?

24  A   My doing that is what I believe I was referring to.  Maybe

25  we can look back, ma'am.

1  Q   Did you say, "It was meant to happen"?

2  A   Yes, ma'am.

3  Q   Sitting here today, you can agree that what happened on

4  January 6th was not a rally, right?

5  A   I don't want to — this is a, I don't want to say the wrong

6  thing or you had me, trip me up or something.  I don't want to

7  say it wasn't a rally, and then, you say, it was a rally.  So

8  it was a rally and not a rally.

9          THE COURT:  Mr. Grider, stop worrying about her

10  motivations.  Listen to her question and answer it.

11          THE WITNESS:  If you referring to what happened at the

12  Capitol Building, it was not a rally, ma'am.

13  BY MS. CHO:

14  Q   And you said you had been to two Trump rallies before,

15  right?

16  A   Yes, ma'am.

17  Q   Were you tear gassed at either of those?

18  A   No, ma'am.

19  Q   Did you have to climb up a bike rack to get into either of

20  those?

21  A   No, ma'am.

22  Q   Did you have to walk into a building with shattered glass

23  and alarms to get into either of those?

24  A   No, ma'am.

25  Q   Was there a shooting after a mob broke a window at any of

Vol. 5 - 760

1  those?

2  A   I don't know, ma'am.

3  Q   You don't know?

4  A   I don't know.  None of mine, ma'am, no.  I am sorry.

5  Q   Okay.  So on January 6th, you got what you expected, right?

6  A   No, ma'am.

7  Q   But it was meant to happen?

8  A   I believe God is in control of everything, ma'am.

9  Q   What you said was, it was meant to happen, yes or no?

10  A   That is what I sent in a text message, ma'am.

11  Q   Yes or no?

12  A   Yes, ma'am.

13          MS. CHO:  One moment, please.

14          No further questions.

15          THE COURT:  All right.  Then, we will take a break at

16  this point.  Ten after 11:00 for any redirect, I assume.  Are

17  you doing redirect, or do you need to think?

18          MR. MAYR:  I probably will.  I just don't think it

19  will be very long is what I can tell you right now.

20          THE COURT:  That is fine.  I am just trying to figure

21  out.  We will do the 15 minutes, so ten after 11:00.  You can

22  step down, sir.

23          THE WITNESS:  Yes, ma'am.

24                          (Witness excused.)

25          (Brief recess, 10:54 a.m. – 11:18 a.m.)

1                         AFTER RECESS

2          THE COURT:  All right, Mr. Grider, if I could ask you

3    to come back up.

4              (Witness resumes.)

5          THE COURT:  We are at redirect at this point.

6          MR. MAYR:  Thank you, Your Honor.

7                    **REDIRECT EXAMINATION**

8    BY MR. MAYR:

9    Q   Mr. Grider, did you ever think that the Government was

10   going to try to use Les Mis to convict you of a serious felony

11   offense?

12   A   No, sir.

13   Q   Could you please, for the Court, with as much detail as

14   possible, explain to everyone the significance of that

15   particular clip and why you were sending it to your friends and

16   family members before coming up here to Washington, DC.

17   A   I sent that clip — well, let me — Les Mis is, has always

18   been my wife's favorite musical.  She was really borderline

19   obsessed with it, even before, even before I met her when she

20   was a little girl.  We met at high school.  We started dating

21   as high school freshmen.

22      She, yeah, she was obsessed with this musical and other

23   musicals.  She was the one that kind of got me into musicals.

24   We held season tickets for Dallas summer musicals.  As an art

25   teacher, every — specifically this, when this iteration of Les

1    Mis was produced, every year, at the end of school, I would
2    always play this for every class period, *One Day More*, you
3    know.  It is it, just one more day.
4        I sent it to my friend Jesse, who also, you know, is
5    familiar with my affinity for musicals, my wife.  I didn't send
6    to it my friend — I wouldn't think I would send it to Jesse.
7    I sent it to my neighbor.  Maybe I don't want him to know that
8    I like musicals, but still, the —
9    Q   What is the one —
10   A   Oh.
11   Q   — what is the one more day that you are referring to?
12   A   This is it.  This is one more rally.  This is his last day.
13   He is — he, after this, he is probably not going to be
14   President anymore.
15   Q   Was there anything else meant beyond you sending that?
16   A   No.  The name of the — really, the name.  I didn't
17   actually expect people to watch the whole clip, what the name
18   of it says, at all, *One Day More*.
19   Q   Did you want to come here and lead a revolution or
20   participate in a revolution?
21   A   No, sir.  I wanted to go see the Trump rally, and then my
22   buddy and I wanted to go find, maybe some Cuban cigars or
23   something like that.
24   Q   Of course, you just didn't go to the rally, right?
25   A   No, sir.

*GRIDER- REDIRECT/MAYR*          Vol. 5 - 763

1    Q    Okay.

2          MR. MAYR:  I want to publish — I want to go back to

3    Defendant's Exhibit 224, which, is it — I don't see it on the

4    monitors out here.  I want to make sure you have it up there?

5    Okay.

6    BY MR. MAYR:

7    Q    You remember testifying — I don't know if it was yesterday

8    or maybe the day before — you remember testifying about this

9    particular exhibit?  Take a look, and just familiarize yourself

10   with it, if you need to.

11   A    I remember seeing it.  I don't remember specifically what

12   was said about it, if you said something or if someone else

13   said something.

14   Q    Okay.  Take a look at it and just — take a look at what is

15   depicted here in this photograph.

16   A    Okay.

17   Q    You see what is depicted here?

18   A    A crowd.

19   Q    All right.  Do you remember taking this photograph?

20   A    I don't remember specifically taking it or —

21   Q    Let me ask you this.  Where are you facing in this

22   particular photograph?

23   A    Facing away from the Capitol towards the Washington

24   Monument.

25   Q    Do you remember explaining to the Court how, and we diagram

1   on the map.  You remember how you walked back out — at some

2   point you said you had walked back out onto the lawn in front

3   of the Capitol; do you remember that?

4   A   Yes, sir.

5   Q   Why did you go back out onto the lawn?

6   A   I had seen some excessive use — like, excessive is the

7   wrong word.  I had seen some, you know, serious use of force,

8   physical force by police officers on the stairs, and I decided

9   to leave at that point, went to see if I can find my — leave

10  that area, see if I can find my friend Jesse.

11  Q   Okay.  You're walking, you were walk — in walking away

12  from the Capitol Building, did you ever think that you were

13  going to be turning around and going back in?

14  A   You said back in.  I don't think at this point I had been

15  in, sir.

16  Q   That is what I am asking is.  You are out there walking

17  around and looking for Mr. Bowen.  Do you remember thinking,

18  I — did you ever think that you were going to find him and

19  possibly go back into the Capitol building?

20  A   No, sir.

21  Q   All right.  I want to talk about that a little bit.

22          THE COURT:  Can we put this in context?  From your

23  perspective, you are walking around in the lawn.  Is that after

24  you have already walked through the Capitol or at some other

25  point?

1          MR. MAYR:  I apologize for that, Your Honor.  He had

2    mentioned being at the —

3          THE COURT:  I am asking him —

4          MR. MAYR:  Sure.

5          THE COURT:  — in terms of his answer.

6          THE WITNESS:  This was before going inside.

7          MR. MAYR:  Okay.

8          THE COURT:  This is before you went into the Capitol

9    and walked around the Capitol?

10          THE WITNESS:  Yes, ma'am.

11          THE COURT:  Okay, all right.  Go ahead.

12    BY MR. MAYR:

13    Q   You are out on the lawn.  You are walking around.  Did you

14    ultimately change your mind and go into the Capitol?

15    A   Yes, sir.

16    Q   Why did you do that?

17    A   I heard a large cheer from behind me, and I turned around

18    and looked back, and all the, the police officers from, that

19    had previous — you know, from my point of view at that moment,

20    all the police officers were gone and had left.

21    Q   Did you see people moving forward, or what did you see?

22    A   Yes, sir.

23    Q   One minute you're not thinking about going into the

24    Capitol, but the next minute you are.  How many times do you

25    think that you changed your mind about what you were going to

1   do throughout this entire ordeal?

2   A   I couldn't put a number on it, sir, but I believe it was

3   quite a bit.

4   Q   What about the feelings that you were experiencing?  How

5   many times did your feelings -- do you think that your feelings

6   changed about what you were perceiving as you're climbing up

7   the stair railing and going up onto the terrace?  How many

8   times do you think that your feelings changed?

9   A   Specifically on railings or --

10  Q   No.  Just throughout --

11          THE COURT:  Feelings about what?

12          MR. MAYR:  Your feelings about what you were

13  experiencing --

14          THE COURT:  Okay.

15          MR. MAYR:  -- throughout the Capitol.

16          THE WITNESS:  I mean, they are constantly changing,

17  sir, throughout the day.

18  BY MR. MAYR:

19  Q   Would you feel multiple things at the same time, or was it

20  just one particular thing that you would feel?

21  A   I would feel multiple things at any given time, yes, sir.

22  Q   Okay.  Your inability to remember every single thought and

23  feeling and thing that you did that day, what -- why is it that

24  you can't do that, Mr. Grider?

25  A   I don't know, sir.  I do know it was definitely the worst

1  day of my life.

