## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-22 (CKK)** |
| **CHRISTOPHER GRIDER,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter.   For the reasons set forth herein, the government requests that this Court sentence Christopher Grider to 87 months of imprisonment, at the high end of the applicable Guidelines range of 70 to 87 months of imprisonment; 3 years of supervised release; $5,044 in restitution; and a mandatory assessment of $405.

### I.      INTRODUCTION

The defendant, Christopher Grider, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.8 million dollars in losses.[1]

---

[1]      As of October 17, 2022, the approximate losses suffered as a result of the siege at the United States Capitol was $2,881,360.20.  That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police.

As this Court concluded after a week-long bench trial, Grider "was a leader, not a follower, during the insurrection of January 6, 2021." (ECF No. 150, at 28). After marching through physical barricades and "AREA CLOSED" signs at the Peace Circle, in the early afternoon of January 6, Grider reached the scaffolding covering the northwestern stairway on the West Front of the Capitol. There, Grider watched as a line of police officers struggled to hold the mob back. Grider himself was tear gassed. On the West Front, Grider also assisted other rioters in dismantling police barricades and turning at least one bike rack into a ladder. As Grider made his way up the stairway, he repeatedly turned around to beckon the mob forward. Once on the Upper West Terrace, Grider picked up a discarded Capitol Police helmet.

Grider entered the Capitol building through the Senate Wing Door at 2:14 p.m., less than two minutes after the Capitol building was first breached at that location. Once inside, Grider zeroed in on a utility panel, where he tried (unsuccessfully) to cut power to the Capitol building. Grider next marched to the Crypt, where he and other rioters muscled their way through a line of Capitol Police officers. Grider then continued toward the House Chamber. After ascending to the second floor, Grider again beckoned other rioters to join him: "We gotta get into the Chamber! This way, this way, this way!"

Within minutes, Grider reached a hallway that led directly to the House Main Door, where another police line had formed to protect the House Chamber. Only minutes earlier, inside the House Chamber, members of Congress had been instructed to don protective "evacuation hoods" designed to protect against gas and other chemical irritants. Grider and other rioters again pushed through the police line, reaching a lobby area leading to the House Main Door. As the mob laid siege to those doors, Grider repeatedly offered up his hard black helmet to be used by the rioters

as a weapon, brandishing it above his head, as other rioters yelled, "Use your helmet! Use your Kevlar!" and "We need to use our Kevlar to knock out those windows."

A few minutes later, when the mob's siege of the House Main Door stalled, Grider sprinted toward the Speaker's Lobby Door on the south side of the House Chamber.   Through the Speaker's Lobby Door's glass panes, Grider could see members of Congress and their staff being evacuated.   Only three Capitol Police officers, the Speaker's Lobby glass doors, and some hastily amassed furniture on the other side of those doors stood between the mob and the evacuees. Determined to take over the House Chamber, Grider pleaded with the officers to open the doors. When that failed, Grider watched as another rioter, Zachary Alam,[2] punched the doors' glass panes with his bare fists, only inches away from one of the officers.   Grider then sought out Alam's attention.   As the duo was conversing, Grider knocked on the helmet—unambiguously conveying that it was hard and could be used as a weapon—and then handed the helmet to Alam.   Moments later, Alam violently banged the helmet against the Speaker's Lobby's glass doors, breaking the rightmost pane.   As another rioter climbed through that opening, a Capitol Police lieutenant on the other side of the glass doors discharged one round, fatally wounding the rioter.   Grider, who had set that chain of events in motion by arming Alam with the black helmet, stood only feet away. Despite witnessing the shooting, and instead of obeying the officers' directives to leave the area, Grider lingered on for several minutes, interfering with police efforts to provide medical assistance to the wounded rioter and restore order to the area.

The government recommends that the Court sentence Grider to 87 months of incarceration,

---

[2]      Zachary Alam is charged in a separate case.

at the high end of the advisory Guidelines range of 70 to 87 months—a sentence that is necessary in light of the severity of Grider's conduct, his complete lack of remorse, his continued obstruction by lying repeatedly under oath at trial, and the need to deter Grider and others.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the Court to the stipulated testimony of United States Secret Service Inspector Lanelle Hawa and Capitol Police Captain Carneysha Mendoza, as summarized in the Court's findings of facts (ECF No. 150 at 2-6), for an overview of the January 6, 2021 attack on the United States Capitol.   *See* Gov't Exs 1, 5.

### B.     Grider's Role in the January 6, 2021 Attack on the Capitol[3]

Grider traveled to Washington, DC on the morning of January 6, 2021, at least in part to attend the former President's speech at the Ellipse.   Grider missed that speech, instead watching most of it via YouTube livestream on a smartphone.   As this Court and others have explained, at that speech, the former President baselessly claimed that the 2020 Presidential Election had been "stolen" from him and exhorted his followers to march to the Capitol to persuade members of Congress to object to the electoral votes of several States.   *E.g.*, *United States v. Grider*, No. 21-022 (CKK), 2022 WL 3030974, at *1-2 (D.D.C. Aug. 1, 2022).   At the conclusion of the former President's address, Grider walked from the Washington Monument down the National Mall to the Capitol.

---

[3]      The facts in this Subsection are generally excerpted from the Court's post-trial findings of facts.   (*See* ECF No. 150 at 6-13).   The images included in this subsection were not part of the Court's findings of fact, but are drawn from the parties' trial exhibits.

