## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

*Plaintiff,*

v.                                    Criminal Action No. 21-22 (CKK)

CHRISTOPHER RAY GRIDER

*Defendant.*

## DEFENDANT'S SENTENCING MEMORANDUM
## AND REQUEST FOR DOWNWARD VARIANCE

TO THE HONORABLE COLLEEN KOLLAR-KOTELLY, UNITED STATES DISTRICT COURT SENIOR JUDGE FOR THE DISTRICT OF COLUMBIA:

CHRISTOPHER RAY GRIDER, the Defendant in the above styled and numbered cause, by and through undersigned counsel, submits the following Sentencing Memorandum to assist this Court in determining an appropriate sentence pursuant to 18 U.S.C. § 3553. He further requests that this Court sustain his objections to the application of the Sentencing Guidelines and grant him a downward variance from the recommended sentencing range as determined to apply based on those Guidelines.

## PROLOGUE

On Saturday, March 25, 2023, former President Donald J. Trump held a rally in Waco, Texas, the first rally of his 2024 Republican presidential campaign. As reported by the Associated Press, footage of the insurrection at the United States Capitol on January 6, 2021 was shown on big screens, displayed at the rally site as a choir

of people imprisoned for their roles in the insurrection sang the national anthem and a recording played of Trump reciting the Pledge of Allegiance.

About 20 miles down the road, Christopher Grider's mind was somewhere entirely different. After learning that Terry Moore, a 10-year-old boy from their community had been diagnosed with stage 4 cancer, well before Trump announced his local rally, Mr. Grider and his wife decided to hold a fundraiser at their winery store in Bruceville-Eddy to help raise money for Terry and his family. They donated all their time and the



*Flyer for Terry's Fight Fundraiser*

food for the event. They encouraged others to donate items to be auctioned off. Held the night before the rally, the event helped raise over $22,000 for Terry and his family.

The following morning, instead of driving up the road to listen to the man who encouraged him to go to Washington, D.C. on January 6, Mr. Grider woke up sore and exhausted from the previous night's event and headed back to his winery store to help clean up, distribute auction items, and get his store up and running for the weekend. Never once did Trump's rally cross his mind.

This Court can interpret Mr. Grider's words and testimony however it so chooses in its discretion. But it cannot ignore that his actions post-January 6 speak louder than his words. If punishment is a function designed to change and correct a person's behavior, reducing or eliminating a targeted and undesirable behavior, then

this Court should plainly see that Mr. Grider has demonstrated through his actions that he has changed and corrected his behavior, that he has no intention or desire to associate with anyone or anything having to do with January 6, and that he will continue to be a positive, contributing member to his community and society at large. To sentence him as harshly as is recommended by the Government and the Probation Office would undoubtedly be significantly greater than necessary to comply with the purposes set forth in 18 U.S.C. § 3553. Quite frankly, it would be tragic. Both the Government and the Probation Office portray him as someone he is not. To accept that he is that person is contrary to the truth. The multitude of letters submitted on his behalf by those who know him well, accounting for his actions prior to, and after January 6, prove who he really is.

## I.   Additional Factual Background

The Presentence Investigation Report (PSR) relied on this Court's Findings of Facts and Conclusions of Law to set out Mr. Grider's offense conduct but omitted several critical facts that this Court must consider, in particular facts related to the nature and circumstances of the offense. *See* 18 U.S.C. § 3553(a)(1).

### A.  No Plan, No Preparation, No Premeditation

Unlike so many others who came to Washington, D.C. who had prominently proclaimed well in advance that they were coming to do violence and participate in an insurrection, *see, e.g. United States v. Anthony Michael Puma*, 21-cr-454-PLF, ECF Dkt. 55 at 2 (defendant convicted of violating 18 U.S.C. § 1512(c)(2), sentenced to 9 months, who, in the week leading up to January 6, posted to Facebook: "On the 6th when we are all there in the capital [sic] and he [former President Trump] is givin

[sic] his second term the people will see. Then you never know we might have to start killing some commie bastards. #stopthesteal."; "Tomorrow is the big day. Rig for Red. War is coming."; and, "Hopefully we are storming the House of Representatives tomorrow at 100pm."); *United States v. John Douglas Wright*, 21-cr-341-CKK, ECF Dkt. 70 (defendant who frequently posted to Facebook with comments such as "WE ARE GOING TO HAVE TO FIGHT THE BLUE TOMORROW"; "FROM WHAT I SEEN TONIGHT THE TEMPERS WILL BE UP TOMORROW AND POLICE LINES WILL BE BREACHED… WE HAVE TO PUSH THRU"; "THE FIRST MISTAKE THEY MAKE IN CHAMBERS WE ARE GOING IN AND DRAG THEM OUT"; and arranged for two charter buses to travel to Washington, D.C. from Canton, Ohio, charging passengers $50 per seat, and bringing over 100 individuals to participate in the riot), as this Court heard during his trial, Mr. Grider's trip to Washington, D.C. was a last-minute trip, planned and booked less than 24 hours before he entered the Capitol grounds and building. There were no Facebook or other social media posts calling for action. His only communications about the trip were with his friend, Jesse Bowen, and his neighbor, David McLean. In those communications, Mr. Grider did not explicitly discuss any forceful entry into, or use of violence at the Capitol, nor did he express any desire to interrupt, impede, or obstruct the certification proceedings. There was no other evidence showing any elaborate planning or discussion about personally engaging in violent, obstructive, or otherwise criminal conduct.[1] In sum, Mr.

---

[1] Mr. Grider anticipates the Government will respond by reminding this Court (and not hopefully playing it in its entirety) about Mr. Grider sharing a video of "One More Day" from Les Misérables and his internet searches the night before coming to Washington, D.C. Whether this Court chose to believe Mr. Grider's innocuous explanations for accessing this content, he submits that these acts pale in

Grider said nothing, nor did anything that clearly indicated that he was planning or preparing to engage in the criminal conduct he was ultimately convicted of.

The Sentencing Guidelines recognize the distinction between someone who plans out or, at least, contemplates their criminal conduct and nevertheless engages in said conduct knowing fully well that such conduct is illegal, versus a person who commits an offense without any significant planning, that is limited in duration, and represents a marked deviation from an otherwise law-abiding life. *See* USSG § 5K2.20; *United States v. Dyce*, 91 F.3d 1462, 1470 (D.C. Cir. 1996) (quoting *United States v. Carey*, 895 F.2d 318, 325 (7th Cir. 1990); *United States v. Burleson*, 22 F.3d 93, 94 (5th Cir. 1994)) (adopting the meaning of "aberrant behavior" as such that "generally contemplates a spontaneous and seemingly thoughtless act rather than one which was the result of substantial planning."). Here, Mr. Grider falls into the latter category and this Court should recognize that when considering an appropriate sentence.

### B. A Conflicted Mind, A Conflicted Soul

Keeping Mr. Grider's character and reputation for being a law-abiding and contributing member of his community in mind, this Court not only must recognize and consider how his actions on January 6 stood in stark contrast to his usual character both before and after that fateful day. It must also consider the struggle to maintain that character that took place within Mr. Grider *that very day*.

---

comparison to the explicit and patently culpable conduct engaged in by many others in advance of January 6 and, they certainly did not amount to "significant planning."

This Court in its Findings of Fact and Conclusions of Law pointed out multiple inconsistencies in Mr. Grider's testimony. However, rather than look at those statements as inconsistent, contradictory, and therefore, not credible, what Mr. Grider wanted — and still wants — for this Court to recognize is that there was not one mental state, not one conscious objective, thought, or desire as the minutes and hours progressed on January 6. Again, this Court can put aside his words and testimony and simply look at his actions to recognize this. From the moment he landed in Washington, D.C., his mind and conscience went through multiple thoughts and emotions. His actions reflected that back-and-forth as well, doing things that were in his nature and things that were entirely not.

The unplanned and chaotic nature of his last-minute arrival in Washington, D.C. was a telling preface of that. Even though the entire (and only) purpose of his trip was to hear former President Trump speak one last time, as this Court heard, Mr. Grider and his friend arrived at Baltimore-Washington International Airport so late that morning that they had to watch Trump's speech en route to the National Mall by a live video stream on his friend's cell phone. Trial Transcript (Tr.) 458. By the time they arrived, the speech had concluded. Tr. 460. But having heard Trump's "marching orders" to proceed down Pennsylvania Avenue and seeing and hearing others heading down that way, Mr. Grider and his friend proceeded that way as well. *Id.*

On the way down, Mr. Grider was not angry and shouting. He did not appear ready for violence. As depicted in the photographs from his phone, he was smiling and stopping to take "selfies" with a Donald Trump impersonator. *See* Def's Ex. 205–

208. When he arrived at the Peace Circle, although he saw barrier fencing with signs showing the area was closed (and took pictures reflecting the same), on the other side, he saw a "very large crowd." Tr. 481–82. This is where one of the first internal conflicts materialized in Mr. Grider's mind.

