```
 1                 IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2       - - - - - - - - - - - - - - - x
         THE UNITED STATES OF AMERICA,
 3                                          Criminal Action No.
                          Plaintiff,        1:21-cr-00022-CKK-1
 4                                          Monday, December 19, 2022
         vs.                                9:04 a.m.
 5
         CHRISTOPHER RAY GRIDER,
 6
                          Defendant.
 7       - - - - - - - - - - - - - - - x
         _____
 8
                          TRANSCRIPT OF BENCH TRIAL
 9           HELD BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
                       UNITED STATES DISTRICT JUDGE
10       _____
         APPEARANCES:
11       For the United States:       FRANCESCO VALENTINI, ESQ.
                                       DOJ-CRM
12                                     950 Pennsylvania Avenue NW
                                       Washington, DC 20530
13                                     (202) 598-2337
                                       francesco.valentini@usdoj.gov
14
                                       CINDY JANE CHO, ESQ.
15                                     DOJ-USAO
                                       Southern District of Indiana
16                                     10 West Market Street
                                       Suite 2100
17                                     Indianapolis, IN 46204
                                       (317) 229-2425
18                                     cindy.cho@usdoj.gov

19       For the Defendant:           THOMAS BRENT MAYR, ESQ.
                                       MAYR LAW, P.C.
20                                     5300 Memorial Drive, Suite 750
                                       Houston, TX 77007
21                                     (713) 808-9613
                                       bmayr@mayr-law.com
22
         Court Reporter:              Lisa A. Moreira, RDR, CRR
23                                     Official Court Reporter
                                       U.S. Courthouse, Room 6718
24                                     333 Constitution Avenue, NW
                                       Washington, DC  20001
25                                     (202) 354-3187
```

```
 1                      P R O C E E D I N G S
 2              THE COURT:  Good morning, everybody.
 3              MR. VALENTINI:  Good morning, Your Honor.
 4              MR. MAYR:  Good morning.
 5              THE COURTROOM DEPUTY:  Criminal Case 21-022, The
 6    United States vs. Christopher Ray Grider.
 7              Counsel, will you please identify yourself for the
 8    record starting with the government.
 9              MR. VALENTINI:  Good morning.  My name is
10    Francesco Valentini.  I'm here for the government.
11              At counsel table with me is Ms. Cindy Cho and
12    Special Agent Michelle Ball, as well as a Paralegal Tiffany
13    Robinson.
14              THE COURT:  All right.  Good morning, everyone.
15              MR. MAYR:  Good morning, Your Honor; Brent Mayr.
16    I'm present with Mr. Grider.
17              THE COURT:  All right.  Good morning as well.
18              All right.  This is scheduled for the closing
19    statements so let me start with the government.
20              MR. VALENTINI:  Good morning.  May it please the
21    Court and counsel.
22              On January 6, 2021, Mr. Grider came to the Capitol
23    with a purpose.  He came ready to accomplish the same
24    objective that the mob encountered again and again --
25              THE COURT:  Slow down a little bit for the court
```

1    reporter.

2           MR. VALENTINI:  -- as he closed in on the House

3    Chamber.

4           (Video playing)

5           MR. VALENTINI:  Mr. Grider intended to stop the

6    certification of an election whose result he just did not

7    like.  Most everything that Mr. Grider did at the Capitol on

8    January 6, 2021, was in service of that objective, of

9    stopping Congress from doing what the Constitution required

10    it to do that day.  That was the whole point of trying to

11    cut power to the U.S. Capitol Building at that electrical

12    closet by the Senate Wing door.  That was the point of

13    Mr. Grider's late siege as part of a large mob to the House

14    main door at the precise time and the precise place where

15    the certification proceeding was supposed to happen.

16           There was also the whole point of attempting to

17    persuade Officer Yetter and his colleagues, as outnumbered

18    as they were, to open the door to the Speaker's lobby.

19    and that was the whole point of pushing down on the

20    barricaded doors to the Speaker's lobby the moment the

21    officers moved away.  And that, of course, was the whole

22    point of Mr. Grider's handing his helmet, his kevlar, to the

23    single-most violent rioter in sight so that that rioter

24    could break down the doors once and for all so that the mob

25    could finally take over the House Chambers as he intended.

1           As my colleague, Ms. Cho, explained when we opened

2     last Monday, the defendant's posture, his progress, and his

3     persistence on January 6th show Mr. Grider's true intent

4     that day.

5           Mr. Grider all but admitted that he intended to

6     obstruct the certification proceeding.  He did so as early

7     as the evening of January 6th in his recorded statement for

8     his friend, Journalist Rissa Shaw.

9           If I may play a short portion from Exhibit 114.

10     (Audio playing)

11     MR. VALENTINI:  "Be heard," he said.  That sounds

12     very benign, except it was not.

13           If your intent is to be heard by Congress on

14     January 6th after 1:00 p.m. at the exact place and the exact

15     time when Congress is required to certify the result of an

16     election, and you know all of that, as Mr. Grider admitted

17     on cross-examination, and you insist by all means available

18     to you to be heard right at that time and right at that

19     place and only at that time and only at that place, then

20     your intent is not benign.  Your intent is to obstruct the

21     certification proceeding that's supposed to happen at that

22     time.

23           Of course, occupying the House Chamber was never

24     going to be easy.  The House main door was locked.  The

25     Speaker's lobby door was barricaded from the inside.

 1          Your Honor, just think of that image.  The door to

 2    the Speaker's lobby being barricaded from the inside, as

 3    Sergeant McKenna testified, and occupying the House Chamber

 4    was always going to take both brains and brawn.  It was

 5    always going to take both fire and ice.  It was always going

 6    to take the incandescent violence of someone like the rioter

 7    in the fur trim hat, someone to shatter glass pane after

 8    glass pane with his fist.

 9          But it was also going to take more.  It was also

10    going to take ingenuity.  It was going to take the colder

11    calculation of turning something like a helmet, a

12    quintessential means of protection, into a tool of

13    aggression.  And that is what Mr. Grider brought to the

14    riot.  That is what he brought to stop the steal on January

15    6, 2021.

16          Now, Mr. Grider, the man in the fur hat, and the

17    rest of the mob did not ultimately succeed.  The mob did not

18    take over the House Chamber.  But they came close.  They

19    came one death and much destruction too close.

20          The evidence last week showed that along the way

21    Mr. Grider committed each and every one of the crimes with

22    which he stands charged in this trial.

23          Let's start at the beginning.  Let's highlight

24    some of the evidence.

25          Even before arriving in our District on January

1     6th, the defendant was expecting violence.  He was expecting

2     a civil disorder.

3              On the eve of January 6th, Mr. Grider sends out

4     videos of street confrontations involving the Proud Boys.

5     He talks about his trip like something of a military

6     operation or, if we listen to some of the other clips that

7     we heard during the trial, somewhat of a revolution.  He

8     wants to coordinate a dress code.  He says the memo is all

9     black.  He wants to wear a red hat, of course.

10             That night, Mr. Grider is also getting excited

11    about the violence.  He sends his friend Jessie a link to a

12    YouTube live stream from that evening, January 5th,

13    captioned, "Watch Live Patriots March to BLM Plaza in

14    Washington, D.C."

15             One second.

16             (Pause)

17             MR. VALENTINI:  He runs Internet searches about

18    the Proud Boys in D.C.  He checks out the Proud Boys contact

19    page, and we all know when and why people check out a

20    contact page of an organization.  He looks into the

21    District's gun laws.

22             He also sends and receives some troubling messages

23    with his mother.  Those messages tie the political violence

24    to the election.