2  Q   Okay.  Have you spent the past — have you done anything

3  over the past two years to try to think back and reflect on

4  everything that you did to be able to inform this Court what

5  you're thinking of and what your intent was?

6  A   You said anything?

7  Q   Yes.

8  A   Can you repeat the question again.  I am sorry.

9  Q   Have you done anything to try to reflect back on everything

10  that you thought of that day?

11  A   Yes, sir.  We went — I have spoken with you, I have gone

12  through discovery.  We, you know, I think originally —

13  originally, before I was arrested, I watched the videos on my

14  phone a couple of times.

15       MS. CHO:  Objection.  Relevance.  The question was

16  what he has done to prepare for his testimony today.  So I

17  don't understand why the things he has done before he was

18  arrested would be responsive to that question.

19       THE COURT:  I will allow.

20  BY MR. MAYR:

21  Q   You have done — you have done a lot, haven't you?

22  A   Yes, sir.

23  Q   Let's go inside the Capitol and talk about when you are

24  at — when you are in the Statuary Hall Connector, okay?

25  A   Yes, sir.

1    (The video was played for the Court.)

2         MR. MAYR:  I am going to publish — for the record, I

3    am going to publish 243, and I will back up to the 2:18 mark

4    and have you watch, Mr. Grider.

5         (The video was played for the Court.)

6         MR. MAYR:  I will stop the video at the 2:43 mark.

7    BY MR. MAYR:

8    Q    What just occurred in this video?

9    A    I was, I was telescoping with my — or periscoping, rather,

10   with my phone.

11   Q    Back up.  Prior to that, can you tell us step by step what

12   you have done?

13   A    I was walking into a crowd.

14   Q    And as you were walking in, you are recording, and do you

15   hear — Ms. Cho had asked you about a person talking.  Do you

16   hear that person talking?

17   A    Yes.  I hear a person talking.

18   Q    What do you remember from that day about what that person

19   was saying as you are walking into this area?

20   A    Generally, I remember him saying something to the effect,

21   they are going to let us come in and sit down if we are

22   peaceful and quiet.

23   Q    You said telescoping, and I — let me back this up.

24   A    Periscoping, I apologize.

25   Q    Okay.  Periscoping.  Give me one second.

1          Okay.  You remember Ms. Cho was asking you about the
2     gentleman that was giving these commands.  You remember that
3     when she was asking you about that?
4     A    Yes, sir.
5     Q    When you were walking up, from the position that you were
6     at, were you able — you were able to hear what that person was
7     saying, correct?
8     A    Not completely, sir, but a good amount.
9     Q    Were you able to see who was giving those commands, talking
10    about being able to peacefully enter?
11    A    No, sir, not, not completely.
12    Q    Just so we are clear for the Court and everyone, so where
13    you are standing at, you cannot see the person that is saying
14    these things?
15    A    No, sir.
16    Q    Why are you unable to see them?
17    A    This is a crowd in front of me, sir.
18    Q    So when you say "periscoping," could you — I am not going
19    to — could you show the Court what that means, assuming that
20    you have a camera in your hand?  You can assume.
21    A    I can use the phone.  It is holding a phone above you to,
22    to see, kind of past you.
23    Q    All right.  Because — well, are you recording at this
24    time?
25    A    I was recording.

*GRIDER- REDIRECT/MAYR*          Vol. 5 - 770

1   Q   Because you are recording, are you able to see on your

2   screen what the image is that it is capturing?

3   A   Yes, sir.

4   Q   When you are holding the phone up like this, how easy is it

5   on your — you have already testified that you can't see the

6   person directly.  Are you able to see the person speaking by

7   looking up at your cell phone?

8   A   I can see a small person.

9   Q   Okay.

10  A   On a small screen.

11  Q   Looking at the small person on your screen, are you able to

12  determine whether that is a police officer or not?

13  A   I thought I was.

14  Q   Okay.  Were you able — could you tell definitively whether

15  it was or was not a police officer?

16  A   I now know I can't, but then, I thought I could.

17  Q   Okay.  And at that time you thought it was —

18  A   A Capitol Police officer.

19  Q   All right.  Were you — did you see other Capitol Police —

20  now, we are back down to your eye level.  Were you able to see

21  through the crowd and see whether or not there were other

22  Capitol Police officers standing up there underneath that

23  archway?

24  A   I mean, I don't remember.  I, I can look at the video.

25  Q   Let me — let me let you watch.

*GRIDER– REDIRECT/MAYR*            Vol. 5 – 771

1   A   Okay.

2           MR. MAYR:  I will continue publishing at 2:31,

3   Exhibit 243.

4       (The video was played for the Court.)

5           MR. MAYR:  I will stop there at the 3:12 mark.

6   BY MR. MAYR:

7   Q   So Mr. Grider, either looking with your naked eyes ahead

8   through the crowd and/or holding up your camera and looking at

9   what image it was capturing, were you able to see that there

10  were other Capitol Police officers up at the front of that

11  line?

12  A   Yes, sir.

13  Q   All right.  Now, we heard the part, and Ms. Cho asked you

14  about you yelling out, "Let me in," right, or something to that

15  effect, right?  You remember that?

16  A   Yes, sir.

17  Q   Okay.  At this particular point, did you start moving your

18  way through the crowd and try to move forward towards these

19  doors in the background?

20  A   I didn't see that from the video, sir.

21  Q   Do you remember pushing through this crowd, pushing aside

22  officers to get to this door?

23  A   No, sir.

24  Q   Why are you not — you just said, let us in.  Why are you

25  not moving your way through the crowd, pushing officers aside

1    to get to that door?

2    A   The crowd is thick, and also, they said they were going to

3    let us in.

4    Q   Okay.  But why are you remaining right here is my question.

5    A   I don't remember.  I suspect after watching the video, that

6    they said they were going to let us in.

7    Q   Okay.  But why did you not decide just to let yourself in

8    at that point?

9    A   Because there is a police line there.

10   Q   Okay.  And what does that mean to you that there is a

11   police line there?

12   A   That there were — waiting for a specific, maybe time.  I

13   don't know.

14   Q   Do you, do you, do you care about the police officers

15   holding the line there or not?

16   A   Yeah.  I mean, yes, sir.

17   Q   You don't want — is it your intent to break through that

18   line at this particular point?

19   A   No, sir.

20   Q   All right.

21       MR. MAYR:  I now want to go to Government's

22   Exhibit 61.

23       THE COURT:  You have to be careful about leading

24   questions here too.

25       MR. MAYR:  I, I will try to do that, Your Honor.

*GRIDER- REDIRECT/MAYR*                    Vol. 5 - 773

1              For the record, I will publish 61.

2         (The video was played for the Court.)

3    BY MR. MAYR:

4    Q   Mr. Grider, I would like for you to listen very carefully

5    to where you recognize your voice and what is being said by

6    you, understood?

7    A   Yes, sir.

8         (The video was played for the Court.)

9              MR. MAYR:  I have stopped the video at the 39-second

10   mark.

11   BY MR. MAYR:

12   Q   Right before you say, "The two cops," what did you hear

13   yourself say?

14   A   "There are people getting crushed over there."

15   Q   Okay.  Referring to what?

16   A   That other door, the, the main door.

17   Q   What was your primary focus when you were here at the

18   Speaker's Lobby Door?

19   A   To notify these police officers that there are people

20   pinned up against that door over there.

21   Q   Once you did that, what, then, became your motivation once,

22   once you have tried to tell the officers about this, is that

23   all you care about, or is there anything else that you care

24   about doing when you are here at the Speaker's Lobby Door?

25   A   I, I, I, I remember, you know, really wanting to let them

1  know that hey, these people are, are stuck over there.  I, I

2  mean, eventually I, I was ready — I wanted to get out of

3  there.

4  Q   Was there anything else that you intended to do there at

5  the Speaker's Lobby Door?

6  A   No, sir.

7  Q   Prior to the shot being fired, just to be clear about that.

8  A   Yes, sir.

9  Q   Is that correct?

10 A   Yes, sir.

11 Q   Was there anything else prior to the shot being fired

12 besides those two things that you intended to do?

13         MS. CHO:  Objection, leading, and asked and answered

14 several times.

15         THE COURT:  Yeah.  I, I do think you are leading —

16 particularly, on redirect in terms of going over other

17 testimony.

18         MR. MAYR:  Sure.

19         THE COURT:  You need to be careful about how you are

20 wording this.  He has answered it, in essence.

21         MR. MAYR:  Again, I just wanted to be clear what the

22 time frame was that he is talking about.  As long as we are

23 done, then, I am okay with that.

24 BY MR. MAYR:

25 Q   Mr. Grider, I will now go to Government's Exhibit 123 —

1    MR. MAYR:  Actually, before we go there, let's go to

2    122 for a second.

3    BY MR. MAYR:

4    Q   Do you, do you recognize these text messages here before

5    you, Mr. Grider?

6    A   These are the text messages that were shown today.

7    Q   Okay.  Which text messages are they?

8    A   I guess, I think they are new ones that were shown today.

9        THE COURT:  You are dropping your voice again.

10       THE WITNESS:  They were new ones that were shown

11   today.