By this time, Grider was wearing a yellow "Don't Tread on Me" flag affixed around his neck like a cape and a red "Make America Great Again" hat.   Def. Ex. 204, 206.   Grider first entered the restricted area at the Peace Circle, where he marched through a gap in two bike racks. Def. Exs. 212, 213.   On one rack, an "AREA CLOSED" sign in large font was clearly visible. Def. Ex. 212.   In front of him were demonstrators that had clambered on top of the monument at Peace Circle.   *Id.*




*Def. Ex. 206*                                        *Def. Ex. 212 (defendant's photograph)*

Undeterred, Grider continued towards the Capitol building itself, arriving at the foot of the northwestern stairway that connects the Lower Terrace to the Upper Terrace, on the West Front of the Capitol, by 2:10 p.m.   Gov't Ex. 30 (at 0:01).   Several rows of rioters ahead of Grider, Capitol Police officers were battling to keep the mob away from the Capitol building.   *Id.* (at 0:35 to 1:20);

Def. Ex. 219.   As Grider watched a thin line of police struggle to keep the mob back, he was tear gassed.   *See* Def. Ex. 214.   Around him, members of the mob shouted at the police, "Fuck You!" and deployed their own chemical spray at police officers.   Def. Ex. 30 (at 0:35 to 0:58).


*Gov't Ex. 30 (at 00:48)*


*Def. Ex. 214*

Shortly thereafter, Grider also assisted other rioters in dismantling police barricades. With the help of at least two other rioters, Grider lifted a bike rack and carried it down the stairs, turning it into a ladder that he and other rioters used to climb onto a wide stone railing adjoining the stairs. Def. Exs. 221, 227.   At approximately 2:10 p.m., Grider ascended onto a large pool of blood on the railing.   Def. Ex. 231 (blood), Gov't Ex. 30 (at 1:29, timestamp).   As Grider made his way up the railing, he lifted his fists jubilantly.   Gov't Ex. 30 (at 1:29 to 3:20).   On two occasions, he also beckoned the crowd behind him to move forward.   *Id.*




*Gov't Ex. 30 (at 02:47) (cropped)*      *Gov't Ex. 30 (at 03:14) (cropped)*

Shortly afterwards, Grider arrived on the Upper West Front, approximately at the time when the Capitol building itself was first breached.   *See* Def. Ex. 238.   There, he stole a case of bottled water that had been left behind by the retreating officers and offered waters to fellow rioters, some of whom had also been sprayed with chemical irritants.   *See id.*   Grider also picked up a discarded black helmet that was identical in shape and color to the helmets used by Capitol Police riot officers.



*Gov't Ex. 90*

7

At approximately 2:14 p.m., less than two minutes after the Capitol building was first breached, Grider entered the Capitol through the Senate Wing Door.   Gov't Ex. 30 (at 4:12).   At this point, the doors had been heavily damaged, with glass strewn across the floor.   *See id.*; Def. Ex. 239.   Upon entering, Grider could also hear an emergency siren blaring.   *See* Def. Ex. 239.



*Gov't Ex. 23 (cropped)*

Approximately thirty seconds after entering, Grider noticed an exposed circuit breaker box and yelled to others, "Turn the power off!"   Def. Ex. 239.   Grider then worked his way through fellow rioters to the breaker itself, where he began flipping switches.   *Id.*   At one point, another rioter shouted at Grider, "Cut the main [power line]!   Cut the whole fucking main!"   Grider

pleaded with this rioter for assistance in cutting the power, "Help me! Help me!"   *Id.*   Eventually,

the group, including Grider, gave up.   *See id.*



*Gov't Ex. 27 (cropped)*

From there, Grider advanced to the Crypt, arriving at approximately 2:19 p.m., five minutes

after he entered the Capitol.   Gov't Ex. 30 (at 5:36).   By the time Grider arrived in the Crypt,

Capitol Police had established a new police line in an effort to block the rioters from reaching the

second floor of the Capitol building, where the Senate and House Chambers are located.   *See id.*

Grider steadily advanced through the mob in the Crypt, until, eventually, only one row of rioters,

if that, separated him from the police line.   Def. Ex. 241.   There, Grider had a direct line of sight

as other rioters scuffled with the police officers and pleaded with the officers to let them through.

The officers refused to do so and attempted to hold their ground.   At approximately 2:25 p.m., the mob, including Grider, shoved their way through the police line, breaking it.   Gov't Ex. 30 (6:25 to 7:00); Def. Ex. 241.   Faced with such an onslaught, the police line stood for no more than a few minutes.   Moments after muscling through the police line, Grider shouted, "Stop the Steal!" Def. Ex. 241 (at 6:05).



*Gov't Ex. 26 (at 02:52)*

After Grider exited the Crypt, moving from the Senate to the House side on the first floor, Grider encountered a map of the Capitol building.   Gov't Ex. 30 (at 10:39); *see also* Def. Ex. 242 (photograph of map).   Grider spent several moments studying the map and then took a photo of the map itself.   *See* Gov't Ex. 30 (at 10:39 to 11:00).   He also engaged with another rioter, pointing to the map and conversing.   *Id.*

 

*Gov't Ex. 28 (at 2:29:00 pm) (cropped)*        *Def. Ex. 242 (defendant's photograph)*

After an apparent effort to orient himself in the building, Grider ascended to the second floor, briefly entering the Rotunda.   Def. Ex. 243 (at 0:25 to 1:31).   Grider then turned around, beckoning other rioters to join him: "We gotta get into the Chamber! This way, this way, this way!"   *Id.* (at 1:30 to 1:40).   The Chamber, as reflected in the map Grider had studied and in the various signs indicating offices for Members of the House—including one for Speaker of the House Nancy Pelosi that Grider zoomed in on in his video footage—was the House Chamber. *See id.* (1:46 to 1:50).