As Mr. Grider testified, at that very moment on January 6, shortly before 2:00 p.m., he did not have any concerns about the sign prohibiting entry beyond the Peace Circle given what Trump had said about continuing the rally and seeing the large amount of people standing there beyond the fencing. Tr. 483. There was no evidence presented to show that Mr. Grider was present when others breached the barriers with those signs. Mr. Grider submits that his belief, based on those isolated facts, was not unreasonable. *See United States v. Carloss*, 818 F.3d 988, 995 (10th Cir. 2016) ("[J]ust the presence of a 'No Trespassing' sign is not alone sufficient to convey to an objective officer, or member of the public, that he cannot go to the front door and knock"; discussing host of cases considering the effect of "No Trespassing" signs on not automatically prohibiting entry onto property). As this Court pointed out, however, "[g]iven Grider's background in guarding restricted areas, such an explanation is particularly specious." ECF Dkt. 150 at 15. Mr. Grider does not disagree with this contention. Even though he was unable to acknowledge it, what unequivocally happened is that he failed to, as he was trained to do, fully assess the situation to determine that his entry beyond that point was indeed prohibited. Even though in his mind he had the training and experience to know how to control restricted areas, in the raucous environment that had been stirred up by former President Trump, the better

choice to stay behind those lines failed to come to his mind. As Mr. Grider approached the Capitol steps, however, the struggle over whether his presence was permitted became more evident and obvious in his mind.

When Mr. Grider approached the Capitol steps, as this Court noted as a significant fact, he was struck by tear gas from officers guarding the Capitol. *Id.*; *see also* Tr. 485; Def. Ex. 214. This was a critical moment for Mr. Grider. While prior to that, he felt like he was at a typical Trump rally, around this point in time, it became evident that this was more of a "protest." Tr. 497. Being hit with tear gas and seeing what was taking place sparked a range of new emotions in Mr. Grider's mind at that moment. He testified about feeling "betrayed" by law enforcement. Tr. 486. But his good sense of mind at that point was not to strike back or retaliate because, as he stated, he was "just not going to do that" as it was "not in [his] nature to do that." Tr. 486–87. But as he further testified, he was still "curious," "excited and confused." Tr. 496.

At this point, Mr. Grider made the first of his many regrettable decisions, attempting to climb up the stairs underneath the scaffolding, then lifting and helping other protesters move a bike rack down the stairs so it could be used as a ladder. Tr. 501–02; Def. Ex. 221. Mr. Grider did not shy away from this regrettable decision and admitted the video from his own phone despite it showing the same. *Id.* But then, a moment of clarity occurred — a moment where the struggle in his mind and conscience became clear as day.

In this critical moment, the good in Mr. Grider took over. As Mr. Grider testi-fied — and was corroborated through the admission of a photograph from his phone — when he "saw a real robust physical use of force by a law enforcement (sic) on the stairs," Mr. Grider "turned around and went down the stairs and walked away from the Capitol and went out onto the lawn." Tr. 506; *see also* Def. Ex. 224.[2] As for why he departed, Mr. Grider stated he "didn't want to be on the receiving end of the, of the use of force," noting it "[d]id not look pleasant," and that he wanted to find his friend, "contemplating kind of being done, like, leaving, time to go to the cigar bar." Tr. 506–07.

If only he had just continued onward and left the Capitol grounds.

Instead, as Mr. Grider testified, he heard a "really loud cheer," saw that "all the Capitol Police officers had left," and decided to return to the Capitol steps. Tr. 508–09. The good in him was still partly with him, taking a photograph of a man distributing what appeared to be bolts, finding it "highly suspicious," thinking it would be useful to law enforcement, and concerned they would be used in "some type of assault on someone or something." Tr. 509–10; *see* Def. Ex. 225. But unfortunately, and regrettably, he forgot about those concerns and climbed up the railing.

---

[2] Although the Court did not permit the use of the metadata recorded by Mr. Grider's phone at his trial, if there is any doubt that Mr. Grider moved away from the Capitol at this point, the metadata — specifically, the GPS longitude and latitude coordinates recording by his device upon taking the picture (Def. Ex. 224) — confirm this, in addition to the photograph depicting the lawn facing west away from the Capitol building.

Why? Why did a man of Mr. Grider's character and integrity continue onward? Although this Court took issue with Mr. Grider's credibility in his testimony, it cannot discount Mr. Grider's raw honesty when trying to explain his behavior:

> Q     What can you remember in terms of what you were thinking about at this point?
>
> A     I don't know.
>
> Q     Why are you unable to remember what you were thinking, Mr. Grider?
>
> A     I don't -- I don't know. I am not a doctor, you know, or anything like that. Or I just -- I don't know. I don't know why.
>
> Q     Sitting here --
>
> A     I was -- it was the worst day of my life. I, I can guess maybe it had something to do with that.
>
> Q     Sitting here and looking at yourself doing this, how does that make you feel?
>
> A     Regretful.

Tr. 515. Despite having no reason or explanation, what this Court should recognize is the conflict between who Mr. Grider really is and what he wanted to do, versus the Mr. Grider who inexplicably acted the opposite. More importantly, this Court should recognize that Mr. Grider undeniably regretted his actions.

This internal conflict continued as Mr. Grider moved his way into the Capitol building. When he reached the terrace, he grabbed water bottles and began to hand them out and throw them over to the railing to others in the crowd, concerned for their well-being. But admittedly, he failed to recognize that, as this Court noted, the bottles were instead "meant for police officers." Tr. 518–19; ECF Dkt. 150 at 7.

He then picked up a black helmet. Tr. 520–21. Even though this Court may not have believed that he thought the helmet belonged to a protestor or that he thought

he could use the helmet for protection from counter-protesters, Tr. 520–21, again, this Court can nevertheless look at Mr. Grider's actions as depicted in other evidence to show what was going through his mind. When he picked it up, he clearly did not intend to use it as weapon or an implement for causing damage at that moment. As he walked into the Capitol building past broken windows, he did not use it to further break those windows. *See, e.g.* Gov't Ex. 30; Def's Ex. 239. Upon entering the lobby, he did not use it to smash open any doors or anything else inside.

The conflict in his mind continued. He regrettably approached an open circuit breaker box and talked with others about trying to cut power. But he did not further use the helmet to cause damage at that point. *Id.* Instead, he realized he should not be doing anything further, abandoned the effort and, began shouting to others inside repeatedly, "Don't break anything" as he walked through the hallways. Def. Ex. 240.

If he did not mean it, he would not have shouted it.

Upon entering the Crypt, while this Court noted that "Grider can be seen steadily advancing through the mob in the Crypt, eventually advancing such that one row of rioters, if that, separated him from the police line," and that he could "see other rioters scuffle with the police officers and plead with the officers to let them through," ECF Dkt. 150 at 8, this Court should recognize that Mr. Grider himself did not try, as he had previously warned others against doing, to inflict any damage on any of the structures within the Crypt nor did he "scuffle with the police officers" or plead to be let through. Def. Ex. 241.

Mr. Grider never shouted to "Push them back!" *Id.* When the police line broke and the mob shoved their way through, Mr. Grider never shouted in jubilee or encouraged others to do the same. *Id.* While this Court found Mr. Grider "shove[d]" and "muscled" his way through the police line, he respectfully requests this Court to reconsider both Government's Exhibit 20 and Defendant's Exhibit 241. *See* ECF Dkt. 150 at 9. Both exhibits clearly show Mr. Grider in the middle of the mob where no one in his position, himself included, was capable of moving anywhere but in the direction of the mob. While his presence certainly contributed to the mob's presence and efforts against the officers, it should be made abundantly clear that Mr. Grider independently did not desire to act against them.

As this Court recognized, when he was pushed up against a police officer and pinned against the wall, he undoubtedly expressed concern for the officer, telling another rioter, "He's going to get hurt," and also telling the officer, "I'm sorry for pushing on you, man, I'm sorry." *See id.*; Def's Ex. 241; Tr. 545–547. But after he was pushed beyond the officer and moved into a more open area of the building, as this Court also recognized, he shouted, "Stop the Steal." *Id.* So within a matter of minutes, he went from expressing concern for an officer to joining the mob in their calls to challenge the election results. More evidence of the back-and-forth in his mind.

Mr. Grider described this back-and-forth in his own words, stating, "And I, I feel at times of, different feelings throughout the day of excitement, curiosity, patriotism, fear, confusion. It is not one fluid, static theme." Tr. 578. Again, even if this Court did not find this testimony credible, the exhibits speak for themselves.

As Mr. Grider proceeded through the building, he found himself in a corridor leading to Congressional offices and specifically recalls seeing Rep. Stan Hoyer's office and videorecording it. *See* Tr. 551; Def's Ex. 241. As the video shows, while other individuals opened the door to enter that private area, Mr. Grider did not. Def's Ex. 241. When asked about that moment, Mr. Grider replied, "I thought two things. We are not supposed to do that, and, well, I thought that it was going to bring — I didn't want to be blamed for someone going into that office or be blamed for — recused (sic), rather, sir, of going into that office. So I made sure to document who did." Tr. 551– 52. This testimony and exhibit undeniably established that Mr. Grider recognized there were areas where his entry was restricted and that he was not going to enter those areas. In other words, in his mind, at that point, he was able to recognize the restriction and abide by it. More importantly, by video recording his actions at that point, Mr. Grider was intending to show, at least at that moment, that it was not his desire to break the law.

This same mindset continued as he moved upstairs into the Rotunda. As he moved toward the House Chamber, he found himself in front of Speaker of the House Nancy Pelosi's office. Def's Ex. 243. Just as he had on the floor below, he never made any attempts to enter her office, knowing that was not right. *Id.* But he regrettably pushed forward to the House Main Door corridor clearly knowing by this point that his presence (and the presence of the hundreds of other protestors) on the Capitol grounds and within the Capitol building was unauthorized. *See* Tr. 560, 637.