25             THE COURT:  Slow down a little bit.  Go ahead.

1          MR. VALENTINI:  His mother sends a message

2     essentially encouraging him to go to D.C.  And later he

3     sends a direct message back to his mother on Facebook, "We

4     will get them out of the creek, all right, and out of D.C."

5          Let me be clear.  This text messages, these

6     communications, are not in and of themselves criminal, but

7     they do provide a window into Mr. Grider's mindset.  I was

8     preparing for this trip to Washington, D.C., on January 6th.

9          Then the big day, January 6th, finally arrives.

10    Little, if anything, of what Mr. Grider did that day at the

11    Capitol is disputed.  It's all, or almost all, on video.

12    Much of it is on video that Mr. Grider himself recorded.

13          So let me highlight some of those points.

14          Within approximately one hour, Mr. Grider breached

15    police line after defensive line.  At least four in total.

16    Regardless of what he claims now, nothing about what he did

17    at the Capitol that day was peaceful.  None of it was

18    respectful of law enforcement.  Special Agent Yetter, then

19    Capitol Police Officer Yetter, made that crystal clear in

20    his testimony before this Court.

21          Mr. Grider breached his police line, his first

22    police line at the scaffolding at the Lower West Terrace.

23    And you can see how terrifying it was for those officers.

24          (Video playing)

25          MR. VALENTINI:  Next, Mr. Grider enters the

1     Capitol Building at 2:15 p.m., and that is in and of itself

2     revealing.  That's only two minutes after the first rioter

3     entered the Capitol Building anywhere that day, and that's

4     Breach No. 2.

5          Now, just consider for a moment what Mr. Grider

6     has already accomplished by that point.  He has helped the

7     mob turn a bike rack into a ladder.  We saw a video in

8     Exhibit 221.  He also climbed using another bike rack on the

9     wall railing of the west side staircase.  That's in

10    Exhibit 231.

11         He then beckoned the crowd forward as he got to

12    the top of the stairs encouraging the crowd to join him in

13    the takeover of the Capitol.  And by then he has stolen a

14    case of water or misappropriated a case of water that he

15    found lying around the Upper West Terrace.  Water evidently

16    left behind by law enforcement as it was trying to protect

17    itself against chemical irritants.

18         Why does he do it?  To offer support to other

19    rioters who are trying to antagonize the police.

20         And, of course, by the time Mr. Grider enters the

21    U.S. Capitol Building, he has picked up a helmet.

22         Now, why does he pick up a helmet?  One thing is

23    for sure.  The story that Mr. Grider later tells his wife

24    and the story that he tried to tell this Court -- that he

25    picked up the helmet because he was afraid that later on at

1   some point somewhere maybe Antifa was going to attack him --

2   that does not hold water.  Mr. Grider does not even hold on

3   to the helmet until he makes it out of the Capitol Building.

4   He gives the helmet -- and we will see in a moment -- to

5   another rioter so that that rioter could break down doors

6   with that helmet.  He's not afraid of Antifa.  He does not

7   care one bit about Antifa.

8           Soon after entering, Mr. Grider also makes his

9   way to an electrical closet.  The electrical closet is right

10  by -- it's near the Senate Wing door.

11          Once there, Mr. Grider tries to cut the power to

12  the U.S. Capitol Building.  Understand, Mr. Grider had a bit

13  of amnesia about the electrical closet, but his actions that

14  are caught on video and Your Honor can see in Exhibit 239

15  speak for themselves.

16          (Video playing)

17      MR. VALENTINI:  Third, Mr. Grider runs into the

18  third police line in the Crypt of the Capitol on his way to

19  the House side on the south side of the Capitol where --

20  precisely where the joint session of Congress is supposed to

21  convene that day.

22          Capitol Police make them stand there, and that's

23  no wonder.  The Crypt is right beneath the Rotunda.  It's

24  the physical center of the U.S. Capitol Building.  It is the

25  neural center of the building.

1        But this line, too, is outnumbered, and it gets

2   overrun by the mob.  And this time, too, Mr. Grider was

3   right there among the first to breach that line.

4        (Video playing)

5        MR. VALENTINI:  How does Mr. Grider, the former

6   salesman, try to explain that one away?  He says he didn't

7   push anyone.  He says that he was pushed by others against

8   others.

9        Again, in his view, he has zero agency in

10  everything that Your Honor just saw and the other evidence

11  that was offered at trial from the Crypt, except that, too,

12  is not true.  Mr. Grider himself admitted that when he was

13  in the Crypt he yelled out things like "reinforcement," and

14  he made other statements like "push, push."

15       (Video playing)

16       MR. VALENTINI:  Mr. Grider was fully committed to

17  breaching the line in the Crypt of the Capitol on January

18  6th, and that was his third breach that day.

19       Mr. Grider then continues down to the south, and

20  just as he reaches the House Wing door he sees another

21  opportunity.

22       As Your Honor can see in the exhibit on

23  Exhibit 28, you will see many rioters just walking through

24  the House Wing door, but you will see Mr. Grider do

25  something else, seizing an opportunity.  He sees a floor

1     plan hanging on the wall.  And that's important because he

2     needs to find his way around that building.  He needs to get

3     to where the certification is set to take place.

4           So what does he do?  He snaps a picture.  The

5     picture is in evidence.  It's Exhibit No. 242.  And only

6     minutes later, having taken the picture, having found out

7     some idea of where to go about the Capitol, Mr. Grider

8     directs other rioters, "We've got to get to the chambers."

9     He starts directing them.

10          (Video playing)

11          MR. VALENTINI:  Fourth, Mr. Grider runs through

12    yet another police line at the Statuary Hall connector.

13    That is the area highlighted on this exhibit.  The red mark

14    is our own between the Statuary Hall and the House Chamber

15    itself.  This one, too, was critical.

16          Why?  Why was that area critical?  Because both

17    Sergeant McKenna and Deputy Clerk McCumber explained --

18    well, first, let's start with Sergeant McKenna.  He

19    explained that from the Statuary Hall connector, if one goes

20    straight, one gets right to the House main door.  If one

21    makes a right then turns a corner, one gets to the

22    Republican door.

23          And then, after rounding another corner to the

24    west side of the Speaker's lobby, if one goes left from the

25    Statuary Hall connector and around a corner, one is at the

1    Democratic door.  And rounding another corner, one gets to

2    the east door to the Speaker's lobby.  We'll get to that

3    again in a second.

4         But why was that area so important at that

5    particular point in time?

6         Well, we heard from Deputy Clerk McCumber.  We

7    heard that at that point some of the leaders in Congress --

8    Speaker Pelosi, Majority Leader Hoyer, Majority Whip

9    Clyburn -- had already been evacuated, but many other

10   members, dozens, remain in the House Chamber and many more

11   remain in the gallery area that was being used because of

12   the COVID restrictions at the time and the staff remain in

13   that House Chamber, too.  And that's why gas masks or

14   evacuation hoods, as Deputy Clerk McCumber called them, are

15   distributed.

16        He remembers the buzzing, the buzzing sound of the

17   evacuation hoods as they are activated by members and staff.

18   And he also remembers his ingenuity and his staff's

19   ingenuity, you know, rescuing some of the most iconic

20   artifacts of our parliamentary tradition.  The

21   constitutionally mandated House Journal, the bill hopper,

22   the box where the bills are physically introduced in the

23   House when a representative introduces a bill in Congress,

24   and the ink desk as well.  My memory is that he referred to

25   it as one of the most ancient artifacts in the House

1    Chamber.

2              In the end, the police line -- that police line

3    falls, too.