12   BY MR. MAYR:

13   Q   Who are they between?

14   A   Between myself and Jesse Bowen.

15   Q   Okay.  And these text messages, when do they start?

16   A   January 2nd, 7:09 p.m.

17   Q   All right.  And you were asked questions about this

18   dialogue between you and Mr. Bowen regarding the possibility of

19   traveling — well, again, I don't want to — let me ask you

20   this.  Let's just — let's go on to the next page.  You

21   remember being asked questions about these responses that I

22   have highlighted over here (indicating)?

23   A   Yes, sir, loosely.

24   Q   Now, I would like to slowly go through these, the remaining

25   text messages, and if you could, just start reading out what

1  some of these text messages are saying between you and

2  Mr. Bowen.

3  A   "Couch fire LOL."  I didn't see the one above, but "Couch

4  fire LOL."

5  Q   Who is that from?

6  A   Jesse Bowen.

7  Q   And then what follows with that?

8  A   "Should we invite MacGuigan on the hunt?"

9  Q   What are you talking about there?

10  A   This is a hog hunt that we had scheduled.

11  Q   Scheduled for when?

12  A   Sometime after –– sometime in January, maybe early January,

13  probably somewhere.

14  Q   Before or after you are taking your trip to, taking your

15  trip here to Washington, DC on January 6th?

16  A   We had it scheduled before, and the hunt was probably the

17  7th, 8th, 9th, something like that.  It had to have been, like

18  around the 9th or so.

19  Q   Let's go to the next text message.  Tell us what we are

20  seeing.  Just explain who says what.

21  A   Says, "We know he can't go" –– wait, "We know he can't go,

22  but the thought LOL."

23  Q   And you reply?

24  A   "Haha."

25  Q   And then, he says?

1  A   "Bad boi."

2  Q   And then, what does he say after that?

3  A   "Up 65 bucks today, LOL."

4  Q   What is he talking about there?

5  A   Probably the stock market.

6  Q   What does he say after that?

7  A   "So far."

8  Q   And then, what do you say after a that?

9  A   "My libertarian ex—weed—growing friend wants to go to the

10 gun range on the 7th."

11 Q   What are you talking about there?

12 A   In Fort Worth.

13 Q   What, what are you discussing right there?

14 A   We — I guess, we were planning on this hog hunt in

15 Abilene, Texas.  And to get to Abilene, you, you can kind of go

16 near Fort Worth, depending on the route that you take.

17 Q   What are these text messages being sent?

18 A   This is the 3rd of January.

19        MR. MAYR:  Let's continue on with Government's 122.

20 BY MR. MAYR:

21 Q   What text messages do we see next?

22 A   He says, "Oh, okay."

23 Q   And then, after that?

24 A   He says, "There's a nice open—air range in Mesquite that's

25 only 20 bucks."

1    Q    What do you say?

2    A    "I know a nice open-air range in Cego that is free."

3    Q    Cego, is this where you live?

4    A    Yes, sir.

5    Q    What are you-all talking -- is this the same discussion, or

6    are you talking about something differently?

7    A    I believe we were talking about practicing before going hog

8    hunting.

9    Q    All right.

10         MR. MAYR:  Let's go to the next text message.

11   BY MR. MAYR:

12   Q    Do you remember what this message was that he sent you?

13   A    No, sir.

14   Q    What does he say after that?

15   A    "I can cut this in half so we each have a bed roll."

16   Q    What does that mean?  What is he talking about?

17   A    He, I guess, was --

18   Q    How do you interpret this?

19   A    If I just read this, I would interpret it as it was some

20   sort of camping gear he was showing me because we were going to

21   camp in Abilene.

22   Q    For this hog hunt?

23   A    For this hog hunt.

24   Q    What does he say after that?

25   A    "LOL."

1   Q   And then, after that?

2   A   "It's gonna be 30 degrees at night."

3   Q   Is he talking about something differently here, or what do

4   you interpret this to be talking about?

5   A   No.  That was the hog hunt.

6   Q   All right.  How do you respond?

7   A   With an expletive.

8   Q   All right.  And what do you say after that?

9   A   "We need the space heater and the trailer enclosure with

10  the fireplace."

11  Q   And then, after that?

12  A   "And a ton of wood."

13  Q   And then, what does he say?

14  A   "Abilene weather, dude."  Said, "Bring your Long Johns."

15  Q   And then, after that?

16  A   "For sure."

17  Q   And then, after that, what does he say?

18  A   "Should we start the trailer build tomorrow, or should I

19  just get us a $50 tent?"

20  Q   Do you remember what he sent you here?

21  A   Do I need to read the other text message?

22  Q   I am sorry.  I thought — what was your reply?

23  A   "$50 tent may not cut it."

24  Q   Do you remember what he sent you here?

25  A   No, sir.

1    Q    You reply, say what?

2    A    "Cool."

3    Q    And what do you, what does he, then, say to you?

4    A    "Dude is taking eight by ten cargo trailer; his cousin, a

5    tent".

6    Q    And then, how do you reply?

7    A    "It might need a warmer sleeping bag."

8    Q    And then, after that?

9    A    "I want an Army one."

10   Q    And he replies?

11   A    "Bro, I got you."

12   Q    And then, you say?

13   A    "Goose down."  He says, "I know, those are nice."

14          MR. MAYR:  I am going to just keep scrolling here,

15   just let you read them to yourself.

16          THE WITNESS:  Okay.

17   BY MR. MAYR:

18   Q    Let me know if I am going too fast, Mr. Grider.

19        Can you see, now, that we are -- what this -- I am on

20   page 14 of the exhibit.  What date are these messages being

21   sent now?

22   A    January 4th.

23   Q    Okay.

24          MR. MAYR:  Let's continue just reading these to

25   yourself, Mr. Grider.

BY MR. MAYR:

Q   January 5th, day before January 6th, what, what is this message, and who is it from?

A   It is from Jesse Bowen.  He said, "Congressman from Georgia said she will not accept the electoral vote."

Q   What is after that?

A   "Senator will object on January 6th."

Q   Is there any response from you?

A   No.

Q   What is the next text message?

        MS. CHO:  Objection.  I believe the record was inaccurately stated regarding the date of the earlier text message we just read regarding the congressman FROM —

        THE WITNESS:  Oh, apologies.  January 4th.

        THE COURT:  Okay.

        MR. MAYR:  That's right.  It was sent on the 4th.

BY MR. MAYR:

Q   When did you actually read it?

A   Sorry — January 5th.  That is the date I looked at it.

Q   All right.

    And then, there is another text message, the one that follows that.  When was it sent?

A   January 4th.

Q   And when did you actually read it?

A   January 5th.

1  Q   At what time?

2  A   3:21.

3  Q   Did you reply to that text message?

4  A   No, sir.

5  Q   What is after that?

6  A   "Saw a big old bobcat this AM.  Got out to chase it and

7  take a pic and no card in the camera."

8  Q   In this entire period of time from the 2nd all the way up

9  to the 5th, have you had any subsequent discussions with

10 Mr. Bowen about coming to Washington, DC?

11 A   I don't recall.

12 Q   Did you tell anyone —— you remember telling anyone whether

13 or not you were going to come here to Washington, DC?

14         MS. CHO:  Objection.  Hearsay.

15         MR. MAYR:  I am asking —— hold on.

16         THE COURT:  It probably is.

17         MR. MAYR:  It is his statement ——

18         THE COURT:  Yeah, it is his statement, but there is no

19 way of challenging or anything.  And it is an out-of-court

20 statement and is being admitted for the truth of the matter

21 that he told somebody.

22         MR. MAYR:  Okay.

23 BY MR. MAYR:

24 Q   Do you see any text messages here between you and Mr. Bowen

25 discussing coming to Washington, DC to participate in any sort

1    of insurrection or revolution?

2    A    No, sir.

3    Q    Left's go the text messages, which I am now publishing

4    Exhibit 123.  These were admitted earlier.  Do you remember

5    these text messages?

6    A    I, I, I believe so, sir.

7    Q    What are they, just so that we are clear for the record?

8    A    They look like text messages between my wife and I on

9    January 5th.

10   Q    All right.  I am just going to scroll here to the end.

11        Can you see this text message right here that she sends you

12   on the 6th at 4:40 p.m.?

13   A    Yes, sir.

14   Q    What does she say?

15   A    "I wish you would not have gone."

16   Q    And you reply how?

17   A    I — it said, "I was meant to happen."

18   Q    And then, you later corrected that to mean?

19   A    "It was meant to happen."

20   Q    Explain to the Court what you meant when you said, "It was

21   meant to happen."

22   A    I meant that God is, is in control of everything.  He is in

23   control of — he always says in the Bible, a man, you know,

24   takes the steps, but you know, God directs him.

25   Q    Were you proud of what had happened that day, Mr. Grider?

1    A    No, sir.

2    Q    Were you happy about having gone to the United States

3    Capitol?

4    A    No, sir.

5    Q    I am going to show you what has been admitted as

6    Government's Exhibit 77.  Do you recognize this text message

7    here?

8    A    It is from my wife.

9    Q    And it was sent — when was it sent to you?

10   A    It says, "January 21st."

11   Q    Okay.  What do you say here at 2:05 p.m.?

12   A    I say, "I'm going into the lions' den.  I pray that the

13   Lord shuts their mouth."

14   Q    What does that mean?

15   A    It is a reference to the book in the Old Testament, Daniel,

16   where he was thrown into a lions' den as punishment, and God

17   sent an angel to shut the — keep the lion's mouth shut, keep

18   the lions from devouring him.