By the time Grider reached the hallway to the House Main Door at approximately 2:32 p.m., a police line had formed to keep rioters from the door.   *See* Gov't Ex. 32.   Grider's presence, as a member of the collective mob, had already disrupted Congressional business by that point.   House leadership had been evacuated from the House Chamber at 2:16 p.m., and, at 2:18 p.m., the House recessed under a special procedural rule. Gov's Ex. 5. Although the House attempted to resume business at 2:26 p.m., it again recessed for its safety at 2:29 p.m., three minutes before Grider's arrival at the hallway to the House Main Door.   *See id.*   As the mob gathered in that corridor, plainclothes Capitol Police officers instructed House Members to don

11

protective "evacuation hoods" designed to protect against gas and other chemical aerosols.   *See* Gov't Ex. 45.   The officers also began to barricade the interior of the House Main Door.   *See id.*

Meanwhile, Grider worked his way toward the makeshift police line in front of the House Main Door.   In the front of the mob, a rioter falsely assured others that police would let the mob into the House Chamber if they behaved peacefully.   Gov't Exs. 32, 34; Def. Ex. 243.   This rioter was within Grider's sightline and wearing a black "Trump" beanie and a grey sweatshirt; at points he spoke through a red bullhorn.   Gov't Exs. 32, 34; Def. Ex. 243.   The rioter's address failed to calm the mob and, as it grew rowdier, Grider beckoned the rioters behind him forward.   Gov't Ex. 31.





*Gov't Ex. 34 (at 00:37)*                    *Gov't Ex. 33 (at 01:28)*

When Grider was approximately three rows from the police line, a fellow rioter shouted "Push!", at which point Grider joined the mob in pushing through the police line and shouting "Stop the

Steal!"   Gov't Exs. 32 (at 3:20 to 3:22), 34; Def. Ex. 243 (at 6:05 to 6:15).

By this point, the mob had reached the House Main Door, with some rioters banging on the door itself and others crowded into an antechamber located in front of it.   Def. Ex. 243; Gov't Exs 35, 36.   While in the antechamber, Grider brandished his helmet for the crowd, lifting it up above his head.   Gov't Ex. 36.   Shortly thereafter, a rioter near Grider yelled, "Use your helmet! Use your Kevlar!" before saying, "We need to use our Kevlar to knock out those windows," referring to the two windows on the House Main Door.   Gov't Exs. 35, 36.   The rioter again pleaded, "Knock the windows out with Kevlar."   Gov't Exs. 35, 36.   At that point, Grider again brandished his police helmet, holding it above his head and offering it up to rioters at the front of the mob.   Grider remained for approximately a minute longer and falsely told others that the "cops [behind the door] are leaving."   Gov't Exs. 35, 36.

 

*Gov't Ex. 35 (at 01:17) (cropped)*                     *Gov't Ex. 35 (at 03:03) (cropped)*

Grider eventually abandoned his efforts to breach the House Main Door, heeding an earlier call by another rioter to "find an alternate way."   As he exited the antechamber, Grider saw other rioters down the hall beckoning others in that direction.   Gov't Ex. 37.   Grider then ran down the

13

hall, following the rioter to the Speaker's Lobby Door on the southern (Democratic) side of the House.   *Id.*   It took Grider only ten seconds to run from the antechamber to the Speaker's Lobby Door.   *See id.*   Throughout his time outside and within the Capitol building, Grider had multiple opportunities to leave.   Instead, he made repeated, concerted decisions to push forward.

At the Speaker's Lobby doors, Grider was met by a police line, including then-Capitol Police Officer Yetter, the intact Speaker's Lobby Door, and furniture stacked behind the Door to prevent entry.   Gov't Ex. 41.   Shortly after Grider arrived at the Speaker's Lobby Door, he could see through the Door's windows that House Members and staff were being evacuated.   Gov't Ex. 43.




*Gov't Ex. 41 (at 00:42)*          *Gov't Ex. 43 (at 00:01)*

Grider nevertheless remained, and pleaded with the officers to open the Speaker's Lobby Door and/or the House Main Door because law enforcement officers by the House Main Door were,

Grider claimed, getting injured by the mob (of which he was a member just moments prior). Gov't Ex. 41.   The officers did not yield.   *Id.*

Grider then watched as another rioter clad in a black fur-trimmed hat, Zachary Alam, violently punched the windows of the Speaker's Lobby Door with his bare fists.   Gov't Ex. 41. After watching Alam attempt to break down the door, Grider turned to Alam and conversed with him.   *Id.*; Gov't Ex. 40.   During this conversation, Grider knocked on his helmet to convey that it was a hard object, and could be used as a weapon, and handed it to Alam.   Gov't Ex. 40; *see also* Gov't Exs. 39 (at 1:02 to 1:07).



*Gov't Ex. 41 (at 01:27)*



*Gov't Ex. 39 (at 01:07)*

Alam then examined the helmet himself and removed his hat.   Gov't Ex. 40 (at 1:19 to 1:36).   At that point, the three Capitol Police officers left their post, as a more heavily armored group of Capitol Police officers was ascending a stairway nearby.   *Id.* (at 1:30 to 1:40).   Seizing on the opportunity, Grider tried to shove the Speaker's Lobby Door open with his hand.   *Id.* (at 1:34); *see also* Gov't Ex. 39 (at 1:23).   When that failed, Alam used Grider's helmet to smash in the door, breaking the rightmost window, which left a gap in the door through which rioters could jump into the Speaker's Lobby.   Gov't Exs. 39 (at 1:35 to 1:59), 40 (at 1:46 to 2:10); *see also* Gov't Ex. 41.