Even at the Speaker's Lobby door, this Court could see that Mr. Grider was conflicted. While others were shouting, screaming, and repeatedly striking the door, as this Court noted in its findings, Mr. Grider was pleading with officers to open the doors "because law enforcement officers by the House Main Door were . . . getting injured by the mob." ECF Dkt. 150 at 11. But then, despite witnessing the actions of Zachary Alam, Mr. Grider gave him the helmet he had been carrying around which Alam then used to smash in the windows to the door. *Id.*

All this is to impart on the Court that Mr. Grider did not enter the restricted areas outside the Capitol building or the interior areas of the Capitol intent on moving "full steam ahead" like so many others are observed doing through the multiple exhibits showing his movement in and around the Capitol. All this is to impart on the Court that Mr. Grider continuously struggled with doing what he was supposed to do and doing what was right, versus being compelled by his emotions and the emotions of the day to continue forward despite knowing his actions and presence were not authorized and illegal. There is no doubt that all of Mr. Grider's illegal actions were borne from his decision to continue forward into restricted areas. But his greatest regret of that entire, tragic day will be not listening to that inner voice that wanted to act in conformity with the law as he had for almost his entire life.

### C. No Pride, No Boasting, No Post-January 6 Obstructive Conduct

Also absent from the PSR are critical facts related to Mr. Grider's conduct after leaving the Capitol grounds. While countless other defendants who have been convicted and sentenced to probation expressed pride in their actions of the day and continued their calls for violence after the fact, Mr. Grider did the exact opposite. *See,*

*e.g., United States v. Jenny Louise Cudd*, 21-cr-68-1-TNM, ECF Dkt. 76 at 5 (defend-ant sentenced to two months' probation who posted a video on social media proclaim-ing, "Fuck yes, I am proud of my actions, I fucking charged the Capitol today with patriots today. Hell yes I am proud of my actions."); *United States v. William Thomas Bostic*, 21-cr-643-2-CKK, ECF Dkt. 94 at 9–10 (defendant texted friend three days later that "people need to storm the capitol").

As this Court will recall, immediately after leaving the Capitol grounds, Mr. Grider reached out to Rissa Shaw, a friend of his who was a reporter for a local news station in Waco, Texas. Tr. 615. She sent him a list of questions and he made video recordings on his phone responding to those questions. *See* Def's Ex. 259–265. In all those videos, Mr. Grider never expressed any pride in his actions; his demeanor and tone, in fact, demonstrate shock and dismay about what he had done and what he had observed. *Id.* As this Court noted in its findings, the most incriminating thing Mr. Grider said was, in a text message to his wife, that "It was meant to happen." ECF Dkt. 150 at 2.

While other defendants engaged in obvious, obstructive efforts to conceal their presence and actions at the Capitol on January 6, Mr. Grider again did the exact opposite.

After learning that the FBI was looking for photographs and videos of what took place, Mr. Grider, despite feeling "a little bit nervous about it," felt compelled to turn over what he had, and contacted an attorney, Nick Oberheiden, to help with his efforts. Tr. 622–24. Upon arriving back in Texas, he then took steps to "preserve [his]

photos and videos on [his] phone, and you know, make sure nothing happens." Tr. 624. Mr. Grider presented (but did not admit) during the trial Defendant's Exhibit 271, a proffer letter from an Assistant United States Attorney sent to Mr. Oberheiden confirming Mr. Grider's desire to meet with members of law enforcement and representatives of the United States Attorney's Office. As Mr. Grider will concede, the Government subsequently rescinded their desire to accept his cooperation when they learned of his actions within the Capitol. Nevertheless, when an arrest warrant was issued for his arrest, Mr. Grider then drove himself down to Austin, Texas to turn himself in and took his cell phone to turn over to law enforcement. All this, in addition to being relevant as to the facts and circumstances, reflects Mr. Grider's respect for the law and his willingness to accept responsibility for his actions. *See* 18 U.S.C. § 3553 (a)(1), (a)(2)(A).

In conclusion, while the facts reflected in the PSR support Mr. Grider's convictions as to all counts of the superseding indictment, this Court must consider all the additional evidence that demonstrated that his conduct and behavior while upsetting, reflected a struggle within Mr. Grider to act in conformity with the law. Further, this Court must consider the evidence establishing that, throughout that entire day, in the days after, and even up until trial and today, Mr. Grider struggled and continues to feel tremendous guilt with acting as he did, in complete contrast to how he lived his life before and after January 6.

## II.    Adjustment for Obstruction of Justice

Although not initially recommended by the Probation Office, *see* ECF Dkt. 159, after the Government filed its Objections to the PSR and, more specifically, argued that Mr. Grider should receive an upward adjustment under USSG § 3C1.1 for obstruction of justice based on his testimony at trial, the Probation Office in its final PSR recommended the same. PSR ¶¶ 37, 61. Based on the law and the factual findings previously made by this Court, however, the enhancement should not apply to Mr. Grider.

While the United States Supreme Court has recognized that a trial court is within its discretion to enhance a defendant's sentence under USSG § 3C1.1 when a defendant testifies and is nevertheless convicted, the Court was careful to note that such an enhancement is only appropriate when there is false testimony given with a "willful intent to provide false testimony." *United States v. Dunnigan*, 507 U.S. 87, 94–95, 113 S. Ct. 1111, 122 L. Ed. 2d 445 (1993). As the Court recognized, "not every accused who testifies at trial and is convicted will incur an enhanced sentence under § 3C1.1 for committing perjury." *Id.* at 95. As the Court explained, "an accused may give inaccurate testimony due to confusion, mistake, or faulty memory." *Id.* The comments to the Guideline itself also recognize this. *See* USSG § 3C1.1, cmt. 2 ("In applying this provision in respect to alleged false testimony or statements by the defendant, the court should be cognizant that inaccurate testimony or statements some-

times may result from confusion, mistake, or faulty memory and, thus, not all inaccurate testimony or statements necessarily reflect a willful attempt to obstruct justice.").[3]

It is worth noting that, as this Court recognized, "the parties only really dispute whether Grider acted with the requisite mental state for each offense to which he has pleaded not guilty." ECF Dkt. 150 at 13. As discussed *supra*, Mr. Grider's account of his actions on January 6 and his actions themselves reflected an amalgam of confusion and internal conflict within his mind. He recognized that he acted in violation of the law but also acknowledged that he could not explain certain behavior. *See, e.g.* Tr. 496, 505, 515, 527. Adding to that, he explained that, even in watching his videos and looking at his photographs — which he described as "disorienting," "difficult," making it "hard to breathe," and "nauseous" — he could not recall what exactly he was thinking at each point throughout them. Tr. 494–96. While this Court found Mr. Grider's testimony as to what he could recall about his mental state to not be credible, nowhere did this Court find that Mr. Grider willfully provided false testimony. *See generally* ECF Dkt. 150.

---

[3] The District of Columbia Court of Appeals has previous applied an enhanced standard for evaluating the application of the enhancement, one which requires clear and convincing evidence of a perjury on the part of the defendant. *United States v. Montague*, 40 F.3d 1251, 1256 (D.C. Cir. 1994). The court further mandated "cases that cause a district court pause require separate and clear findings and careful attention to the evaluating standard in supporting the determination." *Id.*; *see also Dunnigan*, 507 U.S. at 97 ("the trial court must make findings to support all the elements of a perjury violation in the specific case."). Although this holding has not been expressly overruled, the court in a subsequent opinion, noted in a footnote that effective November 1, 1997, the Sentencing Commission deleted language from the commentary to § 3C1.1 so that the Application Note "no longer suggests the use of a heightened standard of proof." *United States v. Dozier*, 162 F.3d 120, 124 n.1 (D.C. Cir. 1998) (quoting U.S.S.G. App. C, amend. 566 (Nov. 1997)).

Such a finding would be inconsistent with Mr. Grider's actions after January 6. Rather than attempting to obstruct justice by concealing his actions from that day or concealing evidence thereof, in addition to allowing his account of the events of that day to be publicized on a local television news broadcast, he answered the call from the FBI to produce photographs and videos, retained counsel, and made efforts to submit to an interview with federal prosecutors. After an arrest warrant was issued, he voluntarily drove himself to surrender to the FBI and turned over his cell phone to be searched. Even during trial, he produced videos that the Government failed to present — even those that were more inculpatory than exculpatory — simply out of a desire for this Court to have a full account of his actions. This proves the opposite of what this Court has to find in order to find the enhancement applicable. Mr. Grider had absolutely no willful intent to provide false testimony to this Court and certainly did not act with any intent to obstruct justice. This Court should not apply an upward adjustment under USSG § 3C1.1 for obstruction of justice.

## III.   Sentencing Enhancements for Obstructing or Interfering with "the Administration of Justice"

The PSR recommends two enhancements to the base offense level under USSG §§ 2J1.2 (b)(1)(B) and (b)(2) due to Mr. Grider's actions of obstructing and interfering with the administration of justice, namely, Congress' certification of the Electoral College vote. PSR ¶¶ 57, 58. Mr. Grider objected to the application of these enhancements as the electoral college proceedings of the 2020 Presidential Election did not involve the "administration of justice" as that term is used in those guidelines, ECF Dkt. 165, and continues to maintain here that the enhancements should not apply.