4              (Video playing)

5              MR. VALENTINI:  That is when the siege on the

6    House main door begins.  That's when rioters start calling

7    for kevlar, when they start wanting to break down the door,

8    the House main door.  They want to use helmets to break down

9    those doors, and Mr. Grider, of course, has a helmet, and he

10   offers that.  He offers up the helmet.  There is no doubt

11   that he does that because the evidence, the video evidence,

12   shows it.

13             (Video playing)

14             MR. VALENTINI:  What did Mr. Grider have to say on

15   the stand about offering up the helmet outside the House

16   main door?  He had no memory of doing that.  Zero.  It was

17   amnesia.  He recalls trivial details like I think there were

18   some references in his testimony at some point about hot

19   dogs outside the Capitol grounds, but he does not remember

20   offering up a helmet to a mob that was trying to break down

21   the House main door.

22             When things stall at the House main door,

23   Mr. Grider moves on.  To do what next?  He says something to

24   the effect "to see if there's anything else that can be

25   done."

1          And another option does come up around by the
2     Speaker's lobby.
3              (Video playing)
4          MR. VALENTINI:  As Your Honor can see in this
5     exhibit, when Mr. Grider finds out about that option, he
6     doesn't just walk there.  He doesn't just go there.  He
7     sprints there.
8              He was not sprinting, as he claimed on the stand,
9     out of concern for the people who may be crushed at the
10    House main door.  He doesn't sprint there out of concern for
11    the law enforcement officers at the House main door.  He
12    sprints there because it's a new way to the House Chamber.
13    It's a new opportunity for him.
14             At the House -- at the Speaker's lobby door,
15    Mr. Grider tries everything he's got.  First he tries to
16    persuade the officers to just open the doors for him.
17             (Video playing)
18         MR. VALENTINI:  Just open the door, ma'am.
19             Of course that doesn't work.  And so when that
20    fails, what happens next?
21             Well, we have seen Exhibits 42 and 40 many times
22    during this trial already.  They tell everything that
23    happened at the Speaker's lobby door at that time.
24             First, Mr. Grider picks out the single-most
25    violent rioter at the scene, a rioter who has just shattered

1    at least two glass panes before his eyes only feet away from

2    Mr. Grider.

3              (Video playing)

4         MR. VALENTINI:  Then Mr. Grider hands this rioter

5    his helmet.  As he does this, Mr. Grider knocks on the

6    helmet to make absolutely sure that the other rioter

7    understands that it's hard, and it can be used to break down

8    doors.

9         Then, as soon as the law enforcement officer --

10   the three officers at the door move away, Mr. Grider himself

11   tries to push down on the barricaded door.  When that fails,

12   the other rioter starts to work on it.  He starts to work on

13   it with the helmet that Mr. Grider just gave him.

14        He breaks down the door -- he breaks down the

15   windows.  A woman tries to climb through.  A shot is fired.

16   The woman is wounded.  She falls backwards, and she

17   eventually dies.

18             (Video playing)

19        MR. VALENTINI:  Now, the defendant thinks that

20   none of this is his fault.  He thinks that it's Former

21   President Donald Trump's fault that he ended up in the

22   Capitol in the first place, and he thinks that because he

23   apparently, he claims, told the other rioter that he,

24   Mr. Grider, was not himself smashing the windows, he's in

25   the clear.

1          But Mr. Grider has it exactly backwards.  To give

2     your brothers in arms a weapon telling him to use it, how to

3     use it, how to achieve a common goal, and then to say, oh,

4     but I'm not going to get my own hands dirty, that is not a

5     defense.  That is the textbook definition of accomplice

6     liability, Your Honor.

7          In fact, ironically Mr. Grider himself seemed to

8     view things that way later on on January 6th on the steps of

9     the Capitol.

10          (Audio playing)

11          MR. VALENTINI:  What does Mr. Grider do next as

12     the woman is lying on the floor only feet away from him?

13     Does he follow the officers' directions and clear the area

14     as the officers repeatedly desperately begged the mob to do?

15          He surely could have.  He had the space.  He had

16     the opportunity.

17          (Audio playing)

18          MR. VALENTINI:  I apologize.

19          He certainly had the opportunity to do that, but

20     he chooses not to do that.

21          Now, Mr. Grider ignores those officers' pleas.  He

22     refuses to leave.  He hangs around for at least eight

23     minutes.  Sometimes he's recording.  Sometimes he's taking

24     pictures.  At all points he's impeding and interfering with

25     officers' carrying out of their duties.  Officer Yetter, now

1    Special Agent Yetter, testified to that time and again.

2              Now, Mr. Grider tries to spin that one, too.  He

3    claims that he felt a civic duty to document his -- I think

4    he referred to this as a George Floyd moment.  That's just

5    appalling.  It's just gaslighting.

6              What else is appalling?  That Mr. Grider tried to

7    compare his own January 6th day to Officer Yetter's January

8    6th day; the Officer Yetter who was sprayed with a fire

9    extinguisher at the Memorial Door and then assaulted by

10   Mr. Grider's brothers in arms, the other rioter in the fur

11   trim hat outside the Speaker's lobby door.

12             One last but important point I wanted to make

13   about the evidence.  In his direct examination Mr. Grider

14   suggested at times that he wasn't sure that the Electoral

15   College certification proceeding, what it was all about,

16   except that explanation, too, makes no sense.  We knew this

17   before his cross-examination even began.

18             Why?  Well, first, on direct examination

19   Mr. Grider admitted that by the time he got to the Statuary

20   Hall he was hoping to see a senator, Senator Cruz, lodge an

21   objection to the certification.  But how could he hope to

22   see a senator lodge an objection to the certification if he

23   didn't know that a certification proceeding was going to

24   happen that day at that time?

25             And second, on January 6th Mr. Grider also

1    admitted on the Capitol steps that he knew that members were

2    being evacuated through the other side of the Speaker's

3    lobby door on the west side.  He admitted that in Government

4    Exhibit 83.

5            All which brings to mind the old maxim that if one

6    just tells the truth, you don't need to remember anything.

7            Last week Mr. Grider decided not to tell the

8    truth, and along the way he kept forgetting the tall tales

9    he was telling.

10           For what Mr. Grider did on January 6th, the

11   defendant faces trial on seven counts.  He's guilty of each,

12   and I would like to quickly run through the elements of

13   those counts.

14           First Count 1, civil disorder.

15           The stipulated testimony and the exhibits from

16   both Inspector Hawa and Captain Mendoza proved that the

17   January 6th riot was a civil disorder.  That is not a

18   surprising conclusion, and it's abundantly established by

19   the evidence.

20           The second stipulated testimony also proves that a

21   civil disorder had an adverse effect on at least two

22   federally protected functions:  the Secret Service

23   protection of the vice president and his family as well as

24   the United States Capitol Police protection of the Capitol

25   and members of Congress.  The evidence also shows in the

1    alternative an adverse effect on commerce.  The Safeway

2    exhibits are in evidence.

3         Mr. Grider obstructed, intentionally, the

4    officers' carrying out of their duties during the civil

5    disorder so let me start with the legal question that Your

6    Honor asked.

7         The statute requires proof that the defendant

8    acted for the purpose of obstructing or interfering with one

9    or more law enforcement officers, but to be clear, those

10   officers don't need to be specifically identified by name.