19   Q    Crystal says what after you send that?

20   A    "You pushed on a stupid door, and they are going to arrest

21   you for it?  You didn't break the door."

22   Q    What was your reply?

23   A    I just think that still shot was the absolute — just

24   think, that was the — I am sorry.  "Just think, that still

25   shot was the absolute best day to get of me."  I think it was a

1    typo midway, I imagine.

2    Q   What do you send after that?

3    A   "If they had a more menacing image of me they would have

4    used it.  That's the worst they can do."

5    Q   What does she say?

6    A   "That is ridiculous.  You barely pushed on a door.  Was

7    that really the door to the Chambers?"

8    Q   What was your reply?

9    A   "I don't know."

10   Q   After that?

11   A   "Speaker's Chamber, yes."

12   Q   What do you say there?

13   A   "I don't remember pushing on the door."

14   Q   Now, this was just weeks after coming up here.  Did you or

15   did you not remember whether you pushed on the door, even on

16   January 21st?

17   A   No, sir, I didn't remember.

18   Q   What do you say after that?

19   A   "But maybe I did.  Hell, who knows?"

20   Q   What does she say?

21   A   "You had a helmet."

22   Q   What is your reply?

23   A   "I found it on the ground outside, was worried that

24   whenever we left that the black-suited Antifa was going to beat

25   the living shit out of us.  I picked it up because I thought I

1   might need it to save my life later on that evening."

2   Q   What does she say?

3   A   "Then, you handed it to some guy, and that guy broke the

4   window, not you."

5   Q   What is your reply?

6   A   "Yes."

7   Q   What do you say after that?

8   A   I told him, "I would not."

9   Q   What does that mean?

10  A   I don't know.  "I am not going to break the window" is what

11  it says.

12  Q   I am sorry?

13  A   It says, "I told him I would not break the window."

14  Q   Who is him?

15  A   The fuzzy-hatted guy.

16      Do you want me to read that?

17  Q   No.

18          MR. MAYR:  May, may I have one moment, Your Honor?

19          THE COURT:  Certainly.

20          MR. MAYR:  Then, I will wrap it up.

21  BY MR. MAYR:

22  Q   Now, I am finally going to go back to Government's

23  Exhibit 123 and show you these text messages between you and

24  Crystal at -- on January 6, okay?  All right.  Do you see these

25  text messages, Mr. Grider?

1  A   Yes, sir.

2  Q   What does Crystal send to you, send to you at 3:55?

3  A   "Please continue to let me know how you are doing."

4  Q   And how do you reply?

5  A   "Leaving now."

6  Q   What time do you send that reply out?

7  A   January 6, 2021, 4:02 p.m.

8  Q   Was this — when was this in relation to when you — was

9  this before or after you left the Capitol?

10 A   I am assuming it is when I left.  I, I don't know.

11 Q   That text message — what does the following text message

12 say?

13 A   "I'm in kinda shock."

14 Q   What time did you send that message saying, "I'm in kinda

15 shock"?

16 A   January 6, 2021, 4:03 p.m.

17 Q   Why did you send that text message, Mr. Grider?  What did

18 you mean by that text message?

19 A   I don't remember.  I could tell you what I think it means

20 now.

21         MS. CHO:  Objection, relevance.

22         THE COURT:  That is not going to — you can't do that.

23         MR. MAYR:  I know.  Okay.

24 BY MR. MAYR:

25 Q   You don't have any dispute about sending this text message

1   to your wife, do you?

2   A   No, sir.

3          MR. MAYR:  Thank you, Your Honor.  I have no further

4   questions.

5                          **EXAMINATION**

6          THE COURT:  All right.  I do have a few questions that

7   I would like to ask Mr. Grider.  Let me start with, there, at

8   least at one point, I believe it was Mr. Mayr, but it may have

9   been one of the other Government attorney.  You testified in

10  sort of summary terms that you knew that it was unlawful to be

11  in the Capitol, sort of in general terms.  But frankly, it is

12  unclear from the totality of the testimony that you provided

13  over these couple of days at what point you knew that you were

14  unauthorized to be in the Capitol?  Assuming that, that you are

15  indicating that you knew that you were — let me start with

16  that.

17         Do you agree that you were — it was unlawful for you

18  to be on the Grounds of the Capitol?  Knew.

19         THE WITNESS:  Yes, Your Honor.

20         THE COURT:  And exactly at what point did you come to

21  know?  That is unclear to me from the testimony that you were

22  unable — that you were unauthorized or unlawful to be on the

23  Grounds of the Capitol and not in the Capitol.

24         THE WITNESS:  Various times I knew — at various

25  amounts, Your Honor.

1     THE COURT:  Well, did you know going in?

2     THE WITNESS:  Ma'am?

3     THE COURT:  Did you know going on the Grounds or when

4     you were in the Capitol?

5     THE WITNESS:  Excuse — I am sorry.  I interrupted

6     you.  Can you restate what you said, Your Honor?

7     THE COURT:  Well, I am trying — in terms of, as I

8     said, you have given testimony that, various reasons for your

9     being there, and I will get to that in a minute.  But I am

10    trying to clarify one, you know, sort of you agreed in general

11    terms that you knew.  Knowledge is the important part, that you

12    knew that it was unauthorized or unlawful to be on the Capitol

13    Grounds when you were and in the Capitol.  And you have just

14    indicated that that is knowledge you had when you went on the

15    Grounds and went into the Capitol; am I correct?

16    THE WITNESS:  Yes, ma'am.

17    THE COURT:  Now, listening to the totality of your

18    testimony, I have to say, it is not clear to me at what point

19    you knew that you were unauthorized, unlawful to be on the

20    Capitol Grounds that day or in the Capitol, when you first got

21    there, afterwards, when?

22    THE WITNESS:  I believe it would be sometime inside of

23    the building, Your Honor.

24    THE COURT:  So be more specific.  When?

25    THE WITNESS:  Your Honor, the location is hard for me

1    to, in time, mix.  It, it, it is difficult to pin down,

2    specifically.  I think I knew it was wrong.  At times, I saw

3    things that cast doubt on my feeling, like, I was not supposed

4    to be there.  But then, then I would later be reaffirmed that I

5    am not supposed to be there.

6            THE COURT:  So it is sort of a moving back and forth

7    between you knew, then, you didn't know.  You knew, you didn't

8    know?

9            THE WITNESS:  Yes, Your Honor.  I think at times I was

10   more confident than other times, but it doesn't erase my

11   confidence, my original confidence.

12           THE COURT:  Well, let me go through your testimony

13   over the last few days.  This is, obviously, a very summary

14   form.  You stated variously, that your entering on the Capitol

15   Grounds, climbing up the steps of the Capitol, entering the

16   Capitol, traveling through the Crypt, Rotunda, Statuary Hall,

17   and what you described as the Senate Chamber and the Speaker's

18   Lobby was lawful because several reasons you gave:

19           The President had invited to you do so — this is

20   former President Trump — or President Trump would be speaking

21   somewhere at the Capitol.  It wasn't clear where, but as you

22   moved through, somehow you expected he would be speaking as you

23   roamed through the halls, and you also said that the Trump

24   rally could be continuing at the Capitol and the Government had

25   granted the permit.  So that is sort of a description of what

1  you said.

2          Now, let me contrast that with what you said at your

3  plea.  Let me read the testimony.  I am starting in the middle

4  of the recitation of what was said.

5          "Vice President Mike Pence was present and presiding

6  first in the Joint Session, and then, in the Senate Chamber.

7  As the proceedings continued in both the House and in the

8  Senate and with Vice President Pence present and presiding over

9  the Senate, a large crowd gathered outside the U.S. Capitol.

10          "As noted above, temporary and permanent barricades

11  were in place around the exterior of the U.S. Capitol, and U.S.

12  Capitol Police were present and attempting to keep the crowd

13  away from the Capitol Building in the proceedings underway

14  inside.  At approximately 2:00 p.m., certain individuals in the

15  crowd forced their way through, up, and over the barricades,

16  and officers of the U.S. Capitol Police and the crowd advanced

17  towards the exterior facade of the building.

18          "The crowd was not lawfully authorized to enter or

19  remain in the building, and prior to entering the building, no

20  members of the crowd submitted to security screenings or

21  weapons checks by the U.S. Capitol Police officers or other

22  authorized security officials."

23          And then, I went on and said:

24          "At such time the certification proceedings were still

25  underway, and the exterior doors and windows of the U.S.

1   Capitol were locked or otherwise secured.  Members of the U.S.

2   Capitol Police attempted to maintain order and keep the crowd

3   from entering the Capitol.  However, shortly after 2:00 p.m.,

4   individuals in the crowd forced entry into the U.S. Capitol,

5   including by breaking windows and by assaulting members of law

6   enforcement as other members of the crowd encouraged those

7   acts."

8       My question to you was, "So do you agree or not

9   dispute what I have just read so far, which is really the

10  background information?"

11      Your answer is, "I agree, Your Honor."

12      Okay.

13      Then, I go on and say:

14      "All right.  In terms of your, from your perspective,

15  Mr. Grider, you entered the U.S. Capitol Building at

16  approximately 2:00 through the Senate Wing Door.  On entering,

17  you paraded through various areas of the U.S. Capitol Building,

18  including the Crypt, Rotunda, Statuary Hall, before ultimately

19  ending up at a barricaded door to the Speaker's Lobby.