*Gov't Ex. 39 (at 1:23)*



*Gov't Ex. 39 (at 1:37)*

By then, the House Floor had mostly been evacuated, but Capitol Police remained. Additionally, scores of House Members were sheltering in the House Gallery, one floor above the House Floor.   When a Capitol Police sergeant on the other side of the doors saw the door being broken down, he drew his service weapon and took a position of cover, ready to use lethal force to protect Members of Congress from violent rioters.   His lieutenant, then the closest officer to

17

the door, also did so, and discharged one round when the first rioter clambered through the door, mortally wounding the rioter.   When Grider saw the lieutenant's gun and heard others shout "He's got a gun!", and before the shot was fired, Grider briefly began to flee and ducked down.   Def. Ex. 273.   After the shot was fired, however, rather than further retreating, Grider remained by the rioter's body for several minutes.   *Id.*   Grider's continued presence, particularly so close to the rioter's body, impeded officers from rendering medical assistance, removing the rioter's body, and restoring order to the area.   *Id.*

Grider was one of the last rioters to leave the Speaker's Lobby Door.   Gov't Ex. 44.   He left only after other rioters at that location began to be forcibly removed by armored officers of the Metropolitan Police Department.   *Id.*   After exiting the Capitol building, Grider identified with the rioters who had broken down the door, telling others who were gathering on the steps of the Capitol, "*we* busted down the window."   Gov't Ex. 83 (emphasis added).   Grider left the District of Columbia the following day.

## III.    THE CHARGES AND TRIAL

On June 1, 2022, a federal grand jury returned a superseding indictment charging Grider with nine counts: (1) Civil Disorder, in violation of 18 U.S.C. § 231(a)(3) (Count One); (2) Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2) (Count Two); (3) Destruction of Government Property, in violation of 18 U.S.C. § 1361 (Count Three); (4) Entering and Remaining in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(1) (Count Four); (5) Disorderly and Disruptive Conduct in a Restricted Building or Grounds, in violation 18 U.S.C. § 1752(a)(2) (Count Five); (6) Engaging in Physical Violence in a Restricted Building or Grounds, in violation of 18 U.S.C. § 1752(a)(4)

(Count Six); (7) Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D) (Count Seven); (8) Committing an Act of Physical Violence in the Capitol Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F) (Count Eight); and (9) Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G) (Count Nine).   On December 12, 2022, Grider pleaded guilty to the misdemeanor charges in Counts Four and Nine of the superseding indictment.   (ECF No. 150 at 2, 151).   The Court presided over a bench trial that lasted from December 12 to December 19, 2022.

At trial, Grider testified in his own defense.   With respect to his actions on January 6, Grider disputed primarily that he was acting with the requisite mental state.   As explained below, many of Grider's sworn statements at trial were false—indeed, several directly contradicted Grider's own sworn statements at his change-of-plea colloquy a few days earlier.[4]

Most glaringly, Grider lied about knowing whether he was authorized to be on Capitol Grounds.   During his plea colloquy, Grider admitted that he "kn[e]w that [he wasn't] authorized to be on the Capitol Grounds in addition to the Capitol itself, which are restricted areas."   Tr. 25. But at trial, Grider testified that he did not have "any concerns" about crossing into the restricted perimeter set up by the Capitol Police on the Capitol Grounds for January 6, assertedly because the former President had "said that we were supposed to be there" and "that is where the rally was going to be continued."   Tr. 482-483; *see also* Tr. 636 ("Q   Okay.   Once you got to the Lower West Terrace outside of the building, you knew police wanted you to leave, right?   A   Not necessarily.").

---

[4]      As noted, on December 12, 2022, Grider pleaded guilty to Counts Four and Nine of the superseding indictment.   (ECF No. 150 at 2; *see also* ECF No. 151).

Grider further testified falsely that even after seeing law enforcement "pepper spraying the crowd" on the Capitol's West Front and "throwing tear gas at the crowd," and even after Grider himself was "pepper sprayed," he *still* did not know he was not allowed on the Capitol's restricted grounds.   Tr. 642-643; *see* ECF No. 150 at 15 ("Even more specious is Grider's insistence that he thought he was lawfully present on the Lower West Terrace when he saw rioters battling police lines and when he himself was tear gassed by police.").   Grider asserted under oath that, even after he made it to the Upper West Terrace and even after stealing a case of water bottles left behind by retreating officers, he still "thought that that is where, I guess, maybe there was going to be maybe some speakers inside."   Tr. 520; *see also id.* (equivocating that "if this is how the rally was going according to a script, like this is what the permit -- you know, everything was permitted and it was maybe a specific time that maybe the officers had said, hey, the rally is starting or Trump is speaking inside, the right time to let people, you know, let people in now").   As the Court has already concluded, Grider's sworn trial testimony about what he knew as he progressed from the West Front to the Upper West Terrace was not "credible."   ECF No. 150 at 14, 16. Indeed, as the Court has emphasized, Grider's testimony was "particularly" incredible in light of Grider's background as a former military police officer entrusted with guarding access to an air base.   *Id.* at 13, 16.

Grider's testimony regarding *when* he finally understood that it was unlawful for him to be inside the Capitol building was also riddled with inconsistencies and falsehoods.   At the plea hearing, Grider testified, without caveat or qualification, that, when he entered the Capitol building, he "knew [he] [was] … not authorized to be in … the Capitol."   Tr. 25; *see also id.* ("THE COURT:   But you went ahead and entered and remained in the Capitol even though it was

restricted and you were not authorized to be there?   THE DEFENDANT:   Yes, Your Honor.