Mr. Grider recognizes that this Court has considered the application of these guidelines in *United States v. Wright*, No. CR 21-341-CKK, 2023 WL 2387816 (D.D.C. Mar. 4, 2023) and found that they apply to the circumstances of the insurrection at the United States Capitol on January 6, 2021. However, as this Court recognized therein, Judge McFadden has held the opposite in *United States v. Seefried*, No. 21-cr-287-TNM, 2022 WL 16528415 (D.D.C. Oct. 29, 2022). *Wright*, 2023 WL 2387816 at *6.

This Court acknowledged Judge McFadden's recognition that "this is a close interpretative call." *Id.* (quoting *Seefried*, 2022 WL 16528415 at *4). Mr. Grider concurs with this. Both this Court and Judge McFadden raise a number of valid points in their respective opinions. Admittedly, however, Mr. Grider believes the reasoning and holding by Judge McFadden should apply in his case.

Just as Mr. Grider respects the Court's verdict, findings, and conclusions in his case, he will respect the Court's opinion on this issue and is not asking for any additional consideration on this question of law. In the event that he chooses to appeal his case, however, he respectfully requests this Court consider and rule on his objections accordingly.

## IV.   Application of the Sentencing Factors Under 18 U.S.C. § 3553(a)

As this Court is undoubtedly aware, the starting point for any federal sentencing proceeding is "correctly calculating the applicable Guidelines range" which serves as the "initial benchmark" in determining an appropriate sentence. *Gall v. United States*, 552 U.S. 38, 49, 128 S. Ct. 586, 169 L. Ed. 2d 445 (2007). However, as this Court is also aware, the Guidelines are not mandatory. *See United States v. Booker*,

543 U.S. 220, 258–59, 125 S. Ct. 738, 160 L. Ed. 2d 621 (2005). Additionally, a sentencing court such as this one "may not presume that the Guidelines range is reasonable." *Gall*, 552 U.S. at 50. Rather, the Court "must make an individualized assessment based on the facts presented." *Id*. If this Court "decides that an outside-Guidelines sentence is warranted," it "must give serious consideration" to "the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance." *Id*. at 46, 50. This is because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions." *Id*. at 46.

It is worth noting that, as per the sentencing table submitted by the Government along with their Sentencing Memorandum, for individuals convicted of violating 18 U.S.C. § 1512(c)(2), presuming the Government's sentencing recommendations have been consistent with Guideline recommended sentences, the sentences imposed have been less than those recommended in over 90% of the cases. Suffice it to say that variances, and more specifically, downward variances have appeared to be the norm in this District for defendants convicted for their corrupt obstruction of the certification proceedings.

Mr. Grider submits that a careful application of the other factors set forth in 18 U.S.C. § 3553(a), therefore, warrants a downward variance from the recommended Guideline range.

### A. The Nature and Circumstances of the Offense

While the Government maintains in their Sentencing Memorandum that the "nature and circumstances of Grider's offenses were of the utmost seriousness," Gov't Sent. Memo at 27, Mr. Grider would submit that, although his criminal violations were indeed serious, they pale in comparison to the patently violent and offensive actions of hundreds of others, in particular, those who physically assaulted police officers with either their hands or weapons, those who themselves inflicted physical damage by breaching doors or windows, and those who continued their calls for violence after January 6.

Again, Mr. Grider asks that this Court carefully consider those facts discussed *supra* that demonstrate the lack of planning and preparation for his conduct on January 6, his struggle to maintain himself in conformity with the law during that fateful day, and his actions after leaving the Capitol grounds that day. As he will discuss *infra*, multiple others who did much worse than him have received probation and sentences of less than one year incarceration, and multiple others who did much worse than him received sentences much lower than what the Government is calling for in his case.

### B. The History and Characteristics of the Defendant

At trial, this Court heard a considerable amount about Mr. Grider's history and background that puts his actions on January 6 into perspective.

As Mr. Grider testified (Tr. 418–422), is reflected in the PSR (PSR ¶ 75), and is confirmed in some of the attached character reference letters, Mr. Grider had a humble upbringing in one of the poorest neighborhoods in the Dallas, Texas

metroplex. He learned at an early age to work hard to support his family and take care of others. He was also raised with a strong religious background in the Christian faith. After dropping out of high school to work in sales, he felt called to serve his country in the Army National Guard.

While the Government in their Sentencing Memorandum refer to his prior military service and work as a military police officer as "particularly troubling," Gov't Sent. Memo at 28, instead, Mr. Grider would direct this Court to his testimony about his experiences in the military and afterwards to help put his actions on January 6 into a greater, more impactful, and helpful perspective.

As this Court can recall from his testimony, Mr. Grider first joined the Army National Guard feeling "very patriotic" about serving his country, proud, and "like [he] was destined to do that." Tr. 423. After September 11, 2001, Mr. Grider felt even more compelled to serve his country and enlisted in the United States Air Force. Tr. 424–25; *see also* PSR ¶¶ 87, 88. This work, in particular, working as a military police officer, continued to make him "proud to serve [his] country." Tr. 426.

All that began to change two and a half years into his service when he was preparing for deployment to Afghanistan. *See* Tr. 427. As Mr. Grider explained, while going through a training exercise, he developed a respiratory condition that led to an honorable medical discharge. *Id.* When asked how that made him feel to have his military career come to an end like that, he responded, "I felt like I lost my family. . . It is a feeling of you can never go home again" Tr. 427–28. While he wanted to try and continue his goal of being a police officer in some capacity, as he explained, after

working in security for some time, he "kind of got tired also of, of being, like an en-forcer . . . the guy that everybody meets on the worst day of their life." Tr. 432.

As this Court will recall, these negative experiences of having his military ca-reer cut short and struggling to find happiness working as either a security officer or loss prevention officer spilled over into Mr. Grider's political beliefs. During his testi-mony, Mr. Grider explained how he was drawn to candidates with anti-war beliefs:

> During the Bush administration, I was very, very pro Bush, very pro --
> I was in the military, very pro everything we were doing in the Middle
> East. I was for it. I was just all in. I, I was, I was a military police officer.
> I just felt this was just, you know, I was -- then, later on, I had a lot of
> doubts about the legitimacy of us even being in Iraq, specifically.

> And later on I kind of felt like I had been duped. I have been lied to
> about, about what went on, maybe even betrayed by what I -- in seeing
> the personal friends of mine, the different, you know, things that they
> experienced with, suffered in the war, I, I felt like it was, it wasn't worth
> it.

Tr. 443. When then asked if this swayed him to embrace the anti-war position pro-moted by then-Presidential candidate, Donald Trump, as this Court will recall, Mr. Grider acknowledged that and then broke down into tears requiring the Court to take a recess. Tr. 443–44.

Obviously, Mr. Grider was deeply impacted by his experiences and feelings of betrayal by the leaders of our country. He was just the type of person a charlatan like Donald Trump could captivate.

Despite all this, Mr. Grider continued to demonstrate positive character traits, working hard to support his family and others in his community. He graduated cum laude from Dallas Baptist University in 2008 with degrees in art and photography. Tr. 432, PSR ¶ 85. He then earned his Masters in Fine Art degree from the University

of Texas at Dallas which ultimately led to a career as an art teacher in various school districts in the Dallas area. Tr. 434–37.

Embedded during this period of Mr. Grider's life was the development of Mr. Grider's passion for winemaking and his desire to open up a winery of his own. *See* Tr. 433–34, 437. As Mr. Grider described, when the business first got off the ground, the business was successful and grew. Tr. 439. In that process he was able to give "jobs to people in the area, a lot of young folks that didn't have opportunities, former students of [his], friends of theirs . . . and other folks in the community that, that didn't have work." Tr. 439. Because of his history and respect for law enforcement, he also used his business to hold fundraisers and social events for local police officers. Tr. 440.

Although Mr. Grider did not testify about this during his trial, the pandemic of 2020 not surprisingly took its toll on Mr. Grider and his businesses. As reflected in some of the attached character reference letters, Mr. Grider had opened a successful restaurant in Waco, Texas shortly before the pandemic hit. Mr. Grider was forced to shut that restaurant down and focus all his attention on keeping his winery operational. As reflected in the PSR, in September 2021, Mr. Grider and his wife jointly filed for Chapter 7 bankruptcy protection after mounting financial difficulties that were extended by the pandemic. *See* PSR ¶ 98.

The time in Mr. Grider's life leading up to January 6 was indeed troubling. As reflected in the PSR, he was drinking habitually and socially using marijuana. *See* PSR ¶ 81. As reflected in his medical records from the Department of Veteran Affairs

which he has moved to submit as a sealed exhibit, in a psychological evaluation, he opened up and disclosed having difficulty since the beginning of the COVID lockdowns in 2020, reporting that a friend being murdered and feeling distress about various sociopolitical issues.

Although the Government maintains that Mr. Grider's "decision to join a violent riot on January 6" was not a "spur-of-the-moment decision," Mr. Grider urges this Court to consider the evidence showing the contrary. As he testified, sometime in December 2020, he and his friend, Jesse Bowen, began discussing going on a guy's trip when Bowen brought up coming to Washington, D.C. for then-President Trump's rally. Tr. 450. Mr. Grider dismissed the idea, wanting instead to go to California to "camp in Joshua Tree, make art . . . go to Lodi and maybe explore some business possibilities and drink some wine." Tr. 450–51.[4] It was not until the evening of January 5, 2021 that Bowen brought up the idea of the trip again and Mr. Grider ultimately (and forever regrettably) decided to book airplane tickets to travel here for the rally. Tr. 451–52; 361 (testimony by Agent Ball confirming the same).