11   It is enough that the defendant engages in acts to interfere

12   with any law enforcement officers' carrying out their duties

13   at a civil disorder.

14        And the Supreme Court case law has interpreted the

15   word "any" -- in other contexts, but still the word "any" --

16   to be a word that, quote, read naturally, has an expansive

17   meaning, that is, one or some indiscriminately of whatever

18   kind.  And that's a quote from *United States vs. Gonzales*,

19   117 Supreme Court at Page 135, decided in 1997.

20        THE COURT:  Slow down.  Slow down.  You're going

21   too fast.

22        MR. VALENTINI:  I apologize.

23        And when Congress does not add language limiting

24   the breadth of that word, "any" means all.  That is what

25   *Gonzales* said.  In other words, it is enough that the

1    defendant committed acts with the purpose of interfering

2    with all law enforcement officers engaged in a particular

3    duty.

4           And so here the defendant had the mental state,

5    that intent, vis-à-vis all law enforcement officers who were

6    manning the police line in the Crypt, vis-à-vis all the law

7    enforcement officers who were enforcing the police line in

8    the Statuary Hall connector, vis-à-vis the law enforcement

9    officers at the House main door, and vis-à-vis the officers

10   in the Speaker's lobby door.  The statute certainly does not

11   require that the law enforcement officers be identified by

12   name as opposed to by image or video, as they were time and

13   again in this case.

14          In any event, we heard from Officer Yetter that

15   what the defendant was doing outside the Speaker's lobby was

16   impeding and interfering with the officers' attempt to

17   secure the area.

18          Let me move on to Count 2, the obstruction count.

19          First, there is no doubt that Mr. Grider's conduct

20   on January 6th, in fact, obstructed the certification of the

21   Electoral College vote.  The proceedings could not proceed

22   so long as the mob was inside the Capitol.  It certainly did

23   not go forward with Mr. Grider lying siege to the House main

24   door and the Speaker's lobby door.

25          Plus, Mr. Grider also breached police line after

1    police line, and he aided and abetted the breaking down of

2    doors -- of the doors of the Speaker's lobby.

3              Second, Mr. Grider intended to obstruct or impede

4    the proceedings.  Start with Mr. Grider's own words inside

5    the Capitol on January 6th.  He's on video telling others,

6    "We need to get to the chambers."  We heard it today.  We

7    heard it last week.  He wanted to get to the chamber right

8    where and when the Electoral College certification

9    proceeding was supposed to happen.  Mr. Grider also chanted

10   "Stop the Steal" inside the Capitol.  The Court knows

11   perfectly well what that means.

12             Again, the whole purpose of Mr. Grider's day was

13   to stop the steal, to stop the proceeding.

14             As Ms. Cho said last week, Mr. Grider's action,

15   his posture, his progress, and his persistence each confirm

16   that.  He crossed police line after police line to get to

17   the House Chamber.  The House Chamber, of all locations.  He

18   teamed up with the most vocal and violent rioter in the mob

19   so that he could finally break through to that chamber, and

20   he later admitted trying to do so even though he knew those

21   members were being evacuated.  And that's in the exhibit I

22   just referenced before.

23             There's also direct evidence of Mr. Grider's

24   intent as well.  There is the messages from January 6th.

25   There's the messages about the Proud Boys, and there is

1     Exhibit 114, which we played early on, where he admits that

2     he was there -- that he, as part -- that the mob was there,

3     quote, to be heard.  As we have seen, to be heard in those

4     circumstances, it means exactly the same thing as to stop

5     the official proceeding, the certification proceeding, that

6     was supposed to happen at that place and at that time.

7          Third element:  Mr. Grider also acted knowingly.

8     There's no question here that his conduct was a mistake or

9     some sort of an accident.  He did what he meant.  He meant

10    what he did.

11         Finally, all the evidence also shows that

12    Mr. Grider was acting corruptly by unlawful means and with

13    consciousness of wrongdoing.  And as to Your Honor's

14    question from last week, the legal question that he posed,

15    yes, we think that the definition of "corruptly" that was

16    adopted in the *Reffitt* case that requires, A, use of

17    unlawful means or unlawful -- wrongful or unlawful purpose

18    and consciousness of wrongdoing is the correct one.  It is

19    supported by the Supreme Court's decision in *Arthur Anderson*

20    *vs. United States* and supported by the D.C. Circuit decision

21    *United States vs. North*.

22         As to Count 3, "Destruction of Government

23    Property," the video evidence, and Exhibit 42 and Exhibit 40

24    in particular, clearly establish that Mr. Grider aided and

25    abetted the other rioters' destruction of the glass panes

1    outside the Speaker's lobby door.  He didn't just pass the

2    helmet.  He passed it to the single-most violent rioter in

3    that group after seeing the rioter in action shattering two

4    glass panes before his eyes.  It's basically destruction of

5    property by delegation.

6         There's no dispute that the glass panes were the

7    property of the government, and Mr. Grider stipulated that

8    the cost of replacing the glass exceeded the sum of $1,000.

9    The stipulation is that the cost of replacing the glass was

10   approximately $3,044.

11        The same evidence that establishes the obstruction

12   count also establishes the disorderly and disruptive conduct

13   counts, Count 5, and the 1752(a)(2) and Count 7,

14   5104(e)(2)(D).

15        And to address your legal question as to whether

16   there's a difference between the quantum of obstruction

17   required for 1512(c)(2) and 5104(e)(2)(D), we don't think

18   there is.

19        Section 1512(c)(2) prohibits obstructing,

20   influencing, or impeding of an official proceeding.  The

21   three operative words:  obstructing, influencing, or,

22   disjunctive, impeding.  These are very flexible and

23   capricious terms, especially the word "influencing."

24        5104(e)(2)(D) for its part prohibits impeding,

25   disrupting, or disturbing, again in the disjunctive; three

1   operative verbs:  impeding, disrupting or disturbing.  Those

2   are also very flexible terms.  And importantly, there's one

3   term, one verb, that the two provisions have in common here,

4   which is "impeding."  Because all of the conduct at issue in

5   this case falls squarely within that verb, within

6   alternative means of satisfying either statute, this Court

7   really doesn't need to decide whether the quantum

8   obstruction impediment is different under 1512(c)(2) or

9   5104(e)(2)(D).

10          Finally, the same evidence that establishes Count

11  3, the destruction of property count, also conclusively

12  establishes that the defendant engages in acts of physical

13  violence in violation of 1752(a)(4) and 5104(e)(2)(F) and as

14  to whether -- Your Honor's question whether the aiding and

15  abetting theory of liability, of criminal -- of guilt is

16  available for the 5104 count, the answer is yes.

17          It is well established in this circuit, and other

18  circuits as well, that the indictment did not specifically

19  charge a violation of 18 USC 2 -- and I'm quoting from

20  *United States vs. Kegler*, 724 F. 2d at Page 200 carryover

21  into 201.  The circuit said -- held an aiding and abetting

22  instruction may be given in a case where the indictment does

23  not allege violation of the aiding and abetting statute.

24          THE COURT:  You've got to slow down quite a bit.

25          MR. VALENTINI:  Your Honor, we've heard a lot of

1   evidence last week; that evidence establishing beyond a

2   reasonable doubt the defendant is guilty on each and every

3   count that is before the Court in this trial.  We would ask

4   the Court find him guilty on each of those counts.

5          THE COURT:  All right.  Mr. Mayr.

6          MR. MAYR:  May it please the Court, Counsel.  We

7   appreciate the Court's time in listening to all the evidence

8   in this case.