20      "A hallway that connected, connects to the House of

21  Representative Chamber in the U.S. Capitol Building.  The

22  doorway with the word Speaker's Lobby visible at the top was

23  being guarded by three Capitol Police officers.  Chairs were

24  among the items visible through the door's glass panels as

25  being used to barricade the door from the outside.

1    "At approximately 2:55 you exited the U.S. Capitol

2    Building through the Upper House Door.  Do you agree you

3    entered the Capitol around 2:15 through the Senate Wing Door?"

4        Your answer, "Yes, Your Honor."

5        "And then, you paraded through the various areas of

6    the Capitol, which included the Crypt, Rotunda, the Statuary

7    Hall before winding up in front of the Speaker's Lobby, which

8    is a hallway that connects the House of Representative Chamber

9    in the Capitol Building; is that correct?

10       "Yes, Your Honor.

11       "And was the door to the Speaker's Lobby's barricaded?

12       "Yes, Your Honor.

13       "And did you see the words "Speaker's Lobby" visible

14   at the top?

15       "Yes, Your Honor.

16       "And was it being guarded by three Capitol Police

17   officers?

18       "Yes, Your Honor.

19       "And were there chairs among the items visible through

20   the door's glass panel as being used to barricade the door from

21   the inside, not the outside?

22       "Yes, Your Honor.

23       "And did you know that you were not authorized to

24   parade in the restricted area, which in this case, was the

25   Capitol?"

1            Your answer, "Yes, Your Honor."

2            "And did you, knowing that, nevertheless paraded in

3    the Capitol?

4            "Yes, Your Honor.

5            "And did you or also know that you weren't authorized

6    to be on the Capitol Grounds in addition to the Capitol itself,

7    which are restricted areas?

8            "Yes, Your Honor.

9            "And did you do that anyway?

10           "Yes, Your Honor.

11           "So in terms of the elements, in terms of Count IV,

12   specifically, you entered or remained in a Restricted Building

13   without lawful authority to do so, and you have agreed that you

14   knew you should not.  You were not authorized to be in a

15   restricted area, in this case, the Capitol; is that correct?

16           "Yes, Your Honor.

17           "But you went ahead and entered and remained in the

18   Capitol even though it was restricted and you weren't

19   authorized to be there?

20           "Yes, Your Honor.

21           "And you knew that you were not authorized to be

22   there?

23           "Yes, Your Honor.

24           "And knowing that, you went ahead and entered and

25   remained in there, in the Restricted Building?

1    "Yes, Your Honor."

2         So there is a contrast between what you said to me as

3    part of this plea.  There were no equivocations, no additional

4    things, explanations; no, I thought so; yes, at this point; not

5    at others, unlike your testimony which seems to have various

6    reasons why you might think that it was okay.  So which is the

7    truth, what you testified to today or what you testified, said

8    under oath to me as part of the plea?

9         THE WITNESS:  Your Honor, I thought that I was going

10   to be arrested by the Metropolitan Police Officer.  In fact, I

11   thought I had basically, I had been detained.

12        THE COURT:  What does that have to do with the answers

13   you gave me as part of the plea —

14        THE WITNESS:  Yes, ma'am.

15        THE COURT:  — which indicated that, you know, without

16   equivocation, no explanations of you thought there was a

17   continuing rally or the President was going to speak or

18   anything else.  None of that was in here.  I asked you these

19   questions.  I expected you to give me —

20        THE WITNESS:  I didn't know —

21        THE COURT:  — under oath —

22        THE WITNESS:  — yes, ma'am.

23        THE COURT:  — when you answered.  So how do you

24   explain the testimony and what you said to me —

25        THE WITNESS:  I —

1          THE COURT:  –– when we started this?

2          THE WITNESS:  I did not know I had the option.

3          MR. MAYR:  Your Honor?

4          THE COURT:  What?

5          MR. MAYR:  With all due respect, I want to interject

6  at this point because Mr. Grider specifically testified both on

7  direct examination and cross–examination.  I, I have heard the

8  Court's recitation of some of the things ––

9          THE COURT:  I said it was in summary form ––

10         MR. MAYR:  Right.

11         THE COURT:  –– but he has given various reasons at

12 various times.  He did not at the time of the plea.

13         MR. MAYR:  But there is ––

14         THE COURT:  They certainly had an opportunity to, to

15 do so.

16         MR. MAYR:  Yeah.

17         THE COURT:  That was not the case.

18         THE WITNESS:  I didn't know –– Your Honor?

19         THE COURT:  Excuse me.

20         THE WITNESS:  Sorry.

21         MR. MAYR:  He specifically testified.  I remember this

22 specifically, especially during Ms. Cho's cross–examination

23 when she was trying to pin him down on that particular time.

24 If the Court will recall, he specifically said, "I knew for

25 certain when I was outside of Speaker Pelosi's office inside

1   the" —

2        THE COURT:  Excuse me a minute.  You are testifying.

3   When I asked him, okay?  I asked him a few minutes ago.  It is

4   unclear from the totality of your testimony at what point you

5   knew that you were unauthorized to be in the Capitol, Grounds

6   of the Capitol.  That is not the answer that he gave.  The

7   answer he gave me today, okay?

8        MR. MAYR:  Okay.

9        THE COURT:  Was that he knew at certain points, not at

10  other points, which fits into the testimony about, well, he

11  thought it was a continuing rally.  He thought it was the

12  President was going to speak, etc.  So he knew, and then, he

13  didn't know.  That contradicts what he said today.

14        Now, I agree with you, he may have said that about

15  Speaker Pelosi, which is why I was trying to — she was trying

16  to pinpoint, I am also, trying to find out where because he —

17  at what point, since obviously it goes to the others, but it

18  also goes to his plea.

19        MR. MAYR:  Sure, but if I can say this as far as the

20  plea goes, because I went through each one of those

21  representations with you.

22        THE COURT:  Mr. — okay, let me just simply say, I, I

23  have read different things, and part of these were part of what

24  the statement was, which he received.  So this is — what I

25  read was a big surprise, okay, at the time of the plea.  It

1    wasn't like I pulled something out that was not out there that

2    he knew, was aware of.

3         He did not give any additional answers.  He was very

4    straightforward, and which is why I accepted the plea, which

5    said, he knew it was unauthorized, he knew it was unlawful,

6    knew it was on the Grounds, going through all of these

7    different places.  He did not equivocate.  He talked about the

8    Speaker's Lobby, etc., he didn't equivocate whatsoever.

9         On the stand, as part of his, his direct testimony and

10   cross, he has not — he has equivocated, from my perspective.

11   So I want to find out, which is it?  Because there is a big

12   contrast between what he said at the plea, which was yes, I

13   knew, no equivocation, no additional things, and what he has

14   said in testimony, which has been, you know, frankly, I thought

15   it was a rally, the President was going to speak, various other

16   things.  So I want to know which is correct.

17        THE WITNESS:  Your Honor?  I didn't know that I was

18   able to equivocate during that plea.

19        THE COURT:  So you didn't tell me the truth, then —

20        THE WITNESS:  I didn't know —

21        THE COURT:  — at the plea?

22        THE WITNESS:  No, I did tell you the truth.

23        THE COURT:  Well, how could you have told me the truth

24   if you, basically, you're now not agreeing that there was —

25   there were no instances when you didn't know?  Your testimony

1   gives it, at some point you did know, at some points you didn't
2   know, and the plea doesn't have any of that in it.  So if
3   you're telling me what you told me was not accurate —
4   　　　　　THE WITNESS:  No, ma'am.
5   　　　　　THE COURT:  — at the plea —
6   　　　　　THE WITNESS:  Your Honor?  Your Honor, may I give an
7   example?  No — once, knowing that feeling guilty, shouldn't be
8   here at, at a given time.  Then, as progressed, I did see
9   things that throw doubt on that feeling of guilt I have.
10   　　　　　THE COURT:  I am sorry, I am missing this.  Are you
11   saying you had certain thoughts when you pled, and you had
12   different thoughts when you testified?
13   　　　　　THE WITNESS:  I am getting confused by, by — I am
14   ending up getting confused by —
15   　　　　　THE COURT:  Hold on a second.  What I am getting at —
16   　　　　　THE WITNESS:  Uh-huh.
17   　　　　　THE COURT:  — is you indicated to me in, you know, I
18   asked you whether this was correct, okay?  I set it out.  We
19   had a longer one, which I went through and asked you, and then,
20   you agreed.  But then, I broke it down, and on each one of
21   those you agreed, you gave no additional explanation.  So I
22   want to know if that is the truth because, frankly, in your
23   testimony, you have given explanations why at certain points
24   you thought it was all right.  So they contrast.  They are
25   completely contrary.

1      MR. MAYR:  Your Honor?

2      THE COURT:  I need to know which is correct.

3      MR. MAYR:  Respectfully, I have to object.  They are

4  not contrary.  If the representations that are in the proffer

5  don't relate to what his knowledge was, it is just —

6      THE COURT:  No, it, I — my question — in the plea,

7  was what do you know?

8      MR. MAYR:  He knew that people — everything that is

9  in there, he affirmed, but there is nothing in the proffer

10  that — there was nothing in the proffer where he specifies I

11  knew at this point or at this point.  He just acknowledges

12  generally, that —

13      THE COURT:  No.  Excuse me.

14      "And you paraded through the various areas of the

15  Capitol, including the Crypt, Rotunda, Statuary Hall before

16  winding up in the Speaker's Lobby?