THE COURT:   And you knew that you were not authorized to be there? THE DEFENDANT:

Yes, Your Honor.").   But at trial, Grider relentlessly equivocated about *when*, during his intrusion

inside the Capitol, he realized that he was not authorized to be there.   On direct examination, he

claimed that, even after he entered the Capitol building, he could not "say that [he] knew 100

percent … that this might be some sort of civil disobedience rather than … a permitted … event

with a permit issued and permission."   Tr. 522; *see also id.* ("The feeling is growing at times, and

then, there are times where it abated, and then, there are times that it ebbed and flowed, that feeling

throughout the whole day[.]").   At one point, Grider claimed that, when he saw a police line form

in the Crypt to contain the rioters, he "started to think that this was a planned, orchestrated[, and]

… permitted event" and that the Crypt "was the designated spot that Trump or one of Trump's

supporters or maybe like a Senator or someone important was going to come and address the

crowd."   Tr. 542.   Grider also claimed that, when he later urged other rioters to "get to the

Chamber," he did so because he "didn't see any type of stage or podium or anything set up" in the

Rotunda, so he inferred that the rally was going to take place in the "Chamber."   Tr. 556-557,

637.   Grider, of course, only got to the Rotunda (let alone the House Main Door) after pushing his

way through multiple police lines, including in the Crypt.   Tr. 556-557, 637.

    During cross-examination, Grider's story again changed.   When pressed, Grider admitted,

albeit only after much equivocation, that the first time he "knew for certain" that he was not

allowed to be inside the Capitol was when he "saw people going in Nancy Pelosi's office."   Tr.

637-638.   By then, as noted, Grider had breached the Senate Wing Door, attempted to cut power

to the Capitol, muscled his way through a police line in the Crypt, and urged others to "get to the

Chamber."   Later during cross-examination, Grider stated that, in fact, he first "knew" that he had unlawfully entered the Capitol "after … the first stampede in the Crypt."   Tr. 639.   Later still, in response to the Court's questions, Grider resumed equivocating.   *See* Tr. 790 ("THE COURT: So be more specific.   When?   THE WITNESS:   Your Honor, the location is hard for me to, in time, mix.   It, it, it is difficult to pin down, specifically.   I think I knew it was wrong.   At times, I saw things that cast doubt on my feeling, like, I was not supposed to be there.   But then, then I would later be reaffirmed that I am not supposed to be there.").   After further questioning by the Court, Grider tried to walk back his sworn testimony at the plea colloquy, "I didn't know that I was able to equivocate during that plea."   Tr. 798.   Ultimately, Grider settled on a story that he first knew it was unlawful for him to be inside the Capitol "after the stampede at the Crypt" but that he had no such knowledge at any point while on Capitol grounds on the West Front and Upper West Terrace.   Tr. 814-815.   As this Court has already concluded, the fact that Grider's story "chang[ed] … so many times" (ECF No. 150 at 14), combined with the fact that it so blatantly contradicted both common sense and Grider's own sworn plea colloquy, shows that no particular version of Grider's story was credible, let alone true.   ECF No. 150 at 14.

Grider's trial testimony was false in other respects as well.   For example, Grider testified that he believed that a rioter who used a bullhorn in the Statuary Hall Connector to announce that the police would allow rioters into the chamber (or gallery) was a Capitol Police officer.   Tr. 559-560, 692.   Moments later, however, Grider can be heard on a video recorded by Grider himself shouting, "Let us in or we'll go in!" and "Let us in!"   Tr. 591; *see* ECF No. 150 at 15-16.   And, shortly after that, Grider joined in the stampede that overran the police line in the Statuary Hall Connector and opened the rioters' way to the House Main Door.   As this Court has already

concluded, "[b]elieving that one would be permitted into the Senate Gallery without passing through any security screenings whatsoever, and while a member of a mob, also strains credulity—particularly so for a former military police officer."   (ECF No. 150 at 16).

Grider's explanation for handing his black helmet to his fellow rioter, Alam, only moments after Alam had repeatedly punched the Speaker's Lobby's glass windows with his bare fists, was also false.   At trial, Grider claimed, under oath, that he gave the helmet to Alam because, right at that moment, Grider had coincidentally "started to … fear for [his] own safety because [he] thought [he] might be crushed."   Tr. 585-587.   More specifically, Grider claimed that, just after Alam had finished punching the windows, Grider came to the serendipitous realization that there "might be a possibility" to leave with the police officers, but became concerned that "maybe the police officers wouldn't let [him] go with them if [he] had" a helmet in his hand.   Tr. 585-587; *see also* Tr. 587 ("Q If you knew that he was going to do that, would you have given him the helmet?   A No, sir.").   *That*, according to Grider, was the reason he handed the helmet to Alam.

The video evidence belies Grider's story, as this Court correctly found.   It shows that, as Grider handed the helmet to Alam, Grider unambiguously knocked on the helmet to signify that it was a hard object.   Gov't Ex. 40.   Nor did Grider make any discernible attempt to follow the three officers as they moved away from the Speaker's Lobby Door.   To the contrary, when the officers moved away, Grider moved right to the front of the unprotected door and shoved it with his hand.   When that didn't yield Grider's desired result, Grider calmly looked on as Alam repeatedly smashed the glass doors with Grider's helmet.   Even after another rioter was shot only feet away from Grider, Grider made no attempt to leave.   Def. Ex. 273; Gov't Ex. 40.   Grider instead lingered at the scene for several more minutes, defying the orders of law enforcement

23

officers who were pleading with the mob to leave, and impeding their efforts to render medical assistance and restore order.   Def. Ex. 273; Gov't Ex. 40; Tr. 231-239.[5]

On December 21, 2022, the Court found Grider guilty on the seven remaining counts of the Superseding Indictment.   (ECF Nos. 150 at 2, 151).   In addition to finding the facts in Section II(B) above, (*see* ECF No. 150 at 2-16), the Court "discount[ed] any of Grider's self-serving statements, finding only his inculpatory statements credible because they are supported by other evidence."   (ECF No. 150 at 16).   The Court based that finding on, among other things, the contradictions in Grider's trial testimony highlighted above.   (*Id.* at 14-16).