In sum, prior to January 6, Mr. Grider was not some fanatical, anti-social, anti-government individual who dwelled upon or obsessed about coming to Washington, D.C. to do harm and violence. He was a productive, positive member of his community with a host of underlying issues and experiences that made him susceptible to being

---

[4] If this Court were, for some reason, to also find this testimony not credible, it could simply look to the evidence — of lack thereof — from his phone messages or internet searches to see that Mr. Grider was making no dedicated efforts to plan for a trip to Washington, D.C. prior to January 5.

manipulated by a narcissist and false beliefs that the 2020 Presidential Election was stolen from Trump.

More importantly than his actions and experiences before January 6, this Court should consider Mr. Grider's actions and behaviors *after* January 6 to see a true reflection of his character. As discussed *supra*, Mr. Grider did not boast or express pride about what occurred on January 6, nor tried to conceal his actions or evidence of the same. To the contrary, he immediately retained counsel and made efforts to provide the Government with the evidence he acquired. When he learned that an arrest warrant was issued, he voluntarily drove himself to Austin, Texas to surrender and provide agents with his cell phone.

While detained, as Mr. Grider can recount for this Court, he recalls being detained by true radicals who were defiant and believed in their actions on January 6. After his detention order was overturned by Judge Ketanji Brown Jackson after spending close to a month in custody, *see* ECF Dkt. 15, instead of coming out hardened and defiant as well, Mr. Grider embraced what was important to him: his family, his faith, and his community and distanced himself entirely from anything having to do with former President Trump and his false beliefs.

Placed under a "High Intensity Supervision Program," Mr. Grider complied with all his conditions of release without any issues over the past two years. *See* PSR ¶ 9. Mr. Grider's supervision officer was so comfortable with him back in the community that she "fully support[ed] terminating his GPS monitoring and curfew requirements," despite the Government's opposition. *See* ECF Dkt. 28, 30.

Even after his conviction on all counts of the superseding indictment by this Court, Mr. Grider remained committed to his family, faith, and community.

Attached to this memorandum as Exhibit 1 are multiple character reference letters from family, friends, and members of Mr. Grider's community that paint a consistent picture of Mr. Grider's character. Here are what some of those letters can tell this Court about the real Christopher Grider who is coming before you for sentencing:

- **Heidi Elliott**, who has known Chris and his family for over nine years, attends church with them, and taught his three boys in Sunday school, gives witness to how Chris is "deeply rooted in his Christian faith and shares biblical insights that can only come from someone who has studied the Bible and has a strong relationship with the Lord." She was present during Chris' trial and Chris has spoken to her candidly about January 6. She has witnessed how he is "not proud of his actions" and "embarrassed and ashamed of his gullibility in believing former President Trump's assertions." She also gives witness to Chris' desire to help others, whether it was employing a veteran with PTSD and TBI despite him being a liability to his business, helping homeless people outside of his business, or helping to raise funds for a young child with cancer. Since returning home from the trial, she has seen Chris continue to be engaged with his growing family, his business, his church, and his community while accepting the full weight of responsibility for his actions.

- **Louis Davion**, who ran the winery Chris first started working for in 2004 in Dallas and continues to remain close to him, describes Chris in numerous points. "Chris is decent. He is not cunning or sly. He's good, not evil period he's a friend, not an enemy. He's honest, tells the truth. He's not deceitful. Chris is trustworthy. His integrity is never in doubt. He's kind to all, with respect for all, not in his nature to be mean or cruel. He's steadfastly dependable, true to his word. He's not unreliable. He's hard working, making every effort to accomplish worthwhile achievements with his life. And he's patriotic." He explains how Chris has expressed regrets about his actions on January 6 and "laments the effects its had on his family." He affirms that "there is no world in which Chris would ever be involved in anything like January 6th again," "he sincerely regrets being involved in January 6," and asks this Court to take into account his wife and children's reliance upon him in deciding an appropriate sentence.

- **Evin Price**, who worked for Chris when he first started his restaurant, Taste by Kissing Tree, in Waco, Texas, accounts how he witnessed Chris deeply caring for

his "employees and customers alike," giving examples of how Chris helped employees who were going through hard times. He describes Chris' generosity. After January 6, he was "deeply troubled and saddened" as Chris' actions were much different that the person he worked with. But he recognized that it could not take away from the "countless acts of kindness and service he had performed throughout his life." He confirmed that Chris "demonstrated remorse for his actions and has taken steps to make amends for his mistakes" on January 6.

- **Melanie Bowen**, another Texas winemaker who has developed a close friendship with Chris and his wife, gives a detailed account of her observations of Chris' dedication to his family and his business. She describes how Chris is "one of the hardest workers in the Texas Winery industry," but beyond that, has used his business to accomplish so much good, providing free meals to his community and church. She too admits she was duped into believing the election was stolen but, like Chris, accepts she made a terrible mistake and recognizes the fault in his action. She notes that while "[h]is charity and love of community existed prior to the January 6, 2021 incident, . . . his humbleness and commitment to church and his community has become even stronger which further shows me his strength and acceptance of his responsibility and atonement for his sins."

- **Madison Elliott**, who has known Chris through church and began working at his winery close to a year ago, describes in the "countless hours with him at work witnessing what a positive impact he makes." She describes him donating his time and food "with anyone in the community who is able to come partake." She describes multiple accounts of him helping homeless people in his community and describes an incident where he refused to press charges against a drug addict who broke into his business only to get food and find a place to sleep out of a desire to help her instead.

- **Amanda Payne**, who came to know Chris and his family after January 6 while attending the same church, expresses her anger over what happened on that day but then describes meeting Chris and seeing someone she would have never expected to have been involved in what occurred that day. She described him as "meek and humble" and "a family man of integrity with a true servant's heart." She explains how she asked others in the church whether Chris was always like this or whether he changed in light of what occurred on January 6. The responses she received were "unanimous," that he had always been a man of "good intentions and character." Having spoken with Chris, she can account that he "directly admitted to me that he wishes he had never stepped foot in DC that day," and strongly affirms that he is "not only highly remorseful regarding his personal actions on January 6th, 2021, but he is also an asset to his family, to his church, and to his community."

- **Brandon & Ginger Fields,** friends of Chris and his wife for over 18 years, they both describe both of their generosity and compassion for them. They describe how

29

they were there for them during happy times, such as hosting birthday parties and their wedding, and during sad times, driving to the hospital to be with them when they lost their newborn son. Both also give accounts of Chris' expression of remorse for what he did. Ginger's mother, **Karen McCrary**, also gives an account of witnessing Chris' generosity and compassion and also affirms the regret she has seen in Chris about his actions on January 6.

- **Sylvia Hall**, who has known Chris for over 8 years, first getting to know him while teaching together in a local school, pours her heart into her letter describing his love and commitment to his family, his "passion and conviction" he puts into his business, and the absence of any discussion of politics. She also emphasizes that Chris has expressed regret and remorse over his decisions on January 6 and how his actions were so unlike the humble, loving, respectful person she has always known.

- **Suzanne Frerich**, who has been a close friend to Chris for over three years, describes him as "a very kind, giving, passionate, considerate, and supportive individual." She further describes how "Chris makes his work environment a family environment and is always giving back to the community by being very welcoming, helping and giving back to others." She also accounts how "Chris has discussed his legal issue with me and has been very open about the mistake he has made with his choices, while expressing strong concern for how the outcome could potentially affect his family."

These are summaries of just some of the numerous letters from *just* friends, coworkers, and fellow church members. Also included are multiple letters from family members, including his wife, Crystal, who all give detailed accounts of the impact Chris' decision has had on them, of the remorse and regret he has shown over his actions on January 6, and how much he has remained committed to them and helping others.

Despite all these positive letters, there are still certain things Mr. Grider has realized he has to overcome. In March of this year, Mr. Grider underwent a psychological evaluation at the local VA hospital.[5] In a mental health diagnostic study conducted, his PHQ-9 Depression Scale Score reflected that he falls into the category for

---

[5] These records are being filed separately, along with a motion to seal as Exhibit 2.

severe depression, while his PCL-5 total score reflected very severe symptoms of post-traumatic stress disorder (PTSD). He also scored high enough to be considered clinically suffering from anxiety requiring active treatment. He was diagnosed with alcohol dependence with withdrawal and referred to a substance abuse treatment program which he has been attending regularly. He was also provisionally diagnosed with schizophrenia spectrum and psychotic disorder – other psychotic disorder not due to a substance or known physiological condition and referred for further evaluation. All this is to demonstrate that Mr. Grider, despite all the good he has done for his family, his church, and community, and after reflecting on his actions from January 6 and going through the experience of trial, recognized that he needed to be more introspective about his life and his decisions. He did so for several reasons.

First, he wants to continue to be the best father and husband that he can be to his family. Even though so many people have given their accounts about his strong and commendable role as a father and husband, he wants to eliminate any other difficulties in his life that could compromise that role. Secondly, he never again — as attested to in many of the character reference letters — wants to find himself manipulated into believing something that is not true as occurred prior to January 6. Thirdly, he wants to continue, as he has his entire life, being a positive and contributing member of society. As accounted for by all the letters submitted, he has always been a kind, caring, loving, and compassionate person. He recognizes that these positive characteristics did not overcome his emotions and judgment on January 6 and,

again, forever regretful of what he did that day, wants to ensure that his character remains strong and is never compromised.