9          For nearly the past two years Mr. Grider has lived

10  under a cloud of suspicion, an accusation that he was a

11  violent insurrectionist who came here to Washington, D.C.,

12  hell bent on stopping or overthrowing the presidential

13  election of 2020.

14         It was a false accusation.  It is a false

15  accusation, and he's been trying, ever since that fateful

16  day, to tell whoever will listen to him that it was not the

17  truth.

18         While so many others, as this Court has heard,

19  reached out to various media sources to boast and to

20  express pride and happiness for what had occurred that day,

21  Mr. Grider reached out to his trusted friend Rissa Shaw, a

22  reporter with a local news station, to share his account of

23  what he observed.

24         In all of his conversations with her and with

25  others, he did not boast.  He did not express pride.  He

1   didn't say, "I wanted to Stop the Steal, and I accomplished

2   it."  He acknowledged that maybe there was fraud, but maybe

3   there wasn't.

4           What he clearly did not do was come and try to

5   impose his will.  He didn't come here as a crazed maniac.

6   He came here and he did exactly what his president wanted

7   him to do; walk down to the Capitol, cheer on our brave

8   senators and congressmen and women, and try to give them the

9   kind of pride and boldness that they need to take back our

10  country.

11          And, again, he left here not with pride, not with

12  joy.  He left here in shock with what occurred.

13          He did not conceal.  He did not impair.  He did

14  not obstruct.

15          He did the exact opposite.  The very next day, as

16  this Court heard, he obtained legal counsel and instructed

17  that attorney that he wanted to cooperate with the

18  government; not obstruct them, not impair their

19  investigation, but to enhance it.

20          He did this because despite what he did that day,

21  he had nothing to hide.  This is a former military police

22  officer.  This is a person who worked with companies to

23  investigate wrongdoing.

24          What you saw was Chris Grider being Chris Grider.

25  He wanted them to see the truth no matter how good or how

1    bad, because that's all that mattered to him.

2            When the arrest warrant was obtained and he

3    learned about it, he did not run.  He did not hide.  He got

4    into his truck, and he drove himself down to Austin, Texas,

5    to turn himself in to the FBI.  He handed them his phone

6    with everything on it, his entire life history before,

7    during, and after January 6th.

8            Had they asked him to bring his clothes that he

9    wore that day, he undoubtedly would have done so.  His wife

10   willingly handed it over to them within days after his

11   arrest.

12           That is who Chris Grider was.  That is who Chris

13   Grider is.

14           He had no intent to hide.  He had no intent to

15   conceal.  He had no intent to impair anything.

16           Despite our pleas to the government, they did not

17   want to accept the truth.  They did as we always know them

18   to do.  They take what evidence they have, they form their

19   beliefs and conclusions from various pieces of that

20   evidence, and they stick to it.  They do not relent.  They

21   do not yield, as they should.

22           Mr. Grider and thousands of others who stood next

23   to him that day, all those other faces that the Court saw in

24   all these videos that have been presented, they all deserve

25   to be held to account for their unlawful actions that day.

1   They do.

2           Did Mr. Grider and thousands of others unlawfully

3   enter and remain in the Capitol that day?  Yes.

4           Did Mr. Grider and thousands of others unlawfully

5   parade and protest within the Capitol that day?  Absolutely.

6           Beyond that, however, this Court has to act.  Is

7   every one of those people depicted in every one of those

8   videos acting with the same intent, with the same purpose?

9   Is everyone in that crowd committed to the same exact

10  unlawful acts?

11          According to the testimony of Sergeant McKenna and

12  Agent Yetter, they would believe that to be true.

13  Throughout their testimony this Court, everyone, heard them

14  refer to and talk about the rioters, the mob, the group, the

15  "they."

16          But as this Court will recall, when I asked

17  Sergeant McKenna and Agent Yetter about individuals

18  depicted in the videos, what about this person or that

19  person and this other person over here, and most notably,

20  when I asked them about Mr. Grider, not one of them could

21  say hardly anything about the others and absolutely nothing

22  about Mr. Grider.

23          The real violent insurrectionists stand out

24  undoubtedly.  The man in the furry hat.  The people shouting

25  in the officers' face, pointing fingers at them.  There's no

1    doubt what those people's intentions are.  There's no doubt

2    about their actions.

3          But Mr. Grider was not one of those individuals.

4          Agent Yetter would have it that anyone and

5    everyone present that day was interfering with their duties.

6    But as every one of the videos show, any time Mr. Grider had

7    any sort of face-to-face interaction with an officer, it was

8    not to yell at them.  It was not pointing in their face

9    calling them traitors.

10          Whether it was in the Crypt and he's trying to

11   push others back and keep them off of Officer Cereesa,

12   whether it was he got to the Speaker's lobby door and tried

13   to tell Officer Lanciano and others that people were getting

14   crushed over there, that there were officers getting

15   crushed, Mr. Grider was not acting with the intended purpose

16   of instructing, impeding, or interfering with one or more

17   law enforcement officers.

18          When he stood there after the woman was shot, he

19   was not intending to impede them.  He wasn't pushing through

20   them.  He wasn't yelling at them.  He stood there while they

21   stood there waiting to make himself available to tell the

22   officers what he observed.

23          Again, he's not yelling at them.  He's not

24   screaming at them.  He's not pointing fingers in their face.

25   He was not there to obstruct them.

1      I think we can all understand when Agent Yetter

2  said that he believed Mr. Grider and others, including those

3  that were recording everything at the Speaker's lobby door,

4  were interfering, but he cannot know what Mr. Grider was

5  thinking.  Only Mr. Grider knows the truth, and he has told

6  the truth.

7      Mr. Grider is not guilty of Count 1 because he

8  never once acted with the specific intended purpose of

9  obstructing, impeding, or interfering with one or more law

10  enforcement officers.  That's not who he is.  That's not who

11  he was.  And his actions before, during, and after January

12  6th prove that beyond all reasonable doubt.

13      Now, this Court asks:  Must the fact-finder

14  conclude that a defendant develop a mental state about a

15  particular officer or officers, or is it sufficient for a

16  fact-finder to conclude that a defendant was aware of

17  officers generally attempting to put down a civil disorder?

18      I would submit that the answer falls somewhere in

19  the middle.  As Judge Bates recognized in *United States vs.*

20  *McHugh*, this is -- there's not a lot of authority on 231,

21  especially in this circuit, but what he concluded was that

22  231(a)(3) is a specific intent statute criminalizing only

23  acts performed with the intent to obstruct, impede, or

24  interfere with a law enforcement officer.

25      There is indeed no authority to support the idea

1   that Mr. Grider has to have the intent to obstruct,

2   impede, or interfere with a specific law enforcement

3   officer, and I agree with the government's representation on

4   that.  It would go well beyond the language of the statute

5   or anything to support that.

6          But, on the other hand, simply requiring the

7   government to prove that Mr. Grider was, one, aware that

8   officers were lawfully attempting to put down a civil

9   disorder and, two, acted in direct contravention of their

10  directives, what that would do was that would impermissibly

11  lower the burden to something much less than what the

12  statute requires.

13         To put it in perspective, in Texas there's a state

14  statute that makes it a misdemeanor to interfere with the

15  duties of a peace officer acting in the course and scope of

16  their duties if the person fails to perceive that their

17  actions are interfering and the failure to perceive that is

18  a gross deviation from what an ordinary person would

19  perceive under those circumstances.