17      "Yes, Your Honor," etc.

18      "And being guarded?

19      "Yes.

20      "And you were there."

21      Chairs, I went through each one of these things that

22  said —

23      MR. MAYR:  And all of those —

24      THE COURT:  "And did you know that you were not

25  authorized to parade in the restricted area, which was the

 1    Capitol?"  And I have gone through all of that, and he says,

 2    "Yes."

 3              MR. MAYR:  So the problem is, with that question, did

 4    he know in the Capitol?  His answer is not conflicting with his

 5    testimony because he has testified that he knew at various

 6    points in the Capitol that it was not authorized.  So —

 7              THE COURT:  Mr. Mayr, you really want to go down that

 8    path?  You are telling me that somehow I am to accept the plea

 9    that indicates no equivocation, no answer, I went through all

10    of the places he, he was there.  And he said he knew — he

11    knew, okay?

12              MR. MAYR:  Right.

13              THE COURT:  At the time, knew, and now we have

14    testimony, and it is not contradictory that he, you know, that

15    he has these various — it was a potentially continued rally,

16    that the President somehow was going to speak or be on the

17    Floor of the, of the House or the Senate, all — or Senator

18    Cruz, or whatever.  All of this, somehow, is compatible.  Is

19    that what your point is?

20              MR. MAYR:  It is, Your Honor.  I would not have —

21    the, the proffer, I went — I would not have had him sign the

22    proffer unless he could affirm that everything was true and

23    correct.

24              THE COURT:  Well, then, you should have indicated to

25    me in some way that there were some other aspects of it.  This

1    is a plea of guilty —

2           MR. MAYR:  I understand.

3           THE COURT:  — to a particular thing, and the

4    definition, in terms of parading or all these other things, is

5    being in restricted areas.  So he has to know that he is in

6    restricted areas.  He can't decide, I — or you should have

7    brought up, well, at certain points he did or not, but he is

8    agreeing.  I have had enough of these pleas where people have

9    said, well, I didn't know going in, but I, then, knew at some

10   point.

11          He didn't do any of that, and if you knew, frankly,

12   that he was going to get up and testify and basically, then,

13   parse out different things when he didn't know, as opposed to

14   what he said to me, it would have been, frankly, incumbent on

15   you to have at least let me know.  I would have done a

16   different plea hearing and made clearer to exactly what he knew

17   and exactly what he was agreeing to.

18          MR. MAYR:  Okay.  If I may, Your Honor, so that I have

19   an — so that I can let the Court know and help understand that

20   there is a meeting of the minds, if you would.  My

21   understanding of the law is that a person — there is nothing

22   in the law that requires that the person cross the threshold,

23   knowing that their presence is not authorized.  My

24   understanding of the law is a person commits — knowingly

25   violates the law if they enter or remain.  So if a person —

1          THE COURT:  Get behind the —

2          MR. MAYR:  Sorry.  So if a person enters, thinking I

3   don't — maybe I am allowed to be here, maybe I am not; and

4   then, once they are inside they realize, no, I am definitely

5   not allowed to be here, then, they are violating the law.

6          THE COURT:  I would agree with that, but that is not

7   what he said.  I mean, I have to say to you I have — no, I

8   have had January 6 Defendants who have said just that.  They

9   went in.  They thought they could.  Then, they got there, and

10  then they decided, no, I am really not.  I have got police

11  lines.  How can I be here?

12         MR. MAYR:  Right.

13         THE COURT:  They have had various variations.  That is

14  not what he did, okay?  Or if you had said to me that, you

15  know, he, generally speaking, he understood or at various times

16  he understood, either one of you said something, then, I would

17  have asked a different set of questions, and we would have had

18  different kinds of answers.  Frankly, at this point, and I will

19  give consideration to it, the plea, which is going through, you

20  know, because it is fairly, you're parading is, you know, you

21  are going in there, and you are remaining.

22         I mean, it is not very — there is not a lot of detail

23  with it, and I went through what the elements are, which is

24  parading.  You are there with other people, with a cause or

25  demonstrating some sort of cause, which I will get to in a

moment.  You know, it, there, it is not that sophisticated.
You either know you are not supposed to be there or you don't,
and I went through all of this in terms of all of the places,
the fact they didn't go through security or anything else.

So as far as I am concerned, as I understand your,
your position, Mr. Mayr, on the one hand you agree that what
you said at the plea; is that what your position is?

THE WITNESS:  I —

THE COURT:  On the other hand, I am supposed to
consider what you said in the testimony and blend the two
together; is that your position?

THE WITNESS:  This is going really fast for me, Your
Honor.

THE COURT:  Okay.  Let me slow down, then.  Am I to
take what you said at the plea, under oath, okay, no
equivocation, no — I expected the President to be there, I
thought it was a rally.

THE WITNESS:  May I —

THE COURT:  I am asking you a question, okay?  So you
answered the questions as I asked them.  You have testified to
other things under oath, which relate to at certain points you
thought it was okay because you thought — you know.  You
thought this was a continuation of the rally, maybe it was
permitted by the Government.  You thought the President was
going to speak at various points.  You have testified to that.

1    So they don't match up, frankly.

2           So is your answer to me that I am to consider, put

3    together what you said without equivocation at the plea, with

4    what you said in these last couple of days or what, what is the

5    truth?

6           THE WITNESS:  Your Honor?  Several things.  I, I

7    didn't know I had an option to equivocate.  This is my first

8    time being in this situation.  I didn't want to sound

9    disrespectful or anything like that.  I thought the only answer

10   I could give to you is yes, Your Honor or no, Your Honor or

11   something — if I felt like I could equivocate or if my counsel

12   would have wanted me to, that is — I would have been perfectly

13   happy to equivocate, Your Honor.

14          MR. MAYR:  Your Honor?

15          THE WITNESS:  I don't mean to, I don't mean to —

16          THE COURT:  I want you to be straight forward.

17          THE WITNESS:  — be embarrassing.

18          THE COURT:  I do think —

19          MR. MAYR:  Your Honor?

20          THE COURT:  Let me make a suggestion at this point.

21   Before he gets into more difficulties, my suggestion would be,

22   because, frankly, you have just undercut your plea.  And based

23   on this, I would have some concerns about continuing to accept

24   it.  I am going to be blunt.

25          MR. MAYR:  Sure.

1    THE COURT:  So my suggestion would be, before he gets

2    into more problems with the truthfulness issue, I will — I am

3    going to take a break.  I think we are at 12:25.  I will take a

4    lunch break at this point, and I will let you have a

5    consultation with each other so that we do not — you don't go

6    down a further rabbit hole.

7    THE WITNESS:  Thank you, Your Honor.

8    MR. MAYR:  Your Honor, will I have an opportunity to

9    reexamine Mr. Grider on this particular point to ask him?

10   THE COURT:  We will wait and see.  I think you need to

11   have a discussion with him —

12   MR. MAYR:  Oh, I know.

13   THE COURT:  — what I heard here is he didn't think he

14   could add the things that he has testified to, in which case, I

15   think it undercuts the plea, and I don't think we have a plea.

16   MR. MAYR:  And I, I understand the Court's confusion.

17   I want, I want to make it clear to the Court, but I need to

18   consult with my client to help —

19   THE COURT:  Right, which is why I am breaking now —

20   MR. MAYR:  Thank you.

21   THE COURT:  — so that there aren't any further issues

22   that are raised, tempting as it is on my part.

23   MR. MAYR:  I am sorry?

24   THE COURT:  Nothing.

25   MR. MAYR:  Okay.

1      THE COURT:  You can step down and talk to your

2   attorney.  I will — let me give you some extra time so you

3   actually get lunch and have a discussion.

4      MR. MAYR:  Okay.

5      THE COURT:  12:30, 1:45.

6      MR. MAYR:  1:45.  Thank you, Your Honor.

7      (Lunch recess, 12:27 p.m. – 1:48 p.m.)

8                    AFTER RECESS

9                **AFTERNOON SESSION**

10      THE COURT:  No problem.  I should have called before I

11   came out.

12      MR. MAYR:  No worries.

13      THE COURT:  All right.  Let me do a mention, a

14   scheduling thing, first.  And that is, we will not do closing

15   arguments today.  I will hold them off until Monday.

16      MR. MAYR:  Okay.

17      THE COURT:  And I won't make an aim of trying to get a

18   decision by Tuesday.  Let me put some things into context in

19   terms of going forward.

20      So I started my questions based on the plea, which did

21   not seem to have qualifications as to the unlawful entry or

22   unauthorized or unlawful entry on the Grounds and the Capitol

23   and what he appeared to be testifying, which, and so what I was

24   seeking was an explanation of how he wanted me to consider the

25   plea and the testimony.

1        I, frankly, became concerned, which is why we started

2   to have it unravel a little bit since he seemed to be

3   struggling somewhat to give an answer, but let's, let's put

4   this in context.  Assuming that Mr. Grider, at this point,

5   affirms the statements that he made at the plea, and assuming

6   that he is confirming his testimony, as he has testified both

7   under oath; and assuming that he wants to — as best I could

8   understand, looking at what he said near the end, that he wants

9   me to consider both the statements of the plea and the

10  statements in his testimony and to consider them together or

11  blend them or however you want to look at, I will do that.