## IV.   STATUTORY PENALTIES

Grider now faces sentencing on his convictions for civil disorder, obstruction of an official proceeding, destruction of government property, entering and remaining in a restricted building or grounds, disorderly and disruptive conduct in a restricted building or grounds, engaging in physical violence in a restricted building or grounds, disorderly and disruptive conduct in a Capitol building, committing an act of physical violence in a Capitol building, and parading, demonstrating, or picketing in a Capitol building.   As noted in the Probation Office's Presentence Report ("PSR"), the defendant faces the following statutory maximum penalties: (1) on Counts One, Two, and Three, terms of imprisonment of up to five, twenty, and ten years, respectively, as well as a term of supervised release of not more than three years, a fine up to $250,000, and mandatory special assessments of $100 per count; (2) on Counts Four through Six, terms of

---

[5]   At trial, Grider claimed that he remained at the scene because he "felt obligated … to document what happened because now I felt like I witnessed a … major crime" and wanted "warn [the officers] that the hallways were full of people."   Tr. 598.   The Court correctly rejected that self-serving explanation as well.   (ECF No. 150 at 16).

imprisonment of up to one year, as well as a term of supervised release of not more than one year, a fine up to $5,000, and mandatory special assessments of $25 per count; and (3) on Counts Seven through Nine, terms of imprisonment of up to six months, a fine up to $100,000, and mandatory special assessments of $10 per count.   PSR ¶¶ 102-106, 111-114, 131-136.[6]

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range."   *United States v. Gall*, 552 U.S. 38, 49 (2007).   The government agrees with the Sentencing Guidelines calculation set forth in the PSR. The Probation Office calculated Grider's adjusted offense level as follows:

| | |
|---|---|
| **Base Offense Level (U.S.S.G. § 2J1.2(a))** | **14** |
| **Specific Offense Characteristics (U.S.S.G. § 2J1.2(b)(1)(B)):** causing or threatening physical injury to a person, or property damage, in order to obstruct the administration of justice, specifically: rioters kicked the Speaker's lobby doors in an attempt to breach the entrance leading to the House chamber and the defendant handed a black helmet to another rioter to assist the rioter in breaking open the windows on the door | **+8** |
| **Specific Offense Characteristics (U.S.S.G. § 2J1.2(b)(2)):** substantial interference with the administration of justice | **+3** |
| **Adjustment for Obstruction of Justice (U.S.S.G. § 3C1.1):** willfully obstructing or impeding, or attempting to obstruct or impede, the administration of justice with respect to the prosecution of the instant offense of conviction by providing false testimony at trial[7] | **+2** |

---

[6]    Any terms of supervised release imposed on Counts One through Six must run concurrently.   18 U.S.C. § 3624(e).

[7]    The Guidelines' obstruction of justice provision (U.S.S.G. § 3C1.1) states: "If (1) the defendant willfully obstructed or impeded, or   attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to … the defendant's offense of conviction and any relevant conduct … increase the offense level by 2 levels."   The Guidelines' commentary

| Total Adjusted Offense Level | 27 |
| --- | --- |

*See* PSR at ¶¶ 56-65.[8]

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed.  PSR ¶ 68.  Accordingly, based on the PSR's and the government's calculation of the defendant's total adjusted offense level (at 27), Grider's Guidelines imprisonment range is 70 to 87 months of imprisonment.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   As described below, the Section 3553(a) factors weigh heavily in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Grider's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from

---

includes "providing materially false information to a judge or magistrate judge"—as Grider did in this case—as a basis for the enhancement.  U.S.S.G. § 3C1.1 app. note 4(F).  Here, Grider's testimony regarding his knowledge and mental state on January 6—which is described in Section III above and which the Court has already found to be not credible (ECF No. 150 at 16)—amply satisfies Section 3C1.1's requirements of falsehood, materiality, and willfulness.  *See also* PSR ¶ 36.

[8]      Under U.S.S.G. § 1B1.1(a)(4), the applicable Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) must be "repeat[ed]" for "each count," and only after the Guidelines analysis as set out in U.S.S.G. § 1B1.1(a)(1)-(3) is performed, is it appropriate to "[a]pply" the grouping analysis as set out in Chapter 3.   The PSR does not lay out the Guidelines calculation for each count.   Instead, it concludes (*see* PSR ¶¶ 52-55) that (1) Counts One through Six group; and (2) this group's offense level (27) is supplied by the offense level for Count Two because Count Two reflects the highest offense level for the counts within this group.   Because the government agrees with both conclusions, it also does not set out the offense level computation for each count in the group.

being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis.   The nature and circumstances of Grider's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 87 months of imprisonment, at the high end of the advisory Guidelines range.

### B.  The History and Characteristics of the Defendant

Grider, who is 41 years old, testified at trial that he previously served as a military police officer in the United States Air Force, guarding an air base, after having served in the Army National Guard.   (ECF No. 150 at 13).   Grider has also worked as a security guard.   (*Id.* at 13-14).   After holding other jobs, in recent years, Grider has operated a family business with his wife. (*Id.* at 14).