In sum, Mr. Grider has demonstrated that he has an exceptional character and desires to maintain that character. More importantly, he is not the evil person the Government portrays him out to be.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

Mr. Grider does not doubt that his offenses were serious. He recognizes he was part of an insurrection that threatened the foundations of our country's democracy and deeply regrets his actions of January 6. While many of the people who know him well and know that he acted entirely out of character would wish for him to, like hundreds of other rioters from January 6, receive probation, Mr. Grider recognizes and accepts that more is needed to reflect the seriousness of his offenses. And, while his respect and admiration for law enforcement was strong before January 6, while ashamed of his actions on that fateful day, his respect for law enforcement and institutions such as this Court have only grown stronger since then. He proved that in his efforts, not to obstruct, but to assist the Government in its efforts to investigate the events of January 6. He proved that by voluntarily surrendering himself to authorities when charges were filed. He continued to prove that after his release from pre-trial detention, complying with intensive conditions of release to the fullest. Finally, he demonstrated — and continues to demonstrate — that by his behavior and demeanor before this Court before, during, and after his trial. A lengthy sentence like

the one called for by the Government will not change or increase the amount of respect Mr. Grider has for the law.

### D. The Need for the Sentence to Afford Adequate Deterrence

Mr. Grider, in recognizing the seriousness of his offenses, also recognizes that his sentence must "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553 (a)(2)(B). He never again wants to witness or be a part of anything like what occurred on January 6 and accepts that his sentence will play a small part in that. There are two strong points, however, that must be considered in this regard.

First, it cannot be ignored that the vast majority of individuals arrested and charged for their actions at the Capitol on January 6 have received probated sentences. This includes a number of people who, as Mr. Grider pointed out in his memorandum of law in support of his motion to dismiss the count alleging a violation of 18 U.S.C. § 1512(c), engaged in arguably worse behavior than Mr. Grider and either were not charged with that offense or other similar felonies, or had those charges dismissed as part of a plea bargain. *See* ECF Dkt. 70-2 at 42–50. The message to the general public has been consistent – it is important to hold those who aided in the insurrection of January 6 accountable for their actions, but it is also important to not ruin those peoples' lives by incarcerating all of them for lengthy periods of time.

Second, and more importantly, why should Mr. Grider 6 face a much lengthier sentence than those others when he has already demonstrated his regret and remorse for his actions and an unequivocal desire to never place himself in a situation, or act as he did on January 6 as accounted for by multiple individuals in the attached character reference letters? *Cf. United States v. Jesus Rivera*, 21-cr-60-CKK, ECF Dkt. 69

at 8–9 (Government's sentencing memorandum noting Rivera's social media posts bragging about his actions and mocking the suffering of U.S. Capitol Police in the days and weeks after January 6). While Mr. Grider expects the Government will point to Mr. Grider's desire to proceed to trial and deny his guilt as to some of the offenses, this Court should recall that efforts were made by Mr. Grider to resolve his case by accepting responsibility for his actions. That his acceptance did not fit squarely into what they believed constituted violations of the law and, worse, that they wanted to limit his ability to allow for any appellate review of his convictions were what ultimately led him to proceed as he did.

The truth of the matter is that the Government's belief that Mr. Grider "has no appreciation for the gravity of his conduct on January 6 and is utterly without remorse," is entirely wrong. Mr. Grider has already proven through his actions that he has no desire to engage in any behavior similar to or associated with January 6 and wants nothing more than to be a positive and contributing member to his family, his community, and this country.

### E. The Need to Protect the Public from Further Crimes of the Defendant

The Government did not address this factor requiring this Court to consider the need for the sentence imposed to protect the public from further crimes of the Defendant in their sentencing memorandum for an obvious reason. *See* 18 U.S.C § 3553(a)(2)(C). There has been absolutely nothing to suggest that Mr. Grider desired — or presently desires or foresees himself engaging in additional criminal activity

and, more importantly, any conduct that would resemble anything like what he engaged in on January 6. This is not only corroborated by his lack of substantive criminal history and his character for being a peaceful and productive member of his community, but also his unblemished record of compliance with strict conditions of release for over two years.

### F. The Need to Provide the Defendant with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner

This factor — also not discussed by the Government in their sentencing memorandum — although not typically given considerable weight, is deserving of some consideration in Mr. Grider's case. *See* 18 U.S.C § 3553(a)(2)(C).

As discussed *supra*, after Mr. Grider was convicted by this Court and upon returning to Texas, Mr. Grider sought treatment from the VA Hospital. In addition to following up for a colonoscopy where polyps were removed in August 2022, Mr. Grider also sought psychological treatment after displaying signs of severe depression, PTSD, and an anxiety disorder. While doctors diagnosed him as alcohol dependent and recommended him to a substance abuse treatment program, they also concluded that he experienced paranoid symptoms that required further assessment and treatment. Additionally, as noted in the PSR, Mr. Grider is partly disabled due to a permanent respiratory condition that he receives treatment and medication for from the VA. *See* PSR ¶ 79.

Undoubtedly, the Bureau of Prisons will be able to continue maintaining Mr. Grider's physical and mental health. Nevertheless, this Court should be mindful of these conditions when determining an appropriate sentence.

**G. The Impact of the Sentencing Guidelines**

As mentioned at the beginning of this section of this memorandum discussing the application of 18 U.S.C. § 3553(a), on a whole, as demonstrated by the sentences handed down in this District for individuals convicted of offenses related to their actions at the Capitol on January 6, variances from Guideline sentencing ranges appears to be the norm. Mr. Grider would submit that, given this is the first time the Government has used 18 U.S.C. § 1512(c)(2) to prosecute individuals for their obstruction of a Congressional proceeding, it is highly likely that the Sentencing Commission did not contemplate such conduct in structuring the Guidelines. *See Seefried*, 2022 WL 16528415, at *11 ("If the Sentencing Commission had foreseen the Capitol breach, it may well have included 'official proceeding' in the text of § 2J1.2. But the Commission did not."). What is even more likely is that, because of the unprecedented use of Section 1512(c)(2) here, there was not "the careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions" that the Court in *Gall* referenced or the "empirical data and national experience, guided by professional staff with appropriate expertise" that the Court noted in *Kimbrough*. *See Gall*, 552 U.S. at 46; *Kimbrough v. United States*, 552 U.S. 85, 109, 128 S. Ct. 558, 169 L. Ed. 2d 481 (2007).

To better consider the impact of the Guidelines, Mr. Grider would invite this Court to consider instead the application of a Guideline that has been used more often to punish conduct that clearly and indisputably violates a statute — USSG §2B1.1, the applicable guideline for a violation of 18 U.S.C. § 1361 — the statute which this Court convicted Mr. Grider of in Count Three of the superseding indictment. *See* ECF

Dkt. 150 at 22–23. This, after all, was part of the conduct (and, arguably, the most malign) that provided the necessary "corrupt" intent needed to establish a violation of Section 1512(c)(2). *Id.* at 22. Looking at that guideline as applied to Mr. Grider's conduct of aiding and abetting the destruction of the Speaker's Lobby door by handing the helmet he picked up to another rioter (Zachary Alam), his total offense level would be a 6. *See* USSG § 2B1.1(a)(2) (base offense level); (b)(1)(A) (loss amount less than $6,500). Mr. Grider does not suggest that he should be sentenced within the appropriate sentencing range for that level (0–6 months). But it nevertheless demonstrates that the Guidelines can vary greatly for some of the criminal conduct that Mr. Grider engaged in.

Instead of putting heavy reliance on the Guidelines' application in this case, Mr. Grider suggests that this Court follow the Supreme Court's instruction in *Kimbrough* as it is most appropriate here:

> The sentencing judge, on the other hand, has "greater familiarity with ... the individual case and the individual defendant before [them] than the Commission or the appeals court." [They are] therefore "in a superior position to find facts and judge their import under § 3553(a)" in each particular case. In light of these discrete institutional strengths, a district court's decision to vary from the advisory Guidelines may attract greatest respect when the sentencing judge finds a particular case "outside the 'heartland' to which the Commission intends individual Guidelines to apply."

*Kimbrough*, 552 U.S. at 109 (citations omitted).

**H. The Need to Avoid Unwarranted Sentence Disparities Among Defendants with Similar Records who Have Been Found Guilty of Similar Conduct**

Of all the Section 3553(a) factors, Mr. Grider believes this Court should give this factor considerable, if not the same weight as Mr. Grider's history and characteristics. *See* 18 U.S.C. § 3553(a)(6).

The Government said it best by noting that "to date, no January 6 defendant has been sentenced on Grider's precise combination of felony convictions." Gov't Sent. Memo at 32. Not only that, but prior to January 6, no person had ever been *prosecuted* for the obstructive and destructive conduct engaged in by Mr. Grider using the statutes that Mr. Grider has been convicted of. This Court should consider this in light of the actions of multiple defendants who faced criminal charges in the District of Oregon for gathering nightly to riot outside of, and vandalize the Mark Hatfield Federal Courthouse in Portland, as well as hurl objects at federal agents guarding it during the summer of 2020. *See United States v. Judd*, 21-cr-40-TNM, ECF Dkt. 203 (Memorandum Order of 12/28/21). As noted by Judge McFadden, the Government charged 74 people for their involvement in those riots. *Id.* As Judge McFadden continued, "[t]he Government dismissed 27 cases brought against Portland defendants, including five felony cases" and opined that "Dismissal of five is downright rare and potentially suspicious." *Id.* at 9–10.