20         With something like that in mind, it only makes

21  sense that to prove the necessary elements of this more

22  serious felony offense, that the government would have to

23  prove to this Court beyond a reasonable doubt, just like

24  Judge Bates suggested in McHugh, that specific intent.  The

25  specific intent to obstruct, impede, or interfere with a law

1    enforcement officer has to prove much more than that

2    Mr. Grider was just aware of what these officers were doing.

3          The government simply cannot meet the high burden

4    needed to prove that Mr. Grider had the requisite intent,

5    and for that reason this Court must acquit him of Count 1.

6          Now, in regards to the obstruction count in Count

7    2, obviously much legal consideration has been given to this

8    count, but as much legal consideration has been given, has

9    been stated throughout multiple filings and the evidence of

10   this case has shown, there is absolutely no factual evidence

11   that specifically shows that Mr. Grider acted that day with

12   the intent to obstruct or interfere with the certification

13   proceedings, and certainly no evidence that he acted

14   corruptly.  Not a text message, not a conversation, not a

15   social media posting.  Nothing to show that Mr. Grider came

16   here to Washington, D.C., with the corrupt intent to stop

17   the certification proceedings.  His actions before, during,

18   and after prove the exact opposite.

19         He came here to Washington, D.C., thinking he was

20   going to attend the president's rally, and that was it.

21   There's nothing that's been presented by the government to

22   prove otherwise.  Searching for Proud Boys and watching

23   videos of protesters clashing with others was because he was

24   worried about what would happen at the rally; at the rally,

25   not at the Capitol.  He had no idea that he would be going

1   to the United States Capitol.

2          While the actions of the Proud Boys are certainly

3   infamous, there has been no evidence presented to this Court

4   in this courtroom other than what Mr. Grider knew about

5   them, and he certainly did not know anything else about what

6   they may or may not have been planning to do that day.

7          So what else is there?  Nothing.  Not a text

8   message, a comment, a social media posting to show that

9   Mr. Grider came here intending to corruptly obstruct the

10  certification proceedings.

11         A clip from Les Mis, which Mr. Valentini never

12  even refers to in his closing arguments, like Mr. Grider

13  said, this is something that Mr. Grider the art teacher

14  would do with his students almost every year to celebrate

15  their last day.  Mr. Grider knew there was nothing he

16  personally could do to change the outcome of the election.

17  He came here to celebrate the president's last day, and that

18  was it.  It would be a farce to rely on that one clip to

19  prove that he intended the contrary.

20         Now, turning to this Court's questions, the Court

21  asked whether the prescribed actions charged in Count 2

22  compared to the prescribed actions charged in Count 7

23  requires the government show more severe and persistent

24  conduct to establish obstruction as compared to impeding or

25  disrupting the orderly conduct of government business or

1    official functions.

2           I would submit that while the severity and the

3    persistency of conduct are not necessary requirements under

4    this Court and other Courts' interpretation of the statute.

5    Severity of one's conduct and the persistency of one's

6    conduct certainly weighs heavily on the inquiry.

7           Now, obviously the difference between the two is

8    that Count 2 requires the additional element of corruptly,

9    and that's an important element for this Court to recognize

10   because it's that element which takes this from a

11   misdemeanor, as alleged in Counts 5 and 7 -- I'm sorry, yes,

12   5 and 7 -- and takes it all the way to a felony where

13   someone faces up to 20 years.

14          So what does it mean to act corruptly?  This Court

15   had also asked can the government, like in the *Reffitt* case,

16   establish, to use Judge Friedrich's language, corrupt intent

17   through consciousness of wrongdoing and unlawful means or

18   unlawful purpose.

19          On behalf of Mr. Grider, I would submit that this

20   is the problem inherent in the statute's use of the word

21   "corruptly."  There is no clear understanding of what

22   corrupt obstruction involves.  Consciousness of wrongdoing

23   appears to be an essential part of this "corrupt"

24   definition.  This seems to be a consistent theme in the

25   decisions by this court, by Judge Bates in *McHugh*, by Judge

1    Moss in *Montgomery*, and so on and so forth.

2         But it's also consistent with the rest of Section

3    1512, which was designed initially to apply to tampering

4    with a witness.  When someone threatens a witness or uses

5    force against a witness in a proceeding to keep them from

6    testifying in that proceeding, inherent in that is some

7    consciousness of wrongdoing.  Also inherent is that they're

8    acting with an unlawful purpose, to keep that witness from

9    testifying in the proceeding.

10        But Judge Friedrich in *Sandlin* also refers to

11   corrupt conduct as being both, quote, independently criminal

12   and inherently maligned.  This is also consistent with the

13   rest of 1512, which prohibits other inherently criminal and

14   inherently maligned conduct like killing someone or

15   threatening someone to prevent them from testifying.

16        When Judge Friedrich, though, in *Reffitt* refers to

17   consciousness of wrongdoing and unlawful means or unlawful

18   purpose, does she mean to say that it requires consciousness

19   of wrongdoing and unlawful means or consciousness of

20   wrongdoing and unlawful purpose?  I would submit that it

21   requires all of those things, Your Honor.  In fact, that's

22   what Judge Friedrich did, is she said in the *Reffitt* case

23   there were all three of those present.

24        Looking at those other cases, though, Your Honor,

25   there seems to be one other common theme that distinguishes

1    those cases from Mr. Grider's.  In all of these other cases,

2    there have been allegations of specifically maligned conduct

3    or proof of inherently maligned conduct.

4         Look at the *Reffitt* case.  Here was a person who

5    made statements that he wanted to drag law makers out of the

6    Capitol by their heels.  He wanted to drag the traitors out.

7         We don't have anything like that in Mr. Grider's

8    case.  Nothing indicating he wanted to do that before,

9    nothing indicated that he wanted to do anything like during

10   or anything after to show that that's what his intent was.

11        During his time here, there is nothing to show

12   that Mr. Grider wanted to corruptly obstruct the

13   certification proceedings.  Again, he only decided to go

14   down to the Capitol when he heard the president's message

15   about walking down to the Capitol and saw other people doing

16   the same.

17        And think about it for a second, Your Honor.  If

18   Mr. Grider wanted to come and stop the certification

19   proceedings, why doesn't he just have the taxicab drop him

20   off there?  Why does it drop him all the way off near where

21   the rally was?

22        It's indicative of what's his intent.  It's

23   indicative of what his purpose was.

24        Once he got down there, he sees the crowds.  He's

25   emotionally overcome by the scene.  He heard the cheers.  He

1    saw the crowds moving inside of the Capitol.

2          I think it's telling, Your Honor, that at one

3    point, if you recall, Mr. Grider describes how he turned

4    around and he walked back out onto the lawn in front of the

5    Capitol steps but then heard the cheers and turned around

6    and saw people moving inside and not seeing the police

7    officers.

8          As he followed in, he did not break entry into the

9    Capitol.  He did not break into or enter any of the

10   legislators' offices.

11         When he stood in the Crypt at the front of the

12   police line, he thought Senator Cruz and possibly President

13   Trump were going to come out and speak to them.

14         Now, I want to use that moment for a second, Your

15   Honor, to sort of break out of the facts and talk about this

16   mentality that's occurring within Mr. Grider at that

17   particular moment.