12        MR. MAYR:  Okay.

13        THE COURT:  Now, and this is on the issue of entering

14  and remaining on the Grounds in the Capitol.

15        MR. MAYR:  Right.

16        THE COURT:  It would be most helpful, and I will ask

17  him when he gets back on the stand to get, to be able to

18  pinpoint, from his perspective, when on the Grounds he knew he

19  should not be there; and when, in the Capitol Building, if he

20  can pinpoint it.  If not, I will parse through his testimony

21  going back and forth, but if there is a particular moment for

22  both the Grounds and the Capitol, that would be helpful in

23  terms of doing it.

24        I, then, have one other question that is part of —

25  sort of that I need to get answered and developed.

1          MR. MAYR:  Okay.

2          THE COURT:  If we can proceed that way, I don't have a

3  problem.

4          MR. MAYR:  I, I, I am comfortable doing that, but

5  before doing so, I think it is important that we have a mutual

6  understanding.  Because as we went back and we looked at

7  everything in trying to both affirm his plea and his testimony,

8  I want to make sure that grammatically speaking, that we have a

9  mutual understanding of what he said and what he pled guilty

10  to.

11          THE COURT:  Okay.

12          MR. MAYR:  This is what I —

13          THE COURT:  You can take it off if it is easier.

14          MR. MAYR:  Thank you.  This is — there is two

15  grammatical issues that I think need to be fleshed out before

16  we proceed forward.

17          THE COURT:  Okay.

18          MR. MAYR:  Looking at the elements as was set out in

19  the proposed charge, as was set out in the waiver and the

20  factual basis that we submitted to the Court —

21          THE COURT:  Right.

22          MR. MAYR:  — the law says there are two elements:

23  That he knowingly enters or remains in a Restricted Building or

24  Grounds and that he does so knowingly.  Now, I think in the

25  proffer — double-check this.  What he stipulated to on page 2

1    is that he entered and remained, and he did so knowingly.

2         So the first thing is, is looking at the two words

3    "enter" and "remain" in the conjunctive versus the disjunctive.

4         THE COURT:  Right.

5         MR. MAYR:  It is not my belief, and it is not his

6    representation when he pled guilty, that he knowingly entered

7    and then, knowingly remained in the building.  It is a

8    combination of the two.  They are treated in the conjunctive.

9    The other issue is whether —

10        THE COURT:  I am sorry, meaning what?

11        MR. MAYR:  It states to the second issue.

12        THE COURT:  No, okay.  I am still — you have lost me

13   here.

14        MR. MAYR:  Right.

15        THE COURT:  Entering, and you know, which would

16   include both entering and remaining.  So it is not one or the

17   other.  We agreed on that, or did I miss this?

18        MR. MAYR:  That is correct.  The two are treated

19   conjunctively.

20        THE COURT:  So if he entered and he stayed there and

21   he knew he shouldn't come in, then, he knows he shouldn't have

22   stayed; is that your point?

23        MR. MAYR:  Exactly because the word "entered" can be

24   both a past and a present participle.  I am worried that the

25   Court — when he says, when he says his plea, I know that I

1   entered and remained, did he have to know that before he

2   entered and remained, or is it okay if he —

3            THE COURT:  You, you — it varies with it.  That is

4   why I raise the question.

5            MR. MAYR:  Right.

6            THE COURT:  In other cases I have had, there has been

7   pleas where people have made it clear, and it has usually been

8   the parading one, not the one about — not the Count IV, I

9   think it is.  It was Count IX where they have entered and then

10  have realized, at that point, that they, it is unauthorized.

11  They didn't know going in.  We have had differing variations on

12  the plea.

13           So in terms of entering and remaining, if he knows he

14  shouldn't be there, then, obviously, he should not stay.  If

15  that is the point you are making, I agree.

16           MR. MAYR:  Okay.  Does he have to know that he is

17  parading before he goes into the Capitol?  It, I mean, does

18  it —

19           THE COURT:  I don't necessarily think so, but at some

20  point when he is in the Capitol, he has to be parading, and it

21  has to be for a cause, just the issue we will get to a little

22  later.

23           MR. MAYR:  Right.  Okay.

24           THE COURT:  You know, at some point I don't — you

25  know, I, I have accepted pleas where people have said they

1    first went in, for some reason they thought there wasn't a

2    problem, got in, stayed, and knowing that they should not have

3    gone in and knowing, at that point, that they definitely should

4    not be staying but decided to stay.

5            MR. MAYR:  To use the language of the statute, and so

6    that I can make sure that we have the mutual understanding,

7    that person has, has gone in and then realized at this point,

8    once inside the building, I have knowingly entered and remained

9    here without permission.

10           THE COURT:  The parading is in the Capitol Building.

11           MR. MAYR:  Sure.

12           THE COURT:  The other count goes to the Grounds in the

13   Capitol, okay, to the count —

14           MR. MAYR:  Yes.

15           THE COURT:  — if you look —

16           MR. MAYR:  Yes.

17           THE COURT:  — so in the terms the one about parading

18   talks about it in the Capitol Building itself —

19           MR. MAYR:  Sure.

20           THE COURT:  — not the Grounds.

21           MR. MAYR:  Okay.  Okay.  I, I think we —

22           THE COURT:  To be frank, my — the questions that I

23   did not get into any details with him, which I have on other —

24   for other pleas beyond what I had set out, was because he was

25   pleading to two counts but was also going to be going to trial.

1          MR. MAYR:  Right.

2          THE COURT:  I did not want to put him in the position

3   of testifying to further things that could be at issue in his

4   trial testimony so I might have asked more questions.

5          MR. MAYR:  Okay.

6          THE COURT:  I, at the time, I was satisfied that it

7   met the requirements of the elements for Count IV and IX.

8          MR. MAYR:  Okay.

9          THE COURT:  By itself, I don't have any problem with

10  it now, assuming he is still affirming it.  It is the

11  combination that needs to be looked at.

12         MR. MAYR:  Fleshed out.  Okay.  I think we are

13  prepared to do this, then.

14         THE COURT:  Does the Government want to make any

15  comment, or are we ready?

16         MS. CHO:  No.  We are fine with proceeding that way.

17         THE COURT:  Mr. Grider, if I can get you to come back

18  up.

19         (Witness resumes.)

20                    **EXAMINATION CONTINUED**

21         THE COURT:  So you can go ahead and take the mask off,

22  it is just easier.  So let me ask you, in terms of the

23  statements you made at the plea, are you affirming those

24  statements?

25         THE WITNESS:  Yes, ma'am.

1    THE COURT:  And you have testified over the last

2 couple of days, and are you affirming that testimony as well?

3    THE WITNESS:  Yes, ma'am.

4    THE COURT:  Okay.  And is it correct that what, what

5 you want me to do in terms of looking at the plea, which does

6 not have qualifications, but the testimony does about the, the

7 authorization or lawfulness of being on the Grounds in the

8 Capitol, to look at, combined, both the plea and your answers

9 at the plea, with your answers and testimony at the trial; is

10 that correct?

11    THE WITNESS:  Yes, ma'am.

12    THE COURT:  Okay.  Now, it would be very helpful for

13 me, though I asked it earlier, but let me ask it again perhaps

14 a little more pointedly.  Can you pinpoint in terms of the

15 Grounds because that is one of the counts, in terms of it being

16 restricted?

17    Did there come a point while you were on the Grounds

18 when you knew, and it is the knowledge, that the, that you

19 were — it was unlawful or unauthorized to be there?  Can you

20 pinpoint a particular event that happened while you were on the

21 Grounds or something that would indicate to me that at this

22 point you had the knowledge?

23    THE WITNESS:  Yes, ma'am.

24    THE COURT:  And what would that be?

25    THE WITNESS:  After the stampede at the Crypt, Your

1   Honor.

2          THE COURT:  That is in the Capitol.  I am asking about

3   the Grounds, you know, outside.  Because the one count talks

4   about restriction — let me get it, get it, so I am accurate.

5          See, it is entering and remaining in a Restricted

6   Building or Grounds.  So we had asked about the Grounds.  Did

7   there come a point, some event that occurred while you were out

8   on the Grounds before you actually went in?  There were certain

9   things that occurred while you were on the Grounds before you

10  actually entered the Capitol.  Is there anything of those

11  events that you, then, knew, based on that, that it, it was

12  unlawful or unauthorized, however you want to word it, to be on

13  the Capitol Grounds?

14         THE WITNESS:  No, Your Honor.

15         THE COURT:  Okay.  So there is no event that the —

16  okay.  So it is only the Capitol that you are indicating?

17         THE WITNESS:  Yes, Your Honor.

18         THE COURT:  Okay.  So in the Capitol, when — what is

19  the event that is at the point that you knew that you, that

20  this was where you were in the Capitol, not the specific place

21  in the Capitol but in the Capitol as a whole, that it was

22  unauthorized or unlawful at that point?

23         THE WITNESS:  The, the police made a line, showing

24  where they wanted people to not go past with their bodies and

25  with their words and their hand motions in the Crypt.

1        THE COURT:  Okay.

2        THE WITNESS:  And obviously, they didn't want us to be

3   on the other side of that.  Otherwise, they wouldn't have made

4   that line.  After the stampede, we were in the area that they

5   did not permit us to go in.