Grider's personal and professional background aggravates his culpability in connection with January 6, 2021.   Having witnessed other rioters' violent conduct as he approached the Capitol building from the West Front, Grider had no excuse for persevering in the violent takeover of the Capitol on January 6.   He cannot blame his poor judgment on lack of maturity, on naivety about political demonstrations,[9] or on social isolation during the COVID-19 pandemic.   Nor was Grider's decision to join a violent riot on January 6 a spur-of-the-moment decision.   Grider traveled to Washington, D.C. from Texas, a substantial journey that gave Grider ample time and opportunity to reflect on what he may encounter in Washington, D.C.   (ECF No. 150 at 14).   Yet, despite all those opportunities for better judgment and despite all his life experiences, Grider settled on the illegal choice.   Grider chose to ignore unmistakable indications that breaching the

---

[9]     At trial, Grider testified that, before January 6, 2021, he had attended two Trump rallies, which he recalls as having been peaceful.   (ECF No. 150 at 14).

restricted perimeter, let alone the Capitol building, was unlawful.  He chose to attempt to cut power to the Capitol building—a terrifying act of political and institutional sabotage.  He chose to push through a police line in the Crypt.  He chose to lead other rioters toward the House Chamber.  He chose to join the siege of the House Chamber at the House Main Door.   And, most tragically, he chose to help Alam break down the Speaker's Lobby's glass doors, setting in motion the chain of events that led to the death of another rioter.

Grider's prior military service and work as a military police officer render his participation in the January 6 attack particularly troubling.  As a former military police officer tasked with guarding an air base, Grider was uniquely positioned to appreciate the risks posed by the mob's intrusion in a sensitive government ground.  (*See* ECF No. 150 at 16).  It is, therefore, particularly disturbing that, on January 6, Grider chose to turn a bike rack—the very tool that was intended to keep unauthorized individuals out—into a ladder to let more rioters in.  Grider's background as a former military police officer also makes it particularly disturbing that, at trial, he claimed that he thought he might be permitted into the Senate Gallery "without passing through any security whatsoever, and while a member of a mob."  (*Ibid.*).  More fundamentally, it is troubling that Grider, who previously served in the Armed Forces, would betray the Military's core values—including the protection of the Nation's democratic institutions—and participate in an attack on our democracy.

### C.   The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a substantial term of incarceration.   Grider's criminal conduct—which, again, ranged from using police barricades

in service of the rioters to stealing a case of water bottles left behind by law enforcement on the Upper West Terrace, from attempting to cut power to the Capitol building to pushing through a police line in the Crypt, from participating in the siege of the House Main Door to handing a hard police helmet to another rioter so he could break down the glass panes of the Speaker's Lobby Door—was the epitome of disrespect for the law. And Grider's repeated lies, under oath, demonstrate an utter lack of respect for this Court and the judicial process.

### D.       The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B).   The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[10] The demands of general deterrence weigh strongly in favor of lengthy term of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.   Overwhelming evidence demonstrates that Grider has failed to understand the gravity of his actions on January 6, 2021, and of the January 6 attack on the Capitol more generally.   On January 6, immediately after another rioter was fatally wounded before Grider's eyes, Grider repeatedly defied orders from law enforcement officers who were pleading with the mob to leave the scene, thereby interfering with the officers' ability to

---

[10]       *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

secure the area and render aid to the rioter who had been shot.   (ECF No. 150 at 12); Tr. 231-239.

After exiting the Capitol, Grider shifted blame for the shooting he had just witnessed to the police.

*See* Gov't Ex. 83 ("There [were] two Capitol Police officers this close, standing right next to her.

They didn't see any threat.   If she was a threat, they could have done something to her.   She was

little.   Some asshole from 20 feet away decided to shoot her through a window.").   Later that

evening, Grider told his wife that his participation in the January 6 attack on the Capitol was

somehow "meant to happen"—as if his attempts to cut power to the Capitol and break into the

Speaker's Lobby were somehow the result of divine intervention.   Gov't Ex. 123; Tr. 758.   More

recently, at his own criminal trial, Grider falsely claimed that, on January 6, he believed that it was

somehow lawful for him to riot inside the Capitol building (at least for a time) and that he thought

that then-President Trump or his surrogates might show up and hold an impromptu rally in the

Crypt.   *See supra* p. 21.

This constellation of troubling statements reveals that Grider has no appreciation for the

gravity of his conduct on January 6 and is utterly without remorse.   It also shows that he does not

appreciate the gravity of what occurred at the United States Capitol on January 6, 2021 more

generally.   Grider's sentence must be sufficient to provide specific deterrence from committing

future crimes of political violence and institutional sabotage.

### E.        The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens

of thousands of sentences and worked with the help of many others in the law enforcement

community over a long period of time in an effort to fulfill [its] statutory mandate."   *Rita v. United

States*, 551 U.S. 338, 349 (2007).   As required by Congress, the Commission has "'modif[ied]

and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m).   In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up).   Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."   So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges."   *Gall v. United States*, 552 U.S. 38, 54 (2007).   In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021).   Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity.[11]   *See United States*

---

[11]      If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct.   *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

*v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan); *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009) ("The best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses and offenders similarly.").

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).

Identifying suitable comparator cases is difficult in this case because, to date, no January 6 defendant has been sentenced on Grider's precise combination of felony convictions: obstructing

federal officers during the civil disorder, obstructing Congress' official proceeding, *and* destruction of property.   In addition, to date, no other January 6 defendant has been sentenced for carrying out (or aiding and abetting) the destruction of the Speaker's Lobby Door—a pivotal moment in the January 6 attack that culminated, only seconds later, in the fatal shooting of another rioter.   Grider's unique strand of vandalism—vandalism that *both* was calculated to give the rioters direct access to the House Chamber at the high point of the insurrection *and* set in motion the chain of events that resulted in a rioter's death—easily sets this case apart from other January 6 cases involving destruction of property that have been sentenced to date.   So does the fact that Grider handed his helmet to Alam—and only Alam—moments after Alam had assaulted a Capitol Police officer by punching the Speaker's Lobby's glass doors only inches away from that officer's face.