Beyond this, as Mr. Grider pointed out *supra*, it cannot be ignored that multiple individuals who engaged in much worse conduct were not only *not* prosecuted for violating 18 U.S.C. § 1512(c)(2), but worse, received probation or sentences of less than a year, despite evidence showing an obvious intent to obstruct the certification

proceedings. *See* ECF Dkt. 70-2 at 42–50. Using the logic and reasoning this Court employed in its Findings of Fact and Conclusions of Law to convict Mr. Grider of all counts against him, certainly an individual like Bradley Rukstales, for instance, who was sentenced to 30 days imprisonment, could have been charged and convicted of nearly all the same criminal offenses. *See* ECF Dkt. 130 in 21-cr-41-CJN (Government Sentencing Memorandum describing Rukstales unlawful entry into the Capitol building, surveillance video capturing Rukstales picking up a chair and hurling it at retreating officers, then resisting his arrest by officers who had to pull him off the floor and drag him out of the building).

The fact remains that what the Government is asking this Court to do is to go well beyond what this Court and other courts have done in terms of sentencing for conduct that is much more abhorrent.

Mr. Grider suggests this Court start by looking at sentences of individuals who engaged in assaultive conduct against police officers as those have resulted in the lengthier sentences among January 6 defendants.

Look, for instance, at the case of Mitchell Gardner. *See United States v. Mitchell Gardner*, 21-cr-622-APM. As reflected in the Government's Sentencing Memorandum from that case, he was part of the mob at the point of one of the most violent confrontations on January 6 at the Lower West Terrace (LWT) Doors. *See* ECF Dkt. 57 in 21-cr-622-APM at 2, 7–10, 16. After pushing through to the front of the door, he encouraged other rioters "to assault police inside the LWT tunnel by repeatedly yelling, 'pull the police out,' 'pull the cops out,' and 'grab their hands and pull them out.'"

*Id.* at 16. He then took OC spray cannisters and "took turns assaulting the police with this chemical." *Id.* at 18–20. He then yelled for other rioters to gain access into the Capitol through a window and encouraged others to break it. *Id.* at 21–22. After climbing through the window and climbing inside, he then handed a broken piece of furniture which appeared to be a table leg with a nail sticking out of it to other rioters who later used it to continue their physical assault on officers guarding the door. *Id.* at 29, 33–34.

Convicted of two of the statutes Mr. Grider was convicted of — 18 U.S.C. § 231 and 18 U.S.C. § 1512(c)(2) — as well as 18 U.S.C. § 111, the Government there recommended a sentence of 71 months, an upward departure from what they believed to be the applicable Guidelines. *See id.* at 54. Judge Mehta subsequently sentenced him to 55 months incarceration. *See* ECF Dkt. 61.

Or recall the case of Howard Charles Richardson who appeared before this Court last year. *See United States v. Howard Charles Richardson*, 21-cr-721-CKK. As this Court may recall, Richardson pleaded guilty to assaulting a peace officer in violation of 18 U.S.C. § 111. *See* ECF Dkt. 35 in 21-cr-791-CKK at 21 (Government Sentencing Memorandum). After passing barriers that he saw people knock over and approaching the Media Tower on the Upper West Terrace, while standing at the front of a police line where officers struggled to maintain their position and hold the mob back, Richardson used a large metal pole to strike a police officer three times, stopping only when the pole broke in his hands. *Id.* at 2. He then helped a group of rioters force a large metal billboard into the same line of besieged officers. *Id.* "Since that

day, in interviews with federal agents and statements to this Court, Richardson [ ] struggled to acknowledge his contributions to the violent attack and the serious impact his actions had on the law enforcement officers present that day." *Id.* As this Court will recall, it followed the recommendation of the Government and sentenced Richardson to the high-end of the agreed upon advisory Guideline range, 46 months incarceration. *See id.*, ECF Dkt. 38 in 21-cr-791-CKK.

With just these two cases in mind, how can the Government justify asking for a sentence nearly twice the length of Gardner and Richardson? Mr. Grider never threatened a police officer much less inflicted injury upon them with repeated attacks like Gardner and Richardson did. Mr. Grider did not act with the same defiance. Instead, as this Court recognized, when Mr. Grider was pushed up against a police officer and pinned against the wall in the Crypt, he undoubtedly expressed concern for an officer, telling another rioter, "He's going to get hurt," and also telling the officer, "I'm sorry for pushing on you, man, I'm sorry." Def's Ex. 241; Tr. 545–547.

Maybe it is worth looking at other defendants who have been convicted of destruction of property in violation of 18 U.S.C. § 1361? Consider, for instance, the case of Hunter Ehmke. *United States v. Hunter Ehmke*, 21-cr-29-TSC. Ehmke arrived at the Capitol and approached the Rotunda Door on the east side of the Capitol. *See* ECF Dkt. 31 in 21-cr-29-TSC at 6–7 (Government Sentencing Memorandum). As Capitol Police officers were attempting to keep the mob from breaching the Rotunda Door, Ehmke jumped up onto the window ledge to a nearby, unprotected window and began waving his hand to draw the attention of the mob. *Id.* at 7–8. Ehmke then began to

"systematically kick in the three lower panes of the window, shattering each in turn" before punching "two additional window panes above the lower panes he had just kicked out." *Id.* at 8. While Capitol Police officers were able to stop and detain Ehmke, they were left to take his identification and release him when the nearby crowd became increasingly aggressive toward the officers. *Id.* at 9. Following the recommendation of the Government, Judge Chutkan sentenced Ehmke to 4 months incarceration. *See* ECF Dkt. 35 in 21-cr-29-TSC.

Or consider the case of Nicholas Rodean. *United States v. Nicholas Rodean*, 21-cr-57-TNM. Like Mr. Grider, at one point, he had been indicted for violating both 18 U.S.C. § 1361 and 18 U.S.C. § 1512(c)(2). *See* ECF Dkt. 12 in 21-cr-57-TNM (Superseding Indictment). The Government, however, superseded a second time, dropping the obstruction count and Mr. Rodean proceeded with a bench trial before Judge McFadden in a case prosecuted as well by Cindy Cho. ECF Dkt. 67 in 21-cr-57-TNM at 14–15. The evidence showed Rodean actually broke the two large panes adjacent to the Senate Wing door that Mr. Grider would later enter the Capitol building through. *Id.* at 11. Prior to that, Rodean was part of a group of rioters who pushed past Capitol Police officers stationed on terrace stairs next to scaffolding set up on the northwest side of the building, the same scaffolding where Mr. Grider later made his entrance. *Id.* To break the windows, Rodean used a flagpole with a "Trump is My President flag" and a small round object attached. *Id.* at 11–12. "After breaking the window glass, Rodean climbed through the emptied frame and into the building." *Id.* at 12. From there, he was part of a group of rioters who encountered and pursued

Capitol Police Officer Eugene Goodman. *Id.* at 12–13. He then "remained in the Ohio Clock corridor for more than 30 minutes, facing off against USCP officers who had stationed themselves in the middle of the corridor." *Id.* at 13. While Judge McFadden convicted Rodean on all counts, at sentencing, despite the Government's demand for a sentence of imprisonment of 57 months, *see id.* at 38, Judge McFadden sentenced Rodean to 60 months of probation with a condition of 240 hours of home detention. ECF Dkt. 75 in 21-cr-57-TNM.

What both these cases — and others where defendants have been convicted and sentenced for violating 18 U.S.C. § 1361 — reflect is that destroying exterior windows, ultimately facilitating the entry of hundreds of rioters into the Capitol is not worthy of a significant or lengthy sentence. *See also United States v. Troy Elbert Faulkner*, 21-cr-126-BAH (sentenced to 5 months incarceration after conviction for violating 18 U.S.C. § 1361). Again, this Court has to ask itself, for someone like Mr. Grider who, like all these other defendants, entered the Capitol building as part of the mob with some desire to obstruct the certification proceedings, and only aided and abetted the destruction of Capitol property, as opposed to actually causing the damage itself, is it truly just, fair, and not disparate to sentence him, as the Government requests, to 87 months imprisonment?

The Government suggests that this Court consider, for reference, the sentence imposed in the case of Guy Reffitt. *United States v. Reffitt*, 21-cr-0032-DLF. While the Government maintains that there are many similarities between his and Mr.

Grider's case, a closer look reveals that representation is as absurd as the Government's sentencing recommendation in this case.