18         As crazy as it sounds, it's easy for all of us to

19   judge things in hindsight, looking at things in hindsight

20   from different videos in a peaceful calm environment.  But

21   in that frenzied, chaotic situation on January 6th, given

22   everything that the president had said before that date,

23   everything that he had said that date, it was truly what

24   Mr. Grider had thought.

25         It's strange, but I think the Court needs to

1    understand and appreciate that when a person is bombarded by

2    social media posts and is moved to the actions -- is moved

3    to action by the words of a captivating but narcissistic

4    president that Mr. Grider loved and admired, and then being

5    surrounded by thousands of others who feel the same way,

6    Mr. Grider's mentality, his way of thinking, his way of

7    remembering everything that takes place was jarred.

8              Just like an ordinary reserved person can turn

9    into a completely different person when attending a sporting

10   event for their favorite team or their athlete or the way a

11   calm, polite school girl or a school boy can become this

12   screaming, crying, emotional person when they see their

13   favorite music artist performing at a concert, the reality

14   was that Mr. Grider was overcome.  He did things he

15   regretted.  He did things he cannot explain, and he did

16   things he cannot remember.

17             In hindsight, it's easy to sit here and say well,

18   he should have thought this or he should have done this, but

19   the Court must appreciate and recognize the battle within

20   his mind of what's taking place.

21             I want to go in.  No, I don't want to go in.

22             I want to see them.  Maybe I shouldn't be here.

23             This is right.  No, I don't want to have anyone

24   breaking anything.

25             It's like Mr. Grider said, Your Honor.  The entire

1    time there was a multitude of emotions that he was feeling;

2    good emotions, bad emotions, conflicting emotions.  There

3    were different things that he was thinking, things he should

4    be doing, things he should not be doing conflicting with one

5    another.

6            The government wants to say well, he's thinking

7    this, and that's the end of the story; and then he's doing

8    this, and that's the end of the story.  That's not the way

9    our brains work.  That's not the way Mr. Grider was thinking

10   that day.

11           In addition to everything he's told you, we have

12   given you everything -- everything -- so that you can see

13   how he is acting, how he is thinking, and what he is doing.

14           With everything that we have presented to you,

15   Your Honor, everything that the government has presented to

16   you, what it has done is shown that he never formulated this

17   corrupt intent to impede or obstruct the certification

18   proceedings.

19           As he walked through the Capitol, he had no idea

20   where he was.  When he arrived at the connecting hall

21   between Statuary Hall and the House Chamber door, he didn't

22   even know that was the House Chamber door.  As this Court

23   can recall from last week, he thought he was at the Senate

24   door, just proving how little he knew about what was really

25   taking place that day.

1          After climbing the stairs from the first to the

2   second floor, he thought he was at the gallery.  When he

3   arrived there, he didn't try to break through the lines.  He

4   listened as an individual with a microphone shouted, an

5   individual standing with police officers shouted, and then

6   used a megaphone to tell everyone in that hallway that they

7   were going to be able to go in if they could remain peaceful

8   and calm.

9          Mr. Grider thought he was going to be allowed to

10   sit in the gallery and do exactly like President Trump had

11   told him to do; cheer on our brave senators and congressmen

12   and women, try to give them the kind of pride and boldness

13   that they need to take back our country.

14          Mr. Grider always knew he himself could not do

15   anything to change the outcome of the election.  He knew and

16   he accepted that well before he came here to Washington,

17   D.C.  He simply wanted to support those who possibly could,

18   and there's been no evidence to prove otherwise.

19          And his actions after he left the Capitol, Your

20   Honor, he didn't boast himself as a patriot, a

21   revolutionary, someone who stopped the steal.  Again, when

22   others spoke about being proud for what they did that day,

23   he never said, "I'm glad I stopped the certification

24   proceedings."

25          You know, acting corruptly means a person acting

1     with consciousness of wrongdoing.  If Christopher Grider is

2     conscious that he's doing something wrong, then why is he

3     video recording it?  Why is he contacting the media and

4     sharing his account of what took place with them to publish

5     to the world?  Why is he then immediately reaching out to

6     the government intending to cooperate with the investigation

7     before they've even come to him?

8            That's not what a guilty person does.  That is not

9     what a person who is conscious of their wrongdoing does.

10           The government has brought you no direct evidence

11    to establish that he acted with the intent to impede -- I'm

12    sorry, obstruct or interfere with the certification

13    proceedings and certainly no evidence that he acted

14    corruptly.  We should not convict people based on

15    insinuations and suppositions.  There is no proof beyond all

16    reasonable doubt to prove that essential element.

17           Turning to Count 3, the damage to the Speaker's

18    lobby door.  First and foremost, I think it's undisputed

19    that there's no evidence to show that he damaged -- that he

20    personally damaged any property within the Capitol, and I

21    think that the Court needs to grasp that and accept that.

22           Again, he himself did not destroy any property

23    here on Capitol grounds.  To the contrary, we presented

24    evidence -- not the government, we presented evidence -- of

25    Mr. Grider yelling out to others, "Do not break anything.

1    Do not touch anything."

2            Now, while he walked up and fiddled with the

3    circuit breaker egged on by others, immediately thereafter

4    this Court can see that his good sense and conscience

5    kicked in, and he knew he should not do anything to touch or

6    damage any Capitol property, and he maintained that good

7    sense and conscience not to do anything as he continued

8    throughout the Capitol.  He saw others doing wrong.  He saw

9    people kicking at doors, entering offices of the

10   legislators, and he did not approve of it, and he did

11   nothing to try to do that.

12           When he saw others acting to protect property, he

13   appreciated that as more in line with what a Trump supporter

14   should be doing.  There is no intent to damage property,

15   period.

16           So why would all of that change when he's left

17   that chaotic situation at the House Chamber's door and

18   trying to seek help and trying to get out of there?

19           As this Court can see, regardless of what

20   Mr. Grider's testimony is, regardless of what he can

21   remember, this Court has been given a glimpse into his mind,

22   into his soul, about what his purpose is when he gets there

23   to the Speaker's lobby door.

24           He's never once on his video heard shouting out

25   "Break the door."  He's never once heard on his video or any

1    other video saying, "Get through there, break this

2    property."  Nothing like that.  At that point it's no longer

3    about wanting to get in and see the proceedings.  The

4    excitement is gone.  The curiosity is gone.  It's now just

5    about, as he said, surviving.

6         You can see from multiple angles of video and hear

7    from his own recordings that when he gets to the Speaker's

8    lobby door there's only two things he's concerned about.

9    Trying to get help for the others who are being crushed and

10   getting out of there.

11        As you watched the video that the government

12   showed, you see him turning around looking back trying to

13   figure out and assess the situation.  His focus is not on

14   the doors.  His focus is not getting through there.  You can

15   hear the panic and the concern in his voice.

16        Shortly before the woman goes through the window

17   or shortly before anyone starts smashing the windows, he's

18   not there cheering them on.  He's not there, "Come on.  Keep

19   doing it.  Way to go."  There's none of that.

20        As you saw last week, watching the video frame by

21   frame Mr. Grider is continuously trying to move away, trying

22   to follow officers down the stairs; and when he can't do

23   that, he tries like a football player to plow his way

24   through the crowd.

25        Now, shortly before he tries to leave, when this

1    man in the furry hat turns towards him, as Mr. Grider's

2    recording from his phone reflects, there is nothing heard

3    said by Mr. Grider encouraging the man in the fuzzy hat or

4    directing him to use the hat as a helmet.

5           I want to stop and think about that for a second.

6    We know -- this Court knows that Mr. Grider's telephone, his

7    cell phone, is capable of recording his voice.  We can hear

8    it as it records him telling the officers about, "There's

9    other people being crushed.  You've got to help them."  Even

10   though there's no video recording, the audio recording is

11   still capturing everything that is taking place in and

12   around him.