6        THE COURT:  All right.  Then, the other question that

7   I have at the plea, and this is the count that has parading —

8   let me be specific here — parading, demonstrating, or

9   picketing in a Capitol Building.  And it was discussed at the

10  plea, parade seemed to fit the definition, which would be —

11  and I defined various things, a public display of you with

12  others for a cause, and you, you agreed to that.

13        I asked in Count IX, terms of parading, presumably

14  terms of you participated with others in a public display

15  towards a cause.  Would that be an accurate description, and

16  you indicated, "Yes, Your Honor."  So, and I didn't get into

17  any details.

18        But today it would be helpful to have you tell me the

19  public display was for what cause?  You indicated this was your

20  first protest, but you have not elaborated as to what, what is

21  the cause that you were there with others parading or, you

22  know, your protest.

23        THE WITNESS:  I had hoped that my representatives

24  would object to the, the — object to some of the, part of the

25  election and send it back to the states for review.

1    THE COURT:  And you are talking about Senator Cruz?

2    THE WITNESS:  Yes, ma'am.

3    THE COURT:  And so you're parading for him to do this?

4    If you can be a little more specific about what you are —

5    THE WITNESS:  It was, I felt that what I read in the

6    news, I can't remember exactly where, that it was rumored that

7    he and others were seriously thinking about it, and that is

8    what I was advocating for.

9    THE COURT:  So your parading, your reason for being in

10   the Capitol was to —— I don't want to put words in your mouth,

11   but to support that he would go and make objections; is that

12   what you are saying?  Or you word it in your own way.

13   THE WITNESS: Yes, ma'am.  That would be the parading.

14   THE COURT:  Right, which is —

15   THE WITNESS:  The parading or advocating or

16   protesting, that would be the thing I, I would have wanted to

17   be considered by my —

18   THE COURT:  So are you protesting the election, or are

19   you supporting the objections?  I want to —

20   THE WITNESS:  Supporting their objections, Your Honor.

21   THE COURT:  To the election?

22   THE WITNESS:  Yes.

23   THE COURT:  The Electoral College?

24   THE WITNESS:  Yes, Your Honor.

25   THE COURT:  All right.  Since I asked questions at the

1   end, if there is any questions, only based on what I have asked

2   additionally that anybody wants to ask, I will give you an

3   opportunity to ask now.  Government, anything you want to

4   clarify or say?

5           MS. CHO:  No.  Thank you, Your Honor.

6           THE COURT:  Mr. Mayr?

7           MR. MAYR:  Neither do I, Your Honor.

8           THE COURT:  All right, then, you can step down.

9           THE WITNESS:  Thank you.

10          MR. MAYR:  Thank you, Your Honor.

11                      *(Witness excused.)*

12          MR. MAYR:  With that, Your Honor, the Defense would

13   rest.

14          THE COURT:  Okay.  Is there any rebuttal?

15          MS. CHO:  There is none.

16          THE COURT:  Okay.  So it is five after 2:00, and as I

17   indicated, unfortunately, something came up that requires me —

18   it is out of my control.  I need to leave by 3:00.  So my

19   suggestion is that as I indicated, this gives you additional

20   time to prepare.

21          MR. MAYR:  Sure.

22          THE COURT:  I will see you promptly, 9:00 o'clock on

23   Monday.  I don't know if there is anything anybody wants to

24   raise at this point.  I want to make sure that I have

25   everything so that I can access everything.  I will have you

1    talk to my law clerk, who is better at IT than I am, in making

2    sure that we have it in, in a way that we can actually access

3    it.  So if you would just go over all of that.

4         I also want to make sure that we have, if you would

5    talk to Ms. Patterson to make sure that we are all in agreement

6    about which exhibits have been admitted.

7         MR. MAYR:  Okay.

8         THE COURT:  With the jury, we would be sending it back

9    to the jury, and we have everybody look and make sure that we

10   all agree of what the exhibits are and which ones have been

11   admitted.  If there is any question, then, I can resolve it.  I

12   am considering them.  I want to make sure that we also know

13   exactly which ones have been admitted.  I don't think there is

14   a problem.

15        When I get off the bench, I will just ask if you would

16   take a few moments to talk to Ms. Patterson about what — we

17   don't need to do it on the record.  If there is a problem, let

18   me know, and I will come back out —

19        MR. MAYR:  Okay.

20        THE COURT:  — relating to, making sure that I have

21   all of the exhibits and we all agree on what they are.

22        Is there anything you want to raise about the closing?

23   I don't need to — since I made it, you know, the 45 minute,

24   even though we had the rest of the day because I wasn't sure if

25   I was going to be in trial.

1    It will give me time to, frankly, write.  So I just as

2    soon do it first thing.  I don't need to see every single, you

3    know, video again.  You can tell me which ones you want me to

4    look at, specifically, or what to look for in them, but I am

5    not precluding you if there are key ones you want to show me as

6    part of your argument, that is fine as well.  We have a lot of

7    videos and a lot of text and a whole bunch of other things.

8    So I don't need to see everything as part of your

9    argument.  Just indicate to me what you want me to focus on,

10   and if there is, as I said, particular ones you want me to look

11   at of the, you know, willing to do so.  Anything else that

12   needs to be raised about the case or anything?  This is the

13   time to do it.

14        MR. MAYR:  I will renew my Rule 29 motion on the same

15   grounds that I previously stated at the conclusion of the

16   Government -- of the Government's case.

17        THE COURT:  Okay.

18        MR. MAYR:  I have nothing further.

19        THE COURT:  And you're taking presumably the same

20   position?

21        MS. CHO:  Yes, Your Honor.

22        THE COURT:  Okay.  All right.  As I said, I will take

23   it under advisement.

24        MR. MAYR:  Thank you.

25        THE COURT:  It will be, you know, dealing with that

1  after whatever I do, assuming it is necessary after the Court

2  enters judgment.  I will aim for Tuesday, at the latest it

3  would be Wednesday.

4          MR. MAYR:  Okay.

5          THE COURT:  There is a lot to look at.  I am going to

6  have to do a little more parsing.

7          MR. MAYR:  Okay.

8          MS. CHO:  Your Honor, whenever that does occur, would

9  that be in open court?

10         THE COURT:  Yes.  He is — he has a felony among his

11 misdemeanors so he is required to be present.  He cannot waive

12 it by Zoom, or you know, waive it in some other way.

13         MR. MAYR:  We understand that.

14         THE COURT:  If it was all misdemeanors, we could, but

15 you can't with a felony.

16         MR. MAYR:  Okay.

17         THE COURT:  So I will coordinate it with you-all in

18 terms of doing it.  That is why I will aim, as I said, to try

19 to get it all out by Tuesday.  I generally write opinions.  We

20 have a lot of issues, and rather than my trying to do it so

21 that it is not very exact for the Court of Appeals, I want to

22 make sure, you know, that what I say is very specific.

23         MR. MAYR:  Okay.

24         THE COURT:  That is what is going to take me a little

25 bit of time is to write it, but also, frankly, to look through

1    everything.  I have, you know, you have gone over quite a bit,

2    and I have looked at some stuff in between.  But I still need

3    to go back and look more carefully.

4            MR. MAYR:  Okay.

5            THE COURT:  All right.  If there is nothing else,

6    then, let me excuse you at this time.

7            MR. MAYR:  Just briefly.  The first thing that you

8    were going to share with us and that you wanted us to talk with

9    your law clerk about, I missed what exactly that was about.  I

10   am sorry.

11           THE COURT:  In terms of any of the exhibits, to make

12   sure, you know, all the electronic exhibits that we have, we

13   actually have —

14           MR. MAYR:  Got it.  Okay.

15           THE COURT:  — in a form that we can access.

16           MR. MAYR:  All right.  Thank you.

17           THE COURT:  I know we had one issue with one of the

18   Government's things, but I want to make sure that we have

19   everything, including the texts and everything else.

20           MR. MAYR:  We will coordinate with Ms. Patterson to

21   make sure we are in agreement —

22           THE COURT:  In terms of the exhibits, and then, with

23   my law clerk to make sure we actually have the —

24           MR. MAYR:  Perfect.

25           THE COURT:  — we have paper ones, but the electronic

1    ones we, obviously, need to make sure that I have them in the

2    form that I can actually access them.

3            MR. MAYR:  Wonderful.

4            THE COURT:  All right.  And we have put out that the

5    two sort of legal questions to weave into your argument that I

6    would like specifically answered that have been raised as part

7    of the legal motions, and frankly, your Rule 29.

8            MR. MAYR:  Okay.

9            THE COURT:  Okay?  All right.  Parties excused.

10   Everybody take care.  Be well over the weekend, and I will see

11   you back on Monday.

12           MR. MAYR:  Have a good weekend, Your Honor.

13           MS. CHO:  Thank you, Your Honor.

14           (Adjourned, 2:11 p.m.)

15                           - - -

16             <u>CERTIFICATE OF COURT REPORTER</u>

17

18           I, Jean A. Knepley, hereby certify that the

19   foregoing is a true and correct transcript from reported

20   proceedings in the above-entitled matter.

21

22   /S/ Jean A. Knepley                   January 6, 2023
     JEAN A. KNEPLEY, RDR/CRR/CRC/FCRR     Date
23   Official Court Reporter
     Southern District of Indiana
24   Indianapolis Division
     Detailed to the U.S. District Court
25   for the District of Columbia