While no previously sentenced case contains the same aggravating factors present here (and the government submits that there are in fact no mitigating factors in this case), the Court may consider, for reference, the sentence imposed in *United States v. Reffitt*, 21-cr-0032 (DLF). Reffitt was convicted after trial on five felony counts, including obstruction of a federal officer during a civil disorder, in violation of 18 U.S.C. § 231(a)(3), obstruction of an official proceeding, in violation of 18 U.S.C. § 1512(c)(2), and obstruction of justice, in violation of 18 U.S.C. § 1512(a)(2)(c).   There are many similarities between the two cases.   Like Grider, Reffitt was a "leader" during the January 6 attack.   (ECF No. 150 at 28).   Like Grider, at key intervals, Reffitt encouraged other rioters onward.   (*Id.*).   Like Grider, Reffitt endeavored to be among the very first to confront police lines—Grider in the Crypt, at the House Main Door, and at the Speaker's Lobby Door, and Reffitt at the stairway on the West Front.   Like Grider, Reffitt showed a

complete lack of remorse in statements he made after the riot. Like Grider, Reffitt actively obstructed justice after the fact—Grider by providing false testimony at trial and Reffitt by threatening his children to prevent them from reporting him to law enforcement. Finally, like Grider, Reffitt did not personally engage in physical attacks on the police or have criminal history points, but also did not qualify for acceptance of responsibility.

One distinction between the cases is that, whereas Reffitt came to the Capitol already wearing protective gear and carrying a weapon, Grider obtained his weapon—the helmet he later handed to Alam—once he reached the Upper West Terrace. But Grider still seized on the opportunity to acquire his weapon when that opportunity presented itself. And, unlike Reffitt, Grider made actual use of his weapon, by handing it to Alam, so that Alam could break the glass panes of the Speaker's Lobby Door. Furthermore, Grider's conduct was more egregious than Reffitt's in several significant respects. Unlike Reffitt, Grider actually entered the Capitol building; attempted to cut power to the building; pushed through multiple police lines inside the building; "wielded a police officer's helmet against officers, turning shield into sword" (ECF No. 150 at 28); and directly advanced the siege on the House Chamber by aiding and abetting the destruction of the Speaker's Lobby's glass doors. For his January 6 offenses, Reffitt was sentenced to 87 months of incarceration. The same sentence is both necessary and appropriate on the comparable facts of this case.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose

restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011).   Two general restitution statutes provide such authority.   First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes."   *Papagno*, 639 F.3d at 1096.   Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA.   *Papagno*, 639 F.3d at 1096.   The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both the VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA).   Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury.   *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b).   Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim.   *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate."   *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C.

2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)).   By contrast, as noted above, the MVRA applies

only to certain offenses, such as a "crime of violence," § 3663A(c)(1)(A), or "Title 18 property

offenses 'in which an identifiable victim . . . has suffered a physical injury or pecuniary loss,'"

*Fair*, 699 F.3d at 512 (citation omitted), but it requires imposition of full restitution without

respect to a defendant's ability to pay.[12]

Because this case involves the related criminal conduct of hundreds of defendants, the

Court has discretion to:  (1) hold the defendants jointly and severally liable for the full amount

of restitution owed to the victim(s), *see* 18 U.S.C. § 3664(f)(1)(A) (requiring that, for restitution

imposed under § 3663, "the court shall order restitution to each victim in the full amount of each

victim's losses as determined by the court and without consideration of the economic

circumstances of the defendant"); or (2) apportion restitution and hold the defendant and other

defendants responsible only for each defendant's individual contribution to the victim's total

losses, 18 U.S.C. § 3664(h).   That latter approach is appropriate here.

Applying these principles, the Court should require Grider to pay a total restitution

amount of $5,044, which is the sum of (i) $3,044 in restitution for aiding and abetting the

damaging of the Speaker's Lobby doors (Count Three); and (ii) $2,000 in restitution based on

Grider's felonious conduct at the Capitol on January 6 in the remaining Counts.   The $3,044

amount, more specifically, reflects the cost of repairing the Speaker's Lobby doors, a repair cost

to which Grider stipulated at trial.   (*See* ECF No. 147 at 7.)   The remaining $2,000 amount

---

[12]    Both statutes permit the sentencing court to decline to impose restitution where doing so
will "complicat[e]" or "prolong[]" the sentencing process.    *See* 18 U.S.C. §§
3663(a)(1)(B)(ii), 3663A(c)(3)(B).

fairly reflects Grider's role in the overall January 6 attack and the damages resulting from the remainder of Grider's conduct on January 6, for which he was convicted in the remaining Counts.  Significantly, in other January 6 cases in which defendants have pleaded guilty to felony offenses pursuant to plea agreements and the defendants were not charged with damaging specific items of property, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court.  Accordingly, a $2,000 restitution amount for Grider's overall participation in the January 6 attack—in addition to the $3,044 restitution amount for the property that Grider was personally and specifically responsible for destroying—avoids sentencing disparities.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 87 months of imprisonment, 3 years of supervised release, $5,044 in restitution, and a mandatory assessment of $405.

April 14, 2023

Respectfully submitted,
MATTHEW M. GRAVES
UNITED STATES ATTORNEY
D.C. Bar No. 481052

By:      */s/ Francesco Valentini*
Francesco Valentini
D.C. Bar No. 986769
Trial Attorney
United States Department of Justice, Criminal Division
Detailed to the D.C. United States Attorney's Office
601 D Street NW
Washington, D.C.   20530
(202) 598-2337
francesco.valentini@usdoj.gov