Reffitt was a leader of the Texas Three Percenters militia group, and "used his membership in the Texas Three Percenters and other militia groups to encourage others to follow his lead to violently attack the Capitol, hoping that a show of force in numbers would help him accomplish his goal of removing and replacing Congress." ECF Dkt. 158 in 21-cr-32-DLF at 8 (Government's Sentencing Memorandum). He "traveled from his home in Texas to the District of Columbia with an AR-15-style semi-automatic rifle and a Smith & Wesson .40 caliber handgun." *Id.* at 5. "At the Ellipse on the morning of January 6, he told other members of his militia group and those gathered around him that he planned to physically drag Speaker Pelosi out of the Capitol building by her ankles, with her head hitting every step on the way down." *Id.* "Upon his arrival at the Capitol, Reffitt, armed with his handgun in a holster on his waist, wearing a tactical helmet and bulletproof armor, and carrying police-style flexicuffs, confronted three U.S. Capitol Police officers on the west side stairs, just north of the temporary scaffolding, outside of the Senate Wing." *Id.* "Reffitt rushed at the officers, who unsuccessfully tried to repel him with two different types of less-than-lethal projectiles before successfully halting his advances with pepper spray." *Id.* "Before and after being hit with pepper spray, Reffitt encouraged other rioters to charge forward at the officers, which they did both by moving up the stairs and by climbing up through the scaffolding, overwhelming the police officers trying to defend their position on a landing at the top." *Id.*

Reffitt also recruited another individual, Rocky Hardie, another militia group member, in December 2020 to join him on the trip to Washington, D.C. *Id.* at 6. "Reffitt made the travel arrangements for the two men and instructed Hardie on what to bring (including firearms, despite discussing with Hardie the fact that they were illegal in the District)." *Id.* While "Hardie brought his own handgun and AR-15 rifle on the trip, Reffitt helped him assemble his rifle to leave in Reffitt's car (along with Reffitt's own assembled rifle) at their hotel in Georgetown on the morning of January 6." *Id.* "Before heading out for the day on January 6, Reffitt donned a plate carrier vest laden with armored plates that could stop a rifle round." *Id.*

Unlike Mr. Grider, "Reffitt returned home to Texas on January 8, triumphant about the integral role he played in the attack on our democracy." *Id.* Two days later, when he learned that the Texas Three Percenters' leader had been questioned by Texas law enforcement agents, he began a campaign of obstruction, telling others to purge their previous conversations and deleting messages from his own cell phone. *Id.* at 6–7. Even worse, the following day (January 11), Reffitt threatened his two teenage children, telling them "that if they turned him in to the FBI they would be traitors, and traitors get shot." *Id.* at 7.

Not to be outdone, however, Reffitt then continued his calls for violence sending multiple messages to other Texas Three Percenters over the next several days proclaiming, in one message, "We took the Capital of the United States of America and we will do it again." *Id.* at 12. In another message sent on January 13, he stated, "This has only just begun and will not end until we The People of The Republic have

won our country back. We had thousands of weapons and fired no rounds yet showed numbers. The next time we will not be so cordial." *Id.*

Appalling. Abhorrent. And absolutely the opposite of anything Mr. Grider did before, during, and after coming to Washington, D.C. on January 6.

If this Court truly wants a case of a defendant with similar records who has been found guilty of similar conduct, then it should look to the case of Larry Brock. *See United States v. Larry Brock*, 21-cr-140-JDB. Like Mr. Grider, Brock was also a veteran of the Air Force from Texas. *See* ECF Dkt. 88 in 21-cr-140-JDB at 2 (Government's Sentencing Memorandum). Like Mr. Grider, he was also charged with violating 18 U.S.C. § 1512(c)(2). *Id.* at 20. Like Mr. Grider, he also pleaded "not guilty" to that count, as well as the same misdemeanors Mr. Grider was charged with, and proceeded to a bench trial before Judge Bates. *Id.* at 20–21. The evidence at his trial showed, unlike Mr. Grider, Brock went to great lengths to plan for a violent insurrection, purchasing tactical gear in anticipation of January 6, even saying he preferred "outright insurrection at this point." *Id.* at 3–9. Similar to Mr. Grider, he traveled to Washington, D.C. from Texas on January 5, 2021. *Id.* at 9. Like Mr. Grider, he approached the Capitol building approaching the same scaffolding on the west side of the building that Mr. Grider did. *Id.* at 11–12. Like Mr. Grider, he entered through the Senate Wing Doors at nearly the same time. *Id.* at 13. Similar to Mr. Grider, instead of picking up a helmet which presumably belonged to an officer guarding the building, Brock picked up a pair of flex-cuffs. *Id.* at 14. Like Mr. Grider encountered officers at the Speaker's Lobby door and saw others engaged in violence there, Brock

encountered officers outside of the Senate Gallery door who were struggling with other rioters attempting to open that door. *Id.* at 15. Unlike Mr. Grider, however, Brock actually entered that legislative chamber gallery and took a "command presence." *Id.* Brock then went downstairs and, unlike Mr. Grider who simply placed his hand on the Speaker's Lobby door once before retreating, Brock attempted to enter the Senate floor using a set of keys and attempting to unlock the door shortly after Vice President Mike Pence had been escorted out the same doors. *Id.* at 17–18. After his unsuccessful attempt at entry, Brock then went to another entrance to the Senate Floor where he gained access and proclaimed along with other rioters, "THIS IS OUR HOUSE" and "This is an IO War. We can't lose the IO War!" *Id.* at 18–19. Like Mr. Grider, Brock initially ignored officers' attempts to direct him out of the building. *Id.* at 19–20. Finally, like Mr. Grider did shortly after leaving the Capitol grounds, Brock also spoke to the media, more specifically, a reporter from the *New Yorker*, giving his account of what he observed. *Id.* at 20.

Brock was convicted by Judge Bates of all counts alleged against him, including the most serious charge alleging a violation of 18 U.S.C. § 1512(c)(2). *Id.* at 21. At sentencing, despite Brock "denying he went to the Capitol to stop the certification, denying that he dressed in tactical gear to support his mission to storm the Capitol and stop the certification; and denying that he picked up and held on to the flex-cuffs in case he needed them for a member of Congress, or to otherwise support his goal of stopping the certification," the Government nor the Probation Office recommended that Brock should receive an upward adjustment for obstruction of justice under

USSG § 3C1.1. *Id.* at 24, n. 20. Instead, as with Mr. Grider's pre-plea guideline and criminal history calculation, Brock's applicable total offense level, according to the Government, was a 25, with a guideline range of 57 to 71 months. *Id.* at 24–25.

While the Government requested a middle-of-the-guideline sentence of 60 months, *id.* at 37, Judge Bates sentenced Brock to 24 months' imprisonment on the count alleging the violation of 18 U.S.C. § 1512(c)(2) and the maximum terms of imprisonment for the misdemeanor counts, all to run concurrently. Minute Entry of 3/17/23 in 21-cr-140-JDB. "In reaching this sentence, the Court determined that the applicable U.S. Sentencing Guidelines ("USSG") range for [the count alleging a violation of 18 U.S.C. § 1512(c)(2)] was 24 to 30 months' imprisonment based on a criminal history category of I, a base offense level of 14, and a 3-level enhancement for substantial interference with the administration of justice per USSG § 2J1.2(b)(2)." ECF Dkt. 107 in 21-cr-140-JDB at 2.

While this Court may disagree with Judge Bates' application of the Guidelines, it is hard to disagree with the ultimate sentence he imposed in an almost-identical case. While Mr. Grider obviously was also convicted of destruction of government property in violation of 18 U.S.C. § 1361, given Brock's attempt to unlock the Senate floor doors and then his ultimate entry into that sacred place, one could align the conduct of the two together and treat both as equally culpable in some respects. And while Mr. Grider was convicted of violating 18 U.S.C. § 231 for interfering with offic-

ers during a civil disorder, Brock could have also been charged and convicted for violating that statute under this Court's logic based on his failure to comply with officer's directives to leave the building.

The only patently distinguishable facts between the two cases are that Mr. Grider obviously did not go to the same lengths to plan and prepare as Brock did, and Mr. Grider certainly came here from Texas with a much different mindset. Whereas Mr. Grider struggled with whether his conduct was lawful or not while inside the Capitol, Brock clearly went into the Capitol "full steam ahead," clearly assuming a "command presence," and reached his intended destination feeling he fulfilled his ultimate goal of blocking the certification proceedings.

As Mr. Grider mentioned *supra*, even the Guidelines recognize a distinction between someone like Brock who plans out or, at least, contemplates their criminal conduct and nevertheless engages in said conduct knowing fully well that such conduct is illegal, versus a person like Mr. Grider who commits an offense without any significant planning, that is limited in duration, and represents a marked deviation from an otherwise law-abiding life. *See* USSG § 5K2.20.

Using Brock's case as an appropriate measuring stick, given Mr. Grider's lack of planning and preparation before engaging in the almost exact same conduct, this Court should grant him a downward variance and sentence him to 18 months incarceration. His positive contributions to his family and community before and after January 6 only lend additional support to this ultimate decision.

## V.   Restitution

Mr. Grider concurs with the Government's recommendation that he should pay a total restitution amount of $5,044.

## VI.   Conclusion

Based on all the reasons set forth above and considering the multiple character reference letters submitted as Exhibit 1 to this memorandum, Mr. Grider respectfully requests this Court impose a sentence of 18 months imprisonment, 3 years of supervised release, $5,044 in restitution, and a mandatory assessment of $405. He is done with Donald Trump. He wants nothing further to do with the political process. He is ready to pay his debt to society so that he can return to his family, his church, his business, and his community as quickly as possible. And he is ready to support and uphold American democracy.

Date: <u>May 8, 2023</u>                    Respectfully Submitted,

                                                   **MAYR LAW, P.C.**

                                                   by: /s/ T. Brent Mayr
                                                   T. BRENT MAYR
                                                   Texas State Bar Number 24037052
                                                   D.C.D.C. Bar ID TX0206
                                                   bmayr@mayr-law.com

                                                   5300 Memorial Dr., Suite 750
                                                   Houston, TX 77007
                                                   Telephone:  713-808-9613
                                                   Fax:  713-808-9991

                                                   ATTORNEY FOR THE DEFENDANT,
                                                   CHRISTOPHER RAY GRIDER

## <u>CERTIFICATE OF SERVICE</u>

I certify that a true and correct copy of this Sentencing Memorandum and exhibits were sent to Counsel for the Government, Francesco Valentini, and Ami Landon, United States Probation Officer, on May 8, 2023, via email.

<u>/s/ T. Brent Mayr</u>
T. BRENT MAYR