13          With all of the government's technology available

14   to enhance, there is no evidence of Mr. Grider encouraging

15   or directing him to use the helmet as a weapon.  Despite all

16   these videos being taken by multiple people there at the

17   Speaker's lobby door, there is nothing heard in the

18   recordings where Mr. Grider is saying anything or directing

19   him to do something with the helmet.

20          He tapped on the helmet.  That's the government's

21   case.  He tapped on the helmet, but that can be interpreted

22   multiple ways.  When the man in the furry hat takes the

23   helmet, you see, Your Honor, what he does.  He does what we

24   expect a person to do with a helmet.  The man in the furry

25   hat takes off his furry hat, and he tries to put on the

1    helmet.

2         Mr. Grider turns his attention back to those

3    critical tasks:  get help for the others being crushed, get

4    himself out.  He's shocked.  He's shocked when the man with

5    the furry hat all of a sudden changes his mind and decides

6    to take the helmet off of his head and uses it to smash the

7    window.

8         Hindsight, Your Honor, indeed is 20/20.  We can

9    all sit here, and we can all agree that well, he should have

10   known, he should have known.  But you have to put yourself

11   in Mr. Grider's shoes at that point in that chaotic

12   environment where all he is concerned about is helping

13   others and get out of there, and here, take this helmet so I

14   can get out of here.  There is nothing to show that he did

15   anything to encourage, aid, assist, abet the other

16   individual in using that helmet as a weapon.

17        Again, when he happens -- he's not cheering him

18   on.  Mr. Grider is standing back, and he has the same look

19   of shock on his face that Sergeant Lively has watching as

20   this maniac is doing what he was doing.

21        He's not raising his fist in glee.  He's not,

22   "Yeah, keep doing it."  He is doing nothing.  He is saying

23   nothing to encourage or direct him to damage the door.  He

24   simply stands there stunned by what he is watching before he

25   snaps out of it and realizes that he has to get out of

1    there.

2         He confirms that the door is secure.  He backs

3    off, and he never once goes near the door again.  In fact,

4    he does the contrary, doing everything he can to get out of

5    that situation.  And that's what the videos show.

6         Knocking on a helmet and handing it over does not

7    clear that very high burden that the government must

8    overcome in order for this Court to find Mr. Grider guilty

9    of aiding and abetting the destruction of property.

10        It all comes down to intent.  It's not he ought to

11   have known or he should have known.  The people who damaged

12   the door will be held accountable, Your Honor.  There's no

13   doubt about that.  But Christopher Grider without a doubt

14   had no intent to damage the Speaker's lobby door.

15        As for the remaining misdemeanor counts, several

16   of the arguments that I've already presented apply in equal

17   force.  Mr. Grider is not guilty of Counts 5 or 7 alleging

18   disorderly or disruptive conduct in a restricted building or

19   ground because he did not intend to impede or disrupt the

20   orderly conduct of government business or official functions

21   or, more specifically as it pertains to Count 7, the orderly

22   session of Congress.

23        He concedes that his conduct along with several

24   others did, in fact, do that.  But that was not his intent.

25        Mr. Grider is not guilty of Counts 6 and 8 because

1    he did not willfully or knowingly engage in physical

2    violence in a restricted area or on Capitol grounds.  In

3    fact, he desired, like his videos -- not the video the

4    government brought, but his video shows he commanded and

5    directed others do not break anything, do not touch anything

6    that would have caused any violence or destruction.

7           The final question that this Court asks is if an

8    aiding and abetting liability theory should apply to Count

9    8.  Now, I would submit that as a matter of due process and

10   notice, I agree with Mr. Valentini's representations and

11   understand that the law clearly says that a person doesn't

12   have to be indicted for aiding and abetting in order for

13   that issue to be submitted.

14          However, in the jury instructions that were

15   presented to this Court prior to trial, that theory was

16   never presented therein, and so given the fact that the

17   indictment is silent on that as well as the government's

18   proposed instructions, I would submit that it would be a

19   violation as a matter of due process and notice that this

20   Court should not consider that particular theory as we were

21   not prepared to defend that until the question was raised by

22   the Court.

23          But regardless, our concerns are minimal because,

24   again, there is -- the evidence shows that Mr. Grider did

25   not want any damage to occur to the property.  He did not

1     want any physical violence to occur on Capitol grounds or

2     buildings.  That is not who Mr. Grider is.  That's not who

3     he was.  And that's just the truth, Your Honor.

4          Mr. Grider has come before this Court with

5     everything that he can present.  Like he said from the

6     witness stand, he's spent the past two years reviewing

7     videos, reliving that horrible day, trying to remember every

8     detail.  He turned over his cell phone to show the

9     government everything that he has.  Good, bad, before,

10    during, after.  He has had nothing to hide, nothing to

11    conceal, nothing to impair.

12         He was never proud of what he did that day.  He

13    never bragged or boasted.  He accepted responsibility for

14    his wrongdoing because after much reflection he knows he did

15    wrong by entering and remaining in the Capitol building, and

16    he knows he did wrong by protesting on Capitol grounds.

17         But as for the remaining allegations, Your Honor,

18    the evidence is just not there.  The evidence is not there

19    presented by the government to overcome that highest burden

20    of beyond all reasonable doubt.  The evidence is not there

21    to prove that he had the intent to do everything else that

22    they have alleged that he has done.

23         I respectfully request and ask that this Court

24    acquit him of the seven counts that remain pending against

25    him and allow him to put this horrible day behind him.

1        Thank you.

2        THE COURT:  All right.  Rebuttal.

3        MR. VALENTINI:  Your Honor, unless the Court has

4   any questions, we will be, of course, happy to answer any

5   questions that the Court may have.  Otherwise, we don't plan

6   to offer a rebuttal.

7        THE COURT:  Okay.  I don't think so in terms of

8   what arguments that you've said.

9        So what I will do next is to contact you relating

10  to when I'll be making the judgment so that you have some

11  time.  And, you know, I'll move immediately on it, and I'll,

12  you know, give you some notice about the judgment because it

13  does include -- no matter what the judgment, it does include

14  felonies, and I do need to do it in person.

15       MR. MAYR:  We will -- I'm assuming that we'll be

16  excused, and we'll just be contacted --

17       THE COURT:  Yes.

18       MR. MAYR:  -- to come back to court.

19       THE COURT:  I'll definitely be -- it certainly

20  isn't going to be today.  There was a lot of evidence to

21  review.

22       MR. MAYR:  We will go back to our hotel, and we

23  will wait for the Court's decision.

24       THE COURT:  All right.  The parties are excused

25  then.

1          MR. MAYR:  Thank you, Your Honor.

2               (Whereupon the hearing was

3               adjourned at 10:26 a.m.)

4

5          **CERTIFICATE OF OFFICIAL COURT REPORTER**

6

7          I, LISA A. MOREIRA, RDR, CRR, do hereby

8     certify that the above and foregoing constitutes a true and

9     accurate transcript of my stenographic notes and is a full,

10    true and complete transcript of the proceedings to the best

11    of my ability.

12        Dated this 19th day of October, 2023.

13

14
                              /s/Lisa A. Moreira, RDR, CRR
15                            Official Court Reporter
                              United States Courthouse
16                            Room 6718
                              333 Constitution Avenue, NW
17                            Washington, DC 20001

18

19

20

21

22

23

24

25